# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | : |
| | : CRIMINAL ACTION NO. |
| UNITED STATES OF AMERICA | : |
| | : 3:15-CR-00071 -BAJ-EWD-1 |
| VERSUS | : |
| | : HON. CHIEF BRIAN A. JACKSON |
| CARLOS L. LINARES | : |
| | : JANUARY 25, 2016 |
| | : |

## TRANSCRIPT OF JURY TRIAL

## VOLUME ONE

===========================================================

### A P P E A R A N C E S:

**FOR THE PLAINTIFF, UNITED STATES OF AMERICA:**

    ALAN STEVENS, ESQ.
    RYAN CROSSWELL, ESQ.

**FOR THE DEFENDANT, CARLOS L. LINARES:**

    JARRETT P. AMBEAU, ESQ.

       REPORTED BY:    CLARE SMITH-NEELY, CCR

**UNITED STATES COURTHOUSE**
**777 FLORIDA STREET**
**BATON ROUGE, LOUISIANA 70801**
**(225) 751-8111**

```
**************************************************************************
                                I N D E X
**************************************************************************
```

| WITNESS: | ATTORNEY: | EXAMINATION: | PAGE: |
|---|---|---|---|
| OPENING STATEMENT | MR. CROSSWELL | | 222 |
| OPENING STATEMENT | MR. AMBEAU | | 248 |
| | | | |
| DEBORAH HARDY | MR. CROSSWELL | DIRECT | 269 |
| DEBORAH HARDY | MR. AMBEAU | CROSS | 296 |
| DEBORAH HARDY | MR. CROSSWELL | REDIRECT | 338 |

1        THE COURT: GOOD MORNING, EVERYONE.

2            BE SEATED.

3            LET'S CALL THE CASE.

4        THE CLERK: CRIMINAL NUMBER 15-71-BAJ,

5            UNITED STATES OF AMERICA VERSUS

6    CARLOS LINARES.

7        THE COURT: LET ME ASK COUNSEL FOR BOTH

8            SIDES TO ENTER THEIR APPEARANCES AT THE

9    PODIUM.

10        MR. STEVENS: YES, JUDGE.  GOOD MORNING.

11            ALAN STEVENS AND RYAN CROSSWELL ON

12    BEHALF OF THE UNITED STATES.

13        THE COURT: MR. STEVENS.

14        MR. STEVENS: AND WITH US TODAY IS

15            SPECIAL AGENT MONIQUE SCHMIDT, IRS CI.

16        THE COURT: OKAY.

17        MR. AMBEAU: GOOD MORNING, YOUR HONOR.

18            JARRED AMBEAU ON BEHALF OF MR. CARLOS

19    LINARES.

20        THE COURT: THANK YOU, MR. AMBEAU.  AND

21            GOOD MORNING TO YOU, TOO, SIR.

22            AT THIS TIME I WOULD ASK THE

23    INTERPRETERS TO PLEASE RISE FOR THE OATH.

24        BY COURTROOM DEPUTY: DO EACH OF YOU SOLEMNLY

25    SWEAR THAT YOU WILL WELL AND TRULY INTERPRET THE

1  PROCEEDINGS BEFORE THE COURT, SO HELP YOU GOD?

2          MS. BROADBECK: I DO.

3          MS. MORALES: I DO.

4          THE COURT: THANK YOU, LADIES.

5          AND, AGAIN, GOOD MORNING, LADIES

6      AND GENTLEMEN.  MY NAME IS JUDGE BRIAN

7      JACKSON, AND I WILL BE PRESIDING OVER THIS

8      TRIAL.  AGAIN, LET ME THANK ALL OF YOU FOR

9      YOUR PRESENCE HERE THIS MORNING.  JURY

10     SERVICE IS A VERY IMPORTANT PART OF OUR

11     CITIZENSHIP, A VALUABLE U.S. CITIZENSHIP.  WE

12     ARE UNIQUE IN THE WORLD, IN THAT WE PROVIDE

13     TO THOSE ACCUSED OF CRIMES, THE OPPORTUNITY

14     TO HAVE THEIR CASES HEARD BEFORE A GROUP OF

15     OPEN MINDED, OBJECTIVE, FAIR CITIZENS LIKE

16     YOURSELVES.  SO, AGAIN, I THANK YOU ALL FOR

17     JOINING US HERE TODAY.

18          YOU KNOW, I VERY OFTEN TELL FOLKS THAT

19     THESE WONDERFUL BENEFITS, PRIVILEGES AND

20     RIGHTS THAT WE ENJOY AS CITIZENS COME WITH

21     OBLIGATIONS.  ONE OF THOSE OBLIGATIONS IS TO,

22     AS YOU ALL KNOW, TO VOTE.  THAT IS ABSOLUTELY

23     ESSENTIAL TO OUR DEMOCRACY.  BUT, REALLY,

24     WHEN YOU THINK ABOUT IT, THE ONLY OTHER

25     OBLIGATION OF CITIZENSHIP OF THE UNITED

1    STATES IS TO MAKE YOURSELVES AVAILABLE FOR

2    JURY SERVICE.  BECAUSE, AGAIN, OUR SYSTEM OF

3    CRIMINAL JUSTICE AND EVEN CIVIL JUSTICE IS

4    UNIQUE IN THE WORLD.  NO OTHER COUNTRY

5    PROVIDES THIS KIND OF -- THESE KINDS OF

6    RIGHTS TO THE ACCUSED.  AND, SO, AGAIN, WE

7    THANK YOU SO MUCH FOR JOINING US HERE TODAY.

8    WE ARE ABOUT TO BEGIN THE JURY SELECTION

9    PROCESS.  IT'S A PROCESS CALLED VOIR DIRE.

10    NOW, THAT TERM VOIR DIRE COMES FROM TWO

11    FRENCH VERBS, THOSE OF YOU WHO SPEAK FRENCH.

12    IT ESSENTIALLY MEANS TO SEE AND TO HEAR.

13    THAT'S WHAT WE'RE ABOUT TO DO IN JUST A

14    MINUTE, IS TO HEAR FROM EACH OF YOU AND TO

15    SEE YOU.  OUR PURPOSE HERE IS TO TRY TO

16    ASSEMBLE A JURY OF FAIR CITIZENS WHO WOULD BE

17    SUITABLE TO PRESIDE OVER THIS CASE AS THE

18    JUDGES OF THE FACTS.  AS WE GO THROUGHOUT

19    THIS PROCESS I WILL BE TELLING YOU THINGS

20    THAT YOU WILL NEED TO KNOW IF YOU ARE

21    SELECTED TO SERVE ON THE JURY.  SO, I ASK

22    THAT YOU PAY VERY CLOSE ATTENTION TO

23    EVERYTHING THAT I SAY.

24    AGAIN, THE GOAL OF THIS VOIR DIRE

25    PROCESS, THIS JURY SELECTION PROCESS, IS TO

1    SELECT A FAIR AND IMPARTIAL JURY.  THAT'S

2    SOMETHING THAT BOTH SIDES ARE ENTITLED TO.

3        WITH THAT IN MIND, AGAIN, I WILL ASK YOU

4    QUESTIONS.  NOW, THESE QUESTIONS, IT'S

5    IMPORTANT FOR YOU TO KNOW, ARE NOT INTENDED

6    TO UNNECESSARILY PRY INTO YOUR PRIVATE LIVES.

7    BUT THEY ARE REQUIRED SO THAT WE EACH GET A

8    CHANCE, EACH OF US, AND MOST ESPECIALLY, THE

9    LAWYERS HAVE AN OPPORTUNITY TO LEARN A LITTLE

10   BIT ABOUT YOU, EACH OF YOU, SO THAT WE CAN

11   DETERMINE WHICH OF YOU WOULD BE SUITABLE,

12   AGAIN, TO SERVE ON THE JURY.

13       NOW, THERE WILL BE A MICROPHONE PASSED

14   AROUND.  AND EACH OF YOU WILL BE ASKED TO

15   PROVIDE SOME BASIC INFORMATION ABOUT

16   YOURSELVES.  I WILL ASK THAT YOU NOT BEGIN TO

17   SPEAK UNTIL YOU HAVE THE MICROPHONE.  CAPTAIN

18   RICK WILL PROVIDE YOU WITH THE MICROPHONE.

19   AND WHEN YOU USE THE MICROPHONE, LADIES AND

20   GENTLEMEN, REMEMBER THAT IT'S PROVIDED BY THE

21   LOWEST BIDDER, AS SO MANY THINGS IN

22   GOVERNMENT.  SO, MAKE SURE IT'S CLOSE TO YOUR

23   MOUTH AND THAT YOU SPEAK CLEARLY AND PROJECT

24   WHEN YOU SPEAK INTO THE MICROPHONE.

25       AT THIS TIME I WILL ASK ALL OF YOU TO

1          RISE, TO RAISE YOUR RIGHT HANDS, AND TO TAKE

2          THE OATH AS MEMBERS OF THE VENIRE.

3          BY COURTROOM DEPUTY: DO EACH OF YOU SOLEMNLY

4   SWEAR THAT YOU WILL MAKE TRUE AND PERFECT ANSWERS TO

5   ALL QUESTIONS THAT SHALL BE PROPOUNDED TO YOU TOUCHING

6   YOUR QUALIFICATION AND COMPETENCY TO SIT AS JURORS IN

7   THE CASE OF THE UNITED STATES OF AMERICA VERSUS CARLOS

8   LINARES, SO HELP YOU GOD?

9          REPORTER'S NOTE: (THE VENIRE ANSWERED

10              AFFIRMATIVELY.)

11         THE COURT: THANK YOU, LADIES AND GENTLEMEN.

12              YOU MAY BE SEATED.

13          BEFORE I BEGIN THE QUESTIONING, I'D LIKE

14          TO TELL YOU VERY BRIEFLY SOMETHING ABOUT THIS

15          CASE.  THIS IS A CRIMINAL CASE, NOT A CIVIL

16          CASE, BUT A CRIMINAL CASE.  AND IT COMES TO

17          YOU BY REASON OF AN INDICTMENT.  IT IS -- AN

18          INDICTMENT, THAT IS, IS SIMPLY THE PROCEDURE

19          BY WHICH A CRIMINAL CASE IS INITIATED IN THE

20          UNITED STATES CRIMINAL JUSTICE SYSTEM.  THE

21          INDICTMENT SERVES NO PURPOSE -- NO OTHER

22          PURPOSE WHATSOEVER.  IT IS MERELY AN

23          ACCUSATION BY THE GOVERNMENT INTENDED TO

24          NOTIFY THE DEFENDANT OF THE CRIME WITH WHICH

25          HE HAS BEEN CHARGED.  THE INDICTMENT IS NOT

1    EVIDENCE.  AND IT IS NOT TO BE CONSIDERED AS

2    SUCH, NOR IS IT TO BE USED TO INFER GUILT IN

3    ANY WAY.

4         AT THIS TIME I WILL READ TO YOU THE

5    INDICTMENT SO THAT YOU ARE INFORMED AS TO

6    WHAT THE CHARGES ARE IF YOU ARE SELECTED TO

7    SERVE AS A JUROR.

8         NOW, THE INDICTMENT READS AS FOLLOWS:

9         UNITED STATES OF AMERICA VERSUS CARLOS

10    L. LINARES.  THE GRAND JURY CHARGES AT ALL

11    RELEVANT TIMES CARLOS L. LINARES, THE

12    DEFENDANT HEREIN, IS A RESIDENT OF BATON

13    ROUGE, LOUISIANA, OWNED AND OPERATED AND

14    MANAGED LATINO'S SUPERMARKET, LLC., WHICH WAS

15    LOCATED ON FLORIDA BOULEVARD IN BATON ROUGE.

16    THE BUSINESS INCLUDED A CONVENIENCE AND

17    CHECK-CASHING STORE, AND WAS REGISTERED AS A

18    MONEY SERVICE BUSINESS WITH THE ABILITY TO

19    CASH CHECKS AND TRANSMIT FUNDS FOR CUSTOMERS

20    AND MEMBERS OF THE GENERAL PUBLIC.

21         LINARES WAS RESPONSIBLE FOR LATINO'S,

22    THAT IS, THE STORE'S, CHECK CASHING

23    OPERATIONS.  LINARES OVERSAW THE DAY-TO-DAY

24    OPERATIONS OF THE STORE, APPROVED

25    TRANSACTIONS, AND MAINTAINED CONTROL OF THE

1       BUSINESS' BANK ACCOUNTS.

2            COUNT ONE: COUNT ONE CHARGES THEFT OF

3       GOVERNMENT FUNDS.  PARAGRAPHS ONE AND TWO OF

4       THE SUPERCEDING INDICTMENT ARE INCORPORATED

5       HEREIN AS FACTUAL ALLEGATIONS.

6            BEGINNING AT LEAST, BY IN OR ABOUT MARCH

7       OF 2012, AND CONTINUING THROUGH MAY OF 2013,

8       IN THE MIDDLE DISTRICT OF LOUISIANA AND

9       ELSEWHERE, THE DEFENDANT, CARLOS L. LINARES,

10      KNOWINGLY DID STEAL AND PURLOIN AND DID AID

11      AND ABET OTHERS TO STEAL AND PURLOIN MONEY

12      AND FUNDS OF THE UNITED STATES; NAMELY, FUNDS

13      ACCESSED THROUGH MORE THAN 250 UNITED STATES

14      TREASURY CHECKS PAYABLE TO INDIVIDUALS WITH

15      ADDRESSES IN NEW YORK, NEW JERSEY,

16      MASSACHUSETTS, PENNSYLVANIA, GEORGIA, FLORIDA

17      AND OTHER LOCATIONS OUTSIDE OF THE STATE OF

18      LOUISIANA, WITH CHECKS HAVING BEEN OBTAINED

19      THROUGH FRAUD.  THE ABOVE IS A VIOLATION OF

20      TITLE 18 UNITED STATES CODE SECTION 641 AND

21      2.

22           COUNT TWO CHARGES, THE FAILURE TO

23      MAINTAIN AN EFFECTIVE MONEY LAUNDERING

24      PROGRAM.  PARAGRAPHS ONE AND TWO OF THE

25      SUPERCEDING INDICTMENT ARE INCORPORATED

1   HEREIN AS FACTUAL ALLEGATIONS.

2        I WILL REMIND YOU, LADIES AND GENTLEMEN

3   THAT COUNTS ONE AND TWO ASSERT THAT CARLOS

4   LINARES WAS A RESIDENT OF BATON ROUGE WHO

5   OWNED AND OPERATED LATINO'S SUPERMARKET.  AND

6   THAT LINARES WAS RESPONSIBLE FOR THE CHECK

7   CASHING OPERATIONS AT THE SUPERMARKET.

8        SO, COUNT TWO CHARGES THAT BEGINNING IN

9   OR AT LEAST IN, OR ABOUT MARCH OF 2012, AND

10  CONTINUING THROUGH IN OR ABOUT JUNE OF 2014,

11  IN THE MIDDLE DISTRICT OF LOUISIANA, CARLOS

12  L. LINARES, THE DEFENDANT HEREIN, DID

13  WILLFULLY VIOLATE THE BANK SECRECY ACT, ALSO

14  KNOWN AS THE BSA, SPECIFICALLY TITLE 31

15  UNITED STATES CODE SECTIONS 5318H AND 5322,

16  AND THE REGULATIONS ISSUED THEREUNDER, NAMELY

17  TITLE 31 THE CODE OF FEDERAL REGULATIONS,

18  SECTION 1022.210.  BY FAILING TO DEVELOP,

19  IMPLEMENT AND MAINTAIN AN EFFECTIVE ANTI-

20  MONEY LAUNDERING PROGRAM AT LATINO'S, A

21  DOMESTIC FINANCIAL INSTITUTION AND MONEY

22  SERVICE BUSINESS.

23       DURING SUCH PERIOD LINARES KNOWINGLY AND

24  WILLFULLY FAILED TO IMPLEMENT AND MAINTAIN

25  EFFECTIVE POLICIES, PROCEDURES AND INTERNAL

1  CONTROLS FOR:

2      A. VERIFYING CUSTOMER INFORMATION AND

3  PARTICULARLY WITH REGARD TO CUSTOMERS WHO

4  CAME TO LATINO'S SEEKING TO CASH UNITED

5  STATES TREASURY CHECKS ISSUED TO INDIVIDUALS

6  WITH ADDRESSES OUTSIDE THE STATE OF

7  LOUISIANA.

8      B.  CREATING AND RETAINING RECORDS AND,

9      C.  RESPONDING TO LAW ENFORCEMENT

10  REQUESTS.

11      SPECIFICALLY, AND AMONG OTHER ACTS AND

12  OMISSIONS, LINARES DID THE FOLLOWING:

13      A.  BETWEEN MARCH, 2012, AND MAY, 2013,

14  LINARES DEPOSITED MORE THAN 270 TREASURY

15  CHECKS INTO HIS STORE'S BUSINESS ACCOUNTS FOR

16  A TOTAL OF MORE THAN 1.6 MILLION DOLLARS.

17  THE VAST MAJORITY OF THE CHECKS, MORE THAN 95

18  PERCENT OF THEM, WERE ADDRESSED TO

19  INDIVIDUALS WITH OUT-OF-STATE ADDRESSES.

20  MOST OF THE CHECKS HAD BEEN OBTAINED THROUGH

21  FRAUD, EITHER BECAUSE THE CHECKS WERE BASED

22  ON FRAUDULENT FEDERAL TAX RETURNS OR BECAUSE

23  THE CHECKS HAD BEEN STOLEN.

24      B.  LINARES ROUTINELY FAILED TO REQUIRE

25  AND/OR RETAIN COPIES OF ANY IDENTIFICATION

1    DOCUMENTS IN CONNECTION WITH THE TREASURY

2    CHECKS HE ACCEPTED.  IN THOSE LIMITED

3    INSTANCES IN WHICH LINARES PURPORTEDLY

4    REQUIRED IDENTIFICATION AND RETAINED A COPY

5    OF SUCH IDENTIFICATION, LINARES FAILED TO

6    TAKE ANY STEPS TO VERIFY WHETHER THE

7    INFORMATION -- IDENTIFICATION DOCUMENT WAS

8    FALSE, FICTITIOUS OR COUNTERFEIT.

9         C.  FOR MUCH OF THE RELEVANT TIME

10   PERIOD, LINARES HAD NO WRITTEN POLICIES,

11   PROCEDURES OR CONTROLS IN PLACE WHATSOEVER.

12   ALTHOUGH LINARES PURPORTEDLY IMPLEMENTED

13   CERTAIN WRITTEN POLICIES, PROCEDURES IN OR

14   ABOUT FEBRUARY, 2014, LINARES FAILED TO TAKE

15   ANY STEPS TO SEE THAT SUCH POLICIES AND

16   PROCEDURES WOULD BE FOLLOWED.

17        D.  IN JUNE OF 2014, IN RESPONSE TO A

18   VALID LAW ENFORCEMENT REQUEST FOR DOCUMENTS

19   AND INFORMATION RELATED TO THE ANTI-MONEY

20   LAUNDERING PROGRAM IN EFFECT AT LATINO'S, IF

21   ANY, LINARES MADE A PRODUCTION THAT WAS

22   INCOMPLETE; THAT IS, IT DID NOT INCLUDE

23   DOCUMENTS WITHIN LINARES' POSSESSION THAT

24   WOULD HAVE BEEN PRODUCED AND WHICH CONTAINED

25   FALSE AND FRAUDULENT DOCUMENTS.

1            NOW, THE CONDUCT DESCRIBED ABOVE

2      VIOLATED THE BANK SECRECY ACT, CODIFIED AT

3      TITLE 31 UNITED STATES CODE, SECTIONS 5313

4      THROUGH 5326, WHICH WAS A SET OF LAWS ENACTED

5      BY CONGRESS TO ADDRESS AN INCREASE IN

6      CRIMINAL MONEY LAUNDERING THROUGH FINANCIAL

7      INSTITUTIONS, CHECK AT CASHERS, FOR INSTANCE,

8      WERE A COMMON VENUE FOR INDIVIDUALS WHO

9      WANTED TO CASH LARGE NUMBERS OF CHECKS

10     ANONYMOUSLY, TO FACILITATE FRAUD AND MONEY-

11     LAUNDERING SCHEMES.

12           INDIVIDUALS ENGAGED IN SUCH CRIMINAL

13     CONDUCT COMMONLY CONVERTED THE PROCEEDS OF

14     THEIR FRAUD INTO CASH BY TAKING CHECKS TO

15     CHECK CASHERS WHOM THEY KNEW WOULD NOT ASK

16     FOR PROOF OF THE PAYEE'S IDENTITIES OR

17     REQUIRE AND INQUIRE INTO THE CIRCUMSTANCES

18     SURROUNDING THE CHECKS.

19           ACCORDINGLY, AMONG OTHER PROVISIONS, THE

20     BANK SECRECY ACT REQUIRED EACH CHECK CASHER

21     TO DEVELOP, IMPLEMENT AND MAINTAIN AN

22     EFFECTIVE ANTI-MONEY LAUNDERING PROGRAM

23     REASONABLY DESIGNED TO PREVENT THE CHECK

24     CASHER FROM BEING USED TO FACILITATE MONEY

25     LAUNDERING.  THE PROGRAM WAS REQUIRED TO HAVE

1       WRITTEN POLICIES, PROCEDURES AND CONTROLS

2       GOVERNING THE VERIFICATION OF CUSTOMER

3       IDENTIFICATION, THE FILING OF REPORTS AS

4       REQUIRED BY LAW, THE CREATION AND RETENTION

5       OF RECORDS, AND RESPONSES TO LAW ENFORCEMENT

6       REQUESTS.

7            AS PART OF THE PROGRAM, THE CHECK CASHER

8       WAS REQUIRED TO PROVIDE ONGOING TRAINING TO

9       ITS EMPLOYEES TO ENSURE THAT THEY WERE

10      KNOWLEDGEABLE REGARDING THE CHECK CASHER'S

11      ANTI-MONEY LAUNDERING POLICIES.

12           AS DESCRIBED ABOVE, LINARES FAILED TO

13      FOLLOW THESE REQUIREMENTS AND TOOK NO STEPS

14      TO PREVENT HIS STORE FROM BEING USED TO

15      FACILITATE CRIMINAL ACTIVITY AND LAUNDER

16      MONEY.  THE ABOVE IS A VIOLATION OF TITLE 31

17      UNITED STATES CODE SECTIONS 5318 AND 5322.

18           COUNT THREE.  COUNT THREE CHARGES

19      OBSTRUCTION OF A PROCEEDING BEFORE A FEDERAL

20      AGENCY.  PARAGRAPHS ONE THROUGH 11 OF THIS

21      SUPERCEDING INDICTMENT ARE INCORPORATED

22      HEREIN AS FACTUAL ALLEGATIONS.  IN OTHER

23      WORDS, THE SAME ALLEGATIONS THAT I PREVIOUSLY

24      READ TO YOU APPLY HERE TO THIS COUNT.

25           ON OR ABOUT AUGUST 12TH, 2010, THE

1    UNITED STATES DEPARTMENT OF TREASURY,

2    INTERNAL REVENUE SERVICE, BEGAN AN

3    EXAMINATION OF LATINO'S TO DETERMINE WHETHER

4    LINARES AND LATINO'S WERE IN COMPLIANCE WITH

5    THE BANK SECRECY ACT AND OTHER APPLICABLE

6    LAWS.  THE EXAMINATION INCLUDED TELEPHONIC

7    AND IN-PERSON INTERVIEWS OF LINARES, A TOUR

8    OF THE STORE, AND A REVIEW OF CERTAIN BOOKS

9    AND RECORDS.

10          FROM ON OR ABOUT AUGUST 12TH, 2010,

11   THROUGH ON OR ABOUT SEPTEMBER 22ND, 2010, IN

12   THE MIDDLE DISTRICT OF LOUISIANA, CARLOS L.

13   LINARES, THE DEFENDANT HEREIN, DID CORRUPTLY

14   INFLUENCE, OBSTRUCT AND IMPEDE AND ENDEAVOR

15   TO INFLUENCE, OBSTRUCT AND IMPEDE THE DUE AND

16   PROPER ADMINISTRATION OF THE LAW UNDER WHICH

17   A PROCEEDING WAS PENDING.  THAT IS, AN

18   EXAMINATION BY THE UNITED STATES DEPARTMENT

19   OF THE TREASURY, INTERNAL REVENUE SERVICE,

20   AND THAT LINARES FALSELY REPRESENTED TO THE

21   EXAMINER THAT HE DID NOT RETAIN ANY RECORDS

22   OF HIS CASH CHECKING BUSINESS OTHER THAN HIS

23   BANK STATEMENTS.  FALSELY STATED THAT HE DID

24   NOT CASH CHECKS EXCEEDING $5,000.00.  FALSELY

25   STATED THAT HE ONLY ALLOWED INDIVIDUALS TO

1  CASH MULTIPLE CHECKS IF THE TOTAL AMOUNT OF

2  THE CHECKS DID NOT EXCEED $5,000.00.  AND

3  CONCEALED NUMEROUS RECORDS RELEVANT TO THE

4  EXAMINATION.

5       THE ABOVE IS A VIOLATION OF TITLE 18

6  UNITED STATES CODE SECTION 1505.

7       AND, FINALLY.

8       COUNT FOUR CHARGES OBSTRUCTION OF A

9  PROCEEDING BEFORE A FEDERAL AGENCY.  AGAIN,

10  THE ALLEGATIONS IN PARAGRAPHS ONE THROUGH 14,

11  WHICH I HAVE PREVIOUSLY READ TO YOU, APPLY

12  HERE.

13       DESPITE LINARES' OBSTRUCTION OF THE

14  TREASURY'S 2010 EXAMINATION REFERENCED ABOVE,

15  THE EXAMINATION FOUND NUMEROUS VIOLATIONS OF

16  THE BANK SECRECY ACT, INCLUDING THE FACT THAT

17  LINARES HAD NO ANTI-MONEY LAUNDERING

18  COMPLIANCE PROGRAM IN PLACE.  LINARES WAS

19  ADVISED OF THE EXAMINATION'S FINDINGS.

20       ON OR ABOUT MARCH 5TH, 2013, THE

21  TREASURY INITIATED A FOLLOW-UP EXAMINATION TO

22  DETERMINE WHETHER LINARES HAD TAKEN ANY OF

23  THE CORRECTIVE MEASURES IDENTIFIED DURING THE

24  2010 EXAMINATION AND DETERMINE WHETHER

25  LINARES AND LATINO'S HAD COME INTO COMPLIANCE

1     WITH THE BANK SECRECY ACT AND OTHER

2     APPLICABLE LAWS.  THIS FOLLOW-UP EXAMINATION

3     ALSO INCLUDED TELEPHONIC AND IN-PERSON

4     INTERVIEWS OF LINARES, A TOUR OF THE STORE,

5     AND A REVIEW OF CERTAIN BOOKS AND RECORDS.

6          FROM ON OR ABOUT MARCH 5TH, 2013,

7     THROUGH ON OR ABOUT JUNE 20TH, 2013, IN THE

8     MIDDLE DISTRICT OF LOUISIANA, CARLOS L.

9     LINARES, THE DEFENDANT HEREIN, DID CORRUPTLY

10    INFLUENCE, OBSTRUCT AND IMPEDE AND ENDEAVOR

11    TO INFLUENCE, OBSTRUCT AND IMPEDE THE DUE AND

12    PROPER ADMINISTRATION OF THE LAW UNDER WHICH

13    A PROCEEDING WAS PENDING.  THAT IS, AN

14    EXAMINATION BY THE UNITED STATES DEPARTMENT

15    OF TREASURY, INTERNAL REVENUE SERVICE, AND

16    THAT LINARES FALSELY REPRESENTED TO THE

17    EXAMINER THAT HE DID NOT RETAIN ANY RECORDS

18    OF HIS CHECK CASHING BUSINESS OTHER THAN HIS

19    BANK STATEMENTS.  AND LINARES CONCEALED

20    NUMEROUS RECORDS RELEVANT TO THE EXAMINATION.

21         THE ABOVE IS A VIOLATION OF TITLE 18

22    UNITED STATES CODE SECTION 1505.

23         IT WAS ALSO WHAT'S CALLED A FORFEITURE

24    ALLEGATION INCLUDED IN THE INDICTMENT, LADIES

25    AND GENTLEMEN, WHICH I WILL NOT READ TO YOU

1    AT THIS TIME, BUT WHICH WILL BE READ TO THOSE

2    OF YOU WHO ARE SELECTED TO SERVE AS JURORS IN

3    THE CASE.

4        NOW, THE INDICTMENT IS SIGNED BY THE

5    UNITED STATES ATTORNEY, THE ASSISTANT UNITED

6    STATES ATTORNEYS WHO ARE PROSECUTING THE CASE

7    AND THE FOREPERSON OF THE GRAND JURY.

8        THANK YOU FOR YOUR PATIENCE WITH ME AS I

9    READ THE INDICTMENT TO YOU.

10        NOW, IT IS IMPORTANT FOR YOU, LADIES AND

11    GENTLEMEN, TO KNOW THAT THE DEFENDANT IN THIS

12    CASE, AS IN EVERY CRIMINAL CASE, IS PRESUMED

13    TO BE INNOCENT UNTIL AND UNLESS HE IS PROVEN

14    GUILTY.

15        THE DEFENDANT NEED NOT PROVE HIS

16    INNOCENCE, NOR PRESENT ANY EVIDENCE.  TO THE

17    EXTENT THAT THE DEFENDANT CHOOSES TO TESTIFY,

18    SUCH A DECISION MAY NOT IN ANY WAY BE

19    CONSTRUED AS AN ADMISSION OF GUILT.  IF HE,

20    AGAIN, CHOOSES NOT TO TESTIFY.  THE LAW GIVES

21    HIM THE RIGHT TO REMAIN SILENT.

22        THE GOVERNMENT, ON THE OTHER HAND, IS

23    REQUIRED TO PROVE THE DEFENDANT'S GUILT

24    BEYOND A REASONABLE DOUBT.  THAT DOES NOT,

25    HOWEVER, REQUIRE THE GOVERNMENT TO PROVE THE

1    DEFENDANT'S GUILT BEYOND ALL POSSIBLE DOUBT.

2    AND I WILL INSTRUCT YOU AT A LATER TIME AS TO

3    THE DEFINITION OF REASONABLE DOUBT.

4    NOW, THROUGHOUT THIS TRIAL EVERYONE WHO

5    WILL TESTIFY BEFORE YOU WILL BE USING A

6    MICROPHONE.  THEY WILL SIT IN THE WITNESS

7    STAND AND THEY WILL SPEAK INTO THE

8    MICROPHONE.  SO, IT'S IMPORTANT THAT YOU BE

9    ABLE TO HEAR THEM, JUST AS IT IS IMPORTANT

10   FOR YOU TO HEAR ME AT THIS TIME.

11   IF ANYONE HERE CANNOT HEAR ME CLEARLY,

12   PLEASE RAISE YOUR HAND.  LET THE RECORD

13   REFLECT THAT NO HANDS ARE BEING RAISED AT

14   THIS TIME.

15   I ANTICIPATE, LADIES AND GENTLEMEN, THAT

16   THERE MAY BE DOCUMENTS INTRODUCED TO YOU

17   DURING THE COURSE OF THE TRIAL.  AND, SO, IT

18   WILL BE IMPORTANT THAT EVERYONE WHO IS

19   SELECTED TO SERVE AS A JUROR BE ABLE TO READ

20   AND WRITE IN THE ENGLISH LANGUAGE.

21   IF YOU CANNOT READ AND WRITE IN THE

22   ENGLISH LANGUAGE, PLEASE RAISE YOUR HAND.

23   AND, AGAIN, LET THE RECORD REFLECT THAT NO

24   HANDS ARE BEING RAISED.

25   AND, FINALLY, AS I MENTIONED TO YOU, IT

1    WILL BE NECESSARY FOR THE MEMBERS OF THE JURY

2    TO REVIEW CERTAIN DOCUMENTS.  SO, IT'S

3    IMPORTANT THAT YOU BE ABLE TO SEE WELL.

4        IF YOU CANNOT SEE ME AT THIS TIME,

5    PLEASE RAISE YOUR HAND.  AND, LET THE RECORD

6    REFLECT THAT NO HANDS ARE BEING RAISED.

7        AT THIS TIME, LADIES AND GENTLEMEN, I

8    HAVE JUST A FEW QUESTIONS FOR YOU.

9        SO, THE FIRST THING THAT I WILL DO IS

10   ASK YOU TO PROVIDE SOME VERY BASIC

11   INFORMATION.  THIS IS ONE OF THOSE QUESTIONS

12   WHERE THERE IS NO WRONG ANSWER UNLESS, OF

13   COURSE, YOU'RE NOT TRUTHFUL.  BUT I KNOW YOU

14   ALL HAVE BEEN SWORN AND YOU WILL BE TRUTHFUL.

15       SO, THE FIRST THING I WILL ASK IS YOUR

16   NAME, YOUR GENDER; THAT IS, -- FIRST OF ALL,

17   YOUR NAME, YOUR AGE, YOUR GENDER, WHETHER

18   YOU'RE MALE, FEMALE, AND YOUR RACE: WHITE,

19   CAUCASIAN, BLACK, AFRICAN-AMERICAN, HISPANIC,

20   ASIAN-AMERICAN, NATIVE AMERICAN, HOWEVER YOU

21   WISH TO IDENTIFY.

22       NOW, YOU'RE PROBABLY ASKING WHY I'M

23   ASKING YOU THESE QUESTIONS.  AGAIN, AS I

24   MENTIONED EARLIER, THAT EVERYTHING THAT WE DO

25   WE STATE ON THE RECORD.  SO, WE HAVE THE

1    MEANS TO RECORD EVERYTHING VIA AUDIO MEANS OR

2    AUDIO DEVICES.  WE DON'T HAVE CAMERAS IN THE

3    COURTROOM EXCEPT FOR SECURITY PURPOSES.

4         IT MIGHT BE POSSIBLE AT SOME LATER TIME

5    THAT ONE SIDE OR THE OTHER MAY CHALLENGE THE

6    MAKE-UP OF THE JURY IN THIS CASE.  AND, SO,

7    IT'S IMPORTANT FOR THE COURT OF APPEALS TO

8    KNOW WHO IS ON THE JURY.  MORE SPECIFICALLY,

9    WHO IS MALE, WHO IS FEMALE, AND THE RACE OF

10   THE JURORS.  AND, SO, FOR THAT REASON I'M

11   ASKING YOU TO SELF-IDENTIFY.

12        ALL RIGHT.  SO, AGAIN, NAME, AGE, GENDER

13   AND RACE, AND WE WILL START WITH JUROR NUMBER

14   ONE IN THE JURY BOX.  I BELIEVE THAT'S MR.

15   GORMAN, CORRECT?

16   THE JUROR: RIGHT.

17   THE COURT: AND BE SURE YOU USE THE

18   MICROPHONE.

19   THE JUROR: OKAY.  RICHARD GORMAN, I'M 58

20        YEARS OLD, AND I'M CAUCASIAN.

21   THE COURT: THANK YOU, MR. GORMAN.  IF YOU

22        WOULD PASS THE MICROPHONE ON TO MS.

23   LANUS; IS THAT CORRECT?

24   THE JUROR: MY NAME IS ERMA LANUS.  I'M

25        52 YEARS OLD.  I'M BLACK, AFRICAN-

1    AMERICAN.

2    THE COURT: THANK YOU, MS. LANUS.  OH, YES.

3        JUST -- FEMALE, CORRECT?

4    THE JUROR: FEMALE.

5    THE COURT: OKAY.  AND MR. GORMAN, YOU'RE

6        A MALE, CORRECT?

7    THE JUROR: RIGHT.

8    THE COURT: ALL RIGHT.  VERY WELL.

9        OKAY.  NEXT, THAT'S MS. ALFORD?

10   THE JUROR: KAITLYN ALFORD, 27, FEMALE,

11       CAUCASIAN.

12   THE COURT: THANK YOU, MA'AM.

13   THE JUROR: IVEY LIEUX, 64, MALE,

14       WHITE.

15   THE COURT: THANK YOU, SIR.

16   THE JUROR: SHERRI HILL, FEMALE, 58, WHITE.

17   THE COURT: THANK YOU, MS. HILL.

18   THE JUROR: JILL LINDBERG, 39, CAUCASIAN,

19       FEMALE.

20   THE COURT: THANK YOU, MA'AM.

21   THE JUROR: CHRISTOPHER DICKERSON, AGE 45,

22       MALE, CAUCASIAN.

23   THE COURT: THANK YOU, SIR.

24   THE JUROR: EMILY RICHARD, AGE 30, CAUCASIAN,

25       FEMALE.

1          THE COURT: THANK YOU, MS. RICHARD.

2          THE JUROR: JENNIFER BOSWELL, 30, FEMALE,

3               AND WHITE.

4          THE COURT: THANK YOU.

5          THE JUROR: BRENT PHILIP, 33, AFRICAN-

6               AMERICAN, MALE.

7          THE COURT: THANK YOU, MR. PHILIP.

8          THE JUROR: DAVID BARBER, 46, CAUCASIAN,

9               MALE.

10         THE COURT: THANK YOU, MR. BARBER.

11         THE JUROR: SUZANNE MARLER, 45, FEMALE,

12              CAUCASIAN.

13         THE COURT: THANK YOU, MA'AM.

14         THE JUROR: STANFORD BARBIER, JR., 62,

15              WHITE, MALE.

16         THE COURT: THANK YOU, SIR.

17         THE JUROR: JUSTIN MINOR, 28, AFRICAN-

18              AMERICAN, MALE.

19         THE COURT: THANK YOU, MR. MINOR.

20         THE JUROR: JEREMY HILL, 27, AFRICAN-

21              AMERICAN, MALE.

22         THE COURT: THANK YOU, MR. HILL.

23         THE JUROR: DANIEL MCCULLOCH, 45,

24              CAUCASIAN, MALE.

25         THE COURT: THANK YOU, MR. MCCULLOCH.

1       THE JUROR: LARRY FREEMAN, 53, WHITE

2           MALE.

3       THE COURT: THANK YOU, SIR.

4       THE JUROR: KEN FIFE, 66, WHITE, MALE.

5       THE COURT: THANK YOU, MR. FIFE.

6       THE JUROR: KIMBERLY JOUBERT, 38,

7           WHITE, FEMALE.

8       THE COURT: THANK YOU.

9       THE JUROR: SHELLEY FARMER, 43, WHITE,

10          FEMALE.

11      THE COURT: THANK YOU, MA'AM.

12      THE JUROR: OCTAVE LANDRY, 64, CAUCASIAN,

13          MALE.

14      THE COURT: THANK YOU, SIR.

15      THE JUROR: WAYNE BIRT, 48, WHITE, MALE.

16      THE COURT: THANK YOU, MR. BIRT.

17      THE JUROR: WILLIAM DUPRE, 53, WHITE,

18          MALE.

19      THE COURT: THANK YOU, MR. DUPRE.

20      THE JUROR: GWENDOLYN LYONS, 57, AFRICAN-

21          AMERICAN, FEMALE.

22      THE COURT: THANK YOU.

23      THE JUROR: ANDREW ZERA, 23, WHITE, MALE.

24      THE COURT: THANK YOU.

25      THE JUROR: GLENN DOMINIGUE, 63, WHITE, MALE.

1          THE COURT: THANK YOU, SIR.

2          THE JUROR: ZOILA CASAS, HISPANIC, 66,

3               FEMALE.

4          THE COURT: THANK YOU, MA'AM.

5          THE JUROR: CAROLINE JENKINS, 49, WHITE,

6               FEMALE.

7          THE COURT: THANK YOU.

8          THE JUROR: JANELLE TOWNSEND, 44, WHITE,

9               FEMALE.

10         THE COURT: THANK YOU, MA'AM.

11         THE JUROR: ALLISON OLIVER, 26, AFRICAN-

12              AMERICAN, FEMALE.

13         THE COURT: THANK YOU.

14         THE JUROR: JARROD DUHON, 45, WHITE, MALE.

15         THE COURT: THANK YOU, MR. DUHON.

16         THE JUROR: GERALD RAMAGOST, 60, WHITE, MALE.

17         THE COURT: THANK YOU, SIR.

18         THE JUROR: WILLIE GUILLORY, 45, AFRICAN-

19              AMERICAN, MALE.

20         THE COURT: THANK YOU, MR. GUILLORY.

21         THE JUROR: JOHN DARDINGER, 48, WHITE, MALE.

22         THE COURT: THANK YOU.

23         THE JUROR: KELLI WALES, 29, WHITE, FEMALE.

24         THE COURT: THANK YOU.

25         THE JUROR: MAY DAIGRE, 59, WHITE, FEMALE.

1      THE COURT: THANK YOU, MS. DAIGRE.

2      THE JUROR: LANI CRONAN, 40 YEAR OLD, WHITE,

3          FEMALE.

4      THE COURT: THANK YOU, MA'AM.

5      THE JUROR: BEVERLY BUCKELS, 62, WHITE,

6          FEMALE.

7      THE COURT: THANK YOU VERY MUCH.  WELL,

8          THAT WASN'T SO HARD, WAS IT?  ALL RIGHT.

9          NOW, SO, THE NEXT QUESTION, A SERIES OF

10     QUESTIONS, ARE AS EASY AS THE LAST QUESTIONS,

11     FOLKS.  WHAT I WOULD ASK IS THAT YOU TELL ME,

12     FIRST, WHETHER YOU ARE EMPLOYED?  AND IF SO,

13     WHAT YOU DO, WHAT YOUR OCCUPATION IS, IN

14     OTHER WORDS, WHAT DO YOU DO ON YOUR JOB.  I

15     WOULD ALSO LIKE TO KNOW IF YOU ARE MARRIED

16     AND, IF SO, WHAT DOES YOUR SPOUSE DO.

17         SO, PRETTY EASY QUESTIONS ONCE AGAIN.

18     IF YOU'RE EMPLOYED, WHAT DO YOU DO?  IF

19     YOU'RE MARRIED, IF SO, WHAT DOES YOUR SPOUSE

20     DO?

21         AND, AGAIN, WE'LL BEGIN WITH YOU, MR.

22     GORMAN.

23     THE JUROR: I'M EMPLOYED.  I'M A MILLWRIGHT.

24         I'M MARRIED, AND MY WIFE IS AN R.N.

25     THE COURT: OKAY.  NOW, YOU'RE A MILLWRIGHT.

1    HOW LONG HAVE YOU DONE THAT SORT OF

2    WORK?

3    THE JUROR: SINCE 2006.

4    THE COURT: AND WHAT IS YOUR WIFE -- WHERE IS

5    SHE EMPLOYED?

6    THE JUROR: SHE'S EMPLOYED AT LANE REGIONAL

7    MEDICAL CENTER.

8    THE COURT: THANK YOU, SIR.

9    JUROR NUMBER TWO, MS. LANUS.  ARE YOU

10    EMPLOYED, MA'AM?

11    THE JUROR: EMPLOYED AT WALMART.  I'M A

12    CASHIER FOR 13 YEARS.

13    THE COURT: WHICH ONE?

14    THE JUROR: WALMART IN BAKER, LOUISIANA.

15    THE COURT: ARE YOU MARRIED?

16    THE JUROR: I'M SINGLE.

17    THE COURT: THANK YOU, MA'AM.

18    JUROR NUMBER THREE, MS. ALFORD.  ARE

19    YOU EMPLOYED?

20    THE JUROR: YES.

21    THE COURT: WHERE?

22    THE JUROR: AT OUR LADY OF THE LAKE REGIONAL

23    MEDICAL CENTER.  I'M A REGISTERED NURSE.

24    THE COURT: OKAY.  HOW LONG HAVE YOU BEEN

25    THERE, MA'AM?

1    THE JUROR: I'VE BEEN THERE A YEAR.

2    THE COURT: OKAY.  ARE YOU MARRIED?

3    THE JUROR: I'M ENGAGED.

4    THE COURT: WELL, CONGRATULATIONS.  YOUR

5        FIANCE'S NAME?

6    THE JUROR: JAMES HARRISON.

7    THE COURT: AND WHAT DOES HE DO?

8    THE JUROR: HE IS A SPORTS RADIO TALK SHOW

9        HOST PRODUCER.

10   THE COURT: OKAY.  ALL RIGHT.  WELL, I'M

11       SURE HE'S GOT A LOT TO SAY THIS MORNING

12   AFTER THOSE GAMES YESTERDAY.

13   THE JUROR: YES, SIR.

14   THE COURT: HAVE YOU SET A DATE?

15   THE JUROR: MAY 21ST.

16   THE COURT: ALL RIGHT.  SO, YOU ARE REALLY

17       ARE.  I MEAN, I GOT TO TELL YOU

18   SOMETIMES I HAVE JURORS WHO TELL ME, WELL,

19   I'M ENGAGED.  AND I ASK THEM, "HAVE YOU SET A

20   DATE," AND THEY SAY, "WELL, NOT YET."  WELL,

21   THAT DOESN'T REALLY COUNT, AT LEAST IN MY

22   OPINION.

23       ALL RIGHT.  WELL, CONGRATULATIONS AGAIN.

24       ALL RIGHT.  NEXT WE HAVE MR. LIEUX; IS

25   THAT CORRECT?

1        THE JUROR: LIEUX.

2        THE COURT: LIEUX, OKAY.  NOW, MR. LIEUX,

3            ARE YOU EMPLOYED?

4        THE JUROR: RETIRED.

5        THE COURT: FROM?

6        THE JUROR: DELTA AIRLINES.

7        THE COURT: HOW LONG WERE YOU WITH DELTA?

8        THE JUROR: TWENTY-FOUR YEARS AND EIGHT

9            MONTHS.

10       THE COURT: WHAT DID YOU DO THERE?

11       THE JUROR: CAPTAIN.

12       THE COURT: IS THAT RIGHT?

13       THE JUROR: YES.

14       THE COURT: SO, YOU ALL HAVE A MANDATORY

15           RETIREMENT AGE, I'M TOLD, CORRECT?

16       THE JUROR: 65.

17       THE COURT: OH, OKAY.  DO YOU STILL FLY

18           EVERY NOW AND THEN?

19       THE JUROR: NO.

20       THE COURT: YOU'RE DONE WITH IT, HUH?

21       THE JUROR: WALKED OUT AND QUIT.

22       THE COURT: OKAY.  ARE YOU MARRIED, SIR?

23       THE JUROR: YES.

24       THE COURT: AND YOUR WIFE'S NAME, CAPTAIN?

25       THE JUROR: VICTORIA AKREE.

1   THE COURT: AND WHAT DOES SHE DO?

2   THE JUROR: JUST STARTED WORKING PART TIME

3         FOR HALLMARK.

4   THE COURT: THANK YOU.

5   THE JUROR: THANK YOU.

6   THE COURT: MS. HILL, HOW ARE YOU?

7   THE JUROR: GOOD MORNING.

8   THE COURT: AND THAT'S JUROR NUMBER FIVE.

9         MS. HILL, ARE YOU EMPLOYED?

10  THE JUROR: NO I'M NOT; I'M A FULL-TIME

11        HOUSEWIFE.

12  THE COURT: OKAY.  THAT'S A TOUCH JOB. ARE YOU

13        MARRIED?

14  THE JUROR: I'VE BEEN MARRIED FOR 38 YEARS.

15  THE COURT: WELL, CONGRATULATIONS.  AND YOUR

16        HUSBAND'S NAME?

17  THE JUROR: RICHARD HILL.

18  THE COURT: AND WHAT DOES HE DO?

19  THE JUROR: WELL, HE USED TO BE A BANKER.

20        HE RETIRED FROM THAT.  NOW HE WORKS

21  COMMERCIAL REAL ESTATE FOR LATTER AND BLUM.

22  THE COURT: OKAY, VERY GOOD.  THANK YOU,

23        MA'AM.

24        NEXT WE HAVE JUROR NUMBER SIX.  MS.

25  LINDBERG; IS THAT RIGHT?

1      THE JUROR: YES, SIR.

2      THE COURT: ARE YOU EMPLOYED, MA'AM?

3      THE JUROR: I AM.  I'M A TEACHER, FIFTH

4          GRADE.

5      THE COURT: AND WHERE?

6      THE JUROR: AT SHENANDOAH ELEMENTARY.

7      THE COURT: OKAY.  VERY GOOD.  THAT'S

8          AN IMPORTANT JOB.  I HAVE TO SAY THAT

9      BECAUSE MY MOM IS A RETIRED TEACHER.

10     THE JUROR: I APPRECIATE YOUR ---

11     THE COURT: IF I DIDN'T SAY THAT, SHE

12         WOULD BE VERY UPSET WITH ME.

13     THE JUROR: I APPRECIATE YOU.

14     THE COURT: BUT IT REALLY IS AN IMPORTANT

15         JOB AND A TOUGH JOB.

16     THE JUROR: IT IS.

17     THE COURT: HOW LONG HAVE YOU BEEN

18         TEACHING?

19     THE JUROR: WELL, I TAUGHT FOR TWO AND

20         A HALF YEARS, HAD MY CHILDREN, AND NOW

21     I'M BACK FOR ABOUT FIVE YEARS.  SO, ALL IN

22     TOTAL ABOUT 11 YEARS.

23     THE COURT: VERY GOOD.  ARE YOU MARRIED?

24     THE JUROR: I AM.  MY HUSBAND IS AN

25         ACCOUNTANT.

1    THE COURT: WHERE?

2    THE JUROR: AT AMEDISYS.

3    THE COURT: AND WHAT'S HIS NAME?

4    THE JUROR: ANDREW LINDBERG.

5    THE COURT: THANK YOU, MA'AM.

6    THE JUROR: YOU'RE WELCOME.

7    THE COURT: MR. DICKERSON, JUROR NUMBER

8        SEVEN, HOW ARE YOU?

9    THE JUROR: DOING GOOD.

10   THE COURT: ARE YOU EMPLOYED?

11   THE JUROR: YES, SIR, I AM.

12   THE COURT: WHERE?

13   THE JUROR: I'M A RESPIRATORY THERAPIST

14       AT WOMAN'S HOSPITAL.

15   THE COURT: HOW LONG HAVE YOU BEEN THERE?

16   THE JUROR: SINCE '98, ABOUT 15 YEARS.

17   THE COURT: ARE YOU MARRIED?

18   THE JUROR: YES, SIR, I AM.

19   THE COURT: SPOUSE?

20   THE JUROR: MY SPOUSE'S NAME IS TAMI

21       DICKERSON.

22   THE COURT: WHERE DOES SHE WORK?

23   THE JUROR: SHE WORKS FOR OSCHNER MEDICAL.

24       SHE'S AN R.N.

25   THE COURT: OKAY.  VERY GOOD.  THANK YOU.

1          AND NEXT WE HAVE MS. RICHARD; IS THAT

2     RIGHT?

3     THE JUROR: YES, SIR.

4     THE COURT: ARE YOU EMPLOYED?

5     THE JUROR: I AM.  I'M A PHYSICIAN AND

6          I'M A DERMATOLOGY RESIDENT IN MY LAST

7     YEAR OF TRAINING.

8     THE COURT: OKAY, VERY GOOD.  I'VE GOT A

9          LITTLE MOLE RIGHT HERE.

10    THE JUROR: I'LL TAKE A LOOK AT IT.

11    THE COURT: I'M KIDDING.  ACTUALLY, I'M

12         NOT KIDDING, BUT THAT'S ANOTHER STORY.

13         YES, CLARE.  MY COURT REPORTER HERE HAS

14    TO KEEP ME IN CHECK EVERY NOW AND THEN.

15         SO, CONGRATULATIONS.  WHERE WILL YOU BE

16    PRACTICING, DO YOU KNOW?

17    THE JUROR: MY HUSBAND AND I ARE ACTUALLY

18         MOVING TO VIRGINIA THIS SUMMER FOR HIM

19    TO CONTINUE HIS TRAINING.

20    THE COURT: WELL, GOOD.  BUT WE NEED YOU ALL

21         DOWN HERE.  NOW, WHAT DOES HE DO?  HE'S

22    OBVIOUSLY A PHYSICIAN AS WELL?

23    THE JUROR: YES, SIR.  HE'S A PHYSICIAN.

24         HE JUST FINISHED HIS INTERNAL MEDICINE

25    TRAINING.  HE'S THE CHIEF RESIDENT WITH LSU

1    AT OUR LADY OF THE LAKE.

2    THE COURT: VERY GOOD.

3    THE JUROR: AND HE'S GOING ON TO DO PULMONARY

4        CRITICAL CARE.

5    THE COURT: AND HIS NAME?

6    THE JUROR: BRIAN RICHARD.

7    THE COURT: OKAY.  VERY GOOD.  WELL, THANK

8        YOU, DOCTOR.

9        ALL RIGHT.  WE'LL START OFF WITH MS.

10   BOSWELL.  MS. BOSWELL, AS JUROR NUMBER NINE,

11   ARE YOU EMPLOYED, MA'AM?

12   THE JUROR: I AM.  I'M A CLOSING SPECIALIST

13       AT A TITLE COMPANY.

14   THE COURT: OKAY.  WHAT'S THE NAME OF THE

15       COMPANY?

16   THE JUROR: COMMERCE TITLE.

17   THE COURT: OKAY.  THEY'RE HERE IN BATON

18       ROUGE?

19   THE JUROR: YES.  BUT I'M ACTUALLY AT THE

20       OFFICE IN PRAIRIEVILLE.

21   THE COURT: HOW LONG HAVE YOU BEEN EMPLOYED

22       LIKE THAT AND DOING THAT KIND OF WORK?

23   THE JUROR: SINCE 2009.

24   THE COURT: ARE YOU MARRIED?

25   THE JUROR: YES.

1    THE COURT: YOUR SPOUSE?

2    THE JUROR: HIS NAME IS JONATHAN BOSWELL.

3         AND HE IS A TEACHER.

4    THE COURT: WHERE?

5    THE JUROR: IN ASCENSION PARISH.

6    THE COURT: VERY GOOD.  THANK YOU, MA'AM.

7         JUROR NUMBER 10, MR. PHILIP. HOW ARE

8    YOU, SIR?

9    THE JUROR: I'M FINE.  AND YOU?

10    THE COURT: GOOD.  ARE YOU EMPLOYED?

11    THE JUROR: I'M EMPLOYED AT MARATHON

12         PETROLEUM.

13    THE COURT: WHAT DO YOU DO THERE?

14    THE JUROR: I WORK IN OPERATIONS.

15    THE COURT: AND HOW LONG HAVE YOU BEEN DOING

16         THAT KIND OF WORK?

17    THE JUROR: I'VE BEEN IN OPERATIONS FOR

18         TWO AND A HALF YEARS.

19    THE COURT: ALL RIGHT.  AND ARE YOU

20         MARRIED, SIR?

21    THE JUROR: NO, SIR.  SINGLE.

22    THE COURT: THANK YOU.  MR. BARBER, HOW

23         ARE YOU?

24    THE JUROR: GREAT.  GREAT.

25    THE COURT: THAT'S JUROR NUMBER 11.

1           NOW, HOW ARE YOU EMPLOYED, SIR?

2       THE JUROR: THE CHIEF FINANCIAL OFFICER

3           FOR A COMPANY CALLED OMNI INDUSTRIES.

4       THE COURT: AND WHAT KIND OF BUSINESS IS

5           OMNI INDUSTRIES?

6       THE JUROR: IT'S A MANUFACTURING COMPANY.

7           WE MAKE LUBRICANTS AND CHEMICALS.

8       THE COURT: OKAY.  AND WHERE IS THAT

9           LOCATED?

10      THE JUROR: THE OFFICE -- THE CORPORATE

11          OFFICE IS HERE IN BATON ROUGE, IN

12      GREENWELL SPRINGS.  AND THE MANUFACTURING

13      FACILITY IS IN SHREVEPORT.

14      THE COURT: AND YOUR TITLE AGAIN, SIR?

15      THE JUROR: YES.  CHIEF FINANCIAL OFFICER.

16      THE COURT: AND DO YOU HAVE AN ACCOUNTING

17          BACKGROUND?

18      THE JUROR: YES.

19      THE COURT: HAVE YOU WORKED IN THE BANKING

20          INDUSTRY BEFORE?

21      THE JUROR: YES.

22      THE COURT: OKAY.  ARE YOU MARRIED?

23      THE JUROR: YES.

24      THE COURT: YOUR SPOUSE?

25      THE JUROR: SABRINA.

1        THE COURT: WHAT DOES SHE DO?

2        THE JUROR: SHE'S A STAY-AT-HOME MOM.

3        THE COURT: THANK YOU, SIR.

4            MS. MARLER; IS THAT CORRECT?

5        THE JUROR: YES.

6        THE COURT: JUROR NUMBER 12.  MS. MARLER,

7            WHAT DO YOU DO FOR A LIVING, MA'AM?

8        THE JUROR: I'M CUSTOMER SUPPORT MANAGER

9            FOR A VIRTUAL COMPANY, SO I ACTUALLY

10       WORK OUT OF MY HOME.

11       THE COURT: OKAY.  VERY GOOD.  AND WHAT'S

12           THE NAME OF THE VIRTUAL COMPANY?

13       THE JUROR: WELCH GLOBAL CONSULTING.

14       THE COURT: AND WHAT KIND OF -- WHAT IS THE

15           NATURE OF THEIR WORK?

16       THE JUROR: WE HAVE SOFTWARE THAT WE SELL

17           TO TECHNOLOGY PEOPLE TO USE --

18       THE COURT: OKAY.

19       THE JUROR:  -- TO SELL BASED ON THE BUSINESS

20           CASE.

21       THE COURT: AND DO YOU ALL SELL ANY

22           SOFTWARE TO THE FINANCIAL INDUSTRY?

23       THE JUROR: NO.

24       THE COURT: ARE YOU MARRIED, MA'AM?

25       THE JUROR: I AM VERY MUCH SO.

1    THE COURT: OKAY.  YOUR SPOUSE'S NAME?

2    THE JUROR: BRAD MARLER.

3    THE COURT: AND WHAT DOES HE DO?

4    THE JUROR: HE'S AN ENVIRONMENTAL SCIENTIST.

5    THE COURT: OKAY.  THANK YOU, MA'AM.

6        MR. BARBIER, HOW ARE YOU?

7    THE JUROR: DOING WELL.

8    THE COURT: ARE YOU EMPLOYED, SIR?

9    THE JUROR: NO.  I'M RETIRED FROM DOW

10       CHEMICAL.

11   THE COURT: HOW LONG WERE YOU WITH DOW?

12   THE JUROR: THIRTY -- RIGHT UNDER 31 YEARS.

13   THE COURT: OKAY.  IT'S A GOOD LONG TIME.

14       NOW, WHAT DID YOU DO FOR DOW?

15   THE JUROR: I WAS AN OPERATOR.

16   THE COURT: ARE YOU MARRIED?

17   THE JUROR: YES, I AM.

18   THE COURT: YOUR SPOUSE'S NAME?

19   THE JUROR: ESTER.

20   THE COURT: AND WHAT DOES SHE DO?

21   THE JUROR: SHE IS RETIRED FROM AT&T, BUT

22       SHE'S PART-TIME WORK FOR BOARDWALK.

23   THE COURT: NOW, WHAT IS BOARDWALK?

24   THE JUROR: PETRO LOGISTICS.

25   THE COURT: OKAY.  VERY GOOD.  THANK YOU,

1              SIR.

2              MR. MINOR, HOW ARE YOU?

3      THE JUROR: DOING GOOD.

4      THE COURT: ARE YOU EMPLOYED?

5      THE JUROR: YES, SIR.

6      THE COURT: WHAT DO YOU DO?

7      THE JUROR: I'M A SENIOR SALESMAN AT

8              CARMAX.

9      THE COURT: OKAY.  AND HOW LONG HAVE YOU

10              BEEN DOING THIS KIND OF WORK?

11      THE JUROR: THIS MARCH IT WILL BE FOUR

12              YEARS.

13      THE COURT: OKAY.  AND SO YOU WILL GIVE

14              EVERYBODY HERE A PRETTY GOOD DEAL,

15      I TAKE IT, HUH?

16      THE JUROR: NO HAGGLING.

17      THE COURT: OKAY.  WELL, THAT, TOO, IS A

18              GOOD DEAL.  LET ME TELL YOU.  NO HAGGLE,

19      THAT'S MUCH APPRECIATED.

20              ARE YOU MARRIED?

21      THE JUROR: NO, SIR.  I'M SINGLE.

22      THE COURT: THANK YOU, SIR.

23              MR. HILL, HOW ARE YOU?

24      THE JUROR: ALL RIGHT.

25      THE COURT: AND WHAT DO YOU DO FOR A LIVING,

1      SIR?

2      THE JUROR: MACHINE ATTENDANT AT COMMUNITY

3          COFFEE.

4      THE COURT: AND HOW LONG HAVE YOU BEEN THERE?

5      THE JUROR: SIX MONTHS.

6      THE COURT: AND WHAT DID YOU DO BEFORE THAT?

7      THE JUROR: I WAS A MACHINE ATTENDANT AT

8          COCA-COLA.

9      THE COURT: ALL RIGHT.  HOW LONG WERE YOU AT

10          COCA-COLA?

11      THE JUROR: EIGHT YEARS.

12      THE COURT: ALL RIGHT.  AND ARE YOU MARRIED,

13          SIR?

14      THE JUROR: NO, SIR.

15      THE COURT: OKAY.  THANK YOU.

16          MR. MCCULLOCH, HOW ARE YOU?

17      THE JUROR: GOOD.

18      THE COURT: ARE YOU EMPLOYED?

19      THE JUROR: I AM.

20      THE COURT: WHAT DO YOU DO?

21      THE JUROR: I'M A PRINCIPAL AT A PRIVATE

22          SCHOOL.

23      THE COURT: WHAT'S THE NAME OF THE SCHOOL?

24      THE JUROR: RIVERDALE CHRISTIAN ACADEMY.

25      THE COURT: ALL RIGHT.  AND WHERE IS THAT

1           LOCATED, SIR?

2       THE JUROR: O'NEAL LANE.

3       THE COURT: OKAY.  NOW, HOW LONG HAVE YOU

4           BEEN PRINCIPAL THERE?

5       THE JUROR: THERE, ONE YEAR.

6       THE COURT: OKAY.  THAT'S PRETTY MUCH

7           NEAR HARRELLS FERRY?

8       THE JUROR: HARRELLS -- THERE'S TWO

9           CAMPUSES, HARRELLS FERRY AND O'NEAL.

10      THE COURT: OKAY.  VERY GOOD.

11          ARE YOU MARRIED?

12      THE JUROR: I AM.

13      THE COURT: YOUR SPOUSE'S NAME?

14      THE JUROR: ANGELA MCCULLOCH.

15      THE COURT: WHAT DOES SHE DO?

16      THE JUROR: SHE'S AN ATTORNEY.

17      THE COURT: OKAY.  WHERE DOES SHE PRACTICE?

18      THE JUROR: FOR THE STATE, OFFICE OF GENERAL

19          COUNSEL.

20      THE COURT: AND SHE HANDLES ADMINISTRATIVE

21          MATTERS' IS THAT RIGHT?

22      THE JUROR: SHE'S CONTRACTS AND HEALTH STUFF.

23      THE COURT: OKAY.  SHE DOESN'T DO ANY

24          FINANCIAL WORK OR WORK FOR THE BANKING

25      INDUSTRY, I TAKE IT?

1     THE JUROR: NOT THAT I KNOW OF.

2     THE COURT: SHE'S NOT A BANK REGULATOR OR

3           A STATE BANK REGULATOR, RIGHT?

4     THE JUROR: NO.

5     THE COURT: ALL RIGHT.  THANK YOU, MR.

6           MCCULLOCH.

7           MR. FREEMAN, HOW ARE YOU?

8     THE JUROR: FINE.

9     THE COURT: ARE YOU EMPLOYED, SIR?

10    THE JUROR: YES, SIR.

11    THE COURT: WHAT DO YOU DO?

12    THE JUROR: I WORK AT ANGOLA.

13    THE COURT: AND WHAT DO YOU DO AT ANGOLA?

14    THE JUROR: I'M A TRANSPORT OFFICER.  I

15          TRANSPORT INMATES.

16    THE COURT: HOW LONG HAVE YOU BEEN AT

17          ANGOLA?

18    THE JUROR: NINETEEN YEARS.

19    THE COURT: VERY GOOD.  WHAT IS YOUR RANK,

20          SIR?

21    THE JUROR: I'M A MASTER SERGEANT.

22    THE COURT: ALL RIGHT.  WELL, CONGRATULATIONS.

23          THAT'S PRETTY HIGH UP THERE.  ARE YOU

24    MARRIED?

25    THE JUROR: YES, SIR.

1        THE COURT: AND HOW LONG HAVE YOU BEEN

2            MARRIED?

3        THE JUROR: THIS IS MY THIRD MARRIAGE.

4        THE COURT: OH, OKAY.  WELL, I'M SURE

5            YOU GOT IT RIGHT THIS TIME.  AND YOUR

6        SPOUSE'S NAME?

7        THE JUROR: MARY FREEMAN.

8        THE COURT: AND WHAT DOES SHE DO?

9        THE JUROR: SHE'S A PARAMEDIC, FIREFIGHTER,

10           EDUCATIONAL DIRECTOR FOR WEST

11       FELICIANA.

12       THE COURT: VERY GOOD.  THANK YOU, SIR.

13           MR. FIFE, HOW ARE YOU?

14       THE JUROR: I'M FINE.

15       THE COURT: THAT'S JUROR NUMBER 18.

16           MR. FIFE, ARE YOU EMPLOYED?

17       THE JUROR: I'M RETIRED.

18       THE COURT: FROM?

19       THE JUROR: THE TELEPHONE COMPANY IN

20           GONZALES.

21       THE COURT: AND THAT WAS EATEL, I GUESS?

22       THE JUROR: EATEL.

23       THE COURT: HOW LONG WERE YOU WITH EATEL?

24       THE JUROR: FORTY YEARS.

25       THE COURT: OH, BOY.  WHAT DID YOU DO

1          FOR EATEL?

2     THE JUROR: I WAS CENTRAL OFFICE

3          SUPERVISOR.

4     THE COURT: OKAY.  ARE YOU MARRIED?

5     THE JUROR: CATHY.

6     THE COURT: OKAY.  WHAT DOES SHE DO?

7     THE JUROR: SHE'S A BEAUTICIAN, OWNS HER OWN

8          SHOP.

9     THE COURT: OKAY.

10    THE JUROR: FORTY-SEVEN YEARS TODAY.

11    THE COURT: OH, BOY.  OKAY.  THAT'S A REASON

12         TO CELEBRATE.  SHE'S A VERY SUCCESSFUL

13    BUSINESS PERSON, I CAN TELL YOU IF SHE'S ---

14    THE JUROR: I SAID, I'M MARRIED 47 YEARS

15         TODAY.

16    THE COURT: OH, YOU'RE MARRIED.

17    THE JUROR: I'M STILL HERE.  YES.

18    THE COURT: THAT'S EVEN BETTER.  WELL,

19         HOPEFULLY, YOU KNOW, YOU'LL HAVE A

20    CHANCE TO GO OUT --

21    THE JUROR: I'M SURE.

22    THE COURT:  -- AND TAKE YOUR BRIDE TO A

23         NICE DINNER.

24    THE JUROR: I JUST RESCHEDULED.

25    THE COURT: OKAY.  VERY GOOD.  WE APPRECIATE

1           THAT.
2       THE JUROR: NO PROBLEM.
3       THE COURT: ALL RIGHT.  THANK YOU, SIR.
4           NOW, NEXT WE HAVE MS. JOUBERT; IS THAT
5   RIGHT?
6       THE JUROR: YES.
7       THE COURT: AND THAT'S JUROR NUMBER 19.
8           MS. JOUBERT, ARE YOU EMPLOYED?
9       THE JUROR: I'M A STAY-AT-HOME, HOMEMAKER.
10      THE COURT: VERY GOOD.  ONCE AGAIN, A
11          VERY TOUGH JOB.  MARRIED?
12      THE JUROR: YES.
13      THE COURT: YOUR SPOUSE?
14      THE JUROR: JIMMY.
15      THE COURT: AND WHAT DOES HE DO?
16      THE JUROR: A BUSINESS OWNER.
17      THE COURT: WHAT BUSINESS?
18      THE JUROR: HEALTH CARE.
19      THE COURT: HEALTH CARE?  AND WHAT'S THE NAME
20          OF HIS BUSINESS?
21      THE JUROR: HE HAS A NURSING HOME AND HE HAS
22          OWNED PART OF A THERAPY COMPANY.
23      THE COURT: AND WHAT'S THE NAME OF IT?
24      THE JUROR: GOLDEN AGE WELSH, LOCATED IN
25          WELSH, LOUISIANA, AND THEN PREMIER REHAB

1       IN GONZALES.

2       THE COURT: VERY GOOD.  THANK YOU, MA'AM.

3           MS. FARMER, JUROR NUMBER 20, CORRECT?

4       THE JUROR: YES.

5       THE COURT: AND, MS. FARMER, ARE YOU EMPLOYED?

6       THE JUROR: I AM.  I WORK FOR THE SCHOOL

7           IMPROVEMENT DEPARTMENT OF ASCENSION

8       PARISH.

9       THE COURT: HOW LONG HAVE YOU DONE THAT WORK?

10      THE JUROR: THAT PARTICULAR WORK, THIS IS MY

11          FOURTH YEAR.  BUT I TAUGHT IN ASCENSION

12      PARISH FOR SEVEN YEARS.

13      THE COURT: VERY GOOD.  AND ARE YOU MARRIED,

14          MA'AM?

15      THE JUROR: I'M A WIDOW.

16      THE COURT: I'M SORRY TO HEAR IT.  WELL,

17          THANK YOU, MA'AM.

18          AND NEXT WE HAVE JUROR NUMBER 21, MR.

19      LANDRY; IS THAT RIGHT?

20      THE JUROR: THAT'S RIGHT.

21      THE COURT: ALL RIGHT.  MR. LANDRY, WHAT

22          DO YOU DO FOR A LIVING?

23      THE JUROR: I'M A COMMERCIAL DRIVER FOR

24          ASSOCIATED GROCERIES DELIVERING

25      GROCERIES.

1    THE COURT: HOW LONG HAVE YOU DONE THAT KIND

2        OF WORK?

3    THE JUROR: NINETEEN AND A HALF YEARS.

4    THE COURT: OKAY.  ARE YOU MARRIED, SIR?

5    THE JUROR: YES, I AM.

6    THE COURT: AND YOUR ---

7    THE JUROR: CHRISTINE.  SHE'S ASSISTANT

8        BOOKKEEPER FOR OAK PARK MARKET.

9    THE COURT: OKAY.  VERY GOOD.  SO, SHE

10        HAS A BACKGROUND IN FINANCIAL -- AT

11    LEAST -- NOT NECESSARILY FINANCIAL SERVICES,

12    BUT SHE'S -- WHEN YOU SAY -- WHAT IS SHE, A

13    BOOKKEEPER OR ACCOUNTANT OR ---

14    THE JUROR: SHE HANDLES THEIR CHECKING.

15    THE COURT: OKAY.  SO, SHE DOES HAVE SOME

16        RESPONSIBILITIES FOR CHECK CASHING AND

17    THAT SORT OF THING?

18    THE JUROR: NO.  WRITING CHECKS TO PAY THE

19        BILLS.

20    THE COURT: OKAY. JUST -- ALL RIGHT.  VERY

21        GOOD.  SO, SHE'S MORE OF AN INTERNAL.

22    SHE'S NOT -- SHE DOESN'T DEAL WITH THE

23    PUBLIC; IS THAT CORRECT?

24    THE JUROR: ONLY ON THE ROUTINE DAY-TO-DAY

25        CASHIER BASIS.

1      THE COURT: THANK YOU VERY MUCH, MR. LANDRY.

2           NEXT WE HAVE MR. BIRT; IS THAT RIGHT?

3      THE JUROR: YES, SIR.  GOOD MORNING.

4      THE COURT: GOOD MORNING TO YOU.  THAT'S

5           JUROR NUMBER 22, MR. BIRT.  MR. BIRT,

6      HOW ARE YOU EMPLOYED, SIR?

7      THE JUROR: FIVE YEARS AS A RAILROAD

8           SIGNALMAN FOR CN RAILROAD.

9      THE COURT: OKAY.  AND BEFORE THAT?

10     THE JUROR: AT AT&T AS A TELECOMMUNICATIONS.

11     THE COURT: OKAY.  ARE YOU MARRIED, SIR?

12     THE JUROR: MARRIED, DAWN BIRT.  SHE WORKS

13          FOR THE POST OFFICE.

14     THE COURT: AND WHAT DOES SHE DO?

15     THE JUROR: SHE'S A CLERK AND MAIL SORTER.

16     THE COURT: THANK YOU VERY MUCH, SIR.

17          MR. DUPRE, HOW ARE YOU?

18     THE JUROR: GOING GOOD, SIR.  THANK YOU.

19     THE COURT: ARE YOU EMPLOYED?

20     THE JUROR: YES, SIR.

21     THE COURT: AND THAT'S JUROR NUMBER 23.

22          HOW ARE YOU EMPLOYED, SIR?

23     THE JUROR: I'M A METER READER SUPERVISOR

24          FOR ENTERGY.

25     THE COURT: OKAY.  HOW LONG HAVE YOU BEEN

1    EMPLOYED BY ENTERGY?

2    THE JUROR: FOURTEEN YEARS.

3    THE COURT: AND ARE YOU MARRIED?

4    THE JUROR: NO, SIR.

5    THE COURT: THANK YOU, SIR.

6        MS. LYONS, HOW ARE YOU?

7    THE JUROR: FINE.  AND HOW ARE YOU?

8    THE COURT: GOOD.  AND THAT'S JUROR NUMBER 24.

9        MS. LYONS, ARE YOU EMPLOYED?

10   THE JUROR: YES, I AM.

11   THE COURT: WHAT DO YOU DO?

12   THE JUROR: I WORK FOR BLUE CROSS BLUE

13       SHIELD OF LOUISIANA.

14   THE COURT: WHAT DO YOU DO FOR THEM?

15   THE JUROR: I'M A QUALITY MANAGER SUPERVISOR.

16   THE COURT: HOW LONG HAVE YOU DONE THAT KIND

17       OF WORK?

18   THE JUROR: I'VE DONE THAT PARTICULAR KIND

19       OF WORK FOR THE PAST TEN YEARS.

20   THE COURT: ARE YOU MARRIED?

21   THE JUROR: YES, I AM.

22   THE COURT: YOUR SPOUSE'S NAME?

23   THE JUROR: WARREN.

24   THE COURT: AND WHAT DOES HE DO?

25   THE JUROR: HE WORKS AT LSU.

1          THE COURT: WHAT DOES HE DO THERE?

2          THE JUROR: HE'S A RESIDENTIAL LIFE

3               SUPERVISOR.

4          THE COURT: OKAY.  THANK YOU, MA'AM.

5               MR. ZERA -- THAT'S JUROR NUMBER 25.  HOW

6     ARE YOU, SIR?

7          THE JUROR: DOING GOOD.  HOW ABOUT YOURSELF?

8          THE COURT: I'M GOOD.  THANK YOU.  NOW,

9               ARE YOU EMPLOYED, SIR?

10         THE JUROR: I'M CURRENTLY WAITING FOR THE NUCS

11              TO OPEN BACK UP.

12         THE COURT: WAITING FOR WHAT NOW?

13         THE JUROR: THE NUCLEAR PLANT.

14         THE COURT: OKAY.  ALL RIGHT.  NOW, WHAT DID

15              YOU -- YOU WORKED IN THAT INDUSTRY?

16         THE JUROR: YES, SIR. I'M JUST A WELDER.

17         THE COURT:  OKAY.  SPECIFICALLY, WHO DO YOU

18              WORK FOR?

19         THE JUROR: DIFFERENT COMPANIES.  BUT I WORK

20              THROUGH OUR LOCAL UNION HALL HERE IN

21          BATON ROUGE.

22         THE COURT: AND HOW LONG HAVE YOU BEEN DOING

23              THAT KIND OF WORK?

24         THE JUROR: NUCLEAR WORK, JUST FOR A YEAR.

25               AND BEFORE THAT I DID CRYOGENICS FOR TWO

1          YEARS.

2          THE COURT: ALL RIGHT.  ARE YOU MARRIED?

3          THE JUROR: NO, SIR.

4          THE COURT: OKAY.  THANK YOU, SIR.

5          THE JUROR: THANK YOU.

6          THE COURT: MR. DOMINIGUE, HOW ARE YOU?

7          THE JUROR: I'M FINE.

8          THE COURT: THAT'S JUROR NUMBER 26.  NOW,

9              MR. DOMINIGUE, ARE YOU EMPLOYED?

10         THE JUROR: I'M RETIRED.

11         THE COURT: FROM?

12         THE JUROR: I DID ENVIRONMENTAL CLEANUP

13             WORK THROUGHOUT THE COUNTRY.

14         THE COURT: OKAY.  WHAT COMPANY DID YOU

15             WORK FOR?

16         THE JUROR: I QUIT WITH WESTIN.

17         THE COURT: AND HOW LONG DID YOU DO THAT

18             KIND OF WORK?

19         THE JUROR: TWENTY-EIGHT YEARS.

20         THE COURT: ARE YOU MARRIED?

21         THE JUROR: YES.

22         THE COURT: YOUR SPOUSE'S NAME?

23         THE JUROR: DIANE.

24         THE COURT: WHAT DOES SHE DO?

25         THE JUROR: SHE'S RETIRED, TOO. SHE WORKS

1    AT A BOWLING CENTER.

2    THE COURT: OKAY.  HERE IN BATON ROUGE?

3    THE JUROR: IN BATON ROUGE.

4    THE COURT: VERY GOOD.  THANK YOU, SIR.

5        MS. CASAS, JUROR NUMBER 27.  HOW ARE

6    YOU?

7    THE JUROR: VERY GOOD.  THANK YOU.

8    THE COURT: ARE YOU EMPLOYED, MA'AM?

9    THE JUROR: YES, I AM.

10   THE COURT: WHERE?

11   THE JUROR: BLUE CROSS BLUE SHIELD OF

12       LOUISIANA.

13   THE COURT: AND WHAT DO YOU DO THERE?

14   THE JUROR: FOR THIRTY-FIVE YEARS.

15   THE COURT: OKAY.

16   THE JUROR: I'M AN AUDITOR.

17   THE COURT: NOW, DO YOU KNOW MS. LYONS?

18   THE JUROR: YES.  SHE'S MY SUPERVISOR.

19   THE COURT: IS SHE A GOOD SUPERVISOR?  YOU

20       DON'T HAVE TO ANSWER THAT.

21   THE JUROR: VERY GOOD.  VERY GOOD.

22   THE COURT: I THINK YOU NEED A RAISE.

23       THAT'S FINE.  BUT, ANYWAY.  SERIOUSLY,

24   HOW LONG HAVE YOU BEEN AT BLUE CROSS?

25   THE JUROR: THIRTY-FIVE YEARS.

1       THE COURT: OH, BOY. OKAY.  THAT'S GREAT.

2               NOW, ARE YOU MARRIED?

3       THE JUROR: YES, SIR.

4       THE COURT: AND YOUR SPOUSE'S NAME?

5       THE JUROR: ROLAND CASAS.

6       THE COURT: AND WHAT DOES HE DO?

7       THE JUROR: HE'S RETIRED.

8       THE COURT: OKAY. FROM?

9       THE JUROR: FROM BREC.

10      THE COURT: AND WHAT DID HE DO FOR BREC?

11      THE JUROR: HE WAS -- HOW DO YOU -- HE -- NO,

12              NO, NO.  HE WASN'T A SUPERVISOR.  I

13              FORGOT IT.  I'M SORRY.

14      THE COURT: WELL, WAS HE A MANAGER THERE?

15      THE JUROR: EXCUSE ME?

16      THE COURT: WAS HE A MANAGER AT BREC?

17      THE JUROR: YES.  YES.  KIND OF, LIKE, HE WAS

18              TO CHECK EVERY -- OPERATOR.

19      THE COURT: OKAY.  OPERATOR.

20      THE JUROR: YES.

21      THE COURT: BUT HE WASN'T INVOLVED, SAY,

22              IN THE OFFICE DOING FINANCIAL WORK FOR

23      BREC?

24      THE JUROR: NO, NO FINANCIAL.

25      THE COURT: OKAY.

1     THE JUROR: YES, CHECKING WORK.

2     THE COURT: OKAY.  GREAT. THANK YOU, MS.

3           CASAS.

4     THE JUROR: UH HUH.  YOU'RE WELCOME.

5     THE COURT: NEXT, WE HAVE MS. JENKINS; IS

6           THAT CORRECT?  JUROR NUMBER 28.

7     THE JUROR: THAT'S CORRECT.

8     THE COURT: AND, MS. JENKINS, ARE YOU

9           EMPLOYED, MA'AM?

10    THE JUROR: YES, SIR.  I'M SELF-EMPLOYED.

11         I OWN MY OWN BUSINESS, CAROLINE'S

12    GARDEN DESIGN.  IT'S A LANDSCAPE BUSINESS.

13    VERY SMALL.

14    THE COURT: HOW LONG HAVE YOU DONE THAT?

15    THE JUROR: FOR 13 YEARS.

16    THE COURT: AND ARE YOU MARRIED?

17    THE JUROR: I'M NOT MARRIED, BUT I'VE HAD

18         A PARTNER FOR 13 YEARS.  HE AND I

19    STARTED THE BUSINESS TOGETHER.

20    THE COURT: WHAT IS HIS NAME?

21    THE JUROR: HIS NAME IS JOE MOAK.

22    THE COURT: AND HE ALSO WORKS WITH YOU?

23    THE JUROR: WORKS WITH ME.  YES.

24    THE COURT: VERY GOOD.  THANK YOU, MA'AM.

25           MS. TOWNSEND, HOW ARE YOU?  THAT'S

1    JUROR NUMBER 29.

2    THE JUROR: JUST FINE.

3    THE COURT: AND ARE YOU EMPLOYED, MA'AM?

4    THE JUROR: YES, SIR.

5    THE COURT: WHAT DO YOU DO?

6    THE JUROR: I'M AN ADMINISTRATIVE ASSISTANT.

7    THE COURT: WHERE?

8    THE JUROR:  FOR UNIVERSAL PLANT SERVICES.

9    THE COURT: OKAY.  AND WHAT -- THAT'S A

10       CONTRACTOR FOR SOME OF THE PLANTS AROUND

11   HERE?

12   THE JUROR: YES, SIR.

13   THE COURT: ALL RIGHT.  HOW LONG HAVE YOU

14       BEEN EMPLOYED IN THAT CAPACITY?

15   THE JUROR: ABOUT SEVEN YEARS.

16   THE COURT: OKAY.  ARE YOU MARRIED?

17   THE JUROR: I AM MARRIED.

18   THE COURT: YOUR SPOUSE?

19   THE JUROR: YES.  HE WORKS AT SHELL CHEMICAL.

20       HE'S AN OPERATOR.

21   THE COURT: WHAT'S HIS NAME?

22   THE JUROR: BRIAN, BRIAN TOWNSEND.

23   THE COURT: THANK YOU VERY MUCH, MS.

24       TOWNSEND.

25       NEXT WE HAVE JUROR NUMBER 30, MS.

1      OLIVER.  CORRECT?

2      THE JUROR: YES.

3      THE COURT: MS. OLIVER, ARE YOU EMPLOYED?

4      THE JUROR: YES.

5      THE COURT: WHAT DO YOU DO?

6      THE JUROR: I'M A TEACHER.

7      THE COURT: WHERE?

8      THE JUROR: ASCENSION PARISH.

9      THE COURT: WHAT GRADE?

10     THE JUROR: SIXTH GRADE.

11     THE COURT: WELL, GREAT.  THANK YOU SO MUCH

12          FOR YOUR SERVICE TO THE PARISH AND TO

13     THE KIDS.  ARE YOU MARRIED?

14     THE JUROR: YES, I AM.

15     THE COURT: YOUR HUSBAND'S NAME?

16     THE JUROR: LIONEL OLIVER.

17     THE COURT: AND WHAT DOES HE DO?

18     THE JUROR: HE WORKS IN I-T FOR PRO SOURCE

19          ASCENSION PARISH AS WELL.

20     THE COURT: THANK YOU, MA'AM.

21          MR. DUHON, HOW ARE YOU?

22     THE JUROR: THAT'S JUROR NUMBER 31.  MR.

23          DUHON, ARE YOU EMPLOYED?

24     THE JUROR: YES, SIR.  I WORK -- I'M A

25          TECHNICIAN FOR AT&T.

1      THE COURT: HOW LONG HAVE YOU BEEN DOING

2          THAT KIND OF WORK?

3      THE JUROR: FOR THEM, 15 YEARS.  I WORKED

4          FOR THE CABLE COMPANY BEFORE THAT,

5      THOUGH.

6      THE COURT: OKAY.  ARE YOU MARRIED?

7      THE JUROR: YES, SIR.

8      THE COURT: YOUR SPOUSE?

9      THE JUROR: HOLLY DUHON.

10     THE COURT: WHAT DOES SHE DO?

11     THE JUROR: SHE'S SELF-EMPLOYED.  SHE OWNS

12         A NAIL SALON.

13     THE COURT: OKAY.  THANK YOU, SIR.

14         NEXT WE HAVE JUROR NUMBER 32, MR.

15     RAMAGOST; IS THAT CORRECT?

16     THE JUROR: RAMAGOST.

17     THE COURT: RAMAGOST.  OKAY.  MR. RAMAGOST,

18         ARE YOU EMPLOYED?

19     THE JUROR: YES, SIR.

20     THE COURT: WHAT DO YOU DO?

21     THE JUROR: I'M A TURBINE MECHANIC.

22     THE COURT: A WHAT NOW, A TURBINE MECHANIC?

23     THE JUROR: A TURBINE MECHANIC AT A SUGAR

24         MILL, CORA TEXAS SUGAR MILL.

25     THE COURT: ALL RIGHT.  AND WHERE IS THAT

1          LOCATED?

2          THE JUROR: WHITE CASTLE.

3          THE COURT: AND HOW LONG HAVE YOU BEEN

4              THERE?

5          THE JUROR: NINETEEN YEARS.

6          THE COURT: ARE YOU MARRIED?

7          THE JUROR: YES, SIR.

8          THE COURT: YOUR WIFE'S NAME?

9          THE JUROR: BETSY RAMAGOST.

10         THE COURT: AND WHAT DOES SHE DO?

11         THE JUROR: SHE IS A MANAGER OF DAIGLE

12             SUPERMARKET IN WHITE CASTLE.

13         THE COURT: OKAY.  IS SHE INVOLVED, DO

14             YOU KNOW, IN ANY CHECK CASHING --

15         ENTRUSTED WITH ANY CHECK CASHING

16         RESPONSIBILITIES?

17         THE JUROR: NO, SIR.

18         THE COURT: THANK YOU, SIR.

19         THE JUROR: YOU'RE WELCOME.

20         THE COURT: ALL RIGHT.  AND NEXT WE HAVE

21             MR. GUILLORY, CORRECT?  THAT'S JUROR

22         NUMBER 33.  MR. GUILLORY?

23         THE JUROR: YES, SIR.

24         THE COURT: HOW ARE YOU, SIR?

25         THE JUROR: GOOD.  HOW ARE YOU DOING?

1          THE COURT: ARE YOU EMPLOYED?

2          THE JUROR: YES, SIR.

3          THE COURT: WHAT DO YOU DO?

4          THE JUROR: OPERATOR FOR GRAND PACKAGING.

5          THE COURT: AND WHAT DO YOU -- AND YOU SAY

6               YOU'RE AN OPERATOR THERE?

7          THE JUROR: CORRECT.

8          THE COURT: AND HOW LONG HAVE YOU BEEN THERE?

9          THE JUROR: ABOUT FOUR YEARS.

10         THE COURT: ARE YOU MARRIED?

11         THE JUROR: YES, SIR.

12         THE COURT: YOUR SPOUSE?

13         THE JUROR: SONYA.

14         THE COURT: WHAT DOES SHE DO?

15         THE JUROR: SHE'S A NURSE AT A HOME HEALTH

16              CARE COMPANY OUT OF CENTRAL, HEALTH CARE

17         OPTIONS.

18         THE COURT: OKAY.  THANK YOU, MR. GUILLORY.

19              NEXT WE HAVE MR. DARDINGER; IS THAT

20         CORRECT?

21         THE JUROR: THAT'S CORRECT.

22         THE COURT: JUROR NUMBER 34.  HOW ARE YOU

23              EMPLOYED, SIR?

24         THE JUROR: I'M A GENERAL MANAGER FOR

25              COMPASS GROUP, USA.

1    THE COURT: AND WHAT KIND OF BUSINESS IS
2         THAT?
3    THE JUROR: FOOD SERVICE, CONTRACTED FOOD
4         SERVICE.
5    THE COURT: OKAY.  HOW LONG HAVE YOU DONE
6         THAT KIND OF WORK?
7    THE JUROR: FOURTEEN YEARS.
8    THE COURT: ARE YOU MARRIED?
9    THE JUROR: I'M MARRIED.
10   THE COURT: YOUR SPOUSE'S NAME?
11   THE JUROR: DEBRA.
12   THE COURT: AND WHAT DOES SHE DO?
13   THE JUROR: SHE'S A STAY-AT-HOME WIFE.
14   THE COURT: THANK YOU VERY MUCH, SIR.
15        NEXT WE HAVE JUROR NUMBER 35, MS. WALES,
16   CORRECT?
17   THE JUROR: YES, SIR.
18   THE COURT: MS. WALES, HOW ARE YOU EMPLOYED?
19   THE JUROR: I WORK AT RAISING CANE'S.
20   THE COURT: AND WHAT DO YOU DO THERE?
21   THE JUROR:  I'M A CREW MEMBER CASHIER.
22   THE COURT: ALL RIGHT.  NOW, YOU UNDERSTAND
23        IF YOU'RE SELECTED TO SERVE AS A JUROR
24   WE EXPECT SOME CHICKEN FINGERS.  YOU KNOW
25        THAT, RIGHT?

1          THE JUROR: YES, SIR, I KNOW.

2          THE COURT: ALL RIGHT.  AND THAT TEA, AS WELL.

3               BUT, ANYWAY.  HOW LONG HAVE YOU DONE

4     THAT KIND OF WORK?

5          THE JUROR: ALMOST FOUR YEARS.

6          THE COURT: AND YOU ARE MARRIED?

7          THE JUROR: NO, SIR.  SINGLE.

8          THE COURT: OKAY.  THANK YOU, MA'AM.

9               MR. -- AND LET ME -- HOW DO YOU

10    PRONOUNCE YOUR NAME?

11         THE JUROR: DAIGRE.

12         THE COURT: DAIGRE.  ALL RIGHT.  MS. DAIGRE,

13              ARE YOU -- THAT'S JUROR NUMBER 36.  ARE

14    YOU EMPLOYED?

15         THE JUROR: I'M A HOMEMAKER.

16         THE COURT: AGAIN, VERY TOUGH JOB.  ARE YOU

17              MARRIED, MA'AM?

18         THE JUROR: YES, I AM.

19         THE COURT: HUSBAND'S NAME?

20         THE JUROR: MY HUSBAND IS MIKE.  AND HE'S

21              SELF-EMPLOYED.

22         THE COURT: WHAT DOES HE DO; WHAT'S HIS

23              BUSINESS?

24         THE JUROR: HE IS A -- HE HAS BOTTOM LINE

25              MAINTENANCE.  HE DOES RENTAL REMODELING.

1          THE COURT: SO, HE'S NOT IN THE FINANCIAL

2                  SERVICES BUSINESS?

3          THE JUROR: NO, SIR.

4          THE COURT: OKAY.  THANK YOU, MS. DAIGRE.

5                  NEXT, WE HAVE JUROR NUMBER 37, MS.

6          CRONAN.  HOW ARE YOU, MA'AM?

7          THE JUROR: FINE.

8          THE COURT: ARE YOU EMPLOYED?

9          THE JUROR: YES, I AM.

10         THE COURT: WHAT DO YOU DO?

11         THE JUROR: I DO HOME HEALTH.  I WORK FOR

12                 STAT HOME HEALTH AS A PHYSICAL

13         THERAPIST.

14         THE COURT: OKAY.  HOW LONG HAVE YOU DONE

15                 THAT KIND OF WORK?

16         THE JUROR: HOME HEALTH, FOR ABOUT SIX YEARS.

17                 BEFORE THAT, OUTPATIENT FOR ABOUT TEN

18         YEARS.

19         THE COURT: ARE YOU MARRIED?

20         THE JUROR: YES.

21         THE COURT: AND YOUR SPOUSE'S NAME?

22         THE JUROR: ROBERT CRONAN.

23         THE COURT: AND WHAT DOES HE DO?

24         THE JUROR: HE WORKS FOR DOW CHEMICAL.

25         THE COURT: OKAY.  THANK YOU, MA'AM.

1          AND, FINALLY, WE HAVE JUROR NUMBER 38,

2     MS. BUCKELS.  HOW ARE YOU, MA'AM?

3     THE JUROR: FINE.

4     THE COURT: ARE YOU EMPLOYED?

5     THE JUROR: YES, SIR.

6     THE COURT: WHAT DO YOU DO?

7     THE JUROR: I'M AN ATF COMPLIANCE

8          ADMINISTRATOR.

9     THE COURT: OKAY.

10     THE JUROR: AT CABELA'S.

11     THE COURT: FOR WHAT?

12     THE JUROR: AT CABELA'S.

13     THE COURT: OH, CABELA'S SPORTING GOODS?

14     THE JUROR: YES, SIR.

15     THE COURT: SO, WHAT KIND OF COMPLIANCE

16          COORDINATOR?

17     THE JUROR: ATF.

18     THE COURT: OKAY.  SO, YOU'RE THE PERSON

19          THAT HELPS CHECK TO MAKE SURE THAT

20     EVERYBODY CAN LAWFULLY OWN A FIREARM?

21     THE JUROR: ABSOLUTELY.

22     THE COURT: HOW LONG HAVE YOU BEEN DOING

23          THAT SORT OF WORK?

24     THE JUROR: SIX MONTHS.

25     THE COURT: AND WHAT DID YOU DO BEFORE THAT?

1      THE JUROR: I WORKED FOR A CPA COMPANY.

2      THE COURT: AND WHAT'S THE NAME OF THE CPA?

3      THE JUROR: POSTLETHWAITE AND NETTERVILLE.

4      THE COURT: ALL RIGHT.  THAT'S A PRETTY LARGE

5           CPA FIRM.

6      THE JUROR: SEVENTEEN YEARS.

7      THE COURT: ARE YOU AN ACCOUNTANT, MA'AM, OR

8           DO YOU HAVE AN ACCOUNTING BACKGROUND?

9      THE JUROR: NO.

10     THE COURT: ARE YOU MARRIED?

11     THE JUROR: YES.

12     THE COURT: YOUR HUSBAND'S NAME?

13     THE JUROR: KEVIN BUCKELS.

14     THE COURT: AND WHAT DOES HE DO?

15     THE JUROR: HE IS A RESPIRATORY THERAPIST

16          AND ASTHMA EDUCATOR FOR THE SAINT

17     ELIZABETH HOSPITALS.

18     THE COURT: VERY GOOD.  WELL, THANK YOU,

19          MS. BUCKELS.

20     THE JUROR: THANK YOU.

21     THE COURT: THANKS TO ALL OF YOU, LADIES

22          AND GENTLEMEN FOR PROVIDING THAT

23     INFORMATION.

24          NOW, NEXT I HAVE A SERIES OF QUESTIONS

25     TO ASK.  THESE MAY OR MAY NOT PERTAIN TO ALL

1    OF YOU.  BUT ALTHOUGH I AM ADDRESSING ALL OF

2    YOU, YOU SHOULD CONSIDER THAT I'M REALLY

3    ADDRESSING YOU INDIVIDUALLY.  IN OTHER WORDS,

4    IF YOUR ANSWER TO ANY ONE OF THESE QUESTIONS

5    IS YES, PLEASE RAISE YOUR HAND AND THE

6    MICROPHONE WILL BE PROVIDED TO YOU.

7        NOW, YOU WILL RECALL, AND YOU WERE SENT A

8    QUESTIONNAIRE.

9        WE'LL BE TAKING A BREAK IN JUST A FEW

10   MINUTES, LADIES AND GENTLEMEN.

11       I'LL JUST ASK YOU AT THIS TIME, HAS

12   ANYONE'S EMPLOYMENT CHANGED SINCE YOU FILLED

13   OUT THE JURY QUESTIONNAIRE THAT WAS INITIALLY

14   PROVIDED TO YOU?

15       IF YOUR EMPLOYMENT HAS CHANGED, PLEASE

16   RAISE YOUR HAND.  AND LET THE RECORD REFLECT

17   THAT NO HANDS ARE BEING RAISED AT THIS TIME.

18   BY DEPUTY CLERK: ONE, JUDGE.

19   BY THE COURT: OH, YES, SIR.  THAT'S MR. --

20       THAT'S JUROR NUMBER 25, MR. ZERA; IS

21   THAT RIGHT?

22   THE JUROR: NO.  ZERA.  ZERA.

23   THE COURT: ZERA.  NOW, YOU SAID YOUR

24       EMPLOYMENT HAS CHANGED.  YOU TOLD US

25   EARLIER THAT YOU'RE NOT EMPLOYED AT THIS

1    TIME, CORRECT?

2    THE JUROR: THAT IS CORRECT.

3    THE COURT: NOW, MR. ZERA, I BELIEVE YOU

4         INDICATED THAT YOU ESSENTIALLY HAVE

5    SEASONAL EMPLOYMENT; IS THAT RIGHT?

6    THE JUROR: YES, SIR.  IN THE FALL AND

7         SPRING.

8    THE COURT: BUT YOU INTEND TO -- YOU BELIEVE

9         THAT YOU WILL BE WORKING SOON?

10   THE JUROR: YES, SIR.

11   THE COURT: OKAY.  WELL, THANK YOU, SIR.

12        I WOULD ASK THAT YOU ALL LOOK AROUND THE

13   COURTROOM RIGHT NOW AND TELL ME IF YOU

14   RECOGNIZE ANY OTHER JURORS WHO ARE WITH US

15   TODAY.  AND MS. LYONS AND MS. CASAS, WE'VE

16   ALREADY ESTABLISHED THAT YOU ALL KNOW EACH

17   OTHER, THAT YOU WORK WITH EACH OTHER.

18        BUT OTHER THAN MS. LYONS AND MS. CASAS,

19   DOES ANYONE ELSE KNOW ANYONE HERE?  ANYONE IN

20   THE FIRST ROW?  ANYONE IN THE SECOND ROW?

21   THAT'S MR. -- JUROR NUMBER 11, MR. BARBER; IS

22   THAT CORRECT?

23   THE JUROR: YES, SIR.

24   THE COURT: WHO DO YOU RECOGNIZE?

25   THE JUROR: BEVERLY BUCKELS AND I WORKED

1        TOGETHER AT POSTLETHWAITE AND

2    NETTERVILLE.

3    THE COURT: OKAY.

4    THE JUROR: IT WAS PROBABLY 13, 14 YEARS

5        AGO.

6    THE COURT: HAVE YOU SEEN HER SINCE THAT

7        TIME?

8    THE JUROR: NO.  BUT IT WAS GOOD TO SEE HER.

9    THE COURT: OKAY.  THANK YOU, MR. BARBER.

10       AND, CAPTAIN, IF YOU WOULD JUST PROVIDE

11   THE MICROPHONE TO MS. BUCKELS SO I CAN VERIFY

12   THAT.

13   THE JUROR: YES, SIR.

14   THE COURT: SO, YOU WORKED WITH MR. BARBER?

15   THE JUROR: YES, SIR.

16   THE COURT: AND HAVE YOU SEEN HIM SINCE THAT

17       TIME?

18   THE JUROR: NO, SIR.

19   THE COURT: THANK YOU VERY MUCH.

20   THE JUROR: GOOD SEEING YOU, DAVID.

21   THE COURT: ANYONE ELSE ON THE BACK ROW?

22       YES.  THAT'S MR. MCCULLOCH?

23   THE JUROR: I BELIEVE MS. CRONAN'S KIDS GO

24       TO MY SCHOOL.

25   THE COURT: OKAY.  LET'S SEE NOW.  MS.

1          CRONAN?  LET ME ASK YOU, MS. CRONAN, DO

2     YOUR CHILDREN ATTEND THE SCHOOL WHERE MR.

3     MCCULLOCH IS THE PRINCIPAL?

4     THE JUROR: YES, THEY DO.

5     THE COURT: OKAY.  SO, YOU HAVE, I GUESS,

6          SOME REGULAR CONTACT THEN WITH MR.

7     MCCULLOCH, CORRECT?

8     THE JUROR: FROM TIME TO TIME.

9     THE COURT: OKAY.  VERY GOOD.  THANK YOU.

10         ANYONE ELSE?  ANYONE ALONG THE RAIL?

11    YES, MA'AM. NOW, THAT'S MS. FARMER; IS THAT

12    CORRECT?

13    THE JUROR: YES.  WE WORK FOR THE SAME

14         SCHOOL DISTRICT.  WE HAVE -- WE DON'T

15    WORK AT THE SAME SCHOOL.  SO, WE JUST SEE

16    EACH OTHER MEETINGS.

17    THE COURT: NOW, THAT'S YOU AND JUROR

18         NUMBER 30, MS. OLIVER; IS THAT RIGHT?

19    THE JUROR: YES.

20    THE COURT: OKAY.  NOW, BUT YOU WORK AT THE

21         SAME ---

22    THE JUROR: SCHOOL DISTRICT, BUT NOT AT THE

23         SAME SCHOOL.

24    THE COURT: OKAY.  HOW LONG HAVE YOU KNOWN

25         MS. OLIVER?

1    THE JUROR: I ONLY CAME TO KNOW HER ABOUT

2    IN THE PAST FULL YEAR.  IN MY JOB I

3    REVIEW VIDEOS AND DIFFERENT LESSONS THE

4    TEACHERS SEND.  I'VE SEEN HER TEACH.

5    THE COURT: OKAY.  VERY WELL.

6    MS. OLIVER, CAN YOU VERIFY THAT?

7    THE JUROR: YES.

8    THE COURT: OKAY.  THANK YOU, MA'AM.

9    CAPTAIN, LET ME SEE YOU FOR A MINUTE.

10    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

11    AN OFF-THE-RECORD DISCUSSION WAS HELD.)

12    THE COURT: WE'RE GOING TO TAKE A VERY QUICK

13    BREAK HERE.  WE'RE NOT GOING TO LEAVE

14    THE COURTROOM.  BUT IF YOU WANT TO GET UP AND

15    STRETCH, YOU'RE WELCOME TO DO SO.  WE'RE OFF

16    THE RECORD AT THIS TIME.

17    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

18    AN OFF-THE-RECORD DISCUSSION WAS HELD.)

19    THE COURT: NOW, LET ME ASK YOU, LADIES AND

20    GENTLEMEN, IF ANY OF YOU HERE ARE -- WHO

21    ARE EMPLOYED, AND IF YOU SUPERVISE OR TRAIN

22    ANY OTHER PERSONS OR IF IT IS A PART OF YOUR

23    DUTIES TO ENFORCE WORKPLACE RULES SUCH THAT

24    THEY ARE, PLEASE RAISE YOUR HANDS.

25    ALL RIGHT.  LET'S BEGIN WITH THE FIRST

1          ROW.  NOW, THAT'S JUROR NUMBER SIX, MS.

2          LINDBERG; IS THAT CORRECT?

3          THE JUROR: YES.

4          THE COURT: AND DO YOU TRAIN, SUPERVISE OR

5               WHAT IS ---

6          THE JUROR: I DO.  I HAVE A STUDENT TEACHER

7               REGULARLY IN MY CLASSROOM.

8          THE COURT: OKAY.  VERY GOOD.  AND THAT

9               STUDENT TEACHER IS WITH YOU EVERY --

10     A NEW STUDENT TEACHER EVERY SEMESTER OR --

11         THE JUROR: IT DEPENDS.  THIS YEAR I HAVE A

12              HOME STUDENT FROM LSU, SO, SHE'S A FULL-

13     YEAR STUDENT TEACHER.

14         THE COURT: VERY GOOD.  THANK YOU.

15              ANYONE ELSE?  DR. RICHARD?

16     THE JUROR: WE REGULARLY WILL HELP TRAIN

17               INCOMING RESIDENTS AND MEDICAL STUDENTS

18     AND NEW NURSES.

19         THE COURT: THANK YOU, MA'AM.

20              ANYONE ELSE ON THE FIRST ROW?  ANYONE

21     ON THE SECOND ROW?

22              NOW, THAT'S JUROR NUMBER NINE, MS.

23     BOSWELL, CORRECT?

24         THE JUROR: I JUST TRAIN NEW CLOSERS THAT

25              COME IN TO TEACH THEM, YOU KNOW, ALL OF

1     OUR PROCEDURES AND HOW WE DO THINGS.

2     THE COURT: OKAY.  VERY GOOD.  NEXT?

3     THE JUROR: YES.  I SUPERVISE ---

4     THE COURT: NOW, WAIT.  THAT'S -- JUST SO

5          THAT THE RECORD IS CLEAR, THAT'S MR.

6     BARBER.  AND, LADIES AND GENTLEMEN, WHEN YOU

7     RECEIVE THE MICROPHONE IF YOU WOULD, AND

8     FORGIVE MR. BARBER AND THE OTHERS I HAVEN'T

9     TOLD YOU THIS.  BUT IF YOU WOULD PLEASE

10    IDENTIFY YOURSELF BEFORE YOU SPEAK.  OKAY?

11    THE JUROR: YES.  DAVID BARBER.  SO, I

12         SUPERVISE AN ACCOUNTING STAFF AND I-T

13    STAFF.

14    THE COURT: OKAY.  THANK YOU, MR. BARBER.

15         NEXT?

16    THE JUROR: JUSTIN MINOR.

17    THE COURT: OKAY.  AND, MR. MINOR?

18    THE JUROR: I SUPERVISE ABOUT ABOUT NINE

19         MENTORS AND WE HAVE TRAINING FOR THE

20    SALESMEN THAT COME INTO THE CARMAX.  AND,

21    ALSO, OTHER MANAGERS IN FRAUDULENT ACTIVITY.

22    THE COURT: NOW, WHEN YOU SAY "FRAUDULENT

23         ACTIVITY," WHAT EXACTLY DO YOU MEAN BY

24    THAT?

25    THE JUROR: TO PROTECT THE ASSET OF THE

1            BUSINESS, AS FAR AS FRAUDULENT

2        CHECK STUBS, DRIVERS LICENSES, TITLES, THINGS

3        OF THAT NATURE.

4        THE COURT: MR. MINOR, ARE YOU PROVIDED ANY

5            TRAINING ON MONEY LAUNDERING, WHAT THAT

6        IS AND HOW TO PREVENT IT, ON YOUR JOB?

7        THE JUROR: YES, SIR.  WE GO THROUGH ANNUAL

8            TRAINING.

9        THE COURT: OKAY.  AND, AGAIN, THAT TRAINING

10            DOES INCLUDE ANTI-MONEY LAUNDERING

11        TRAINING?

12        THE JUROR: YES, SIR.

13        THE COURT: VERY GOOD.  THANK YOU, SIR.

14            MR. MCCULLOCH?

15        THE JUROR: I TRAIN AND SUPERVISE ALL OF

16            MY TEACHERS.

17        THE COURT: OKAY.  VERY GOOD.  THANK YOU.

18            ANYONE ALONG THE RAIL?  MR. FREEMAN?

19        THE JUROR: MY NAME IS LARRY FREEMAN.

20            LIKE I SAID, I WORK AT ANGOLA.  I'M A

21        TRIP OFFICER.  I HELP TRASPORT OR TEACH THE

22        NEW OFFICERS HOW TO TRANSPORT INMATES.

23        THE COURT: THANK YOU, SIR.  ANYONE ELSE?

24        THE JUROR: THANK YOU.  SHELLEY FARMER.

25            JUROR 20.  I SUPERVISE 15 TEACHERS ON MY

1    CAMPUS, AND I PLAN THE PROFESSIONAL

2    DEVELOPMENT AT THE SCHOOL.

3    THE COURT: THANK YOU, MA'AM.

4    THE JUROR: SENIOR RAILROAD SIGNALMAN.

5         I'M WAYNE BIRT.  I'M THE UNIONIZED

6    ASSISTANT TO MANAGEMENT RESPONSIBLE FOR

7    TRAINING NEW EMPLOYEES, OVERSEEING SAFETY AND

8    QUALITY APPLICATION OF PROCEDURES.

9    THE COURT: THANK YOU, SIR.  ANYONE ELSE?

10   THE JUROR: WILLIAM DUPRE.  I HAVE TRAINED

11        AND I DO SUPERVISE READERS OUT IN THE

12   FIELD.

13   THE COURT: OKAY.  THANK YOU, MR. DUPRE.

14        MS. LYONS?

15   THE JUROR: GWEN LYONS.  I TRAIN AND SUPERVISE

16        DIRECTLY, TEN EMPLOYEES AND 20 IN THE

17   UNIT FOR QUALITY AND BENEFITS PENDING OF BLUE

18   CROSS BENEFITS.

19   THE COURT: THANK YOU, MS. LYONS.

20   THE JUROR: ANDREW ZERA.  I TEACH NEW

21        WELDERS, NEW INCOMING WELDERS, AT

22   NIGHT PART TIME.

23   THE COURT: OKAY.  VERY GOOD. THANK YOU, SIR.

24        ANYONE ELSE?  ANYONE ON THE SECOND

25   ROW?  MS. JENKINS?

1      THE JUROR: I JUST TRAIN AND SUPERVISE

2           EMPLOYEES.

3      THE COURT: HOW MANY EMPLOYEES, MA'AM?

4      THE JUROR: WE'RE VERY SMALL.  RIGHT NOW

5           WE HAVE TWO SUBCONTRACTORS AND TWO

6      EMPLOYEES.  AND WE'RE ALWAYS LOOKING FOR

7      MORE.

8      THE COURT: THANK YOU, MA'AM.  ANYONE ELSE?

9      THE JUROR:  ALLISON OLIVER.  I MENTOR,

10          SUPPORT AND HELP TRAIN NEW TEACHERS ON

11     THE SCHOOL PROCEDURES AND PROTOCOL.

12     THE COURT: OKAY.  DO YOU HAVE ANY STUDENT

13          TEACHERS, AS WELL, MS. OLIVER?

14     THE JUROR: NO.  I'M ACTUALLY A TECHNICAL

15          TEACHER, SO I HAVE ABOUT FIVE OR SIX

16     TEACHERS THAT I SUPPORT AND SERVE.

17     THE COURT: OKAY.  VERY GOOD.  THANK YOU,

18          MA'AM.

19          ANYONE ELSE?

20     THE JUROR: JOHN DARDINGER.  I OVERSEE

21          ALL THE COMPANY POLICIES AND PROCEDURES

22     AND THE TRAINING FOR OUR SITE EMPLOYEES.

23     THE COURT: ALL RIGHT.  THANK YOU, SIR.

24          ANYONE ELSE?  ALL RIGHT.  WELL, THANK

25     YOU ALL SO MUCH.

1          NOW, IF ANYONE ELSE HAS PREVIOUSLY

2     SERVED IN THE MILITARY, PLEASE RAISE YOUR

3     HAND AND I WILL HAVE ADDITIONAL INFORMATION

4     FOR YOU.

5          ANYONE ON THE FIRST ROW OF THE JURY BOX?

6     MR. DICKERSON, CORRECT?

7     THE JUROR: YES, SIR.

8     THE COURT: AND WHAT BRANCH OF THE MILITARY?

9     THE JUROR: U.S. ARMY.

10    THE COURT: AND HOW LONG WERE YOU IN THE U.S.

11         ARMY?

12    THE JUROR: '92 TO '97 I WAS IN THE REGULAR

13         ARMY, THEN I JOINED THE GUARD AND THE

14    RESERVES AFTER THAT.

15    THE COURT: ALL RIGHT.  NOW, MR. DICKERSON,

16         WHAT WAS YOUR RANK AT THE TIME OF YOUR

17    SEPARATION?

18    THE JUROR: WHEN I SEPARATED FROM THE GUARD,

19         I BELIEVE I WAS AN E-7, STAFF SERGEANT.

20    THE COURT: OKAY.  AND WHAT WAS YOUR MOS,

21         YOUR OCCUPATION?

22    THE JUROR: I WAS A RESPIRATORY THERAPIST

23         WHEN I WAS IN THE REGULAR ARMY.  AND

24    THEN I THINK THEY HAD ME DOING LIKE A SUPPLY

25    SERGEANT JOB WHEN I WAS LOCATED OUT OF RYAN

1       AIRPORT.

2           THE COURT: NOW, WERE YOU AT ANY TIME

3               INVOLVED IN MILITARY POLICE ACTIVITIES?

4           THE JUROR: NO.  NO, SIR.

5           THE COURT: THANK YOU.  I APPRECIATE VERY

6               MUCH YOUR SERVICE, MR. DICKERSON.  THANK

7       YOU.

8           THE JUROR: THANK YOU.

9           THE COURT: ANYONE ELSE ON THE FIRST ROW?

10              ANYONE ON THE SECOND ROW?  ANYONE ALONG

11      THE RAIL?

12              MR. LANDRY, CORRECT?

13          THE JUROR: YES, SIR.

14          THE COURT:  THAT'S JUROR NUMBER 21.  AND

15              WHAT BRANCH OF THE MILITARY WERE YOU

16      IN, MR. LANDRY?

17          THE JUROR: UNITED STATES AIR FORCE.

18          THE COURT: AND WHAT YEARS?

19          THE JUROR: 1970 TO 1991, FOR -- I RETIRED

20              AT 21 YEARS FOUR MONTHS.

21          THE COURT: WELL, THANK YOU SO MUCH FOR

22              YOUR SERVICE.  THAT'S A LONG TIME.

23      WHAT WAS YOUR RANK AT THE TIME OF YOUR

24      SEPARATION?

25          THE JUROR: MASTER SERGEANT, E-7.

1     THE COURT: AND YOUR MOS?

2     THE JUROR: SUPPLY, LOGISTICS.

3     THE COURT: AND WERE YOU INVOLVED IN

4          MILITARY POLICE ACTIVITIES IN ANY WAY,

5     SIR?

6     THE JUROR: NO, SIR.

7     THE COURT: THANK YOU SO MUCH, SERGEANT.

8          I APPRECIATE IT, MASTER SERGEANT.

9          AND NEXT WE HAVE MR. BIRT; IS THAT

10    CORRECT?

11    THE JUROR: YES, SIR.  WAYNE BIRT.

12         U.S. ARMY, I WAS A CORPORAL, 1984 TO

13    '88, FOUR YEARS.

14    THE COURT: OKAY.

15    THE JUROR: 16 SIERRA PA PA. I WAS IN AIRBORNE

16         AIR DEFENSE.

17    THE COURT: OKAY.  THANK YOU AGAIN FOR YOUR

18         SERVICE, AS WELL.

19    THE JUROR: THANK YOU.

20    THE COURT: NOW, I HAVE TO ASK.  WERE YOU

21         INVOLVED IN MILITARY POLICING?

22    THE JUROR: NO.  NO MILITARY POLICE.

23    THE COURT: THANK YOU, SIR.

24         ANYONE ELSE?  ANYONE ON THE FIRST

25    ROW ALONG THE RAIL, ANYONE ON THE SECOND ROW?

1          ALL RIGHT.  WELL, GENTLEMEN, AGAIN, LET

2     ME THANK ALL OF YOU.  AND I SPEAK FOR

3     EVERYONE ASSEMBLED HERE IN THANKING ALL OF

4     YOU FOR YOUR SERVICE.

5          NOW, THE DEFENDANT IN THIS CASE, AS

6     I MENTIONED PREVIOUSLY, IS MR. CARLOS L.

7     LINARES.  MR. LINARES, PLEASE STAND AT THIS

8     TIME. (DEFENDANT COMPLIES.)

9     THE COURT: NOW, MR. LINARES YOU MAY BE

10         SEATED. (DEFENDANT COMPLIES.)

11    THE COURT: IS ANYONE HERE RELATED TO

12         MR. LINARES, EITHER BY BLOOD OR

13    MARRIAGE?  OR IF YOU ARE PERSONALLY

14    ACQUAINTED WITH MR. LINARES IN ANY WAY,

15    PLEASE RAISE YOUR HAND.

16         LET THE RECORD REFLECT THAT NO HANDS ARE

17    BEING RAISED AT THIS TIME.

18         IN JUST AN ABUNDANCE OF CAUTION ASK,

19    DOES ANYONE HAVE ANY CONNECTION OR IF YOU

20    KNOW IF ANY OF YOUR FAMILY MEMBERS OR CLOSE

21    PERSONAL FRIENDS HAVE ANY CONNECTION TO MR.

22    LINARES?  IF SO, PLEASE RAISE YOUR HAND.

23         AND LET THE RECORD REFLECT THAT NO HANDS

24    ARE BEING RAISED AT THIS TIME.

25         NOW, MR. LINARES IS REPRESENTED BY MR.

1          JARRED P. AMBEAU.  MR. AMBEAU IS NOW

2      STANDING.  IS ANYONE FAMILIAR OR RELATED TO

3      BY BLOOD OR MARRIAGE TO MR. AMBEAU?  PLEASE

4      RAISE YOUR HAND.

5          THANK YOU, MR. AMBEAU.

6          NOW, MR. AMBEAU HAS HIS OWN LAW FIRM.

7      AND IF ANY OF YOU OR IF YOU KNOW IF ANY OF

8      YOUR CLOSE FRIENDS OR FAMILY MEMBERS HAVE

9      BEEN REPRESENTED BY MR. AMBEAU IN ANY

10     CAPACITY, IN ANY TYPE OF CASE, PLEASE RAISE

11     YOUR HAND.

12         AND LET THE RECORD REFLECT THAT NO HANDS

13     ARE BEING RAISED AT THIS TIME.

14         NOW, THE UNITED STATES IS REPRESENTED BY

15     MR. ALAN STEVENS AND MR. RYAN CROSSWELL.

16     THANK YOU, GENTLEMEN.

17         IN ADDITION TO THAT, THE CASE AGENT IS

18     MS. MONIQUE SCHMIDT.  MS. SCHMIDT.  THANK

19     YOU.

20         IF ANYONE HERE IS RELATED TO MR.

21     CROSSWELL, MR. STEVENS OR MS. SCHMIDT BY

22     BLOOD OR MARRIAGE OR IS FAMILIAR WITH THEM IN

23     ANY WAY, PLEASE RAISE YOUR HAND.

24         LET THE RECORD REFLECT THAT NO HANDS ARE

25     BEING RAISED AT THIS TIME.

1    I WILL TELL YOU THAT MS. SCHMIDT IS AN

2    AGENT OF THE IRS.  IS THAT CORRECT, AGENT?

3    MS. SCHMIDT: CRIMINAL INVESTIGATIONS

4       DIVISION.

5    THE COURT: CRIMINAL INVESTIGATIONS DIVISION,

6       IRS CID, AS IT IS MORE COMMONLY CALLED.

7    SO, AGAIN, IS ANYONE HERE FAMILIAR WITH --

8    AND, ALSO, I WILL ALSO TELL YOU THAT MR. WALT

9    GREEN, JAMES WALTER GREEN, IS THE UNITED

10   STATES ATTORNEY HERE FOR THE MIDDLE DISTRICT

11   -- WHAT WE CALL THE MIDDLE DISTRICT OF

12   LOUISIANA.

13   IS ANYONE HERE FAMILIAR WITH OR IS

14   ANYONE RELATED TO MR. GREEN BY BLOOD OR

15   MARRIAGE?  IF SO, PLEASE RAISE YOUR HAND.

16   AND LET THE RECORD REFLECT THAT NO HANDS ARE

17   BEING RAISED AT THIS TIME.

18   AT THIS TIME I WILL READ THE NAMES OF

19   THE PERSONS WHO WE ANTICIPATE MAY BE CALLED

20   TO TESTIFY AS WITNESSES AT THIS TRIAL.  I

21   WOULD ASK YOU ONCE AGAIN TO LISTEN VERY

22   CAREFULLY.  IF YOU RECOGNIZE ANY OF THESE

23   NAMES OR KNOW ANY OF THESE PEOPLE, PLEASE

24   RAISE YOUR HAND AND I WILL HAVE ADDITIONAL

25   QUESTIONS FOR YOU.

1          DANA ARMWOOD, HECTOR BLANCO, MARK

2    BRZYZEK.

3          IS THAT CORRECT, MR.STEVENS?

4    MR. STEVENS: YES.

5    THE COURT: BRZYZEK, MARK BRZYZEK,

6          B-R-Z-Y-Z-E-K.

7          JOSEPH CHBEIR, C-H-B-E-I-R,

8    C-H-B-E-I-R, VICKY CRAIG, SYLVIA DE LA ROSA.

9          DR. RICHARD, ARE YOU FAMILIAR WITH

10   MS. VICKY CRAIG?

11   THE JUROR: I WENT TO SCHOOL WITH A VICKY

12          CRAIG'S SON GROWING UP, BUT THAT WAS

13   WAS IN LAFAYETTE.

14   THE COURT: OKAY.  AND HOW OLD IS THE VICKY

15          CRAIG THAT YOU KNOW?  HOW OLD WOULD

16   SHE BE TODAY?

17   THE JUROR: SHE WOULD BE IN HER 50'S TO 60'S.

18   THE COURT: GENTLEMEN?

19   MR. STEVENS: I DON'T THINK THAT'S THE SAME

20          FAMILY, JUDGE.

21   THE COURT: OKAY.  AND, TO YOUR KNOWLEDGE,

22          DOCTOR, IS SHE STILL IN LAFAYETTE?

23   THE JUROR: TO MY KNOWLEDGE.  YES, SIR.

24   THE COURT: OKAY.  THANK YOU.

25          SYLVIA DE LA ROSA.  ANYONE FAMILIAR

1        WITH SYLVIA DE LA ROSA?

2              MARLEN DIAZ, ANDREW GUILLOTT, DEBORAH

3         HARDY, CLINTON HARTSFIELD, RAMON HERNANDEZ

4         SANTOS HERNANDEZ, MICHELLE JEANSONNE,

5         MICHELLE KHAN, K-H-A-N.  MICHELLE KHAN.

6         JENNIFER LOPEZ.

7              NOT THE SINGER AND ACTRESS, OF COURSE.

8         ALTHOUGH.  YES, MA'AM. THAT'S MS. LINDBERG,

9         JUROR NUMBER 16, CORRECT?

10       THE JUROR:  YES, SIR. I RECOGNIZE THAT NAME.

11             ONE OF MY STUDENTS, HER MOTHER'S NAME IS

12       JENNIFER LOPEZ.

13       THE COURT: AND APPROXIMATELY, WHAT IS HER

14             AGE, HER APPROXIMATE AGE?

15       THE JUROR: I WOULD SAY IN HER EARLY 30'S.

16             I DON'T HAVE THAT MUCH ASSOCIATION WITH

17       HER.  I KNOW HER NAME THROUGH SOME DEALINGS.

18       BUT I'VE NEVER ACTUALLY MET HER IN PERSON,

19       UNFORTUNATELY.

20       THE COURT: AND, TO YOUR KNOWLEDGE, DOES

21             SHE RESIDE IN EAST BATON ROUGE,

22       ASCENSION OR DO YOU KNOW?

23       THE JUROR: IN EAST BATON ROUGE PARISH.

24             YES, SIR.

25       THE COURT: GENTLEMEN?

1      MR. STEVENS: THE MS. LOPEZ IN OURS LIVES

2            IN NEW ORLEANS, JUDGE.

3      THE COURT: OKAY.  VERY GOOD.  THANK YOU.

4      THE JUROR: THANK YOU.

5      THE COURT: DANIELLE LEBLANC.  DANIELLE

6            LEBLANC, JULIO LINARES HERNANDEZ, JULIO

7      LINARES HERNANDEZ, JAMES LOTT, L-O-T-T,

8      CORY MOTON, M-O-T-O-N, JEFFERSON RAMIREZ,

9      MONIQUE SCHMIT, OUR CASE AGENT, WHO WE

10     PREVIOUSLY INTRODUCED TO YOU.

11           STEFANIA VANIN.  STEFANIA VANIN,

12     V-A-N-I-N, PAMELA WATSON, JUAN TOMAS SANCHEZ.

13           AND, FINALLY, ANGELINA REYES.

14     ANGELINA REYES.

15           OKAY.  LET THE RECORD REFLECT THAT NO

16     HANDS WERE BEING RAISED OTHER THAN THE HANDS

17     PREVIOUSLY NOTED.

18     MR. STEVENS: I'M SORRY, YOUR HONOR.  CAN

19           WE APPROACH FOR JUST ONE SECOND, JUDGE?

20     THE COURT: YES.

21     REPORTER'S NOTE: (THEREFORE, AT THIS,

22           TIME A BENCH CONFERENCE WAS HELD.)

23     MR. STEVENS: WE MIGHT CALL A POSTAL

24           INSPECTOR, ALLISON HOFFINE.  MR.

25     CROSSWELL REMINDED ME THIS MORNING.

1    THE COURT: HOFFINE.

2    MR. STEVENS: H-O-F-F-I-N-E.

3    THE COURT: OKAY.

4    MR. STEVENS: ALLISON, SHE'S A POSTAL

5          INSPECTOR IN BATON ROUGE.  I'M SORRY FOR

6    NOT MENTIONING HER SOONER.

7    THE COURT: OKAY.  THAT'S ALL RIGHT.

8          THANK YOU.

9    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

10          THE BENCH CONFERENCE WAS CONCLUDED.)

11    THE COURT: AND ONE MORE NAME, LADIES AND

12          GENTLEMEN.  MS. ALLISON HOFFINE,

13    H-O-F-F-I-N-E, WHO IS WITH THE U.S. POSTAL

14    INSPECTION SERVICE. ALLISON HOFFINE.  ANYONE

15    RECOGNIZE OR KNOW MS. HOFFINE?

16          AND LET THE RECORD REFLECT THAT NO HANDS

17    ARE BEING RAISED.  SO, THANK YOU.

18          NOW, AS I TOLD YOU PREVIOUSLY, THE

19    DEFENDANT IS CHARGED WITH THE THEFT OF

20    GOVERNMENT FUNDS, WITH THE FAILURE TO

21    MAINTAIN AN EFFECTIVE MONEY-LAUNDERING

22    PROGRAM AND OBSTRUCTION OF A PROCEEDING

23    BEFORE A FEDERAL AGENCY.

24          DOES ANYONE HERE HAVE ANY PERSONAL

25    KNOWLEDGE OF THE FACTS OF THIS CASE? IF SO,

1        PLEASE RAISE YOUR HAND.

2                AND LET THE RECORD REFLECT THAT NO HANDS

3        ARE BEING RAISED AT THIS TIME.

4                HAS ANYONE HERE HEARD ANYTHING OR READ

5        ANYTHING IN THE NEWSPAPER OR DO YOU THINK

6        YOU'VE SEEN ANYTHING ABOUT THIS, ON

7        TELEVISION OR ANY INTERNET WEBSITES OR NEWS

8        WEBSITES, PLEASE RAISE YOUR HAND.

9                AND LET THE RECORD REFLECT THAT NO HANDS

10       ARE BEING RAISED.

11               NOW, HAS ANYONE HERE HAD ANY DISCUSSIONS

12       WITH ANYONE ABOUT THIS CASE OR HAVE YOU

13       OVERHEARD ANY DISCUSSIONS ABOUT THIS CASE IN

14       ANY WAY, PLEASE RAISE YOUR HAND.

15               AND, AGAIN, LET THE RECORD REFLECT THAT

16       NO HANDS ARE BEING RAISED.

17               DOES ANYONE HERE HAVE AN OPINION ABOUT

18       ANY OF THE ISSUES IN THIS CASE?  IF YOU'VE

19       FORMED AN OPINION IN ANY WAY BASED SOLELY ON

20       THE LIMITED INFORMATION YOU HAVE RECEIVED

21       ABOUT THIS CASE, PLEASE RAISE YOUR HAND.

22               AND, AGAIN, LET THE RECORD REFLECT THAT

23       NO HANDS ARE BEING RAISED.

24               NOW, THERE MAY BE, AND I DON'T KNOW THIS

25       WITH CERTAINTY, BUT SOMETIMES IN CRIMINAL

1  CASES, PERSONS WHO TESTIFY AS WITNESSES HAVE

2  ENTERED INTO A PLEA AGREEMENT AND HAVE PLED

3  GUILTY TO CERTAIN CRIMES AND MAY TESTIFY AS

4  WITNESSES IN THE CASE.  I WILL INSTRUCT YOU

5  AT THIS TIME THAT PLEA BARGAINING IS LAWFUL.

6  IT IS SANCTIONED UNDER THE LAW.  IT IS

7  PROPER.  AND THE RULES OF COURT EXPRESSLY

8  PROVIDE FOR IT.

9  NOW, HAVING SAID THAT, IS THERE ANYONE

10  WHO WOULD NOT BE ABLE TO BELIEVE A WITNESS

11  SIMPLY BECAUSE THAT WITNESS HAS PLED GUILTY

12  AND HAS ENTERED INTO A PLEA AGREEMENT WITH

13  THE UNITED STATES GOVERNMENT?  IF YOU WOULD

14  HAVE A PROBLEM WITH THAT, BELIEVING SUCH A

15  WITNESS, PLEASE RAISE YOUR HAND.

16  AND LET THE RECORD REFLECT THAT NO HANDS

17  ARE BEING RAISED.

18  DO ANY OF YOU HERE HAVE ANY PROBLEM WITH

19  THE PRINCIPLE UNDER OUR LAWS THAT A DEFENDANT

20  IS INNOCENT UNTIL PROVEN GUILTY?  IF YOU HAVE

21  AN ISSUE WITH THAT, PLEASE RAISE YOUR HAND.

22  AND, AGAIN, LET THE RECORD REFLECT THAT

23  NO HANDS ARE BEING RAISED AT THIS TIME.

24  I PREVIOUSLY EXPLAINED TO YOU THAT THE

25  GOVERNMENT HAS THE BURDEN OF PROVING THE

1    DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

2    I WILL TELL YOU THAT IF THE GOVERNMENT FAILS

3    TO DO SO, THEN YOU MUST RETURN A VERDICT OF

4    NOT GUILTY.  DOES ANYONE HAVE A PROBLEM WITH

5    THIS RULE OF LAW? IF SO, PLEASE RAISE YOUR

6    HAND.

7         LET THE RECORD REFLECT THAT NO HANDS ARE

8    BEING RAISED AT THIS TIME.

9         ON THE OTHER HAND, IF THE GOVERNMENT

10   DOES PRESENT EVIDENCE PROVING TO YOUR

11   SATISFACTION THAT THE DEFENDANT IS GUILTY

12   BEYOND A REASONABLE DOUBT, WILL YOU BE ABLE

13   TO RETURN A VERDICT OF GUILTY?  IF YOU --

14   DESPITE THAT -- IF YOU'RE NOT ABLE TO RETURN

15   A VERDICT OF GUILTY, PLEASE RAISE YOUR HAND.

16        AND LET THE RECORD REFLECT THAT NO HANDS

17   ARE BEING RAISED.

18        IF YOU ARE SELECTED TO SERVE AS JURORS

19   IN THIS CASE, YOU WOULD BE REQUIRED TO PUT

20   ASIDE ANY FEELINGS OF PREJUDICE AND SYMPATHY

21   AND DECIDE THIS CASE SOLELY ON THE EVIDENCE

22   PRESENTED AT TRIAL AND THE LAW THAT I GIVE

23   THROUGH THE INSTRUCTIONS AT THE CONCLUSION OF

24   THE TRIAL.  AND YOU MUST DISREGARD ANY OTHER

25   IDEAS, NOTIONS OR BELIEFS ABOUT THE LAW YOU

1     MAY HAVE ENCOUNTERED REACHING YOUR VERDICT.

2     IF ANYONE HAS A PROBLEM WITH THIS, IF YOU

3     CANNOT OR WILL NOT, AGAIN, PUT ASIDE FEELINGS

4     OF SYMPATHY, PREJUDICE, AND DECIDE THIS CASE

5     SOLELY ON THE BASIS OF THE EVIDENCE IN THIS

6     CASE, RAISE YOUR HAND.

7       AND, AGAIN, LET THE RECORD REFLECT THAT

8     NO HANDS ARE BEING RAISED.

9       DO ANY OF YOU KNOW OR HAVE ANY REASON

10    WHY YOU THINK YOU MIGHT BE PREJUDICED FOR OR

11    AGAINST EITHER THE GOVERNMENT OR THE

12    DEFENDANT IN THIS CASE?  IF YOU THINK YOU

13    WOULD BE PREJUDICED FOR OR AGAINST EITHER

14    SIDE, FOR ANY REASON, PLEASE RAISE YOUR HAND.

15      LET THE RECORD REFLECT THAT NO HANDS ARE

16    BEING RAISED AT THIS TIME.

17      DO ANY OF YOU HAVE ANY BELIEF OR OPINION

18    THAT ANY OF THE OFFENSES WITH WHICH THE

19    DEFENDANT HAS BEEN CHARGED WERE UNIQUE IN ANY

20    RESPECT AND THAT THEY SHOULD BE PURSUED WITH

21    ANY EXTRAORDINARY VIGOR OR THAT, PERHAPS,

22    THEY SHOULDN'T CONSTITUTE AN OFFENSE, PLEASE

23    RAISE YOUR HANDS.

24      AGAIN, LET THE RECORD REFLECT THAT NO

25    HANDS ARE BEING RAISED AT THIS TIME.

1          NOW, DO YOU OR ANY OF YOUR FAMILY

2     MEMBERS OR CLOSE PERSONAL FRIENDS HAVE ANY

3     EDUCATION OR TRAINING AS LAWYERS OR HAVE

4     WORKED IN THE LEGAL PROFESSION, EITHER,

5     PERHAPS AS A LEGAL SECRETARY OR A PARALEGAL?

6     IF SO, PLEASE RAISE YOUR HAND AND I WILL HAVE

7     ADDITIONAL QUESTIONS FOR YOU.

8          WE'LL BEGIN WITH THE FIRST ROW.  AND

9     THAT'S MR. LIEUX; IS THAT RIGHT?

10    THE JUROR: MY DAUGHTER IS AN ATTORNEY.

11    THE COURT: AND WHAT IS YOUR DAUGHTER'S NAME?

12    THE JUROR: LENA RENEE LIEUX BRECKFIELD.

13    THE COURT: AND WHERE DOES SHE PRACTICE LAW?

14    THE JUROR: LEMOYNE, PENNSYLVANIA.

15    THE COURT: OKAY.  WHAT KIND OF LAW DOES

16         SHE PRACTICE?

17    THE JUROR: BANKING.

18    THE COURT: SO, SHE IS ---

19    THE JUROR: SHE'S AN INVESTMENT BANKER.

20    THE COURT: ALL RIGHT.

21    THE JUROR: AND AN ATTORNEY.

22    THE COURT: AND AN ATTORNEY?

23    THE JUROR: RIGHT.

24    THE COURT: THANK YOU VERY -- DOES SHE

25         WORK FOR A FIRM THERE?

1          THE JUROR: YES.

2          THE COURT:  AND WHAT'S THE NAME OF THE

3               FIRM, IF YOU KNOW?

4          THE JUROR: BYBEL, BRECKRIDGE -- BYBEL

5               RUTLEDGE.

6          THE COURT: DO YOU KNOW IF SHE IS RESPONSIBLE

7               FOR ADVISING THE CLIENTS ON MONEY

8          LAUNDERING ACTIVITIES? IF YOU KNOW.

9          THE JUROR: SHE'S A THIRD PARTNER IN THE

10               FIRM.  AND SHE IS THE INVESTMENT BANKER.

11          THE COURT: OKAY.  BUT YOU DON'T KNOW IF SHE

12               ADVISES CLIENTS OR ANYTHING LIKE THAT?

13          THE JUROR: NO.

14          THE COURT: THANK YOU, CAPTAIN.

15               MS. HILL -- THAT'S JUROR NUMBER 5; IS

16          THAT CORRECT?

17          THE JUROR: YES.  MY SON JUST FINISHED LAW

18               SCHOOL AT LOYOLA.  SO, HE'S NOT

19          PRACTICING YET.  HE'S TRYING TO PASS THE BAR.

20          THE COURT: OKAY.  VERY GOOD.  AND HAS HE

21               ACCEPTED EMPLOYMENT AT ANY LAW FIRM OR

22          GOVERNMENT AGENCY, DO YOU KNOW?

23          THE JUROR: HE'S WORKING PART TIME WITH

24               A CRIMINAL ATTORNEY DOWN THERE.  I DON'T

25          EVEN KNOW HER NAME.

1       THE COURT: OKAY.  BUT YOU KNOW THAT HE'S

2          PROBABLY GOING TO BE A CRIMINAL DEFENSE

3       LAWYER, CORRECT?

4       THE JUROR: HE JUST WANTS TO PASS THE BAR

5          RIGHT NOW.

6       THE COURT: I UNDERSTAND.  THANK YOU VERY

7          MUCH, MS. HILL.  BY THE WAY, MS. HILL,

8       LET ME JUST ASK YOU.

9          AND, FIRST, LET'S GO BACK TO MR. LIEUX.

10      THE FACT THAT YOUR DAUGHTER IS A LAWYER IN

11      THE FINANCIAL INDUSTRY, WOULD THAT IN ANY WAY

12      HAVE ANY BEARING, DO YOU THINK, ON YOUR

13      ABILITY TO SERVE AS A JUROR IN THIS CASE,

14      KNOWING WHAT YOU KNOW ABOUT THE CHARGES, MR.

15      LIEUX?

16      THE JUROR: NO, SIR.

17      THE COURT: OKAY.  THANK YOU, SIR.

18          AND, MS. HILL, KNOWING THAT YOUR SON

19      MAY VERY WELL PRACTICE CRIMINAL LAW AS A

20      CRIMINAL DEFENSE LAWYER, WOULD THAT HAVE ANY

21      BEARING, IN YOUR MIND, ABOUT -- ANY BEARING

22      ON YOUR ABILITY TO SERVE AS A FAIR AND

23      IMPARTIAL JUROR IN THIS CASE?

24      THE JUROR: NO.

25      THE COURT: THANK YOU, MA'AM.

1              DR. RICHARD?

2        THE JUROR: MY DAUGHTER'S GODFATHER IS A

3              LAWYER IN TOWN.  AND I'M ALSO THE

4        GODMOTHER FOR HIS DAUGHTER.

5        THE COURT: AND WHAT IS HIS NAME?

6        THE JUROR: DAVID BOGGS.

7        THE COURT: AND WHAT KIND OF LAW DOES HE

8              PRACTICE?

9        THE JUROR: I DON'T KNOW.  I KNOW THAT

10              HE DOES SOMETHING FOR THE CITY OR THE

11        STATE.

12        THE COURT: OKAY.  SO, YOU THINK HE'S

13              EMPLOYED FOR THE CITY OR THE STATE,

14        GOVERNMENT LAWYER?

15        THE JUROR: YES, SIR.

16        THE COURT: ALL RIGHT.  BUT YOU DON'T KNOW

17              EXACTLY WHERE?

18        THE JUROR: NO, I DON'T.

19        THE COURT: YOU DON'T HAVE ANY IDEA OF

20              WHAT KIND OF LAW HE PRACTICES?

21        THE JUROR: NO.  I KNOW THAT HE -- HE DOESN'T

22              DO TRIAL WORK.

23        THE COURT: NOW, AS I EXPLAINED TO YOU

24              EARLIER, TWO OF THE LAWYERS

25        PARTICIPATING IN THIS TRIAL ARE GOVERNMENT

1    LAWYERS.  WOULD THAT HAVE ANY BEARING ONE WAY

2    OR ANOTHER ON YOUR ABILITY TO SERVE AS A FAIR

3    AND IMPARTIAL JUROR IN THIS CASE?

4    THE JUROR: NO, SIR.

5    THE COURT: THANK YOU.

6         ANYONE ON THE SECOND ROW?  MS. BOSWELL?

7    THE JUROR: YES, SIR.  I WORK CLOSELY WITH

8         REAL ESTATE ATTORNEYS IN MY JOB.

9    THE COURT: OKAY.  AND DO YOU REMEMBER THEIR

10        NAMES?

11   THE JUROR: WALTER COMEAUX IS MY IMMEDIATE

12        BOSS.  AND WE'VE GOT OTHER ATTORNEYS AT

13   OTHER OFFICES.

14   THE COURT: THOSE ARE CLOSING ATTORNEYS,

15        CORRECT?

16   THE JUROR: YES.  CORRECT.

17   THE COURT: ALL RIGHT.  THANK YOU VERY MUCH.

18        ANYONE ELSE ON THE SECOND ROW?  MR.

19   MCCULLOCH?

20   THE JUROR: MY WIFE IS AN ATTORNEY FOR

21        THE STATE.

22   THE COURT: WHAT IS HER NAME?

23   THE JUROR: ANGELA MCCULLOCH.

24   THE COURT: AND, AGAIN, WHERE DOES SHE

25        PRACTICE?

1        THE JUROR: SHE PRACTICES FOR THE OFFICE

2            OF GENERAL COUNSEL.

3        THE COURT: AND, ALL RIGHT.  AND, AGAIN,

4            KNOWING THAT THE GOVERNMENT IS

5        REPRESENTED ---

6        REPORTER'S NOTE: (THEREFORE, AT THIS

7            TIME, AN OFF-THE-RECORD DISCUSSION

8            WAS HELD.)

9        THE COURT: ALL RIGHT.  LADIES AND

10           GENTLEMEN, WHAT WE'LL DO.  WE'LL TAKE

11       OUR MORNING BREAK AT THIS TIME WHILE WE TRY

12       TO ADDRESS SOME OF THESE TECHNOLOGICAL

13       ISSUES.

14           I HAVE SOME VERY SPECIFIC INSTRUCTIONS

15       FOR YOU, HOWEVER, BEFORE WE TAKE THE BREAK.

16           FIRST, IT'S CRITICAL THAT YOU NOT SPEAK

17       ANYONE DURING THE COURSE OF OUR BREAK.  NOW,

18       I WILL TELL YOU THAT WE HAVE SOME VERY

19       FRIENDLY, VERY NICE PEOPLE WHO WORK IN THIS

20       FEDERAL COURTHOUSE.  BUT I HAVE INSTRUCTED

21       THEM, AS HAVE THE OTHER JUDGES, NOT TO SPEAK

22       TO ANYONE WHO HAS THAT JUROR TAG.  ALL RIGHT?

23       SO, WHEN YOU ENCOUNTER FOLKS -- NOT TO SPEAK

24       WITH OR IN ANY WAY HAVE ANY ENCOUNTERS WITH

25       ANYONE WEARING THE JUROR TAGS THAT YOU ALL

1      ARE WEARING.

2            THE OTHER THING I WILL TELL YOU, THAT

3      YOU SHOULD NOT AND CANNOT SPEAK TO ANYONE

4      ABOUT THIS CASE, ANYTHING YOU'VE LEARNED THUS

5      FAR ABOUT THIS CASE.  SO, AGAIN, DON'T

6      DISCUSS THE MATTER AMONG YOURSELVES.  TO THE

7      EXTENT YOU HAVE THE ABILITY TO SPEAK WITH

8      SOMEONE OUTSIDE OF THIS COURTROOM, I WILL

9      SPECIFICALLY INSTRUCT YOU NOT TO SPEAK TO

10     ANYONE ABOUT IT.

11           AND, FINALLY, I WILL INSTRUCT YOU TO

12     REMEMBER WHERE YOU'RE SITTING AT THIS TIME.

13     BECAUSE IT IS VERY IMPORTANT THAT YOU BE

14     SEATED IN THE VERY SAME SEAT WHEN WE RETURN

15     FROM THE BREAK.

16           NOW, WE WILL BE GONE FOR ABOUT TEN

17     MINUTES.  IT'S IMPORTANT -- WE'RE TRYING OUR

18     BEST TO GET THE JURY SEATED THIS MORNING IF

19     WE CAN.  IT MAY BE NECESSARY FOR US TO TAKE A

20     LUNCH BREAK AND COME BACK.  BUT IF EVERYONE

21     RETURNS ON TIME AND IS PROPERLY SEATED WITHIN

22     TEN MINUTES OR SO, I'M CONFIDENT THAT WE CAN

23     GO ON AND ASSEMBLE A JURY THIS MORNING.

24           SO, AGAIN, PLEASE DON'T TALK TO ANYONE

25     DURING THE COURSE OF THIS BREAK.  YOU CAN

1      CERTAINLY TALK AMONG OURSELVES.  YOU JUST

2      CAN'T DISCUSS ANYTHING HAVING TO DO WITH THIS

3      TRIAL.

4           LET'S ALL RISE FOR THE JURY.

5           REPORTER'S NOTE: (THE JURY IS EXCUSED.)

6      THE COURT: WE ARE OFF THE RECORD, CLARE.

7      REPORTER'S NOTE: (THEREFORE, AT THIS

8           TIME, THE COURT IS IN RECESS FOR A

9           BREAK.) (COURT IS RESUMED.)

10     THE COURT: BE SEATED.  OKAY.  I THINK BEFORE

11          WE TOOK OUR BREAK, MR. MCCULLOCH, I WAS

12     ASKING YOU ABOUT YOUR WIFE'S PRACTICE.

13          MY QUESTION TO YOU -- YOUR WIFE IS A

14     GOVERNMENT LAWYER.  TWO GOVERNMENT LAWYERS

15     ARE PARTICIPATING IN THIS CASE.  THE FACT

16     THAT THE GOVERNMENT LAWYERS ARE INVOLVED IN

17     THIS CASE, WOULD THAT IN ANY WAY AFFECT YOUR

18     ABILITY, YOU THINK, TO SERVE AS A FAIR AND

19     IMPARTIAL JUROR?

20     THE JUROR: NO, SIR.

21     THE COURT: THANK YOU, SIR.

22          ANYONE ALONG THE FRONT ROW?  AND, AGAIN,

23     I'LL REPEAT THE QUESTION.

24          IF YOU OR ANY MEMBER OF YOUR FAMILY OR

25     FRIENDS ARE LAWYERS, PARALEGALS, LEGAL

1        ASSISTANTS ARE IN ANY WAY MEMBERS OF THE

2        LEGAL PROFESSION, PLEASE RAISE YOUR HAND.

3             OKAY.  AND THAT'S MS. JOUBERT?

4        THE JUROR: YES, MY BROTHER-IN-LAW, JOHN

5             JOUBERT.

6        THE COURT: OKAY.  AND WHERE DOES HE PRACTICE?

7        THE JUROR: BATON ROUGE.

8        THE COURT: AND DOES HE HAVE A FIRM OR WITH

9             AN AGENCY?

10       THE JUROR: HE HAS A FIRM.

11       THE COURT: DO YOU KNOW WHAT FIRM?

12       THE JUROR: JOHN JOUBERT.

13       THE COURT: OKAY.  HE'S GOT HIS OWN LAW

14            FIRM, RIGHT?  DOES HE HANDLE CRIMINAL

15       LAW?

16       THE JUROR: IT'S PERSONAL INJURY.  I THINK

17            THEY HAVE OTHER ASPECTS, BUT I THINK THE

18       OTHER ATTORNEYS HANDLE THOSE.

19       THE COURT: THAT'S YOUR BROTHER-IN-LAW,

20            CORRECT?

21       THE JUROR: CORRECT.

22       THE COURT: THE FACT THAT YOUR BROTHER-IN-LAW

23            IS A PRACTICING LAWYER IN TOWN, WOULD

24       THAT IN ANY WAY AFFECT YOUR ABILITY TO SERVE

25       AS AN IMPARTIAL JUROR IN THIS CASE?

1     THE JUROR: NO, SIR.

2     THE COURT: THANK YOU, MA'AM.

3          ANYONE ELSE?  ANYONE ALONG THE FIRST

4     ROW?  ANYONE ON THE SECOND ROW?

5     THE JUROR: KELLI WALES.

6     THE COURT: YES, MS. WALES.

7     THE JUROR: MY STEPBROTHER IS AN ATTORNEY.

8     THE COURT: AND HIS NAME?

9     THE JUROR: BRETT SANDIFER.

10    THE COURT: AND WHERE DOES MR. SANDIFER

11         PRACTICE?

12    THE JUROR: BATON ROUGE.

13    THE COURT: WHERE DOES HE PRACTICE?

14    THE JUROR: HE HAS HIS OWN LAW FIRM.  I

15         HONESTLY HAVE NO IDEA WHAT HE DOES.

16    THE COURT: YOU DON'T KNOW IF HE PRACTICES

17         CRIMINAL DEFENSE?

18    THE JUROR: NO, SIR.

19    THE COURT: THE FACT THAT YOUR BROTHER -- IT'S

20         YOUR BROTHER-IN-LAW, YOU SAID?

21    THE JUROR: STEPBROTHER.

22    THE COURT: STEPBROTHER.  THE FACT THAT

23         YOUR STEPBROTHER IS AN ATTORNEY, WOULD

24    THAT IN ANY WAY AFFECT, IN YOUR MIND, YOUR

25         ABILITY TO SERVE AS A FAIR AND IMPARTIAL

1          JUROR IN THIS CASE?

2          THE JUROR: NO, SIR.

3          THE COURT: THANK YOU, MA'AM.

4                ANYONE ELSE?

5                ALL RIGHT, FOLKS, THANK YOU VERY MUCH.

6                NOW, HAVE YOU OR ANY OF YOUR IMMEDIATE

7          FAMILY MEMBERS OR CLOSE PERSONAL FRIENDS EVER

8          SERVED AS A LAW ENFORCEMENT OFFICER OR WORKED

9          FOR A LAW ENFORCEMENT AGENCY?

10                AND, MR. FREEMAN, OF COURSE, WE'VE HEARD

11          FROM YOU.  SO, IT WON'T BE NECESSARY FOR YOU

12          TO RESPOND.

13                BUT IF ANYONE ELSE, STARTING ON THE

14          FIRST ROW, IS INVOLVED OR HAS BEEN INVOLVED

15          IN LAW ENFORCEMENT OR ANY -- AGAIN, CLOSE

16          PERSONAL FRIENDS OR IMMEDIATE FAMILY MEMBERS.

17                MR. DICKERSON?

18          THE JUROR: YES, SIR.  MY FATHER-IN-LAW IS

19                A RETIRED CITY POLICEMAN.  MY BROTHER-

20          IN-LAW -- BOTH MY BROTHER-IN-LAWS, ONE IS A

21          STATE POLICEMAN AND THE OTHER ONE, I BELIEVE

22          HE'S WORKING -- WITH THE MP'S IN NEW ORLEANS.

23          THE COURT: NOW, YOUR FATHER'S NAME OR

24                FATHER-IN-LAW?

25          THE JUROR: MY FATHER-IN-LAW?

1     THE COURT: YES.

2     THE JUROR: MORRIS DAUGET.

3     THE COURT: OKAY.  AND YOU SAID HE WAS

4          WITH THE BATON ROUGE CITY POLICE?

5     THE JUROR: YES, SIR.

6     THE COURT: AND YOUR BROTHER-IN-LAW WAS

7          WITH THE STATE POLICE?

8     THE JUROR: MY BROTHER-IN-LAW, HE IS WITH

9          THE LOUISIANA STATE POLICE.

10    THE COURT: AND HIS NAME?

11    THE JUROR: KELLY FEET.

12    THE COURT: OKAY.  AND, FINALLY?

13    THE JUROR: MY OTHER BROTHER-IN-LAW IS

14         TRAVIS DAUGET, AND HE'S LOCATED OUT

15    OF NEW ORLEANS.  I BELIEVE IT'S THE MP'S, BUT

16    I KNOW NOW HE'S WITH THE NATIONAL GUARD.

17    THE COURT: IN THE MILITARY?

18    THE JUROR: YES.

19    THE COURT: THE FACT THAT YOU HAVE THESE

20         FAMILY MEMBERS WHO SERVE IN LAW

21    ENFORCEMENT, WOULD IT, IN YOUR MIND, CAUSE

22    YOU TO BELIEVE A LAW ENFORCEMENT WITNESS MORE

23    THAN YOU WOULD BELIEVE ANY OTHER PERSON

24    CALLED TO TESTIFY HERE?

25    THE JUROR: NO, SIR.

1       THE COURT: ALL RIGHT.  WOULD THE FACT THAT

2           YOU HAVE RELATIVES IN LAW ENFORCEMENT,

3       IN YOUR MIND, WOULD THAT PREVENT YOU FROM

4       GIVING THE -- ESSENTIALLY THE DEFENDANT A

5       FAIR SHAKE, IF YOU WILL?

6       THE JUROR: NO, SIR.

7       THE COURT: ALL RIGHT.  SO YOU THINK YOU

8           WOULD BE ABLE TO EVALUATE THE LAW

9       ENFORCEMENT WITNESSES THE SAME AS YOU WOULD

10      EVALUATE THE TESTIMONY OF ANY OTHER WITNESSES

11      IN THIS TRIAL?

12      THE JUROR: YES.

13      THE COURT: THANK YOU, MR. DICKERSON.

14          ANYONE ELSE ON THE FIRST ROW?  MS.

15      LANUS?

16      THE JUROR: YES.  OFFICER RILEY HARBOR,

17          CITY POLICE.

18      THE COURT: AND WHO IS THAT?

19      THE JUROR: HE'S A COUSIN OF MINE.

20      THE COURT: ALL RIGHT.  AND THE FACT THAT

21          YOU HAVE A COUSIN IN THE CITY POLICE,

22      YOU'VE HEARD THE QUESTIONS THAT I PUT TO MR.

23      DICKERSON.  WOULD THAT CAUSE YOU, IN YOUR

24      MIND, TO BELIEVE THE TESTIMONY OF THE LAW

25      ENFORCEMENT WITNESS MORE THAN YOU WOULD

1    BELIEVE THE TESTIMONY OF ANY OTHER WITNESS

2    IN THIS TRIAL?

3    THE JUROR: NO, SIR.

4    THE COURT: WOULD IT IN ANY WAY AFFECT

5        YOUR ABILITY TO SERVE AS A FAIR AND

6    IMPARTIAL JUROR?

7    THE JUROR: NO, SIR.

8    THE COURT: THANK YOU, MS. LANUS.

9        ANYONE ELSE ON THE FIRST ROW?  ANYONE ON

10   THE SECOND ROW?  MR. BARBER?

11   THE JUROR: DAVID BARBER.  MY FIRST COUSIN

12       IS TONY MANCUSO.  HE'S A SHERIFF OF

13   CALCASIEU PARISH.

14   THE COURT: ALL RIGHT.  ANYONE ELSE?

15   THE JUROR: NO.

16   THE COURT: ALL RIGHT.  THE FACT THAT YOUR

17       COUSIN IS THE SHERIFF OF CALCASIEU,

18   WOULD THAT CAUSE YOU TO BELIEVE THE TESTIMONY

19   OF LAW ENFORCEMENT WITNESS MORE THAN YOU

20   WOULD ANY OTHER WITNESS WHO TESTIFIES IN THIS

21   TRIAL?

22   THE JUROR: NO, SIR.

23   THE COURT: WOULD IT IN ANY WAY AFFECT YOUR

24       ABILITY TO SERVE AS A FAIR AND IMPARTIAL

25   JUROR IN THIS CASE?

1    THE JUROR: NO.

2    THE COURT: THANK YOU, SIR.

3         NEXT, WE HAVE MR. BARBIER, CORRECT?

4    THE JUROR:  RIGHT.  STAN BARBIER.

5         MY BROTHER-IN-LAW WAS A FORMER DEPUTY IN

6    PLAQUEMINE.

7    THE COURT: AND WHAT IS HIS NAME?

8    THE JUROR: MITCHELL OURSO.

9    THE COURT: ALL RIGHT.  THE FACT THAT YOU

10   HAVE A RELATIVE WHO WAS IN LAW

11   ENFORCEMENT, AGAIN, YOU'VE HEARD THE

12   QUESTIONS I'VE PUT TO THE OTHER MEMBERS OF

13   THE VENIRE, WOULD THAT CAUSE YOU TO BELIEVE

14   THE TESTIMONY OF A LAW ENFORCEMENT WITNESS

15   MORE THAN YOU WOULD THE TESTIMONY OF ANY

16   OTHER WITNESS IN THIS CASE?

17   THE JUROR: NO.  IT WOULDN'T BE A PROBLEM.

18   THE COURT: WOULD IT IN ANY WAY AFFECT YOUR

19        ABILITY TO SERVE AS A FAIR AND

20   IMPARTIAL JUROR IN THIS CASE?

21   THE JUROR: NO.

22   THE COURT: THANK YOU, MR. BARBIER.

23        ANYONE ELSE ALONG THE SECOND ROW?

24   ANYONE ALONG THE RAIL?

25   THE JUROR: WAYNE BIRT.  AS A VOLUNTEER

1        FIREMAN, I KNOW AND AM FRIENDS WITH
2    SEVERAL POLICE OFFICERS IN THE SPRINGFIELD
3    KILLIAN AREA.  ALSO, I'M ASPIRING TO THE
4    KILLIAN POLICE DIVE TEAM.
5    THE COURT: NOW, WOULD THAT IN ANY WAY
6        CAUSE YOU TO BELIEVE THE TESTIMONY OF A
7    LAW ENFORCEMENT WITNESS MORE OR GIVE GREATER
8    WEIGHT TO THAT TESTIMONY THAN YOU WOULD ANY
9    OTHER WITNESS IN THE CASE, MR. BIRT?
10   THE JUROR: ALL THE OFFICERS I KNOW ARE
11       HONORABLE AND ETHICAL MEN.  I WOULD VIEW
12   THEIR TESTIMONY AS A PROFESSIONAL, HONEST
13   TESTIMONY.
14   THE COURT: WELL, AND I UNDERSTAND THAT.  BUT
15       WOULD YOU TEND TO BELIEVE THEIR
16   TESTIMONY OR GIVE THEIR TESTIMONY MORE WEIGHT
17   --
18   THE JUROR: YES, SIR.  I WOULD.
19   THE COURT:  -- THAN ANY OTHER WITNESS?
20       NOW, WHY WOULD YOU DO THAT?
21   THE JUROR: AS I SAID, HONORABLE AND ETHICAL
22       MEN.  IF THEY WERE TO SAY SOMETHING, I
23   WOULD BELIEVE THEM.
24   THE COURT: NOW, YOU UNDERSTAND THAT ALL
25       PERSONS WHO -- PERSONS SELECTED TO SERVE

1    AS JURORS IN THIS CASE HAVE TO INDIVIDUALLY

2    WEIGH THE TESTIMONY OF EVERY WITNESS WHO

3    TESTIFIES IN THIS TRIAL.  DO YOU UNDERSTAND

4    THAT, SIR?

5    THE JUROR: YES, SIR.  I DO UNDERSTAND THAT.

6    THE COURT: AND YOU HAVE TO EVALUATE THEIR

7         TESTIMONY, NOT BASED UPON THEIR STATUS

8    OR THEIR EMPLOYMENT.  BUT SIMPLY BASED UPON

9    THE OTHER FACTORS THAT YOU WOULD APPLY TO ANY

10   WITNESS; IS THAT RIGHT?

11   THE JUROR: YES, SIR.  THAT IS CORRECT.

12   THE COURT: AND PART OF THAT, MR. BIRT, MEANS

13        THAT YOU WOULD HAVE TO JUDGE THE

14   CREDIBILITY OF EACH WITNESS.  YOU UNDERSTAND

15   THAT, DON'T YOU, SIR?

16   THE JUROR: YES, SIR.

17   THE COURT: AND THAT YOU WOULD HAVE TO

18        -- YOU WOULD BE ENTITLED TO REJECT SOME

19   OF THE TESTIMONY IF YOU FOUND IT WASN'T

20   BELIEVABLE.  DO YOU UNDERSTAND THAT?

21   THE JUROR: YES, SIR.

22   THE COURT: AND, SO, I'LL ASK YOU MORE

23        SPECIFICALLY.  IF A LAW ENFORCEMENT

24   WITNESS TESTIFIED BEFORE YOU AND YOU

25   CONCLUDED THAT THE WITNESS WAS NOT BEING

1    CREDIBLE, IF THAT WAS YOUR BELIEF, WOULD YOU

2    BE ABLE TO FAIRLY EVALUATE THAT TESTIMONY; IN

3    FACT, CONCLUDE THAT IT WASN'T CREDIBLE?

4    THE JUROR: YES, SIR.  THAT'S A CORRECT

5        STATEMENT.

6    THE COURT: ALL RIGHT.  SO, YOU WOULD BE

7        ABLE TO -- AND I DON'T WANT TO PUT WORDS

8    IN YOUR MOUTH AND I WANT TO BE CLEAR ABOUT

9    THIS.  IF, IN YOUR HONEST BELIEF, A LAW

10   ENFORCEMENT WITNESS WAS NOT BEING TRUTHFUL

11   AND CREDIBLE, WOULD YOU BE ABLE TO RECOGNIZE

12   IT AS BEING NOT CREDIBLE TESTIMONY AND TREAT

13   IT AS SUCH?

14   THE JUROR: IF I FELT THE POLICE OFFICER

15       WAS BEING DISHONEST, YES, I COULD.

16   THE COURT: OKAY.

17   THE JUROR: AND WOULD ACCEPT IT AS SUCH.

18   THE COURT: OKAY.  ALL RIGHT.  AND, SO,

19       IF A NON-LAW ENFORCEMENT WITNESS

20   TESTIFIES BEFORE YOU AND YOU BELIEVE THAT THE

21   TESTIMONY, LET'S SAY, WAS CREDIBLE AND

22   ACCURATE, WOULD YOU BE ABLE AND WILLING TO

23   TREAT IT AS SUCH?

24   THE JUROR: YES, SIR.

25   THE COURT: EVEN IF IT WASN'T A GOVERNMENT

1    WITNESS?

2    THE JUROR: YES, SIR.

3    THE COURT: IF THE DEFENDANT CALLED A

4    WITNESS WHO YOU BELIEVE TESTIFIED

5    CREDIBLY AND TRUTHFULLY, WOULD YOU BE WILLING

6    TO WEIGH THAT TESTIMONY IN THE DEFENSE'S

7    FAVOR?

8    THE JUROR: YES, SIR.  I WOULD.

9    THE COURT: ALL RIGHT.  THANK YOU, MR. BIRT.

10    ALL RIGHT.  ANYONE ELSE?  MS. LYONS.

11    THE JUROR: YES.  I HAVE A BROTHER-IN-LAW

12    OF A DECEASED SISTER THAT'S A POLICEMAN

13    IN CONCORDIA PARISH.

14    THE COURT: AND HIS NAME?

15    THE JUROR: CHARLES FERGUSON.

16    THE COURT: NOW, THE FACT THAT YOU HAVE A

17    RELATIVE WHO IS IN LAW ENFORCEMENT,

18    WOULD THAT CAUSE YOU TO -- WOULD YOU TEND TO

19    BELIEVE THE TESTIMONY OF A LAW ENFORCEMENT

20    WITNESS MORE OR GIVE GREATER WEIGHT TO THAT

21    TESTIMONY THAN NON-LAW ENFORCEMENT TESTIMONY?

22    THE JUROR: NO.

23    THE COURT: ALL RIGHT.  WOULD THAT IN ANY

24    WAY CAUSE YOU TO NOT BE ABLE TO SERVE AS

25    A FAIR AND OBJECTIVE JUROR?

1       THE JUROR: NO.

2       THE COURT: ALL RIGHT.  THANK YOU, MA'AM.

3               ANYONE ELSE?  ANYONE ON THE SECOND ROW?

4       MS. OLIVER?

5       THE JUROR: YES.  I HAVE SEVERAL FAMILY

6               MEMBERS WHO ARE POLICE OFFICERS.

7       THE COURT: THEIR NAMES?

8       THE JUROR: JAMES ADKINS, BILL ABRAMTON --

9               ABRAM.

10      THE COURT: AND WHO ARE THEY WITH; WHAT

11              LAW ENFORCEMENT AGENCIES?

12      THE JUROR: I KNOW ONE OF THEM IS WITH

13              ASCENSION PARISH.  I THINK THE OTHER ONE

14      THE STATE.  I'M NOT SURE.

15      THE COURT: OKAY.  NOW, THE FACT THAT YOU

16              HAVE RELATIVES WHO ARE MEMBERS OF LAW

17      ENFORCEMENT COMMUNITY, WOULD THAT MEAN THAT

18      YOU WOULD TEND TO GIVE THE TESTIMONY OF SUCH

19      LAW ENFORCEMENT WITNESSES GREATER WEIGHT THAN

20      YOU WOULD ACCORD THE TESTIMONY OF NON-LAW

21      ENFORCEMENT WITNESSES?

22      THE JUROR: NO, SIR.

23      THE COURT: ALL RIGHT.  THE FACT THAT YOU

24              HAVE LAW ENFORCEMENT OFFICERS IN YOUR

25      FAMILY, WOULD THAT IN ANY WAY CAUSE YOU TO

1    NOT BE CAPABLE OF SERVING AS A FAIR AND

2    IMPARTIAL JUROR IN THIS CASE?

3    THE JUROR: NO, SIR.

4    THE COURT: OKAY.  THANK YOU.

5    ANYONE ELSE?  ALL RIGHT.  WELL, THANK

6    YOU, LADIES AND GENTLEMEN.

7    NOW, SOME OF THE WITNESSES IN THIS CASE,

8    AS I'VE SURE YOU'VE NOTICED, MAY TESTIFY IN

9    THE SPANISH LANGUAGE.  IF ANY SUCH WITNESSES

10   WOULD TESTIFY IN THE SPANISH LANGUAGE, WOULD

11   THAT INFLUENCE YOUR VIEW OF THEM OR THEIR

12   TESTIMONY IN ANY WAY?  IF SO, PLEASE RAISE

13   YOUR HAND.

14   AND LET THE RECORD REFLECT THAT NO HANDS

15   ARE BEING RAISED AT THIS TIME.

16   NOW, I HAVE READ THE INDICTMENT TO YOU.

17   AND, BY THE WAY, AS YOU CAN ALSO SEE,

18   MR. LINARES IS -- WE HAVE INTERPRETERS HERE

19   THAT ARE ASSISTING MR. LINARES IN

20   UNDERSTANDING OR HEARING AND UNDERSTANDING

21   THE TESTIMONY AS WELL AS MY COMMENTS TODAY.

22   DOES ANYONE HERE HAVE ANY PROBLEM WITH

23   OR WOULD IT TEND TO INFLUENCE YOUR VIEW OF

24   THE CASE OR OF THE DEFENDANT, KNOWING THAT HE

25   IS RECEIVING ASSISTANCE WITH A SPANISH

1       INTERPRETER DURING THE COURSE OF THIS TRIAL?

2       IF YOU HAVE A PROBLEM WITH THAT, PLEASE RAISE

3       YOUR HAND.

4            AND, AGAIN, LET THE RECORD REFLECT THAT

5       NO HANDS ARE BEING RAISED AT THIS TIME.

6            NOW, I READ TO YOU THE INDICTMENT.  AS

7       YOU KNOW, THE IRS, THE INTERNAL REVENUE

8       SERVICE, AT SOME POINT CONDUCTED ITS OWN

9       REVIEW OF THE ACTIVITIES AT ISSUE HERE.  AND,

10      IN FACT, THE CASE AGENT IS WITH THE IRS

11      CRIMINAL INVESTIGATION DIVISION.

12           TO THE BEST OF YOUR KNOWLEDGE, HAVE YOU

13      OR ANY OF YOUR FAMILY MEMBERS OR CLOSE

14      PERSONAL FRIENDS BEEN AN EMPLOYEE OR OFFICIAL

15      OF THE IRS OR ANY GOVERNMENT AGENCY,

16      INCLUDING, LET'S SAY, THE U.S. DEPARTMENT OF

17      JUSTICE, U.S. ATTORNEY'S OFFICE.  IF THE

18      ANSWER IS YES, PLEASE RAISE YOUR HAND.

19      THE JUROR: U.S. AIR FORCE.

20      THE COURT: OKAY.  AND, AGAIN, THAT'S MR.

21           LANDRY.  CORRECT, MR. LANDRY?

22      THE JUROR: THAT'S CORRECT.

23      THE COURT: OKAY.  OTHER THAN THOSE OF YOU

24           WHO SERVED IN THE MILITARY, LET'S SAY.

25      IF YOU OR ANY CLOSE PERSONAL FAMILY MEMBERS

1          ARE EMPLOYEES OR OFFICIALS OF ANY AGENCY OF

2          THE FEDERAL GOVERNMENT, PLEASE RAISE YOUR

3          HAND. AND LET THE RECORD ---

4               AND, YES, SIR.  THAT'S MR. PHILIP?

5          THE JUROR: YES, SIR.

6          THE COURT: CORRECT?  NOW, MR. PHILIP, WHAT

7               FAMILY MEMBER IS EMPLOYED BY THE FEDERAL

8          GOVERNMENT?

9          THE JUROR: WELL, IT'S NOT A FAMILY MEMBER.

10              IT'S A CLOSE FRIEND.

11         THE COURT: AND WHO IS THAT?

12         THE JUROR: GABBY MITCHELL.

13         THE COURT: AND GABBY?

14         THE JUROR: YES.  GABRIELLE.

15         THE COURT: AND WHERE DOES MS. MITCHELL WORK?

16         THE JUROR: SHE WORKS IN D.C.  SHE WORKS

17              FOR THE FBI.  SHE'S AN AUDITOR.

18         THE COURT: OKAY.  THE FACT THAT YOUR

19              FRIEND IS EMPLOYED BY THE FBI AS AN

20         AUDITOR, WOULD THAT IN ANY WAY HAVE ANY

21         BEARING ON YOUR ABILITY TO SERVE AS A FAIR

22         AND IMPARTIAL JUROR IN THIS CASE, MR. PHILIP?

23         THE JUROR: NO, SIR.

24         THE COURT: OKAY.  DO YOU THINK YOU WOULD BE

25              ABLE TO GIVE THE TESTIMONY OF, AGAIN,

1      NON-GOVERNMENT EMPLOYEE WITNESSES THE SAME AS

2      YOU WOULD OR EVALUATE THEIR TESTIMONY THE

3      SAME AS YOU WOULD WITH ANY OTHER WITNESS WHO

4      IS CALLED TO TESTIFY IN THIS CASE?

5      THE JUROR: YES, SIR.

6      THE COURT: THANK YOU, MR. PHILIP.

7      THE JUROR: THANK YOU.

8      THE COURT: ANYONE ELSE?

9           OKAY.  AND LET THE RECORD REFLECT THAT

10     NO OTHER HANDS ARE BEING RAISED AT THIS TIME.

11          NOW, HAS ANYONE HERE, AND I MENTIONED

12     EARLIER, THE INTERNAL REVENUE SERVICE

13     CRIMINAL INVESTIGATION DIVISION IS THE AGENCY

14     THAT CONDUCTED THE INVESTIGATION THAT

15     RESULTED IN THE FILING OF CHARGES IN THIS

16     CASE.  NOW, I RECOGNIZE THAT IT'S ALWAYS A

17     CHALLENGE SOMETIMES TO PAY TAXES.  WE MAY

18     HAVE AN OPINION ONE WAY OR AN OPINION FOR

19     GOOD OR BAD ABOUT THE ROLE OF THE IRS.

20          BUT IF ANYONE HERE IS NOT ABLE TO

21     EVALUATE THE TESTIMONY OF AN IRS EMPLOYEE THE

22     SAME AS YOU WOULD EVALUATE THE TESTIMONY OF

23     ANY OTHER WITNESS IN THIS CASE, PLEASE RAISE

24     YOUR HAND.

25          AND LET THE RECORD REFLECT THAT NO HANDS

1    ARE BEING RAISED AT THIS TIME.

2         HAS ANYONE HERE HAD ANY -- HAVE ANY

3    STRONG OPINION ABOUT LOCAL, STATE OR FEDERAL

4    LAW ENFORCEMENT OR LAW ENFORCEMENT OFFICIALS?

5    IF YOU HAVE ANY -- WE ALL RECOGNIZE THAT THEY

6    HAVE A ROLE IN OUR SOCIETY, CERTAINLY IN OUR

7    NATION.  BUT IF YOU HAVE A PARTICULARLY

8    STRONG FEELING ABOUT LAW ENFORCEMENT, LOCAL,

9    STATE OR FEDERAL, PLEASE RAISE YOUR HAND AND

10   I'LL HAVE ADDITIONAL QUESTIONS FOR YOU.

11        AND LET THE RECORD REFLECT THAT NO HANDS

12   ARE BEING RAISED AT THIS TIME.

13        DO ANY OF YOU HERE BELIEVE THAT SIMPLY

14   STEALING GOVERNMENT FUNDS IS A VICTIMLESS

15   CRIME BECAUSE THE MONEY IS COMING FROM THE

16   U.S. TREASURY AND NOT NECESSARILY FROM AN

17   INDIVIDUAL PERSON?  IF YOU BELIEVE THAT IT

18   SHOULDN'T BE A CRIME TO STEAL FROM THE U.S.

19   TREASURY AS OPPOSED TO AN INDIVIDUAL, PLEASE

20   RAISE YOUR HAND.

21        AND LET THE RECORD REFLECT THAT NO HANDS

22   ARE BEING RAISED AT THIS TIME.

23        NOW, IF ANY OF YOU HAVE EVER SERVED ON A

24   JURY BEFORE, PLEASE RAISE YOUR HAND AND I

25   WILL HAVE ADDITIONAL QUESTIONS FOR YOU.

1           AND LET'S BEGIN WITH THE FIRST ROW OF

2     THE JURY BOX.  WE'LL BEGIN WITH YOU, JUROR

3     NUMBER ONE, MR. GORMAN.  MR. GORMAN, DID YOU

4     -- YOU'VE SERVED PREVIOUSLY ON A JURY; IS

5     THAT RIGHT?

6     THE JUROR: YES, I DID.

7     THE COURT: WAS THAT IN A CIVIL CASE OR

8           A CRIMINAL CASE?

9     THE JUROR: STATE CRIMINAL COURT.

10    THE COURT: CRIMINAL?

11    THE JUROR: STATE CRIMINAL CASE.

12    THE COURT: HOW LONG AGO WAS THAT, MR. GORMAN?

13    THE JUROR: I'D SAY PROBABLY ABOUT TWO YEARS

14          AGO.

15    THE COURT: DO YOU REMEMBER THE CRIME CHARGED?

16    THE JUROR: MURDER.

17    THE COURT: DID THE JURY DELIBERATE IN THE

18          CASE OR WAS THERE A PLEA BEFORE YOU

19    DELIBERATED?

20    THE JUROR: WE DELIBERATED.

21    THE COURT: AND DID YOU FIND -- WAS THE

22          VERDICT GUILTY OR NOT GUILTY?

23    THE JUROR: IT WAS ALREADY GUILTY.  THERE

24          WAS NO QUESTION.  IT WAS JUST THE

25    DEGREE.

1      THE COURT: OKAY.  AND DO YOU RECALL WHAT THE

2          VERDICT ---

3      THE JUROR: SECOND DEGREE MURDER.

4      THE COURT: SECOND?

5      THE JUROR: SECOND.

6      THE COURT: SECOND DEGREE MURDER.  OKAY.

7          ALL RIGHT.  DID YOU SERVE AS THE

8      FOREPERSON OF THE JURY, SIR?

9      THE JUROR: NO.

10     THE COURT: NOW, AT THAT TIME, YOU MAY OR

11         MAY NOT RECALL THAT THE JUDGE IN THE

12     CASE GAVE YOU CERTAIN INSTRUCTIONS THAT

13     GUIDED YOUR DELIBERATIONS IN THE CASE.  DO

14     YOU REMEMBER THAT, SIR?

15     THE JUROR: I REMEMBER THEM.

16     THE COURT: OKAY.  NOW, IT'S VERY IMPORTANT,

17         MR. GORMAN, THAT IF YOU ARE SELECTED TO

18     SERVE AS A JUROR IN THIS CASE, THAT YOU

19     DISREGARD ANYTHING THAT YOU RECALL FROM

20     HAVING SERVED AS A JUROR TWO YEARS AGO IN A

21     MURDER CASE, AND BASE YOUR DECISION SOLELY ON

22     THE INSTRUCTIONS THAT I GIVE YOU IN THIS

23     CASE.  DO YOU UNDERSTAND THAT, SIR?

24     THE JUROR: YES, SIR.

25     THE COURT: DO YOU HAVE ANY PROBLEM WITH THAT,

1              MR. GORMAN?

2          THE JUROR: NO, SIR.

3          THE COURT: THANK YOU, SIR.

4              ANYONE ELSE ON THE FIRST ROW?  MS.

5      LINDBERG?

6          THE JUROR: YES.

7          THE COURT: NOW, DID YOU SERVE ON A CIVIL

8              CASE OR A CIVIL TRIAL OR A CRIMINAL

9      TRIAL?

10          THE JUROR: CIVIL.

11          THE COURT: WAS THAT IN STATE COURT OR

12              FEDERAL COURT?

13          THE JUROR: IT WAS IN STATE COURT.

14          THE COURT: DO YOU RECALL HOW LONG AGO

15              THAT WAS?

16          THE JUROR: IT WAS OCTOBER OF 2014.

17          THE COURT: AND DO YOU REMEMBER THE NATURE

18              OF THE CASE, THE NATURE OF THE DISPUTE?

19          THE JUROR: YES, SIR.

20          THE COURT: WHAT WAS IT?

21          THE JUROR: IT WAS AN ACCIDENT.  IT WAS,

22              BASICALLY, SHE WAS SUING THE PERSON

23      THAT HIT HER, THE INSURANCE COMPANY, FOR

24      FUNDS.

25          THE COURT: SO, IT WAS AN AUTOMOBILE ACCIDENT?

1          THE JUROR: YES.

2          THE COURT: DID THE JURY DELIBERATE OR WAS

3              THERE A SETTLEMENT?

4          THE JUROR: YES, WE DID DELIBERATE.

5          THE COURT: DID YOU FIND FOR THE PLAINTIFF;

6              THAT IS, THE PERSON WHO BROUGHT THE

7          LAWSUIT, OR THE DEFENDANT, THE PERSON OR

8          ENTITY THAT WAS SUED?

9          THE JUROR: WE FOUND FOR THE PLAINTIFF.

10         THE COURT: WAS A MONEY JUDGMENT AWARDED?

11         THE JUROR: YES, THERE WAS.

12         THE COURT: DID YOU SERVE AS THE FOREPERSON

13             OF THAT JURY?

14         THE JUROR: NO, I DID NOT.

15         THE COURT: DO YOU UNDERSTAND, MS. LINDBERG,

16             THAT THIS IS A CRIMINAL CASE AND THAT

17         WHATEVER INSTRUCTIONS ON THE LAW THAT WERE

18         PROVIDED TO YOU IN THAT CASE DO NOT APPLY

19         HERE?  DO YOU UNDERSTAND THAT?

20         THE JUROR: YES, I DO.

21         THE COURT: DO YOU THINK THAT IF YOU'RE

22             SELECTED TO SERVE AS A JUROR IN THIS

23         CASE YOU WOULD BE CAPABLE OF DISREGARDING

24         ANYTHING YOU REMEMBER BEING GIVEN; THAT IS,

25         IN TERMS OF THE JURY INSTRUCTIONS IN THAT

1      CASE AND BASE YOUR DECISION SOLELY ON THE

2      EVIDENCE IN THIS CASE AND THE INSTRUCTIONS ON

3      THE LAW THAT I GIVE YOU?

4      THE JUROR: YES, SIR.

5      THE COURT: THANK YOU, MA'AM.

6      THE JUROR: THANK YOU.

7      THE COURT: ANYONE ELSE ON THE FIRST ROW?

8          ANYONE ON THE SECOND ROW?  MR. BARBIER?

9      WAS IT A CRIMINAL CASE OR A CIVIL CASE, SIR?

10     THE JUROR: I WAS ON A GRAND JURY.

11     THE COURT: OKAY.  WAS THAT IN FEDERAL COURT

12         OR STATE COURT?

13     THE JUROR: I BELIEVE IT WAS STATE.

14     THE COURT: DO YOU REMEMBER HOW LONG AGO

15         THAT WAS?

16     THE JUROR: TEN TO 15 YEARS.

17     THE COURT: DID YOU COME INTO THIS BUILDING

18         OR WAS IT ANOTHER BUILDING?

19     THE JUROR: NO, IT WAS IN IBERVILLE PARISH.

20     THE COURT: OKAY, THAT'S RIGHT.  THAT WOULD

21         HAVE BEEN STATE COURT GRAND JURY.

22         NOW, MR. BARBIER, AND I'M SURE YOU

23     UNDERSTAND THAT THE ROLE OF THE GRAND JURY

24     DIFFERS FROM THE ROLE OF A TRIAL JURY.  DO

25     YOU UNDERSTAND THAT, SIR?

1      THE JUROR: YES, I DO.

2      THE COURT: IN OTHER WORDS, THE ROLE IN THE

3          GRAND JURY WAS JUST MERELY TO DETERMINE

4      IF THERE WAS PROBABLE CAUSE TO BELIEVE THAT A

5      CRIME WAS COMMITTED, NOT WHETHER OR NOT A

6      PERSON WAS GUILTY OF THE CRIME.  DO YOU

7      RECALL THAT, SIR?

8      THE JUROR: YES, SIR.

9      THE COURT: ALL RIGHT.  WERE YOU THE

10         FOREPERSON OF THE GRAND JURY?

11     THE JUROR:  NO, I WASN'T.

12     THE COURT: NOW, IF YOU ARE SELECTED TO

13         SERVE AS A JUROR IN THIS CASE, SIR,

14     WOULD YOU BE ABLE TO DISREGARD ANYTHING YOU

15     RECALL IN TERMS OF THE INSTRUCTIONS GIVEN TO

16     YOU BY THE SUPERVISING JUDGE IN THAT IN

17     IBERVILLE PARISH, AND BASE YOUR DECISION

18     SOLELY ON THE EVIDENCE IN THIS CASE AND THE

19     INSTRUCTIONS ON THE LAW THAT I PROVIDE YOU?

20     THE JUROR: YES, SIR, I CAN.

21     THE COURT: THANK YOU, MR. BARBIER.

22         ANYONE ELSE IN THE JURY BOX?  ANYONE

23     ALONG THE RAIL?  MS. LYONS?

24         NOW, MS. LYONS, WAS IT A CRIMINAL CASE

25     OR A CIVIL CASE?

1    THE JUROR: YOU HONOR, I RALLY DON'T REMEMBER.

2         IT'S BEEN ABOUT -- AT LEAST 17 YEARS

3    AGO.

4    THE COURT: AND WAS IT IN STATE COURT OR

5         FEDERAL COURT?

6    THE JUROR: STATE COURT.

7    THE COURT: BUT YOU DON'T REMEMBER IF IT

8         WAS A CRIME OR AN AUTOMOBILE ACCIDENT

9    OR ANYTHING LIKE THAT?

10   THE JUROR: I'M THINKING IT WAS A -- IT

11        WAS SOMETHING WITH THE MANAGER ABUSING

12   THE SICK LEAVE AT HOME AND HAVING THE STATE

13   WORKERS ALSO TO WORK AT HIS HOUSE.

14   THE COURT: NOW, WOULD YOU BE CAPABLE OF

15        DISREGARDING ANY INSTRUCTIONS YOU WOULD

16   HAVE RECEIVED FROM THE JUDGE IN THAT CASE,

17   AND IF SELECTED TO SERVE AS A JUROR HERE

18   WOULD YOU BE ABLE TO ABIDE BY MY INSTRUCTIONS

19   AND CONSIDER ONLY THE EVIDENCE IN THIS CASE?

20   THE JUROR: YES.

21   THE COURT: THANK YOU, MA'AM.

22        MR. DOMINIGUE?

23   THE JUROR: YES.

24   THE COURT: CRIMINAL OR CIVIL CASE, SIR?

25   THE JUROR: CRIMINAL.

1    THE COURT: HOW LONG AGO WAS THAT?

2    THE JUROR: MID '90'S, AS I RECALL.

3    THE COURT: FEDERAL COURT OR STATE COURT?

4    THE JUROR: STATE.

5    THE COURT: WHERE?

6    THE JUROR: EXCUSE ME?

7    THE COURT: DO YOU RECALL WHAT PARISH?

8    THE JUROR: OH, IN BATON ROUGE.

9    THE COURT: BATON ROUGE.  OKAY.  EAST

10        BATON ROUGE PARISH?

11    THE JUROR: YES.

12    THE COURT: ALL RIGHT.  DID THE JURY

13        DELIBERATE IN THE CASE?

14    THE JUROR: YES.

15    THE COURT: AND WHAT WAS THE VERDICT?

16    THE JUROR: GUILTY.

17    THE COURT: DO YOU REMEMBER THE CRIME?

18    THE JUROR: NARCOTICS.

19    THE COURT: WOULD YOU BE CAPABLE, SIR,

20        IF YOU'RE SELECTED TO SERVE AS A JUROR

21    IN THIS CASE, WOULD YOU BE CAPABLE OF

22    DISREGARDING ANYTHING YOU REMEMBER ABOUT THAT

23    CASE AND, MORE SPECIFICALLY, THE INSTRUCTIONS

24    GIVEN TO YOU IN THAT CASE BY THE JUDGE?

25        COULD YOU PUT THAT ASIDE, AND IF SELECTED TO

1    SERVE AS A JUROR IN THIS CASE, BASE YOUR

2    DECISION SOLELY ON THE EVIDENCE AND THE LAW

3    IN THIS CASE?

4    THE JUROR: YES, SIR.  I CAN.

5    THE COURT: THANK YOU, SIR.

6        ANYONE ON THE SECOND ROW?  EXCUSE ME.

7    THAT'S MR. TOWNSEND?

8    THE JUROR: NO.

9    THE COURT: NO.  MR. DUHON?

10    THE JUROR: YES.

11    THE COURT: YES.  MR. DUHON, WAS IT A

12        CRIMINAL CASE OR A CIVIL CASE, SIR?

13    THE JUROR: CRIMINAL.

14    THE COURT: FEDERAL COURT OR STATE COURT?

15    THE JUROR: STATE.

16    THE COURT: DO YOU REMEMBER WHAT PARISH?

17    THE JUROR: EAST BATON ROUGE.

18    THE COURT: AND HOW LONG AGO WAS THAT?

19    THE JUROR: TWENTY-THREE YEARS AGO.

20    THE COURT: DO YOU REMEMBER THE CHARGE?

21    THE JUROR: IT WAS MURDER.

22    THE COURT: AND DID THE JURY DELIBERATE

23        IN THE CASE?

24    THE JUROR: YES.

25    THE COURT: WHAT WAS THE VERDICT?

1    THE JUROR: GUILTY.

2    THE COURT: AND WAS IT FIRST DEGREE MURDER,

3        SECOND DEGREE OR DO YOU RECALL?

4    THE JUROR: I DON'T REMEMBER.

5    THE COURT: WERE YOU REQUIRED TO DETERMINE

6        THE SENTENCING PHASE?  IN OTHER WORDS,

7    WAS THE DEATH PENALTY SOUGHT IN THE CASE?

8    THE JUROR: I'M NOT SURE.

9    THE COURT: BUT YOU DON'T RECALL

10        DELIBERATING ON THE DEATH PENALTY?

11    THE JUROR: IT'S BEEN SO LONG AGO.

12    THE COURT: ALL RIGHT.  NOW, WERE YOU THE

13        FOREPERSON OF THAT JURY, SIR?

14    THE JUROR: NO, SIR.

15    THE COURT: WOULD YOU BE CAPABLE -- YOU

16        HAVE HEARD ME ASK THE OTHERS, AND I'LL

17    ASK YOU, SIR.  ARE YOU CAPABLE OF

18    DISREGARDING ANY INSTRUCTIONS ON THE LAW THAT

19    YOU WOULD HAVE RECEIVED BY THE JUDGE IN THAT

20    CASE?  AND IF SELECTED TO SERVE AS A JUROR IN

21    THIS CASE, COULD YOU BASE YOUR DECISION

22    SOLELY ON THE EVIDENCE IN THIS CASE AND THE

23    LAW THAT I GIVE YOU?

24    THE JUROR: YES, SIR.

25    THE COURT: ALL RIGHT.  THANK YOU, SIR.

1          ANYONE ELSE?  MS. CRONAN?

2     THE JUROR: YES.

3     THE COURT: WAS IT A CRIMINAL CASE OR A

4          CIVIL CASE, MA'AM?

5     THE JUROR: I'VE DONE BOTH, CRIMINAL AND

6          CIVIL.

7     THE COURT: OKAY.  LET'S TAKE THE MORE

8          RECENT ONE.

9     THE JUROR: THE MORE RECENT ONE WAS 20

10          YEARS AGO, WHICH THAT WAS CIVIL.

11     IT WAS A CAR ACCIDENT.  WELL, THEY WERE SUING

12     THE INSURANCE COMPANY.

13     THE COURT: AND DID THE JURY DELIBERATE

14          IN THE CASE OR WAS THERE A SETTLEMENT

15     BEFORE YOU DELIBERATED?

16     THE JUROR: THERE WAS DELIBERATION.  I

17          DON'T REMEMBER THE OUTCOME, HONESTLY.

18     THE COURT: OKAY.  WAS THAT STATE COURT

19          OR CRIMINAL COURT OR FEDERAL COURT?

20     THE JUROR: I DON'T REMEMBER.

21     THE COURT: AND TELL ME ABOUT YOUR SECOND

22          EXPERIENCE AS A JUROR.

23     THE JUROR: THE OTHER ONE WAS CRIMINAL.  IT

24          WAS -- IT WAS ABOUT 22 YEARS AGO.

25     IT WAS A ARMED ROBBERY, BURGLARY, AND HE WAS

1      FOUND GUILTY.

2          THE COURT: WAS THAT IN FEDERAL COURT OR

3              STATE COURT?

4          THE JUROR: I THINK FEDERAL.

5          THE COURT: AND THE JURY DID DELIBERATE

6              ON GUILT; IS THAT CORRECT?

7          THE JUROR: CORRECT.

8          THE COURT: ALL RIGHT.  DID YOU SERVE AS

9              THE FOREPERSON IN EITHER OF THOSE

10     CRIMES?

11         THE JUROR: NO.

12         THE COURT: TRIALS, I SHOULD SAY.  NOW,

13             TO THE EXTENT YOU REMEMBER ANYTHING, ANY

14     INSTRUCTIONS ON THE LAW THAT WERE GIVEN TO

15     YOU BY THE JUDGES IN THOSE CASES, WOULD YOU

16     BE CAPABLE OF SETTING THAT ASIDE, AND IF

17     SELECTED TO SERVE AS A JUROR IN THIS TRIAL

18     BASE YOUR DECISION SOLELY ON THE EVIDENCE IN

19     THIS CASE AND THE INSTRUCTIONS THAT I GIVE

20     YOU?

21         THE JUROR: YES.

22         THE COURT: THANK YOU, MA'AM.

23             AND, FINALLY, MS. BUCKELS?  WAS IT A

24     CRIMINAL CASE OR A CIVIL CASE, MA'AM?

25         THE JUROR: CIVIL.

1    THE COURT: A STATE COURT OR A FEDERAL COURT?

2    THE JUROR: STATE.

3    THE COURT: DO YOU REMEMBER THE NATURE OF

4        THE DISPUTE?

5    THE JUROR: INSURANCE.

6    THE COURT: WAS IT AN AUTOMOBILE ACCIDENT

7        WHEN YOU SAY IT WAS INSURANCE?

8    THE JUROR: NO.  IT WAS -- A GENTLEMAN

9        WAS CUTTING TREES THAT WERE ON LINES AND

10   HE GOT INJURED THAT WAY.

11   THE COURT: NOW, DID THE JURY DELIBERATE IN

12       THE CASE OR WAS THERE A SETTLEMENT

13   BEFORE DELIBERATION?

14   THE JUROR: NO, THERE WAS DELIBERATION.

15   THE COURT: AND WHAT WAS THE VERDICT?

16   THE JUROR: IT WAS AGAINST THE PLAINTIFF.

17   THE COURT: IT WAS AGAINST THE PLAINTIFF,

18       OKAY.  SO, YOU FOUND FOR THE DEFENDANT

19   IN THE CASE, CORRECT?

20   THE JUROR: YES.

21   THE COURT: WERE YOU THE FOREPERSON OF THE

22       JURY?

23   THE JUROR: NO, SIR.

24   THE COURT: WOULD YOU BE CAPABLE OF SETTING

25       ASIDE ANYTHING YOU REMEMBER ABOUT THAT

1    CASE IN TERMS OF THE INSTRUCTIONS, AND IF

2    SELECTED TO SERVE AS A JUROR IN THIS CASE

3    BASE YOUR DECISION SOLELY ON THE EVIDENCE AND

4    THE INSTRUCTIONS ON THE LAW THAT I GIVE YOU?

5    THE JUROR: ABSOLUTELY.

6    THE COURT: THANK YOU, MS. BUCKELS.

7         ANYONE ELSE?   ALL RIGHT.   THANK YOU

8    ALL VERY MUCH.

9         NOW, HAVE ANY OF YOU EVER BEEN REQUIRED

10   -- FIRST OF ALL, HAVE YOU OR ANY OF YOUR

11   IMMEDIATE FAMILY MEMBERS EVER HAVE TO BRING A

12   LAWSUIT IN COURT EITHER AS A PLAINTIFF OR A

13   DEFENDANT?  IF SO, PLEASE RAISE YOUR HAND AND

14   I'LL HAVE ADDITIONAL QUESTIONS FOR YOU.

15   WE'LL BEGIN IN THE JURY BOX IN THE FIRST ROW.

16   ANYONE?  ANYONE ON THE SECOND ROW?  ANYONE

17   ALONG THE RAIL?

18        YES, SIR.  THAT'S MR. ZERA?

19   THE JUROR: YES, SIR.

20   THE COURT: AND DID YOU BRING A LAWSUIT

21        OR WERE YOU THE DEFENDANT IN A LAWSUIT?

22   THE JUROR: IT WAS -- MY GRANDMOTHER GOT

23        BROUGHT TO COURT BY MY UNCLE.  IT WAS AN

24   INTERDICTION ON POWER OF ATTORNEY OVER MY

25   AUNT.

1        THE COURT: OKAY.  AND WHAT WAS YOUR ROLE IN

2            THAT, SIR?

3        THE JUROR: I WAS -- I JUST ENTERED THE

4            COURTROOM.  I WAS THERE FOR THE CASE.

5    I MEAN, I'VE BEEN HEARING ABOUT THIS FOR

6    ABOUT THE PAST SIX MONTHS.

7        THE COURT: OKAY.  BUT YOU WEREN'T BEING

8            SUED AND YOU'RE NOT SUING, CORRECT?

9        THE JUROR: NO, UH UH.

10       THE COURT: DO YOU KNOW IF YOU'RE A WITNESS

11           IN THAT CASE, SIR?

12       THE JUROR: MAYBE DOWN THE ROAD IF HE BRINGS

13           THE CHARGES UP.

14       THE COURT: OKAY.  BUT RIGHT NOW YOU'RE NOT?

15       THE JUROR: NO.

16       THE COURT: OKAY.  THANK YOU, SIR.

17           ANYONE ON THE SECOND ROW?  OKAY.

18           LET THE RECORD REFLECT THAT NO HANDS

19    ARE BEING RAISED.  THANK YOU, LADIES AND

20    GENTLEMEN.

21           NOW, IF ANY OF YOU WERE EVER REQUIRED TO

22    TESTIFY IN COURT IN ANY LEGAL PROCEEDINGS AS

23    A WITNESS OR EVEN IF YOU WERE REQUIRED TO

24    SUBMIT TO A DEPOSITION, WHICH IS A TESTIMONY

25    BEFORE A COURT REPORTER OUTSIDE OF THE COURT

1      IN PREPARATION FOR TRIAL, PLEASE RAISE YOUR

2      HAND.  AND WE'LL BEGIN WITH THE FIRST ROW.

3          ANYONE ON THE FIRST ROW?  YES, SIR.  MR.

4      GORMAN?  NOW, WHAT KIND OF CASE WAS IT?  DID

5      YOU TESTIFY?

6      THE JUROR: IT WAS PERSONAL BANKRUPTCY ABOUT

7          20 YEARS AGO.

8      THE COURT: ALL RIGHT.  VERY GOOD.  THANK

9          YOU, SIR.

10         ANYONE ELSE?  MS. LANUS?

11     THE JUROR: UH HUH.

12     THE COURT: OKAY.

13     THE JUROR: I HAD TO TESTIFY WHEN I WAS

14         WORKING AT A CONVENIENCE STORE AND THE

15     GUY ROBBED ME.

16     THE COURT: OKAY.

17     THE JUROR: HAD TO COME TO COURT.

18     THE COURT: HOW LONG AGO WAS THAT?

19     THE JUROR: IT WAS IN THE EARLY '90'S.

20     THE COURT: OKAY.  NOW, THE FACT THAT YOU

21         TESTIFIED IN CONNECTION WITH THAT CRIME,

22     WOULD THAT IN ANY WAY AFFECT YOUR ABILITY TO

23     SERVE AS A FAIR AND IMPARTIAL JUROR IN THIS

24     CASE?

25     THE JUROR: NO.

1    THE COURT: YOU UNDERSTAND THAT MR. LINARES

2        HAS ONLY BEEN ACCUSED OF A CRIME?  YOU

3    UNDERSTAND THAT?

4    THE JUROR: YES, SIR.

5    THE COURT: NOW, THERE OR MAY NOT BE TESTIMONY

6        THAT THERE WAS A SMALL STORE THAT WAS

7    INVOLVED AND YOU WORKED AT A SMALL STORE,

8    OBVIOUSLY, AT SOME POINT, CORRECT?

9    THE JUROR: YES, SIR.

10   THE COURT: WOULD THE FACT THAT SORT OF

11       SMALL NEIGHBORHOOD GROCERY STORE OR A

12   BUSINESS OF SOME SORT IS INVOLVED IN THIS

13   CASE, SIMILAR PERHAPS TO WHERE YOU WORKED,

14   WOULD THAT IN ANY WAY AFFECT YOUR ABILITY TO

15   SERVE AS A FAIR AND IMPARTIAL JUROR, MA'AM?

16   THE JUROR: NO, SIR.

17   THE COURT: THANK YOU, MA'AM.

18       ANYONE ELSE?  MR. LIEUX?

19   THE JUROR: ABOUT 35 YEARS AGO THERE WAS A

20       PLANE CRASH IN PATTERSON, AND I GAVE A

21   DEPOSITION.

22   THE COURT: OKAY.  ALL RIGHT.  THANK YOU,

23       SIR.

24       AND, MS. LINDBERG?

25   THE JUROR: YES.  MY HUSBAND HAS BEEN

1              SUBPOENAED, I HAVE NOT, FOR AN ARMED

2         ROBBERY IN OUR HOME.

3         THE COURT: AND WHEN DID THAT ROBBERY

4              TAKE PLACE?

5         THE JUROR: OCTOBER OF 2014.

6         THE COURT: THAT WAS AN ARMED ROBBERY,

7              YOU SAID?

8         THE JUROR: WE WERE NOT THERE.  YES,

9              A FIREARM WAS FOUND UNDER MY DAUGHTER'S

10        MATTRESS.

11        THE COURT: OKAY.  BUT, SO, THE FACT THAT

12             YOU ARE THE VICTIM OF THIS CRIME, WOULD

13        THAT IN ANY WAY CAUSE YOU TO NOT BE CAPABLE

14        OF BEING FAIR TO MR. LINARES IN THIS TRIAL?

15        THE JUROR: NO.

16        THE COURT: NOW, YOU KNOW THAT MR. LINARES

17             IS NOT CHARGED WITH OR NOT INVOLVED --

18        WELL, HE CERTAINLY HASN'T BEEN ACCUSED OF

19        HAVING ANY SUCH INVOLVEMENT IN A CRIME

20        INVOLVING A FIREARM OR A BURGLARY OR ROBBERY

21        OR ANYTHING LIKE THAT.  DO YOU UNDERSTAND

22        THAT?

23        THE JUROR: YES.  AND THE ONLY REASON THAT

24             I BROUGHT IT UP IS BECAUSE THERE WERE --

25        THEY WERE ALSO INVOLVED IN A INCIDENT AT A

1    CONVENIENCE STORE THE NIGHT BEFORE.

2    THE COURT: OKAY.

3    THE JUROR: SO, I WANTED TO MAKE SURE THAT

4        THAT ---

5    THE COURT: OKAY.  SO THERE WERE ARRESTS

6        MADE IN CONNECTION WITH THAT, CORRECT?

7    THE JUROR: YES.  THEY WERE APPREHENDED IN

8        MY HOME.

9    THE COURT: OH, IN YOUR HOME.  OKAY.

10    THE JUROR: YES.

11    THE COURT: THE FACT THAT A CONVENIENCE

12        STORE OR A SMALL STORE MAY HAVE BEEN

13    INVOLVED, THERE MAY HAVE BEEN SOME

14    INVOLVEMENT IN SUCH A LOCATION, WOULD THAT

15    HAVE ANY BEARING, MA'AM, ON YOUR ABILITY TO

16    SERVE AS A FAIR AND IMPARTIAL JUROR IN THIS

17    CASE?

18    THE JUROR: NO.

19    THE COURT: THANK YOU, MA'AM.

20    THE JUROR: THANK YOU.

21    THE COURT: ANYONE ELSE IN THE FIRST ROW?

22        ANYONE IN THE SECOND ROW?  MR. PHILIP?

23    THE JUROR: YES, SIR.  IT WAS A DEPOSITION FOR

24        NATCHIDOCHES FIREFIGHTERS VERSUS THE

25    STATE.

1    THE COURT: OKAY.  AND WHO DID YOU -- WERE

2         YOU DEPOSED AS A WITNESS FOR THE

3    FIREFIGHTERS OR THE STATE?

4    THE JUROR: I WAS AN ACCOUNTANT FOR THE

5         FIREFIGHTERS AT THE TIME, SO I HAD TO --

6    BASED OFF MY KNOWLEDGE OF THE JOB.

7    THE COURT: OKAY.  ALL RIGHT.  NOW, WERE

8         YOU -- DID YOU TESTIFY IN THE TRIAL?

9    THE JUROR: NO, SIR.  IT WAS JUST A

10        DEPOSITION WAS ALL WE HAD.

11   THE COURT: NOW, WHAT WAS YOUR ROLE TO

12        THE FIREFIGHTERS?

13   THE JUROR: STAFF ACCOUNTANT.

14   THE COURT: OKAY.  DO YOU HAVE AN ACCOUNTING

15        BACKGROUND, SIR?

16   THE JUROR: YES, SIR.

17   THE COURT: WERE YOU EVER TRAINED IN

18        MONEY LAUNDERING OR, MORE SPECIFICALLY,

19   ANTI-MONEY LAUNDERING MEASURES?

20   THE JUROR: NO, SIR.

21   THE COURT: OKAY.  AND WHAT DO YOU DO NOW?

22   THE JUROR: I MANAGE -- I WORK AT A PLANT.

23   THE COURT: SO YOU'RE NO INVOLVED IN ANY

24        TYPE OF FINANCIAL ACTIVITIES OF ANY

25   KIND?

1    THE JUROR: NO, SIR.

2    THE COURT: NOW, OTHER THAN THAT JOB

3        WITH THE FIREFIGHTERS, WERE YOU

4    INVOLVED IN ANY FINANCIAL SERVICES OTHER THAN

5    THAT?

6    THE JUROR: NO, SIR.

7    THE COURT: OKAY.  THANK YOU, MR. PHILIP.

8    THE JUROR: UH HUH.

9    THE COURT: ANYONE ELSE?

10    THE JUROR: YES.  I WAS INVOLVED IN AN

11        ACCIDENT WHERE I WAS AT FAULT IN 1986.

12    THE COURT: AND THAT'S MR. BARBER?

13    THE JUROR: YES.  I'M SORRY.

14    THE COURT: YES.  ALL RIGHT.

15    THE JUROR: AND I WAS A WITNESS -- I THINK

16        THE INSURANCE COMPANIES WERE TRYING TO

17    DETERMINE WHAT LEVEL OF RESPONSIBILITY EACH

18    INSURANCE COMPANY HAD AND IF MAYBE OTHERS HAD

19    SOME FAULT IN THE ACCIDENT, AS WELL.

20    THE COURT: SO, YOU WERE DEPOSED.  BUT WERE

21        YOU REQUIRED TO TESTIFY AT TRIAL?

22    THE JUROR: YES.

23    THE COURT: OKAY.  WHEN WAS THE TRIAL, SIR?

24    THE JUROR: IT WAS IN 1986.

25    THE COURT: OKAY.  AND WERE YOU A PARTY TO

1          THE LAWSUIT OR WAS YOUR INSURANCE

2    COMPANY SUED -- OR WERE YOU SUED OR WAS IT

3    JUST YOUR ---

4    THE JUROR: JUST THE INSURANCE COMPANY.

5    THE COURT: OKAY.  AND DID THE MATTER GO TO

6          A VERDICT OR WAS THERE A SETTLEMENT, DO

7    YOU KNOW?

8    THE JUROR: I DON'T KNOW.

9    THE COURT: VERY GOOD.  OKAY.  THANK YOU,

10          MR. BARBER.

11          ANYONE ELSE IN THE SECOND ROW?  ANYONE

12    ALONG THE RAIL?

13          NOW, MR. LANDRY?

14    THE JUROR: YES, SIR.

15    THE COURT: DID YOU TESTIFY AT A TRIAL

16          OR WERE YOU DEPOSED?

17    THE JUROR: I WAS THE VICTIM OF AN ARMED

18          ROBBERY AT CIRCLE-K IN '93, WHERE I HAD

19    TO GO TO COURT AND BASICALLY PERFORM AS A

20    WITNESS.

21    THE COURT: WAS THAT HERE IN BATON ROUGE?

22    THE JUROR: HERE IN BATON ROUGE, YES.

23    THE COURT: OKAY.  AND YOU DID TESTIFY AT

24          THE TRIAL?

25    THE JUROR: YES.

1       THE COURT: OKAY.  NOW, THE FACT THAT YOU WERE

2            THE VICTIM OF A CRIME, SIR, YOU

3       UNDERSTAND THAT MR. LINARES IS NOT CHARGED

4       WITH A FIREARM OFFENSE?  YOU UNDERSTAND THAT,

5       SIR?

6       THE JUROR: YES.

7       THE COURT: WOULD THAT HAVE ANY BEARING IN

8            YOUR ABILITY TO SERVE AS A FAIR AND

9       IMPARTIAL JUROR IN THIS CASE?

10      THE JUROR: NO.

11      THE COURT: DO YOU THINK YOU WOULD STILL

12           GIVE MR. LINARES DUE CONSIDERATION AND A

13      FAIR SHAKE, IF YOU WILL?

14      THE JUROR: I BELIEVE I WOULD.

15      THE COURT: YOU BELIEVE?  IT'S IMPORTANT.

16      THE JUROR: I WOULD.

17      THE COURT: OKAY.  VERY GOOD.  THANK

18           YOU, MR. LANDRY.

19           ALL RIGHT.  YES, SIR.  MR. BIRT?

20      THE JUROR: I'VE GIVEN DEPOSITIONS IN AN

21           ARSON CASE.

22      THE COURT: OKAY.  AND ---

23      THE JUROR: APPROXIMATELY SEVEN YEARS AGO.

24      THE COURT: BUT YOU DIDN'T HAVE TO TESTIFY

25           AT THE TRIAL, RIGHT?

1           THE JUROR: NO, SIR.

2           THE COURT: ALL RIGHT.  THANK YOU VERY MUCH,

3                SIR.

4                NOW, LET ME ASK YOU THIS, MR. BIRT.  WAS

5           THAT IN CONNECTION WITH A LAWSUIT OR WAS IT

6           IN CONNECTION WITH AN INVESTIGATION BY

7           CRIMINAL AUTHORITIES?

8           THE JUROR: INVESTIGATION AS MY DUTY AS

9                A FIREMAN.

10          THE COURT: OKAY.  ALL RIGHT.  VERY GOOD.

11               THANK YOU, SIR.

12               ANYONE ELSE ALONG THE FIRST ROW?  ANYONE

13          ON THE SECOND ROW?

14               OKAY.  THANK YOU ALL VERY MUCH, LADIES

15          AND GENTLEMEN.

16               NOW, WOULD ANYONE HERE TEND TO GIVE LESS

17          WEIGHT OR MORE WEIGHT TO THE TESTIMONY OF A

18          LAW ENFORCEMENT OFFICER OR A GOVERNMENT

19          EMPLOYEE JUST BECAUSE HE OR SHE IS A LAW

20          ENFORCEMENT OFFICER OR A GOVERNMENT EMPLOYEE?

21          IF YOUR ANSWER TO THAT QUESTION IS YES,

22          PLEASE RAISE YOUR HAND.

23               AND LET THE RECORD REFLECT THAT NO HANDS

24          ARE BEING RAISED AT THIS TIME.

25               HAS ANYONE HERE -- THE NEXT QUESTION

1    WILL ENCOMPASS TWO THINGS.  ONE.  OTHER THAN

2    THOSE WHO HAVE ALREADY SHARED WITH US THE

3    FACT THAT SOME OF YOU MAY HAVE BEEN THE

4    VICTIM OF CRIMES. AND IF YOU'VE ALREADY

5    SHARED THAT WITH US THERE'S NO NEED FOR YOU

6    TO RAISE YOUR HAND ON THIS NEXT QUESTION.

7        BUT FOR THOSE OF YOU WHO HAVE NOT SHARED

8    WITH US THAT YOU WERE A VICTIM OF A CRIME OR

9    CLOSE FAMILY MEMBER, I WOULD ASK THAT -- OR

10   IF YOU OR A CLOSE FAMILY MEMBER HAS BEEN

11   ACCUSED OF A CRIME, I WOULD ASK YOU TO TELL

12   ME MORE ABOUT THAT.

13       NOW, IF THE CRIME IS PARTICULARLY

14   TROUBLING OR IF YOU ARE MORE COMFORTABLE

15   COMING HERE TO THE BENCH TO TELL ME ABOUT

16   THAT, YOU'RE FREE TO DO SO.  OTHERWISE, I

17   WOULD ASK YOU TO ANSWER FROM THE SEATS.

18       SO, AGAIN, IF YOU OR ANY IMMEDIATE

19   FAMILY MEMBER HAVE BEEN THE VICTIM OF A

20   CRIME, I'D LIKE TO KNOW THAT.  OR IF YOU OR

21   ANY OF YOUR CLOSE PERSONAL FAMILY MEMBERS

22   HAVE BEEN CONVICTED OF A CRIME OR EVEN

23   ARRESTED FOR A CRIME, OTHER THAN THE TRAFFIC

24   OFFENSE, LET'S SAY, I WOULD ASK THAT YOU

25   RAISE YOUR HANDS, AND I'LL HAVE ADDITIONAL

1        QUESTIONS FOR YOU.

2              WE'LL BEGIN WITH THE FIRST ROW OF THE

3        JURY BOX.  ANYONE ON THE FIRST ROW?  ANYONE

4        ON THE SECOND ROW?

5              MR. PHILIP?

6        THE JUROR: BRENT PHILIP.  I WAS THE VICTIM

7              OF AN AGGRAVATED ASSAULT.

8        THE COURT: WHEN WAS THAT?

9        THE JUROR: I THINK AUGUST OR SEPTEMBER.

10       THE COURT: OF THIS LAST YEAR?

11       THE JUROR: YES, SIR.

12       THE COURT: WHERE WAS THAT, SIR?

13       THE JUROR: GONZALES/PRAIRIEVILLE.

14       THE COURT: AND WAS ANYONE ARRESTED IN

15              CONNECTION WITH THAT?

16       THE JUROR: YES, SIR.

17       THE COURT: DO YOU KNOW IF THE PERSON

18              ASSOCIATED OR ARRESTED HAS BEEN ACTUALLY

19       CHARGED WITH A CRIME?

20       THE JUROR: THE LAST I SPOKE WITH THE DA,

21              HE WAS WORKING OUT A PLEA DEAL WITH HIM.

22       THE COURT: OKAY.  NOW, THE FACT THAT YOU

23              HAVE BEEN THE VICTIM OF A CRIME, SIR, IN

24       YOUR MIND WOULD THAT CAUSE YOU TO NOT BE

25              CAPABLE OF SERVING AS A FAIR AND IMPARTIAL

1    JUROR IN THIS CASE?

2    THE JUROR: NO.

3    THE COURT: AGAIN, MR. LINARES IS NOT CHARGED

4         WITH ASSAULT, WHICH, SADLY, YOU KNOW,

5    YOU WERE A VICTIM OF.  SO, I WANT TO BE

6    ABSOLUTELY CERTAIN.  WOULD THAT IN ANY WAY,

7    THAT IS, YOUR HORRIBLE EXPERIENCE IN ANY WAY

8    PREVENT YOU FROM SERVING AS A FAIR AND

9    IMPARTIAL JUROR IN THIS CASE?

10   THE JUROR: NO.

11   THE COURT: THANK YOU, MR. PHILIP.

12        ANYONE ELSE?  MR. BARBER?

13   THE JUROR: YES.  I WAS HELD AT A GUN

14        POINT -- ROBBED IN NEW ORLEANS, MEMORIAL

15   DAY, 1995.

16   THE COURT: AND WAS ANYONE ARRESTED IN

17        CONNECTION WITH THAT OFFENSE?

18   THE JUROR: NO.

19   THE COURT: NOW, YOU'VE HEARD ME TELL

20        MR. PHILIP AND OTHERS THAT MR. LINARES

21   IS NOT CHARGED WITH AN ARMED ROBBERY OR

22   ANYTHING LIKE THAT.  WOULD THE FACT THAT YOU

23   WERE THE VICTIM OF SUCH A CRIME PREVENT YOU

24   FROM SERVING AS A FAIR AND IMPARTIAL JUROR IN

25   THIS CASE?

1      THE JUROR: NO, SIR.

2      THE COURT: THANK YOU, SIR.

3          MR. BARBIER?

4      THE JUROR: STAN BARBIER.  MY STEPSON IS

5          INCARCERATED RIGHT NOW FOR THEFT AND

6      DRUGS.

7      THE COURT: HOW LONG HAS HE BEEN INCARCERATED?

8      THE JUROR: HE JUST STARTED FOUR AND A HALF

9          YEARS.

10     THE COURT: AND WHAT IS HIS NAME?

11     THE JUROR: ALBERT FALCON.

12     THE COURT: AND WHERE IS HE INCARCERATED?

13     THE JUROR: INCARCERATED.  SOMEWHERE IN

14         NORTH LOUISIANA.

15     THE COURT: SO, IT WAS A STATE CONVICTION;

16         IS THAT RIGHT?

17     THE JUROR: YES.

18     THE COURT: OKAY.  NOW, THE FACT THAT YOUR

19         STEPSON, YOU SAID?

20     THE JUROR: YES, SIR.

21     THE COURT: THE FACT THAT YOUR STEPSON IS

22         INCARCERATED, WOULD THAT IN ANY WAY

23     PREVENT YOU FROM SERVING AS A FAIR AND

24     IMPARTIAL JUROR, SIR?

25     THE JUROR: NO.  I DON'T THINK.

1    THE COURT: OKAY.  WELL, ---

2    THE JUROR: NO, IT WON'T.

3    THE COURT: OKAY.  VERY GOOD.  AND I HAVE

4         TO ASK YOU.  AND I'M SURE YOU

5    UNDERSTAND, MR. BARBIER, THAT BOTH SIDES IN

6    THIS CASE ARE ENTITLED TO A FAIR EVALUATION

7    AND TREATMENT OF THE EVIDENCE, BOTH THE

8    GOVERNMENT AS WELL AS MR. LINARES.

9         SO, KNOWING THAT YOUR SON -- STEPSON HAS

10   HAD THESE PROBLEMS, DO YOU THINK,

11   NONETHELESS, THAT YOU COULD BE FAIR WITH THE

12   GOVERNMENT AND THE WITNESSES WHO TESTIFY FOR

13   THE GOVERNMENT IN THIS CASE?

14   THE JUROR: YES, I DO.

15   THE COURT: OKAY.  WAS HE CONVICTED OF ANY

16        FINANCIAL CRIMES OR WAS IT JUST DRUG

17   CRIMES?  IF YOU KNOW.

18   THE JUROR: HE WAS A HABITUAL LIAR, DRUGS,

19        THIEF.

20   THE COURT: ALL RIGHT.  WELL, I'M SORRY TO

21        HEAR THAT.  THANK YOU, MR. BARBIER.

22        ANYONE ELSE?  MR. MCCULLOCH?

23   THE JUROR: MY FATHER WAS CONVICTED OF

24        A FEDERAL CRIME HERE IN THIS COURT.

25   THE COURT: HOW LONG AGO WAS THAT, SIR?

1          THE JUROR: TWENTY-FIVE YEARS AGO.

2          THE COURT: AND DO YOU REMEMBER THE

3              CONVICTION OR THE OFFENSE?

4          THE JUROR: IT WAS FINANCIAL.

5          THE COURT: DO YOU KNOW IF HE WAS -- WAS

6              IT A FRAUD CASE?

7          THE JUROR: IT WAS.  I KNOW HE WAS

8              COMPTROLLER FOR CHAMPION INSURANCE

9          COMPANY.

10         THE COURT: OKAY, YES.  THAT WAS A BIG

11             INVESTIGATION.  I THINK INVOLVING THE

12         INSURANCE COMMISSIONER AND ALL OF THAT,

13         CORRECT?

14         THE JUROR: YES.

15         THE COURT: ALL RIGHT.  AND YOUR FATHER'S

16             NAME?

17         THE JUROR: DONALD MCCULLOCH.

18         THE COURT: OKAY.  NOW, HE'S NOT

19             INCARCERATED AT THIS TIME, RIGHT?

20         THE JUROR: NO.  HE'S PASSED AWAY.

21         THE COURT: I'M SORRY TO HEAR THAT, SIR.

22             THE FACT THAT YOUR FATHER WAS CONVICTED

23         OF A FEDERAL OFFENSE THAT MANY YEARS AGO, MR.

24         MCCULLOCH, WOULD THAT HAVE ANY BEARING ON

25         YOUR ABILITY TO SERVE AS A FAIR AND IMPARTIAL

1    JUROR IN THIS CASE?

2    THE JUROR: I'LL DO MY BEST.

3    THE COURT: MEANING THAT YOU WILL TRY NOT TO,

4         BUT THAT IT COULD BE ---

5    THE JUROR: ALL I CAN SAY IS THAT IT'S BROUGHT

6         UP A THOUGHT IN MY MIND, YOU KNOW,

7    TODAY, ABOUT THIS IS WHAT MY DAD WENT

8    THROUGH.

9    THE COURT: ALL RIGHT.  I UNDERSTAND.

10        OKAY.  WELL, THANK YOU, MR. MCCULLOCH.

11        ANYONE ELSE ALONG THE RAIL?  MR. LANDRY?

12   THE JUROR: MY BROTHER IN HOUMA WAS JAILED FOR

13   THEFT OF RENTAL GOODS AND SALES OF RENTAL

14   GOODS.

15   THE COURT: SALE OF WHAT NOW?

16   THE JUROR: RENTAL GOODS.

17   THE COURT: OKAY.  ALL RIGHT.  HOW LONG AGO

18        WAS THAT, SIR?

19   THE JUROR: ABOUT THREE AND A HALF YEARS

20        AGO.

21   THE COURT: IS HE STILL INCARCERATED?

22   THE JUROR: NO.  HE'S BEEN LET OUT. NEVER KNOW

23        WHEN HE'S GOING TO GO IN AGAIN.

24   THE COURT: OKAY.  I TAKE IT YOU DON'T

25        HAVE A WHOLE LOT OF CONFIDENCE IN HIM?

1    AND, FORGIVE ME, I DON'T MEAN -- THIS IS NOT

2    A LAUGHING MATTER, OF COURSE, MR. LANDRY.

3    IT'S SAD FOR YOU AND FOR YOUR FAMILY AND

4    CERTAINLY FOR HIM.  SO, FORGIVE ME.

5        WOULD THE FACT THAT YOUR BROTHER HAS

6    HAD THESE PROBLEMS, WOULD THAT IN ANY WAY

7    PREVENT YOU FROM SERVING AS A FAIR AND

8    IMPARTIAL JUROR?

9    THE JUROR: NO, SIR.

10   THE COURT: OKAY.  THANK YOU, SIR.

11       ANYONE ELSE ALONG THE RAIL?  YES, MR.

12   BIRT.

13   THE JUROR: MY ANSWER INVOLVES MY WIFE.

14       I'D LIKE TO ANSWER PRIVATELY.

15   THE COURT: YES.  YOU MAY COME FORWARD.

16   THE JUROR: TO YOU?

17   THE COURT: YES.

18   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

19       A BENCH CONFERENCE WAS HELD.)

20   THE COURT: JUST A MINUTE.  MAKE SURE WE'VE

21       GOT EVERYBODY HERE. AND YOU CAN SPEAK IN

22   YOUR NORMAL TONE.  NOBODY CAN HEAR YOU.

23   THE JUROR: YES, SIR.  MY WIFE HAS A FELONY

24       CONVICTION FOR FRAUD -- CHECK FRAUD.

25   THIS WAS EIGHT YEARS AGO IN NEW ORLEANS.

1    THE COURT: WAS THAT IN FEDERAL COURT?

2    THE JUROR: IT WAS IN FEDERAL.

3    THE COURT: AND YOUR WIFE'S NAME?

4    THE JUROR: DAWN BIRT, B-I-R-T.

5    THE COURT: WAS SHE SENTENCED TO

6         INCARCERATION OR ---

7    THE JUROR: SHE DID 20 DAYS, GIVE OR TAKE,

8         PRIOR TO A PLEA DEAL.

9    THE COURT: OKAY.  AND IS SHE STILL ON

10        PROBATION, DO YOU KNOW?

11   THE JUROR: NO.  SHE'S CLEAR OF ALL OF THAT.

12   THE COURT: HOW MUCH WAS INVOLVED IN THAT

13        FRAUD?

14   THE JUROR: I DON'T KNOW THE AMOUNTS.  I

15        WOULD SAY UNDER 100,000.

16   THE COURT: OKAY.  NOW, THE FACT THAT YOUR

17        WIFE HAD THESE PROBLEMS AND WAS

18   CONVICTED, WOULD THAT PREVENT YOU FROM

19   SERVING AS A FAIR AND IMPARTIAL JUROR IN THIS

20   CASE?

21   THE JUROR: IT WOULD MAKE ME LEAN TOWARDS

22        MR. LINARES.  BUT I CAN SET THAT ASIDE

23   AND REMAIN NEUTRAL.

24   THE COURT: THAT'S GOING TO BE VERY

25        IMPORTANT THAT YOU BE ABLE TO SET THAT

1    ASIDE AND NOT LEAN REALLY TOWARD ANY SIDE.

2    THE JUROR: YES, SIR.  I UNDERSTAND.

3    THE COURT: AND I KNOW YOU UNDERSTAND THAT,

4         MR. BIRT.  BUT ARE YOU TELLING ME THAT

5    YOU WOULD HAVE A DIFFICULT TIME DOING THAT?

6    I MEAN, LISTEN.  I JUST WANT YOUR HONEST

7    ANSWER.

8    THE JUROR: I DON'T BELIEVE SHE WAS SERVED

9         FAIRLY, AND I'M STILL VERY BITTER FROM

10   THE EVENT.

11   THE COURT: OKAY.  WELL, THANK YOU SO MUCH,

12        FOR YOUR HONESTY AND YOUR CANDOR.

13   THE JUROR: YES, SIR.

14   THE COURT: I HOPE SHE'S DOING WELL.

15   THE JUROR: SHE'S EXCELLENT.

16   THE COURT: OKAY.  GREAT.  THANK YOU,

17        MR. BIRT.

18   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

19   THE BENCH CONFERENCE WAS CONCLUDED.)

20   THE COURT: OKAY.  ANYONE ELSE ALONG THE

21        RAIL?  ANYONE ON THE SECOND ROW?  ALL

22   RIGHT.  THANK YOU ALL VERY MUCH.

23        YES? YES.  YOU MAY COME UP.  THAT'S

24   MS. OLIVER?  YES.

25   REPORTER'S NOTE: (THEREFORE, AT THIS TIME, A

1    BENCH CONFERENCE WAS HELD.)

2    THE COURT: MS. OLIVER?

3    THE JUROR: YES.

4    THE COURT: OKAY.

5    THE JUROR: MY DAD WAS ---

6    THE COURT: YOU CAN SPEAK IN YOUR NORMAL

7        TONE.  NOBODY CAN HEAR YOU.

8    THE JUROR: OH, I AM.  MY DAD WAS JUST

9        IN AND OUT OF JAIL A LOT WHEN I WAS

10    YOUNGER FOR DRUGS.  I DON'T KNOW ---

11    THE COURT: OKAY.  IS HE -- WHEN WAS THE

12        LAST TIME HE WAS IN JAIL?

13    THE JUROR: 2005.

14    THE COURT: OKAY.

15    THE JUROR: I DON'T KNOW THE FULL DEAL.

16    THE COURT: BUT YOU BELIEVE IT WAS FOR

17        DRUG USE?

18    THE JUROR: I MEAN, I KNOW IT WAS FOR DRUG

19        USE.  BUT I DON'T KNOW ---

20    THE COURT: WHAT IS YOUR FATHER'S NAME?

21    THE JUROR: FLOYD MAYFIELD.

22    THE COURT: FLOYD?

23    THE JUROR: MAYFIELD.

24    THE COURT: OKAY.  AND THE FACT THAT YOUR

25        FATHER HAS HAD THESE PROBLEMS, WOULD

1          THAT IN ANY WAY PREVENT YOU FROM SERVING AS A

2          FAIR AND IMPARTIAL JUROR --

3          THE JUROR: NO.

4          THE COURT:  -- IN THIS CASE?

5          THE JUROR:  NO. NO, SIR.

6          THE COURT: OKAY.  I HAVE TO ASK YOU, BECAUSE

7               IT'S IMPORTANT THAT WE NOT SPEAK AT THE

8          SAME TIME, --

9          THE JUROR: OH.

10         THE COURT:  -- JUST SO THAT MY COURT

11              REPORTER CAN GET EVERYTHING.

12         THE JUROR: SORRY.

13         THE COURT: THAT'S OKAY.  SO, YOU THINK

14              THAT, NONETHELESS, YOU COULD SERVE AS A

15         FAIR AND IMPARTIAL JUROR?

16         THE JUROR: YES.

17         THE COURT: OKAY.  THANK YOU VERY MUCH,

18              MA'AM.

19         REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

20         THE BENCH CONFERENCE WAS CONCLUDED.)

21         THE COURT: ANYONE ELSE?  ALL RIGHT.  THANK

22              YOU.

23              NOW, EARLIER TODAY I, AS YOU SAW,

24         WE HAVE INTERPRETERS WHO ARE SWORN TO

25         INTERPRET FOR US THROUGHOUT THIS TRIAL.  MS.

1    MORALES AND MS. BROADBACK, IF YOU ALL WOULD

2    BE KIND ENOUGH TO STAND AT THIS TIME.  I

3    NEGLECTED TO ASK IF ANYONE IS FAMILIAR WITH

4    OR HAS PERSONAL KNOWLEDGE OR IS RELATED TO

5    EITHER OF OUR INTERPRETERS, MS. BROADBACK OR

6    MS. MORALES.  IF THE ANSWER IS YES, PLEASE

7    RAISE YOUR HAND.

8         AND LET THE RECORD REFLECT THAT NO HANDS

9    ARE BEING RAISED.  THANK YOU, LADIES.

10        NOW, DO ANY OF YOU HERE BELONG TO ANY

11   FRATERNAL ORGANIZATIONS, VOLUNTEER OR CIVIC

12   ORGANIZATIONS, SOCIAL GROUPS, TRADE GROUPS OR

13   PROFESSIONAL ORGANIZATIONS OF ANY KIND?  AND,

14   MORE SPECIFICALLY, IF YOU ARE AN OFFICER IN

15   ANY SUCH ORGANIZATIONS, PLEASE RAISE YOUR

16   HAND.

17        AND WE'LL START IN THE FIRST ROW OF THE

18   JURY BOX.  ANYONE ON THE SECOND ROW?  ANYONE

19   ALONG THE RAIL?  YES, MR. BIRT.

20   THE JUROR: BROTHERHOOD OF RAILROAD SIGNALMEN

21        UNION, AND I'M AN OFFICER, A FINANCIAL

22   OFFICER.  ACTUALLY, I'M THE BACKUP. I REALLY

23   HAVEN'T FUNCTIONED IN THAT ROLE.  IF THE

24   SECRETARY STEPPED DOWN, I WOULD TAKE OVER THE

25   BOOKS.

1    THE COURT: THANK YOU, SIR.

2    THE JUROR: ALSO A VOLUNTEER FIREMAN.

3    THE COURT: THANK YOU.  ANYONE ELSE ALONG

4        THE RAIL?  ANYONE ON THE SECOND ROW?

5    YES, MR. GORMAN?

6    THE JUROR: I WAS ---

7    THE COURT: WAIT, WAIT, JUST A MINUTE.

8        LET ME MAKE SURE WE HAVE THE MICROPHONE

9    THERE.  YES, SIR.

10   THE JUROR: OKAY.  IS IT JUST FOR PEOPLE

11       WHO ARE INVOLVED IN THE FINANCIAL PARTS?

12   THE COURT: NO, NO.  NO. ANYTHING, WHETHER

13       YOU'RE AN OFFICER IN A HOMEOWNERS

14   ASSOCIATION, --

15   THE JUROR: NO. I'M NOT AN OFFICER.

16   THE COURT: -- A CIVIC ORGANIZATION?

17   THE JUROR: I'M JUST A MEMBER OF A TRADE

18       UNION.

19   THE COURT: OKAY.  AND WHAT TRADE UNION IS

20       THAT?

21   THE JUROR: 720 MILLWRIGHTS -- 729 NOW,

22       MILLWRIGHTS.

23   THE COURT: THANK YOU, SIR.

24       ANYONE ELSE?  YES, MR. BARBER.

25   THE JUROR: STAN BARBER. I'M THE TREASURER

1      OF OUR HOMEOWNERS ASSOCIATION, GOODWOOD

2      PROPERTY OWNERS ASSOCIATION.

3      THE COURT: THANK YOU, SIR.  ANYONE ELSE?

4            YES, SIR.  MR. ZERA?

5      THE JUROR: I'M JUST A MEMBER OF THE LOCAL

6            198 PIPEFITTERS UNION.

7      THE COURT: OKAY.  THANK YOU, SIR.

8            ANYONE ELSE?  ALL RIGHT.  THANK YOU,

9      LADIES AND GENTLEMEN.

10           NOW, DO ANY OF YOU HERE HAVE ANY BUMPER

11     STICKERS OR DECALS OR EVEN LICENSE PLATE

12     FRAMES ON YOUR CAR?  I KNOW THAT'S AN UNUSUAL

13     QUESTION.  ANY SUCH THING OTHER THAN LSU, OR

14     SOUTHERN OR THE SAINTS.  IF YOU HAVE A BUMPER

15     STICKER OR A DECAL OF ANY KIND OR A LICENSE

16     PLATE FRAME THAT SAYS SOMETHING, PLEASE RAISE

17     YOUR HAND AND I'LL HAVE ADDITIONAL QUESTIONS

18     FOR YOU.

19           BEGINNING WITH THE FIRST ROW OF THE JURY

20     BOX.  ANYONE?  ALL RIGHT.  YES, MA'AM.

21     THAT'S MS. HILL, CORRECT?

22     THE JUROR: YES.  I HAVE A STICKER SAYS

23           COLORADO -- JUST SAYS COLORADO.

24     THE COURT: UNIVERSITY OF COLORADO?  JUST

25           COLORADO?

1    THE JUROR: COLORADO STATE.

2    THE COURT: OKAY.  VERY GOOD.  THANK YOU.

3        ANYONE ELSE?

4        YES, DOCTOR.

5    THE JUROR: I JUST HAVE A STICKER FOR A

6        PARKING TAG.

7    THE COURT: FOR ONE OF THE HOSPITALS?

8    THE JUROR: YES, SIR.  FOR WORK.

9    THE COURT: GREAT.  THANK YOU.

10        ANYONE ELSE?  ANYONE ON THE SECOND ROW?

11    ANYONE ALONG THE RAIL?  YES, MR. FREEMAN.

12    THE JUROR: I ALSO HAVE A LICENSE PLATE,

13        FIREFIGHTER.  I'M A VOLUNTEER

14    FIREFIGHTER FOR WEST FELICIANA.

15    THE COURT: OKAY.  THANK YOU, SIR.

16        ANYONE ELSE?

17    THE JUROR: I HAVE A SCHOOL-RELATED STICKER.

18    THE COURT: OKAY.  THAT'S MS. JOUBERT.  AND

19        WHAT DOES IT SAY?

20    THE JUROR: I REALLY COULDN'T TELL YOU.

21        MAYBE U-CLUB OR SOMETHING.

22    THE COURT: OKAY.  ALL RIGHT.  THANK YOU,

23        MA'AM.

24        ANYONE ELSE?

25    THE JUROR: MY SON'S BASEBALL TEAM.

1      THE COURT: THAT'S MS. FARMER.  AND WHAT

2          DOES IT SAY?

3      THE JUROR: HIS NAME AND HIS NUMBER.

4      THE COURT: OKAY.  VERY GOOD.  THANK YOU.

5          ANYONE ELSE?  MR. BIRT?

6      THE JUROR: UNION STICKER, BROTHERHOOD

7          OF RAILROAD SIGNALMEN.

8      THE COURT: THANK YOU, MR. BIRT.

9          ANYONE ELSE ON THE FIRST ROW?  MR. ZERA?

10     THE JUROR: I GOT A PAIR OF NICE SUNGLASSES

11         FOR CHRISTMAS AND IT COMES WITH

12     STICKERS. THAT'S IT.

13     THE COURT: WHAT DOES IT SAY?

14     THE JUROR: IT'S JUST LIKE A "C" BUT IT COMES

15         WITH DEL MAR SUNGLASSES.

16     THE COURT: OKAY. VERY GOOD.  THANK YOU, SIR.

17         ANYONE ELSE?  SECOND ROW?  MS. JENKINS.

18     GARY, THE OTHER SIDE, GARY.  YES, MA'AM.

19     THE JUROR: I HAVE A J.B. STICKER ON ALL MY

20         CARS. IT'S FOR JEFFERSON PLACE, BOCAGE

21     STICKER.

22     THE COURT: THANK YOU, MA'AM.

23     THE JUROR: AND I'VE GOT AN OLD BEAT-UP

24         SUBURBAN, AND I THINK IT'S GOT LIKE AN

25     OLD SCHOOL -- EPISCOPAL OR SOMETHING KIND OF

1        WORN OFF.

2        THE COURT: OKAY.  THANK YOU, MA'AM.

3            ANYONE ELSE?

4        THE JUROR: ALLISON OLIVER.  I HAVE A

5            LICENSE PLATE FRAME WITH LIKE THE

6        MAKER OF MY VEHICLE.

7        THE COURT: ALL RIGHT.  OKAY.  THANK YOU,

8            MA'AM.

9        THE JUROR: GARY DUHON, I HAVE RACING

10            NUMBERS.  MY SON RACES.

11        THE COURT: OKAY.  THANK YOU.

12        THE JUROR: KELLI WALES.  I HAVE A MONOGRAM

13            OF MY INITIALS.

14        THE COURT: ALL RIGHT.

15        THE JUROR: ON MY CAR.

16        THE COURT:  THANK YOU, MS. WALES.

17            ANYONE ELSE?  ALL RIGHT.  WELL,

18        THANK YOU ALL VERY MUCH.

19            NOW, DO ANY OF YOU HERE HAVE ANY SPECIAL

20        DISABILITY, ANY MEDICAL CONDITION OR ANY

21        OTHER PROBLEM THAT WOULD MAKE SERVING AS A

22        MEMBER OF THIS JURY DIFFICULT OR IMPOSSIBLE?

23        AND LET ME JUST TELL YOU, FOLKS.  I KNOW THAT

24        IT'S INCONVENIENT TO SERVE AS JURORS.  SO, I

25        WOULD ASK THAT YOU NOT ANSWER THIS QUESTION

1       SIMPLY BECAUSE IT'S INCONVENIENT FOR YOU.

2       BUT IF THERE IS A SERIOUS OR CERTAINLY A

3       LEGITIMATE MEDICAL CONDITION OR DISABILITY OR

4       ANYTHING ELSE THAT WOULD MAKE SERVICE ON THIS

5       JURY DIFFICULT OR IMPOSSIBLE, I WOULD ASK YOU

6       TO RAISE YOUR HAND.  IF YOU WOULD LIKE TO

7       COME TO THE BENCH AND ANSWER THE QUESTION,

8       YOU ARE WELCOME TO DO SO.

9           ANYONE ON THE FIRST ROW OF THE JURY BOX?

10      ANYONE ON THE SECOND ROW?  ANYONE ALONG THE

11      RAIL?  ANYONE ON THE SECOND ROW?

12          YES.  MS. JENKINS?

13      THE JUROR: CAN I COME FORWARD?

14      THE COURT: YES, YOU MAY.

15      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

16          A BENCH CONFERENCE WAS HELD.)

17      THE COURT: ALL RIGHT.  YOU CAN SPEAK IN

18          YOUR NORMAL TONE.  NOBODY CAN HEAR YOU,

19      MS. JENKINS.

20      THE JUROR: I CAME DOWN WITH CAT SCRATCH

21          FEVER SEVERAL MONTHS AGO.  IT TOOK

22      SEVERAL MONTHS TO GET DIAGNOSED.

23      ENCEPHALITIS, MENINGITIS-TYPE EFFECT.  AND

24      I'VE BEEN UNDER THE CARE OF A PSYCHIATRIST,

25      DR. RENNIE BRUNO.

1    THE COURT: OKAY.

2    THE JUROR: AND SHE SENT A LETTER IN BECAUSE

3         SHE HAD TO TAKE ME OFF OF ALL MY

4    MEDICATION AND THEY PUT ME BACK ON THE

5    MEDICATION.  AND I'M TAKING HIGH DOSES OF

6    XANAX RIGHT NOW.

7    THE COURT: OKAY.

8    THE JUROR: FOR PANIC ATTACKS AND FOR ANXIETY.

9    THE COURT: OKAY.

10   THE JUROR: I HAVE A HORRIBLE ANXIETY AND

11        PANIC ATTACKS.  IT'S A MENTAL ILLNESS

12   GOING ON.  AND I'M -- THE LETTER SHOULD BE

13   HERE.  I'M JUST NOT CLEAR IN THE HEAD.  I

14   MEAN, I -- I TALKED TO THE DOCTOR SATURDAY,

15   SUNDAY.  I SAW HER LAST WEEK.  AND THE WEEK

16   BEFORE.  I'VE BEEN SEEING HER FOR SEVERAL

17   YEARS.  AND I REALLY WOULD LIKE TO SERVE ON

18   THE JURY, BUT I DON'T FEEL VERY CLEAR.

19   THE COURT: ARE YOU ABLE TO FOCUS?

20   THE JUROR: NO.

21   THE COURT: OKAY.

22   THE JUROR: I MEAN, WITH THE LIGHTS HURTING

23        MY EYES.  I'M NOT ABLE TO FOCUS.  I

24   MEAN, I'M TAKING THREE XANAX A DAY,

25   PRACTICALLY.  IT'S JUST TOO MUCH MEDICINE.

1    THE COURT: YES.

2    THE JUROR: I MEAN, ---

3    THE COURT: WELL, FOR WHAT IT'S WORTH,

4        MS. JENKINS, YOU'RE DOING GREAT.  YOU

5    REALLY ARE.  AND I APPRECIATE YOUR COMING ON

6    IN TODAY.

7    THE JUROR: YES.

8    THE COURT:  AND I APPRECIATE YOUR LETTING ME

9        KNOW ABOUT THAT.

10    THE JUROR: YES.

11    THE COURT:  I'M GOING TO GO ON AND EXCUSE

12        YOU.  YOU DON'T HAVE TO SERVE, IN OTHER

13    WORDS, BECAUSE OF YOUR MEDICAL CONDITION.

14    THE JUROR: AND IT'S EMBARRASSING TO HAVE

15        A MENTAL ISSUE, BUT, YOU KNOW, IT IS

16    WHAT IT IS.

17    THE COURT: YES.  AND LET ME TELL YOU,

18        MS. JENKINS, YOU DON'T HAVE TO

19    APOLOGIZE.  AND I KNOW IT'S UNCOMFORTABLE FOR

20    YOU TO COME HERE AND DEAL WITH THAT.

21    THE JUROR: IT IS.

22    THE COURT: WHICH IS WHY I REALLY, REALLY --

23        AND I KNOW I SPEAK FOR ALL OF THESE

24    GENTLEMEN, WE ALL APPRECIATE YOUR ---

25    THE JUROR: WELL, YES, ABSOLUTELY.  I MEAN,

1           I WANT TO DO MY CIVIC DUTY, BUT I --

2     YOU KNOW, I ---

3     THE COURT: AND YOU ARE.

4     THE JUROR: I'M TRYING.

5     THE COURT: AND IT'S IMPORTANT, BUT YOU ARE

6           DOING YOUR CIVIC DUTY, SO.

7     MR. JUROR: YES.

8     THE COURT: WE ALL APPRECIATE THAT. AND ---

9           BUT YOU'RE DOING GREAT.  OKAY?

10    THE JUROR: WELL, THANK YOU.

11    THE COURT: OKAY?  ALL RIGHT.  THANK YOU

12          SO MUCH.

13    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

14          THE BENCH CONFERENCE WAS CONCLUDED.)

15    THE COURT: ALL RIGHT.  OKAY.  ANYONE ELSE?

16          NOW, THIS IS NOT WHAT WE CALL A

17    SEQUESTERED JURY.  IN OTHER WORDS, YOU WON'T

18    HAVE TO LIVE IN A HOTEL DURING THE COURSE OF

19    THIS TRIAL.  YOU WILL BE ALLOWED TO RETURN TO

20    YOUR HOMES AT THE END OF EACH DAY.  IT IS

21    ANTICIPATED THAT THIS CASE WOULD TAKE PERHAPS

22    UP TO THREE DAYS TO TRY THE CASE.  WE WILL

23    START EACH MORNING AT 8:30 IN THE MORNING.  I

24    WILL ASK THE JURORS, THE MEMBERS OF THE JURY,

25    THAT IS, TO BE HERE AT ABOUT 8:15, 8:20 EACH

1    MORNING.  AND WE'LL GO UNTIL ABOUT 5:30 OR

2    SIX O'CLOCK OR, FRANKLY, WHATEVER TIME THE

3    JURY -- HOWEVER LONG, I SHOULD SAY, THE JURY

4    WANTS TO GO.

5         SO, IF ANY OF YOU HERE HAVE ANY PERSONAL

6    OR BUSINESS MATTERS THAT WILL PREVENT YOU

7    FROM COMING IN TO COURT -- AGAIN, I KNOW IT'S

8    INCONVENIENT, BUT ANY COMPELLING PERSONAL

9    REASONS OR PROFESSIONAL REASONS FROM SERVING

10   ON THE JURY FOR THE NEXT THREE DAYS.  I GUESS

11   IT'S -- THEORETICALLY COULD LEAD INTO A

12   FOURTH DAY, BUT HOPEFULLY THAT WON'T HAPPEN.

13        IF ANY OF YOU HERE HAVE ANY MATTERS THAT

14   WOULD SO INTERFERE WITH YOUR CONCENTRATION AS

15   TO MAKE A JURY SERVICE DIFFICULT, PLEASE

16   RAISE YOUR HAND.

17        ANYONE ON THE FIRST ROW?  SECOND ROW?

18        MR. GORMAN?

19   THE JUROR: YES.

20   THE COURT: WAIT JUST A MINUTE.  YES, SIR,

21        MR. GORMAN.

22   THE JUROR: WE ARE RIGHT AT THE VERY END

23        OF THE PROCESS OF BUYING A HOUSE.

24   THE COURT: OKAY.

25   THE JUROR: AND WE'RE TO THE POINT OF

1    AS SOON AS WE GET -- WHERE THEY LOOK AND

2    SEE WHAT IT'S WORTH, WE'LL GO IN FOR THE

3    SIGNING.  SO, THAT ---

4    THE COURT: YOU HAVEN'T ---

5    THE JUROR: THAT MIGHT BE A BIT DISTRACTING.

6    WE SHOULD HAVE A FEW DAYS TO DEAL WITH

7    IT.

8    THE COURT: BUT NO CLOSING IS SCHEDULED

9    BETWEEN, SAY, THE NEXT ---

10   THE JUROR: IT'S NOT SCHEDULED YET.

11   THE COURT: OKAY.  VERY GOOD.  OKAY.

12   WELL, THANK YOUR, MR. GORMAN.

13   ANYONE ELSE ON THE FIRST ROW? ANYONE ON

14   THE SECOND ROW?  YES, MA'AM.

15   AND THAT'S MS. HILL, CORRECT?

16   THE JUROR: MARLER, SUZANNE MARLER.  DO

17   YOU MIND IF I APPROACH?

18   THE COURT: OH, YES.  MS. MARLER.  COME

19   FORWARD.

20   REPORTER'S NOTE: (THEREFORE, AT THIS TIME, A

21   BENCH CONFERENCE WAS HELD.)

22   THE COURT: OKAY.  AND YOU CAN SPEAK IN

23   YOUR NORMAL VOICE.

24   THE JUROR: I'M THE PERSON RESPONSIBLE

25   FOR MY MOTHER AND MY FATHER.  BOTH ARE

1        ELDERLY.

2        THE COURT: OKAY.

3        THE JUROR: AND HAVE ALZHEIMER'S.

4        THE COURT: OKAY.

5        THE JUROR: AND THEN MY MOTHER-IN-LAW.

6            ALSO, MY HUSBAND WORKS IN BATON ROUGE

7        AND SOMETIMES HE'S GOING OUT OF TOWN.  SO,

8        I'M ULTIMATELY RESPONSIBLE FOR THEM AS WELL.

9        THE COURT: SO, YOU'RE THEY'RE CARETAKER --

10            THEIR CARE GIVER?

11        THE JUROR: I AM.  THEY DO LIVE IN AN

12            ASSISTED LIVING FACILITY.

13        THE COURT: OKAY.

14        THE JUROR: BUT ANY DOCTORS' APPOINTMENTS,

15            WHICH THEY DO HAVE -- MY MOTHER-IN-LAW

16        HAS ONE WEDNESDAY. YOU KNOW, ANY EMERGENCY

17        THAT MAY ARISE, IT WOULD BE ME THEY WOULD

18        CONTACT.  OF COURSE, THERE'S NO WAY FOR THEM

19        TO CONTACT ME HERE.

20        THE COURT: ALL RIGHT.  WELL, I APPRECIATE

21            YOUR SHARING THAT WITH US, --

22        THE JUROR: SURE.

23        THE COURT: -- MS. MARLER.  AND I DON'T KNOW

24            HOW THINGS ARE GOING TO FARE IN TERMS OF

25        THE JURY ---

1      THE JUROR: AND IF I NEED TO.  YOU KNOW, IF

2          IT'S MEANT FOR ME TO BE HERE, IT WILL

3      WORK IT OUT.

4      THE COURT: OKAY.

5      THE JUROR: YOU KNOW, AND THAT WILL BE

6          FINE.  BUT I JUST THOUGHT THAT I NEEDED

7      TO SAY IT.

8      THE COURT: AND I APPRECIATE YOUR SHARING

9          THAT WITH US.  AND GOOD LUCK.  I

10     KNOW THAT'S AN IMPORTANT RESPONSIBILITY YOU

11     HAVE.

12     THE JUROR: IT IS.  BUT YOU KNOW WHAT?

13         THEY'RE MOM AND DAD, AND MY MOM-IN-LAW,

14     AND I'M VERY BLESSED TO HAVE THEM STILL.

15     THE COURT: ABSOLUTELY.

16     THE JUROR: SO, I HAVE NO COMPLAINTS.

17     THE COURT: WELL, LET'S JUST SEE HOW THINGS

18         GO.

19     THE JUROR: OKAY.

20     THE COURT: BUT, AGAIN, I APPRECIATE YOUR

21         SHARING THAT.

22     THE JUROR: THANK YOU.

23     THE COURT: THANK YOU.

24     REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

25         THE BENCH CONFERENCE WAS CONCLUDED.)

1    THE COURT: OKAY.  ANYONE ELSE IN THE JURY

2         BOX?  ANYONE ALONG THE RAIL?  ANYONE IN

3    THE SECOND ROW?

4         OKAY.  THANK YOU ALL VERY MUCH, LADIES

5    AND GENTLEMEN

6         DOES ANYONE HERE BELIEVE THAT THEY

7    CANNOT, FOR ANY REASON, SERVE AS A JUROR IN

8    THIS CASE AND RENDER A FAIR, HONEST AND

9    IMPARTIAL VERDICT?  IF YOU DON'T THINK THAT

10   YOU CANNOT, UNDER ANY CIRCUMSTANCES, OR FOR

11   WHATEVER REASON THAT WE HAVEN'T YET

12   DISCUSSED, SERVE AS A JUROR AND RENDER A FAIR

13   AND IMPARTIAL VERDICT, PLEASE RAISE YOUR

14   HAND.

15        AND LET THE RECORD REFLECT THAT NO HANDS

16   ARE BEING RAISED AT THIS TIME.

17        LET ME SEE COUNSEL FOR BOTH SIDES AT THE

18   BENCH.

19   REPORTER'S NOTE: (THEREFORE, AT THIS TIME, A

20        BENCH CONFERENCE WAS HELD.)

21   THE COURT: OKAY.  ANY FOLLOW-UP QUESTIONS

22        FROM THE GOVERNMENT?

23   MR. STEVENS: ONE QUESTION I HAD, JUDGE.

24        MR. GUILLORY, NUMBER 33.

25   THE COURT: OKAY.

1         MR. STEVENS: I THINK HE SAID HIS WIFE

2             WORKED FOR HEALTHCARE OPTIONS,

3         HEALTHCARE FACILITY.

4         THE COURT: OKAY.

5         MR. STEVENS: AND I -- IN AN ABUNDANCE OF

6             CAUTION, I RECOGNIZE THE NAME.  AND I

7         WONDERED IF THEY HAVE BEEN A PARTY TO A CIVIL

8         CASE OR IF EITHER ONE OF THE COMPANIES THAT

9         WAS PROSECUTED IN THOSE EARLY STRIKE-FORCE

10        CASES.  AND, SO, HE MAY NOT HAVE BEEN

11        THINKING ABOUT IT AT THE TIME, BUT I WONDER

12        IF WE COULD ---

13        THE COURT: WHEN WERE THOSE PROSECUTIONS?

14        MR. STEVENS: 2010 TO 2013 TIME FRAME.

15            AND THERE MAY HAVE BEEN A CIVIL MATTER.

16        THE COURT: OKAY.  WELL, I'LL ---

17        MR. STEVENS: I WONDER IF MAYBE AT THE BENCH

18            YOU WOULD ASK HIM IF HIS WIFE HAD ANY

19        INVOLVEMENT IN ANY OF THOSE.

20        THE COURT: HEALTHCARE OPTIONS WAS THE NAME

21            OF THAT?

22        MR. STEVENS: I DON'T WANT TO SAY UNDER OATH,

23            BUT THE NAME SOUNDS VERY FAMILIAR.

24        THE COURT: ALL RIGHT.  LET'S SEE MR.

25            GUILLORY.  MAX?

1    THE MARSHALL: YES, YOUR HONOR.

2    THE COURT: WOULD YOU ASK -- PAM, JUST TURN

3        OFF THE WHITE NOISE FOR JUST A MINUTE.

4    TURN IT OFF FOR A MINUTE.

5    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

6        THE BENCH CONFERENCE WAS CONCLUDED.)

7    THE COURT: MR. GUILLORY, MAY WE SEE YOU,

8        PLEASE?  YES.

9    REPORTER'S NOTE: (THEREFORE, AT THIS TIME, A

10    BENCH CONFERENCE WAS HELD.)

11    THE COURT: MR. GUILLORY, WHERE DOES YOUR

12        WIFE WORK?

13    THE JUROR: SHE'S A CNA FOR A HOME HEALTH

14        COMPANY CALLED HEALTHCARE OPTIONS.

15    THE COURT: OKAY.  HOW LONG HAS SHE BEEN

16        THERE, DO YOU KNOW?

17    THE JUROR: ABOUT EIGHT YEARS.

18    THE COURT: OKAY.  DO YOU KNOW IF THAT

19        COMPANY WAS INVOLVED IN ANY LAWSUITS OF

20     ANY KIND, DO YOU KNOW?

21    THE JUROR: NO.

22    THE COURT: OKAY.  DO YOU KNOW IF YOUR WIFE

23        HAS BEEN INVOLVED IN ANY LAWSUITS --

24    THE JUROR: OH, NO. UH UH.

25    THE COURT:  -- ASSOCIATED WITH ---

1      THE JUROR: NO.

2      THE COURT: OKAY.  DO YOU KNOW IF THAT

3         COMPANY HAS BEEN INVESTIGATED?  I MEAN,

4      I'M NOT SURE IT HAS.  BUT THERE IS A LOT OF

5      HEALTH -- LET ME TELL YOU WHY I ASK YOU

6      THAT, BECAUSE WE JUST WANT TO BE CLEAR.

7      THERE ARE OFTEN INVESTIGATIONS OF HOME HEALTH

8      CARE AGENCIES AND NURSING HOMES AND OTHER

9      HEALTHCARE PROVIDERS.  THEY ALL HAVE PRETTY

10     MUCH THE SIMILAR NAMES.

11     THE JUROR: RIGHT.

12     THE COURT: SO, WE'RE NOT ACCUSING YOUR --

13     THE JUROR: YES.

14     THE COURT:  -- WIFE OR HER EMPLOYER OF

15        ANY WRONGDOING.

16     THE JUROR: SURE.

17     THE COURT: BUT WE JUST WANT TO BE SURE ---

18     THE JUROR: YES.

19     THE COURT: YES.

20     THE JUROR: I KNOW SHE'S NEVER BEEN IN --

21        INVOLVED IN ANYTHING.  BUT I DON'T KNOW

22     ABOUT THE COMPANY.

23     THE COURT: BUT YOU'RE NOT AWARE OF ANY?

24     THE JUROR: I'M NOT -- I'M NOT AWARE OF IT.

25     THE COURT: OKAY. WELL, THANK YOU FOR COMING

1              UP, SIR.  I APPRECIATE IT.

2         THE JUROR: SURE.

3         THE COURT:  AND, AGAIN, I HOPE YOU

4              UNDERSTAND WE'RE NOT -- THANK YOU.

5              ANYTHING ELSE, ANY FOLLOW-UP?

6         MR. STEVENS: NONE FROM THE GOVERNMENT.

7              NO.

8         THE COURT: MR. AMBEAU?

9         MR. AMBEAU: YOUR HONOR, JUROR NUMBER ONE.

10        THE COURT: ALL RIGHT.

11        MR. AMBEAU: WHEN ASKED ABOUT THE CRIMINAL

12             PROCEEDING THAT HE WAS INVOLVED IN,

13        STATED THAT THE DEFENDANT WAS ALREADY GUILTY.

14        I THOUGHT PERHAPS YOUR HONOR COULD FOLLOW UP

15        AND ASK HIM IF THAT WAS HIS UNDERSTANDING OF

16        THE LAW OR PERHAPS WAS HE INSTRUCTED THAT THE

17        DEFENDANT WAS ALREADY GUILTY WHEN THEY

18        STARTED -- HE SAID IT WAS A MATTER OF DEGREE

19        AND NOT A MATTER OF GUILT.

20        THE COURT: OKAY.

21        MR. AMBEAU: AND I WANT TO KNOW IF THAT'S A

22             FUNDAMENTAL MISUNDERSTANDING.

23        THE COURT: IN OTHER WORDS, ON THE FIRST --

24             WHEN HE SERVED AS A JUROR IN THE SECOND

25        DEGREE MURDER CASE?

1    MR. AMBEAU: CORRECT, YOUR HONOR.

2    THE COURT: OKAY.  LET'S SEE.

3         MR. GORMAN, COME FORWARD, PLEASE.

4         NOW, MR. GORMAN, YOU MENTIONED -- YOU

5    TOLD US EARLIER THAT YOU SERVED AS A JUROR IN

6    A MURDER CASE, CORRECT?

7    THE JUROR: RIGHT.

8    THE COURT: DO YOU RECALL IF THE DEFENDANT

9         IN THAT CASE WAS CHARGED WITH FIRST

10   DEGREE MURDER CASE?

11   THE JUROR: NO.

12   THE COURT: I MEAN, FIRST DEGREE MURDER?

13   THE JUROR: NO.

14   THE COURT: THE CHARGE WAS SECOND DEGREE

15        MURDER?

16   THE JUROR: THE CHARGE WAS SECOND DEGREE

17        MURDER.

18   THE COURT: OKAY.  AND THE JURY FOUND THAT

19        HE, IN FACT, WAS GUILTY OF SECOND DEGREE

20   MURDER, CORRECT?

21   THE JUROR: YES.

22   THE COURT: MR. AMBEAU, ANY FOLLOW-UP

23        QUESTIONS?

24   THE JUROR: THIS PARTICULAR CASE, THERE

25        WAS NO QUESTION ON WHETHER OR NOT HE

1       SHOT THE PERSON.  IT WAS INTENT.

2       THE COURT: OKAY.  I SEE.  AND, SO, DID

3           THE JURY CONSIDER, MAYBE, MANSLAUGHTER?

4       THE JUROR: WE WERE TOLD TO CONSIDER

5           MANSLAUGHTER.

6       THE COURT: OKAY.  AND YOU DID?

7       THE JUROR: YES.

8       THE COURT: AND YOU CONSIDERED SECOND

9           DEGREE MURDER?

10      THE JUROR: THE EVIDENCE POINTED IT TO

11          SECOND DEGREE MURDER.

12      THE COURT: BUT YOU DID CONSIDER THE

13          OTHER VARYING DEGREES OF HOMICIDE,

14      CORRECT?

15      THE JUROR: YES.

16      THE COURT: AND THE JUDGE INSTRUCTED YOU

17          ON THOSE VARYING DEGREES?

18      THE JUROR: IT WAS EITHER MANSLAUGHTER OR

19          SECOND DEGREE.

20      THE COURT: OKAY.  ANY ADDITIONAL QUESTIONS?

21      MR. AMBEAU: NO, JUDGE.

22      THE COURT: AND, AGAIN, JUST TO BE SURE,

23          MR. GORMAN.  THE FACT THAT YOU SERVED

24      ON A JURY, YOU TOLD US EARLIER, WOULD NOT IN

25      ANY WAY CAUSE YOU TO NOT BE ABLE TO --

1      THE JUROR: NO.

2      THE COURT:  -- OR CAPABLE OF SERVING AS A

3          FAIR AND IMPARTIAL JUROR IN THIS CASE,

4      CORRECT?

5      THE JUROR: RIGHT.

6      THE COURT: ALL RIGHT.  ANYTHING FURTHER?

7      MR. AMBEAU: NO.  THANK YOU.

8      THE COURT: THANK YOU, MR. GORMAN.

9      MR. AMBEAU: AND SECOND, YOUR HONOR,

10         JUROR NUMBER 27, MS. CASAS.  I BELIEVE

11     THAT SHE IS AN ENGLISH SECOND-LANGUAGE

12     PERSON.

13     THE COURT: RIGHT.

14     MR. AMBEAU: IS IT POSSIBLE TO ASK HER IF

15         SHE IS FAMILIAR WITH SOME OF THE MORE

16     COMPLEX, LEGAL TECHNICAL TERMS?

17     THE COURT: WELL, I DON'T THINK I'M GOING TO

18         ASK HER THAT.

19     MR. AMBEAU: OKAY.

20     THE COURT: I MEAN, THE FACT OF THE MATTER

21         IS, SHE'S -- I WANT THE RECORD TO

22     REFLECT THAT SHE HAS INDICATED THAT SHE READS

23     AND SPEAKS IN THE ENGLISH LANGUAGE.  SHE'S

24     BEEN WORKING AT HER COMPANY FOR, WHAT, 35

25     YEARS?

1     MR. AMBEAU: THIRTY-FIVE YEARS.

2     THE COURT: SHE APPARENTLY HAS EVERY REASON

3          TO BELIEVE THAT SHE'S BEEN CAPABLE OF

4     UNDERSTANDING EVERYTHING THAT I'VE SAID

5     DURING VOIR DIRE.  AND, SO, I DON'T THINK

6     THERE'S A BASIS TO QUESTION HER ENGLISH

7     SPEAKING OR OTHER UNDERSTANDING.

8     MR. AMBEAU: UNDERSTOOD.  MY OTHER ISSUE

9          WOULD BE THAT THERE ARE A COUPLE OF

10    PEOPLE WHO HAVE SOME INVOLVEMENT IN ANTI-

11    MONEY LAUNDERING PROGRAMS AND TRAINING

12    THERETO.  AND I'M -- I DON'T KNOW IF IT'S

13    PROPER TO ASK THEM IF THEY'RE FAMILIAR WITH

14    ANY OF THE CIVIL OR CRIMINAL PUNISHMENT

15    RELATED THERETO, HAVING HAD THAT TRAINING,

16    SINCE THAT'S NOT WITHIN THEIR ---

17    THE COURT: WELL, I WOULD IMAGINE THAT ANY

18         TIME SOMEONE IS AWARE THAT CERTAIN

19    ACTIVITY IS A CRIME, IS SOMETHING IS THAT

20    THERE ARE CERTAIN PENAL CONSEQUENCES TO THAT.

21    WHICH -- WE'RE TALKING ABOUT ---

22    MR. AMBEAU: JUROR NUMBER 14, MR. MINOR,

23         WHO WORKS AT THE CAR PLACE AND TRAINS

24    PEOPLE ON THE ANTI-MONEY LAUNDERING PROGRAM

25    THERE, YOUR HONOR.  CARMAX.

1    THE COURT: AND WHO IS THE OTHER ONE?

2    MR. AMBEAU: RAMAGOST.  HIS SPOUSE IS A

3         CHECK CASHER AT THE SUPERMARKET --

4    THE COURT: YES.

5    MR. AMBEAU:  -- AND IT'S BY STATUTE BEEN

6         TOLD ABOUT THE BSA.

7    THE COURT: BUT MR. RAMAGOST, HIS -- I THINK

8         HIS WIFE -- THAT WAS HIS WIFE WHO ---

9    MR. AMBEAU: THAT IS CORRECT, YOUR HONOR.

10        SHE WAS A CHECK CASHER AT THE

11   SUPERMARKET.

12   THE COURT:  BUT I DON'T THINK HE SAID

13        THAT HE WAS ---

14   MR. AMBEAU: HE WAS NOT.

15   THE COURT: I WILL QUESTION MR. MINOR,

16        NONETHELESS.

17        MR. MINOR.  THANK YOU, MR. MINOR.

18   NOW, MR. MINOR, YOU TOLD US THAT YOU HAVE

19   RECEIVED SOME TRAINING ON MONEY LAUNDERING

20   AND, SPECIFICALLY, ANTI-MONEY LAUNDERING

21   ACTIVITIES IN CONNECTION WITH AUTO SALES,

22   CORRECT?

23   THE JUROR: YES, SIR.

24   THE COURT: ALL RIGHT.  AND THAT TRAINING

25        WAS PROVIDED BY YOUR EMPLOYER, CORRECT?

1      THE JUROR: THROUGH CARMAX.  YES, SIR.

2      THE COURT: ALL RIGHT.  NOW, IS A PART OF

3           THAT TRAINING -- WERE YOU SPECIFICALLY

4      NOTIFIED OR INFORMED OF THE CONSEQUENCES TO

5      THOSE WHO WOULD ENGAGE IN MONEY LAUNDERING

6      ACTIVITIES?  DID IT GO INTO THAT LEVEL OF

7      DEPTH?

8      THE JUROR: YES.  CERTAIN PENALTIES AND

9           TIME THAT THEY MAY BE FACING.

10     THE COURT: AND WHAT WERE THE -- AS YOU

11          UNDERSTAND IT, WHAT ARE THE PENALTIES?

12     THE JUROR: FINES, JAIL TIME, BANK PAYMENTS,

13          THINGS OF THAT NATURE.

14     THE COURT: AND THAT WAS YOUR UNDERSTANDING

15          OF WHAT COULD RESULT FROM THOSE WHO

16     ENGAGE IN CERTAIN TYPES OF MONEY LAUNDERING

17     OFFENSE?

18     THE JUROR: YES, SIR.

19     THE COURT: ANY FOLLOW-UP?

20     MR. AMBEAU: NONE, YOUR HONOR.

21     THE COURT: ANYTHING, GENTLEMEN?

22     MR. STEVENS: NO, JUDGE.  THANK YOU.

23     THE COURT: THANK YOU, MR. MINOR.

24          ALL RIGHT. ANYTHING ELSE?

25     MR. AMBEAU: AND THE LAST ONE IS MR. PHILIP

1        OR PHILIPS.  I'M NOT SURE IF THERE'S

2        AN "S" ON HIS NAME.

3        THE COURT: PHILIP.

4        MR. AMBEAU: HE SAID THAT HE HAS A CURRENT,

5        PENDING CASE IN ASCENSION PARISH.

6        THE COURT: HE'S A VICTIM.

7        MR. AMBEAU: YES.  I AM A CONTRACT PUBLIC

8        DEFENDER IN ASCENSION PARISH.  AND

9        I DON'T KNOW IF THE PUBLIC DEFENDER'S OFFICE

10       IS INVOLVED IN REPRESENTING THE ALLEGED

11       PERPETRATOR AND/OR IF HE KNOWS WHO THAT

12       ATTORNEY IS.  IN FACT, I'M -- I DON'T EVEN IF

13       IT'S MINE BECAUSE I DON'T KNOW THE NAME OF

14       THE PERPETRATOR.

15       THE COURT: WELL, I CAN ASK.  BUT I WILL

16       POINT OUT TO YOU THAT IT'S NOT UNCOMMON.

17       I MEAN, WE HAVE ESSENTIALLY ONE ASSISTANT

18       PUBLIC DEFENDER HERE IN FEDERAL COURT, AS YOU

19       WELL KNOW, WHO HANDLES A VARIETY OF THINGS.

20       AND SIMPLY BECAUSE HE'S INVOLVED WITH A

21       VARIETY OF DIFFERENT CASES -- WELL, I'LL ASK

22       THE QUESTION, NONETHELESS.  I DON'T KNOW IF

23       THIS WOULD NECESSARILY BE A DISQUALIFIER, BUT

24       WE'LL -- I'M HAPPY TO ASK THE FOLLOW-UP

25       QUESTION.  THAT IS, IF HE KNOWS WHO IS

1    REPRESENTING THE PERSON ACCUSED OF COMMITTING

2    THE CRIME AGAINST HIM.

3         MR. PHILIP.  NOW, MR. PHILIP, YOU TOLD

4    US EARLIER THAT YOU WERE THE VICTIM OF A

5    CRIME A FEW MONTHS BACK.

6    THE JUROR: YES, SIR.

7    THE COURT: AND THAT AN ARREST WAS MADE

8         AND THAT THE PERSON WHO HAS BEEN -- THAT

9    PERSON HAS ACTUALLY BEEN CHARGED NOW WITH

10   COMMITTING A CRIME; IS THAT RIGHT?

11   THE JUROR: HE WAS ARRESTED FOR AGGRAVATED

12        ASSAULT WITH A FIREARM.  HE WAS

13   ARRESTED.  HE HASN'T BEEN -- A JURY HASN'T

14   BEEN NOTIFIED.  THE DA IS TRYING TO WORK OUT

15   A PLEA DEAL.

16   THE COURT: I UNDERSTAND.  BUT HE'S,

17        NONETHELESS, BEEN ARRESTED, CHARGES HAVE

18   NOT BEEN FILED.  IT'S PENDING; IS THAT RIGHT?

19   THE JUROR: YES, SIR.  THEY'RE STILL PENDING.

20   THE COURT: DO YOU KNOW WHO REPRESENTS THAT

21        GENTLEMAN?

22   THE JUROR: HIS GIRLFRIEND TOLD ME -- WELL,

23        HIS EX-GIRLFRIEND TOLD ME IT WAS HIS

24   COUSIN.  I DON'T KNOW WHO THAT IS.

25   THE COURT: OKAY.  SO, HE'S BEING REPRESENTED

1       BY A FAMILY MEMBER, IS YOUR

2   UNDERSTANDING?

3   THE JUROR: YES, SIR.

4   THE COURT: AND TO BE SURE, YOU DON'T -- IT'S

5       NOT -- YOU HAVEN'T BEEN TOLD THAT MR.

6   AMBEAU, FOR INSTANCE, WHO IS, OBVIOUSLY, A

7   CRIMINAL DEFENSE ATTORNEY REPRESENTS HIM; IS

8   THAT RIGHT?

9   THE JUROR: NO.  IT'S NOT HIM.

10   THE COURT: OKAY.  THANK YOU VERY MUCH,

11       MR. PHILIP.

12   MR. AMBEAU: THAT'S ALL FOR ME.

13   THE COURT: ALL RIGHT.

14   MR. STEVENS:  NO ADDITIONAL FOLLOW-UP,

15       JUDGE.

16   THE COURT: OKAY.  SO, WHAT WE'LL DO IS

17       WE'LL GO ON AND -- I'M GOING TO GO ON

18   AND TAKE A LUNCH BREAK.  AND I'D LIKE TO AT

19   LEAST GET THE JURY SELECTED NOW RATHER THAN

20   SENDING THEM OUT TO LUNCH AND COMING BACK.

21       I'D LIKE TO HOPEFULLY GIVE YOU ABOUT

22   FIVE MINUTES TO MAKE YOUR STRIKES. I HAVE A

23   COUPLE OF FOLKS THAT I WILL EXCUSE.  I'LL

24   HEAR CHALLENGES FOR CAUSE AND LET YOU DO YOUR

25   THING.  OKAY?

1        MR. STEVENS: YES, SIR.

2        MR. AMBEAU: THANK YOU, JUDGE.

3        THE COURT: THANK YOU.

4        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

5        THE BENCH CONFERENCE WAS CONCLUDED.)

6        THE COURT: OKAY, LADIES AND GENTLEMEN.

7              THANK YOU SO MUCH FOR YOUR PATIENCE.

8              LET ME TELL YOU HOW WE'RE GOING TO DO

9        THIS NOW.  THOSE ARE ALL THE QUESTIONS THAT

10       WE HAVE FOR YOU.  SO, THE GOOD NEWS IS THIS.

11       WE WILL NOT TAKE A LUNCH BREAK RIGHT NOW.

12       THAT'S ACTUALLY GOOD NEWS.  BECAUSE WE THINK

13       THAT WE CAN HAVE THE JURY SELECTED IN JUST A

14       FEW MINUTES AND, THEREBY, LET THOSE OF YOU

15       WHO HAVE NOT BEEN SELECTED TO SERVE AS JURORS

16       JUST GO FOR THE DAY.  FOR THOSE OF YOU,

17       HOWEVER, WHO ARE SELECTED TO SERVE AS JURORS,

18       WE'LL TAKE A LUNCH BREAK RIGHT AFTER THAT.

19       NOW, WE THINK THAT WILL OCCUR WITHIN THE NEXT

20       15 OR 20 MINUTES.  SO, WE'RE GOING TO ASK FOR

21       YOU ALL JUST TO BE VERY PATIENT WITH US.  WE

22       THINK WE CAN COMPLETE THIS PORTION OF THE

23       TRIAL, AGAIN, WITHIN THE NEXT 20 MINUTES.

24       SO, THAT IF YOU'RE NOT SELECTED TO SERVE, YOU

25       WILL BE EXCUSED AND, IN FACT, DISCHARGED.

1       SO, WHAT WE'LL DO AT THIS TIME IS TAKE A

2    BREAK.  IT WILL BE ABOUT A TEN TO 15-MINUTE

3    BREAK.

4       ONCE AGAIN I WOULD ASK THAT YOU BE

5    CAREFUL NOT TO SPEAK WITH ANYONE ABOUT YOUR

6    SERVICE AS A JUROR DURING THE BREAK.  PLEASE

7    DON'T DISCUSS THE CASE AMONG YOURSELVES.  AND

8    AS IMPORTANT, PLEASE REMEMBER WHERE YOU'RE

9    SITTING RIGHT NOW BECAUSE IT WILL BE VERY,

10   VERY IMPORTANT WHEN WE RETURN FROM OUR BREAK.

11   OKAY?

12       LET'S ALL RISE.

13   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

14       THE JURY WAS EXCUSED FOR A BREAK.)

15   THE COURT: BE SEATED.  OKAY.  THE COURT

16       WILL EXCUSE THE FOLLOWING JURORS:

17       JUROR NUMBER 16, MR. DANIEL WAYNE

18   MCCULLOCH.  IF YOU RECALL, HE REPORTED THAT

19   HIS FATHER WAS CONVICTED OF A FELONY FRAUD

20   OFFENSE HERE IN THIS COURTHOUSE SEVERAL YEARS

21   AGO.  HE EQUIVOCATED ON HIS ABILITY TO BE

22   FAIR AND IMPARTIAL IN THIS CASE BECAUSE OF

23   HIS EXPERIENCE WITH HIS FATHER, MORE

24   SPECIFICALLY, HIS FATHER'S EXPERIENCE.

25       AND, SO, FOR THAT REASON THE COURT WILL

1    EXCUSE JUROR NUMBER 16.

2         THE COURT WILL ALSO EXCUSE JUROR NUMBER

3    22, MR. WAYNE DAVID BIRT.  AGAIN, DESPITE THE

4    FACT THAT I ATTEMPTED TO REHABILITATE HIM

5    WITH RESPECT TO WHETHER HE COULD FAIRLY

6    EVALUATE THE TESTIMONY OF LAW ENFORCEMENT

7    WITNESSES AND NON-LAW ENFORCEMENT WITNESSES,

8    I AM NOT SATISFIED THAT MR. BIRT WILL SUCCEED

9    IN DOING SO.  HE WAS PRETTY EMPHATIC, IN

10   FACT, VERY EMPHATIC, IN HIS RESPECT FOR LAW

11   ENFORCEMENT AND THE HONOR HE ACCORDS THEM.

12        AND, SO, FOR THAT REASON I'M CONCERNED

13   ABOUT HIS OBJECTIVITY AND HIS ABILITY TO

14   SERVE AS A FAIR AND IMPARTIAL JUROR.  AND FOR

15   THAT REASON, JUROR NUMBER 22, MR. BIRT, WILL

16   BE EXCUSED.

17        ANY OBJECTION TO EITHER SIDE, ANY

18   OBJECTION BY THE GOVERNMENT?

19   MR. STEVENS: NO OBJECTION.

20   MR. AMBEAU: NONE BY THE DEFENSE.

21   THE COURT: ALL RIGHT.  AT THIS TIME I

22        AM PREPARED TO CONSIDER ANY CHALLENGES

23   FOR CAUSE, BEGINNING WITH THE UNITED STATES.

24   MR. AMBEAU: YOUR HONOR, JUST MOMENTARILY.

25        WILL THERE BE AN EXCUSE FOR MEDICAL FOR

1    THE YOUNG LADY HERE THAT SAID THAT SHE HAD

2    ---

3    THE COURT: NO.  FOR THE -- OH, YES.  I'M

4        SORRY.  THAT'S MS. -- THANK YOU FOR

5    REMINDING ME.  THAT IS -- YES, MS. JENKINS

6    WILL ALSO BE EXCUSED FOR MEDICAL REASONS, FOR

7    THE REASONS SHE SHARED WITH US AT THE BENCH.

8        SO, AGAIN, JUROR NUMBER 28, MS. JENKINS,

9    IS ALSO EXCUSED.

10        ALL RIGHT.  MR. STEVENS, ANY

11    CHALLENGES FOR CAUSE FROM THE GOVERNMENT?

12    MR. STEVENS: NO, JUDGE.

13    THE COURT: OKAY.  THANK YOU.  MR. AMBEAU,

14        ANY CHALLENGES FOR CAUSE BY THE DEFENSE?

15    MR. AMBEAU: NONE, YOUR HONOR.

16    THE COURT: OKAY.  THANK YOU.

17        ALL RIGHT, GENTLEMEN.  WHAT I WILL DO

18    IS EXCUSE MYSELF FOR ABOUT FIVE MINUTES.  WE

19    WILL ALLOW OUR INTERPRETERS TO TAKE A BREAK

20    AS WELL.

21        LET ME ASK THAT YOU PLEASE FILL OUT YOUR

22    STRIKE SHEETS.  REMEMBER, YOU DON'T HAVE TO

23    AVAIL YOURSELF OF ALL THE STRIKES.  BUT YOU

24    CERTAINLY ARE FREE TO DO SO.  AND PLEASE

25    DON'T FORGET TO SIGN THE STRIKE SHEETS.  I

1    BELIEVE YOU BOTH HAVE YOUR STRIKE SHEETS,

2    CORRECT?

3    MR. STEVENS: YES, YOUR HONOR.

4    MR. AMBEAU: YES.

5    THE COURT: NOW, I WOULD ALSO ASK, GENTLEMEN,

6        IF YOU WOULD, THERE'S NO SIGNATURE LINE

7    FOR A DATE.  BUT I WOULD ASK YOU,

8    NONETHELESS, TO DATE THE STRIKE SHEET AS

9    WELL.  OKAY?

10        ANY QUESTIONS, GENTLEMEN?

11    MR. AMBEAU: NO, JUDGE.

12    MR. STEVENS: NO.

13    THE COURT: ALL RIGHT.  COURT WILL BE IN

14        RECESS.

15    REPORTER'S NOTE: (THEREFORE, AT THIS TIME

16    COURT IS IN RECESS.) (COURT IS RESUMED.)

17    THE COURT: OKAY. BACK ON THE RECORD.

18        THE FOLLOWING PERSONS WILL SERVE AS THE

19    REGULAR JURORS IN THIS CASE.

20        BUT, FIRST OF ALL, JUST SO THAT BOTH

21    SIDES ARE AWARE, THE GOVERNMENT STRUCK THE

22    FOLLOWING JURORS:

23        JUROR NUMBER 6, MS. LINDBERG.

24        JUROR NUMBER 25, MR. ZERA.

25        JUROR NUMBER 26, MR. DOMINIGUE.

1          JUROR NUMBER 30, MS. OLIVER.

2          AND JUROR NUMBER 31, MR. DUHON.

3           THE DEFENSE HAS STRUCK THE FOLLOWING:

4           JUROR NUMBER 4, MR. LIEUX.

5          JUROR NUMBER 5, MS. HILL.

6          JUROR NUMBER 10, MR. PHILIP.

7          JUROR NUMBER 11, MR. BARBER.

8          JUROR NUMBER 14, MR. MINOR.

9          JUROR NUMBER 17, MR. FREEMAN.

10          JUROR NUMBER 20, MS. FARMER.

11          JUROR NUMBER 21, MR. LANDRY.

12          JUROR NUMBER 23, MR. DUPRE.

13          AND JUROR NUMBER 24, MR. LYONS.

14           THOSE ARE THE 12 PERSONS WHO WILL SERVE

15           AS THE JURORS IN THIS CASE.

16           THE STRIKE FORMS WILL BE RETURNED TO

17      BOTH SIDES.  WE WILL SELECT TWO ALTERNATES.

18      I WILL INSTRUCT YOU TO SELECT ANY ALTERNATE

19      YOU HAVE -- YOU EACH HAVE ONLY ONE.  ANY

20      ALTERNATE AFTER JUROR NUMBER 31, MR. DUHON.

21      MR. AMBEAU: YOUR HONOR, I THINK MAYBE I'M

22           MISCOUNTING.  OKAY.

23      THE COURT: LET ME -- IT'S BEEN BROUGHT TO

24           MY ATTENTION.  I DIDN'T TELL YOU WHICH

25           -- I TOLD YOU WHICH JURORS HAD BEEN STRUCK.

1           THE FOLLOWING ARE MEMBERS OF THE JURY:

2             JUROR NUMBER ONE, MR. GORMAN.

3             JUROR NUMBER TWO, MS. LANUS.

4             JUROR NUMBER THREE, MR. ALFORD.

5             JUROR NUMBER SEVEN, MR. DICKERSON.

6             JUROR NUMBER EIGHT, MS. RICHARD, OR

7                DR. RICHARD.

8             JUROR NUMBER NINE, MS. BOSWELL.

9             JUROR NUMBER 12, MS. MARLER.

10            JUROR NUMBER 13, MR. BARBIER.

11            JUROR NUMBER 15, MR. HILL.

12            JUROR NUMBER 18, MR. FIFE.

13            JUROR NUMBER 19, MS. JOUBERT.

14            JUROR NUMBER 27, MS. CASAS.

15        THOSE ARE THE 12 MEMBERS OF THE REGULAR JURY.

16            SO, AGAIN, AND I APOLOGIZE FOR THAT

17        CONFUSION, GENTLEMEN.

18            SO, YOU CAN TAKE -- EACH HAVE ONE STRIKE

19        AFTER JUROR NUMBER 31, MR. DUHON.  ONE STRIKE

20        FOR EACH SIDE.  THE FIRST TWO UNSTRUCK JURORS

21        AFTER NUMBER 31 WILL SERVE AS THE TWO

22        ALTERNATES.

23        MR. AMBEAU: YOUR HONOR, I BELIEVE MS.

24            TOWNSEND, JUROR NUMBER 29, HAS NOT ---

25        THE CLERK: THAT'S RIGHT, JUDGE.

1    THE COURT:  OH, I'M SORRY.  THAT'S CORRECT.

2         THANK YOU FOR POINTING THAT OUT.

3    SO, AFTER 29, BUT NOT JUROR NUMBER 30 OR

4    31.  THAT'S FINE.

5         ALL RIGHT, GENTLEMEN.  THE FOLLOWING TWO

6    PERSONS WILL SERVE AS ALTERNATES IN THIS

7    CASE: JUROR NUMBER 29, MS. TOWNSEND.

8         AND JUROR NUMBER 35, MR. GUILLORY.

9         ALL RIGHT.  LET'S GO ON AND RETURN THE

10   JURY ---

11   MR. STEVENS: 35, MR. GUILLORY?

12   THE COURT: 33, I'M SORRY, 33.  LET'S SEE.

13        SO, 29 AND JUROR NUMBER 33, MR.

14   GUILLORY.

15   MR. STEVENS: THANK YOU, JUDGE.  I'M SORRY.

16   THE COURT: THAT'S QUITE ALL RIGHT.

17        ANYTHING ELSE?  ALL RIGHT.  LET'S

18   ALL RISE AS THE VENIRE RETURNS TO THE

19   COURTROOM.

20   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

21        THE JURY IS RETURNED TO THE COURTROOM.)

22   THE COURT: YOU MAY BE SEATED.  WELL,

23        WELCOME BACK, LADIES AND GENTLEMEN.  AND

24   THANK YOU FOR YOUR SERVICE.  I AM PLEASED TO

25   REPORT THAT WE HAVE SELECTED A JURY FOR THIS

1          TRIAL.  AT THIS TIME I WILL DIRECT MS.

2          HARTER, MY COURTROOM DEPUTY, TO READ ALOUD

3          THE NAMES OF THOSE PERSONS WHO HAVE BEEN

4          SELECTED TO SERVE AS JURORS IN THIS CASE.

5          MS. HARTER?

6          MS. HARTER: JUROR NUMBER ONE, MR. GORMAN.

7               JUROR NUMBER TWO, MS. LANUS.

8               JUROR NUMBER THREE, MS. ALFORD.

9               JUROR NUMBER SEVEN, MR. DICKERSON.

10              JUROR NUMBER EIGHT, DR. RICHARD.

11              JUROR NUMBER NINE, MS. BOSWELL.

12              JUROR NUMBER 12, MS. MARLER.

13              JUROR NUMBER 13, MR. BARBIER.

14              JUROR NUMBER 15, MR. HILL.

15              JUROR NUMBER 18, MR. FIFE.

16              JUROR NUMBER 19, MS. JOUBERT.

17              JUROR NUMBER 27, MS. CASAS.

18         THE COURT: OKAY.  NOW, THERE ARE TWO,

19              IN ADDITION TO THOSE 12, WHO WE HAVE

20         DESIGNATED AS ALTERNATES.  THOSE PERSONS WILL

21         SIT THROUGHOUT THE TRIAL AND WILL PARTICIPATE

22         IN THE JURY DELIBERATIONS IN THE EVENT THAT

23         ONE OR MORE OF THE REGULAR JURORS ARE UNABLE

24         TO FULFILL THEIR RESPONSIBILITIES.  THEIR

25         NAMES WILL BE CALLED AT THIS TIME.

1        MS. HARTER: JUROR NUMBER 29, MS. TOWNSEND.

2              JUROR NUMBER 33, MR. GUILLORY.

3     THE COURT: OKAY.  THANK YOU FOR THOSE OF

4        YOU, FIRST OF ALL, WHOSE NAMES WERE

5     CALLED, I WILL ASK YOU TO REMAIN HERE IN THE

6     COURTROOM FOR A MOMENT.  WE WILL BREAK FOR

7     LUNCH IN JUST A FEW MINUTES.  BUT I WILL HAVE

8     ADDITIONAL INSTRUCTIONS FOR YOU.

9        FOR THOSE OF YOU WHOSE NAMES WERE NOT

10    CALLED, LET ME ONCE AGAIN THANK YOU ALL FOR

11    SATISFYING YOUR CIVIC OBLIGATION, YOUR DUTIES

12    AS CITIZENS, BY COMING DOWN HERE AND MAKING

13    YOURSELVES AVAILABLE FOR JURY SERVICE.  I

14    SPEAK FOR EVERYONE ASSOCIATED WITH THIS

15    TRIAL, NOT JUST THE LAWYERS AND THE PARTIES

16    INVOLVED, BUT MY STAFF IN THANKING ALL OF YOU

17    FOR DISCHARGING, ONCE AGAIN, YOUR CIVIC

18    RESPONSIBILITY FOR COMING IN TODAY.

19        MS. PALMER IS AT THE BACK OF THE

20    COURTROOM.  AND SHE WILL ANSWER ANY QUESTIONS

21    ANY OF YOU MAY HAVE OR PROVIDE ANY OF YOU

22    WITH PAPERWORK IF YOU NEED PAPERWORK.

23        ONCE AGAIN, THANK YOU ALL SO MUCH FOR

24    JOINING US THIS MORNING.

25        LET'S ALL RISE.  AND THOSE WHOSE NAMES

1    WERE NOT CALLED ARE NOW EXCUSED.

2    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

3        THE VENIRE WAS EXCUSED.)

4    THE COURT: YOU MAY BE SEATED.

5        OKAY. LADIES AND GENTLEMEN, AT THIS

6    TIME I WILL SEAT THE MEMBERS OF THE JURY;

7    THAT IS, I WOULD ASK THAT YOU BE SEATED IN

8    THESE SEATS THAT I ASSIGN TO YOU THROUGHOUT

9    THE COURSE OF THIS TRIAL.

10        MR. GORMAN, OF COURSE, YOU MAY REMAIN

11    SEATED WHERE YOU ARE.

12        MS. LANUS, YOU AS WELL.

13        MS. ALFORD, YOU MAY BE SEATED THERE.

14        MR. DICKERSON, IF YOU WOULD COME BY

15    AND SIT NEXT TO MS. ALFORD IN SEAT NUMBER

16    FOUR.

17        AND, DR. RICHARD, IF YOU WOULD SIT IN

18    SEAT NUMBER FIVE.

19        MS. BOSWELL, IF YOU WOULD COME DOWN TO

20    THE FIRST ROW AND BE SEATED IN SEAT NUMBER --

21    CHAIR NUMBER SIX.

22        MS. MARLER, WOULD YOU COME DOWN, PLEASE,

23    AND BE SEATED -- WELL, ACTUALLY, YOU COULD

24    REMAIN THERE ON THAT ROW AND BE SEATED IN

25    SEAT ONE OF THAT ROW.  THANK YOU, MA'AM.

1    AND MR. BARBIER, IF YOU WOULD COME ON

2    DOWN.

3    MR. HILL, IF YOU WOULD TAKE THE THIRD

4    CHAIR.

5    MR. FIFE, IF YOU WOULD TAKE SEAT NUMBER

6    FOUR ON THE SECOND ROW.

7    FOLLOWED BY MS. JOUBERT.

8    AND, FINALLY, MS. CASAS.  IF YOU WOULD

9    BE KIND ENOUGH TO SIT IN THE SIXTH SEAT ON

10   THE SECOND ROW.

11   NOW, MS. TOWNSEND, IF YOU WOULD TAKE

12   CHAIR NUMBER SEVEN.

13   AND, FINALLY, MR. GUILLORY, IF YOU WOULD

14   TAKE CHAIR NUMBER EIGHT ON THE SECOND ROW.

15   NOW, YOU HAVE EACH -- YOU WERE

16   PREVIOUSLY SWORN AS MEMBERS OF THE VENIRE.

17   AT THIS TIME I WOULD ASK YOU TO STAND TO

18   RECEIVE THE OATH AS MEMBERS OF THE JURY.

19   THE CLERK: RAISE YOUR RIGHT HAND.

20   DO EACH OF YOU SOLEMNLY SWEAR THAT YOU WILL WELL AND

21   TRULY TRY ISSUE BETWEEN UNITED STATES VERSUS CARLOS

22   LINARES, AND A TRUE VERDICT RENDERED, ACCORDING TO THE

23   LAW AND EVIDENCE AS IT SHALL BE GIVEN TO YOU BY THE

24   COURT, SO HELP YOU GOD?

25   THE JURY: I DO.

1    THE COURT: YOU MAY BE SEATED.

2        IT IS AT THIS TIME IN THE TRIAL,

3    LADIES AND GENTLEMEN, THAT I WILL CUSTOMARILY

4    PROVIDE WHAT WE CALL PRELIMINARY

5    INSTRUCTIONS.  THAT IS, I WILL TELL YOU A

6    LITTLE BIT MORE ABOUT THIS TRIAL.  I WOULD

7    GIVE YOU A SENSE OF THE -- OR ROADMAP, MORE

8    PROPERLY, ABOUT WHAT WE WILL DO AS WE BEGIN

9    THE TRIAL.  I WILL DISPENSE WITH THAT AT THIS

10   TIME.  I WILL PROVIDE THOSE INSTRUCTIONS FOR

11   YOU WHEN WE RETURN FROM THE LUNCH BREAK.

12       WE WILL -- IT'S ABOUT 12:50 RIGHT NOW.

13   OBVIOUSLY, THAT CLOCK IS NOT -- IS IN ERROR.

14   IT'S AN HOUR AHEAD.  THIS IS THE GOVERNMENT.

15   SOMETIMES IT TAKES A WHILE TO GET THE GSA TO

16   GO ON AND CHANGE THINGS BACK TO WHERE THEY

17   SHOULD BE WHEN WE'RE IN STANDARD TIME.

18       SO, AGAIN, IT'S 12:50.  WHAT I WOULD

19   LIKE VERY MUCH TO DO IS ASK YOU ALL TO RETURN

20   TO THE COURTHOUSE BY TWO O'CLOCK.  THAT GIVES

21   YOU A LITTLE OVER AN HOUR TO GET LUNCH.  YOU

22   SHOULDN'T HAVE A PROBLEM DOING THAT.  THERE

23   ARE SEVERAL DINERS AND LUNCH PLACES HERE IN

24   DOWNTOWN BATON ROUGE.  IN FACT, WHAT I'LL DO

25   IS WE'LL BREAK FOR ABOUT AN HOUR AND -- WE'LL

1    BREAK UNTIL 2:15.  THAT WAY, FOR THOSE OF YOU

2    WHO ARE NOT FAMILIAR WITH DOWNTOWN BATON

3    ROUGE, YOU WILL HAVE PLENTY OF TIME TO FIND A

4    PLACE TO EAT.  BUT GOING FORWARD WE'LL ONLY

5    BREAK FOR ABOUT AN HOUR, MAYBE AN HOUR AND 15

6    TOMORROW AND ON WEDNESDAY.

7         WHEN YOU ALL RETURN, I ASK THAT YOU

8    REMAIN SEATED IN THE VERY SEATS YOU'RE IN

9    RIGHT NOW.  SO, PLEASE MAKE A MENTAL NOTE OF

10   YOUR SEATING POSITION.

11        THE OTHER THING I WILL TELL YOU IS THAT

12   NOW THAT YOU HAVE BEEN SWORN AS JURORS, THIS

13   TRIAL HAS, IN FACT, BEGUN.  AND, SO, THERE

14   ARE RULES THAT APPLY EVERY TIME YOU LEAVE

15   THIS COURTROOM.

16        FIRST, DON'T DISCUSS THE CASE WITH

17   ANYONE, NOT EVEN YOURSELVES.  YOU DON'T HAVE

18   ANY EVIDENCE IN THE CASE YET.  THE ONLY THING

19   YOU KNOW ABOUT THIS CASE, FOR INSTANCE, AT

20   THIS POINT IS WHAT I'VE TOLD YOU.  I'VE

21   SIMPLY READ THE INDICTMENT TO YOU.  SO, YOU

22   REALLY DON'T KNOW ENOUGH ABOUT THIS TO REALLY

23   ENGAGE IN A DISCUSSION AMONG YOURSELVES OR

24   WITH ANYONE.

25        PLEASE DON'T ACCESS YOUR SMART PHONES OR

1    ANY INTERNET THROUGH ANY DEVICE WHERE YOU CAN

2    GET ON THE INTERNET TO LEARN ABOUT THE

3    DEFENDANTS OR ABOUT SOME OF THE THINGS THAT

4    YOU'VE LEARNED ABOUT THUS FAR FROM THE

5    READING OF THE INDICTMENT.  EVERYTHING THAT

6    YOU NEED TO KNOW TO DISCHARGE YOUR DUTIES AS

7    JURORS WILL BE TOLD TO YOU DURING THIS TRIAL,

8    IN THIS COURTROOM, BY THE WITNESSES WHO SIT

9    IN THAT WITNESS BOX AND ON THE WITNESS STAND

10   AND THE INSTRUCTIONS THAT I GIVE YOU.

11         SO, AGAIN, PLEASE DON'T CONDUCT ANY

12   OUTSIDE RESEARCH DURING THE TIME THAT YOU'RE

13   AWAY FOR LUNCH.

14         NOW, YOU ARE FREE TO CALL YOUR HOMES AND

15   YOUR EMPLOYERS AND REPORT THAT YOU'VE BEEN

16   SELECTED TO SERVE AS A JURY.  YOU CAN EVEN

17   TELL THEM THAT IT'S A CRIMINAL CASE IN

18   FEDERAL COURT.  BUT, PLEASE, DON'T TELL THEM

19   ANYTHING BEYOND THAT.  IF THEY INQUIRE, YOU

20   TELL THEM THAT YOU'RE UNDER SPECIFIC

21   INSTRUCTIONS BY THE JUDGE NOT TO DISCUSS THE

22   CASE AT THIS TIME.  OKAY?

23         NOW, THE OTHER THING IS, I DON'T BELIEVE

24   THERE'S ANY MEDIA COVERAGE OF THIS TRIAL.

25   BUT IF YOU HAPPEN UPON A TELEVISION, A

1    NEWSPAPER DURING THE COURSE OF THIS TRIAL AND

2    YOU SEE SOME NEWS COVERAGE, PLEASE AVERT YOUR

3    ATTENTION.  PLEASE DON'T READ ANYTHING, WATCH

4    ANY NEWS, OR LISTEN TO ANY RADIO NEWS

5    COVERAGE.  AGAIN, I DON'T THINK WE HAVE ANY

6    MEDIA COVERING THIS.  BUT IN CASE WE DO,

7    PLEASE, AGAIN, MAKE EVERY EFFORT TO AVOID

8    THAT.

9    AND, AGAIN, FINALLY, I SHOULD SAY,

10    PLEASE DON'T BEGIN TO FORM ANY OPINIONS ABOUT

11    THE ULTIMATE ISSUES IN THIS CASE.  YOU,

12    AGAIN, DON'T KNOW ENOUGH ABOUT THIS CASE TO

13    EVEN BEGIN TO DO SO.

14    SO, LET ME THANK YOU ALL ONCE AGAIN FOR

15    YOUR SERVICE AS JURORS.

16    I WILL, BY THE WAY, BE MENTIONING THESE

17    RULES TO YOU THROUGHOUT THE COURSE OF THIS

18    TRIAL WHENEVER WE TAKE A BREAK FROM THIS

19    COURTROOM.  SO, I APPRECIATE YOUR BEARING

20    WITH ME.

21    AGAIN, WE WILL BREAK FOR LUNCH UNTIL

22    2:15.  I WOULD ASK, HOWEVER, THAT YOU BE BACK

23    IN THE COURTHOUSE NO LATER THAN SAY FIVE

24    MINUTES AFTER TWO SO THAT WE CAN GET YOU

25    UPSTAIRS AND PROPERLY SEATED SO THAT WE CAN

1    BEGIN THE EVIDENCE PORTION OF THE TRIAL.

2         LET'S ALL RISE FOR THE JURY.

3    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

4         THE JURY WAS EXCUSED FOR LUNCH BREAK.)

5    THE COURT: BE SEATED.  I NEGLECTED TO ASK

6         MR. AMBEAU, DOES THE DEFENSE HAVE ANY

7    OBJECTIONS TO THE MAKE-UP OF THE JURY?

8    MR. AMBEAU: WE DO NOT, YOUR HONOR.

9    THE COURT: DOES THE UNITED STATES HAVE

10        ANY OBJECTION TO THE MAKE-UP OF THE

11   JURY?

12   MR. STEVENS: NO, JUDGE.

13   THE COURT: OKAY.  ALL RIGHT.  GENTLEMEN,

14        WHAT WE WILL DO IS, I'M GOING TO ASK YOU

15   ALL TO RETURN TO THE COURTROOM NO LATER THAN

16   TEN AFTER TWO.  BECAUSE AT THAT TIME, AS WE

17   DISCUSSED IN OUR MEETING IN MY CHAMBERS, I

18   HAVE A COUPLE OF ISSUES TO TAKE UP WITH THE

19   DEFENDANT, SPECIFICALLY, AT THAT TIME,

20   OUTSIDE THE PRESENCE OF THE JURY.

21        IS THERE ANYTHING FURTHER WE SHOULD

22   DISCUSS BEFORE WE BREAK FOR LUNCH?  ANYTHING

23   FROM THE UNITED STATES?

24   MR. STEVENS: NO, JUDGE.

25   THE COURT: ANYTHING FROM THE DEFENSE?

1        MR. AMBEAU: NOTHING FROM THE DEFENSE, YOUR

2            HONOR.

3        THE COURT: OKAY.  THANK YOU.  ENJOY LUNCH.

4            COURT IS IN RECESS.

5        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

6            THE COURT IS IN RECESS FOR LUNCH BREAK.)

7        THE COURT: BE SEATED.  OKAY.  ARE

8            BOTH SIDES PREPARED TO PROCEED?

9        MR. STEVENS: YES, JUDGE.

10        MR. AMBEAU: YES, YOUR HONOR.

11        THE COURT: ALL RIGHT.  BEFORE WE PROCEED,

12            I DO HAVE ONE OTHER MATTER TO TAKE UP.

13            BUT BEFORE DOING SO, MR. ROZAS, LET ME

14        ASK YOU TO COME TO THE BENCH FOR A MINUTE ON

15        AN UNRELATED MATTER, PLEASE.

16        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

17            AN OFF-THE-RECORD DISCUSSION WAS HELD.)

18        REPORTER'S NOTE: (DISCUSSION WAS CONCLUDED.)

19        THE COURT: OKAY.  WE'RE BACK ON THE RECORD

20            IN THE CASE OF UNITED STATES VERSUS

21        LINARES.

22            LET THE RECORD REFLECT THAT THE

23        DEFENDANT IS PRESENT IN COURT AT THIS TIME.

24            MR. LINARES, WOULD YOU PLEASE RISE WHILE

25        I ADDRESS YOU, SIR.  IT WON'T BE NECESSARY,

1      AS IT WOULD OTHERWISE WOULD BE, FOR YOU TO

2      STEP TO THE PODIUM.  SINCE YOU HAVE THE

3      DEVICE REQUIRED FOR THE TRANSLATORS, I WILL

4      SIMPLY ADDRESS YOU AT COUNSEL TABLE.  DO YOU

5      HAVE ANY PROBLEMS HEARING AND UNDERSTANDING

6      ME, SIR?

7      MR. LINARES: YES.

8      THE COURT: YOU DO HAVE A PROBLEM OR YOU ---

9      BY INTERPRETER: THE AUDIO IS NOT GOOD.

10     THE COURT: OKAY.  MS. MORALES AND MS.

11     BROADBECK, WE CERTAINLY WANT THE RECORD

12     TO REFLECT THAT OUR TWO INTERPRETERS ARE

13     PRESENT AND YOU HAVE BEEN INTERPRETING FOR

14     THE DEFENDANT ALL ALONG.  IS IT FEASIBLE,

15     LADIES, FOR YOU ALL TO SIMPLY SIT NEXT TO THE

16     DEFENDANT DURING THE COURSE -- AT LEAST FOR

17     THE REST OF TODAY UNTIL WE CAN GET THIS

18     PROBLEM WORKED OUT?

19     BY INTERPRETER: IF YOU ASK US TO, YOUR HONOR,

20     WE WILL.

21     THE COURT: WHATEVER WE HAVE TO DO TO

22     ENSURE THAT THE DEFENDANT IS -- CAN HEAR

23     YOU.  I MEAN, THAT'S MY CONCERN.  HE'S

24     TELLING ME THAT HE CANNOT HEAR.  AND, SO, FOR

25     THAT REASON I WOULD ASK IF YOU ALL WOULD

1    SIMPLY DISCONTINUE THE USE OF THE ELECTRONIC
2    APPARATUS AND SIMPLY SIT NEXT TO THE
3    DEFENDANT.
4    THE INTERPRETER: YES, YOUR HONOR.  WE WILL.
5    THE COURT: OKAY.  LADIES, I WOULD ASK THAT
6    YOU TURN THE MICROPHONE AWAY FROM YOU SO
7    THAT YOU'RE NOT PICKED UP ON THE AUDIO.
8    OKAY?
9    ACTUALLY, FOR THIS PORTION OF THE TRIAL
10   I WILL REQUIRE THE USE OF THE MICROPHONE FOR
11   RIGHT NOW.  SO, IF HE COULD POSITION THE
12   MICROPHONE TO THE INTERPRETER.
13   MR. AMBEAU: OKAY, YOUR HONOR.
14   THE COURT:  THANK YOU, MR. AMBEAU.
15   MR. AMBEAU: OKAY.
16   THE COURT: MR. LINARES, I AM REQUIRED UNDER
17   THE LAW TO ADVISE YOU OF CERTAIN THINGS
18   PRIOR TO PROCEEDING WITH TRIAL TODAY.
19   FIRST.  IT IS MY UNDERSTANDING, SIR,
20   THAT YOU HAVE BEEN OFFERED A PLEA DEAL; THAT
21   IS, THE OPTION TO PLEAD GUILTY TO SOME OR ALL
22   OF THE CHARGES CONTAINED IN THE SUPERCEDING
23   INDICTMENT, SIR.  WERE YOU MADE AWARE OF THAT
24   PLEA OFFER?
25   MR. LINARES: YES.

1       THE COURT: AND DID YOU DISCUSS THE OFFER

2           MADE BY THE GOVERNMENT WITH YOUR LAWYER

3       PRIOR TO TRIAL?

4       MR. LINARES: YES.

5       THE COURT: AND IS IT YOUR DECISION TO

6           REJECT THE PLEA OFFER AND TO PROCEED

7       TO TRIAL AT THIS TIME?

8       MR. LINARES: YES.

9       THE COURT: VERY WELL.  WOULD YOU AT THIS

10          TIME LIKE TO FURTHER DISCUSS THE PLEA

11      AGREEMENT OR THE PLEA OFFER WITH YOUR LAWYER?

12      MR. LINARES: NO.

13      THE COURT: VERY WELL.  ALSO, I WOULD LIKE

14          TO ADVISE YOU, SIR, THAT YOU HAVE THE

15      RIGHT TO TESTIFY AT THIS TRIAL IF YOU WISH TO

16      DO SO IN YOUR OWN DEFENSE.  IT IS IMPORTANT

17      THAT YOU UNDERSTAND, HOWEVER, THAT YOU ARE

18      NOT REQUIRED TO TESTIFY IN YOUR OWN DEFENSE.

19      DO YOU UNDERSTAND THAT, MR. LINARES?

20      MR. LINARES: YES.

21      THE COURT: THAT IS A DECISION THAT YOU AND

22          ONLY YOU CAN MAKE AFTER CONFERRING WITH

23      YOUR LAWYER.  YOU DO NOT HAVE TO MAKE THE

24      DECISION TO TESTIFY AT THIS TIME.  THE

25          IMPORTANT THING IS THAT YOU SIMPLY BE AWARE

1    THAT YOU HAVE THE RIGHT TO TESTIFY.  DO YOU

2    UNDERSTAND THAT?

3    MR. LINARES: YES.

4    THE COURT: OKAY.  AND, FINALLY, I HAVE

5        BEEN INFORMED, SIR, THAT YOU, THROUGH

6    YOUR LAWYER, HAVE REACHED AN AGREEMENT WITH

7    THE GOVERNMENT ON CERTAIN STIPULATED FACTS.

8    DO YOU RECALL SPEAKING TO YOUR LAWYER ABOUT

9    THE ENTRY OF ANY STIPULATIONS DURING THIS

10   TRIAL?

11   MR. LINARES: YES.

12   THE COURT: OKAY.  NOW, HAVE THE STIPULATIONS

13       BEEN OFFERED, MR. STEVENS?

14   MR. STEVENS: NO, JUDGE, NOT YET.  BECAUSE

15       SOME OF THESE RELATE TO EXHIBITS THAT WE

16   MAY END UP NOT INTRODUCING.

17   THE COURT: OKAY.

18   MR. STEVENS: SO, I DON'T KNOW WHAT YOUR

19       PREFERENCE IS.  I CAN INTRODUCE THEM ALL

20   NOW, OR WE COULD WAIT UNTIL THOSE EXHIBITS

21   COME UP.

22   THE COURT: WELL, I DON'T WANT TO INTRODUCE

23       THEM AT ALL.  I SIMPLY WANT TO MAKE SURE

24   THAT THE DEFENDANT HAS SPOKEN WITH HIS LAWYER

25   ABOUT THE STIPULATIONS, AND THAT HE HAS AT

1    LEAST SIGNED THE STIPULATIONS.  WHETHER THE

2    UNITED STATES OR THE DEFENSE WISH TO

3    INTRODUCE THE STIPULATIONS IS ENTIRELY UP TO

4    YOU ALL.  I JUST WANT TO SATISFY MYSELF

5    BEFOREHAND THAT MR. LINARES HAS KNOWINGLY AND

6    VOLUNTARILY ENTERED INTO THOSE STIPULATIONS.

7        SO, IF I COULD SEE THOSE STIPULATIONS.

8    THANK YOU.

9        NOW, MR. LINARES, I HAVE BEFORE ME A

10   STIPULATION REGARDING THE AUTHENTICITY OF

11   VIDEO.  DO YOU RECALL SIGNING THAT

12   STIPULATION, SIR?

13   MR. LINARES: YES.

14   THE COURT: I ALSO HAVE A -- THAT PERTAINS

15       TO AN "EXHIBIT 2."  THERE'S ALSO AN

16   "EXHIBIT 3, UNITED STATES EXHIBIT 3" THAT

17   ALSO IS INCLUDED WITHIN THE STIPULATION

18   REGARDING THE VIDEO.  DO YOU RECALL SIGNING

19   THAT STIPULATION, SIR?

20   MR. LINARES: YES.

21   THE COURT: I ALSO HAVE A STIPULATION HERE

22       THAT PURPORTS TO BEAR YOUR SIGNATURE

23   THAT IS DESCRIBED AS A STIPULATION REGARDING

24   SEARCH WARRANT DOCUMENTS.  DO YOU RECALL

25   SIGNING THAT STIPULATION, SIR?

1        MR. LINARES: YES.

2        THE COURT: NEXT I HAVE A STIPULATION

3            REGARDING THE INTRODUCTION OF CERTAIN

4        GRAND JURY TRANSCRIPTS.  DO YOU RECALL

5        SIGNING THAT STIPULATION, SIR?

6        MR. LINARES: YES.

7        THE COURT: AND, FINALLY, I HAVE A

8            STIPULATION REGARDING THE ENTRY AND

9        ADMISSION OF CERTAIN IRS RECORDS.  DO YOU

10       RECALL SIGNING THAT STIPULATION, SIR?

11       MR. LINARES: YES.

12       THE COURT: NOW, BEFORE YOU SIGNED THESE

13           STIPULATIONS, DID YOU DISCUSS THESE

14       STIPULATIONS WITH MR. AMBEAU?

15       MR. LINARES: YES.

16       THE COURT: AND DID YOU REVIEW THE DOCUMENTS

17           OR OTHER EVIDENCE THAT FORMED THE BASIS

18       OF THAT -- ARE THE SUBJECTS OF THESE

19       STIPULATIONS?

20       MR. LINARES: YES.

21       THE COURT: ALL RIGHT.  AND, SO, IN OTHER

22           WORDS, YOU SAW THE EVIDENCE BEFORE YOU

23       SIGNED THE STIPULATIONS, CORRECT?

24       MR. LINARES: YES.

25       THE COURT: WERE YOU ADVISED, SIR, THAT

1          YOU HAVE THE RIGHT TO NOT ENTER THE

2     STIPULATIONS?

3     MR. LINARES: YES.

4     THE COURT: IN OTHER WORDS, DID YOUR LAWYER

5          TELL YOU THAT YO DON'T HAVE TO SIGN THE

6     STIPULATIONS, SIR?

7     MR. LINARES: YES.  YES.

8     THE COURT: MY POINT, SIR, IS THAT YOU

9          UNDERSTAND THAT NO ONE -- DID ANYONE

10    FORCE YOU TO SIGN THE STIPULATIONS, SIR, OR

11    DID YOU DO SO VOLUNTARILY?

12    MR. LINARES: YES.

13    THE COURT: LET ME ASK YOU AGAIN.  DID

14         ANYONE FORCE YOU TO SIGN THE

15    STIPULATIONS?

16    MR. LINARES: NO.

17    THE COURT: DID YOU SIGN THE STIPULATIONS

18         VOLUNTARILY AND OF YOUR OWN FREE WILL?

19    MR. LINARES: YES.

20    THE COURT: VERY WELL.  I FIND THAT THE

21         STIPULATIONS HAVE BEEN ENTERED INTO

22    BY THE DEFENDANT, WITH A FULL KNOWLEDGE OF

23    THE SUBJECTS OF EACH OF THE STIPULATIONS

24    AFTER REVIEW OF THE EVIDENCE.

25         I FURTHER FIND THAT THE DEFENDANT

1           ENTERED THE STIPULATIONS VOLUNTARILY AND OF

2           HIS OWN FREE WILL.

3               ACCORDINGLY, SHOULD EITHER SIDE MOVE FOR

4           THE INTRODUCTION OF THE STIPULATIONS, SUCH

5           STIPULATIONS WILL BE ADMITTED INTO EVIDENCE.

6               OKAY.  ANYTHING ELSE REGARDING THE

7           STIPULATIONS?

8           MR. STEVENS: NO, THANK YOU.

9           THE COURT: OKAY.  YOU ALL MAY BE SEATED

10              AT THIS TIME.

11              OKAY.  THE FINAL THING WE SHOULD

12          COVER BEFORE THE JURY IS BROUGHT IN.  I HAVE

13          BEEN INFORMED IN OUR CONFERENCE PRIOR TO THE

14          TRIAL THAT BOTH SIDES WISH TO WITHDRAW

15          CERTAIN MOTIONS THAT THEY HAVE FILED,

16          BEGINNING WITH THE UNITED STATES.

17              MR. STEVENS?

18          MR. STEVENS: YES, JUDGE.  WE FILED A

19              MOTION TO EXCLUDE CERTAIN DEFENSE

20          EVIDENCE, DOCUMENT NUMBER 50.  THAT CAN BE

21          WITHDRAWN AT THIS TIME.

22              I'VE BEEN TOLD BY MR. AMBEAU HE MAY HAVE

23          THREE EXHIBITS, TWO OF THEM I HAVEN'T SEEN,

24          BUT I -- I BELIEVE THAT THEY WILL BE

25          DOCUMENTS PULLED FROM OUR DISCOVERY.  THE

1          THIRD IS A SUMMARY THAT I THINK WE CAN TAKE

2          UP WHEN WE GET TO THAT POINT IN THE TRIAL.

3               AND, SO, AT THIS POINT I MOVE TO

4          WITHDRAW THAT MOTION.

5          THE COURT: AND I ASSUME, MR. AMBEAU,

6               THAT YOU DON'T WISH TO BE HEARD ON

7          THAT; THAT YOU HAVE NO OPPOSITION TO THE

8          GOVERNMENT'S MOTION?

9          MR. AMBEAU: THAT IS CORRECT, YOUR HONOR.

10         THE COURT: ALL RIGHT.  VERY WELL.  THE

11              GOVERNMENT'S MOTION IS GRANTED.

12              ANYTHING FURTHER?

13         MR. STEVENS: I DON'T KNOW IF THIS IS THE

14              TIME.  BUT WE'VE GOT A PENDING MOTION

15         OR REQUEST FOR JUDICIAL NOTICE.  AND IF THE

16         COURT WOULD TAKE THAT UP NOW OR MAYBE BEFORE

17         THE WITNESS, THAT THAT REQUEST RELATES TO.

18         IT'S UP TO THE COURT, OF COURSE.

19         THE COURT: WHEN DO YOU INTEND TO CALL THAT

20              WITNESS?

21         MR. STEVENS: THAT WOULD BE THE CASE AGENT.

22              SO, TOWARDS THE END OF OUR CASE.

23         THE COURT: OKAY.  VERY WELL.  WE'LL TAKE

24              THAT UP BEFORE THE CASE AGENT TESTIFIES.

25         MR. STEVENS: THANK YOU, JUDGE.

1    THE COURT: MR. AMBEAU?

2    MR. AMBEAU: YOUR HONOR, THE DEFENSE HAD

3    PREVIOUSLY FILED A MOTION FOR A BILL OF

4    PARTICULARS.  THE GOVERNMENT RESPONDED TO

5    THAT MOTION FOR A BILL OF PARTICULARS BY

6    TELLING US THAT, IN FACT, WHAT DOCUMENTS THEY

7    WERE REFERRING TO.

8    MS. BROADBECK: THE INTERPRETERS CANNOT

9    HEAR MR. AMBEAU.

10    THE COURT: OKAY. MR. AMBEAU, WHY DON'T

11    YOU ADDRESS ME FROM THE COUNSEL TABLE.

12    MR. AMBEAU: I'M SORRY, YOUR HONOR.

13    THE DEFENSE HAD PREVIOUSLY FILED A

14    MOTION FOR A BILL OF PARTICULARS.  AND YOUR

15    HONOR ASKED US TO CONFER ON THOSE PARTICULARS

16    ABOUT WHAT DOCUMENTS THE GOVERNMENT WAS

17    ASSERTING THAT MR. LINARES HAD CONCEALED IN

18    THE 2010 AND 2013 INVESTIGATIONS.  AND WE

19    HAVE DETERMINED THAT THOSE DOCUMENTS ARE, IN

20    FACT, OR WERE, IN FACT, TAX CHECKS IN THIS

21    PARTICULAR MATTER. SO, I THINK THAT THAT'S

22    SUFFICIENT FOR ME, YOUR HONOR, AS AN ANSWER.

23    AND, ACCORDINGLY, WE WOULD WITHDRAW THAT

24    MOTION FOR A BILL OF PARTICULARS AT THIS

25    TIME.

1    THE COURT: VERY WELL.  THE MOTION IS

2        GRANTED.

3        ANYTHING FURTHER, GENTLEMEN?

4    MR. STEVENS: NOT THAT WE'RE AWARE OF,

5        JUDGE.

6    THE COURT: OKAY.  ARE WE PREPARED TO

7        PROCEED WITH THE PRELIMINARY

8    INSTRUCTIONS TO THE JURY AND OPENING

9    STATEMENTS?

10   MR. AMBEAU: YOUR HONOR, AND I THINK THE

11       DEFENSE IS GOING TO MOVE FOR A

12   SEQUESTRATION UNDER RULE 650.

13   THE COURT: VERY WELL.  THE RULE HAS BEEN

14       INVOKED.  I WOULD ORDER THAT ANY PERSONS

15   PRESENT IN COURT AT THIS TIME WHO HAVE BEEN

16   SUBPOENAED TO TESTIFY, EXCUSE THEMSELVES FROM

17   THE COURTROOM.

18       I WOULD ALSO ASK COUNSEL FOR BOTH SIDES

19   TO LOOK ABOUT THE COURTROOM AND TO -- IF YOU

20   DETERMINE IF ANY OF YOUR WITNESSES ARE

21   PRESENT.  IF SO, PLEASE INSTRUCT THEM TO

22   EXCUSE THEMSELVES UNTIL SUCH TIME AS THEY ARE

23   CALLED TO TESTIFY.

24       I WOULD ALSO ASK, GENTLEMEN, TO ENSURE

25   THAT YOUR WITNESSES UNDERSTAND THAT THEY

1    CANNOT, SHALL NOT DISCUSS THEIR TESTIMONY

2    WITH ANYONE FROM THIS POINT UNTIL THEY ARE

3    CALLED TO TESTIFY.  OKAY?

4        ANYTHING FURTHER?

5    MR. STEVENS: NOTHING FROM THE GOVERNMENT.

6    THE COURT: HEARING NOTHING, LET'S ALL

7        RISE FOR THE JURY.

8    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

9        THE JURY RETURNS FROM THE LUNCH BREAK.)

10   THE COURT: BE SEATED.

11       WELL, WELCOME BACK, LADIES AND

12   GENTLEMEN.  I HOPE YOU DIDN'T HAVE ANY

13   DIFFICULTY FINDING A GOOD PLACE TO HAVE LUNCH

14   TODAY.

15       BEFORE WE ADJOURNED FOR LUNCH I GAVE YOU

16   CERTAIN INSTRUCTIONS.  I, FOR INSTANCE,

17   INSTRUCTED YOU NOT TO DISCUSS THIS CASE AMONG

18   YOURSELVES OR WITH ANYONE THAT YOU WOULD

19   ENCOUNTER DURING THE COURSE OF THE LUNCH

20   BREAK.  I TOLD YOU TO AVOID WATCHING,

21   LISTENING TO OR READING ANYTHING ABOUT THIS

22   CASE IN THE MEDIA.  I ALSO INSTRUCTED YOU NOT

23   TO FORM ANY OPINIONS ABOUT THE CASE AT THIS

24   TIME.

25       IF ANYONE HERE WAS UNABLE TO ABIDE BY

1    THOSE INSTRUCTIONS, PLEASE RAISE YOUR HAND.

2    LET THE RECORD REFLECT THAT NO HANDS ARE

3    BEING RAISED.  SO, THANK YOU FOR TAKING

4    SERIOUSLY THOSE INSTRUCTIONS.

5    AT THIS TIME, LADIES AND GENTLEMEN, NOW

6    THAT YOU'VE BEEN SWORN, I WILL GIVE YOU SOME

7    PRELIMINARY INSTRUCTIONS THAT WILL GUIDE YOU

8    THROUGHOUT THIS TRIAL.  IT WILL BE YOUR DUTY

9    FROM THE EVIDENCE TO FIND THE FACTS.  YOU AND

10    YOU ALONE ARE THE JUDGES OF THE FACTS.  YOU

11    WILL THEN HAVE TO APPLY THOSE FACTS TO THE

12    LAW AS I GIVE IT TO YOU AT THE CONCLUSION OF

13    THIS TRIAL.  NOW, YOU MUST FOLLOW THAT LAW

14    WHETHER YOU AGREE WITH IT OR NOT.

15    NOTHING THAT THE COURT MAY SAY AND DO

16    DURING THE COURSE OF THIS TRIAL IS INTENDED

17    TO INDICATE OR SHOULD BE INTERPRETED BY YOU

18    AS INDICATING WHAT I THINK YOUR VERDICT

19    SHOULD BE.

20    THE EVIDENCE FROM WHICH YOU WILL FIND

21    THE FACTS WILL CONSIST OF THE TESTIMONY OF

22    WITNESSES WHO WILL BE SEATED ON THE WITNESS

23    STAND AND TESTIFY BEFORE YOU, AS WELL AS

24    DOCUMENTS AND OTHER ITEMS THAT ARE RECEIVED

25    INTO EVIDENCE AS EXHIBITS.  AND ANY FACTS

1       THAT THE LAWYERS IN THIS CASE MAY AGREE OR

2       STIPULATE TO; THAT IS, FACTS THAT BOTH

3       PARTIES, BOTH SIDES, AGREE ARE SUITABLE FOR

4       YOUR CONSIDERATION AS YOU DELIBERATE.

5           NOW, THERE ARE CERTAIN THINGS THAT ARE

6       NOT EVIDENCE IN THE CASE AND ARE NOT TO BE

7       CONSIDERED BY YOU IN ANY WAY.  ANY

8       STATEMENTS, ARGUMENTS OR QUESTIONS BY THE

9       LAWYERS ARE NOT EVIDENCE.  WHAT THE LAWYERS

10      SAY, IN OTHER WORDS, IS NOT EVIDENCE.  IT'S

11      IMPORTANT FOR YOU TO UNDERSTAND THAT.

12          HOWEVER, THE LAWYERS ARE REQUIRED TO ASK

13      CERTAIN QUESTIONS.  THE QUESTIONS THEMSELVES

14      ARE NOT EVIDENCE, BUT THE ANSWERS TO THOSE

15      QUESTIONS CERTAINLY ARE CONSIDERED EVIDENCE.

16          NOW, THERE MAY BE OBJECTIONS MADE TO

17      CERTAIN QUESTIONS THAT ARE POSED BY THE

18      LAWYERS.  THE LAWYERS, IN FACT, HAVE AN

19      OBLIGATION TO THEIR CLIENTS TO MAKE

20      OBJECTIONS WHEN THEY BELIEVE THAT THE

21      QUESTIONS DO NOT COMPORT WITH THE FEDERAL

22      RULES OF EVIDENCE OR ARE IMPROPER IN SOME

23      WAY.  YOU SHOULD NOT BE INFLUENCED BY THE

24      FACT THAT A LAWYER HAS MADE AN OBJECTION, NOR

25      SHOULD YOU BE INFLUENCED BY MY RULING ON IT.

1          IF I BELIEVE THAT THE QUESTION IS A

2     PROPER ONE, I WILL OVER-RULE THE OBJECTION

3     AND I WILL ALLOW THE WITNESS TO ANSWER THE

4     QUESTION.

5          IF, HOWEVER, I BELIEVE THAT IT IS AN

6     IMPROPER QUESTION IN SOME WAY, I WILL SUSTAIN

7     THE OBJECTION AND THE WITNESS WILL NOT BE

8     PERMITTED TO ANSWER THE QUESTION.

9          AGAIN, YOU ARE NOT TO DRAW ANY

10    CONCLUSIONS ABOUT MY OPINION OF THIS CASE OR

11    ANY OF THE ISSUES IN THIS TRIAL ON THE BASIS

12    OF MY RULINGS ON THE OBJECTIONS OFFERED BY

13    COUNSEL.

14         NOW, THERE MAY BE FROM TIME TO TIME

15    TESTIMONY THAT IS OFFERED BY A WITNESS THAT I

16    MAY CONSIDER TO BE IMPROPER UNDER THE FEDERAL

17    RULES OF EVIDENCE.  AND, SO, THERE MAY BE

18    OCCASIONS THAT I TELL YOU TO DISREGARD THE

19    TESTIMONY.  IF I INSTRUCT YOU TO DO SO, I

20    WILL, OF COURSE, EXPECT YOU TO DISREGARD ANY

21    SUCH TESTIMONY AND NOT CONSIDER IT DURING

22    YOUR DELIBERATIONS.

23         NOW, ANYTHING THAT YOU HAVE SEEN OR

24    HEARD OUTSIDE OF THIS COURTROOM IS NOT

25    EVIDENCE.  ANYTHING THAT YOU MAY HAVE SEEN ON

1    TELEVISION OR HEARD OR PEOPLE TALK ABOUT IS

2    NOT EVIDENCE.  AGAIN, ONLY THE TESTIMONY

3    COMING FROM THE WITNESSES AND THE EXHIBITS

4    THAT ARE INTRODUCED AT TRIAL ARE CONSIDERED

5    EVIDENCE IN THIS CASE.

6        NOW, THERE ARE TWO TYPES OF EVIDENCE

7    THAT YOU MAY CONSIDER:

8        THE FIRST IS DIRECT EVIDENCE, WHICH IS

9    DIRECT PROOF OF THE FACTS, SUCH AS THE

10    TESTIMONY OF AN EYEWITNESS.

11        CIRCUMSTANTIAL EVIDENCE MAY ALSO BE

12    CONSIDERED BY YOU.  NOW, THAT IS CONSIDERED

13    EVIDENCE OF PROOF OF FACTS FROM WHICH YOU MAY

14    INFER OR CONCLUDE THAT AN EVENT OR FACT TOOK

15    PLACE.

16        I WILL GIVE YOU FURTHER INSTRUCTIONS AT

17    THE END OF THE TRIAL ABOUT THE DIRECT

18    EVIDENCE AND THE CIRCUMSTANTIAL EVIDENCE YOU

19    SHOULD CONSIDER.  BUT JUST KEEP IN MIND THAT

20    YOU MAY CONSIDER BOTH TYPES OF EVIDENCE.

21        IT WILL ULTIMATELY BE YOUR DECISION TO

22    DECIDE WHAT TESTIMONY TO BELIEVE AND WHAT

23    TESTIMONY TO NOT BELIEVE, WHICH WITNESSES TO

24    BELIEVE AND WHICH WITNESSES NOT TO BELIEVE,

25    AND HOW MUCH OF A WITNESS' TESTIMONY TO

1    BELIEVE.  YOU MAY BELIEVE ALL OF THE WITNESS'

2    TESTIMONY OR ONLY A PART OF THAT TESTIMONY.

3    AND, AGAIN, I WILL OFFER MORE GUIDANCE AND

4    INSTRUCTIONS TO YOU ON THAT AT THE CONCLUSION

5    OF THE TRIAL.

6          NOW, THIS IS, AS I EXPLAINED TO YOU

7    EARLIER, A CRIMINAL CASE.  THERE ARE THREE

8    BASIC RULES ABOUT CRIMINAL CASES THAT YOU

9    MUST ALWAYS KEEP IN MIND.

10          THE FIRST, AS I EXPLAINED TO YOU

11   EARLIER, IS THAT THE DEFENDANT, AS HE SITS

12   HERE TODAY, IS PRESUMED TO BE INNOCENT UNTIL

13   AND UNLESS HE IS PROVEN TO BE GUILTY.  THE

14   INDICTMENT THAT HAS BEEN BROUGHT BY THE

15   GOVERNMENT IS MERELY AN ACCUSATION, NOTHING

16   MORE.  IT IS NOT PROOF OF GUILT OR ANYTHING

17   ELSE.  ITS ONLY PURPOSE IS TO INFORM THE

18   DEFENDANT OF THE ACCUSATIONS BY THE GRAND

19   JURY.

20          SECOND.  PLEASE REMEMBER THAT THE BURDEN

21   OF PROOF, AGAIN, IS ON THE GOVERNMENT TO

22   PROVE THE DEFENDANT'S GUILT.  THE GOVERNMENT

23   BEARS THAT BURDEN THROUGHOUT THIS TRIAL AND,

24   IN FACT, TO THE END OF THIS CASE.

25          THE DEFENDANT HAS ABSOLUTELY NO BURDEN

1    TO PROVE HIS INNOCENCE OR TO PRESENT ANY --

2    EVEN TO PRESENT ANY TESTIMONY OR TO TESTIFY.

3    AND SINCE THE DEFENDANT HAS THE RIGHT TO

4    REMAIN SILENT, THE LAW PROHIBITS YOU IN

5    ARRIVING AT YOUR VERDICT BY CONSIDERING THAT

6    THE DEFENDANT DID NOT TESTIFY OR THAT THE

7    DEFENDANT DID NOT PRESENT ANY EVIDENCE.

8    BECAUSE, AGAIN, HE DOES NOT HAVE TO DO SO

9    UNDER OUR LAWS.

10    THIRD.  THE GOVERNMENT IS REQUIRED TO

11    PROVE THE DEFENDANT'S GUILT BY WHAT IS CALLED

12    BEYOND A REASONABLE DOUBT STANDARD.  AGAIN, I

13    WILL GIVE YOU FURTHER INSTRUCTIONS ON WHAT

14    THAT MEANS AT A LATER POINT.  BUT IN THIS

15    REGARD, JUST REMEMBER THAT THIS CASE, A

16    CRIMINAL CASE, DIFFERS FROM THAT OF A CIVIL

17    CASE.

18    NOW, AGAIN, I WILL GIVE YOU DETAILED

19    INSTRUCTIONS ON THE LAW AT THE END OF THIS

20    TRIAL.  THOSE INSTRUCTIONS WILL CONTROL YOUR

21    DELIBERATIONS AND GUIDE YOUR DECISIONS.

22    BUT I WILL PROVIDE YOU AT THIS TIME A

23    BRIEF SYNOPSIS OR SUMMARY OF THE CHARGES MADE

24    AGAINST THE DEFENDANT.  AND I WILL REMIND YOU

25    THAT THE GOVERNMENT MUST PROVE THESE ELEMENTS

1    BEYOND A REASONABLE DOUBT.

2         FIRST.  THE DEFENDANT IS CHARGED IN

3    COUNT ONE OF THE INDICTMENT, AS I READ TO YOU

4    EARLIER, WITH THE THEFT OF GOVERNMENT FUNDS,

5    VIOLATION OF TITLE 18, UNITED STATES CODE

6    SECTION 641.  NOW, THAT PROVISION OF THE LAW

7    MAKES IT A CRIME FOR ANYONE TO STEAL OR

8    KNOWINGLY CONVERT ANY MONEY, PROPERTY OR

9    THING OF VALUE BELONGING TO THE UNITED STATES

10   HAVING AN AGGREGATE VALUE OF MORE THAN

11   $1,000.00.  NOW, FOR YOU TO FIND THE

12   DEFENDANT GUILTY OF THIS OFFENSE, THE UNITED

13   STATES WOULD BE REQUIRED TO PROVE EACH OF THE

14   FOLLOWING ELEMENTS, AND IT MUST DO SO BEYOND

15   A REASONABLE DOUBT.

16        FIRST.  THAT THE MONEY DESCRIBED IN THE

17   SUPERCEDING INDICTMENT, AS READ TO YOU

18   EARLIER, BELONGED TO THE UNITED STATES

19   GOVERNMENT.  AND THAT IT HAD A VALUE IN

20   EXCESS OF $1,000.00.

21        SECOND.  THAT THE DEFENDANT STOLE OR

22   KNOWINGLY CONVERTED SUCH MONEY OR PROPERTY TO

23   HIS OWN USE OR THE USE OF ANOTHER.

24        AND, THIRD.  THAT THE DEFENDANT DID SO

25   KNOWING THAT THE MONEY WAS NOT HIS MONEY AND

1     WITH THE INTENT TO DEPRIVE THE OWNER OF THE

2     USE OR THE BENEFIT OF THE MONEY OR PROPERTY.

3         NOW, COUNT TWO OF THE INDICTMENT CHARGES

4     THE DEFENDANT WITH FAILING TO MAINTAIN AN

5     EFFECTIVE MONEY LAUNDERING PROGRAM IN

6     VIOLATION OF TITLE 31 UNITED STATES CODE

7     SECTION 5322A.

8         NOW, THAT PROVISION OF LAW MAKES IT A

9     CRIME FOR ANYONE TO WILLFULLY VIOLATE BY

10    VARIOUS STATUTORY SUBSECTIONS AND REGULATORY

11    PROVISIONS PERTAINING TO EFFORTS TO ELIMINATE

12    MONEY LAUNDERING.

13        BUT IN ORDER FOR YOU TO FIND THE

14    DEFENDANT GUILTY OF THIS OFFENSE, THE UNITED

15    STATES WILL BE REQUIRED TO PROVE BEYOND A

16    REASONABLE DOUBT EACH OF THE FOLLOWING

17    ELEMENTS:

18        FIRST.  THAT THE DEFENDANT OPERATED A

19    FINANCIAL INSTITUTION AS DEFINED UNDER LAW,

20    LOCATED WITHIN THE UNITED STATES.

21        SECOND.  THAT THE DEFENDANT FAILED TO

22    DEVELOP AN ANTI-MONEY LAUNDERING PROGRAM AS

23    REQUIRED BY FEDERAL LAW.  NOW, SUCH A MONEY

24    LAUNDERING PROGRAM MUST:

25        ONE.  BE IN WRITING.

1          TWO.  MUST INCLUDE POLICIES, PROCEDURES

2     AND INTERNAL CONTROLS FOR VERIFYING CUSTOMER

3     IDENTIFICATION, FILING REPORTS, SUCH AS

4     CURRENCY TRANSACTION REPORTS, AND CREATING

5     AND RETAINING RECORDS AND RESPONDING TO LAW

6     ENFORCEMENT REQUESTS.  IT MUST ALSO DESIGNATE

7     A COMPLIANCE OFFICER WHO MUST ASSURE DAY-TO-

8     DAY COMPLIANCE WITH THE PROGRAM AND MUST

9     INCLUDE ONGOING EMPLOYEE TRAINING AND MUST

10    INCLUDE AN INDEPENDENT AUDIT FUNCTION TO TEST

11    THE PROGRAM.

12         NOW, COUNTS THREE AND FOUR OF THE

13    INDICTMENT CHARGE THE DEFENDANT WITH AN

14    OBSTRUCTION OF A PROCEEDING BEFORE A FEDERAL

15    AGENCY IN VIOLATION OF TITLE 18 UNITED STATES

16    CODE SECTION 1505.

17         IN ORDER FOR YOU TO FIND THE DEFENDANT

18    GUILTY OF THESE COUNTS, THE UNITED STATES

19    WOULD BE REQUIRED TO PROVE EACH OF THE

20    FOLLOWING ELEMENTS, AND IT MUST DO SO BEYOND

21    A REASONABLE DOUBT.

22         FIRST.  THAT ON OR ABOUT THE DATE SET

23    FORTH IN THE INDICTMENT, A PROCEEDING WAS

24    PENDING BEFORE AN AGENCY OF THE UNITED

25    STATES.

1        SECOND.  THAT THE DEFENDANT KNEW THAT A

2    PROCEEDING WAS PENDING BEFORE AN AGENCY OF

3    THE UNITED STATES.

4        AND, THIRD.  THAT THE DEFENDANT

5    CORRUPTLY ENDEAVORED TO INFLUENCE, OBSTRUCT

6    OR IMPEDE THE DUE ADMINISTRATION AND PROPER

7    ADMINISTRATION OF THE LAW UNDER WHICH THE

8    PROCEEDINGS WERE PENDING.

9        NOW, LET ME MENTION A FEW THINGS ABOUT

10   YOUR CONDUCT AS JURORS:

11       I'VE ALREADY INSTRUCTED YOU THAT DURING

12   THE COURSE OF THIS TRIAL YOU SHALL NOT SPEAK

13   WITH ANY PERSONS THAT YOU KNOW TO BE

14   WITNESSES OR BELIEVE TO BE WITNESSES, NOR

15   WITH THE DEFENDANT, NOR WITH ANYONE

16   ASSOCIATED WITH THE UNITED STATES IN THIS

17   CASE.  PLEASE DO NOT TALK TO ANY OF THEM

18   ABOUT ANYTHING AT ALL.

19       I UNDERSTAND THAT IT IS NATURAL FOR US

20   TO EXCHANGE NICE COMMENTS TO EACH OTHER AT

21   THE BEGINNING OF THE DAY OR IN THE AFTERNOON

22   WHEN WE ENCOUNTER PEOPLE.  BUT I'M

23   SPECIFICALLY INSTRUCTING YOU NOT TO DO SO

24   HERE, AT LEAST WITH RESPECT TO PERSONS

25   ASSOCIATED WITH THIS TRIAL.

1    NOW, YOU MAY BE UNAWARE OF THE IDENTITY

2    OF PERSONS WHO ARE OR ALL OF THE PERSONS WHO

3    ARE ASSOCIATED WITH THIS TRIAL.  SO, IN ORDER

4    TO AVOID EVEN THE APPEARANCE OF IMPROPRIETY,

5    I AM STRONGLY URGING YOU THAT YOU NOT ENGAGE

6    IN CONVERSATION WITH ANYONE IN THE COURTHOUSE

7    OTHER THAN YOURSELVES WHEN YOU'RE IN THE JURY

8    ROOM, AND EVEN THEN PLEASE DO NOT TALK ABOUT

9    THIS CASE.  AT LEAST AT THIS TIME.

10    I THINK IT'S BEST THAT YOU REMAIN IN THE

11    JURY ROOM DURING YOUR BREAKS AND NOT LINGER

12    IN THE HALLWAYS.

13    AGAIN, PLEASE DON'T SPEAK TO YOUR FAMILY

14    MEMBERS, FRIENDS, NEIGHBORS, COWORKERS.  WHEN

15    WE ADJOURN TODAY AND YOU'RE ABLE TO GO HOME,

16    DO NOT DISCUSS THE CASE, AGAIN, AMONG

17    YOURSELVES UNTIL ALL OF THE EVIDENCE IS IN

18    AND I HAVE PROVIDED YOU THE INSTRUCTIONS THAT

19    WILL GUIDE YOUR DELIBERATIONS.  OTHERWISE,

20    WITHOUT REALIZING IT, YOU MAY BEGIN TO FORM

21    AN OPINION BASED UPON A DISCUSSION YOU'VE HAD

22    WITH ANOTHER JUROR IN THE CASE.

23    NOW, YOU AS JURORS MUST DECIDE THE CASE

24    SOLELY BASED ON THE EVIDENCE PRESENTED TO YOU

25    WITHIN THIS COURTROOM.  THAT MEANS THAT

1   DURING THE TRIAL YOU MUST NOT CONDUCT ANY

2   INDEPENDENT OR OUTSIDE RESEARCH ON THIS CASE

3   ABOUT ANY OF THE PERSONS YOU'VE LEARNED ABOUT

4   OR PLACES YOU'VE LEARNED ABOUT OR ON ANY

5   MATTERS IN THIS CASE.

6         IN OTHER WORDS, YOU SHOULD NOT CONSULT

7   ANY DICTIONARIES OR REFERENCE MATERIALS.

8   WHEN YOU RETURN TO YOUR HOMES TONIGHT, PLEASE

9   DON'T CONDUCT ANY INTERNET RESEARCH OR ACCESS

10  ANY WEBSITES OR BLOGS OR THROUGH ANY

11  INDEPENDENT MEANS TO TRY TO FIND OUT ANYTHING

12  ABOUT THIS CASE.

13        THAT ALSO HOLDS TRUE, OF COURSE, FOR

14  YOUR CELL PHONES.  PLEASE DON'T USE YOUR CELL

15  PHONES TO CONDUCT ANY RESEARCH DURING ANY

16  BREAKS, TO THE EXTENT THAT YOU MAY HAVE

17  ACCESS TO THEM.

18        I WILL HAVE MORE INSTRUCTIONS FOR YOU ON

19  THIS AT THE END OF TODAY'S PROCEEDINGS.

20        I WILL, HOWEVER, TELL YOU THAT I EXPECT

21  TO BE INFORMED AS SOON AS POSSIBLE IF YOU

22  FIND THAT ANY OTHER JUROR VIOLATES THESE

23  INSTRUCTIONS.

24        I WOULD ALSO ASK IF ANYONE ATTEMPTS TO

25  CONTACT YOU THIS EVENING IN RELATION TO THIS

1    CASE OR TO ENGAGE YOU IN A DISCUSSION OF THIS

2    CASE OR, IN ANY WAY ATTEMPTS TO ENGAGE IN ANY

3    INAPPROPRIATE CONDUCT WITH YOU AS A RESULT OF

4    YOUR SERVICE AS JURORS, THAT YOU NOTIFY ME AS

5    SOON AS POSSIBLE.

6         I WILL NOW GIVE YOU A ROAD MAP THAT WILL

7    DESCRIBE TO YOU WHAT WILL NOW HAPPEN AS WE

8    BEGIN THE EVIDENCE PORTION OF THE TRIAL.

9         FIRST.  WE WILL HEAR WHAT WE CALL

10    OPENING STATEMENTS FROM THE LAWYERS.  THE

11    GOVERNMENT, THAT IS, THE UNITED STATES, WILL

12    ADDRESS YOU FIRST.  THEY WILL DISCUSS WITH

13    YOU THE CHARGES THAT HAVE BEEN FILED AGAINST

14    THE DEFENDANT AND DISCUSS WITH YOU WHAT IT

15    BELIEVES SOME OF THE EVIDENCE IN THIS TRIAL

16    WILL BE.

17         NEXT.  THE ATTORNEY, MR. AMBEAU, FOR THE

18    DEFENDANT WILL HAVE AN OPPORTUNITY TO MAKE AN

19    OPENING STATEMENT AND TO ADDRESS YOU AND TO

20    DISCUSS WITH YOU EVIDENCE THAT HE BELIEVES

21    WILL BE INTRODUCED TO YOU OVER THE COURSE OF

22    THIS TRIAL.

23         NOW, WHAT THE LAWYERS SAY, AGAIN, IS NOT

24    EVIDENCE.  IT IS VERY IMPORTANT, HOWEVER,

25    THAT YOU GIVE THEM YOUR ATTENTION.

1    WHAT YOU WILL NOT HEAR IN OPENING

2    STATEMENTS, I'M SURE, ARE LEGAL ARGUMENTS.

3    THIS IS NOT THE TIME FOR THAT.  SO, YOU

4    SHOULDN'T EXPECT TO HEAR LEGAL ARGUMENTS OR

5    THE LAWYERS CITING CASES AND THAT SORT OF

6    THING.  THAT WILL COME AT THE END OF THIS

7    TRIAL.

8    BUT, AGAIN, PLEASE BEAR IN MIND THAT THE

9    DEFENDANT IS PRESUMED TO BE INNOCENT.  AND HE

10    NEED NOT PROVE HIS INNOCENCE OR PRESENT ANY

11    EVIDENCE OR CERTAINLY TO TESTIFY IN HIS OWN

12    BEHALF.

13    AT THE CONCLUSION OF THE OPENING

14    STATEMENTS, THE GOVERNMENT WILL THEN PRODUCE

15    EVIDENCE IN THE FORM OF WITNESSES AND OTHER

16    ITEMS, AFTER WHICH, AGAIN, THE DEFENDANT MAY

17    OR MAY NOT DECIDE TO OFFER EVIDENCE IN HIS

18    OWN DEFENSE.

19    AT THE CONCLUSION OF THE EVIDENCE

20    PORTION OF THE TRIAL, BOTH SIDES WILL ADDRESS

21    YOU ONCE AGAIN IN WHAT IS CALLED CLOSING

22    ARGUMENTS.  AND IT IS AT THAT TIME THAT THE

23    LAWYERS CAN ARGUE THE LAW.

24    THE GOVERNMENT WILL GO FIRST BECAUSE THE

25    GOVERNMENT BEARS THE BURDEN OF PROOF,

1       FOLLOWED BY COUNSEL FOR THE DEFENDANT.  AND

2       THE LAW, BECAUSE THE GOVERNMENT BEARS THE

3       BURDEN OF PROOF, ALLOWS THE GOVERNMENT TO

4       SPEAK TO YOU TWICE IN CLOSING ARGUMENTS.  SO,

5       YOU WILL HEAR FROM ONE OF THE LAWYERS FROM

6       THE GOVERNMENT IN WHAT IS CALLED REBUTTAL, AT

7       THE CLOSE OF -- AT THE VERY END OF THE TRIAL.

8           AFTER WHICH I WILL GIVE YOU INSTRUCTIONS

9       THAT WILL GUIDE YOUR DELIBERATIONS, AND THEN

10      YOU WILL BE FREE TO BEGIN YOUR DELIBERATIONS.

11          SO, THAT'S HOW OUR TRIAL WILL PROCEED.

12          SO, AGAIN, AT THIS TIME THE LAWYERS WILL

13      ADDRESS YOU IN OPENING STATEMENTS AND TELL

14      YOU ABOUT THIS CASE.  SO, PLEASE GIVE THEM

15      YOUR UNDIVIDED ATTENTION.

16          COUNSEL?

17      MR. CROSSWELL: THANK YOU, YOUR HONOR.

18              OPENING STATEMENT

19      MR. CROSSWELL:

20          GOOD AFTERNOON.  MY NAME IS ASSISTANT

21      UNITED STATES ATTORNEY RYAN CROSSWELL.

22      TOGETHER WITH MY CO-COUNSEL, AUSA ALAN

23      STEVENS, LEAD COUNSEL IN THIS CASE, AND WITH

24      THE HELP OF SHANNON TRAYLOR, WE REPRESENT THE

25      UNITED STATES OF AMERICA.  AND IT'S AN HONOR

1    TO DO SO.

2         THIS IS NOT A DIFFICULT CASE.  THE

3    EVIDENCE WILL SHOW THE DEFENDANT, CARLOS

4    LINARES, RAN A CORRUPT CHECK CASHING

5    BUSINESS.  HE RAN THIS CORRUPT CHECK CASHING

6    BUSINESS FROM HIS GROCERY STORE, CALLED

7    LATINO'S.

8    THE COURT: PLEASE CHECK THE MICROPHONE.

9    MR. CROSSWELL:  HE RAN THIS CORRUPT CHECK

10        CASHING BUSINESS FROM HIS GROCERY STORE

11   CALLED LATINO'S ON FLORIDA BOULEVARD.  AND IT

12   SERVED AS THE FINAL STOP ON A TAX REFUND

13   FRAUD, A RESULTING THEFT OF OVER A MILLION

14   DOLLARS.

15        THE EVIDENCE WILL FURTHER SHOW THE

16   DEFENDANT IGNORED FEDERAL LAW BY FAILING TO

17   MAINTAIN A PROGRAM AT HIS STORE TO PREVENT

18   MONEY LAUNDERING.  AND HE OBSTRUCTED TWO

19   FEDERAL PROCEEDINGS, CALLED BANK SECRECY ACT

20   COMPLIANCE EXAM, BY LYING TO FEDERAL AGENTS

21   AND BY HIDING DOCUMENTS FROM THEM.

22        SO HE STANDS HERE CHARGED TODAY WITH ONE

23   COUNT OF FAILURE TO MAINTAIN THE ANTI-MONEY

24   LAUNDERING PROGRAM, TWO COUNTS OF OBSTRUCTION

25   OF PROCEEDINGS BEFORE A FEDERAL AGENCY, AND

1          ONE COUNT OF THEFT OF GOVERNMENT FUNDS,

2          NAMELY, OVER 250 UNITED STATES TREASURY

3          CHECKS.

4                AND YOU'RE GOING TO HEAR FROM A NUMBER

5          OF WITNESSES IN THIS CASE AND YOU'LL SEE A

6          NUMBER OF DOCUMENTS.  BUT PERHAPS THE MOST

7          IMPORTANT EVIDENCE YOU'LL HEAR WITH REGARD TO

8          THE COUNT ALLEGING HE FAILED TO MAINTAIN THE

9          ANTI-MONEY LAUNDERING PROGRAM, IS THAT HE

10          ADMITTED HE FAILED TO MAINTAIN AN ANTI-MONEY

11          LAUNDERING PROGRAM, BOTH IN WRITING AND

12          ORALLY, TO A FEDERAL AGENT.

13                WITH REGARD TO THE TWO COUNTS ALLEGING

14          HE OBSTRUCTED FEDERAL PROCEEDINGS. YOU'RE

15          GOING TO HEAR THAT IN 2010 AND 2013, THE IRS

16          CONDUCTED COMPLIANCE EXAMINATIONS AT HIS

17          STORE.  AND THEY ASKED TO SEE RECORDS OF HIS

18          CHECK CASHING, AND HE SAID HE DIDN'T HAVE

19          ANY.  BUT AS THE IRS BECAME INCREASINGLY

20          SUSPICIOUS OF HIS FINANCIAL TRANSACTIONS,

21          THEY EVENTUALLY DECIDED TO EXECUTE A SEARCH

22          WARRANT AT HIS STORE AND THEY FOUND DOZENS OF

23          SUCH RECORDS.

24                AND WITH REGARD TO THE COUNT ALLEGING HE

25          STOLE GOVERNMENT FUNDS, YOU'RE GOING TO HEAR

1          THE DEFENDANT'S BUSINESS, LATINO'S, CASHED

2     TAX REFUND CHECKS ISSUED TO PEOPLE AS FAR

3     FLUNG AS GEORGIA AND MASSACHUSETTS AND NEW

4     YORK AND FLORIDA, WITHOUT THEIR KNOWLEDGE,

5     AND WITHOUT THEIR PERMISSION.

6          AND LET ME STEP BACK FIRST AND LET ME

7     TELL YOU HOW HE GOT HERE IN THE FIRST PLACE.

8     AND, REALLY, THIS STORY STARTS WITH A WOMAN

9     NAMED MS. DEBORAH HARDY.

10          MS. HARDY IS A REVENUE AGENT WITH THE

11     IRS.  SHE'S BEEN WITH THE IRS FOR ABOUT TEN

12     YEARS.  SHE'S A WELL-EDUCATED WOMAN, A

13     BACHELOR'S DEGREE IN BUSINESS ADMINISTRATION,

14     AN MBA.

15          IN 2010, SHE WAS PART OF THE IRS'S BANK

16     SECRECY ACT GROUP.  AND YOU'RE GOING TO HEAR

17     A LOT ABOUT THE BACK SECRECY ACT IN THIS

18     CASE.  IT'S VERY IMPORTANT TO THIS STORY.

19          THE BANK SECRECY ACT IS A FEDERAL LAW

20     AIMED AT PREVENTING MONEY LAUNDERING, WHICH

21     IS SOMETHING YOU MAY BE AWARE IS A PROCESS BY

22     WHICH CRIMINALS TAKE MONEY THEY'VE EARNED

23     ILLEGALLY AND DISGUISE AS MONEY THEY'VE

24     EARNED LEGITIMATELY.  WELL, THE BANK SECRECY

25     ACT APPLIES TO WHAT ARE CALLED MONEY SERVICE

1    BUSINESSES, INCLUDING CHECK CASHING

2    BUSINESSES.  AND IT REQUIRES THESE MONEY

3    SERVICE BUSINESSES TO IMPLEMENT PROGRAMS TO

4    PREVENT CRIMINALS FROM LAUNDERING MONEY

5    THROUGH THEIR SERVICES.  AND THESE ARE CALLED

6    ANTI-MONEY LAUNDERING PROGRAMS.  AND THE IDEA

7    IS THAT THESE BUSINESSES IMPLEMENT THESE

8    ANTI-MONEY LAUNDERING PROGRAMS, THEY'LL BE

9    ABLE TO BETTER DETECT AND PREVENT FINANCIAL

10   FRAUD FROM OCCURRING.

11       SO, FOR EXAMPLE, IN THE CASE OF CHECK

12   CASHING BUSINESSES, THESE ANTI-MONEY

13   LAUNDERING PROGRAMS ARE EXPECTED TO INCLUDED

14   POLICIES FOR VERIFYING CUSTOMER

15   IDENTIFICATION.  FOR VERIFYING THAT THE

16   PERSON WHO IS ATTEMPTING TO CASH THE CHECK IS

17   THE SAME PERSON TO WHOM THE CHECK WAS ISSUED.

18   IN OTHER WORDS, FROM VERIFYING THAT THE

19   CUSTOMERS AT THE CHECK CASHING BUSINESS

20   AREN'T TRYING TO CASH STOLEN CHECKS.  AND

21   YOU'LL UNDERSTAND WHY THIS IS IMPORTANT IN A

22   FEW MINUTES.

23       SO, BACK TO MS. HARDY.  IN 2010, SHE, AS

24   PART OF THE BANK SECRECY ACT GROUP, WAS --

25   ONE OF HER DUTIES WAS TO CONDUCT COMPLIANCE

1      EXAMINATIONS.  AND ONE OF THE STORES TO WHICH

2      SHE WAS ASSIGNED WAS LATINO'S, THE

3      DEFENDANT'S BUSINESS.

4          SO, IN AUGUST OF 2010, SHE CALLED

5      LATINO'S AND SHE TALKED TO THE DEFENDANT, MR.

6      LINARES.  AND SHE EXPLAINED THAT SHE WOULD

7      NEED TO COME DO AN EXAMINATION AND SHE TOLD

8      HIM WHAT DOCUMENTS SHE WOULD NEED TO SEE AND

9      SHE EXPLAINED THE PROCESS.  TOGETHER THEY SET

10     UP A DATE AND THEY SET UP A TIME.

11         AND, SO, IN SEPTEMBER OF 2010, SEPTEMBER

12     13TH, TO BE EXACT, SHE DROVE TO LATINO'S TO

13     CONDUCT HER EXAMINATION.  NOW, YOU'RE GOING

14     TO SEE A PHOTOGRAPH OF LATINO'S AND YOU'RE

15     GOING TO SEE A VIDEO OF THE INTERIOR OF THE

16     STORE.  SO, YOU'RE GOING TO GET AN IDEA OF

17     WHAT IT LOOKS LIKE.  BUT JUST TO PAINT A

18     PICTURE FOR YOU.

19         LATINO'S IS LOCATED ON FLORIDA

20     BOULEVARD, THE SAME STREET AS THIS

21     COURTHOUSE, EAST OF HERE.  IT'S NEAR THE

22     INTERSECTION OF FLORIDA AND SHERWOOD.  AND

23     WHEN YOU -- WHEN YOU WALK INTO LATINO'S,

24     OFFSET TO THE LEFT YOU SEE SORT OF ROWS OF

25     GROCERIES.  IT'S A GROCERY STORE, AFTER ALL.

1    AND SO TO THE FAR LEFT THERE'S FRESH PRODUCE.

2    IN THE BACK THERE'S A BUTCHER'S COUNTER.  AND

3    THERE'S A REFRIGERATOR WITH DAIRY PRODUCTS

4    AND BEER, ET CETERA.  AND IN THE IMMEDIATE

5    RIGHT WHEN YOU WALK IN IS THE CASHIER'S

6    COUNTER AND THE COUNTER WHERE LATINO'S

7    CONDUCTS ITS MONEY SERVICES.  AND LATINO'S

8    OFFERS CHECK CASHING AND IT OFFERS WIRE

9    TRANSMISSIONS.

10        SO, MS. HARDY IS GOING TO TELL YOU, THAT

11    WHEN SHE VISITED IN 2010 SHE ASKED THE

12    DEFENDANT TO SEE HIS CHECK CASHING RECORDS,

13    AND HE TOLD HER HE DIDN'T HAVE ANY.  AND SHE

14    ASKED TO SEE HIS ANTI-MONEY LAUNDERING

15    PROGRAM.  THE PROGRAM REQUIRED BY FEDERAL

16    LAW.  AND HE SAID HE DIDN'T HAVE ONE.

17        SO, MS. HARDY EXPLAINED TO HIM HIS

18    OBLIGATION UNDER FEDERAL LAW, UNDER THE

19    BANK'S SECRECY ACT, TO IMPLEMENT A PROGRAM.

20    AND THEN SHE EXPLAINED TO HIM AGAIN IN A

21    LETTER AFTER HER VISIT, ALL TOTAL FROM HER

22    FIRST INTERACTION WITH THE DEFENDANT TO HER

23    LAST INTERACTION WITH THE DEFENDANT, SHE

24    EXPLAINED TO HIM AT LEAST THREE TIMES, HE WAS

25    OBLIGATED UNDER THE LAW TO IMPLEMENT ANTI-

1    MONEY LAUNDERING PROGRAM AT LATINO'S.  AND

2    THE DEFENDANT, IN FACT, SAID HE WOULD DO SO.

3    HE SAID HE WOULD PROVIDE IT TO HER BY OCTOBER

4    OF 2010.

5        AND MAYBE IF THE DEFENDANT HAD DONE SO

6    AND ENFORCED THAT PROGRAM, WE WOULDN'T BE

7    HERE.  BUT HE NEVER DID.

8        SO, FAST FORWARD THREE YEARS LATER.

9    LATINO'S COMES DUE FOR ANOTHER BANK SECRECY

10   ACT COMPLIANCE EXAMINATION.  AND THIS ONE IS

11   GOING TO BE CONDUCTED BY MS. DANA ARMWOOD.

12   MS. ARMWOOD IS ANOTHER REVENUE AGENT WITH THE

13   IRS.  SHE'S YOUNGER THAN MS. HARDY, HAVING

14   JUST GRADUATED FROM SOUTHERN IN 2009.  SHE

15   COMES FROM A FAMILY OF ACCOUNTANTS.  SHE'S A

16   WELL-QUALIFIED REVENUE AGENT.

17       SO, MS. ARMWOOD IS GOING TO TELL YOU

18   THAT WHEN SHE CAME TO LATINO'S IN 2013, SHE

19   ASKED TO SEE THE DEFENDANT'S CHECK CASHING

20   RECORDS.  HE SAID HE DIDN'T HAVE ANY.

21   SPECIFICALLY, SHE WANTED TO SEE COPIES OF THE

22   CHECKS HE WAS CASHING.  HE SAID HE DIDN'T

23   HAVE ANY.  SHE ASKED TO SEE A COPY OF HIS

24   ANTI-MONEY LAUNDERING PROGRAM.  HE SAID HE

25   DIDN'T HAVE ONE.  IN FACT, MR. LATINO'S

1    ACKNOWLEDGED, BOTH IN WRITING AND ORALLY,

2    THAT HE DIDN'T HAVE ONE.  AND YOU'RE GOING TO

3    SEE -- YOU'RE GOING TO SEE HOW HE

4    ACKNOWLEDGED IT IN WRITING.

5         SO, FROM 2010 TO 2013, THREE YEARS AFTER

6    IT WAS EXPLAINED TO HIM THAT HE'S REQUIRED TO

7    IMPLEMENT A PROGRAM, HE HAD NOT DONE SO.  BUT

8    IT'S NOT JUST THAT HE FAILED TO IMPLEMENT

9    THIS PROGRAM.  IT'S THAT HE WAS MAKING FALSE

10   STATEMENTS ABOUT THIS BUSINESS.

11        YOU SEE, WHEN YOU WANT TO OPEN A MONEY

12   SERVICE BUSINESS, YOU'RE SUBJECTED TO CERTAIN

13   FEDERAL REGULATIONS AND CERTAIN STATE

14   REGULATIONS.  AND THE REASON BEING THAT, AS A

15   MONEY SERVICE BUSINESS, YOU'RE ESSENTIALLY

16   FULFILLING SOME OF THE ROLES OF A BANK.  AND,

17   SO, IT CAN BE A VERY LUCRATIVE PROFITABLE

18   BUSINESS, BUT IT'S NOT LIKE OPENING A

19   SMOOTHIE KING.  THERE'S GOING TO BE

20   OVERSIGHT.

21        AND, SO, WHEN MS. HARDY AND MS. ARMWOOD

22   COME TO VISIT, THEY ASK QUESTIONS ABOUT THE

23   NATURE OF THE BUSINESS.  AND THEY'RE GOING TO

24   TELL YOU IT'S TO HELP THE BUSINESS OWNERS

25   STAY COMPLIANT WITH THE LAW.  BUT IN 2010,

1    MS. HARDY ASKED THE DEFENDANT, "WHAT ARE THE

2    SIZES OF THE CHECKS YOU'RE CASHING?  HOW MUCH

3    ARE THEY WORTH?"  AND THE DEFENDANT SAID HE

4    NEVER CASHED MORE THAN $5,000.00 FOR A SINGLE

5    CUSTOMER IN A SINGLE DAY.  BUT THAT WASN'T

6    TRUE.

7         IN 2010 ALONE, BEFORE MS. HARDY'S VISIT,

8    23 TIMES HE CASHED MORE THAN $5,000.00 IN

9    CHECKS FOR A SINGLE CUSTOMER IN A SINGLE DAY.

10   IN FACT, JUST ONE WEEK BEFORE HER VISIT, SIX

11   TIMES IN ONE DAY HE CASHED MORE THAN

12   $5,000.00 IN CHECKS TO A SINGLE CUSTOMER IN A

13   SINGLE DAY.  THAT'S SIX CUSTOMERS,

14   $30,000.00, ONE DAY.  HE TOLD MS. HARDY, TOLD

15   HER A WEEK LATER, HE NEVER DID IT.

16        THEN IN 2013, MS. ARMWOOD ASKED ABOUT

17   WHERE HIS CUSTOMERS CAME FROM, THE LOCALE OF

18   HIS CUSTOMERS.  AND HE SAID THE MAJORITY OF

19   HIS CUSTOMERS, MOST OF THEM ARE LOCAL.  AND

20   HE ONLY CASHED CHECKS FOR A FEW CUSTOMERS

21   THAT WEREN'T LOCAL.  THAT WASN'T TRUE EITHER.

22        FROM MARCH OF 2012, UNTIL MAY OF 2013,

23   THE DEFENDANT CASHED 272 TAX REFUND CHECKS.

24   TWELVE OF THOSE CHECKS WERE FOR PEOPLE LIVING

25   IN THE STATE OF LOUISIANA.  NOT JUST BATON

ROUGE, THE STATE.  AND YET HE SAID HE ONLY

CASHED CHECKS FOR A FEW PEOPLE LIVING OUTSIDE

OF THIS AREA.

BUT PERHAPS MOST IMPORTANTLY AND MOST

OMINOUSLY WAS THAT BOTH MS. HARDY AND MS.

ARMWOOD ASKED TO SEE HIS CHECK CASHING

RECORDS.  AND HE TOLD BOTH HE DIDN'T HAVE

ANY.  BUT AS THE IRS BECAME INCREASINGLY

SUSPICIOUS OF HIS ACTIVITIES, THEY EVENTUALLY

EXECUTED A SEARCH WARRANT, AND THEY FOUND 92

PHOTOCOPIES OF CHECKS THAT HE HAD CASHED,

WHICH HAD NEVER BEEN DISCLOSED TO THEM.

SO, WHAT WAS GOING ON BETWEEN 2010 AND

2013?  WHY DID THE DEFENDANT DELIBERATELY

FAIL TO MAINTAIN, MUCH LESS IMPLEMENT, AN

ANTI-MONEY LAUNDERING PROGRAM?  AND WHY WAS

HE MAKING FALSE STATEMENTS TO THESE AGENTS?

AND WHY WAS HE HIDING DOCUMENTS FROM THESE

AGENTS?  WELL, THE EVIDENCE WILL PRODUCE THE

ANSWER.  THE DEFENDANT WAS INVOLVED IN A TAX

REFUND FRAUD.

YOU'RE GOING TO HEAR FROM SPECIAL AGENT

MONIQUE SCHMIDT.  SHE'S BEEN WITH THE IRS FOR

20 YEARS.  SHE'S THE LEAD AGENT IN THIS CASE.

SHE'S SEATED AT COUNSEL'S TABLE WITH US.

1     SPECIAL AGENT SCHMIDT IS GOING TO EXPLAIN TO

2     YOU HOW TAX REFUND FRAUD WORKS.  SHE'S GOING

3     TO TELL YOU THAT SOMETIMES IT STARTS WITH A

4     TAX REFUND CHECK BEING STOLEN FROM THE MAIL.

5     AND OTHER TIMES IT STARTS WITH THE STEALING

6     OF A SOCIAL SECURITY NUMBER.  THAT SOCIAL

7     SECURITY NUMBER IS THEN USED TO FILE FOR A

8     FRAUDULENT TAX RETURN.  OFTEN TIMES PEOPLE

9     INVOLVED IN THESE SCHEMES, THEY USE THE

10    IDENTITIES OF PUERTO RICAN CITIZENS.

11    BECAUSE, AS YOU MAY KNOW, CITIZENS OF PUERTO

12    RICO GENERALLY DON'T NEED TO FILE FEDERAL

13    INCOME TAX RETURNS.  THEY GENERALLY DON'T PAY

14    FEDERAL INCOME TAX.  AND, SO, THEY WOULDN'T

15    KNOW A TAX RETURN WAS FILED IN THEIR NAME.

16         AND THEN -- AND THIS IS IMPORTANT.  THEN

17    THEY PROVIDE THE IRS WITH A FALSE OR PHONY

18    ADDRESS.  BECAUSE IF YOU'RE GOING TO FILE A

19    FRAUDULENT TAX RETURN, YOU'RE NOT GOING TO

20    HAVE THAT TAX REFUND CHECK SENT TO THE ACTUAL

21    TAXPAYER.  YOU'RE GOING TO HAVE IT SENT TO

22    ANOTHER ADDRESS AND YOU'RE GOING TO COLLECT

23    THE CHECK.

24         AND THEN COMES THE FINAL TRICKY STEP.

25    IS FINDING SOMEONE WILLING TO CASH DOZENS OR

1      PERHAPS HUNDREDS OF STOLEN TAX REFUND CHECKS.

2      SOMETIMES PEOPLE INVOLVED IN THESE SCHEMES,

3      THEY FIND A CORRUPT BANK TELLER AND SOMETIMES

4      THEY FIND SOMEONE WITH A BUSINESS CHECKING

5      ACCOUNT AND SOMETIMES THEY FIND SOMEONE WHO'S

6      A CORRUPT CHECK CASHING BUSINESS.  AND THAT'S

7      WHAT HAPPENED HERE.

8          YOU'RE GOING TO HEAR FROM MS. VICKY

9      CRAIG.  AND MS. CRAIG IS REALLY THE FIRST

10     PERSON THAT KIND OF CAUGHT ON TO WHAT WAS

11     HAPPENING -- TO WHAT WAS HAPPENING AT

12     LATINO'S.  AND SHE'S GOING TO TELL YOU THAT

13     SHE WORKS FOR WHITNEY BANK.  AND HER JOB IS

14     TO INVESTIGATE POTENTIAL INSTANCES OF FRAUD

15     BY WHITNEY BANK CUSTOMERS.  WELL, LATINO'S

16     WAS A CUSTOMER OF WHITNEY BANK.

17         SHE'S GOING TO TELL YOU THAT AROUND

18     2014, SHE BECAME SUSPICIOUS OF LATINO'S,

19     BECAUSE OF THE STARTLING NUMBER OF CHECKS

20     BEING CASHED AT LATINO'S THAT WERE ISSUED TO

21     ADDRESSES OUTSIDE OF THE STATE OF LOUISIANA.

22         SHE'S GOING TO TELL YOU THAT THE

23     DEFENDANT OPENED A CHECKING ACCOUNT AT

24     LATINO'S IN MACH OF 2012.  AND IN JUST FOUR

25     MONTHS, FROM MARCH OF 2012 UNTIL JULY OF

1  2012, THE DEFENDANT CASHED 120 REFUND CHECKS

2  WORTH OVER $700,000.00.  OF THOSE 120 CHECKS,

3  JUST FOUR -- FOUR WERE ISSUED TO PEOPLE IN

4  THE STATE OF LOUISIANA.

5  THE COURT: JUST A MOMENT, MR. CROSSWELL.

6         THANK YOU, SIR. YOU MAY RESUME.

7  MR. CROSSWELL: THANK YOU, YOUR HONOR.

8         THEN IN JULY OF 2012, THE DEFENDANT

9  OPENED A SECOND CHECKING ACCOUNT.  AND FROM

10 JULY OF 2012 TO MAY OF 2013, LATINO'S CASHED

11 152 TAX REFUND CHECKS, WORTH $918,000.00.  OF

12 THOSE 152 REFUND CHECKS, JUST EIGHT WERE

13 ISSUED TO ADDRESSES IN THE STATE OF

14 LOUISIANA.  YOU CAN SEE THE BREAKDOWN OF THE

15 CHECKS RIGHT HERE -- THE STATES WHERE THEY

16 CAME FROM.

17        SO, IN MS. CRAIG'S MIND, THIS WAS

18 INDICATIVE OF FRAUD.  BECAUSE WHY WOULD

19 SOMEONE DRIVE ALL THE WAY FROM NEW YORK TO

20 CASH THEIR REFUND CHECK AT A GROCERY STORE IN

21 BATON ROUGE?  WHY WOULD 120 PEOPLE DRIVE ALL

22 THE WAY FROM NEW YORK TO CASH THEIR TAX

23 REFUND CHECKS.

24        SO, WHITNEY BANK NOTIFIED THE IRS FRAUD

25 UNIT.

1       THE COURT: JUST A MINUTE.  OKAY.  LET'S

2          RESUME.

3       MR. CROSSWELL: OKAY.  THANK YOU, YOUR HONOR.

4          SO, WHITNEY BANK NOTIFIED THE IRS FRAUD

5    DETECTION CENTER TO INVESTIGATE THESE CHECKS.

6    YOU'RE GOING TO HEAR FROM MS. PAMELA WATSON

7    FROM THE IRS FRAUD DETECTION CENTER.  SHE WAS

8    ASSIGNED THIS CASE.  AND SHE'S GOING TO TELL

9    YOU ALL THE RED FLAGS SHE FOUND RELATED TO

10   THE CHECKS THAT HAD BEEN CASHED AT LATINO'S.

11          AND, SO, YOU'RE GOING TO SEE FROM THE

12   EVIDENCE THAT THE VAST MAJORITY OF THE CHECKS

13   CASHED AT LATINO'S, FROM MARCH OF 2012 UNTIL

14   MAY OF 2013, HAD EITHER BEEN STOLEN FROM THE

15   MAIL AND CASHED AT LATINO'S OR AS A RESULT

16   FROM FRAUDULENT INCOME TAX RETURNS BEING

17   FILED IN THE NAME OF SOMEONE WHOSE SOCIAL

18   SECURITY NUMBER WAS STOLEN.

19          AND YOU'RE GOING TO HEAR FROM SOME OF

20   THE VICTIMS OF THIS TAX REFUND FRAUD.

21   THEY'RE GOING TO TELL YOU THEY DIDN'T REALIZE

22   ANYTHING WAS WRONG UNTIL THEY FILED THEIR TAX

23   RETURN AND THEIR REFUND CHECK NEVER CAME.

24   AND, SO, THEY CONTACTED THE IRS AND LET THE

25   IRS KNOW.  AND THE IRS SAID, "YOUR REFUND

1    CHECK HAS ALREADY BEEN CASHED."  WELL, THOSE

2    REFUND CHECKS HAD BEEN CASHED AT LATINO'S.

3         THEY'RE GOING TO TELL YOU THEY'VE NEVER

4    BEEN TO LATINO'S.  THEY'VE NEVER EVEN BEEN TO

5    BATON ROUGE.  AND IN SOME CASES THESE

6    WITNESSES HAVE NEVER ENTERED THIS STATE, AND

7    THEY CERTAINLY NEVER GAVE THEIR REFUND CHECKS

8    AND THEIR PHOTO ID'S TO SOMEONE ELSE TO CASH

9    AT LATINO'S FOR THEM.  AND, YET, THEIR REFUND

10   CHECKS, THEIR HARD-EARNED REFUND CHECKS, WERE

11   CASHED AT LATINO'S, WITHOUT THEIR KNOWLEDGE,

12   WITHOUT THEIR PERMISSION.

13        SO, AS I SAID AT THE START, THE

14   DEFENDANT IS CHARGED HERE WITH FOUR COUNTS.

15   AT THE END OF THIS TRIAL, HIS HONOR JUDGE

16   JACKSON IS GOING TO GIVE YOU FURTHER

17   EXPLANATION ABOUT THE LAW BEHIND THESE

18   COUNTS.  HE'S ALREADY GIVEN YOU SOME

19   EXPLANATION.  BUT, BASICALLY, THE GOVERNMENT,

20   WE NEED TO PROVE CERTAIN ELEMENTS WITH EACH

21   COUNT.

22        SO, FOR THE FIRST COUNT, FAILURE TO

23   MAINTAIN AN ANTI-MONEY LAUNDERING PROGRAM,

24   WE'LL NEED TO PROVE:

25        FIRST, THE DEFENDANT OPERATED A MONEY

1        SERVICE BUSINESS IN THE UNITED STATES.

2            SECOND, THAT HE FAILED TO IMPLEMENT THE

3        ANTI-MONEY LAUNDERING PROGRAM.

4            AND, THIRD, THAT THAT FAILURE WAS

5        WILLFUL.  THAT HE KNEW THAT HIS FAILURE TO

6        DEVELOP, IMPLEMENT AND MAINTAIN AN ANTI-MONEY

7        LAUNDERING PROGRAM WAS UNLAWFUL.

8            THE EVIDENCE WILL EASILY MATCH THESE

9        ELEMENTS.

10       MR. AMBEAU: OBJECTION, YOUR HONOR.  MAY WE

11           APPROACH?

12       THE COURT: YES.

13       REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

14           A BENCH CONFERENCE WAS HELD.)

15       MR. AMBEAU: WE'VE NOT YET AGREED ON THE

16           ELEMENTS NECESSARY TO PROVE THE MONEY

17       LAUNDERING COUNT.  BUT THEY ARE CERTAINLY

18       MORE PLENTIFUL THAN WAS JUST STATED BY THE

19       GOVERNMENT IN HIS OPENING STATEMENT.  BUT HE

20       -- WHAT HE JUST CHARGED THE JURY WITH, THE

21       GOVERNMENT HAVING TO PROVE, WAS AN INACCURATE

22       STATEMENT OF WHAT HE HAS TO PROVE IN ORDER TO

23       PROVE MY CLIENT GUILTY OF ANY MONEY

24       LAUNDERING COUNT.

25       THE COURT: WELL, THERE'S NOTHING WRONG WITH

1          THE GOVERNMENT AT LEAST REVIEWING WITH

2     THE JURY THE ELEMENTS OF THE CRIMES CHARGED.

3     I BELIEVE THAT'S WHAT MR. CROSSWELL WAS

4     DOING.  AND I THINK THERE'S SOME DISAGREEMENT

5     AS TO WHAT THE ELEMENTS ARE.

6          I WOULD ASK, THOUGH, GENTLEMEN, THAT YOU

7     ALL CONFINE THE ELEMENTS THAT I GAVE THE

8     JURY, JUST KIND OF THE BARE BONES KIND OF --

9     I THINK WHAT I PROVIDED IS NOT IN DISPUTE

10    BECAUSE IT'S PRETTY MUCH OUT OF THE FIFTH

11    CIRCUIT PATTERN JURY.

12          NOW, SO, LET ME JUST ASK.  IF YOU HAVE

13    THE FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS

14    --  AND I UNDERSTAND THAT IN COUNT TWO WE

15    DON'T HAVE A FIFTH CIRCUIT PATTERN ---

16    MR. AMBEAU: BUT THERE'S NOT ONE FOR THAT THAT

17          WAS JUST TALKED ABOUT.

18    THE COURT: RIGHT.  SO, JUST BE VERY CAREFUL

19          WHEN YOU REACH COUNT TWO.

20    MR. CROSSWELL: OKAY.

21    THE COURT:  I THINK COUNT ONE, COUNT THREE

22          AND COUNT FOUR ARE PRETTY MUCH ---

23    MR. CROSSWELL: HE WAS ACTUALLY TALKING ABOUT

24          COUNT TWO.

25    MR. AMBEAU: HE WAS TALKING ABOUT COUNT TWO

1              BUT HE SAID COUNT FIVE.

2         THE COURT: OKAY.

3         MR. CROSSWELL: YOUR HONOR, I THINK THAT MY

4              INSTRUCTION IS EVEN MORE FAVORABLE THAN

5         THE ONE YOU GAVE, BECAUSE I DIDN'T -- BUT AT

6         ANY RATE, ---

7         THE COURT: OKAY.  SO, OKAY?

8         MR. AMBEAU: THANK YOU.

9         MR. STEVENS: LET ME ASK A RELATED QUESTION,

10             THOUGH.  YOU SAID WE SHOULD STICK TO THE

11        ELEMENTS AS YOU GAVE THEM.

12        BY THE COURT: RIGHT.

13        BY MR. STEVENS: WHEN YOU TALKED ABOUT COUNT

14             ONE.

15        THE COURT: UH HUH.

16        MR. STEVENS: I DON'T -- I DIDN'T HEAR YOU

17             MENTION ANY AIDING AND ABETTING

18        LANGUAGE.  HE WAS PLANNING TO MENTION THAT

19             ---

20        THE COURT: YES.  I DID MENTION AIDING AND

21             ABETTING.

22        MR. AMBERAU: DID YOU?

23        THE COURT: I KNOW I MENTIONED IT EARLIER

24             TODAY.  I MENTIONED IT VERY, VERY

25        BRIEFLY, THOUGH.

1          MR. STEVENS: OKAY.

2          THE COURT: I DIDN'T GO INTO A LOT OF

3              DETAILS OF IT.

4          MR. STEVENS: OKAY.

5          THE COURT: BUT, YES, THE INDICTMENT DOES

6              CHARGE AIDING AND ABETTING.  SO, YES.

7          YOU CAN MENTION AIDING AND ABETTING.

8          MR. CROSSWELL: AND I WON'T GO INTO DETAIL

9              ON IT.

10         THE COURT: OKAY?  THANK YOU, GENTLEMEN.

11         REPORTER'S NOTE: (THEREFORE, THE BENCH

12             CONFERENCE WAS CONCLUDED.)

13         THE COURT: OKAY.  LET'S PROCEED.

14         MR. CROSSWELL: AS I WAS SAYING, LADIES

15             AND GENTLEMEN, THE EVIDENCE WILL EASILY

16         MATCH THE ELEMENTS.

17             YOU WILL KNOW THAT THE DEFENDANT

18         OPERATED A MONEY SERVICE BUSINESS IN THE

19         UNITED STATES.  IT'S CALLED LATINO'S.  IT'S

20         LOCATED ON FLORIDA BOULEVARD.  AND YOU'RE

21         GOING TO HEAR THAT THE DEFENDANT IS THE

22         OWNER, THE OPERATOR AND THE SOLE AUTHORIZED

23         SIGNER ON HIS CHECKING ACCOUNT.

24             WITH REGARD TO THE TWO COUNTS ALLEGING

25         OBSTRUCTION OF PROCEEDINGS BEFORE A FEDERAL

1    AGENCY, WE'LL NEED TO PROVE:

2         FIRST, THAT PROCEEDINGS WERE CONDUCTED

3    BEFORE A FEDERAL AGENCY.

4         SECOND, THAT THE DEFENDANT KNEW THE

5    PROCEEDINGS.

6         AND, THIRD, THAT HE CORRUPTLY ENDEAVORED

7    TO IMPEDE THE DUE AND PROPER ADMINISTRATION

8    OF THE LAW UNDER WHICH THE PROCEEDINGS WERE

9    BEING CONDUCTED.

10        WE WILL NOTE THAT THERE WERE TWO FEDERAL

11   PROCEEDINGS, THEY ARE CALLED BANK SECRECY ACT

12   COMPLIANCE EXAMINATIONS.  THERE WAS ONE IN

13   2010 AND ONE IN 2012 -- EXCUSE ME.  ONE IN

14   2010 AND ONE IN 2013.  AND YOU WILL NOTE THE

15   DEFENDANT KNEW OF THEM.  THEY WERE CONDUCTED

16   AT HIS STORE.  AND YOU'LL KNOW THAT HE

17   CORRUPTLY ENDEAVORED TO IMPEDE THEM WHEN HE

18   LIED ABOUT THE DOCUMENTS IN HIS POSSESSION

19   AND WHEN HE FAILED TO PROVIDE THEM TO MS.

20   HARDY AND MS. ARMWOOD.

21        AND WHEN YOU HEAR THE NATURE OF THESE

22   DOCUMENTS, YOU'LL UNDERSTAND WHY HE DIDN'T

23   PROVIDE THEM TO THOSE AGENTS.

24        REMEMBER HOW I TOLD YOU THAT OFTENTIMES

25   IN THESE SCHEMES, FAKE OR FALSE ADDRESSES ARE

1       PROVIDED TO THE IRS, TO WHICH THE CHECKS CAN

2       BE ISSUED.  WELL, THE IRS ADVISES THESE CHECK

3       CASHERS ABOUT THESE POLICIES.  AND IT

4       PROVIDES AN ADVISEMENT ABOUT TELL-TALE SIGNS

5       THAT CHECK CASHING CUSTOMERS ARE PROVIDING

6       FAKE ADDRESSES.  THIS IS WHAT THAT ADVISORY

7       LOOKS LIKE.  AND MS. ARMWOOD IS GOING TO TELL

8       YOU SHE PROVIDED TO THE DEFENDANT WHEN SHE

9       CAME TO THE STORE IN 2013.

10      AND SO IF YOU SEE THE FIRST BULLET

11      POINT, IT TALKS ABOUT HOW ONE DESIGNS THE TAX

12      REFUND FRAUD IS WHEN CHECKS ARE COMING FROM

13      ADDRESSES THAT ARE NOT IN CLOSE PROXIMITY TO

14      THE CHECK CASHER.

15      AND IF YOU LOOK AT THE THIRD BULLET

16      POINT IT, IT TALKS ABOUT MULTIPLE CHECKS

17      BEING SENT TO A SINGLE ADDRESS.

18      WELL, LADIES AND GENTLEMEN, WHEN THOSE

19      AGENTS EXECUTED THAT SEARCH WARRANT AND THEY

20      FOUND THOSE 92 PHOTOCOPIES OF THOSE CHECKS,

21      AMONG THOSE CHECKS THEY FOUND THE DEFENDANT

22      HAD CASHED 27 CHECKS ISSUED TO PEOPLE WITH

23      ADDRESSES IN A TOWN CALLED NEWNAN, GEORGIA,

24      INCLUDING SIX CHECKS -- EXCUSE ME, INCLUDING

25      SIX CHECKS TO A SINGLE STREET ADDRESS.  AND

1      THESE ARE TAX REFUND CHECKS.

2          THEY FOUND THE DEFENDANT'S BUSINESS

3      CASHED SEVEN REFUND CHECKS ISSUED TO A SINGLE

4      STREET ADDRESS IN VILLA ROCA, GEORGIA.

5          THEY FOUND THAT THE DEFENDANT'S BUSINESS

6      CASHED FOUR CHECKS ISSUED TO A SINGLE

7      APARTMENT UNIT IN NEW YORK.  AND THESE FOUR

8      CHECKS WERE ALL ISSUED TO DIFFERENT

9      INDIVIDUALS.

10         BUT EVEN MORE STARTLING IS THE CHECKS

11     THE DEFENDANT CASHED THAT HE DID KEEP RECORDS

12     OF.  AND THIS RELATES TO THE THIRD COUNT,

13     THEFT OF GOVERNMENT FUNDS.

14         THE DEFENDANT'S BUSINESS CASHED 31

15     CHECKS ISSUED TO PEOPLE WITH ADDRESSES IN

16     WORCESTER, MASSACHUSETTS, INCLUDING EIGHT

17     CHECKS TO A SINGLE APARTMENT IN THIS

18     MASSACHUSETTS TOWN.  AND OF THOSE EIGHT

19     CHECKS, ALL WERE ISSUED TO DIFFERENT

20     INDIVIDUALS.

21         THE DEFENDANT'S BUSINESS CASHED 29

22     CHECKS ISSUED TO ADDRESSES IN A TOWN CALLED

23     CARROLLTON, GEORGIA, INCLUDING NINE CHECKS

24     SENT TO A SINGLE STREET ADDRESS.

25         THE DEFENDANT'S BUSINESS CASHED 51

1    CHECKS ISSUED TO ADDRESSES IN A SINGLE STREET

2    CALLED SEDGWICK AVENUE.  AND FOR THOSE OF YOU

3    THAT AREN'T AWARE FO SEDGWICK AVENUE AND

4    AREN'T FAMILIAR WITH IT, IT'S LOCATED NEAR

5    THE STADIUM.  NOT TIGER STADIUM.  YANKEE

6    STADIUM.  SEDWGICK AVENUE IS IN THE BRONX,

7    NEW YORK.  THE DEFENDANT CASHED 51 CHECKS

8    ISSUED TO ADDRESSES ON A SINGLE STREET IN THE

9    BRONX.  AND THESE CHECKS WERE WORTH OVER

10   $300,000.00.

11   THE COURT: FIVE MINUTES.

12   MR. CROSSWELL: THANK YOU, YOUR HONOR.

13         SO, THE FINAL COUNT, THEFT OF GOVERNMENT

14   FUNDS, WE'LL NEED TO PROVE:

15         FIRST, THE PROPERTY ALLEGED IN THE

16   INDICTMENT IS IN EXCESS OF $1,000.00.  AND

17   YOU'LL KNOW IT'S IN EXCESS OF ONE MILLION

18   DOLLARS.  THE DEFENDANT'S BUSINESS CASHED

19   OVER ONE MILLION DOLLARS IN FRAUDULENT

20   CHECKS.

21         SECOND, WE'LL NEED TO PROVE THE

22   DEFENDANT STOLE THESE CHECKS.

23         AND, THIRD, WE'LL NEED TO PROVE THAT HE

24   STOLE THE CHECKS KNOWING THAT HE WAS NOT THE

25   RIGHTFUL OWNER, AND WITH THE INTENT OF

1  DEPRIVING THE RIGHTFUL OWNER OF THEIR

2  BENEFIT.

3          AND YOU'LL KNOW THESE CHECKS WERE

4  STOLEN.  YOU'LL KNOW THE VALUE IS IN EXCESS

5  OF $1,000.00.  SO, THE QUESTION WILL BE, DID

6  THE DEFENDANT KNOW THAT THEY WERE STOLEN?

7  AND TO BE CLEAR, WHAT YOU'RE NOT GOING TO

8  HEAR FROM IS A WITNESS THAT'S GOING TO COME

9  AND SAY, "I'M THE ONE THAT TOOK ALL THOSE

10  STOLEN CHECKS TO LATINO'S.  I'M THE ONE WHO

11  FILED THOSE FRAUDULENT TAX RETURNS."  TO BE

12  CANDID, WE DON'T KNOW HOW THE DEFENDANT GOT

13  HOLD OF ALL OF THESE STOLEN TREASURY CHECKS.

14          BUT YOU'RE GOING TO HEAR THE JUDGE'S

15  INSTRUCTION ON AIDING AND ABETTING.  AND

16  YOU'RE GOING TO HEAR ABOUT HOW THE DEFENDANT

17  DELIBERATELY FAILED TO IMPLEMENT, MUCH LESS

18  MAINTAIN, THAT ANTI-MONEY LAUNDERING PROGRAM.

19          AND YOU'RE GOING TO HEAR ABOUT THE FALSE

20  STATEMENTS HE MADE ABOUT THE NATURE OF HIS

21  BUSINESS AND THE LOCALE OF HIS CUSTOMERS,

22  WHERE THEY CAME FROM.

23          AND YOU'RE GOING TO HEAR HOW HE LIED

24  ABOUT THE DOCUMENTS IN HIS POSSESSION AND HOW

25  HE CONCEALED THOSE INCRIMINATING DOCUMENTS

1    FROM THESE AGENTS.

2         AND YOU'RE GOING TO KNOW ABOUT THE

3    STAGGERING NUMBER OF CHECKS HE CASHED, ISSUED

4    TO ADDRESSES OUTSIDE OF LOUISIANA.  AND NOT

5    IN BORDER STATES OF MISSISSIPPI OR TEXAS,

6    STATES A HALF A CONTINENT AWAY.

7         AND YOU'RE GOING TO KNOW ABOUT THE

8    STARTLING NUMBER OF BATCHES OF CHECKS HE

9    CASHED ISSUED TO SINGLE APARTMENTS AND SINGLE

10    STREET ADDRESSES IN TOWNS IN GEORGIA AND

11    MASSACHUSETTS.  AND YOU'RE GOING TO ASK

12    YOURSELF, IS IT EVEN REMOTELY POSSIBLE THAT

13    THE DEFENDANT DIDN'T KNOW HE WAS CASHING

14    STOLEN CHECKS.

15    AND WHEN HE HID RECORDS FROM FEDERAL AGENTS

16    THAT HE DID KNOW HE WAS CASHING STOLEN

17    CHECKS.

18         AND WOULD HE HAVE LIED TO FEDERAL AGENTS

19    IF HE DIDN'T KNOW HE WAS CASHING STOLEN

20    CHECKS?

21         THIS IS NOT A DIFFICULT CASE.  A TAX

22    REFUND FRAUD OCCURRED, A MAJOR TAX REFUND

23    FRAUD, AND THE DEFENDANT LITERALLY CASHED IN

24     ON IT.

25         AND WE, THE GOVERNMENT, WE BEAR THE

1    BURDEN OF PROOF IN THIS CASE.  IT'S PROOF

2    BEYOND A REASONABLE DOUBT.  WE ACCEPT THAT

3    BURDEN.  WE WELCOME THAT BURDEN.  AND THE

4    EVIDENCE WILL MEET THAT BURDEN.

5         AND IN THIS TRIAL WE'RE GOING TO ASK YOU

6    TO RETURN THE VERDICT THAT THE EVIDENCE

7    WARRANTS AND JUSTIFIES.  WE'RE GOING TO ASK

8    YOU TO FIND THE DEFENDANT, CARLOS LINARES,

9    GUILTY ON ALL FOUR COUNTS.

10        THANK YOU.

11   THE COURT: THANK YOU, MR. CROSSWELL.

12        MR. AMBEAU?

13        OPENING STATEMENT

14   MR. AMBEAU: GOOD AFTERNOON, LADIES AND

15        GENTLEMEN.  MY NAME IS JARRETT AMBEAU.

16   I'M A CRIMINAL DEFENSE ATTORNEY.  I REPRESENT

17   MR. CARLOS LINARES, WHO IS SITTING AT THE

18   TABLE HERE WITH ME.  AND MY PARALEGAL IS ALSO

19   SITTING HERE WITH ME.

20        I'M GOING TO START WITH A BIT OF A TIME

21   LINE, BECAUSE I THINK MAKING A TIME LINE IS

22   GOING TO MAKE IT A LITTLE EASIER TO SEE HOW

23   THESE EVENTS OCCURRED.

24        AND IF I MAY, YOUR HONOR, ---

25   THE COURT: YES.

1      MR. AMBEAU: MR. LINARES OPENED HIS BUSINESS

2          IN 2009, IN BATON ROUGE, LOUISIANA.  ALL

3      AND ANY OF THE ALLEGATIONS IN THIS COMPLAINT

4      COVER UNTIL FEBRUARY OF 2014.  AND THERE WERE

5      A NUMBER OF EVENTS THAT HAPPENED ALONG THIS

6      TIME LINE, A NUMBER OF EVENTS THAT ARE

7      IMPORTANT TO PUT INTO PERSPECTIVE, THE

8      GOVERNMENT'S ASSERTION AGAINST MR. LINARES.

9          LET'S START WITH THE INITIAL

10     EXAMINATION, IRS EXAMINATION, RIGHT AFTER MR.

11     LINARES OPENS IN AUGUST OF 2010.

12         AS YOU HEARD EARLIER, THERE IS AN IRS

13     BANK SECRECY ACT INVESTIGATOR, A SPECIALIST,

14     SOMEONE WHO SPECIALIZES IN THE BANK SECRECY

15     ACT AND THOSE MATTERS THAT ARE RELATED TO

16     PEOPLE WHO CHECK -- CASH CHECKS, TRANSFER

17     MONEY TO OTHER COUNTRIES, ISSUE MONEY ORDERS,

18     THOSE KINDS OF THINGS.  ALL OF THE THINGS

19     THAT ARE IMPORTANT TO PAY ATTENTION TO IN

20     TERMS OF AN ANTI-MONEY LAUNDERING PROGRAM.

21         IN THIS AUGUST, 2010 EXAMINATION, THEY

22     EXAMINE A TIME PERIOD THAT STARTS IN FEBRUARY

23     OF 2010.  AND THAT'S THE EXAM PERIOD.

24     FEBRUARY OF 2010 TO AUGUST, 2010.

25         FAST FORWARD TO OCTOBER -- EXCUSE ME,

1    MARCH -- LET'S SEE.  EXCUSE ME.  MAY OF 2013.

2    NOW, IN MAY OF 2013, THERE IS A SECOND IRS

3    EXAMINATION BY A SECOND BANK SECRECY ACT

4    INVESTIGATOR, A SECOND SPECIALIST.  IN FACT,

5    SOMEONE WHO IS TRAINED TO, BY THE IRS, TO

6    RECOGNIZE MONEY LAUNDERING, MONEY LAUNDERING

7    PRACTICES, MONEY -- TO -- TO EXAMINE MONEY

8    LAUNDERING PROGRAMS, AND EVEN TO ASSESS RISK.

9    TO ASSESS THE RISK OF THE BUSINESS THAT'S IN

10    -- THAT THEY'RE EXAMINING AT THAT TIME.  THEY

11    EXAMINED MR. LINARES' BUSINESS ON THAT DATE.

12        LET'S TAKE A LOOK AT WHEN THE GOVERNMENT

13    SAYS THAT MR. LINARES IS, IN FACT, DOING

14    SOMETHING NOT LEGAL.  MARCH OF 2012, TO MAY

15    OF 2013.  THIS IS ACTUALLY MARCH OF 2013,

16    THE SECOND -- THE SECOND EXAMINATION.  TO MAY

17    OF 2013.  DURING THIS TIME, THIS TIME --

18    DURING THIS TIME THE GOVERNMENT CLAIMS THAT

19    MR. LINARES AIDS AND ABETS OTHERS IN A THEFT.

20    THIS IS COUNT ONE OF THE INDICTMENT.  THAT

21    MR. LINARES AIDS AND ABETS OTHERS IN STEALING

22    1.6 MILLION DOLLARS FROM THE FEDERAL

23    GOVERNMENT.

24        YOU'LL NOTICE THAT THE SECOND IRS

25    INVESTIGATION OCCURS INSIDE THIS TIME PERIOD

1    THAT HE'S BEING ACCUSED OF CASHING THESE

2    FRAUDULENT TAX CHECKS.  AND, IN FACT, THE

3    EXAMINATION PERIOD IS OCTOBER OF 2012 TO THAT

4    MARCH DATE.  THAT'S THE EXAMINATION PERIOD.

5         THAT BSA AGENT, THE BANK SECRECY ACT IRS

6    AGENT COMES IN IN 2013 AND DOES AN

7    EXAMINATION OF A FULL SET OF MONTHS WITHIN

8    THE TIME THAT MR. LINARES IS BEING ACCUSED OF

9    FAILING TO DISCOVER THIS MONEY LAUNDERING --

10   THIS FRAUDULENT TAX SCHEME IN HIS BUSINESS.

11        THE GOVERNMENT ALSO SAYS THAT MR.

12   LINARES WILLFULLY FAILS TO HAVE AN ANTI-MONEY

13   LAUNDERING PROGRAM IN HIS STORE FROM MARCH OF

14   2012 ALL THE WAY TO FEBRUARY OF 2014.

15        NOW, WHAT'S INTERESTING ABOUT THIS --

16   WHAT'S INTERESTING ABOUT THIS TIME LINE IS

17   THAT THE EVIDENCE IS GOING TO SHOW VERY

18   CLEARLY THAT THE EXAMINATION IN 2010,

19   PERFORMED BY THE BANK SECRECY ACT IRS

20   INVESTIGATOR, FINDS THAT MR. LINARES MUST

21   TAKE CERTAIN STEPS TO IMPROVE THE MANNER IN

22   WHICH HE'S CASHING CHECKS AND SENDING MONEY

23   TRANSFERS OUT OF THE COUNTRY.  AND HE'S GIVEN

24   THAT.  AND IT'S A FAIRLY LENGTHY EXAMINATION.

25   AND YOU'LL SEE THAT.  AND YOU'LL SEE THAT IN

1       THERE IT SAYS, "YOU NEED TO TAKE THESE

2       AFFIRMATIVE STEPS."  ONE OF THEM IS, PUT IN

3       PLACE AN ANTI-MONEY LAUNDERING PROGRAM.  ONE

4       OF THEM IS, PUT IN PLACE A CHECK-CASHING

5       PROGRAM.  SOME PROCEDURES.  SOMETHING FOR

6       YOUR CHECK CASHING.  DESPITE THE FACT THAT HE

7       TELLS THEM AT THAT TIME THAT HE HAS RULES,

8       THEY SAY, "PUT IT IN PLACE.  WRITE IT DOWN.

9       PUT IT IN PLACE."

10      YOU'LL SEE THAT AT THE MARCH, 2013, THE

11      SECOND IRS EXAMINATION, THE ONE DURING THE

12      TIME THAT THEY CLAIM -- THAT THE GOVERNMENT

13      CLAIMS THAT MR. LINARES IS, IN FACT,

14      UNDERTAKING THIS THEFT OF GOVERNMENT FUNDS,

15      THE BSA, THE IRS EXAMINER, ACKNOWLEDGES IN

16      THE REPORT, THAT HE HAS, IN FACT, STARTED AN

17      ANTI-MONEY LAUNDERING PROGRAM.  AND IT IS IN

18      PLACE IN HIS BUSINESS.  BUT DESPITE THE FACT

19      THAT THE GOVERNMENT IS TELLING YOU THAT HE'S

20      WILLFULLY FAILING TO DO SO FROM MARCH, 2012,

21      ALL THE WAY TO FEBRUARY, 2014, HER REPORT IN

22      NO UNCERTAIN TERMS WILL SAY, "HE HAS PUT IN

23      AN ANTI-MONEY LAUNDERING PROGRAM IN PLACE.

24      HE'S IMPLEMENTED THIS PROGRAM."

25      AND IN HER VIOLATIONS OF HER EXAM, SHE

1          DOES NOT INCLUDE THAT HE HAS NOT PUT AN ANTI-

2          MONEY LAUNDERING PROGRAM IN PLACE.  SHE, IN

3          FACT, AGREES THAT HE HAS DONE SO.  YET WE'RE

4          HERE FOR WILLFUL FAILURE TO ENACT AN ANTI-

5          MONEY LAUNDERING PROGRAM.

6               AT THAT SAME 2013 -- AND I THINK THE

7          GOVERNMENT -- I JUST WROTE IT DOWN WHAT THE

8          GOVERNMENT SAID ABOUT THESE CHECKS.  THE

9          GOVERNMENT SAYS THAT IN THE 2010 AND 2013, IN

10          BOTH, THAT HE TOLD THE EXAMINERS THAT HE

11          DIDN'T HAVE ANY CHECK CASHING RECORDS AT ALL.

12          EXCEPT THAT BOTH EXAMINERS GET COPIES OF

13          EVERY CHECK HE'S CASHED IN THE BUSINESS FOR

14          THE EXAMINATION PERIODS.  EVERY CHECK, LADIES

15          AND GENTLEMEN, INCLUDING EVERY TAX CHECK.

16               MR. LINARES DOESN'T HAVE MULTIPLE

17          ACCOUNTS.  HE HAS A SINGLE BANK ACCOUNT.  AND

18          HE CASHES EVERY CHECK, TAX OR OTHERWISE, IN

19          THAT SINGLE BANK ACCOUNT.  AND BOTH OF THOSE

20          EXAMINERS ASKED MR. LINARES TO PRODUCE THOSE

21          BANK ACCOUNTS.  HE GOES TO HIS BANK, GETS

22          COPIES OF EVERY CHECK HE'S DEPOSITED IN HIS

23          LITTLE ACCOUNT AND HANDS THEM OVER TO THE

24          EXAMINER, EVERY CHECK, WITH EVERY ONE OF

25          THOSE ADDRESSES ON IT, WITH EVERY ONE OF

1    THOSE ADDRESSES IN NEW YORK AND EVERY ONE OF

2    THOSE ADDRESSES IN GEORGIA, AND EVERY ONE OF

3    THOSE ADDRESSES IN FLORIDA.  EVERY ADDRESS.

4    AND THE BANK SECRECY ACT IRS AGENT REVIEWS

5    ALL OF THOSE CHECKS, BY THEIR OWN ADMISSION,

6    IN THEIR REPORT.

7    YOU KNOW, I THINK THE REAL STORY OF THIS

8    CASE IS THAT WHAT THE GOVERNMENT SAID EARLIER

9    ABOUT, MAYBE IF THE DEFENDANT HAD DID SO,

10   SPEAKING ABOUT AN ANTI-MONEY LAUNDERING

11   PROGRAM, THAT -- AND ENFORCED THAT PROGRAM WE

12   WOULDN'T BE HERE.  THE GOVERNMENT IS

13   ATTEMPTING TO HOLD MR. LINARES, A GROCERY

14   STORE OWNER ON FLORIDA BOULEVARD IN BATON

15   ROUGE, ACCOUNTABLE FOR A TAX FRAUD THAT THE

16   IRS COULDN'T EVEN CATCH.  SEE, MR. LINARES

17   DIDN'T STEAL ANY CASH AND HE DIDN'T FILE ANY

18   FRAUDULENT INCOME TAX RETURNS.

19   HUMAN BEINGS, ONE AT A TIME, CAME INTO

20   MR. LINARES' STORE WITH PICTURE ID'S AND TAX

21   CHECKS ISSUED BY THE UNITED STATES TREASURY,

22   WITH ALL THE FANCY PAPER AND FANCY INK AND

23   ALL THE STUFF THAT MAKES YOU THINK THIS IS AN

24   ACTUAL TAX CHECK -- AND THEY WERE ACTUAL TAX

25   CHECKS.  AND THEY PRESENTED THOSE TO MR.

1    LINARES AT HIS CHECK CASHING BUSINESS.  AND

2    MR. LINARES CASHED THOSE CHECKS.  HE TOOK HIS

3    ONE AND A HALF PERCENT FEE.  AND THEY WENT

4    ABOUT THEIR WAY.

5        AND THEN THE AUDITOR CAME IN AND AUDITED

6    AND SAID, "NO SUSPICIOUS TRANSACTIONS." I'VE

7    REVIEWED THESE SEVEN MONTHS OF TRANSACTIONS

8    AND ALL THESE CHECKS FROM ALL THESE PLACES

9    AND THERE'S NOTHING SUSPICIOUS HERE.  THERE'S

10   NOT EVEN A REPORTABLE TRANSACTION HERE.

11   THERE'S NOT EVEN A TRANSACTION HERE THAT

12   RISES TO THE LEVEL OF SOMETHING YOU WOULD

13   HAVE TO REPORT TO THE GOVERNMENT.

14       YOU SEE, WHEN THE ATTORNEY FOR THE

15   GOVERNMENT, A MOMENT AGO, MADE AN ISSUE OF

16   THIS CASHING MORE THAN $5,000.00 IN A DAY,

17   WELL, THAT'S MR. LINARES' LIMIT.  THAT'S NOT

18   A LEGAL LIMIT.

19       THERE ARE ONLY TWO LEGAL LIMITS THAT

20   APPLY HERE.  ONE OF THEM IS IF THERE IS

21   SUSPICIOUS ACTIVITY AND THE CHECK OR MONEY

22   TRANSACTION IS ABOVE $2,000.00, YOU SHOULD

23   FILE A REPORT.  IN BOTH OF THE IRS AUDITS,

24   BOTH TIMES, BOTH AUDITORS, NO SUSPICIOUS

25   ACTIVITY. NO REPORTS NECESSARY.

1    YOU KNOW WHAT THE OTHER LIMIT IS?

2    $10,000.00.  ANY SINGLE TRANSACTION ABOVE

3    $10,000.00 OR ANY MULTIPLE TRANSACTIONS BY

4    THE SAME PARTY IN THE SAME DAY OF $10,000.00.

5    YOU KNOW HOW MANY TIMES THAT THAT HAPPEN

6    DURING THE EXAMINATION PERIODS?  ZERO.

7    YOU SEE, LADIES AND GENTLEMEN, THE

8    GOVERNMENT WANTS MR. LINARES TO STOP WHAT IS

9    A VERY COMPLEX, VERY SOPHISTICATED FRAUD

10    ACTED UPON THE TREASURY OF THE UNITED STATES.

11    BUT AT THE SAME TIME THAT THEY WERE EXPECTING

12    MR. LINARES TO STOP IT, THEIR OWN BANK

13    SECRECY AGENTS AUDITING HIS BUSINESS COULD

14    NOT DETERMINE THAT IT WAS GOING ON AND DID

15    NOT STOP IT.

16    MR. LINARES' BANK  -- BY THE WAY, AND SO

17    THAT WE UNDERSTAND THE KIND OF CONFUSION THAT

18    GOES ON IN A CASE LIKE THIS.  BECAUSE OF THE

19    NUMBER OF RECORDS, THERE'S 6,500 PAGES OF

20    RECORDS THAT THE FBI SEIZED FROM MY CLIENT'S

21    BUSINESS, THE THOUSANDS AND THOUSANDS OF

22    PAGES OF BANK RECORDS THAT WE HAVE.  LET ME

23    TELL YOU HOW EASY IT IS TO MAKE A MISTAKE.

24    THE GOVERNMENT'S ATTORNEY JUST SAID THAT MR.

25    LINARES OPENED THE ACCOUNT AT WHITNEY BANK ON

1   MARCH, 2012.  THAT SEEMS REALLY BAD, RIGHT,

2   IF HE STARTED CASHING CHECKS AT THAT TIME.

3   RIGHT?  HE STARTED CASHING THESE TAX CHECKS

4   IN MARCH OF 2012, AND HE HAD JUST OPENED A

5   BANK ACCOUNT.  I MEAN, THAT -- I MEAN, THAT

6   MAKES AN INFERENCE.  AND THAT INFERENCE IS,

7   WHY DID HE JUST OPEN THAT ACCOUNT AND HE

8   STARTED CASHING ALL THOSE TAX CHECKS?  HE

9   DIDN'T JUST OPEN THE ACCOUNT.  THE ACCOUNT

10  HAD BEEN OPEN.

11        HANCOCK BANK WAS BOUGHT BY WHITNEY BANK

12  IN EARLY 2012.  AND HIS BANK ACCOUNT FROM

13  HANCOCK WAS CONVERTED TO A WHITNEY BANK

14  ACCOUNT IN MARCH OF 2012.  IS THAT SOMETHING

15  THAT THE IRS AGENTS OUGHT TO KNOW?  IS THAT

16  SOMETHING THAT THE INVESTIGATIVE OFFICER

17  SHOULD KNOW?  IS THAT SOMETHING THAT THE U.S.

18  ATTORNEY SHOULD KNOW?

19        AS OPPOSED TO AN INFERENCE THAT HE

20  OPENED AN ACCOUNT IN MARCH OF 2012 AND

21  SOMEHOW THAT GOES TO THE CORRUPT NATURE OF

22  THIS -- OF THESE TRANSACTIONS.  RIGHT?

23        SO, WE HAVE TO MAKE SURE THAT WE DO --

24  IS TO BE PRECISE.  THIS IS A FINANCIAL CRIME

25  WITH A TREMENDOUS AMOUNT OF INFORMATION.  AND

1    IF WE ARE PRECISE IN OUR ANALYSIS, WE'LL SEE

2    THE TRUTH ABOUT WHAT'S GOING ON HERE.  IF

3    WE'RE PRECISE IN SEEING THE WAY THE ANALYSIS

4    WAS DONE BY THE PROFESSIONALS.  WE'LL SEE

5    WHAT'S GOING ON.

6        YOU SEE,  HANCOCK/WHITNEY BANK WAS

7    TAKING ALL THESE CHECKS IN, ALL OF THEM, WITH

8    ALL THESE ADDRESSES, ALL THESE OUT OF TOWN

9    ADDRESSES, THEY WERE TAKING THEM AT THE

10   BRANCH ON BROADMOOR IN BATON ROUGE,

11   LOUISIANA.  AND THERE WASN'T A TELLER THERE.

12   THERE WASN'T A BANK PERSON THERE.  THERE

13   WASN'T A BANK OFFICER THERE.  THERE WASN'T

14   ANYONE THERE THAT SUSPECTED.

15       IN FACT, THESE CHECKS STARTED COMING

16   BACK.  SO, THERE'S THIS THING CALLED

17   RECLAMATION.  YOU'LL SEE THAT.  THE EVIDENCE

18   WILL SHOW THAT THERE ARE A BUNCH OF CHECKS

19   THAT GOT RECLAIMED.  SO WHAT HAPPENS IS, MR.

20   LINARES TOOK THE CHECK IN HIS BUSINESS; HE

21   CASHED IT.  DEPOSITED IT INTO HIS BANK

22   ACCOUNT.  THE CHECK PROVED TO NOT BE A VALID

23   TAX CHECK, AND THE BANK CAME BACK TO MR.

24   LINARES TO GET SOME MONEY.  THEY SAID, "WE

25   WANT OUR MONEY BACK.  WE'VE GIVEN YOU THIS

1    MONEY OUT OF THE BANK.  YOU HAVE TO PAY US

2    BACK."  MR. LINARES DIDN'T CLOSE HIS BANK

3    ACCOUNT.  HE DIDN'T RUN AWAY.  HE DIDN'T HEAD

4    FOR THE HILLS.  HE PAID IT.  IN FACT, HE PAID

5    EVERY ONE OF THEM, TO THE TUNE OF $59,000.00,

6    OUT OF HIS POCKET.  OUT OF THE MONEY HE'S

7    EARNED.  HE GOT VICTIMIZED BY THE PEOPLE

8    PERPETRATING THIS FRAUD ON THE UNITED STATES

9    OF AMERICA, TO THE TUNE OF $59,000.00, OF

10   WHICH HE PAID TO THE BANK, BECAUSE AT THIS

11   POINT HE OWES THE BANK ZERO DOLLARS.

12   NOTHING.  HE'S PAID EVERY RECLAMATION THAT'S

13   COME BACK.

14        YOU THINK SOMEBODY AT THE BANK, WHEN

15   THESE TAX CHECKS STARTED COMING BACK, YOU

16   THINK SOMEBODY AT THE BANK THOUGHT, "HMMM,

17   MAYBE SOMETHING IS WRONG HERE.  LET'S CHECK

18   THE ADDRESSES ON THESE THINGS."  WELL, OF

19   COURSE, THEY DID.

20        THE GOVERNMENT IS GOING TO PUT UP A BANK

21   SECRECY AGENT EXPERT FROM HANCOCK/WHITNEY

22   BANK ON THE STAND TO TELL YOU JUST HOW EXPERT

23   HE IS.  AND THEN I GUESS HE'LL EXPLAIN TO YOU

24   WHY HE DIDN'T NOTICE, NOR DID ANYONE ELSE AT

25   THE BANK NOTICE, AFTER THESE CHECKS WERE

1    BEING RECLAIMED THAT THERE WAS A FRAUD AFOOT.

2        BUT THE GOVERNMENT EXPECTS YOU TO HOLD

3    MR. LINARES ACCOUNTABLE, BECAUSE HE DIDN'T

4    DISCOVER THE FRAUD.  AND, IN FACT, EVEN WORSE

5    THAN THAT, THEY EXPECT YOU TO BLAME HIM FOR

6    THE FRAUD.  THEY EXPECT YOU TO POINT THE

7    FINGER AND SAY, "YOU STOLE THE MONEY BECAUSE

8    YOU DIDN'T NOTICE WHAT WAS GOING ON."

9        COUNT THREE AND FOUR OF THIS INDICTMENT,

10    THE OBSTRUCTION OF THOSE TWO -- OF THOSE TWO

11    EXAMINATIONS.  THE STORY DOESN'T WORK UNLESS

12    THERE'S SOME OBSTRUCTION.  THE STORY DOESN'T

13    WORK UNLESS MR. LINARES CORRUPTLY INFLUENCED

14    BOTH OF THOSE EXAMINATIONS.  BUT MR. LINARES

15    DIDN'T DO ANYTHING CORRUPT; HE DIDN'T DO

16    ANYTHING CORRUPT.  WHAT HE DID WAS HE GAVE

17    THEM HIS BANK RECORDS.  "HERE'S ALL THE

18    CHECKS I'VE CASHED."

19        IN THE SUMMER OF 2014, WHEN REQUESTED BY

20    LAW ENFORCEMENT TO GIVE THEM ALL THE RECORDS

21    OF HIS CHECK CASHING BUSINESS IN THE LAST

22    FIVE YEARS, MR. LINARES GOES INTO THE SIX

23    BOXES OF PAPER HE HAS IN HIS STORE, WHICH

24    YOU'LL SEE AS THE FBI EXECUTED THE SEARCH

25    WARRANT.  THESE BOXES OF PAPER.  THIS 6,500

1     PAGES OF PAPER IN THOSE BINDERS THAT WE'VE

2     PRINTED, THROWN INTO BOXES.  HE FISHES

3     THROUGH THOSE BOXES.  HE FINDS EVERY TAX

4     CHECK HE CAN FIND THAT HAS AN ID ATTACHED TO

5     IT AND BRINGS IT TO THE LAW ENFORCEMENT

6     OFFICER AND SAYS, "HERE IT IS."

7         THE GOVERNMENT CHARGES HIM WITH FAILURE

8     TO KEEP AN EFFECTIVE ANTI-MONEY LAUNDERING

9     PROGRAM.  AND PART OF THAT ASSERTION IN THE

10    INDICTMENT IS, AND VERY SUCCINCTLY STATED,

11    ROUTINELY FAILED TO REQUIRE AND/OR RETAIN

12    COPIES OF ANY IDENTIFICATION DOCUMENTS.

13    BECAUSE AT THE TIME, THE GOVERNMENT, EVEN UP

14    UNTIL AND INCLUDING A COUPLE OF WEEKS AGO,

15    THOUGHT THAT THERE WERE 40-ISH ID'S FOR THE

16    271 CHECKS CASHED IN MR. LINARES' BUSINESS.

17    YOU'LL SEE THAT AFTER AN EXAMINATION OF THOSE

18    SEARCH WARRANT RECORDS THAT THERE ARE 184

19    ID'S OF THE 272 CHECKS CASHED BY MR. LINARES,

20    NOT 40.  ONE HUNDRED EIGHTY-FOUR (184).

21        IN RECORDS THAT HAVE BEEN IN THE

22    POSSESSION OF THE FBI SINCE THEIR SEARCH

23    WARRANT EXECUTION, THAT WERE NOT DISCOVERED

24    BY THE FBI OR BY AGENTS OF THE IRS OR BY THE

25    UNITED STATES ATTORNEY, BUT BY MR. LINARES'

1    DEFENSE.

2        THE GOVERNMENT WANTS TO MAKE A LOT OUT

3    OF THAT THESE CHECKS WERE IN OTHER PLACES.

4    I'M GOING TO TELL YOU -- IN FACT, I THINK THE

5    GOVERNMENT JUST ASKED A MOMENT AGO, YOU KNOW

6    WHERE SEDGWICK AVENUE IN THE BRONX IS.  I

7    GUESS THE INFERENCE THERE IS THAT THEY THINK

8    THAT MR. LINARES SHOULD KNOW WHERE SEDGWICK

9    AVENUE IN THE BRONX IS.  THAT WAS HIS DUTY TO

10   KNOW THAT THAT WASN'T A HIGH RISE APARTMENT

11   COMPLEX IN NEW YORK WITH 500 UNITS, 1,000

12   UNITS, 1,500 UNITS.  MAKING 90 PERCENT FULL

13   OF SPANISH PEOPLE, TRANSIENTS GOING AROUND

14   THE COUNTRY WORKING AND CASHING THEIR TAX

15   CHECK.

16       YOU SEE, IT'S ALL THAT PART OF THE

17   GOVERNMENT'S ASSERTION THAT MR. LINARES HAD A

18   DUTY TO FIND OUT AND ROOT OUT THIS

19   UNBELIEVABLY COMPLEX TAX SCHEME, BUT THE IRS

20   DIDN'T HAVE THE DUTY TO DO SO.  THE IRS, WHO

21   ISSUED THE CHECKS.  THE IRS INVESTIGATORS WHO

22   WENT TO HIS BUSINESS DIDN'T HAVE THE DUTY TO

23   DO SO.  THE BANK DIDN'T HAVE A DUTY TO DO SO.

24   NO ONE ELSE.  THERE AREN'T CO-DEFENDANTS

25   SITTING AT THIS TABLE.  HANCOCK BANK IS NOT

1     OVER THERE.  IT'S MR. LINARES, A GROCERY

2     STORE OWNER ON FLORIDA BOULEVARD IN BATON

3     ROUGE.

4          NOT ONE WITNESS IS GOING TO TAKE THE

5     STAND AND TELL YOU THAT MR. LINARES HAD

6     ANYTHING TO DO WITH THIS SCHEME.  AND THERE

7     HAVE BEEN MANY, MANY CONVICTIONS RELATED TO

8     THIS TAX SCHEME.  NOT ONE PERSON IS GOING TO

9     TAKE THE STAND AND SAY THAT HE WAS INVOLVED

10    IN ANY WAY, SHAPE OR FORM.

11         IN FACT, THE GOVERNMENT IS NOT GOING TO

12    SHOW YOU THAT HE PROFITED FROM THIS BUSINESS.

13    THEY'RE NOT GOING TO SHOW YOU THAT HE TOOK

14    ANY MORE THAN ONE AND A HALF PERCENT OF THE

15    CHECKS HE CASHED.  AND THEIR OWN AGENT,

16    DURING THE BSA EXAMINATION, 2013 AND 2010,

17    MORE SPECIFICALLY 2013 DURING THIS TIME

18    PERIOD, THAT THE CASH FLOW ANALYSIS OF HIS

19    BUSINESS FOR THREE MONTHS AND SAYS, "THERE'S

20    NOTHING HERE.  THERE'S NO APPRECIABLE

21    DIFFERENCE IN THE CASH.  THERE'S NOTHING

22    GOING ON.  WE'VE DONE AN ANALYSIS OF HIS

23    RECEIPTS AT THE REGISTER.  HIS CASH IN AND

24    OUT AT THE BANK.  HIS TAX -- HIS CHECKS

25    CASHED.  THERE'S NO APPRECIABLE DIFFERENCE."

1    AND I THINK -- I'LL FINISH WITH THIS

2    GROSS MISUNDERSTANDING.  THE UNITED --

3    ASSISTANT UNITED STATES ATTORNEY SAID THAT

4    MR. LINARES CASHED IN ON IT.  CASHED IN ON

5    THIS FRAUD.  I'M NOT GREAT AT MATH.  BUT ONE

6    AND A HALF PERCENT OF 1.6 MILLION IS

7    $24,000.00.  AND MR. LINARES IS OUT

8    $59,000.00 IN RECLAMATIONS PAID TO WHITNEY

9    BANK.  HE WAS HURT BY THIS FRAUD, BY THIS

10   SCHEME. BY THIS UNBELIEVABLY COMPLEX TAX

11   FRAUD.  AND, NOW, THE GOVERNMENT IS LINING UP

12   TO DO IT AGAIN.

13   YOU WILL SEE AT THE END OF THIS THAT

14   NONE OF THIS MAKES ANY SENSE.

15   I'M GOING TO ADDRESS ONE OTHER THING.

16   MR. LINARES, AS YOU WELL KNOW, BY THIS POINT

17   SPEAKS SPANISH.  HE ALSO SPEAKS ENGLISH.

18   HE'S CAPABLE OF TALKING TO ME AND TO YOU.

19   HE'S BEEN HERE FOR A VERY LONG TIME.

20   UNFORTUNATELY, WHEN WE START TO TALK ABOUT

21   COMPLEX LEGAL ISSUES OR COMPLEX FINANCIAL

22   ISSUES, HIS ENGLISH GOES AWAY.  I KNOW A LOT

23   ABOUT DNA.  IF I STARTED TALKING ABOUT DNA TO

24   PEOPLE, THEY GET LOST REALLY QUICKLY.  IT'S

25   THE SAME SORT OF THING.  IT'S JUST A BUNCH OF

1    STUFF THAT HE DOESN'T DEAL WITH ON A REGULAR

2    BASIS.  SO, HE HAS A TRANSLATOR NOW AND HE

3    WILL HAVE A TRANSLATOR IF HE CHOOSES TO TAKE

4    THE STAND AND TALK TO YOU.  HE'LL HAVE A

5    TRANSLATOR DURING THAT TIME.  PLEASE DON'T

6    HOLD HIM ACCOUNTABLE OR PUNISH HIM FOR DOING

7    SO.  HE ISN'T TRYING TO FOOL YOU THAT HE

8    DOESN'T KNOW ENGLISH.  AND HE WILL TALK TO

9    YOU IN ENGLISH THEN.  BUT THE SPANISH -- THE

10   SPANISH TRANSLATION IS TO ASSIST HIM IN

11   UNDERSTANDING SOME OF THE MORE COMPLEX THINGS

12   WE'RE TALKING ABOUT HERE TODAY.

13        LADIES AND GENTLEMEN, THIS IS A -- THIS

14   IS, IN FACT, A SIMPLE CASE.  THE GOVERNMENT

15   IS RIGHT.  IT'S NOT COMPLEX.  THIS IS NOT

16   SOME HIGHBROW, COMPLEX, MULTI-NATIONAL FRAUD

17   AGAINST THE IRS TO STEAL MILLIONS AND

18   MILLIONS OF DOLLARS.  THIS IS A MAN WHO WAS

19   VICTIMIZED AT HIS PLACE OF BUSINESS, STILL

20   OPEN, STILL DOING BUSINESS, BY THE SAME

21   PEOPLE THAT VICTIMIZED THE TREASURY AND

22   EVERYONE ELSE HERE.

23        AND NOW THE GOVERNMENT IS TRYING TO MAKE

24   IT HIS DUTY TO HAVE CAUGHT THIS FRAUD, AND

25   THIS IS JUST NOT THE CASE.  THEY JUST CAN'T

1    CARRY THEIR BURDEN.

2        AND AT THE END OF THIS, AFTER YOU SEE

3    THE EVIDENCE, AFTER THE EVIDENCE MATCHES WHAT

4    I TOLD YOU HERE TODAY, I'M GOING TO ASK YOU

5    TO FIND CARLOS LINARES INNOCENT, ACTUALLY,

6    FACTUALLY INNOCENT, NOT GUILTY OF THE CHARGES

7    AGAINST HIM.

8        I THANK YOU FOR YOUR TIME.

9    THE COURT: THANK YOU, MR. AMBEAU.

10    REPORTER'S NOTE: (AT THIS TIME, OPENING

11    STATEMENTS WERE CONCLUDED)

12    THE COURT: AT THIS TIME, LADIES AND

13        GENTLEMEN, THE GOVERNMENT WILL CALL ITS

14    FIRST WITNESS.

15    MR. CROSSWELL: YOUR HONOR, THE GOVERNMENT

16        CALLS DEBORAH HARDY.

17    THE COURT: VERY WELL.

18    MR. STEVENS: JUDGE, MAY WE APPROACH WHILE

19        THE NEXT WITNESS IS COMING IN?

20    THE COURT: YES.

21    REPORTER'S NOTE: (THEREFORE, AT THIS

22        TIME A BENCH CONFERENCE WAS HELD.)

23    THE COURT: OKAY.  YES, SIR.

24    MR. STEVENS: ONE, I THINK WE ALL

25        UNDERSTAND THAT THE CASE AGENT IS

1    EXCUSED FROM THE SEQUESTRATION.  I SHOULD

2    HAVE MADE THAT REQUEST ON THE RECORD.

3    THE COURT: AND I SHOULD HAVE STATED IT ON

4        THE RECORD.

5    MR. AMBEAU: I UNDERSTAND.

6    THE COURT: AND THINK MR. AMBEAU UNDERSTANDS

7        THAT.

8    MR. STEVENS: AND I KNOW WE NEED TO APPROACH

9        WHEN THE WITNESSES ON THE STAND.

10   THE COURT: YES.

11   MR. STEVENS: IF WE'RE JUST SETTING UP

12       BEFORE THE WITNESS COMES IN, CAN WE JUST

13   DO THAT FREELY?

14   THE COURT: YES.  THAT'S FINE.

15   MR. STEVENS: OKAY.  THAT WILL SAVE A LITTLE

16       BIT OF TIME.

17   THE COURT: WHAT DO WE HAVE TO SET UP?

18   MR. STEVENS: I THINK FOR THIS WITNESS IT'S

19       ALMOST DONE.  BUT FOR OTHER WITNESSES, I

20   THINK ONE OF US WILL PUT SOME DOCUMENTS UP ON

21   THE STAND --

22   THE COURT: I UNDERSTAND.

23   MR. STEVENS:  -- WHILE THE WITNESS IS COMING

24       IN.

25   THE COURT: YES.  YES.  THERE'S NO NEED

1          TO ASK FOR PERMISSION TO DO THAT.

2      MR. STEVENS: OKAY.

3      MR. AMBEAU: THANK YOU, JUDGE.

4      THE COURT: THANK YOU, GENTLEMEN.

5      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

6          THE BENCH CONFERENCE WAS CONCLUDED.)

7      THE COURT: OKAY.  WE CALLED THE WITNESS?

8          IS THE WITNESS HERE?  THE WITNESS MAY

9      MOVE FORWARD.

10     THE COURT: LADIES, IT LOOKS LIKE WE HAVE

11         THE TECHNICAL ISSUE WORKED OUT?

12     THE INTERPRETER: YES, YOUR HONOR.

13     THE COURT: MA'AM, PLEASE COME FORWARD.

14     THE CLERK: RAISE YOUR RIGHT HAND.

15 THE WITNESS, DEBORAH ANN HARDY, AFTER HAVING FIRST

16 BEEN DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH,

17 AND NOTHING BUT THE TRUTH, TESTIFIED AS FOLLOWS:

18     THE CLERK: STATE AND SPELL YOUR NAME

19         FOR THE RECORD.

20     THE WITNESS: DEBORAH ANN HARDY,

21         D-E-B-O-R-A-H  A-N-N HARDY,

22     H-A-R-D-Y.

23     THE COURT: YOU MAY PROCEED.

24     MR. CROSSWELL: THANK YOU, YOUR HONOR.

25         DIRECT EXAMINATION

1  MR. CROSSWELL:

2  Q.  GOOD AFTERNOON, MS. HARDY.

3  A.  GOOD AFTERNOON.

4  Q.  MS. HARDY, ARE YOU CURRENTLY EMPLOYED?

5  A.  YES, I AM.

6  Q.  BY WHOM?

7  A.  INTERNAL REVENUE SERVICE.

8  Q.  AND DO YOU WORK WITH A CERTAIN GROUP OR DIVISION

9     WITH THE INTERNAL REVENUE SERVICE?

10 A.  YES.  I WORK IN THE BANK SECRECY ACT, MY GROUP.

11 Q.  AND WHAT IS YOUR POSITION WITH THE BANK SECRECY

12    ACT GROUP?

13 A.  I'M AN INTERNAL REVENUE AGENT.

14 Q.  AND ARE YOU FAMILIAR WITH THE DEFENDANT?

15 A.  YES, I AM.

16 Q.  ARE YOU FAMILIAR WITH THE DEFENDANT, CARLOS

17    LINARES?

18 A.  YES, I AM.

19 Q.  HOW ARE YOU FAMILIAR WITH HIM?

20 A.  I EXAMINED HIS BUSINESS.

21 Q.  OKAY.  WE'LL COME BACK TO THAT.

22       FIRST, CAN YOU TELL THE JURY HOW LONG YOU'VE

23    BEEN WITH THE IRS?

24 A.  I'VE BEEN WITH THE IRS SINCE SEPTEMBER OF 2006.

25 Q.  AND HAVE YOU BEEN A REVENUE AGENT FOR THAT LONG?

```
1   A.   YES.  I'VE BEEN A REVENUE AGENT SINCE 2008.

2   Q.   AND WHAT DOES YOUR JOB AS A REVENUE AGENT ENTAIL?

3   A.   I CONDUCT COMPLIANCE EXAMINATIONS FOR MONEY

4        SERVICE BUSINESSES.

5   Q.   OKAY.  AND ARE YOU CURRENTLY LOCATED IN BATON

6        ROUGE OR SOMEWHERE ELSE?

7   A.   I'M CURRENTLY LOCATED IN GULFPORT, MISSISSIPPI.

8   Q.   AND WERE YOU AT ONE POINT LOCATED IN BATON ROUGE?

9   A.   YES.  I WAS LOCATED IN THE GROUP IN THE BATON

10       ROUGE OFFICE.

11  Q.   WHEN DID YOU MOVE FROM BATON ROUGE TO GULFPORT?

12  A.   APPROXIMATELY 2010.

13  Q.   AND CAN YOU JUST TELL THE JURORS BRIEFLY ABOUT

14       YOUR EDUCATION?

15  A.   I HAVE A MASTER'S IN BUSINESS ADMINISTRATION.

16  Q.   MS. HARDY, I WANT TO ASK YOU ABOUT THE BANK

17       SECRECY ACT.  IS THIS A FEDERAL LAW?

18  A.   YES, IT IS.

19  Q.   AND WHAT IS ITS PURPOSE?

20  A.   THE BANK SECRECY ACT IS ACTUALLY DESIGNED TO

21       DETECT AND DETER MONEY LAUNDERING.  IT REQUIRES

22       BUSINESSES TO MAINTAIN CERTAIN RECORDS AND TO

23       REPORT CERTAIN REPORTS THROUGH TRANSACTIONS.

24  Q.   AND HOW WOULD YOU DESCRIBE MONEY LAUNDERING?

25  A.   MONEY LAUNDERING IS DESCRIBED AS THE ACT OF
```

1       CONCEALING ILLEGAL MONEY.

2   Q.   AND WHY IS MONEY LAUNDERED?

3   A.   MONEY IS LAUNDERED TO CONCEAL ILLEGAL ACTIVITIES,

4       SUCH AS DRUG TRAFFICKING, TERRORISM, OR AN

5       ILLEGAL TAX AVOIDANCE.

6   Q.   AND TO WHOM DOES THE BANK SECRECY ACT APPLY?

7   A.   IT WOULD APPLY -- IT APPLIES TO ALL MONEY SERVICE

8       BUSINESSES.

9   Q.   CAN YOU SORT OF DEFINE WHAT MONEY SERVICE

10       BUSINESSES ARE?

11  A.   A MONEY SERVICE BUSINESS IS A BUSINESS THAT

12       CASHES CHECKS FOR ANY CUSTOMER ON A SINGLE DAY

13       GREATER THAN $1,000.00.  THEY OFFER WIRE

14       TRANSACTIONS AT ANY DENOMINATION AND THEY ALSO

15       SELL MONEY ORDERS AT $1,000.00, TO ANY CUSTOMER

16       ON A SINGLE DAY -- THEY'RE CONSIDERED A MONEY

17       SERVICE BUSINESS.

18  Q.   OKAY.  FROM HERE MY QUESTIONS ARE GOING TO

19       PRIMARILY FOCUS ON THE CHECK CASHING.

20  A.   OKAY.

21  Q.   WHAT DOES THE BANK SECRECY ACT REQUIRE OF CHECK

22       CASHERS?

23  A.   IT REQUIRES CHECK CASHERS TO REGISTER AS A MONEY

24       SERVICE BUSINESS WITH THEIR FINANCIAL CRIMES

25       ENFORCEMENT NETWORK.  IT REQUIRES THEM TO

```
 1        MAINTAIN AN ANTI-MONEY LAUNDERING PROGRAM, AND

 2        ALSO CHECK CASHING POLICIES AND PROCEDURES.

 3   Q.   OKAY.  CAN YOU GIVE ME AN EXAMPLE OF A

 4        TRANSACTION THAT'S TO BE RECORDED BY A CHECK

 5        CASHER?

 6   A.   TRANSACTIONS SUCH AS A CURRENCY TRANSACTION

 7        REPORT IF A CUSTOMER CASHES A CHECK OVER

 8        $10,000.00, OR GIVES A CUSTOMER MONEY BACK OVER

 9        $10,000.00 OR TAKES IN OVER $10,000.00, THEY'RE

10        REQUIRED TO FILE A CURRENCY TRANSACTION REPORT.

11   Q.   AND YOU MENTION ANTI-MONEY LAUNDERING PROGRAMS.

12        WHAT ARE THEY?

13   A.   AN ANTI-MONEY LAUNDERING PROGRAM IS DESIGNED TO

14        PREVENT THE MONEY SERVICE BUSINESS FROM BEING

15        USED TO FACILITATE MONEY LAUNDERING.  EVERY MONEY

16        SERVICE BUSINESS IS REQUIRED TO DEVELOP,

17        IMPLEMENT AND MAINTAIN AN ANTI-MONEY LAUNDERING

18        PROGRAM.  AND THAT PROGRAM SHOULD BE -- IS

19        REQUIRED TO BE TAILORED TO THAT BUSINESS.

20   Q.   OKAY.  AND WHAT DO THESE ANTI-MONEY LAUNDERING

21        PROGRAMS INCLUDE, SPECIFICALLY?

22   A.   THEY INCLUDE WHAT WE CALL THE FOUR PILLARS.  THAT

23        PROGRAM SHOULD BE IN WRITING AND IT SHOULD ENTAIL

24        THE BUSINESS' INTERNAL POLICIES AND PROCEDURES,

25        THEIR INTERNAL CONTROLS.  THEY HAVE TO DESIGNATE
```

1    A COMPLIANCE OFFICER.  ALL INDIVIDUALS THAT CASH

2    CHECKS FOR THAT BUSINESS HAS TO -- ARE REQUIRED

3    TO HAVE TRAINING IN WRITING.  AND THEY'RE

4    REQUIRED TO DESIGNATE AN INDEPENDENT REVIEWER AND

5    CONDUCT INDEPENDENT REVIEWS.

6  Q.  AND YOU SAID THE TRAINING FOR INDIVIDUALS.  WHAT

7    KIND OF INDIVIDUALS?

8  A.  INDIVIDUALS THAT CASH CHECKS IN THAT BUSINESS.

9    ALL INDIVIDUALS THAT CASH CHECKS IN THAT BUSINESS

10   IS REQUIRED TO HAVE TRAINING.  AND THOSE RECORDS

11   ARE REQUIRED TO BE MAINTAINED FOR FIVE YEARS.

12 Q.  OKAY.  THANK YOU.  AS PART OF THE BANK SECRECY

13   ACT DO YOU CONDUCT ANY EXAMINATIONS?

14 A.  YES, WE DO.

15 Q.  WHAT ARE THEY CALLED?

16 A.  WE CONDUCT COMPLIANCE EXAMINATIONS.

17 Q.  AND CAN YOU SORT OF DESCRIBE THE COMPLIANCE

18   EXAMINATION FOR THE JURORS?

19 A.  SURE.  A COMPLIANCE EXAMINATION IS WHEN WE GO OUT

20   TO DETERMINE THE ADEQUACY OF THAT BUSINESS' ANTI-

21   MONEY LAUNDERING PROGRAM, CHECK CASHING POLICIES

22   AND PROCEDURES, WE ALSO MAKE SURE THAT THAT

23   BUSINESS IS IN COMPLIANCE WITH THEIR BANK SECRECY

24   ACT REQUIREMENTS WHILE WE'RE OUT THERE.  AND WE

25   ALSO INFORM THE BUSINESS OF THEIR REGISTRATION

1    REQUIREMENTS, THEIR REQUIREMENTS TO MAINTAIN

2    CERTAIN RECORDS AND CERTAIN REPORTS THAT THE BANK

3    SECRECY ACT REQUIRES.

4  Q.  OKAY.  I THINK YOU MIGHT HAVE SAID IT.  BUT ARE

5    THESE EXAMINATIONS CONDUCTED BY PHONE OR IN

6    PERSON?

7  A.  THEY'RE CONDUCTED IN PERSON.

8  Q.  AND WERE YOU CONDUCTING THESE EXAMINATIONS IN THE

9    YEAR 2010?

10 A.  YES, SIR.

11 Q.  HOW MANY SUCH EXAMINATIONS DO YOU SAY YOU

12   CONDUCTED IN 2010?

13 A.  OH, I WOULD SAY APPROXIMATELY 50 OR MORE.

14 Q.  I THINK YOU MENTIONED THAT YOU CONDUCTED A

15   COMPLIANCE EXAMINATION AT LATINO'S; IS THAT

16   CORRECT?

17 A.  THAT'S CORRECT.

18 Q.  IS LATINO'S REQUIRED TO BE EXAMINED UNDER THE

19   BANK SECRECY ACT?

20 A.  YES, THEY ARE.

21 Q.  AND WHY IS THAT?

22 A.  BECAUSE THEY'RE DEEMED A CHECK CASHER. THEY

23   CASHED CHECKS OVER $1,000.00 FOR ONE PERSON IN A

24   PARTICULAR DAY, SINGLE DAY.

25 Q.  AND IS LATINO'S LOCATED IN THE UNITED STATES?

1  A.   YES, THEY ARE.

2  Q.   WHERE?

3  A.   LOCATED ON FLORIDA, IN BATON ROUGE, LOUISIANA.

4  Q.   FLORIDA ---

5  A.   FLORIDA BOULEVARD, I THINK IT IS.

6  Q.   AND WHO IS THE OWNER OF LATINO'S?

7  A.   MR. CARLOS LINARES.

8  Q.   AND HOW DO YOU KNOW THAT?

9  A.   I KNOW IT BECAUSE I EXAMINED HIS BUSINESS AND HE

10      WAS PRESENT AT THE EXAMINATION.

11  Q.   WHEN WAS THIS EXAMINATION?  YOU SAID IN 2010?

12  A.   APPROXIMATELY, IN SEPTEMBER OF 2010.

13  Q.   AND WHAT WAS YOUR FIRST CONTACT WITH THE

14      DEFENDANT?

15  A.   MY FIRST CONTACT WAS IN AUGUST BY PHONE, INITIAL

16      CONTACT.

17  Q.   AND WHEN YOU CALLED AND TALKED TO MR. LINARES,

18      DID YOU IDENTIFY YOURSELF?

19  A.   I DID.  YES.

20  Q.   AND DID YOU TELL MR. LINARES WHO YOU WERE WITH?

21  A.   YES.  I TOLD HIM THAT I WAS WITH THE INTERNAL

22      REVENUE SERVICE, AND I WAS CALLING TO CONDUCT A

23      COMPLIANCE EXAMINATION.  AND I FURTHER EXPLAINED

24      WHAT A COMPLIANCE EXAMINATION WAS AND HIS

25      REQUIREMENTS AS A MONEY SERVICE BUSINESS.

1    Q.    DID YOU TELL HIM THAT YOU NEEDED TO SEE ANYTHING

2          DURING THE COURSE OF THAT EXAMINATION?

3    A.    YES.  I TOLD HIM I WOULD NEED TO SEE HIS ANTI-

4          MONEY LAUNDERING PROGRAM AND HIS CHECK CASHING

5          POLICIES AND PROCEDURES, AND ANY RECORDS THAT HE

6          MAY HAVE REGARDING CHECK CASHING.

7    Q.    WHAT DID HE SAY WHEN YOU TOLD HIM THAT YOU NEEDED

8          TO SEE HIS ANTI-MONEY LAUNDERING PROGRAM?

9    A.    HE TOLD ME HE DID NOT HAVE AN ANTI-MONEY

10         LAUNDERING PROGRAM.

11   Q.    AND WHAT DID HE SAY WHEN YOU TOLD HIM YOU NEEDED

12         TO SEE RECORDS FROM HIS CHECK CASHING BUSINESS?

13   A.    HE TOLD ME HE DID NOT HAVE ANY.

14   Q.    AND WHEN YOU SAY YOU NEEDED TO SEE HIS RECORDS OF

15         HIS CHECK CASHING BUSINESS, WHAT ARE YOU

16         REFERRING TO, SPECIFICALLY?

17   A.    ANY RECORDS THAT HE MAY HAVE OR REGISTRATION

18         DOCUMENTS OR RECORDS THAT HE WOULD HAVE TO DEEM

19         THE TYPE OF CHECKS THAT HE WAS CASHING OR

20         IDENTIFICATION OF HIS CUSTOMERS.

21   Q.    WHEN YOU TALKED TO HIM, WHAT LANGUAGE WERE YOU

22         SPEAKING?

23   A.    ENGLISH.

24   Q.    DID HE EVER INDICATE TO YOU THAT HE DIDN'T

25         UNDERSTAND WHAT YOU WERE SAYING?

1   A.   NO, SIR.  HE DIDN'T.

2   Q.   WAS THERE ANY INDICATION WHETHER HE WAS CONFUSED

3       OR NOT CONFUSED AS TO WHAT YOU WERE EXPLAINING

4       ABOUT THE ANTI-MONEY LAUNDERING PROGRAM?

5   A.   NO, SIR.  NO INDICATION.

6   Q.   NO INDICATION OF WHAT?

7   A.   NO INDICATION THAT HE WAS CONFUSED OR THAT HE DID

8       NOT UNDERSTAND.  HE DIDN'T SHOW THAT.

9   Q.   SO, YOU TALKED TO HIM ON THE PHONE.  AND WHAT

10      HAPPENED NEXT?

11  A.   WHAT HAPPENED NEXT IS THAT WE CAME UP WITH A

12      DATE.  I GAVE HIM A DATE THAT I WOULD BE COMING

13      OUT.  AND TOLD HIM THAT I WOULD NEED TO SEE HIS

14      ANTI-MONEY LAUNDERING PROGRAM, CHECK CASHING

15      POLICIES AND PROCEDURES, ANY RECORDS THAT HE HAD,

16      AND WE SCHEDULED A DATE TO GO OUT AND THEN THE

17      NEXT FOLLOW-UP WAS THAT DATE, ON SEPTEMBER THE

18      15TH, WHEN I WENT OUT AND STARTED THE EXAMINATION.

19  Q.   WAS THAT SEPTEMBER 15TH, 2010?

20  A.   OF 2010.

21  Q.   AND WAS THERE ANY COMMUNICATION BETWEEN YOU AND

22      MR. LINARES BETWEEN THE PHONE CALL AND VISIT?

23  A.   NO, SIR.  THERE WASN'T.

24  Q.   THERE WAS ANY CORRESPONDENCE?

25  A.   YES.  I SENT AN APPOINTMENT LETTER OUT AND I SENT

```
1    A -- VERIFYING TO THE SAME DATE THAT WE HAD

2    DISCUSSED, SEPTEMBER THE 15TH, AND THE TIME.  AND,

3    ALSO, I SENT AN INFORMATION DOCUMENT REQUEST OF

4    RECORDS THAT I WOULD LIKE FOR HIM TO HAVE

5    AVAILABLE AT THE APPOINTMENT.

6  Q.  OKAY.  MS. HARDY, DO YOU HAPPEN TO HAVE ANY

7    DOCUMENTS IN FRONT OF YOU RIGHT NOW?

8  A.  YES, I DO.

9  Q.  CAN YOU LOOK AT THOSE DOCUMENTS, PLEASE?  ARE

10   THEY MARKED AS "EXHIBITS 4A"?

11 A.  YES.  YES, SIR.

12 Q.  "4A, 4B, 4C," AND "4D"?

13 A.  YES, SIR.

14 Q.  DO YOU RECOGNIZE THESE DOCUMENTS?

15 A.  YES, I DO.

16 Q.  AND DID YOU REVIEW THESE DOCUMENTS BEFORE TRIAL?

17 A.  YES, I HAVE.

18 Q.  DO THESE DOCUMENTS RELATE TO YOUR COMPLIANCE

19   EXAMINATION OF LATINO'S?

20 A.  YES, SIR.  THEY DO.

21       MR. CROSSWELL: YOUR HONOR, AT THIS TIME

22         THE GOVERNMENT ASKS TO PLEASE SUBMIT

23      "GOVERNMENT EXHIBITS 4A, 4B, 4C" AND "4D"?

24      THE COURT: ANY OBJECTION?

25      MR. AMBEAU: NO OBJECTION.
```

1          THE COURT: WITHOUT OBJECTION, THE EXHIBITS

2               ARE ADMITTED.  THAT'S "GOVERNMENT

3          EXHIBITS" WHAT NOW?  "4A, B, C" AND "D,"

4          CORRECT?

5          MR. CROSSWELL: THAT'S CORRECT, YOUR HONOR.

6               MS. HARTER, MAY I PLEASE PUBLISH "4A"?

7   MR. CROSSWELL:

8   Q.   MS. HARDY, DO YOU RECOGNIZE THIS DOCUMENT?

9   A.   YES, SIR.  I DO.

10  Q.   WHAT IS THIS?

11  A.   THIS IS OUR APPOINTMENT LETTER THAT I SENT OUT TO

12       MR. LINARES.

13  Q.   AND IS IT OKAY IF I JUST CALL IT THE OPENING

14       LETTER?

15  A.   YES.

16  Q.   AND TO WHOM IS IT ADDRESSED?

17  A.   LATINO'S SUPERMARKET, ATTENTION CARLOS LINARES.

18  Q.   AND WHAT IS THE DATE ON THAT LETTER?

19  A.   IT'S AUGUST THE 12TH, 2010.

20  Q.   AND CAN YOU PLEASE READ THE LAST SENTENCE OF THE

21       SECOND PARAGRAPH?

22  A.   "PLEASE HAVE AVAILABLE THE RECORDS REQUESTED ON

23       THE ENCLOSED FORM 4564, INFORMATION DOCUMENT

24       REQUEST."

25  Q.   WOULD YOU PLEASE DIRECT YOUR ATTENTION TO PAGE

1    TWO OF "GOVERNMENT EXHIBIT 4A."  IS THIS THE FORM

2    THAT IS REFERRED TO IN THE OPENING LETTER?

3  A.  YES, IT IS.

4  Q.  AND WHAT'S THIS FORM CALLED?

5  A.  THIS IS THE INFORMATION DOCUMENT REQUEST.

6  Q.  CAN YOU PLEASE READ THE FIRST SENTENCE IN BOLD,

7    STARTING WITH "PLEASE SEND"?

8  A.  YES.  "PLEASE SEND A COPY OF THE ANTI-MONEY

9    LAUNDERING COMPLIANCE PROGRAM AT LEAST TWO WEEKS

10   BEFORE THE APPOINTMENT DATE, AND A COPY OF THE

11   WRITTEN CHECK CASHING POLICIES AND PROCEDURES IF

12   SUCH POLICIES AND PROCEDURES ARE AVAILABLE."

13 Q.  SO, WHAT DOCUMENTS WERE YOU REQUESTING THAT HE

14   SEND TO YOU?

15 A.  I WAS REQUESTING HIS ANTI-MONEY LAUNDERING

16   PROGRAM, HIS CHECK CASHING POLICIES AND

17   PROCEDURES.

18 Q.  AND CAN YOU PLEASE READ THE NEXT LINE, STARTING

19   WITH "PLEASE HAVE," IN BOLD?

20 A.  "PLEASE HAVE AVAILABLE THE FOLLOWING DOCUMENTS

21   FOR OUR APPOINTMENT."

22 Q.  AND CAN YOU PLEASE DOWN TO LETTER 2G AND READ

23   WHAT IT SAYS THERE?

24 A.  "DOCUMENTS MAINTAINED TO IDENTIFY CHECK CASHING

25   TRANSACTIONS, INCLUDING CUSTOMER IDENTIFICATION

1        INFORMATION."

2   Q.   WHY DO YOU NEED TO SEE THESE DOCUMENTS AS PART OF

3        YOUR BANK SECRECY ACT COMPLIANCE EXAMINATION?

4   A.   THESE DOCUMENTS REQUIRE -- ARE NEEDED TO BE SEEN

5        TO MAKE SURE THAT HE'S IN COMPLIANCE WITH THE

6        ANTI-MONEY LAUNDERING PROGRAM.

7   Q.   OKAY.  SO, I THINK YOU SAID THAT YOU VISITED THE

8        STORE ON SEPTEMBER 15TH, 2010?

9   A.   YES, SIR.

10  Q.   AND I KNOW IT'S BEEN A FEW YEARS.  BUT CAN YOU

11       TELL THE JURY WHAT THE FIRST THING YOU WOULD HAVE

12       DONE WOULD HAVE BEEN?

13  A.   THE FIRST THING IS TO -- WE CONDUCT AN INTERVIEW.

14       I CONDUCTED AN INTERVIEW WITH THE OWNER.  AND

15       THAT HELPS ME TO GET A BETTER UNDERSTANDING OF

16       THE BUSINESS TO FIND OUT HOW THEY RUN THE

17       BUSINESS, THE TYPE OF RECORDS AND OTHER THINGS

18       THAT THEY HAVE.

19  Q.   AND WHAT ARE SOME OF THE THINGS YOU DISCUSSED

20       WITH MR. LINARES?

21  A.   WE DISCUSSED HOW LONG THE BUSINESS HAS BEEN OPEN,

22       WHAT KIND OF RECORDS HE HAS REGARDING HIS CHECK

23       CASHING BUSINESS.

24  Q.   DO YOU RECALL IF HE MENTIONED HAVING ANY CHECK

25       CASHING COMPETITORS IN THE AREA?

1  A.  YES, HE DID.

2  Q.  DO YOU HAPPEN TO REMEMBER THE NAME OF THE

3      COMPETITORS?

4  A.  YES.  JUANITA'S GROCERY AND PATRONA'S GROCERY.

5  Q.  AND THESE ARE CHECK CASHING AS WELL?

6  A.  YES.

7  Q.  AND, AGAIN, DURING YOUR -- I KNOW YOU MENTIONED

8      THE PHONE.  BUT DURING YOUR PERSONAL VISIT DID

9      YOU ASK ABOUT THE ANTI-MONEY LAUNDERING PROGRAM?

10 A.  I DID.  I ASKED DURING THE INTERVIEW, ALSO, IF HE

11     HAD AN ANTI-MONEY LAUNDERING PROGRAM.  HE SAID,

12     NO.

13 Q.  WHEN HE TOLD YOU HE DIDN'T HAVE AN ANTI-MONEY

14     LAUNDERING PROGRAM, DID YOU HAVE ANY FOLLOW-UP

15     WITH THAT?

16 A.  YES.  I TOLD HIM HE WAS REQUIRED TO MAINTAIN AN

17     ANTI-MONEY LAUNDERING PROGRAM.  AND I ASKED HIM

18     WHY DIDN'T HE HAVE ONE.

19 Q.  AND DID YOU PROVIDE HIM WITH ANY WRITTEN

20     EXPLANATIONS?

21 A.  DURING THE INTERVIEW?

22 Q.  RIGHT.

23 A.  YES.  I PROVIDED HIM WITH A COPY OF -- WE HAVE A

24     BROCHURE THAT DESCRIBES THE MONEY SERVICE

25     BUSINESS REQUIREMENT AS A MONEY SERVICE BUSINESS.

1    IT DESCRIBES THE RECORDS THAT THEY NEED TO

2    MAINTAIN, THE REPORTING OF CERTAIN TRANSACTIONS,

3    AND THEIR REQUIREMENTS TO MAINTAIN AN ANTI-MONEY

4    LAUNDERING PROGRAM.

5    Q.  SO, ARE THESE IN WRITING?

6    A.  YES, IT IS.

7    Q.  AND WHY DO YOU PROVIDE THEM TO HIM?

8    A.  TO INFORM THEM OF WHAT IS REQUIRED OF THE

9    BUSINESS.

10   Q.  AND BASED ON YOUR INTERACTION WITH HIM, DID YOU

11   HAVE ANY IMPRESSION AS TO WHETHER OR NOT HE

12   UNDERSTOOD WHAT YOU WERE DISCUSSING WITH HIM?

13   A.  I'M SORRY.  CAN YOU REPEAT THAT?

14   Q.  BASED ON HIS INTERACTION, DID YOU HAVE AN

15   IMPRESSION AS TO WHETHER OR NOT HE UNDERSTOOD

16   WHAT YOU WERE DISCUSSING?

17   A.  YES.  I FELT THAT HE UNDERSTOOD WHAT I SAID.  ALL

18   THE QUESTIONS AND EVERYTHING THAT I -- AND THE

19   INFORMATION THAT I PROVIDED TO HIM.

20   Q.  IF MR. LINARES HAD ANY QUESTIONS, WOULD YOU HAVE

21   ANSWERED THOSE?

22   A.  SURE.  YES, I WOULD HAVE.

23   Q.  AT ANY POINT DID YOU DISCUSS THE NATURE OF HIS

24   BUSINESS WITH HIM?

25   A.  YES, I DID.

1   Q.   AND WAS THERE ANY DISCUSSION ABOUT THE TYPES OF

2        CHECKS HE WAS CASHING?

3   A.   YES.  HE TOLD ME HE CASHED -- HE DID NOT CASH

4        CHECKS OVER $5,000.00 FOR ANY PERSON ON -- IN A

5        DAY.  AND THAT HE OFFERED CHECK CASHING SERVICES

6        AND THAT HIS FEE WAS ABOUT ONE AND A HALF

7        PERCENT.

8   Q.   AND DID YOU SEE A FEE SCHEDULE POSTED ANYWHERE IN

9        THE STORE?

10  A.   NO, SIR.  I DID NOT.

11  Q.   SO, YOU HAD TO TAKE HIS WORD FOR THAT?

12  A.   YES.

13  Q.   AT ANY POINT DID YOU -- DID HE MAKE ANY

14       REPRESENTATIONS AS TO WHAT KIND OF RECORDS HE

15       KEPT IN HIS STORE?

16  A.   HE DID SAY THAT THE ONLY RECORDS THAT HE KEPT WAS

17       THE FIRST CHECK THAT HE CASHED FOR A CUSTOMER AND

18       A COPY OF THAT CUSTOMER'S IDENTIFICATION.

19  Q.   DID YOU ASK TO SEE THESE?

20  A.   I DID.

21  Q.   DID HE PROVIDE THEM TO YOU?

22  A.   NEVER PROVIDED THOSE TO ME.

23  Q.   AND DURING YOUR VISIT, WHAT LANGUAGE WERE YOU

24       SPEAKING?

25  A.   I WAS SPEAKING ENGLISH.

1   Q.   AND WAS HE RESPONDING TO YOU IN ENGLISH?

2   A.   YES, SIR.

3   Q.   MS. HARDY, DO YOU SPEAK SPANISH?

4   A.   NO, SIR.

5   Q.   SO, SUFFICE IT TO SAY, COULD YOU CONDUCT AN

6        EXAMINATION IN SPANISH?

7   A.   NO, SIR.

8   Q.   WHEN WAS THE LAST TIME THAT YOU SAW MR. LINARES

9        ON SEPTEMBER 15TH?

10  A.   THE MORNING -- AFTER THE INTERVIEW I HAD GIVEN

11       HIM AN INFORMATION DOCUMENT REQUEST TO TAKE TO

12       THE BANK TO GET SOME RECORDS.  HE LEFT AND I

13       DIDN'T SEE HIM AT ALL.  HE DIDN'T COME BACK UNTIL

14       THE NEXT DAY.

15  Q.   AND WHAT KIND OF RECORDS FROM THE BANK DID HE

16       BRING BACK?

17  A.   HE DIDN'T BRING BACK ANY.

18  Q.   MS. HARDY, AS A RESULT OF YOUR EXAMINATION, DID

19       YOU MAKE A DETERMINATION AS TO WHETHER OR NOT MR.

20       LINARES' BUSINESS WAS IN COMPLIANCE WITH THE BANK

21       SECRECY ACT?

22  A.   NO, I DID NOT.  YOU SAID, COULD I -- DID I MAKE A

23       DETERMINATION?

24  Q.   YES.

25  A.   YES.  THAT HE WAS NOT IN COMPLIANCE WITH THE BANK

 1         SECRECY ACT.

 2    Q.   AND WHY?

 3    A.   BECAUSE HE DID NOT MAINTAIN AN ANTI-MONEY

 4         LAUNDERING PROGRAM OR CHECK CASHING POLICIES AND

 5         PROCEDURES.

 6    Q.   HOW ABOUT INTERNAL CONTROLS, DID YOU FIND HE HAD

 7         THEM?

 8    A.   HE DID NOT HAVE INTERNAL CONTROLS.  NO.

 9    Q.   HOW ABOUT TESTING FOR PERSONNEL TO ESTABLISH

10         ADEQUACY IN TRAINING?

11    A.   NO.  HE DID NOT HAVE RECORDS.  HE DID NOT HAVE

12         INTERNAL POLICIES AND CONTROLS.  HE DID NOT HAVE

13         TRAINING FOR ANYONE THAT CASHED CHECKS IN HIS

14         BUSINESS.  HE DID NOT DESIGNATE A COMPLIANCE

15         OFFICER.  AND HE DID NOT DESIGNATE AN INDEPENDENT

16         REVIEWER OR CONDUCT INDEPENDENT REVIEWS.

17    Q.   DO THESE POLICIES, CAN THEY BE ORALLY OR DO THEY

18         NEED TO BE IN WRITING?

19    A.   THE POLICY HAS TO BE IN WRITING.

20    Q.   IF THE BUSINESS OWNER NEEDS HELP IN DEVELOPING

21         IT, CAN YOU GIVE HIM ADVICE TO HELP HIM WITH

22         THAT?

23    A.   YES, I CAN.  ALSO, I HAD GIVEN HIM THE BROCHURE

24         THAT I MENTIONED.  IT ALSO DETAILS WHAT'S

25         DESCRIBED IN THE -- SHOULD BE DESCRIBED IN YOUR

1  PROGRAM.

2  Q.  MS. HARDY, CAN YOU DIRECT YOUR ATTENTION TO THE

3  SCREEN IN FRONT OF YOU?  I'M SHOWING YOU WHAT'S

4  BEEN PREVIOUSLY ADMITTED AS "U.S. EXHIBIT 4C."

5  CAN YOU SEE THAT, MS. HARDY?

6  A.  YES, SIR.

7  Q.  DO YOU RECOGNIZE THIS DOCUMENT?

8  A.  YES, I DO.

9  Q.  AND WHAT IS THIS DOCUMENT?

10  A.  THIS IS OUR CLOSING LETTER DESCRIBING THE

11  EXAMINATION, THE FINDINGS.

12  Q.  AND TO WHOM IS IT ADDRESSED?

13  A.  LATINO'S SUPERMARKET.

14  Q.  AND WHEN WAS THIS DONE?

15  A.  SEPTEMBER THE 16TH.

16  Q.  IS THAT THE DAY AFTER YOUR EXAMINATION?

17  A.  YES.

18  Q.  MS. HARDY, WOULD YOU PLEASE READ THE FIRST TWO

19  SENTENCES OF THE SECOND PARAGRAPH, STARTING WITH

20  "ENCLOSED"?

21  A.  "ENCLOSED IS FORM 13726, SUMMARY OF EXAMINATION

22  FINDINGS AND RECOMMENDATIONS REGARDING THE

23  IDENTIFIED WEAKNESSES, DEFICIENCIES OR

24  VIOLATIONS.  IF YOU ACCEPT OUR FINDINGS AND ANY

25  ACCOMPANYING RECOMMENDATIONS AND AGREE TO

1      IMPLEMENT THE APPROPRIATE CORRECTIVE ACTION IN A

2      TIMELY MANNER, PLEASE SIGN THE ENCLOSED FORM

3      13727 ACCEPTANCE STATEMENT.  IN ADDITION, PREPARE

4      A WRITTEN EXAMINATION" ---

5  Q.  STOP RIGHT THERE.

6  A.  OH.

7  Q.  SO, CAN YOU KIND OF DESCRIBE WHAT THAT MEANS

8      THERE?

9  A.  THAT MEANS THAT I WAS ISSUING HIM THE EXAMINATION

10     FINDINGS.  AND IF HE AGREED WITH MY FINDINGS,

11     THAT HE WAS TO SIGN THE ACCEPTANCE STATEMENT AND

12     RETURN IT.

13 Q.  AND CAN YOU READ THE LAST SENTENCE ON THAT PAGE,

14     STARTING WITH "IF YOU DISAGREE"?

15 A.  YES.  "IF YOU DISAGREE WITH OUR FINDINGS OR

16     RECOMMENDATIONS, PLEASE SEND US A WRITTEN

17     EXPLANATION DETAILING YOUR POSITION TO THE ABOVE

18     ADDRESS WITHIN 30 DAYS OF THE DATE OF THIS

19     LETTER."

20 Q.  DID MR. LINARES END UP AGREEING WITH YOUR

21     FINDINGS THAT HE HAD VIOLATED THE BANK SECRECY

22     ACT OR DID HE DISAGREE WITH THE FINDINGS THAT HE

23     VIOLATED?

24 A.  HE AGREED WITH THE FINDINGS.

25 Q.  THAT HE VIOLATED THE ACT?

1  A.   THAT HE -- THAT HE HAD VIOLATED IT.  YES, SIR.

2            MR. CROSSWELL: I'M SHOWING THE WITNESS

3                 PAGE THREE OF "EXHIBIT 4C."

4  MR. CROSSWELL:

5  Q.   MS. HARDY, IF I COULD DIRECT YOUR ATTENTION TO

6       THE MIDDLE OF THE PAGE UNDER -- WHERE IT SAYS,

7       "APPARENTLY HE HAD ANTI-MONEY LAUNDERING PROGRAM

8       VIOLATIONS."  CAN YOU READ THE DATE, PLEASE?

9  A.   THE DATE IS SEPTEMBER THE 16TH, 2010.

10 Q.   CAN YOU READ WHAT'S TO THE RIGHT OF THAT, PLEASE?

11 A.   YES.  "31 CODE OF FEDERAL REGULATIONS 103, 125

12      ANTI-MONEY LAUNDERING PROGRAM REQUIREMENTS FOR

13      THE MONEY SERVICE BUSINESS."

14 Q.   AND WHAT DOES THIS MEAN?

15 A.   THAT MEANS THAT HE WAS IN VIOLATION.  HE DID NOT

16      HAVE THE ANTI-MONEY LAUNDERING PROGRAM.

17            MR. CROSSWELL: I'M NOW SHOWING THE WITNESS

18                 WHAT'S BEEN PREVIOUSLY ADMITTED AS

19                 "UNITED STATES 4D"?

20 MR. CROSSWELL:

21 Q.   MS. HARDY, CAN YOU LOOK AT "EXHIBIT 4D" IN FRONT

22      OF YOU, PLEASE?

23 A.   YES, SIR.

24 Q.   AND WHAT IS THIS?

25 A.   THIS IS THE ACCEPTANCE STATEMENT.

1  Q.  CAN YOU READ THE FIRST SENTENCE, STARTING WITH

2      "I"?

3  A.  "I, CARLOS L. LINARES, HAVE RECEIVED AND REVIEWED

4      FORM 13726, SUMMARY OF EXPLANATION OF FINDINGS

5      AND RECOMMENDATIONS, ADDRESSING SPECIFIC AREAS OF

6      NONCOMPLIANCE WITH THE BANK SECRECY ACT, RECORD

7      KEEPING AND REPORTING REQUIREMENTS.  DATED

8      SEPTEMBER 16TH, 2010."

9  Q.  AND THE NEXT SENTENCE, PLEASE?

10 A.  "I AGREE TO THE FOLLOWING RECOMMENDATIONS AND

11     CORRECT" -- I'M SORRY, I DON'T HAVE MY GLASSES.

12     "THE ANTI-MONEY LAUNDERING PROGRAM REPORTING AND

13     RECORD KEEPING VIOLATIONS."

14 Q.  AND, FINALLY, THE LAST SENTENCE.

15 A.  "I WILL TAKE THE FOLLOWING SPECIFIC CORRECTIVE

16     ACTIONS BY OCTOBER 7TH, 2010."

17 Q.  AND WHAT CORRECTIVE ACTIONS WERE THEY?

18 A.  THE CORRECTIVE ACTIONS WERE SUPPOSED TO BE THAT

19     HE PROVIDE ME WITH A COPY OF HIS ANTI-MONEY

20     LAUNDERING PROGRAM AND CHECK CASHING POLICIES AND

21     PROCEDURES.

22 Q.  AND BY THAT DATE?

23 A.  BY OCTOBER THE 7TH, YES, 2010.

24 Q.  WHAT DOES THIS -- I'M SORRY.  UNDER HIS

25     SIGNATURE, IS THAT DOCUMENT SIGNED?

1  A.  YES.  THAT DOCUMENT IS SIGNED BY MR. CARLOS L.

2      LINARES.  AND IT SHOWS HIS TITLE AS THE OWNER,

3      AND THE DATE THAT HE SIGNED IT.

4  Q.  WHAT DOES THIS SIGNATURE REPRESENT TO YOU AS TO

5      WHETHER OR NOT HE ACCEPTED OR DISPUTED YOUR

6      FINDINGS?

7  A.  IT REPRESENTS THAT HE'S ACCEPTED MY FINDINGS, AND

8      THAT HE AGREES TO THE FINDINGS.

9  Q.  MS. HARDY, WHEN WAS YOUR FINAL VISIT TO LATINO'S?

10 A.  SEPTEMBER 22ND.

11 Q.  AND WHAT WAS THE PURPOSE FOR THAT MEETING?

12 A.  THE PURPOSE WAS TO REVIEW AND -- IMAGES FROM THE

13     BANK AND ALSO TO HAVE A CLOSING CONFERENCE WITH

14     MR. LINARES.

15 Q.  AND WHAT DID YOU DISCUSS WITH HIM DURING THAT

16     MEETING?

17 A.  I DISCUSSED THAT MY FINDINGS AND INFORMED HIM

18     THAT HE WAS REQUIRED TO HAVE AN ANTI-MONEY

19     LAUNDERING PROGRAM, CHECK CASHING POLICIES AND

20     PROCEDURES.

21 Q.  AT ANY POINT FROM YOUR FIRST CONTACT TO THE LAST

22     CONTACT WITH THE DEFENDANT, BASED ON YOUR ACTION,

23     DID YOU EVER HAVE ANY INKLING THAT HE DIDN'T

24     UNDERSTAND YOU?

25 A.  NO.  I NEVER HAD ANY INKLING.

1          BY MR. CROSSWELL: ONE MOMENT, PLEASE.

2   BY MR. CROSSWELL:

3   Q.   MS. HARDY, JUST A FEW MORE QUESTIONS.

4          WHEN YOU CONDUCT THESE BANK SECRECY ACT

5          COMPLIANCE EXAMINATIONS, DO YOU DO SO WITH THE

6          PURPOSE OF FINDING VIOLATIONS?

7   A.   NO, SIR.  WE DO SO WITH THE PURPOSE OF ENSURING

8          THAT THE BUSINESS IS IN COMPLIANCE AND TO INFORM

9          THEM OF THEIR RECORD KEEPING REQUIREMENTS WHEN WE

10         FIND THAT THEY DON'T UNDERSTAND.

11  Q.   ARE YOU PAID ANY EXTRA IF YOU FIND ANY

12         VIOLATIONS?

13  A.   NO, SIR.

14  Q.   ARE YOU GIVEN ANY RAISE IF YOU FIND ANY

15         VIOLATIONS?

16  A.   NO, SIR.

17  Q.   DO YOU FIND BUSINESSES THAT ARE IN COMPLIANCE?

18  A.   YES.  I HAVE FOUND BUSINESSES THAT ARE IN

19         COMPLIANCE.

20  Q.   AND WHEN RECORDS ARE NOT PROVIDED TO YOU, DO YOU

21         JUST SORT OF RELY ON THE PERSON'S WORDS AND WHAT

22         THEY'RE SAYING ABOUT THEIR TRANSACTIONS?

23  A.   YES, SIR.  IF WE DON'T HAVE ANYTHING TO LOOK AT,

24         WE JUST RELY ON THEM.

25  Q.   FROM WHAT YOU'RE TOLD?

1  A.   FROM WHAT WE'RE TOLD.  YES.

2  Q.   HOW MANY DIFFERENT TIMES WOULD YOU SAY YOU TOLD

3       MR. LINARES ABOUT HIS REQUIREMENT IN THE ANTI-

4       MONEY LAUNDERING PROGRAM, FROM YOUR FIRST CONTACT

5       TO YOUR LAST CONTACT?

6  A.   FROM MY FIRST INITIAL CONTACT TO THE LAST

7       CONTACT, I WOULD SAY FIVE TIMES.

8  Q.   DO YOU KNOW IF MR. LINARES OWNS ANY OTHER

9       BUSINESSES?

10 A.   YES, HE DOES. HE OWNED -- AT THE TIME HE TOLD ME

11      HE OWNED A LAGUNA BEACH VOLLEYBALL.  IT'S A MINI-

12      RESTAURANT BUSINESS, MINI-BAR.

13 Q.   AT ANY POINT DURING YOUR VISIT DID HE PROVIDE

14      COPIES OF ANY CHECKS TO YOU?

15 A.   NO, SIR.

16 Q.   AND SO IF HE WAS ACTUALLY IN POSSESSION OF COPIES

17      OF CHECKS HE CASHED, IS THAT SOMETHING YOU WERE

18      AWARE OF?

19 A.   NO.  I WAS NOT AWARE IF HE WAS.

20 Q.   THANK YOU.

21          MR. CROSSWELL: YOUR HONOR, I HAVE NOTHING

22               FURTHER.

23          THE COURT: OKAY.  THANK YOU, MR. CROSSWELL.

24               LADIES AND GENTLEMEN, WE WILL TAKE OUR

25          AFTERNOON BREAK.

1       LET ME REMIND YOU TO PLEASE DO NOT

2  DISCUSS THE CASE AMONG YOURSELVES.  PLEASE

3  DON'T DISCUSS ANY OF THE TESTIMONY YOU'VE

4  HEARD THUS FAR.  AGAIN, I DON'T THINK YOU

5  HAVE ACCESS TO ANY DEVICES ON WHICH YOU MAY

6  ACCESS THE INTERNET OR ANY MEDIA OUTLETS.

7  BUT IF YOU DO, PLEASE DO NOT ACCESS OR USE

8  THOSE DEVICES TO DO SO.  PLEASE DO NOT YET

9  BEGIN TO FORM ANY OPINIONS ABOUT ANYTHING.

10      WE WILL TAKE ABOUT A TEN-MINUTE BREAK.

11  SO, I WOULD ASK YOU TO BE READY TO COME BACK

12  INTO THE COURTROOM IN ABOUT TEN MINUTES AND

13  BE SEATED WHERE YOU ARE SEATED AT THIS

14  TIME.

15      LET'S ALL RISE FOR THE JURY.

16  REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

17      THE JURY WAS EXCUSED FOR A BREAK.)

18  THE COURT: BE SEATED.

19      NOW, MS. HARDY, THANK YOU FOR COMING

20  IN TODAY, MA'AM.  LET ME INSTRUCT YOU NOT TO

21  DISCUSS YOUR TESTIMONY WITH ANYONE OVER THE

22  COURSE OF THE BREAK.  I UNDERSTAND THAT YOU

23  ARE A GOVERNMENT WITNESS.  YOU ARE NOT,

24  HOWEVER, PERMITTED TO DISCUSS YOUR TESTIMONY

25  AT THIS TIME WITH ANY ATTORNEY FOR THE

1      GOVERNMENT, ANY OF YOUR CO-WORKERS AT THE

2      IRS, OR ANYONE ASSOCIATED WITH ANY ON EITHER

3      SIDE IN THIS TRIAL.  IS THAT UNDERSTOOD?

4      IN OTHER WORDS, WHEN YOU RETURN TO THE

5      WITNESS STAND IN ABOUT TEN MINUTES, I WANT

6      YOU TO DO SO WITHOUT HAVING SPOKEN WITH

7      ANYONE ABOUT YOUR TESTIMONY.  DO YOU HAVE ANY

8      QUESTIONS ABOUT THAT?

9      THE WITNESS: NO.

10     THE COURT: OKAY.  THANK YOU, MA'AM.

11          IS THERE ANYTHING WE SHOULD TAKE UP

12     BEFORE WE BREAK?

13     MR. STEVENS: NO, JUDGE.

14     MR. AMBEAU: NOTHING, YOUR HONOR.

15     THE COURT: VERY WELL.  COURT IS IN RECESS.

16     REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

17          COURT IS IN RECESS.)(COURT IS RESUMED.)

18     THE COURT: BE SEATED.  LET'S -- MR. AMBEAU,

19          WOULD YOU PLEASE RETRIEVE YOUR CLIENT?

20     MR. AMBEAU: I SHALL, YOUR HONOR.

21     THE COURT: OKAY.  LET THE RECORD REFLECT

22          THAT THE DEFENDANT IS IN THE COURT AT

23     THIS TIME, WHERE WE WILL RESUME THE TESTIMONY

24     OF MS. HARDY.

25          LET'S ALL RISE FOR THE JURY.

1        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

2            THE JURY RETURNS FROM BREAK.)

3        THE COURT: BE SEATED. LADIES AND GENTLEMEN,

4            AT THIS TIME WE WILL RESUME THE

5        TESTIMONY OF MS. HARDY.

6            MR. AMBEAU, ANY CROSS EXAMINATION OF THE

7        WITNESS?

8        MR. AMBEAU: YES, YOUR HONOR.

9                CROSS EXAMINATION

10   MR. AMBEAU:

11   Q.   GOOD AFTERNOON, MS. HARDY.

12   A.   GOOD AFTERNOON.

13   Q.   I PLACED A COUPLE OF DOCUMENTS TO BEGIN, JUST TO

14        YOUR RIGHT THERE THAT ARE MARKED "DEFENSE 1" AND

15        "2," OR "D1" AND "D2."  WOULD YOU MIND TAKING A

16        LOOK AT THOSE FOR ME, PLEASE?

17            THE DOCUMENT THAT HAS BEEN MARKED "D1" IS A

18        DOCUMENT THAT HAS BATES STAMPS ON THE BOTTOM OF

19        IT, LATINO'S 0008600111.  CAN YOU IDENTIFY THAT

20        DOCUMENT FOR ME, PLEASE, MS. HARDY?

21   A.   YES.  THIS IS MY APPOINTMENT LETTER THAT WAS SENT

22        OUT TO LATINO'S SUPERMARKET.

23   Q.   ACTUALLY, CAN YOU IDENTIFY THAT ENTIRE PACKET OF

24        DOCUMENTS, IN GLOBO, THE ENTIRE "DEFENSE EXHIBIT

25        1"?

1  A.  YES, I CAN.

2  Q.  AND CAN YOU TELL THE JURORS WHAT THAT IS?

3  A.  THE ENTIRE PACKET?

4  Q.  YES, MA'AM.  AND IN ITS ENTIRETY, WHAT IS THAT?

5  A.  IT'S THE APPOINTMENT LETTERS, INFORMATION

6      DOCUMENT REQUEST THAT WAS SENT OUT, DOCUMENTS

7      THAT ARE PERTAINING TO THE CASE FILE.

8  Q.  OKAY.  THERE'S A SECOND DOCUMENT IN YOUR HAND

9      MARKED "D2" AND STAMPED ON THE BOTTOM, LATINO'S

10     00143, ALL THE WAY TO 00234.  DO YOU SEE THAT

11     DOCUMENT?

12 A.  YES.

13 Q.  AND CAN YOU IDENTIFY THOSE DOCUMENTS IN TOTAL?

14 A.  THESE ARE ALSO DOCUMENTS PERTAINING TO THE CASE

15     FILE.

16 Q.  THE TWO EXHIBITS, "DEFENSE EXHIBIT 1" AND "D2,"

17     MARKED "D1" AND "D2," DO THOSE COMPRISE THE

18     ENTIRETY OF YOUR EXAMINATION, BOTH SUPPORTING

19     DOCUMENTS AND COMMUNICATION?  IN FACT, ALL OF

20     YOUR EXAMINATION OF LATINO'S IN 2010?

21 A.  YES, SIR.

22          MR. AMBEAU: YOUR HONOR, THE DEFENSE WOULD

23              OFFER, FILE AND INTRODUCE WHAT'S BEEN

24          MARKED "D1" AND "D2" AND IDENTIFIED BY THE

25          WITNESS AS OUR FIRST EXHIBITS.

1        THE COURT: ANY OBJECTION?

2        MR. CROSSWELL: CAN I HAVE ONE MOMENT,

3            YOUR HONOR?

4        THE COURT: YES.

5        MR. CROSSWELL: YOUR HONOR, WE'D JUST LIKE

6            A COPY OF THE EXHIBIT.

7        THE COURT: MR. AMBEAU?

8        MR. AMBEAU: I HAVE -- THESE ARE EXHIBITS

9            AND DOCUMENTS THAT HAVE BEEN PROVIDED

10       TO ME BY THE GOVERNMENT.  I HAVE A COPY FOR

11       THE WITNESS, AND I HAVE A COPY HERE.  EITHER

12       ONE OF THOSE CAN BE GIVEN TO THE GOVERNMENT

13       BECAUSE I'M GOING TO PLACE THEM ON THE

14       MONITOR.

15       THE COURT: ARE THEY -- DO YOU KNOW IF THEY

16           ARE AMONG THE EXHIBITS THAT THE

17       GOVERNMENT HAS IDENTIFIED FOR USE DURING THIS

18       TRIAL?

19       MR. AMBEAU: THEY ARE -- THE GOVERNMENT'S

20           EXHIBITS THAT THEY JUST INTRODUCED ARE

21       PART AND PARCEL OF THESE EXHIBIT, BUT THESE

22       ARE A LARGER SET OF DOCUMENTS.

23       THE COURT: OKAY.  WHY DON'T YOU GO ON AND

24           PROVIDE MR. CROSSWELL THE OPPORTUNITY TO

25       REVIEW THOSE DOCUMENTS AND TO SATISFY

1            THEMSELVES THAT THE GOVERNMENT -- THE

2            DOCUMENTS ARE, IN FACT, IN THE GOVERNMENT'S

3            POSSESSION.  AND THEN WE'LL MOVE ON AND

4            PUBLISH THEM.

5            MR. AMBEAU: MAY I APPROACH THE WITNESS?

6            THE COURT: YES.

7            THE WITNESS: MAY I MAKE A COMMENT ON ONE

8                OF THESE?

9   MR. AMBEAU:

10  Q.   NOT JUST YET.

11           THE COURT: NOT JUST YET, MA'AM.

12           THE WITNESS: SOME OF THESE ARE NOT FROM

13               MY CASE FILE.

14           THE COURT: MAX?

15           MR. AMBEAU: YOUR HONOR, I PREVIOUSLY

16               STATED THAT "DEFENSE EXHIBIT 2" RAN

17           UNTIL THE BATES NUMBER LATINO'S 0235.  I WAS

18           MISTAKEN.  IT RUNS UNTIL LATINO'S 00228.

19           THE COURT: OKAY.  MR. CROSSWELL, ANY

20               OBJECTION TO THE ADMISSION OF THOSE

21           DOCUMENTS?

22           MR. CROSSWELL: NO, YOUR HONOR.

23           THE COURT: VERY WELL.  "DEFENSE EXHIBITS

24               1" AND "2" ARE ADMITTED AND MAY BE

25           PUBLISHED TO THE JURY.

1  MR. AMBEAU:

2  Q.  LET'S START FIRST WITH WHAT IS THE FIRST PAGE OF

3      "DEFENSE EXHIBIT 1," WHICH IS THE CONTACT LETTER

4      FROM YOU.  IS THAT THE CONTACT LETTER FROM YOU,

5      MS. HARDY?

6  A.  THIS IS THE COPY OF THE APPOINTMENT LETTER.

7  Q.  THE APPOINTMENT LETTER.  OKAY.  AND IN THAT

8      APPOINTMENT LETTER THE FIRST SENTENCE STATES VERY

9      CLEARLY THAT THE BANK SECRECY ACT REQUIRES A

10     FINANCIAL INSTITUTION TO REPORT CURRENCY

11     TRANSACTIONS OF MORE THAN $10,000.00; IS THAT

12     CORRECT?

13 A.  THAT'S CORRECT.

14 Q.  IS THERE A REQUIREMENT THAT A -- THE CHECK

15     CASHING BUSINESS OF MR. LINARES REPORT A CURRENCY

16     TRANSACTION UNDER $10,000.00?

17 A.  NO, SIR.

18 Q.  IN THE NEXT SECTION, OR IN ACTUALLY THE THIRD

19     SENTENCE THERE, THERE IS A SENTENCE THAT SAYS,

20     "HOWEVER, YOU MAY BE LIABLE FOR PENALTIES FOR

21     FAILURE TO COMPLY WITH THE BSA."  CAN YOU TELL ME

22     WHAT THAT MEANS?

23 A.  YES.  THE BUSINESS MAY BE RELIABLE -- LIABLE FOR

24     PENALTIES FOR FAILING TO COMPLY WITH BANK SECRECY

25     ACT REPORTING, MAINTAINING OF RECORDS, SUCH AS AN

1    ANTI-MONEY LAUNDERING PROGRAM, CHECK CASHING

2    POLICIES AND PROCEDURES, WHICH PERTAINS TO THE

3    BANK SECRECY ACT.

4  Q.  THOSE PENALTIES ARE BOTH CIVIL AND ARE CRIMINAL?

5  A.  YES.  THOSE PENALTIES ARE DEEMED FROM THE

6    FINANCIAL CRIMES' ENFORCEMENT NETWORK, THEY WILL

7    REQUIRE PENALTIES.

8  Q.  AND THIS EXAMINATION THAT YOU UNDERTOOK IN

9    SEPTEMBER OF 2010 WAS THE INITIAL EXAMINATION FOR

10    MR. LINARES' BUSINESS, LATINO'S, CORRECT?

11  A.  THAT WAS MY FIRST EXAMINATION FOR HIS BUSINESS.

12  Q.  AND DO YOU HAPPEN TO RECALL THAT HE HAD BEEN IN

13    BUSINESS -- WHEN HE HAD BEEN IN BUSINESS SINCE?

14  A.  2009.

15  Q.  AND, SO, THIS WAS THE -- IS THAT A NORMAL COURSE

16    FOR YOU TO GO AND EXAMINE A NEW BUSINESS WITHIN

17    THE FIRST YEAR OF ITS EXISTENCE?

18  A.  IT'S THE COURSE OF WHENEVER I AM ASSIGNED THE

19    CASE.  I DON'T MAKE THAT DECISION.

20  Q.  IS THERE A NORMAL COURSE OF ACTION WHEN YOU DOIN

21    BUSINESSES?  IN OTHER WORDS, YOU GO WITHIN A

22    CERTAIN AMOUNT OF TIME WHEN THE BUSINESS OPENS?

23  A.  NOT TO MY KNOWLEDGE.

24  Q.  AND THE RANGE OF THIS PARTICULAR EXAMINATION WAS,

25    AS I UNDERSTAND, FROM FEBRUARY OF 2010 TO JULY OF

1       2010; IS THAT CORRECT?

2  A.   FEBRUARY -- YES.  THAT'S CORRECT.

3  Q.   AND IN THAT -- AND WITHIN THAT RANGE, THOSE WERE

4       THE RANGE OF TRANSACTIONS THAT YOU WERE GOING TO

5       REVIEW?

6  A.   THAT RANGE IS THAT SIX-MONTH PERIOD.  AND I DO A

7       SAMPLING OF THAT -- DURING THAT PERIOD, THAT SIX-

8       MONTH PERIOD OF TRANSACTIONS THAT I LOOK AT.

9  Q.   AND THAT SAMPLING OCCURS AS THE BUSINESS OWNER

10      PRESENTS DOCUMENTS TO YOU?

11 A.   IT JUST OCCURS AS I LOOK THROUGH EXAMINATION OF

12      THE RECORDS AND DETERMINE MY SAMPLING PERIOD.

13 Q.   SO, THAT INCLUDES ALL OF THE EXAMINATION THAT YOU

14      UNDERTAKE WITH REGARD TO THE BUSINESS?

15 A.   YES.

16 Q.   AND AS I LOOK AT YOUR -- WHAT IS MARKED "D2"

17      THERE, WHICH IS YOUR -- SEEMINGLY YOUR HOURLY

18      ACTIVITY RECORD.  IT SEEMS TO ME THAT YOU SPENT

19      ABOUT 30 HOURS IN THE BUSINESS OF LATINO'S.

20           THE COURT: I'M SORRY.  I DON'T UNDERSTAND

21                WHAT -- WHAT ARE YOU REFERRING TO NOW,

22           COUNSEL?

23           MR. AMBEAU: I'M REFERRING TO WHAT'S "D2,"

24                LATINO'S 00147.

25           THE COURT: OKAY.  LET'S GO ON AND PLACE

1          THAT ON THE SCREEN, IF WE HAVE IT.

2   MR. AMBEAU:

3   Q.   THIS IS YOUR -- CAN YOU IDENTIFY THIS DOCUMENT

4        FOR ME?

5   A.   YES.

6   Q.   AND WHAT IS THAT?

7   A.   MY ACTIVITY RECORD.

8   Q.   OKAY.  AND IS THIS THE RECORD OF YOUR ACTIVITY AS

9        IT RELATES TO LATINO'S?

10  A.   YES.

11  Q.   OKAY.  AND EACH OF THESE ACTIVITIES GIVES US A

12       DATE, CORRECT?

13  A.   YES.

14  Q.   AND A LOC.  CAN YOU TELL THE JURY WHAT LOC IS?

15  A.   LOCATION.

16  Q.   AND WHAT DOES "T" STAND FOR?

17  A.   WHERE YOU ARE AT THE BUSINESS, THE BUSINESS

18       LOCATION.

19  Q.   THE TAXPAYER?

20  A.   THE TAXPAYER'S BUSINESS.

21  Q.   OKAY.  AND THEN IT TELLS HOW MANY HOURS YOU SPENT

22       AT THAT LOCATION?

23  A.   YES.

24  Q.   AND THEN NEXT TO THIS ENTRY FOR 9/15 IT SAYS, TEN

25       HOURS?

1  A.   YES.  THE TIME ON THE ACTIVITY.

2  Q.   AND THEN THE NEXT ONE, 9/16, ALSO SAYS, TEN

3       HOURS?

4  A.   YES.  THE TEN HOURS OF ACTIVITY FOR WORKING THAT

5       DAY, PLUS LEAVING THE HOUSE AND TRAVELING TO THE

6       BUSINESS.

7  Q.   OKAY.  DID YOU LIVE IN BATON ROUGE?

8  A.   YES.

9  Q.   OKAY.  AND, SO, WHAT WAS YOUR TRAVEL TIME TO THE

10      BUSINESS?

11 A.   AT THIS TIME I CAN'T -- I -- I DO NOT RECALL THE

12      TRAVEL TIME TO THE BUSINESS.  AND DEPENDING ON

13      WHAT DAY IT WAS AND -- I DON'T RECALL THE TRAVEL

14      TIME.

15 Q.   FOR CLARITY'S SAKE, YOU'RE THE PERSON THAT FILLED

16      OUT THESE REPORTS, CORRECT?

17 A.   YES.

18 Q.   YOU FILLED OUT THESE REPORTS ACCURATELY; IS THAT

19      RIGHT?

20 A.   YES, SIR.

21 Q.   AND TO THE BEST OF YOUR MEMORY, AT THE TIME THAT

22      YOU FILLED THESE REPORTS OUT; IS THAT CORRECT?

23 A.   YES.

24 Q.   AND, IN FACT, IN 2010 WHEN YOU DID THIS, THIS IS

25      NOW GOING TO BE GOING ON FIVE AND A HALF YEARS

1      AGO?

2    A.    YES.

3    Q.    SO, DO YOU THINK YOUR MEMORY IS BETTER TODAY, AS

4          WE THINK ABOUT THAT EXAMINATION, OR BETTER AS WE

5          REVIEWED THESE RECORDS?  WHICH ONE IS THE MORE

6          ACCURATE STATEMENT OF WHAT HAPPENED?

7    A.    BOTH.

8    Q.,   HOW DID YOU PREPARE FOR THE TAKING THE STAND

9          TODAY?

10   A.    I REVIEWED MY RECORDS AND REMEMBERING THE

11         EXAMINATION.

12   Q.    AND YOU HAVE A SPECIFIC, PERSONAL RECOLLECTION OF

13         THE EXAMINATION WITH MR. LINARES' BUSINESS FIVE

14         AND A HALF YEARS AGO?

15   A.    I WOULDN'T SAY EVERYTHING, BUT I WOULD SAY A BIG

16         PART OF IT.  YES.

17   Q.    AND HOW MANY EXAMINATIONS HAVE YOU DONE BETWEEN

18         THEN AND NOW?

19   A.    I DON'T KNOW HOW MANY I'VE DONE BETWEEN THEN AND

20         NOW, SIR.

21   Q.    YOU SAID EARLIER YOU ---

22   A.    APPROXIMATELY, DURING A YEAR'S TIME, PROBABLY 50

23         IN A YEAR.

24   Q.    SO, AT FIVE AND A HALF YEARS, YOU'RE 275

25         EXAMINATIONS BETWEEN THE TIME YOU DID THIS

1          EXAMINATION AND TODAY?

2   A.     I GUESS SO.

3   Q.     SO, WE'RE BACK TO THE TIME OF ACTIVITY YOU SPENT

4          IN MR. LINARES' BUSINESS.  DO YOU HAVE A PERSONAL

5          RECOLLECTION OF THE AMOUNT OF TIME SPENT IN MR.

6          LINARES' BUSINESS ON SEPTEMBER 15TH OF 2010?

7   A.     PROBABLY, APPROXIMATELY, TEN HOURS, THE TEN HOURS

8          THAT I STATED.

9   Q.     OKAY.  THEN HOW ABOUT ON SEPTEMBER 16TH OF 2010?

10         IS YOUR RECOLLECTION DIFFERENT THAN THAT THAT'S

11         IN THIS DOCUMENT, TEN HOURS IN MR. LINARES'

12         BUSINESS?

13  A.     NO.

14  Q.     AND, AGAIN, ON 9/22, AT MR. LINARES' BUSINESS FOR

15         TEN HOURS.  IS THAT YOUR RECOLLECTION OF THE

16         AMOUNT OF TIME YOU SPENT WORKING AT HIS BUSINESS?

17  A.     YES.  I WOULD SAY WORKING FOR -- WORKING ON THIS

18         CASE AT THIS TIME, IT WOULD BE TEN HOURS.

19  Q.     SO, MY ORIGINAL QUESTION WAS, IN THOSE THREE DAYS

20         AND DURING THIS EXAMINATION YOU SPENT VERY NEARLY

21         OR APPROXIMATELY 30 HOURS AT THE BUSINESS,

22         LATINO'S?

23  A.     VERY NEARLY CLOSE TO.

24  Q.     OKAY.  AND IN THIS 30 HOURS AT THE BUSINESS, YOU

25         WERE GIVEN AN OPPORTUNITY TO REVIEW A NUMBER OF

1   DOCUMENTS; IS THAT CORRECT?

2   A.   YES.  CORRECT.

3   Q.   AND THOSE DOCUMENTS HAD TO DO WITH THE MONEY

4        LAUNDERING -- EXCUSE ME, MONEY TRANSFERS?

5   A.   YES.

6   Q.   CHECK CASHING?

7   A.   YES, SIR.

8   Q.   AND AT THAT TIME, ALSO MONEY ORDER ISSUING,

9        CORRECT?

10  A.   YES.

11  Q.   AND I'M GOING TO REFER YOU TO WHAT'S BEEN MARKED

12       LATINO'S 00157.

13            THE COURT: AND THAT'S STILL "EXHIBIT D2,"

14                 MR. AMBEAU?

15            MR. AMBEAU: "D2," YOUR HONOR.

16            THE COURT: OKAY.

17            MR. AMBEAU: AND I WILL MAKE SURE TO INCLUDE

18                 THAT IN THE STATEMENTS.

19  MR. AMBEAU:

20  Q.   "D2," LATINO'S, 00157.  IN THE MIDDLE THERE WHERE

21       IT SAYS, "COMPLIANCE EXAMINATION PROCESS," YOU

22       ADVISED THE OWNER, AND YOU CAN READ ALONG WITH ME

23       IF YOU'D LIKE, THAT YOU WOULD REVIEW HIS BOOKS

24       AND RECORDS TO INCLUDE MONEY ORDER AND WIRE

25       TRANSFERS.  THOSE WERE ANY CTRS FILED, BANK

1    STATEMENTS, DEPOSIT SLIPS, REGISTRATION REPORTING

2    AND THE RECORD KEEPING PROCEDURES; IS THAT

3    CORRECT?

4  A.  THAT'S CORRECT.

5  Q.  AND DID YOU -- DID YOU, IN FACT, EXAMINE THESE

6    DOCUMENTS IN THE BUSINESS?

7  A.  I EXAMINED THE BOOKS THAT WERE PROVIDED, THE BANK

8    STATEMENTS.  HE DID NOT HAVE CURRENCY TRANSACTION

9    REPORTS.  I ONLY EXAMINED THE BOOKS THAT HE

10    PROVIDED, WHICH WAS DEPOSIT SLIPS AND BANK

11    STATEMENTS.

12  Q.  YOU DID GET -- NOW YOU'RE SAYING THAT HE PROVIDED

13    BANK STATEMENTS?

14  A.  HE DID NOT PROVIDE ANY CHECK CASHING RECORDS WHAT

15    I WAS ASKED.  HE DID NOT PROVIDE ANTI-MONEY

16    LAUNDERING PROGRAM OR CHECK CASHING RECORDS.

17  Q.  IF I'M NOT MISTAKEN, THE GOVERNMENT ASKED YOU

18    EARLIER WHETHER OR NOT HE PROVIDED YOU BANK

19    STATEMENTS.  AND YOU SAID THAT HE LEFT THAT DAY

20    AND HE DIDN'T RETURN; IS THAT CORRECT?

21  A.  HE LEFT THAT DAY ---

22        THE COURT: WAIT, WAIT, WAIT.  JUST DON'T

23          ANSWER.  IS THAT AN OBJECTION?

24        MR. CROSSWELL: YES, IT IS, YOUR HONOR.

25          HE'S MISSTATING THE QUESTIONS.

1            THE COURT: MR. AMBEAU?

2            MR. AMBEAU: I BELIEVE I'M STATING EXACTLY

3                HOW THE QUESTION WAS ASKED AND THE

4                ANSWER GIVEN BY THE WITNESS EARLIER.

5            THE COURT: OKAY.  I'LL PERMIT THE QUESTION.

6                AND, MR. CROSSWELL, YOU CAN COVER IT ON

7                REDIRECT. LET'S PROCEED.

8    MR. AMBEAU:

9    Q.   AND I MAY BE MISTAKEN.  SO, I BELIEVE I REMEMBER

10        YOU SAYING THAT HE HAD LEFT FOR THE DAY AND DID

11        NOT RETURN; IS THAT CORRECT?

12   A.   YES.

13   Q.   AND THAT HE DID NOT PROVIDE YOU WITH BANK

14        RECORDS?

15   A.   NO.  I DID NOT SAY HE DID NOT PROVIDE ME WITH

16        BANK RECORDS.  HE DID NOT PROVIDE THE IMAGES THAT

17        I REQUESTED ON THE INFORMATION DOCUMENT REQUEST.

18   Q.   AND THOSE IMAGES ARE THE CHECKS CASHED, CORRECT?

19   A.   NO.  THEY WERE -- ACTUALLY, THEY WERE -- I HAD TO

20        HAVE THE BANK RECORDS TO PRODUCE THE INFORMATION

21        DOCUMENT REQUEST.  THE INFORMATION DOCUMENT

22        REQUEST DETAILED DEPOSIT DATES AND THEN THE

23        AMOUNT OF THE DEPOSITS.  AND I REQUESTED IMAGES

24        OF THOSE CHECKS THAT WERE $2,000.00 AND GREATER

25        THAT WERE WITHIN THOSE DEPOSITS.  AND HE DIDN'T

1     RETURN WITH THOSE IMAGES ON THAT DAY.

2  Q.  BUT YOU, IN FACT, REVIEWED THOSE IMAGES?

3  A.  A LATER DAY, ON THE 22ND.

4  Q.  AND THE THIRD TEN-HOUR PERIOD YOU SPENT AT HIS

5     BUSINESS?

6  A.  YES.

7  Q.  YOU REVIEWED EVERY CHECK DEPOSITED INTO HIS

8     WHITNEY BANK ACCOUNT OVER $2,000.00?

9  A.  I REVIEWED THE IMAGES THAT THE BANK PROVIDED.  I

10     DON'T KNOW IF IT WAS EVERY.  I REVIEWED THE

11     IMAGES THAT THE BANK PROVIDED.

12  Q.  ARE YOU ASSERTING THAT THE BANK FAILED TO ANSWER

13     THE REQUEST FOR THE NUMBER OF IMAGES, EVERY CHECK

14     OVER $2,000.00 DEPOSITED IN HIS ACCOUNT DURING

15     THAT SIX-MONTH PERIOD?

16  A.  CAN YOU REPEAT THAT?

17  Q.  SURE.  ARE YOU SAYING THAT THE BANK FAILED TO

18     PROVIDE THOSE RECORDS?

19  A.  NO.  I'M NOT SAYING THAT.

20  Q.  AND, SO, YOU -- DID YOU GET THOSE RECORDS FROM

21     THE BANK?

22  A.  I GOT THEM FROM MR. LINARES THAT HE STATED HE

23     BROUGHT THEM FROM THE BANK.

24  Q.  DID YOU REVIEW THOSE RECORDS?

25  A.  I DID.

1    Q.   AND DID THOSE RECORDS RECONCILE WITH THE BANK

2         STATEMENTS IN TERMS OF THE AMOUNT OF CHECKS, THE

3         TOTAL NUMBER OF CHECKS, TOTAL NUMBER OF CHECK

4         VALUES AND THE AMOUNT OF DEPOSITS IN THE BANK?

5    A.   NO.  THEY WERE NOT RECONCILED, BECAUSE I DID NOT

6         ASK FOR EVERY CHECK.  THAT WOULD HAVE BEEN

7         INCLUDED IN THAT DEPOSIT.  SO, I WOULD NOT KNOW

8         -- NO WAY FOR ME TO RECONCILE THAT HE WAS GIVING

9         ME EVERY CHECK THAT WAS DEPOSITED.  I JUST

10        REQUESTED CHECKS AT $2,000.00 AND GREATER.  SO,

11        THEY WERE NOT RECONCILED WITH THE DEPOSIT.

12   Q.   HOW MANY CHECKS DID YOU REVIEW THAT WERE OVER

13        $2,000.00 -- $2,000.00 OR GREATER; DO YOU RECALL?

14   A.   I DON'T RECALL.

15   Q.   WAS IT TEN OR WAS IT 100?

16   A.   I DON'T RECALL.

17   Q.   AT ALL?

18   A.   NOT -- NO.

19   Q.   WHEN MR. LINARES -- BY YOUR STATEMENT EARLIER,

20        SAID THAT HE DID NOT HAVE RECORDS FOR CHECK

21        CASHING.  WHAT DID YOU UNDERSTAND THAT TO MEAN?

22   A.   HE DID NOT HAVE RECORDS FOR CHECK CASHING, ANY

23        RECORDS FOR CHECKS.

24   Q.   AND, YET, YOU SAID LATER IN YOUR TESTIMONY THAT

25        HE DID, IN FACT, PROVIDE YOU WITH SOME

1    IDENTIFICATIONS FROM THOSE CHECKS THAT WERE

2    CASHED FROM THE FIRST TIME CHECK CASHERS,

3    CORRECT?

4  A.    NO.  HE DID NOT PROVIDE ME WITH THAT.

5  Q.    BUT HE TOLD YOU THAT HE COLLECTED THOSE IDS FROM

6    THOSE FIRST-TIME CHECK CASHERS?

7  A.    HE TOLD ME THAT HE MAINTAINED COPIES OF THE FIRST

8    CHECK THAT A CUSTOMER CASHES AT THE STORE AND

9    THAT CUSTOMER'S IDENTIFICATION.  BUT I WAS NEVER

10    PROVIDED ANY OF THOSE RECORDS.

11  Q.    WERE YOU -- WERE YOU SHOWN AROUND THE STORE TO

12    WHERE MR. LINARES KEPT HIS RECORDS?

13  A.    I TOOK A TOUR AROUND THE BUSINESS.

14  Q.    INCLUDING THE BOXES WHERE HE KEPT ALL OF HIS

15    RECORDS?

16  A.    INCLUDING THE STORE.  I'M NOT AWARE OF ANY BOXES

17    WHERE HE KEPT ANY RECORDS.  AS HE TOLD ME HE

18    DIDN'T HAVE RECORDS.

19  Q.    AND IN THIS RECORDS -- TELLING YOU HE DIDN'T HAVE

20    RECORDS, WAS THERE A TIME AFTER 2010 WHERE YOU

21    FOUND SOME RECORDS THAT HE HAD?

22  A.    I NEVER RECEIVED ANY RECORDS THAT MR. LINARES

23    HAD.  THE ONLY RECORDS I RECEIVED WAS THE RECORD

24    FROM THE BANK.

25  Q.    SO, MR. LINARES TOLD YOU THAT HE DIDN'T RETAIN

1      ANY RECORDS OF HIS CHECK CASHING BUSINESS OTHER

2      THAN HIS BANK STATEMENT, CORRECT?

3  A.  MR. LINARES TOLD ME THAT HE KEPT A COPY -- HE HAD

4      A COPY OF THE CUSTOMER'S FIRST CHECK THAT THEY

5      CASHED AND THE CUSTOMER'S IDENTIFICATION.  BUT I

6      WAS NEVER PROVIDED ANY OF THOSE RECORDS.

7  Q.  MR. LINARES HAS BEEN ALLEGED, ACCUSED, OF FALSELY

8      REPORTING TO YOU THAT HE DIDN'T RETAIN ANY

9      RECORDS OTHER THAN BUSINESS RECORDS.  BUT NOW

10     YOU'RE SAYING THAT'S NOT THE CASE?

11 A.  I'M SAYING THAT HE NEVER PROVIDED ME ANY RECORDS.

12 Q.  I UNDERSTAND HE DIDN'T GIVE THEM TO YOU ANY.  BUT

13     HE'S NOT BEEN ACCUSED OF NOT GIVING THEM TO YOU.

14     HE'S BEEN ACCUSED OF REPRESENTING TO YOU THAT HE

15     DIDN'T HAVE ANY RECORDS.

16        MR. CROSSWELL: OBJECTION, YOUR HONOR.

17 THE WITNESS:

18 A.  HE TOLD ME ---

19        THE COURT: WAIT, WAIT, WAIT, WAIT.

20           JUST A MINUTE.  OBJECTION?

21        MR. CROSSWELL: HE'S ASKING THE WITNESS

22           ABOUT ACCUSATIONS AGAINST THE DEFENDANT.

23        THE COURT: I WILL ALLOW ---

24        MR. AMBEAU: I CAN PHRASE IT DIFFERENTLY,

25           YOUR HONOR.

1          THE COURT: I UNDERSTAND.  I WILL ALLOW

2              THE QUESTION -- I WILL ALLOW COUNSEL TO

3          PROVIDE AT LEAST SOME CONTEXT TO FRAME THE

4          QUESTION.  LET'S PROCEED.

5              YOUR OBJECTION IS OVERRULED.

6  MR. AMBEAU:

7  Q.   THE ALLEGATION AGAINST MR. LINARES IS THAT HE

8       FALSELY REPRESENTED TO YOU THAT HE DID NOT RETAIN

9       ANY RECORDS OF HIS CHECK CASHING BUSINESS OTHER

10      THAN HIS BANK STATEMENTS.

11 A.   MR. LINARES TOLD ME THAT ---

12         THE COURT: WAIT, WAIT, WAIT.  JUST A

13             MINUTE.

14 MR. AMBEAU:

15 Q.   IS THAT THE TRUTH?

16         THE COURT: WAIT, WAIT.  ASK THE QUESTION

17             AGAIN.

18         MR. AMBEAU: I UNDERSTAND.

19         THE COURT: I'M SORRY, MS. HARDY.

20         MR. AMBEAU: MY APOLOGIES.

21         THE COURT: MR. AMBEAU HAS TO ASK YOU THE

22             QUESTION FIRST AND --

23         THE WITNESS: OKAY.

24         THE COURT:  -- THEN YOU WILL ANSWER.

25             OKAY.  YOU CAN THEN ANSWER.  OKAY?

1           VERY WELL.

2                 OKAY, MR. AMBEAU.  LET'S TRY IT ONE MORE

3           TIME.

4  MR. AMBEAU:

5  Q.  DID MR. LINARES REPORT TO YOU THAT HE DID NOT

6       RETAIN ANY RECORDS OTHER THAN -- FOR HIS CHECK

7       CASHING BUSINESS OTHER THAN HIS BANK STATEMENTS?

8  A.  AT THE INITIAL CONTACT, YES, HE DID.

9  Q.  AND AFTER THAT, DURING THE SAME INVESTIGATION, HE

10      TOLD YOU THAT, IN FACT, HE DID RETAIN SOME OF THE

11      RECORDS?

12 A.  DURING THE INTERVIEW, HE SAYS HE HAD COPIES --

13      THEY MADE COPIES OF THE CUSTOMER'S FIRST CHECK

14      THAT THEY CASHED.

15 Q.  DURING THIS SAME ---

16 A.  AND HE NEVER REPORTED -- HE NEVER GAVE ME

17      ANYTHING.

18 Q.  I UNDERSTAND THAT HE DIDN'T GIVE YOU.  I GET IT.

19      BUT DURING THAT SAME INTERVIEW HE DID, IN FACT,

20      TELL YOU THAT HE KEPT OTHER RECORDS; IS THAT

21      CORRECT?

22 A.  THE CUSTOMER'S FIRST COPY OF THE CHECK.

23 Q.  DID HE ALSO STATE TO YOU DURING THAT TIME THAT HE

24      DID NOT CASH CHECKS ABOVE $5,000.00?

25 A.  YES.

1  Q.  IS THERE SOME LEGAL SIGNIFICANCE TO CASHING A

2      CHECK ABOVE $5,000.00?

3  A.  THERE IS NO SIGNIFICANCE OF IT.

4  Q.  SO, THE ACTUAL MONETARY VALUE THAT MAKES THE

5      DIFFERENCE, AS FAR AS YOU'RE CONCERNED, IS

6      $10,000.00, CORRECT?

7  A.  WELL, DURING THE INTERVIEW WE ASK, "WHAT IS YOUR

8      CHECK CASHING LIMIT?"  AND THAT'S WHEN THAT CAME

9      UP, THAT HE DOES NOT CASH CHECKS OVER $5,000.00.

10 Q.  IT'S A PERSONALLY-IMPOSED LIMIT THEN, CORRECT?

11 A.  THAT'S HIS LIMIT.

12 Q.  RIGHT.  IT'S HIS PERSONAL LIMIT.  IT'S WHAT HE

13     FEELS COMFORTABLE CASHING.

14 A.  YES.

15 Q.  AND, SO, HE EXPRESSED TO YOU, "IT'S MY

16     PERSONALLY-IMPOSED LIMIT TO NOT CASH A CHECK OVER

17     $5,000.00"?

18 A.  WELL, HE SAID HE DID NOT CASH CHECKS OVER

19     $5,000.00.

20 Q.  IF HE CASHED A CHECK FOR $5,020.00, WAS THAT

21     SOMEHOW NOW AGAINST THE LAW?

22 A.  NO.

23 Q.  THERE WASN'T ANY VIOLATION OF THE LAW FOR CASHING

24     A CHECK FOR $5,500.00, LET'S SAY?

25 A.  RIGHT.  AND THAT WASN'T HIS VIOLATION THAT HE WAS

1      CITED WITH.

2  Q.   WELL, UNDERSTOOD.  YOU DIDN'T CITE HIM FOR ANY

3       VIOLATION RELATED TO THE AMOUNT, THE DOLLAR

4       AMOUNT OF CHECKS HE CASHED; IS THAT CORRECT?

5  A.   NO.

6  Q.   AND, IN FACT, YOU DIDN'T CITE HIM FOR ANY

7       VIOLATION OF CASHING MULTIPLE CHECKS FOR A SINGLE

8       PARTY ABOVE $5,000.00 ON A SINGLE DAY, EITHER;

9       YOU DIDN'T CITE HIM FOR THAT?

10 A.   NO.

11 Q.   I'M GOING TO SHOW YOU WHAT'S MARKED AS LATINO'S

12      00194.

13          THE COURT: AND, AGAIN, IS THIS PART OF

14              "EXHIBIT D2"?

15          MR. AMBEAU: "D2," YOUR HONOR.  MY APOLOGIES.

16              THIS IS -- THIS IS INSIDE OF "EXHIBIT

17          D2."

18 MR. AMBEAU:

19 Q.   THIS IS A MONEY TRANSMITTING -- TRASMITTER WORK

20      PAPER; IS THAT CORRECT?

21 A.   YES, SIR.

22 Q.   THESE ARE MATTERS RELATED TO THE MONEY WIRE

23      TRANSFERS OF HIS BUSINESS; IS THAT CORRECT?

24 A.   YES, SIR.

25 Q.   AND IN THESE MATTERS, THERE'S NO ALLEGATION THAT

1      MR. LINARES SENT ANY MONEY OVER $10,000.00 AT ANY

2      TIME?

3           MR. CROSSWELL: OBJECTION.  RELEVANCE.

4           THE COURT: COUNSEL?

5           MR. AMBEAU: YOUR HONOR, PART OF THE

6                ASSERTION HERE IS THAT HE DOESN'T HAVE

7           AN EFFECTIVE MONEY LAUNDERING PROGRAM.  AND

8           THAT MONEY LAUNDERING PROGRAM APPLIES ACROSS

9           THE BOARD TO BOTH MONEY TRANSFERS, CASH --

10          CHECK CASHING AND MONEY ORDERS.  THE

11          EXAMINATION ISN'T FOCUSED ON ONLY ONE OF

12          THOSE THINGS BUT ALL THREE OF THOSE THINGS.

13          AND, SO, ---

14          THE COURT: IF IT WAS A PART OF THE WITNESS'

15                EXAMINATION, I WILL ALLOW TESTIMONY ON

16          IT.  SO THE OBJECTION IS OVER-RULED.

17 MR. AMBEAU:

18 Q.   AND THESE ARE -- THESE ARE A NUMBER OF THE --

19      RELATED TO TWO OF THE MONEY TRANSMITTERS THAT MR.

20      LINARES WAS USING AT THAT TIME; IS THAT CORRECT?

21 A.   YES.

22 Q.   CJ AND MONEY MAN?

23 A.   UH HUH.

24 Q.   DO YOU RECALL HOW MANY TOTAL MONEY TRANSMITTERS

25      HE WAS USING AT THAT TIME?

1  A.  I KNOW THERE WAS MULTIPLE, MORE THAN CJ AND --

2      NOT -- I'M NOT TOO SURE OF THE EXACT AMOUNT.

3  Q.  AND YOU DID THAT BANK SECRECY ACT ANALYSIS OF

4      THOSE TRANSACTIONS AS WELL, AND THERE WAS NOTHING

5      THERE?

6  A.  CORRECT.

7  Q.  LET'S MOVE ON TO THE CHECKING -- THE CHECK

8      CASHING ---

9  A.  THE WIRE TRANSACTIONS?

10 Q.  WE'LL GET TO THAT.

11 A.  IS THAT WHAT WE WERE JUST TALKING ABOUT?  THERE

12     WERE SOME.

13 Q.  RIGHT.  AND I KNOW YOU'RE ---

14 A.  THERE ---

15 Q.  I'LL ACTUALLY TALK ABOUT THIS.

16 A.  OKAY.

17 Q.  SO, LET'S TALK ABOUT THE CHECK CASHING RECORDS.

18     AGAIN, MR. LINARES HAD NO WRITTEN CHECK CASHING

19     PROCEDURES IN PLACE AT THIS TIME; IS THAT

20     CORRECT?

21 A.  THAT'S CORRECT.

22 Q.  BUT HE DID, IN FACT, HAVE A CHECK CASHING POLICY

23     OF SOME KIND, RIGHT?

24 A.  NO.

25 Q.  WELL, WE JUST TALKED ABOUT -- I'M GOING TO SHOW

1          YOU WHAT IS --

2                    MR. AMBEAU: "D2," YOUR HONOR.

3     MR. AMBEAU:

4     Q.   -- LATINO'S 00167, THAT HE TOLD YOU THAT HE HAD A

5          CHECK CASHING LIMITATION OF $5,000.00.  THAT'S A

6          CHECK CASHING POLICY; IS IT NOT?

7     A.   HE DID NOT HAVE WRITTEN CHECK CASHING POLICIES

8          AND POLICIES AND PROCEDURES TO WHICH IS REQUIRED.

9          THE ANTI-MONEY LAUNDERING PROGRAM AND CHECK

10         CASHING POLICIES AND PROCEDURES IS REQUIRED TO BE

11         IN WRITING.

12    Q.   SO, I'LL GO BACK TO MY FIRST QUESTION.

13              HE HAD A CHECK CASHING POLICY IN PLACE.  HE

14         JUST DIDN'T HAVE IT WRITTEN DOWN?

15    A.   NO, HE DIDN'T.

16    Q.   HIS LIMIT OF $5,000.00, HIS PERSONALLY-IMPOSED

17         LIMIT OF $5,000.00; IS THAT A CHECK CASHING

18         POLICY?  HAD HE HAD THAT WRITTEN DOWN, WOULD HE

19         HAVE BEEN IN COMPLIANCE?

20    A.   NOT WITH JUST THAT.

21    Q.   IT TAKES A LITTLE MORE THAN JUST WRITING DOWN A

22         LIMIT, PERSONAL LIMIT?

23    A.   THAT'S NOT POLICIES AND PROCEDURES.  THAT'S NOT

24         -- THAT DOESN'T DETAIL YOUR CHECK CASHING

25         POLICIES AND PROCEDURES -- YOUR SERVICES.

1  Q.  IN THIS SAME EXAMINATION, MR. LINARES -- YOU HAVE

2      ACKNOWLEDGED THAT MR. LINARES HAS AT HIS -- HIS

3      PLACE OF BUSINESS AN ANTI-MONEY LAUNDERING

4      PROGRAM PROVIDED TO HIM BY MONEY GRAM; IS THAT

5      CORRECT?

6  A.  YES.

7  Q.  BUT HE FREELY ADMITS TO YOU IN THIS EXAMINATION,

8      I THINK, THAT HE SAYS THAT WE HAVE NOT ADOPTED

9      THIS PROGRAM IN OUR BUSINESS, CORRECT?

10 A.  RIGHT.  THEY HAD NOT ADOPTED THAT PROGRAM.  THEY

11     DID NOT HAVE ONE.

12 Q.  IN FACT, IN ORDER TO SEND OUT WIRES THROUGH EACH

13     OF THESE SERVICES, THE WIRE COMPANIES REQUIRE

14     THOSE PEOPLE TO HAVE THESE WIRE SERVICES IN THEIR

15     BUSINESS TO BE INFORMED OF ANY MONEY LAUNDERING

16     PROTOCOLS AND BE TRAINED RIGHT, BECAUSE THEY ARE

17     ALSO REQUIRED TO BE IN COMPLIANCE WITH THE BSA;

18     IS THAT RIGHT?

19 A.  RIGHT.

20 Q.  AND THEY HAD DONE SO -- MR. LINARES HAD SHARED

21     WITH YOU THAT HE HAD BEEN TRAINED ON THE PHONE,

22     BUT THAT HE HADN'T ADOPTED THAT PROGRAM IN HIS

23     BUSINESS IS THAT CORRECT?

24 A.  THAT'S CORRECT.

25 Q.  AND HIS SON WAS THERE AT THE MEETING AND HE SAID

1          THE SAME THING; IS THAT CORRECT?

2    A.   YES.

3    Q.   IS A PART OF YOUR ANALYSIS OF THE BUSINESS TO DO

4         A RISK ASSESSMENT AS TO THAT BUSINESS AS IT

5         PERTAINS TO MONEY LAUNDERING?

6    A.   YES.

7    Q.   AND DID YOU, IN FACT, UNDERTAKE A RISK ASSESSMENT

8         AS TO CARLOS LINARES' BUSINESS AT LATINO'S?

9    A.   YES.

10   Q.   DO YOU RECALL WHAT THAT RISK ASSESSMENT WAS?

11   A.   WE SAID THAT HE WAS NOT IN COMPLIANCE WITH THE

12        BSA REQUIREMENTS.

13   Q.   AND WE SAW EARLIER THAT SENTENCE ABOUT HIM NOT

14        BEING IN COMPLIANCE IN WHAT IS -- WAS "GOVERNMENT

15        EXHIBIT" -- IN FACT IT WAS "GOVERNMENT EXHIBIT

16        4C," WHICH IS "DEFENSE EXHIBIT 2," LATINO'S

17        00217.  WOULD YOU TURN TO THAT, PLEASE?  I'LL

18        SHOW YOU THAT.

19   A.   UH HUH.

20   Q.   APPARENT ANTI-MONEY LAUNDERING, PROGRAM

21        VIOLATIONS.  THERE'S A SINGLE VIOLATION HERE; WAS

22        THAT CORRECT?

23   A.   UNDER THE APPARENT ANTI-MONEY LAUNDERING

24        VIOLATION, BECAUSE THAT COVERS ALL PILLARS OF THE

25        VIOLATION, OF THE ANTI-MONEY LAUNDERING PROGRAM.

1  Q.   OKAY.  JUST CURIOUSLY, HAS THE LAW CHANGED SINCE

2       2010, THE ANTI-MONEY LAUNDERING PROGRAM LAWS?

3  A.   NONE, TO MY KNOWLEDGE.

4  Q.   IT'S BEEN REORGANIZED, RIGHT?  THERE'S ALL NEW

5       NUMBERS AND NEW ---

6  A.   YES.

7  Q.   AND IN THAT REORGANIZATION, THERE'S BEEN A

8       BREAKOUT OF SOME OF THE MANNER IN WHICH YOU CAN

9       VIOLATE PARTICULAR SECTIONS OF THE CODE; IS THAT

10       RIGHT?  ARE YOU FAMILIAR WITH THAT?

11  A.   I AM.  I'M NOT SURE WHERE YOU'RE GOING WITH IT,

12       BUT IT'S ---

13            MR. AMBEAU: ONE MOMENT, YOUR HONOR.

14              I'M SHOWING THE GOVERNMENT -- WHAT'S

15            BEEN MARKED AS "DEFENSE EXHIBIT 3."  IT WAS

16            TURNED OVER TO ME BY THE GOVERNMENT.

17            MR. STEVENS: YOUR HONOR, MAY WE APPROACH?

18            THE COURT: YES.

19            REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

20              A BENCH CONFERENCE WAS HELD.)

21            MR. STEVENS: JUDGE, I THINK THIS IS WHY

22              YOU WANT THE PARTIES TO SHARE EXHIBITS,

23            WHY WE DID THAT WEEKS AGO.  WE PRODUCED THESE

24            DOCUMENTS.  DISCOVERY WAS, YOU KNOW, TEN

25            MONTHS AGO.  SO, WE HAVEN'T SEEN THESE IN A

1    WHILE.  WE DON'T HAVE COPIES IN FRONT OF US.

2    WE'RE GOING TO BE FOR WEEKS AT THIS RATE.

3    THE COURT: MR. AMBEAU?

4    MR. AMBEAU: IT'S NOT POSSIBLE THAT WE

5    CAN ANTICIPATE EVERYTHING THAT A WITNESS

6    IS GOING TO SAY ON THE STAND.  THE FACT THAT

7    THIS WITNESS HAS TOLD ME THAT THERE IS NO

8    DIFFERENCE IN THE CHARGE OF EACH OF THESE

9    LINES OF CODE IS JUST NOT TRUE.  AND I HAVE

10   THE BSA REGULATIONS IN THIS, PROVIDED TO ME

11   BY THE GOVERNMENT AS A -- AS A CONSEQUENCE OF

12   THE EXAMINATION THAT SHOWS, IN FACT, THAT

13   THERE ARE A NUMBER OF DIFFERENT WAYS TO

14   CHARGE, A NUMBER OF DIFFERENT VIOLATIONS

15   UNDER EACH ONE CODE ARTICLE, AND THERE'S A

16   NUMBER OF DIFFERENT VIOLATIONS.

17   I JUST NEED HER TO ACKNOWLEDGE THAT,

18   THAT THAT IS, IN FACT, THE CASE.  BUT I COULD

19   NOT HAVE POSSIBLY ANTICIPATED THIS.  THIS WAS

20   A DOCUMENT TURNED OVER TO ME BY THE

21   GOVERNMENT.  IT'S IN MY POSSESSION.  I'VE

22   TOLD HER EXACTLY WHERE IT IS.  IT WAS TURNED

23   OVER TO ME ELECTRONICALLY.  SO, I WOULD

24   ASSUME THAT THEY HAVE IT READILY ACCESSIBLE

25   IN AN ELECTRONIC FORM ON ANY OF THEIR ---

1          THE COURT: BUT IT HASN'T BEEN MARKED AS A

2             GOVERNMENT EXHIBIT?

3       MR. AMBEAU: IT HAS NOT BEEN MARKED AS A

4             GOVERNMENT EXHIBIT.

5       THE COURT: OKAY.  HAVE YOU HAD A CHANCE

6             TO REVIEW IT?

7       MR. STEVENS: WE SAW THE FIRST PAGE.  I

8             MEAN, YOU SAW WE DIDN'T WANT TO PULL

9       THINGS UP, SO WE GLANCED AT IT.

10      THE COURT: WELL, I WILL ALLOW IT.  I HAVE

11            MORE TO SAY ABOUT THIS WHEN WE CONCLUDE

12      TODAY'S TESTIMONY.  BUT I WILL ALLOW IT.

13      IT'S A GOVERNMENT EXHIBIT.  IF YOU WANT TO

14      TAKE EVEN MORE TIME TO REVIEW IT, I'LL ALLOW

15      YOU TO DO THAT. I DON'T WANT YOU TO BE

16      SURPRISED BY IT.  WHY DON'T WE TAKE THE TIME

17      RIGHT NOW TO FULLY REVIEW THE DOCUMENT.  EVEN

18      IF YOU NEED THE TIME TO RETRIEVE IT FROM YOUR

19      STACK OF DOCUMENTS, I'LL ALLOW YOU TO DO

20      THAT.  BUT IT CERTAINLY IS FAIR FOR THE

21      DEFENSE TO QUESTION HER ABOUT THAT, GIVEN THE

22      MANNER IN WHICH SHE'S TESTIFIED.

23      MR. CROSSWELL: YOUR HONOR, JUST TO BE CLEAR,

24            THAT'S NOT A GOVERNMENT EXHIBIT.  THAT'S

25      FROM OUR ---

1     MR. AMBEAU: IT'S A GOVERNMENT PRODUCTION.

2     MR. CROSSWELL: RIGHT.  EXACTLY.  AND

3          WE DON'T DOUBT THAT IT'S FROM OUR

4     PRODUCTION.  BUT WE -- LIKE HE SAID, I MEAN,

5     FIRST OF ALL, TO SAY HE DIDN'T ANTICIPATE

6     BECAUSE IT WASN'T MARKED, I THINK THAT'S --

7     MR. AMBEAU: I JUST PUT THE STICKER ON THERE.

8     MR. AMBEAU: BECAUSE I MARKED ON IT.

9     MR. CROSSWELL:  -- WE JUST WANT TO BE ABLE

10         TO REVIEW IT AT THE SAME ---

11    THE COURT: SURE. I UNDERSTAND.

12    MR. CROSSWELL: I MEAN.

13    THE COURT: ALL RIGHT.  SO, DO YOU WANT

14         TO TAKE THE TIME TO TRY TO RETRIEVE IT

15    OR DO YOU WANT TO REVIEW THE DEFENSE VERSION

16    OF IT?

17    MR. CROSSWELL: WE WOULD RATHER JUST KEEP

18         MOVING.

19    THE COURT: ALL RIGHT.  WE'LL KEEP MOVING.

20         AND, AGAIN, WE'LL ADDRESS THIS AT THE

21    CLOSE OF TODAY'S BUSINESS.

22    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

23         THE BENCH CONFERENCE WAS CONCLUDED.)

24    MR. AMBEAU: YOUR HONOR, MAY I APPROACH?

25    THE COURT: YES, YOU MAY.

1  MR. AMBEAU:

2  Q.  I'VE JUST HANDED YOU WHAT'S BEEN MARKED "D3,"

3      "DEFENSE EXHIBIT 3" IN GLOBO.  CAN YOU IDENTIFY

4      THAT DOCUMENT FOR ME?

5  A.  YES.  IT'S AN ANTI-MONEY LAUNDERING PROGRAM

6      VIOLATION.

7  Q.  OKAY.  AND THAT IS A DOCUMENT THAT YOU USE TO --

8      THOSE ARE THE SUGGESTED, IN FACT, APPROVED

9      LANGUAGE TO USE WHEN WRITING OUT THE VIOLATION AS

10     A PART OF THE EXAMINATION THAT YOU UNDERTOOK IN

11     2010; IS THAT CORRECT?

12 A.  YES.

13 Q.  AND I'LL GET YOU TO TURN TO PAGE 25 OF THAT

14     THROUGH THE LANGUAGE FOR BSA VIOLATIONS, WHAT'S

15     MARKED AT THE BOTTOM THERE AS LATINO'S 00394.

16         THE COURT: MR. AMBEAU, WHY DON'T YOU JUST,

17             AS A COURTESY, JUST SHOW THAT TO

18         MR. CROSSWELL.

19 MR. AMBEAU:

20 Q.  NOW, IN THAT, ON THE LEFT SIDE THERE, THERE -- IT

21     SAYS, "TYPE OF VIOLATION"; IS THAT CORRECT?

22 A.  THAT'S CORRECT.

23 Q.  AND THEN IT CITES THE CODE ARTICLE OF THE U.S. --

24     UNITED STATES CODE OF FEDERAL REGULATION NUMBER

25     OF THE VIOLATION; IS THAT CORRECT?

1   A.   THAT'S CORRECT.

2   Q.   AND YOU SEE THAT THE FIRST TWO ARE BOTH 31 CFR

3        1022.210; IS THAT CORRECT?

4   A.   THAT'S CORRECT.

5   Q.   BUT ON THE RIGHT SIDE WHERE IT SAYS, "APPROVED

6        LANGUAGE FOR APPARENT BSA VIOLATION," THERE IS

7        DIFFERENT LANGUAGE APPROVED, RIGHT?  BECAUSE

8        UNDER THAT PARTICULAR REGULATION YOU CAN VIOLATE

9        THIS BANK SECRECY ACT IN A NUMBER OF WAYS; IS

10       THAT CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   AND THIS IS A DOCUMENT YOU USED REGULARLY AS YOU

13       COME UP WITH THE LANGUAGE WITH WHICH TO WRITE THE

14       VIOLATIONS IN YOUR REPORT?

15  A.   WELL, THE LANGUAGE IS ALREADY STATED AND THIS IS

16       THE DOCUMENT THAT I USED TO CITE THE VIOLATION.

17  Q.   AND THAT'S THE APPROVED LANGUAGE, CORRECT?

18  A.   YES.

19           MR. AMBEAU: YOUR HONOR, WE'D LIKE TO OFFER,

20               FILE AND INTRODUCE WHAT'S BEEN MARKED

21           "D3."

22           THE COURT: ANY OBJECTION?

23           MR. CROSSWELL: NO OBJECTION, YOUR HONOR.

24           THE COURT: ADMITTED.  IT MAY BE PUBLISHED.

25           MR. AMBEAU: THANK YOU.

1          THE COURT: YES.  WOULD YOU LIKE TO

2              PUBLISH THAT TO THE JURY AT THIS TIME,

3          MR. AMBEAU?

4          MR. AMBEAU: I THINK I'LL ACTUALLY PUT IT

5              ON THE ELMO.  IF I MAY?

6          THE COURT: YES. ON THE ELMO, IN OTHER

7              WORDS.

8          MR. AMBEAU: YES, YOUR HONOR.  ON THE ELMO.

9   MR. AMBEAU:

10  Q.   AND, SO, WHAT WE'RE LOOKING AT IS ON THE TOP LEFT

11       THERE, 31 CFR 1022.210, WHICH WE'VE JUST

12       DISCUSSED; IS THAT CORRECT?

13  A.   THAT'S CORRECT.

14  Q.   OKAY.  AND THAT IS THE NEW NOMENCLATURE FOR THE

15       BANK SECRECY ACT LAW FOR WHICH YOU CITED MR.

16       LINARES VIOLATION IN 2010 UNDER THE FORMERLY 31

17       CFR 103.125; IS THAT CORRECT?

18  A.   THE NEW ONE.  THIS IS NOT THE ONE THAT WAS IN

19       2010.

20  Q.   YES, CORRECT.  BUT IT -- BUT IT, IN FACT, CITES

21       THE PREVIOUS, THE FORMER?

22  A.   YES.  YES.

23  Q.   AND IN THE RIGHT SIDE OVER HERE, THAT'S THE

24       APPROVED LANGUAGE, RIGHT?

25  A.   YES.

1   Q.   THOSE TWO AT THE TOP, RIGHT?  AND THE FIRST ONE

2        IS RELATED TO "MONEY SERVICE BUSINESSES SHALL

3        DEVELOP AND IMPLEMENT AND MAINTAIN"; IS THAT

4        RIGHT?

5   A.   YES.

6   Q.   AND, IN FACT, IN 2010, THAT IS THE PART OF THAT

7        STATUTE THAT YOU CITED MR. LINARES FOR HAVING

8        VIOLATED; IS THAT RIGHT?

9   A.   YES.

10  Q.   OKAY.  AND I WILL SHOW YOU NOW WHAT IS "D2,"

11       LATINO'S 00218, AND, IN FACT, THE EXPLANATION OF

12       MR. LINARES' VIOLATION IN 2010.  AND, IN FACT,

13       MIRRORS THAT LANGUAGE, "EACH MONEY SERVICES

14       BUSINESS SHALL DEVELOP AND IMPLEMENT AND MAINTAIN

15       AN EFFECTIVE ANTI-MONEY LAUNDERING PROGRAM"; IS

16       THAT CORRECT?

17  A.   YES.

18  Q.   AND YOU USED THAT LANGUAGE, AND THEN YOU FOLLOW

19       IT WITH WHAT I PRESUME IS A -- WHAT IS THAT

20       SECOND PARAGRAPH THERE?

21  A.   THE ONE THAT SAYS, "THE ENTITY HAS NOT DEVELOPED

22       IMPLEMENTED"?  IT'S JUST A BREAKDOWN OF

23       EXPLAINING THE -- EXPLAINING MY FINDINGS.

24  Q.   AND IT'S A LITTLE MORE SPECIFIC EXPLANATION OF

25       WHY YOU FOUND HIM IN VIOLATION OF 31 CFR 103.125;

1          IS THAT RIGHT?

2     A.   YES.

3     Q.   AND THEN AS IT GOES DOWN THERE, THE REPORT OF

4          SUSPICIONS ACTIVITY BY A MONEY SERVICES BUSINESS,

5          THE SECOND VIOLATION.  IS THAT THE SECOND

6          VIOLATION UNDERNEATH?

7     A.   YES.

8     Q.   THESE ARE THE TWO VIOLATIONS THAT YOU CITED MR.

9          LINARES FOR IN 2010; IS THAT CORRECT?

10    A.   YES.

11    Q.   THAT IS THE FOCUS -- ALL OF THE VIOLATIONS THAT

12         YOU CITED HIM FOR IN 2010; IS THAT CORRECT?

13    A.   YES.

14    Q.   OKAY.  AND THE TRANSACTIONS ON THE BOTTOM ARE NOT

15         CHECK CASHING TRANSACTIONS, THOSE ARE MONEY

16         TRANSFER TRANSACTIONS; IS THAT RIGHT?  OR WIRE

17         TRANSFER TRANSACTIONS?

18    A.   YES.

19    Q.   RIGHT?

20    A.   YES.

21    Q.   SO, FOR OUR PURPOSES HERE TODAY, THAT VIOLATION

22         IS IRRELEVANT TO OUR PROCEEDING?  IT'S NOT WHY

23         WE'RE HERE?  RIGHT?

24    A.   (THE WITNESS DID NOT RESPOND.)

25              MR. CROSSWELL: JUDGE, ---

1        MR. AMBEAU: I'LL WITHDRAW.

2   MR. AMBEAU:

3   Q.   AS A PART OF YOUR ASSESSMENT, AND I'M SHOWING YOU

4        WHAT'S "D2," LATINO'S 00167.  THIS IS ---

5        MR. AMBEAU: EXCUSE ME, YOUR HONOR.  MY

6              APOLOGIES, YOUR HONOR.  I CITED THE

7              WRONG ONE.

8   MR. AMBEAU:

9   Q.   LATINO'S 00188.  THIS IS THE SUMMARY OF

10       EXAMINATION UNDER TITLE 31; IS THAT WHAT WE'RE

11       LOOKING AT?

12  A.   YES.

13  Q.   AND THIS IS YOUR -- AGAIN, THE SUMMARY IS A

14       FAIRLY STRAIGHTFORWARD THING, RIGHT?  THIS IS

15       YOUR FINAL IMPRESSION OF THE BUSINESS; IS THAT

16       RIGHT?

17  A.   IT'S A SUMMARY OF THE EXAMINATION.

18  Q.   AND, IN YOUR VIOLATIONS SUMMARY LETTER HERE IN

19       THIS PARAGRAPH, CAN YOU READ ME THE SECOND TO

20       LAST SENTENCE IN THAT PARAGRAPH?

21  A.   "NO ADDITIONAL REFERRALS OR EXAMINATION

22       EXPANSIONS WERE MADE DUE TO THIS BEING A FIRST

23       EXAMINATION AND NO INTENTIONAL VIOLATIONS

24       IDENTIFIED."

25  Q.   AT THAT POINT YOUR IMPRESSION OF LATINO'S

1    SUPERMARKET WAS THAT THERE WAS NO ADDITIONAL

2    REFERRAL MADE.  WHAT DOES THAT MEAN?

3  A.  THAT I DID NOT FIND A MEANS TO REFER TO ANYONE

4    ELSE.

5  Q.  THERE'S NO NEED TO EXAMINE ANY MORE, OTHER THAN

6    THAT A FOLLOW-UP EXAMINATION SHOULD BE SCHEDULED?

7  A.  WELL, I WOULDN'T HAVE EXAMINED ANY MORE.  A

8    FOLLOW-UP EXAMINATION WAS RECOMMENDED TO ENSURE

9    THAT THEY WERE IN COMPLIANCE, BECAUSE THEY WERE

10    NOT IN COMPLIANCE AT MY VISIT.

11 Q.  BUT THERE ARE A NUMBER OF APPARATUS FOR YOU, IN

12    YOUR POSITION, TO REPORT THIS TO, FOR INSTANCE,

13    CRIMINAL INVESTIGATIONS, RIGHT?

14 A.  IF THAT'S DEEMED NECESSARY.

15 Q.  AND YOU, IN FACT, DID NOT DEEM THAT NECESSARY?

16 A.  I DID NOT DEEM IT NECESSARY FOR THAT REASON.  BUT

17    AT THE FOLLOW-UP WAS DEEMED NECESSARY BECAUSE HE

18    WAS NOT IN COMPLIANCE DURING MY VISIT.

19 Q.  I UNDERSTAND THAT.  I UNDERSTAND.  I GET THAT

20    PART.

21        AND GIVEN THAT YOU THOUGHT THAT ANOTHER BSA

22    EXAMINATION SHOULD OCCUR AT SOME TIME DOWN THE

23    ROAD TO MAKE SURE THAT HE'S DONE WHAT HE SAID HE

24    WAS GOING TO DO?

25 A.  RIGHT.

1  Q.  BUT AT THIS POINT, IN SEPTEMBER OF 2010, YOU

2      FOUND NO INTENTIONAL VIOLATION, DID NOT SEE A

3      REASON TO REFER THIS TO ANY CRIMINAL DIVISION OR

4      ANY CRIMINAL INVESTIGATIONS OR ANYTHING LIKE

5      THAT?

6  A.  RIGHT.

7  Q.  AND, IN FACT, YOU DIDN'T EVEN THINK THAT THE

8      EXAMINATION SHOULD BE EXPANDED, BECAUSE YOU ALSO

9      HAD THAT AT YOUR DISPOSAL, CORRECT?

10 A.  RIGHT.  I FOUND ENOUGH DURING MY PERIOD THAT I

11     LOOKED AT TO DETERMINE IF HE WASN'T -- THAT HE

12     WAS IN VIOLATION.  SO, I DIDN'T HAVE TO EXPAND

13     IT.

14 Q.  AND, SO, YOU SAID TO HIM, "IF YOU FIX THESE TWO

15     THINGS, YOU'LL BE IN COMPLIANCE."

16 A.  HE HAD MORE THAN TWO THINGS TO FIX.

17 Q.  DIDN'T YOU -- DIDN'T YOU CITE HIM ---

18 A.  WELL, THE -- THE -- THE TWO THINGS ON THE CHECK

19     CASHING POLICIES AND PROCEDURES, ANTI-MONEY

20     LAUNDERING PROGRAM, AND THEN THE VIOLATIONS FOR

21     THE WIRING.

22 Q.  FOR THE WIRE TRANSFER.

23 A.  YES.

24 Q.  SO, HE HAD -- HE HAD COME IN COMPLIANCE WITH THE

25     ANTI-MONEY LAUNDERING STATUTE, RIGHT?  THAT WAS A

1    VIOLATION?

2  A.  UH HUH.

3  Q.  AND THE WIRE TRANSFERS, THAT WAS A VIOLATION?

4  A.  YES.  AND CHECK CASHING.

5  Q.  FIX THESE TWO THINGS -- WELL, THE CHECK CASHING

6      IS UNDER THE ANTI-MONEY LAUNDERING PROCEDURES,

7      ISN'T IT?

8  A.  RIGHT.

9  Q.  WE CAN AGREE THAT -- LET'S -- WE'LL CALL IT THREE

10     THINGS.  ANTI-MONEY LAUNDERING PROGRAM, CHECK

11     CASHING PROGRAM AND THESE WIRE TRANSFER ISSUES?

12 A.  UH HUH.

13 Q.  YOU FIX THESE THREE THINGS AND EVERYTHING WILL BE

14     FINE.

15 A.  WHAT ARE YOU ASKING?

16 Q.  I'M ASKING IF HE WOULD BE IN COMPLIANCE AT THAT

17     POINT?

18 A.  AT THAT POINT HE WOULD HAVE BEEN IN COMPLIANCE.

19 Q.  AND I'M GOING TO REFER YOU TO "D2," LATINO'S

20     00191.  THIS IS THE CHECK CASHING WORK PAPER.

21     CAN YOU TELL ME WHAT HIS IS?

22 A.  THE CHECK CASHING WORK PAPERS OF MY REVIEW OF HIS

23     CHECK CASHING.

24 Q.  OKAY.  AND IN THIS CHECK CASHING WORK PAPER,

25     UNDER TEST TRANSACTIONS FOR GREATER THAN 10,000,

1      YOU REVIEWED THE HANCOCK BANK ACCOUNT AND

2      DETERMINED THAT THE THREE HIGHEST DEPOSIT MONTHS

3      TO BE APRIL, JUNE AND JULY; IS THAT CORRECT?

4  A.  YES.

5  Q.  YOU STATED HE DIDN'T HAVE RECORDS FOR CHECK

6      CASHING SERVICES, WHICH HE REPRESENTED TO YOU

7      THAT HE DIDN'T.  AND YOU PREPARED SOMETHING TO

8      REQUEST IMAGES OF THOSE CHECKS IN THE AMOUNT OF

9      2,000 OR GREATER; IS THAT RIGHT?

10 A.  YES.

11 Q.  YOU PREPARED SOMETHING TO HAVE HIM GO TO THE BANK

12     TO GET THOSE IMAGES OF THOSE CHECKS OVER

13     $2,000.00, RIGHT?  WE TALKED ABOUT THAT EARLIER.

14 A.  YES.

15 Q.  OKAY.  YOU ALSO LOOKED AT A LIST OF ALL DEPOSITS

16     IN EXCESS OF $10,000.00; IS THAT RIGHT?

17 A.  YES.

18 Q.  AND AFTER EXAMINING ALL OF THIS, YOU FOUND THERE

19     TO BE NO SUSPICIOUS ACTIVITY?

20 A.  AFTER EXAMINING ALL OF THIS I DID NOT FIND WHERE

21     HE HAD A REPORTING TRANSACTION TO FILE A CTR,

22     WHERE HE HAD CASHED CHECKS OVER $10,000.00.

23 Q.  AND WE TALKED ABOUT THAT AS WELL.  HE HAD NO --

24     HE HAD NO NEED TO HAVE FILED ANY PAPERWORK WITH

25     THE GOVERNMENT FROM ANY OF THESE TRANSACTIONS

1          THAT YOU REVIEWED?

2    A.   NOT FROM WHAT I REVIEWED.

3    Q.   IF HE HAD, THAT WOULD HAVE BEEN ANOTHER

4         VIOLATION, RIGHT?  FOR FAILING TO DO SO; IS THAT

5         CORRECT?

6    A.   IF HE HAD FAILED TO DO SO.  YES.

7    Q.   BUT YET -- AND LASTLY, I'M GOING TO TALK TO YOU

8         ABOUT THE NEXT PAGE, WHICH IS 00192.  AND YOUR

9         LAST STATEMENT RELATED TO YOUR 2010 BANK SECRECY

10        ACT EXAMINATION OF CARLOS LINARES' BOOKS.  AND

11        WHAT DOES THAT LAST SENTENCE SAY?

12   A.   AND WHAT PAGE WAS THIS -- WAS THIS PAGE REGARDING

13        THE CHECK CASHING OR WIRE TRANSACTIONS?

14   Q.   IT'S THE SECOND PAGE OF THE CHECK CASHING WORK

15        PAPER THAT WE JUST LOOKED AT.

16   A.   OKAY.

17   Q.   IT'S 00 ---

18   A.   ALL RIGHT.

19   Q.   IT'S THE SECOND PAGE OF THE CHECK CASHING WORK

20        PAPER, WHICH IS "D2," LATINO'S 00191.  THE SECOND

21        PAGE OF THAT IS 00192.  AND THE FINAL SENTENCE.

22        CAN YOU READ THE FINAL SENTENCE TO THE JURY?

23   A.   "EXAMINER DID NOT IDENTIFY ANY ERRORS OF

24        POTENTIAL RISK FOR MONEY LAUNDERING OR TERRORIST

25        ACTIVITY."

1              MR. AMBEAU: ONE MOMENT, YOUR HONOR, IF

2                   I MAY. I HAVE NO FURTHER QUESTIONS OF

3              THIS WITNESS.

4              THE COURT: OKAY.  ANY REDIRECT BY THE

5                   GOVERNMENT?

6              MR. CROSSWELL: YES, YOUR HONOR.  THANK YOU.?

7              THE COURT: PAM?

8              MR. CROSSWELL: THANK YOU.

9              THE COURT: YOU MAY PROCEED, MR. CROSSWELL.

10             MR. CROSSWELL: YES, YOUR HONOR.

11                   REDIRECT EXAMINATION

12   MR. CROSSWELL:

13   Q.   MS. HARDY, I BELIEVE THERE WAS QUESTIONS ABOUT

14        WHAT THINGS MEANT AND WHAT PERHAPS YOUR MEMORY IN

15        2010?

16             MR. CROSSWELL:  I'M SHOWING THE WITNESS PAGE

17                   FOUR OF "EXHIBIT 4C," WHICH HAS BEEN

18             PRECIOUSLY ADMITTED.

19   MR. CROSSWELL:

20   Q.   FIRST OF ALL, MS. HARDY, DO YOU RECOGNIZE WHAT

21        THIS IS?

22   A.   YES, SIR.

23   Q.   OKAY.  CAN YOU PLEASE READ THE SECOND PARAGRAPH?

24   A.   "THE ENTITY HAS NOT DEVELOPED, IMPLEMENTED OR

25        MAINTAINED A WRITTEN ANTI-MONEY LAUNDERING

1   PROGRAM -- COMPLIANCE PROGRAM RELATIVE TO THE

2   CHECK CASHING, MONEY ORDER AND WIRE SERVICES IT

3   OFFERS ITS CUSTOMERS.  THE OWNER SHALL MAIL A

4   COPY OF THE ENTITY'S COMPLETED ANTI-MONEY

5   LAUNDERING COMPLIANCE PROGRAM TO INCLUDE THE

6   ENTITY'S CHECK CASHING POLICIES AND PROCEDURES TO

7   THE EXAMINER NO LATER THAN SEPTEMBER 30TH, 2010."

8   Q.  DID THAT EVER HAPPEN?

9   A.  THAT NEVER HAPPENED.

10          MR. CROSSWELL:  AND I'M GOING TO SHOW THE

11              WITNESS PAGE 188 OF "EXHIBIT D2."

12  MR. CROSSWELL:

13  Q.  CAN YOU READ THE HIGHLIGHTED PORTION THERE?

14  A.  "THERE IS NO ANTI-MONEY LAUNDERING COMPLIANCE

15      PROGRAM.  THERE WAS A LACK OF INTERNAL CONTROLS.

16      THERE IS NO TESTING ON PERSONNEL TO ESTABLISH

17      ADEQUACY OF TRAINING.  THERE WERE NO INDEPENDENT

18      OR COMPLIANCE REVIEWS.  THERE WAS A STRONG CHANCE

19      OF CUSTOMERS USING WIRE -- MULTIPLE SERVICES TO

20      CIRCUMVENT THE REPORTING AND RECORD KEEPING

21      REQUIREMENTS."

22  Q.  THANK YOU.  AND THESE ARE YOUR FINDINGS?

23  A.  THAT'S MY FINDINGS.  YES, SIR.

24  Q.  THERE'S SOME QUESTIONS ABOUT WIRE SERVICES.  SO,

25      DURING YOUR EXAMINATION WERE YOU EXAMINING JUST

1    CHECK CASHING OR WERE YOU EXAMINING SOMETHING
2    ELSE?
3  A.  I WAS EXAMINING THE WIRE TRANSFER SERVICES, AND
4    ALSO THE MONEY ORDER SERVICE.
5  Q.  OKAY.  AND I BELIEVE MONEY GRAM WAS MENTIONED.
6    DOES THAT RELATE TO CHECK CASHING AT ALL?
7  A.  NO.
8  Q.  WHAT DOES IT RELATE TO?
9  A.  IT RELATES TO THE SELLING OF MONEY ORDERS AND THE
10    WIRE TRANSFER SERVICES.
11 Q.  AND ALL MY QUESTIONS ON REDIRECT.  IN YOUR MIND,
12    WAS I ADDRESSING WIRE SERVICES AT ALL?
13 A.  NO, SIR.
14 Q.  AND, SO, DURING THAT EXAMINATION THAT TOOK THREE
15    DAYS, WAS THERE A SIGNIFICANT OR INSIGNIFICANT
16    AMOUNT OF TIME SPENT ON WIRE TRANSFERS?
17 A.  A LOT OF TIME SPENT ON WIRE TRANSFERS.
18 Q.  ANY IMAGES OF CHECKS YOU SAW, DID THEY COME FROM
19    MR. LINARES OR FROM THE BANK?
20 A.  THEY CAME FROM THE BANK.
21 Q.  AND DID HE EVER PROVIDE TO YOU ANY PHOTOCOPIES OF
22    CHECKS THAT HE HAD MADE?
23 A.  NO, SIR.
24 Q.  AND IF HE HAD MADE PHOTOCOPIES OF CHECKS A WEEK
25    OR TWO WEEKS EARLIER THAN THAT, DID HE EVER MAKE

1      YOU AWARE OF THAT?

2  A.  HE DID NOT.  NO.

3  Q.  WHY IS IT A GOOD IDEA FOR A MONEY SERVICE

4      BUSINESS TO MAKE PHOTOCOPIES OF CHECKS?

5  A.  WELL, IT'S A GOOD IDEA SO YOU WILL BE ABLE TO

6      HAVE YOUR -- IT'S YOUR INTERNAL POLICIES AND

7      PROCEDURES FOR INTERNAL CONTROL SO YOU'LL KNOW

8      WHAT'S GOING ON IN YOUR BUSINESS.  WHAT'S

9      HAPPENING IN YOUR BUSINESS. WHAT ARE YOU -- IT'S

10     ALSO GOOD TO KNOW -- TO USE FOR AS AN ANTI-MONEY

11     LAUNDERING PROGRAM, YOU HAVE TO HAVE SOME PROGRAM

12     MONITORING.  SO, YOU NEED TO KNOW WHAT'S GOING ON

13     WITH THE BUSINESS.  YOU HAVE TO HAVE THE

14     INDEPENDENT REVIEWS.  AND THAT REVIEWER SHOULD BE

15     ABLE TO HAVE SOME DOCUMENTS TO REVIEW.

16 Q.  OKAY.  AND I BELIEVE THAT IDENTIFICATION CARDS

17     CAME UP ON CROSS EXAMINATION.  DID YOU ASK TO SEE

18     COPIES OF IDENTIFICATION CARDS?

19 A.  NO, SIR.  I DIDN'T.

20 Q.  AND THE QUESTION OF -- THE QUESTION ABOUT -- I

21     BELIEVE THE TESTIMONY WAS THAT THE DEFENDANT

22     REPRESENTED THAT HE WOULD MAKE COPIES OF CHECKS

23     FOR CHECK CASHING; IS THAT ACCURATE?

24 A.  YES, SIR. I BELIEVE THAT THE -- THAT HE -- THAT

25     HE WOULD MAKE COPIES OF THE FIRST CHECK THAT A

1          CUSTOMER.  I NEVER RECEIVED ANY OF THEM, ANY

2          COPIES OF ANY CHECKS.

3  Q.   SO HE TOLD YOU HE DID THAT?

4  A.   YES.

5  Q.   DID YOU EVER SEE IT?

6  A.   I NEVER SEEN IT.

7  Q.   AND IN TERMS OF THE SELF-IMPOSED POLICY OF NOT

8          CASHING OVER $5,000.00, DID HE SHOW YOU ANY

9          RECORDS OF THAT OR IS THAT SOMETHING THAT HE TOLD

10         TO YOU?

11 A.   THAT'S JUST VERBAL; THAT'S WHAT HE TOLD ME.

12 Q.   OKAY.  SO, IF HE HAD CASHED MORE THAN $5,000.00

13         IN CHECKS FOR THE SINGLE CUSTOMER IN A SINGLE

14         DAY, WERE YOU AWARE OF THAT?

15 A.   NO.

16 Q.   SO, WERE YOU GOING OFF THE DEFENDANT'S WORD?

17 A.   YES.

18 Q.   AND WHEN YOU MAKE YOUR DETERMINATIONS, ARE YOU

19         REQUIRED TO RELY ON THE DEFENDANT'S WORD?

20 A.   IF I DON'T HAVE RECORDS TO REVIEW, BASICALLY,

21         RELYING ON THEIR WORDS.

22              MR. CROSSWELL: YOUR HONOR, ONE MOMENT.

23                    I HAVE NOTHING FURTHER.

24              THE COURT: OKAY.  THANK YOU, MR. CROSSWELL.

25                    MS. HARDY, THANK YOU FOR COMING IN

1          TODAY, MA'AM.  YOU ARE NOW EXCUSED.

2               WELL, LADIES AND GENTLEMEN, WE WERE

3           PREPARED TO GO TO ABOUT 5:30 TODAY.  IT'S

4          ABOUT 5:23, ACCORDING TO MY OFFICIAL COURT

5          CLOCK.  AND, SO, IT MAKES SENSE FOR US TO

6          BREAK AT THIS TIME RATHER THAN LISTEN TO

7          ESSENTIALLY JUST A COUPLE OF MINUTES OF

8          TESTIMONY BEFORE WE BREAK FOR THE EVENING.

9               WE WILL RESUME TRIAL TOMORROW MORNING

10         PROMPTLY AT 8:30.  I WOULD ASK THAT YOU BE IN

11         THE COURTHOUSE NO LATER THAN 8:15 SO WE CAN

12         HAVE YOU UP HERE AND READY TO GO PROMPTLY AT

13         8:30.  IT'S IN ALL OF OUR INTERESTS IF YOU

14         ALL CAN GET HERE ON TIME, NEEDLESS TO SAY.

15         WE'RE ABLE TO STICK TO OUR SCHEDULE.  WE CAN

16         GO ON AND CONCLUDE THIS CASE AS EFFICIENTLY

17         AS POSSIBLE.  SO, AGAIN, I APPRECIATE YOUR

18         WORKING WITH ALL OF US ON THAT POINT.

19               LET ME REMIND YOU, AGAIN, OF THE RULES.

20         YOU WILL -- I ASSURE YOU WILL GET TIRED OF

21         HEARING ME TELL YOU THIS.  BUT PLEASE DON'T

22         DISCUSS THE FACTS THAT YOU LEARNED THUS FAR,

23         THE EVIDENCE YOU'VE LEARNED THUS FAR IN THIS

24         TRIAL WITH ANYONE DURING OUR OVERNIGHT BREAK.

25               YOU ARE FREE, AGAIN, TO TELL YOUR FAMILY

1          MEMBERS, NEIGHBORS, FRIENDS AND COWORKERS

2          THAT YOU'VE BEEN SELECTED TO SERVE ON A JURY

3          IN FEDERAL COURT.  YOU CAN ALSO TELL THEM

4          THAT IT'S A CRIMINAL TRIAL. BUT YOU CANNOT

5          TELL THEM ANYTHING BEYOND THAT.

6              PLEASE DON'T CONDUCT ANY OUTSIDE

7          RESEARCH WHEN YOU GET HOME BY USING THE

8          INTERNET OR ANY OTHER SOURCE.

9              PLEASE DO NOT BEGIN TO FORM ANY OPINIONS

10         YET ON ANY OF THE ISSUES IN THIS CASE.

11             AGAIN, I DON'T THINK THERE IS ANY MEDIA,

12         NEWS MEDIA COVERING THE CASE.  TO THE EXTENT

13         THERE MAY BE THAT I'M NOT AWARE OF, PLEASE

14         DON'T WATCH, LISTEN TO OR READ ANY NEWS

15         ACCOUNTS OF THIS CASE.

16             AGAIN, WE WILL BEGIN PROMPTLY AT 8:30

17         TOMORROW.  SO, I WOULD APPRECIATE YOUR

18         COOPERATION BY BEING HERE NO LATER THAN 8:15

19         IN THE MORNING.

20             I HOPE YOU ALL HAVE A GOOD NIGHT.  THANK

21         YOU FOR YOUR ATTENTION AND YOUR PATIENCE WITH

22         US TODAY.

23             LET'S ALL RISE FOR THE JURY.

24         REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

25             THE JURY WAS EXCUSED FOR THE NIGHT.)

1     THE COURT: BE SEATED.  OKAY.  IS THERE

2        ANYTHING WE SHOULD TAKE UP BEFORE WE

3     ADJOURN FOR THE DAY?

4     MR. STEVENS: NO, JUDGE.

5     THE COURT: LET ME JUST ---

6     MR. STEVENS: I'M SORRY.  MR. CROSSWELL

7        MAY HAVE SOMETHING.

8     MR. CROSSWELL: YOUR HONOR, I JUST WANT TO

9        GO BACK TO THE EXHIBITS.

10    THE COURT: YES.  I WANT TO ADDRESS THAT,

11       AS WELL.

12       MR. AMBEAU, AGAIN, ALL WE CAN DO, AS YOU

13    KNOW, I CAN'T FORCE YOU TO SUBMIT A WITNESS

14    LIST OR AN EXHIBIT LIST, FOR THAT MATTER.  I

15    WILL ASK OVER NIGHT THAT YOU MAKE ANOTHER

16    GOOD FAITH DETERMINATION OF WHAT DOCUMENTS

17    THAT THE GOVERNMENT HAS PROVIDED YOU THAT YOU

18    THINK YOU MIGHT REASONABLY RELY ON IN CROSS

19    EXAMINATION.  AND JUST SAVE US A LOT MORE

20    TIME.  OTHERWISE, I'M GOING TO HAVE TO SHUT

21    EVERYTHING DOWN AND GIVE THE GOVERNMENT AN

22    OPPORTUNITY TO RETRIEVE THE DOCUMENT FROM ITS

23    COLLECTION OF DOCUMENTS, TO REVIEW THE

24    DOCUMENT, TO BECOME REFAMILIAR WITH THE

25    DOCUMENTS BEFORE WE MOVE ON.

1        SO, I'M SIMPLY ASKING YOU IN AN EFFORT

2    TO STREAMLINE THINGS AND TO CONDUCT A MORE

3    EFFICIENT TRIAL THAT TO THE EXTENT YOU KNOW

4    WHICH WITNESSES WILL TESTIFY.  AND I'M NOT

5    SURE IF THE GOVERNMENT HAS INFORMED YOU OF

6    WHICH WITNESSES THEY WILL CALL TO TESTIFY

7    TOMORROW.

8        AND, MR. CROSSWELL, MR. STEVENS, I'M

9    URGING YOU ALL TO CONSIDER AT LEAST INFORMING

10    MR. AMBEAU OF WHICH WITNESSES YOU WILL NEXT

11    CALL, THE NEXT THREE OR FOUR WITNESSES, SO

12    THAT HE CAN DETERMINE IF THERE ARE SOME

13    DOCUMENTS THAT HE MIGHT USE IN CROSS

14    EXAMINATION.

15        AND, MR. AMBEAU, I WOULD ASK THAT YOU

16    CONSIDER INFORMING THE GOVERNMENT OF THOSE

17    EXHIBITS.  OKAY?

18    MR. AMBEAU: I WILL.  THANK YOU, YOUR HONOR.

19    THE COURT: ALL RIGHT.

20    MR. CROSSWELL: THERE MAY BE JUST A PHOTOCOPY

21        OF THE EXHIBIT.  EVEN IF WE DON'T KNOW

22    AHEAD OF TIME, IF WE CAN JUST GET OUR OWN

23    COPY.  BECAUSE, AGAIN, IT'S -- IT MAY BE

24    SOMETHING WE PRODUCED, BUT WE PRODUCED

25    PROBABLY 10,000 PAGES.

1          THE COURT: I DON'T THINK THAT'S AN
2               UNREASONABLE REQUEST, MR. AMBEAU.
3     IF YOU COULD SIMPLY HAVE A COPY AVAILABLE,
4     NOT JUST FOR THE WITNESS BUT FOR THE
5     GOVERNMENT SO THAT THEY CAN FOLLOW ALONG AS
6     WELL.
7     MR. AMBEAU: I'LL DO SO, YOUR HONOR.
8     THE COURT: OKAY?  SO, ONE DOWN AND 23 MORE TO
9               GO?
10    MR. STEVENS: WE'RE GOING TO CUT THAT BACK,
11              JUDGE.  WE'VE GOT PLACES TO BE.
12    THE COURT: WELL, I DON'T WANT TO DEPRIVE
13              MR. CROSSWELL THE OPPORTUNITY TO ENJOY
14    THE MARDI GRAS FESTIVITIES COMING UP.  BUT
15    THIS -- AT THIS RATE I GUESS WE'LL BE I THIS
16    COURTHOUSE THROUGHOUT WEEKEND AND ON INTO
17    MARDI GRAS.  LET'S HOPE NOT.  BUT I WOULD
18    APPRECIATE YOU RE-EVALUATING THINGS.
19              AGAIN, I WANT TO BE CLEAR.  I DON'T WANT
20    TO DEPRIVE YOU OR THE DEFENSE THE OPPORTUNITY
21    TO PUT ON YOUR CASE.  BUT I'M SIMPLY POINTING
22    OUT THAT, HOPEFULLY, WE WON'T HAVE ANY ISSUES
23    WITH RESPECT TO TIME.
24              LET ME THANK ALL OF YOU SO FAR.  I THINK
25    EVERYONE IS DOING A GREAT JOB.  CLEARLY,

1          EVERYONE IS TRYING TO MAKE THIS AS EFFICIENT

2          AS POSSIBLE.  AND I APPRECIATE THAT VERY

3          MUCH.

4               LADIES, MS. BROADBECK, MS. MORALES,

5          THANK YOU ALL SO MUCH.  I KNOW THESE ARE NOT

6          EASY.  THANK YOU SO MUCH FOR YOUR SERVICES

7          TODAY.  AND I WILL SEE YOU ALL TOMORROW.

8               IF THERE'S NOTHING FURTHER, YOU ALL HAVE

9          A GOOD NIGHT.  WE'LL READJOURN TOMORROW AT

10         8:30. COURT IS ADJOURNED.

11         REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

12         COURT IS IN RECESS FOR THE DAY.)

13

14              C E R T I F I C A T E

15

16      I CERTIFY THAT THE FOREGOING IS A CORRECT

17   TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN

18   THE ABOVE-ENTITLED NUMBERED MATTER.

19

20         _____S/CLARE SMITH-NEELY_____

21

22         CLARE SMITH-NEELY, CCR

23         CERTIFIED COURT REPORTER

24

25