# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | : |
| | :  **CRIMINAL ACTION NO.** |
| **UNITED STATES OF AMERICA** | : |
| | :  **3:15-CR-00071 -BAJ-EWD-1** |
| **VERSUS** | : |
| | :  **HON.  CHIEF BRIAN A.  JACKSON** |
| **CARLOS L. LINARES** | : |
| | :  **JANUARY 28, 2016** |
| | : |

## TRANSCRIPT OF JURY TRIAL

## VOLUME FOUR

===============================================================

### A P P E A R A N C E S:

**FOR THE PLAINTIFF, UNITED STATES OF AMERICA:**

    ALAN STEVENS, ESQ.
    RYAN CROSSWELL, ESQ.

**FOR THE DEFENDANT, CARLOS L. LINARES:**

    JARRETT  P.  AMBEAU, ESQ.

      **REPORTED BY:**    **CLARE SMITH-NEELY, CCR**

**UNITED STATES COURTHOUSE**
**777 FLORIDA STREET**
**BATON ROUGE, LOUISIANA 70801**
**(225) 751-8111**

```
**************************************************************************
                              I N D E X
**************************************************************************
```

| WITNESS: | ATTORNEY: | EXAMINATION: | PAGE: |
| --- | --- | --- | --- |
| MONIQUE SCHMIT | MR. AMBEAU | CROSS | 04 |
| MONIQUE SCHMIT | MR. STEVENS | REDIRECT | 64 |
| | | | |
| ALLYSON HOFFINE | MR. STEVENS | DIRECT | 93 |
| ALLYSON HOFFINE | MR. AMBEAU | CROSS | 100 |
| ALLYSON HOFFINE | MR. STEVENS | REDIRECT | 104 |

UNITED STATES       RESTS ................................................. 105

| CARLOS LINARES | MR. AMBEAU | DIRECT | 132 |
| CARLOS LINARES | MR. STEVENS | CROSS | 161 |
| CARLOS LINARES | MR. AMBEAU | REDIRECT | 198 |

CHARGE CONFERENCE ............................................. 210

DEFENSE       RESTS................................................. 250

CLOSING       MR. STEVENS ........................................ 252
CLOSING       MR. AMBEAU ........................................ 291
CLOSING (REBUTTAL)  MR. STEVENS .............................................. 321

1    THE COURT: GOOD MORNING, EVERYONE.

2        BE SEATED.

3        WELL, ANYTHING WE SHOULD DISCUSS BEFORE

4    WE HAVE THE JURY ESCORTED BACK TO THE

5    COURTROOM?

6    MR. STEVENS: NOT THAT I KNOW OF, JUDGE.

7    MR. AMBEAU: YOUR HONOR, THE DEFENSE

8        FILED TWO -- MY APOLOGY, TWO TRIAL

9    DATES. THIS MORNING IT WAS ---

10   THE COURT: THAT'S ALL RIGHT.

11   MR. AMBEAU: THE FIRST ONE.

12   THE COURT: AND I DID GET THAT.  I HAVEN'T

13       YET, OF COURSE, HAD A CHANCE TO REVIEW

14   YOUR OPPOSITIONS.

15   MR. AMBEAU: I JUST WANTED TO LET YOU KNOW.

16   THE COURT: YES.  BUT I MOST CERTAINLY

17       WILL TAKE A LOOK AT THEM AT THE FIRST

18   OPPORTUNITY.

19   MR. AMBEAU: THANK YOU.

20   THE COURT: OKAY.  THERE BEING NO FURTHER

21       BUSINESS  -- AGENT SCHMIT, GOOD MORNING

22   TO YOU.  LET'S ALL RISE FOR THE JURY.

23   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

24       THE JURY RETURNS TO THE COURTROOM.)

25   THE COURT: BE SEATED.  WELL, GOOD MORNING,

1       LADIES AND GENTLEMEN, AND WELCOME BACK
2       TO FEDERAL COURT.  I HOPE YOU ALL HAD A
3       RESTFUL EVENING.
4       BEFORE WE ADJOURNED YESTERDAY I GAVE YOU
5       THE INSTRUCTIONS, NOT TO DISCUSS THE CASE
6       WITH ANYONE, NOT TO WATCH, LISTEN TO OR READ
7       ANY POSSIBLE NEWS MEDIA ACCOUNTS OF THIS
8       TRIAL, NOT TO CONDUCT ANY OUTSIDE RESEARCH OF
9       ANY PARTIES, PLACES OR THINGS YOU HAVE
10      LEARNED ABOUT THUS FAR THROUGH THE TESTIMONY.
11      AND NOT TO BEGIN TO FORM AN OPINION ABOUT THE
12      GUILT OF THE DEFENDANT AT THIS POINT OR THE
13      NOT GUILT, FOR THAT MATTER.
14      IF ANYONE HERE WAS UNABLE TO ABIDE BY
15      THOSE INSTRUCTIONS, PLEASE RAISE YOUR HAND.
16      AND LET THE RECORD REFLECT THAT NO HANDS ARE
17      BEING RAISED.  THANK YOU AGAIN FOR TAKING
18      SERIOUSLY THOSE INSTRUCTIONS.
19      AT THIS TIME WE WILL RESUME THE CROSS
20      EXAMINATION OF SPECIAL AGENT SCHMIT.
21      MR. AMBEAU?
22      MR. AMBEAU: THANK YOU, YOUR HONOR.
23      RESUME CROSS EXAMINATION
24  MR. AMBEAU:
25  Q.   GOOD MORNING, AGENT SCHMIT.

1   A.   GOOD MORNING.

2   Q.   LET'S BEGIN BY BEING CLEAR WHERE WE LEFT OFF

3        YESTERDAY, THAT -- A COUPLE OF THINGS.

4             THE CONNECTION BETWEEN MR. LINARES AND THIS

5        FRAUD THAT OCCURRED IN NEW YORK, THIS FRAUD WHERE

6        15 PEOPLE WERE ARRESTED, WAS THE FACT THAT THOSE

7        CHECKS WERE CASHED AT HIS BUSINESS ONLY, CORRECT?

8   A.   NO, THAT'S NOT CORRECT.  WE COVERED THE SEARCH

9        WARRANT AFFIDAVIT PARAGRAPH THAT YOU HAD ME READ.

10  Q.   WHICH IS WAS AN INFORMATION ABOUT SOMEONE CASHING

11       CHECKS AT HIS BUSINESS, CORRECT?

12  A.   CORRECT.  BRINGING CHECKS TO HIS BUSINESS TO BE

13       CASHED.

14  Q.   OKAY.  SO, HIS CONNECTION TO THIS FRAUD IN NEW

15       YORK IS THE FACT THAT THE PEOPLE CAME TO HIS

16       BUSINESS TO CASH THESE CHECKS, CORRECT?

17  A.   THAT'S NOT MY UNDERSTANDING OF THE PARAGRAPH IN

18       THE SEARCH WARRANT AFFIDAVIT.  THAT INDIVIDUAL

19       BROUGHT MULTIPLE CHECKS, TO MY UNDERSTANDING.

20  Q.   FOR A FEW PEOPLE BROUGHT MULTIPLE CHECKS TO CASH

21       AT HIS BUSINESS.  IN FACT, WE'VE LOOKED AT THAT.

22       THAT, IN FACT, A NUMBER OF PEOPLE HAVE ONE OR TWO

23       CHECKS.  IN FACT, I THINK ONE PERSON HAD THREE

24       CHECKS TO COME CASH AT HIS BUSINESS; IS THAT

25       CORRECT?

1   A.   NO.  MAYBE I'M NOT BEING CLEAR.  MY UNDERSTANDING

2        OF THE PARAGRAPH IN THE AFFIDAVIT THAT I PREPARED

3        ---

4   Q.   SO THAT -- I'M GOING TO STOP YOU BEFORE YOU TELL

5        ME YOUR UNDERSTANDING OF THE PARAGRAPH.  BECAUSE

6        -- AND I'M GOING TO ASK YOU A COUPLE OF QUESTIONS

7        ABOUT IT.  YOU DIDN'T INTERVIEW THE PERSON IN

8        THAT PARAGRAPH; IS THAT CORRECT?

9   A.   THAT'S CORRECT.  I DID NOT ---

10  Q.   YOU DIDN'T TALK TO ANY OF THE PARTIES THAT ARE

11       MENTIONED IN THAT PARAGRAPH; IS THAT CORRECT?

12  A.   NO.  I SPOKE WITH A FAMILY MEMBER THAT IS

13       MENTIONED IN THAT PARAGRAPH.

14  Q.   AND, OF THAT -- SO, THE FAMILY MEMBER WASN'T

15       INVOLVED IN CASHING A CHECK AT CARLOS LINARES'

16       BUSINESS, THE PERSON YOU SPOKE TO?

17  A.   NOT TO MY KNOWLEDGE.

18  Q.   IS THAT A NO OR A YES?

19  A.   THE -- THE FAMILY MEMBER I SPOKE TO TALKED ABOUT

20       THE CONVERSATIONS THEY OVERHEARD.

21  Q.   THEY WERE NOT INVOLVED IN ANY OF THIS FRAUD IN

22       NEW YORK?

23  A.   I DIDN'T MAKE THAT STATEMENT.

24  Q.   THE FAMILY MEMBER YOU SPOKE TO WAS NOT INVOLVED

25       IN THE FRAUD IN NEW YORK, CORRECT?

1   A.   THEY WERE A FAMILY MEMBER OF THE SUBJECT FROM NEW

2        YORK.

3             THE COURT: WELL, WAIT.  THAT'S NOT THE

4             -- REPEAT THE QUESTION.

5   MR. AMBEAU:

6   Q.   THE FAMILY MEMBER THAT YOU SPOKE TO WAS NOT

7        INVOLVED IN THE FRAUD IN NEW YORK?

8   A.   I -- I DO NOT -- THEY WERE A FAMILY MEMBER OF ONE

9        OF THE SUBJECTS FROM NEW YORK.

10  Q.   SO, WERE THEY INVOLVED IN THE FRAUD IN NEW YORK

11       OR WERE THEY JUST A FAMILY MEMBER OF ONE OF THE

12       SUBJECTS INVOLVED?

13  A.   WHEN THE SUBJECT FROM NEW YORK WOULD TRAVEL HERE,

14       HE WOULD STAY WITH THAT PERSON.

15  Q.   SO, BECAUSE SOMEONE INVOLVED IN A CRIME STAYED AT

16       THIS PERSON'S HOUSE, YOU THINK THEY WERE POSSIBLY

17       INVOLVED?

18  A.   SHE HAD KNOWLEDGE OF WHY HE WAS TRAVELING HERE.

19  Q.   TO CASH A CHECK?

20  A.   TO CASH SIRF CHECKS.

21  Q.   AND YOU SPOKE TO THIS PERSON, AND THIS PERSON

22       DIDN'T GO CASH ANY CHECKS AT CARLOS LINARES'

23       BUSINESS, RIGHT?

24  A.   THE FAMILY MEMBER I'M REFERRING TO, NO, DID NOT.

25  Q.   DID YOU --

1   A.   TO MY KNOWLEDGE.

2   Q.   -- SPEAK TO THAT PERSON THAT TRAVELED HERE?

3   A.   NO, I DIDN'T SPEAK TO HIM.

4   Q.   DID YOU SPEAK TO ANYONE ELSE CONTAINED IN THAT

5        PARAGRAPH YESTERDAY?

6   A.   NO.

7   Q.   SO, AND WHEN YOU FILED THAT AFFIDAVIT, YOU PUT

8        THE WHOLE OF YOUR INFORMATION IN THAT PARAGRAPH

9        WHEN YOU'RE ASKING THE COURT FOR A SEARCH

10       WARRANT, RIGHT?

11  A.   YES.  THAT WAS INCLUDED.

12  Q.   AND THAT INFORMATION SIMPLY CONTAINS THAT THIS

13       PERSON WENT TO THE CARLOS LINARES' BUSINESS TO

14       CASH CHECKS?

15  A.   BROUGHT CHECKS TO CARLOS LINARES TO BE CASHED.

16  Q.   OKAY.  SO, THE INFORMATION THAT YOU HAVE OF ANY

17       CONNECTION BETWEEN CARLOS LINARES AND ANY OF THIS

18       CRIME THAT WENT ON IN NEW YORK IS THE FACT THAT

19       PEOPLE WENT TO HIS BUSINESS TO CASH THESE CHECKS?

20  A.   LET ME MAKE A DISTINCTION BETWEEN AN ---

21  Q.   ACTUALLY, JUST ANSWER THE QUESTION I'VE ASKED

22       YOU.

23  A.   I -- I CAN'T.  YOU'RE CONFUSING THE SEMANTICS.

24            THE COURT: WHY DON'T YOU REPHRASE THE

25                QUESTION.

1  MR. AMBEAU:

2  Q.   YOU HAVE INFORMATION, AND WE HAVE SEEN THAT A

3       NUMBER OF PEOPLE WENT TO CARLOS LINARES' BUSINESS

4       TO CASH FRAUDULENT TAX CHECKS, CORRECT?

5  A.   YES.

6  Q.   THAT INCLUDED SOMEONE FROM NEW YORK THAT YOU HAD

7       SOME INFORMATION ON?

8  A.   YES.

9  Q.   THAT PERSON'S INTERACTION WITH CARLOS LINARES WAS

10      CASHING CHECKS AT HIS BUSINESS.

11           THE COURT: IS THAT CORRECT?  IS THAT A

12                QUESTION?

13           MR. AMBEAU: THAT IS A QUESTION.

14  MR. AMBEAU:

15  Q.   IS THAT CORRECT?

16  A.   BRINGING CHECKS TO BE CASHED.  BRINGING ---

17  Q.   I'M GOING TO MOVE ON, BECAUSE I JUST THINK THAT

18       WE'RE OBVIOUSLY NOT COMMUNICATING.

19           SO, IT'S ALSO THE CASE THAT THERE WAS SOMEONE

20       WHO HAS PLED TO BEING -- TO HAVE PARTICIPATED IN

21       THIS CRIME IN A VERY REAL WAY HERE IN BATON

22       ROUGE, CORRECT?

23  A.   TO CASHING SIRF CHECKS FROM DIFFERENT SCHEMES.

24       YES.

25  Q.   KNOWINGLY PARTICIPATING IN THE FRAUD, CORRECT?

1        MR. STEVENS: OBJECTION, YOUR HONOR.  JUST

2            TO MAKE IT CLEAR, THAT'S A DIFFERENT

3        FRAUD.  NOT THIS FRAUD.  I THINK THAT'S -- WE

4        ESTABLISHED THAT YESTERDAY AT THE BENCH.

5        THE COURT: YOU WANT TO REPHRASE THE QUESTION?

6            OR, DO YOU UNDERSTAND THE QUESTION,

7        MA'AM?

8    MR. AMBEAU:

9    Q.   THAT THIS PERSON PLED TO BEING INVOLVED IN THIS

10        SIRF SCHEME, RIGHT, THIS FRAUD?

11   A.   CASHING SIRF CHECKS, BUT THERE'S TWO DISTINCT

12        LEGS OF THE SCHEME.

13   Q.   THERE'S TWO DISTINCT LEGS OF THE SCHEME.

14        YESTERDAY THERE WAS ONE TAX FRAUD WITH TWO

15        PARTICIPANTS.  YOUR WORDS, CORRECT?  I THINK IT'S

16        A YES OR NO STATEMENT.  YES OR NO?

17   A.   NO.

18   Q.   YESTERDAY WHEN I ASKED YOU ABOUT THIS TAX FRAUD

19        IN NEW YORK, AND I SAID, "WHAT WAS THE

20        CONNECTION?"  YOU SAID, "WELL, THERE WAS TWO

21        PEOPLE HERE IN BATON ROUGE THAT WERE INVOLVED IN

22        THAT TAX FRAUD."  HAS THAT CHANGED OVERNIGHT?

23   A.   NO.  IT HAS NOT.

24   Q.   SO THERE WAS ANOTHER PERSON IN BATON ROUGE THAT

25        WAS INVOLVED IN THIS TAX FRAUD SCHEME IN NEW YORK

1     TO DEFRAUD THE UNITED STATES TREASURY OF MONEY.

2  A.  THE SCHEME IS VERY BROAD AND INVOLVES MULTIPLE

3     PEOPLE.  THERE'S DIFFERENT PEOPLE THAT PRODUCE

4     SIRF CHECKS.  THERE ARE DIFFERENT SOURCES.

5  Q.  SURE.  SO, YOU SAY THAT.  THERE WERE LIKE 15

6     PEOPLE THAT WERE ARRESTED AS A PART OF THIS

7     FRAUD, CORRECT?

8  A.  OF THE NEW YORK INVESTIGATION.

9  Q.  RIGHT.  SO THERE WERE EVEN MORE THAN THAT ACROSS

10    THE COUNTRY.

11 A.  YES.

12 Q.  RIGHT.

13 A.  IT'S A NATIONWIDE PROBLEM.

14 Q.  BUT, IN FACT, THIS IS A NATIONWIDE, SINGLE ARREST

15    WITH SINGLE SET OF TRANSACTIONS, CORRECT?  I

16    MEAN, THIS IS A FRAUD.  I UNDERSTAND THERE ARE A

17    LOT OF SIRF FRAUDS.  BUT THIS IS THE ONE

18    INVESTIGATION.  THIS IS ONE INVESTIGATION BY YOU,

19    RIGHT?

20 A.  NO.  A & R ELITE WAS ONE INVESTIGATION.  LATINO'S

21    SUPERMARKET, MR. LINARES, WAS A SEPARATE

22    INVESTIGATION.

23 Q.  I UNDERSTAND THAT THOSE ARE SEPARATE BECAUSE THE

24    TARGET OF THAT INVESTIGATION IS SEPARATE.  BUT

25    THOSE RESULT FROM THE SAME TAX FRAUD, THE SAME

```
 1        SCHEME, THE SAME TAX FRAUD, THE SAME --
 2   A.   NO.
 3   Q.   -- HUMAN BEINGS IN NEW YORK PARTICIPATING IN THAT
 4        TAX FRAUD?
 5   A.   NO.  THE INFORMATION FROM NEW YORK WAS THAT THE
 6        CHECKS HAD BEEN CASHED AT THESE TWO LOCATIONS.
 7        ONCE I GOT INTO THE INVESTIGATIONS, AS I STATED,
 8        THEY TRADE THE CHECKS.  WE DETERMINED THE SOURCE
 9        OF THE CHECKS FOR A & R WAS FROM PHILADELPHIA,
10        WAS FROM DIFFERENT SOURCES INDIVIDUALS SUPPLYING
11        THE CHECKS TO HER.
12   Q.   OKAY.  SO, AS YOU SAID EARLIER, THERE WAS A
13        PERSON IN NEW YORK THAT HAD CHECKS CASHED AT
14        LINARES AND AT THE A & R ELITE, CORRECT?
15   A.   BASED ON THE SOCIAL SECURITY NUMBERS ASSOCIATED
16        WITH THAT INDIVIDUAL.  AND THE RETURN, WHEN A NEW
17        YORK AGENT DID THE WARRANT, THE RETURNS CAME
18        BACK.  THEY ORDERED THE CHECKS.  THERE WERE
19        CHECKS CASHED AT A & R, THREE, AND TWO AT
20        LATINO'S.
21   Q.   FROM A SINGLE PERSON IN NEW YORK?
22             MR. BROADBECK: YOUR HONOR, THE INTERPRETERS
23                  NEED A VERY SHORT BREAK BETWEEN QUESTION
24             ANSWER.
25             MR. AMBEAU: UNDERSTOOD.
```

1           THE COURT: VERY WELL.

2           MR. AMBEAU: UNDERSTOOD.

3           THE COURT: OKAY.  EVERYBODY UNDERSTAND

4               THAT?  THANK YOU, MS. BROADBECK.

5               LET'S PROCEED.

6   MR. AMBEAU:

7   Q.   FROM A SINGLE PERSON IN NEW YORK, CORRECT?

8   A.   THAT PERSON CONTROLLED THE SOCIAL SECURITY

9        NUMBERS AND GOT THE CHECKS.  I DO NOT KNOW THAT

10       THAT'S THE INDIVIDUAL THAT CASHED THE CHECKS

11       HERE.  AS I STATED, THEY TRADE CHECKS.

12  Q.   AND, SO, YESTERDAY WHEN WE SPOKE OF THIS, THERE

13       WAS A FRAUD THAT HAD OCCURRED IN NEW YORK AND THE

14       INFORMATION THAT YOU GOT FROM UP THERE WAS THAT

15       THERE WAS SOMEONE WHO HAD CASHED CHECKS AT A & R

16       ELITE AND AT LATINO'S?

17  A.   NO.  NO.  THE CHECKS WERE CASHED FROM THAT FRAUD

18       HERE.  NOT THAT THAT ONE PERSON CASHED THE CHECKS

19       HERE.

20  Q.   THE CHECKS WERE CASHED FROM THAT FRAUD IN BATON

21       ROUGE AT THOSE TWO PLACES?

22  A.   CORRECT.

23  Q.   FROM THAT FRAUD IN NEW YORK?

24  A.   THAT'S WHERE THE CHECK WAS GENERATED.  ASSOCIATED

25       WITH THE SOCIAL SECURITY NUMBERS WITH THAT

1      SUBJECT IN NEW YORK.

2   Q.  SO, NOW THAT THE PERSON AT A & R ELITE, THE WOMAN

3      THAT OWNED A & R ELITE OR RAN A & R ELITE HAS

4      PLED AND BEEN A VERY COOPERATIVE WITNESS, BY YOUR

5      OWN ADMISSION, CORRECT?

6   A.  YES.

7   Q.  SHE'S GIVEN YOU NO INFORMATION THAT CARLOS

8      LINARES WAS INVOLVED IN THIS FRAUD, CORRECT?

9   A.  NOT TO MY KNOWLEDGE.

10  Q.  DID YOU EVEN -- DID YOU ASK HER IF SHE KNEW

11      CARLOS LINARES?

12  A.  YES.

13  Q.  AND WHAT DID SHE SAY TO YOU?

14  A.  THAT SHE KNEW OF HIM BECAUSE HE OPENED A BUSINESS

15      DOWN THE STREET.

16  Q.  BUT THAT HE WAS NOT INVOLVED IN THIS FRAUD TO

17      CASH CHECKS?

18  A.  SHE DIDN'T PROVIDE INFORMATION RELATING THAT TO

19      ME.

20  Q.  SHE DIDN'T TELL YOU ANY INFORMATION THAT HE WAS

21      INVOLVED, CORRECT?

22  A.  SHE STATED HE OWNED THE STORE DOWN THE STREET.

23      SHE KNEW OF HIM.

24  Q.  DESPITE THE FACT THAT SHE WAS A COMPLETELY

25      COOPERATIVE WITNESS GIVING YOU LOTS OF

1     INFORMATION ABOUT THE FRAUD, CORRECT?

2  A.  THE SOURCES OF HER CHECKS, WERE A TOTALLY

3     DIFFERENT SOURCE FROM PHILADELPHIA.  I DON'T KNOW

4     HOW TO MAKE IT ANY CLEARER.  SHE PROVIDED US ALL

5     THE INFORMATION SHE COULD ABOUT HER SOURCE OF THE

6     CHECKS.

7  Q.  ALL RIGHT.  AND THE SOURCE IN NEW YORK WHO HAD

8     CASHED CHECKS IN HER BUSINESS?

9  A.  NO.  SHE DIDN'T KNOW THE NEW YORK PERSON.

10 Q.  JUST MAGICALLY GOT CHECKS CASHED AT HER BUSINESS.

11 A.  I TOLD YOU, THEY TRADE CHECKS.

12 Q.  SO, AND LASTLY, YOU HAVE NO EVIDENCE THAT CARLOS

13     LINARES PROFITED FINANCIALLY FROM ANY OF THE

14     FRAUDULENT CHECKS PRESENTED TO HIM AT HIS STORE,

15     CORRECT?

16 A.  OTHER THAN HE WOULD HAVE RECEIVED THE CHECK

17     CASHING FEE, BECAUSE HE OPERATES THE BUSINESS.  I

18     DO NOT KNOW THE AMOUNT OF THE FEE.  HE COULD HAVE

19     GOTTEN ONE AND A HALF.  HE COULD HAVE GOTTEN 20

20     LIKE SHE DID.  I DO NOT KNOW THAT.  ALL I KNOW IS

21     THE NUMBER OF CHECKS THAT WERE CASHED IN HIS

22     BUSINESS.

23 Q.  AND YOU UNDERTOOK NO FORENSIC EXAMINATION OF HIS

24     ACCOUNTS, NO FORENSIC EXAMINATION OF HIS BANK

25     ACCOUNTS TO DETERMINE WHETHER OR NOT HE HAD TAKEN

1    MORE THAN ONE AND A HALF PERCENT, CORRECT?

2         MR. STEVENS: OBJECTION, YOUR HONOR.  ASKED

3              AND ANSWERED TWICE YESTERDAY, ALREADY.

4         THE COURT: WELL, I'LL ALLOW IT ONE MORE

5              TIME.  DO YOU REMEMBER THE QUESTION,

6         MA'AM?

7         THE WITNESS: YES.

8  THE WITNESS:

9  A.   NO.  I DID NOT DO A COMPLETE FORENSIC ANALYSIS OF

10      HIS RECORDS.  I WAS UNABLE TO.

11  MR. AMBEAU:

12  Q.   LET'S MOVE ON AND TALK ABOUT WHAT THE GOVERNMENT

13      WAS TALKING ABOUT YESTERDAY WITH REGARD TO THE

14      THREE ADDRESSES.  SO, GOVERNMENT -- THE

15      GOVERNMENT WAS TALKING YESTERDAY ABOUT AN ADDRESS

16      ON SEDGWICH AVENUE IN NEW YORK.  DO YOU RECALL

17      THAT CONVERSATION?

18  A.   YES.  WHERE I WAS COUNTING.

19  Q.   YES.  YOU ALL WERE COUNTING THE NUMBERS OF CHECKS

20      THAT HAD BEEN CASHED AT SEDGWICH AVENUE, CORRECT?

21  A.   YES.

22  Q.   AND I'M GOING TO ---

23         MR. AMBEAU: YOUR HONOR, I'M PUTTING ON THE

24              CAMERA HERE WHAT'S BEEN PREVIOUSLY

25              ADMITTED AS "UNITED STATES EXHIBIT 16A."

1    MR. AMBEAU:

2    Q.   AND THESE ARE THE CHECKS THAT WERE CASHED FROM

3         SEDGWICH AVENUE; IS THAT CORRECT?

4    A.   YES.

5    Q.   THESE CHECKS WERE CASHED AT MR. LINARES' BUSINESS

6         AND DEPOSITED ON THOSE DATES ON THE LEFT SIDE; IS

7         THAT RIGHT?

8    A.   YES.

9    Q.   AND THE GOVERNMENT MADE QUITE A BIT OF THE DATE

10        OF ISSUE OF THE CHECK, THAT A LOT OF THESE CHECKS

11        WERE ISSUED ON THE SAME DATE; IS THAT RIGHT?

12   A.   YES.

13   Q.   WERE THOSE CHECKS ISSUED TO MR. LINARES?

14   A.   THE DATE OF THE CHECKS IS THE DATE PRINTED ON THE

15        TREASURY CHECK.

16   Q.   OKAY.  SO, DID MR. LINARES FILE THOSE FRAUDULENT

17        TAX RETURNS TO OBTAIN THOSE CHECKS?

18   A.   NOT TO MY KNOWLEDGE.

19   Q.   AND, SO, THE DATE OF THE ISSUANCE OF THE CHECK,

20        THE ONLY SIGNIFICANT THAT HAS IS THAT IT'S

21        SOMEWHERE ON THE CHECK?

22   A.   NO.  I BELIEVE THE POINT WAS THAT A LOT OF THE

23        DATES COINCIDED.

24   Q.   BUT THE DATES WERE THE SAME; THE CHECKS WERE

25        ISSUED ON THE SAME DAY?

1  A.  CORRECT.

2  Q.  AND THAT'S PRINTED ON THE FRONT OF THE CHECK?

3  A.  YES.

4  Q.  WE HAD TALKED ABOUT THAT EARLIER, RIGHT, ABOUT

5      THE DATES THAT ISSUED THOSE 2010 CHECKS, RIGHT?

6  A.  YES.

7  Q.  AND YOUR CONTENTION IS THAT BECAUSE THOSE DATES

8      WERE PRINTED ON THE FRONT OF THE CHECK, MR.

9      LINARES AT LATINO'S GROCERY STORE ON FLORIDA

10     BOULEVARD IN BATON ROUGE SHOULD HAVE NOTICED THAT

11     THEY WERE PRINTED ON THE SAME DAY?

12 A.  WHEN YOU'RE CASHING MULTIPLE CHECKS FROM THE SAME

13     PERSON OR FROM THE SAME GEOGRAPHIC AREA OR STREET

14     ADDRESS.

15 Q.  OKAY.

16 A.  YES.

17 Q.  ON DIFFERENT DAYS, THOUGH, RIGHT?  BECAUSE, LOOK

18     AT THE DATES DEPOSITED.  TWO ON THE 21ST, ONE ON

19     THE 29TH, ONE ON THE 2ND, TWO ON THE 19TH, TWO ON

20     THE 23RD.  THESE CHECKS WERE SEEMINGLY BROUGHT IN

21     TO HIS STORE AND CASHED ON VERY -- ON DIFFERENT

22     DAYS OVER A LONG PERIOD OF TIME.  IN FACT, THIS

23     FIRST PAGE COVERS FOUR MONTHS.  IS THAT CORRECT?

24 A.  THE DEPOSITED DATE REFLECTS THE DATE THE CHECK

25     WAS DEPOSITED INTO HIS ACCOUNT.  WE DISCUSSED

1   THAT YESTERDAY.  THE DAY HE CASHED IT -- WANT ME

2   TO GO WITH -- MY THEORY WOULD BE IT CLOSELY

3   CORRESPONDS TO THE DEPOSIT DATE.

4 Q. AND THAT DATE RANGE OF THIS PAGE WAS FOUR MONTHS,

5   CORRECT?

6 A. YES.  FROM MARCH TO JULY.

7 Q. OVER A FOUR-MONTH PERIOD THESE CHECKS WERE CASHED

8   AT HIS BUSINESS?

9    AND I'LL GIVE YOU THE SECOND PAGE OF

10   "16APPLE" WHICH IS LATER IN 2012.  AND SOME OF

11   THESE ARE DEPOSITED ON THE SAME DAY; IS THAT

12   RIGHT?

13 A. YES.

14 Q. MR. LINARES -- EXCUSE ME.  THE U.S. ATTORNEY

15   SAID, "DID HE FILE A SUSPICIOUS ACTION REPORT ON

16   ANY OF THESE?"  HE DIDN'T, DID HE?

17 A. I ANSWERED, NOT TO MY KNOWLEDGE.  AN SAR.

18   CORRECT.

19 Q. AND HE SAID -- AND I THINK THE GOVERNMENT

20   ATTORNEY SAID THAT HE -- DID HE NOTIFY THE

21   AUTHORITIES?  AND YOU SAID WHAT?

22 A. NOT TO MY KNOWLEDGE.

23 Q. DID HE TELL ANYBODY THAT SOMETHING SUSPICIOUS WAS

24   GOING ON, AND YOU SAID WHAT?

25 A. EITHER NO, NOT TO MY KNOWLEDGE, OR WORDS TO THAT.

1   Q.   HOW ABOUT THE BANK? DID THE BANK FILE ANY

2        SUSPICIOUS ACTIVITY REPORTS?

3   A.   IN WHAT TIME PERIOD?

4   Q.   IN ANY OF THIS TIME PERIOD, AS IT RELATES TO

5        THESE CHECKS CASHED ON SEDGWICH AVENUE IN BRONX,

6        NEW YORK.

7   A.   I DO NOT KNOW THE EXACT DATE OF THE SUSPICIOUS

8        ACTIVITY REPORTS PREPARED BY HANCOCK, WHITNEY.

9   Q.   WOULD YOU LIKE TO REFRESH YOUR MEMORY BY

10       REFERRING TO SOME OF YOUR INVESTIGATIVE ---

11  A.   THERE WERE SUSPICIOUS ACTIVITY REPORTS PREPARED

12       BY HANCOCK, WHITNEY.

13  Q.   BASED ON THE FACT THAT THESE CHECKS WERE

14       ADDRESSED FROM SEDGWICH AVENUE?

15  A.   NOT SEDGWICH AVENUE, BASED ON OUT-OF-STATE CHECKS

16       BEING CASHED.

17  Q.   AND WHEN DID THAT OCCUR?

18  A.   I JUST -- I DON'T RECALL THE EXACT DATE.

19  Q.   DO YOU THINK IT OCCURRED BEFORE MARCH OF 2013

20       WHEN THEY INITIATED -- STARTED TO INITIATE AN

21       INVESTIGATION?

22  A.   I DON'T RECALL THE EXACT DATE.

23  Q.   BECAUSE THE TRUTH OF IT IS, IS THAT WHEN THE BANK

24       TOOK POSSESSION OF THIS NEGOTIABLE INSTRUMENT,

25       THESE CHECKS, THEY HAD TO THEN NEGOTIATE THAT TO

1       THE IRS IN ORDER TO GET THE MONEY FROM THEM,

2       CORRECT, OR TO THE TREASURY?

3   A.  I'M NOT A BANKER.  BUT THAT IS APPROXIMATES MY

4       UNDERSTANDING.

5   Q.  YOU'RE AN IRS AGENT, THOUGH?

6   A.  YES.

7   Q.  YOU HAVE SOME UNDERSTANDING OF FINANCES.  THAT'S

8       WHAT YOU DO FOR A LIVING, RIGHT?

9   A.  I'M A SPECIAL AGENT FOR CRIMINAL INVESTIGATION.

10  Q.  IN THE IRS?

11  A.  CORRECT.

12  Q.  SO, WHEN THE BANK TAKES A CHECK, THE BANK HAS

13      THEN GOT TO GET THAT MONEY FROM THE TREASURY,

14      RIGHT?

15  A.  YES.  AND IT GOES THROUGH CLEARING HOUSES AND THE

16      FED AND I DON'T KNOW THAT EXACT ---

17  Q.  RIGHT.  AND THE BANK DIDN'T NOTICE THE REPETITIVE

18      SEDGWICH AVENUE ADDRESS IN THE BRONX, NEW YORK,

19      BECAUSE THEY DIDN'T FILE A SUSPICIOUS ACTION

20      REPORT AS TO MULTIPLE CHECKS FROM SEDGWICH

21      AVENUE, THE BRONX, CORRECT?

22  A.  NOT IN 2012.  DID THEY EVENTUALLY FILE ONE?  YES.

23      I DO NOT KNOW THE EXACT DATE.

24  Q.  BUT YOU WERE IN THE COURTROOM WHEN THE -- MS.

25      CRAIG FROM THE BANK SAID THAT THERE WAS NO

1   SUSPICION AND NO ACTIVITY AND NO INVESTIGATION AT

2   THE BANK UNTIL MARCH OF 2012, RIGHT?  I MEAN,

3   2013, RIGHT?

4  A.   CORRECT.  I WAS HERE PRESENT FOR MS. CRAIG'S

5   TESTIMONY.

6  Q.   AND SO THAT WE'RE CLEAR, ALL OF THESE CHECKS FROM

7   SEDGWICH AVENUE, THE BRONX, WERE DEPOSITED INTO

8   HANCOCK BANK, THIS ENTIRE PAGE, IN THE FOUR-MONTH

9   PERIOD FROM MARCH OF '12 TO JULY OF '12; IS THAT

10   RIGHT?

11  A.   YES.  THOSE ARE THE DEPOSIT DATES.

12  Q.   OKAY.  AND THEN ALL OF THIS PAGE WERE DEPOSITED

13   INTO HANCOCK BANK BETWEEN JULY OF 2012, MINUS THE

14   LAST ONE, AND OCTOBER OF 2012, RIGHT?

15  A.   CORRECT.

16  Q.   AND THIS DIDN'T GENERATE ANY INVESTIGATION BY

17   HANCOCK BANK, CORRECT?

18  A.   NOT UNTIL THE ONE MS. CRAIG SPOKE OF.

19  Q.   IN MARCH OF 2013?

20  A.   THAT'S MY UNDERSTANDING.

21  Q.   AND DESPITE THE FACT THAT BANKING PROFESSIONALS,

22   A COMPANY THE SIZE OF HANCOCK OR WHITNEY BANK,

23   WITH ACTUAL INDIVIDUALS ASSIGNED TO WATCH OUT FOR

24   THIS STUFF DIDN'T CATCH IT, YOU WOULD EXPECT MR.

25   CARLOS LINARES TO HAVE CAUGHT THIS AT HIS CHECK

1     CASHING STORE ON FLORIDA BOULEVARD?

2  A.  MR. LINARES IS DEALING WITH PEOPLE BRINGING THE

3     CHECKS IN AND HE DOES HAVE A DUE DILIGENCE

4     OBLIGATION AS THE CHECK CASHER.

5  Q.  YOU WOULD HAVE EXPECTED MR. LINARES TO HAVE

6     CAUGHT THIS FRAUD, THIS FRAUD BEING ENACTED ON

7     THE TREASURY, THAT THE BANK WAS NOT CAPABLE OF

8     CATCHING, BUT YOU EXPECT MR. LINARES TO HAVE

9     CAUGHT IT?

10 A.  I EXPECTED MR. LINARES TO DO HIS DUE DILIGENCE AS

11     A CHECK CASHER.

12 Q.  WHICH IS?

13 A.  HE IS THE FRONT LINE AND HE MEETS THE PEOPLE

14     BRINGING CHECKS TO HIM.

15 Q.  AND THAT DUE DILIGENCE IS TO GET PICTURE ID.,

16     MATCH THE NAME TO THE CHECK, CASH THE CHECK FOR

17     PEOPLE THAT LOOK LIKE THE PICTURE ID, CORRECT?

18 A.  I'M NOT SURE OF HIS EXACT CHECK CASHING

19     PROCEDURES AT THAT TIME.  THAT'S WHAT I WOULD

20     THINK A REASONABLE PERSON WOULD DO.

21 Q.  ALL RIGHT.  AND WITHIN THE SEARCH WARRANT

22     DOCUMENTS WE COVERED YESTERDAY THERE ARE 195

23     CHECKS ACCOUNTED FOR WITH PICTURE ID'S?

24         MR. STEVENS: OBJECTION, YOUR HONOR.  I

25             DON'T THINK THAT'S IN EVIDENCE.

1           THE COURT: WHAT EXHIBIT ARE YOU REFERRING

2               TO, MR. AMBEAU?

3           MR. AMBEAU: WELL, WE STIPULATED THAT

4               THE -- THAT IN THE SEARCH WARRANT

5           MATERIALS THERE ARE ENOUGH ID'S TO COVER 168

6           UNITED STATES TREASURY CHECKS.  AND THE

7           GOVERNMENT HAS SUBMITTED ---

8           THE COURT: IN OTHER WORDS, THE LAST

9               STIPULATION THAT WAS READ TO THE JURY?

10          MR. AMBEAU: YES, YOUR HONOR.  AND THEN

11              IN ADDITION TO THAT --

12          THE COURT: OKAY.

13          MR. AMBEAU:  -- THE GOVERNMENT HAS SUBMITTED

14              THE CHECKS THAT MR. LINARES PRESENTED TO

15          THE GRAND JURY WHERE THERE ARE AN ADDITIONAL

16          27, WHICH EQUALS 192.

17          THE COURT: CORRECT.  WELL, THE OBJECTION

18              IS OVER-RULED.

19  MR. AMBEAU:

20  Q.   SO, WE KNOW THAT THERE ARE IDENTIFICATION

21       DOCUMENTS, THAT PURPORT TO BE IDENTIFICATION

22       DOCUMENTS, --

23  A.   PURPORTED ID'S.

24  Q.   -- FOR 195 OF 272 CHECKS.  CORRECT?

25  A.   BASED ON THE STIPULATION.

1   Q.   WELL, SEE, THAT'S HOW A STIPULATION WORKS.  THAT

2        WHATEVER WE STIPULATE TO, YOU DO UNDERSTAND THAT

3        WHAT WE STIPULATE TO IS, IN FACT, CONSIDERED A

4        PROVEN FACT IN THIS COURTROOM, CORRECT?

5   A.   THAT'S AN AGREEMENT WE ARE BOUND BY.  YES.

6   Q.   OKAY.  IT'S MORE THAN THAT.

7             MR. AMBEAU: YOUR HONOR, COULD I ASK THE

8                  COURT TO INSTRUCT THE WITNESS AS TO

9             NATURE OF THE STIPULATION AND WHAT THAT ---

10            THE COURT: I DON'T THINK IT'S NECESSARY

11                 TO DO SO.  I THINK I'M SATISFIED

12            THAT THE WITNESS KNOWS WHAT A STIPULATION IS.

13            LET'S GO ON AND MOVE ON.

14  MR. AMBEAU:

15  Q.   LET'S LOOK AT WHAT'S BEEN MARKED AS "U.S. EXHIBIT

16       16B."  THESE ARE CHECKS FROM WHAT LOOK LIKE, AND

17       I DON'T KNOW HOW TO SAY THIS WORD, I THINK IT'S

18       WORCESTER, MASSACHUSETTS.

19  A.   I SEE THE STATE.

20  Q.   AND THE GOVERNMENT SHOWED THIS TO YOU YESTERDAY;

21       IS THAT CORRECT?

22  A.   YES.

23  Q.   AND ON THE SECOND PAGE OF "U.S. 16B" THERE ARE

24       TWO CHECKS FROM THAT SAME ADDRESS.  AND ALL OF

25       THOSE CHECKS ARE COLLECTED BETWEEN AUGUST OF

1   2012, AND THE END OF DECEMBER, 2012; IS THAT

2   CORRECT?

3   A.   YES.

4   Q.   AND DESPITE THE FACT THAT THE GOVERNMENT WENT

5        OVER THIS THING ABOUT HOW MR. LINARES DIDN'T FILE

6        AN SAR, AND HE DIDN'T CONTACT AUTHORITIES AND ALL

7        THAT KIND OF STUFF.  NEITHER DID THE BANK DURING

8        THAT TIME; IS THAT CORRECT?

9   A.   I'M NOT AWARE OF ANY THAT THE BANK FILED.

10  Q.   AND, AGAIN, "UNITED STATES 16E" MARIE STREET,

11       TEMPLE, GEORGIA.

12  A.   I SEE THE STATE.

13  Q.   AGAIN, THIS TIME MR. LINARES LOOKS LIKE HE

14       DEPOSITED FIVE CHECKS ON 8/22, 2012, FROM ONLY

15       TWO PEOPLE, RIGHT?  THERE ARE MULTIPLE CHECKS; WE

16       TALKED ABOUT THAT EARLIER, RIGHT?

17  A.   YES.

18  Q.   AND THOSE PEOPLE WHO HAD MULTIPLE TREASURY

19       CHECKS, THAT 8/22/12, THAT TIME FRAME, THE BANK

20       DIDN'T FILE ANY SUSPICIOUS ACTIVITY REPORTS OR

21       REPORT TO AUTHORITIES OR CALL THE IRS OR INITIATE

22       ANY INVESTIGATIONS; IS THAT RIGHT?

23  A.   NOT THAT I'M AWARE OF.

24  Q.   IS THE BANK ACTUALLY HELD TO A HIGHER STANDARD OF

25       DUTY AS IT RELATES TO THE BANK SECRECY ACT, THAN

1    AN INDIVIDUAL, FOR INSTANCE?

2  A.  I DON'T KNOW THAT I'M QUALIFIED TO ANSWER THAT.

3    THE BANK SECRECY ACT APPLIES TO -- APPLIES TO

4    EVERYONE.

5  Q.  DO YOU KNOW WHAT 1022210 STATES THAT APPLIES TO

6    ANTI-MONEY LAUNDERING PROGRAM?  DO YOU KNOW WHAT

7    THAT -- DO YOU KNOW THAT AT ALL?

8  A.  DO I HAVE SOME FAMILIARITY WITH IT?  YES.  HAVE

9    WE LOOKED AT EXCERPTS OF IT?  YES.  CAN I QUOTE

10    IT TO YOU?  NO.

11  Q.  DO YOU KNOW THAT THERE'S A SENTENCE IN THERE THAT

12    SAYS THAT THE ANTI-MONEY LAUNDERING PROGRAM THAT

13    YOU HAVE IN PLACE HAS TO BE COMMENSURATE WITH THE

14    RISK OF THE BUSINESS?  HAVE YOU EVER HEARD THAT

15    SENTENCE?

16  A.  I REMEMBER THAT BEING READ.  YES.

17  Q.  DO YOU -- CAN WE AGREE THAT THE RISK, THEN, THE

18    ANTI-MONEY LAUNDERING RISK TO A BANK IS

19    SUBSTANTIALLY GREATER THAN THE ANTI-MONEY

20    LAUNDERING RISK TO A PERSON WHO IS CASHING CHECKS

21    AT A BUSINESS?

22  A.  DUE TO THE NUMBER OF ACCOUNTS AND CLIENTS THEY

23    HAVE?

24  Q.  SURE.

25  A.  YES.

1  Q.  AND THAT, IN FACT, HANCOCK BANK HAS A DEPARTMENT

2      FOCUSED ON BANK SECRECY ACT COMPLIANCE.  YOU KNOW

3      THAT TO BE THE CASE?

4  A.  YES.  THAT'S MY UNDERSTANDING.

5  Q.  AND DESPITE THE FACT THAT ALL OF THESE CHECKS

6      WERE DEPOSITED INTO HANCOCK BANK AND HANCOCK BANK

7      NEVER DISCOVERED THE FRAUD, RIGHT, DIDN'T

8      DISCOVER THE FRAUD DURING ALL OF 2012 AND DIDN'T

9      DISCOVER THE FRAUD UNTIL LATE IN 2013, THE FRAUD

10     THAT WAS BEING PERPETRATED, YOUR EXPECTATION IS

11     THAT MR. LINARES SHOULD HAVE DISCOVERED THE

12     FRAUD?

13 A.  AS I STATED EARLIER, MR. LINARES IS THE ONE

14     DEALING WITH THE CHECK CASHING CLIENTS THAT COME

15     IN TO HIS BUSINESS FACE TO FACE.  HE HAS A DUE

16     DILIGENCE OBLIGATION.  HE'S GOING TO SEE THE

17     PERSON FIRST WITH THE PURPORTED ID OR WHATEVER

18     THEY HAVE.  EACH CIRCUMSTANCE -- FOR EACH CHECK

19     OR CHECKS THAT ARRIVE.

20 Q.  SO, WITH THE EXCEPTION OF -- BECAUSE THOSE THINGS

21     ARE DISTINCT, RIGHT?  MATCHING AN ID TO A CHECK

22     AND CASHING THE CHECK BASED ON THAT MATCH WITH

23     THE ID AND THE CHECK, THAT IS A DISTINCT PIECE OF

24     INFORMATION FROM THE ADDRESSES ASSOCIATED WITH

25     THE CHECK, CORRECT?

1  A.  THE ID IS A DISTINCT DOCUMENT FROM THE CHECK.  IS

2      THAT YOUR QUESTION?

3  Q.  CORRECT.

4  A.  YES.

5  Q.  THERE'S BEEN AN ASSERTION OR SOME IDEA THAT

6      BECAUSE ALL OF THESE CHECKS CAME FROM OUT OF TOWN

7      OR THE MAJORITY OF THEM, OF THE 272 CHECKS CAME

8      FROM OUT OF TOWN, OUT OF STATE, IN NEW YORK, FOR

9      INSTANCE, THAT SOMEHOW THAT THAT SHOULD HAVE BEEN

10     AN INDICATOR THAT THERE WAS A CRIME AFOOT, RIGHT?

11 A.  I THINK IT WAS SIGNIFICANT WHEN YOU LOOK AT THE

12     NUMBERS THAT COME IN, THE DATES THAT HE DEPOSITED

13     THEM AND WHERE THE PEOPLE WERE FROM.

14 Q.  SURE.  AND BECAUSE YOU THINK THOSE THINGS ARE

15     SIGNIFICANT, THAT IS A BIG PIECE OF WHY THIS

16     FRAUD SHOULD HAVE BEEN FOUND BY MR. LINARES?

17 A.  MR. LINARES IS THE ONE DEALING WITH THE -- HIS

18     CHECK-CASHING CLIENTS, HE SHOULD BE WORKING WITH.

19     I MEAN, HE HAS HIS DUE DILIGENCE REQUIREMENT.

20     AND WHATEVER HIS PROTOCOL WAS AT THAT POINT IN

21     TIME, --

22 Q.  RIGHT.

23 A.  -- ASSUMING WE'RE STILL IN 2012.

24 Q.  SO, DO YOU UNDERSTAND THAT THE DISTINCTION I'M

25     MAKING IS THAT THAT INFORMATION ABOUT OUT-OF-TOWN

1     CHECKS, THE 272 CHECKS AND THE PERCENTAGE OF

2     CHECKS FROM NEW YORK, THE BANK HAD ALL OF THAT

3     INFORMATION AS WELL, CORRECT?

4  A.  I DON'T KNOW IF THEY HAD IT ORGANIZED IN THAT

5     FORMAT.  THEY WERE -- OBVIOUSLY, AS YOU POINTED

6     OUT, A LARGER ENTITY WITH MORE CLIENTS.  BUT,

7     YES, THE CHECKS WERE DEPOSITED INTO THEIR

8     ACCOUNT.

9  Q.  WE COULD BE REASONABLY CERTAIN THAT MR. LINARES

10    NEVER HAD THIS ORGANIZED SPREADSHEET RELATED TO

11    THESE CHECKS WITH ALL THESE ADDRESSED ON THEM AND

12    ALL THESE DATES?  COULD WE BE REASONABLY CERTAIN

13    THAT THAT'S THE CASE?

14 A.  I DON'T KNOW THAT.  I'M NOT AWARE OF HIM HAVING A

15    SPREADSHEET IN THAT ORGANIZATION.

16 Q.  AND, SO, JUST LIKE THE BANK, MR. LINARES DIDN'T

17    TAKE A BIG PICTURE OF THIS -- THESE DEBIT CHECKS

18    AND NEITHER DID THE BANK, RIGHT?  THAT WAS YOUR

19    POINT BY SAYING THE BANK DIDN'T ORGANIZE IT?

20 A.  YES.

21 Q.  AL RIGHT.  BUT, IN FACT, THE BANK HAD ALL OF THE

22    INFORMATION AS TO THE OUT-OF-TOWN CHECKS AND ALL

23    OF THE INFORMATION AS TO THE AMOUNT OF THE CHECKS

24    AND ALL OF THE INFORMATION AS TO THE DATES THEY

25    WERE DEPOSITED, AND ALL OF THE INFORMATION AS TO

1      THE DATES THE CHECKS WERE ISSUED BY THE IRS,

2      CORRECT?

3  A.  THEY WOULD HAVE HAD IT THROUGH HIS DEPOSITED

4      ITEMS.

5  Q.  AND DESPITE ALL OF THAT, IT TOOK THEM 15 MONTHS

6      TO REALIZE SOME FRAUD WAS OCCURRING, CORRECT?

7  A.  THEIR FRAUD INVESTIGATION, BASED ON MS. CRAIG'S

8      STATEMENT, STARTED IN 2013.

9  Q.  LET'S TALK A LITTLE BIT ABOUT THE GRAND JURY

10     INVESTIGATION THAT MR. LINARES RESPONDED TO IN

11     THE SUMMER OF 2014. I'M CORRECT IN STATING THAT

12     MR. LINARES WAS NOT A TARGET OF THAT GRAND JURY

13     INVESTIGATION, CORRECT?

14 A.  HE WAS ISSUED A GRAND JURY SUBPOENA TO PROVIDE

15     DOCUMENTATION.

16         THE COURT: THAT WASN'T THE QUESTION, MA'AM.

17             I MEAN, PERSONS ARE ALWAYS ISSUED

18         SUBPOENAS IN CONNECTION WITH A GRAND JURY

19         INVESTIGATIONS WHEN THEY'RE NOT, IN FACT, A

20         TARGET OF AN INVESTIGATION, I THINK AS YOU

21         KNOW.  PLEASE ANSWER THE QUESTION.

22             PLEASE REPEAT THE QUESTION.

23 MR. AMBEAU:

24 Q.  WHEN MR. LINARES RESPONDED TO THE GRAND JURY

25     SUBPOENA IN THE SUMMER OF 2014, HE WAS NOT THE

1    TARGET OF THAT GRAND JURY INVESTIGATION; IS THAT

2    CORRECT?

3 A.   LATINO'S SUPERMARKET WAS.  I MEAN, THAT -- WE

4    ISSUED THE SUBPOENA TO THE CUSTODIAN OF RECORD

5    FOR LATINO'S SUPERMARKET.

6 Q.   BUT NEITHER LATINO'S SUPERMARKET NOR MR. LINARES

7    WAS THE TARGET OF THAT INVESTIGATION.  THAT GRAND

8    JURY SUBPOENA WAS ISSUED IN ANOTHER INVESTIGATION

9    THAT WAS ONGOING WITH THE GRAND JURY AT THAT

10    TIME, CORRECT?

11 A.   THAT MAY BE CORRECT.  YES.  I'M -- I CAN'T RECALL

12    EXACTLY.

13         THE COURT: WELL, YOU WERE THE CASE AGENT.

14            WERE YOU THE CASE AGENT ON THE OTHER

15         CASE?

16         THE WITNESS: YES, SIR, I WAS.  I'M TRYING

17            TO REMEMBER THE GRAND JURY SUBPOENA.

18         THE COURT: LET ME SEE COUNSEL AT THE

19            BENCH.

20         REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

21            A BENCH CONFERENCE WAS HELD.)

22         THE COURT: APPEARS THE JURY -- HAVE YOU

23            TALKED TO YOUR WITNESS AND YOUR CASE

24         AGENT?  BECAUSE IT SEEMS TO ME THAT SHE'S

25            BEING INCREDIBLY EVASIVE.  LISTEN, ANYBODY

1     THAT'S BEEN A CASE AGENT AS LONG AS SHE'S

2     BEEN A CASE AGENT KNOWS WHAT A TARGET OF AN

3     INVESTIGATION IS.  PERIOD.  END OF STORY.

4     IT'S BLACK LETTER LAW AND POLICY.

5     MR. STEVENS: YES.

6     THE COURT: SHOULD I EXCUSE THE JURY AND

7          HAVE YOU SPEAK WITH HER?  WHAT I'M

8     HEARING IS VERY EVASIVE ANSWERS.  NOW, THE

9     JURY WILL MAKE ITS OWN DETERMINATION OF

10    CREDIBILITY.  BUT I HAVE AN OBLIGATION TO

11    MAKE SURE THAT QUESTIONS THAT COMPORT WITH

12    THE RULES OF EVIDENCE ARE ANSWERED PROPERLY

13    BY THE WITNESS.  AND I'M NOT SURE THAT'S

14    HAPPENING HERE.  AM I MISSING SOMETHING?

15    MR. STEVENS: JUDGE, AND IT'S SIMILAR TO

16         THE POINT I MADE YESTERDAY.  TARGET

17    MEANS A LOT OF THINGS TO A LOT OF PEOPLE.

18    THE COURT: IT MEANS ONE THING TO A SPECIAL

19         AGENT.  THEY GET TRAINING.  IT'S DEFINED

20    WHEN THEY GO TO GLYNCO, GEORGIA.  I'VE DONE

21    IT.  I'VE PARTICIPATED IN THAT TRAINING.

22    MR. STEVENS: BUT THAT'S NOT WHAT HE ASKED

23         HER.  HE DIDN'T -- HE SAID TARGET ---

24    THE COURT: HE ASKED, WAS THIS MAN A TARGET

25         OF THE INVESTIGATION AT THE TIME OF THE

1    GRAND JURY SUBPOENA WAS ISSUED.   IT'S A YES

2    OR A NO ANSWER.  NOW, HE COULD HAVE BEEN A

3    SUBJECT.

4    MR. STEVENS: YES.

5    THE COURT: IN WHICH CASE THE ANSWER WOULD

6        BE NO.  AND HE WASN'T A TARGET; HE WAS

7    THE SUBJECT.  BUT, IT WAS A TARGET.  THERE'S

8    A WITNESS, THERE'S A SUBJECT AND THEN THERE'S

9    A TARGET.  IT'S THAT SIMPLE.

10   MR. STEVENS: I DON'T -- OBVIOUSLY, I DON'T

11       DISPUTE THAT THE ANSWERS SEEM ---

12   THE COURT: WE'RE GOING TO BE HERE FOREVER

13       IF -- AND I'M GOING TO ASK YOU TO DO

14   EVERYTHING YOU CAN, MR. AMBEAU.  THIS POOR

15   JURY.  THESE ARE ISSUES THAT WE -- AND I

16   UNDERSTAND THIS IS VERY IMPORTANT

17   INFORMATION.  AND I WANT TO GIVE YOU A FULL

18   OPPORTUNITY TO DEFEND YOUR CLIENT IN A WAY

19   YOU DEEM APPROPRIATE.  BUT THIS IS GONE ON

20   AND ON AND ON BECAUSE, IN PART, BECAUSE IT'S

21   JUST -- THIS IS JUST FAR TOO PROTRACTIVE THAN

22   IT NEEDS TO BE.

23   MR. AMBEAU: I'VE REORGANIZED MY CROSS.  I

24       THROUGH THESE QUESTIONS WOULD BE VERY

25   ROTE.  IN FACT, I DIDN'T THINK ANY OF WHAT

1    I'VE DONE THUS FAR WOULD TAKE AS MUCH TIME AS

2    IT HAS.  THE WITNESS IS BEING VERY COMBATIVE

3    AND NOT -- NOT BEING RESPONSIVE TO THE

4    QUESTIONS I'M ASKING, YOUR HONOR.  AND IT'S

5    MAKING IT VERY, VERY DIFFICULT.

6    MR. STEVENS: JUDGE, I DON'T HAVE ANY

7        OBJECTION.  I THINK MAYBE EXCUSING THE

8    JURORS BRIEFLY WOULD BE A GOOD IDEA.  AND I

9    THINK THAT I THINK -- AND I'M HAPPY TO DO IT.

10    BUT IF YOUR HONOR WANTS TO MAKE SURE THE

11    WITNESS UNDERSTANDS THAT SHE CAN SPEAK

12    FREELY.

13    THE COURT: THAT'S NOT MY JOB.

14    MR. STEVENS: I MEAN, I'M HAPPY TO DO IT.

15        BUT I -- I ---

16    THE COURT: LET'S MOVE ON.  LET'S JUST SEE HOW

17        THINGS GO.  HOPEFULLY THINGS WILL GET

18    BETTER.

19    MR. STEVENS: OKAY.

20    THE COURT: BUT IF THINGS ARE -- WELL, I'LL

21        BE FORCED TO TAKE A BREAK IN JUST A

22    MINUTE, BUT LET'S JUST ---

23    MR. STEVENS: OKAY.

24    THE COURT: HOPEFULLY THINGS WILL MOVE ON.

25        BUT I'M JUST -- I WANT TO JUST STATE ON

1      THE RECORD, I'M GETTING CONCERNED HERE.

2      MR. STEVENS: I MEAN, JUDGE, LET ME MAKE --

3          AND THIS IS A TECHNICAL POINT.  BUT, I

4      MEAN, YOU WILL RECALL WHEN A FILE IS OPENED

5      IN OUR OFFICE, IT MAY BE OPENED IN THE NAME

6      OF INDIVIDUAL-A OR COMPANY-A.  THAT FILE CAN

7      BE -- MIGHT BE OPENED FOR YEARS, NUMEROUS

8      SUBPOENAS MAY BE ISSUED UNDER THAT FILE.

9      THE COURT: NO DOUBT ABOUT IT.  AND THAT'S NOT

10         THE ISSUE. THE ISSUE WAS, AT THE TIME

11     THE SUBPOENA WAS ISSUED.  SURELY SOMEBODY IN

12     THE U.S. ATTORNEY'S OFFICE AND THE LEAD CASE

13     AGENT OUGHT TO KNOW WAS THIS A SUBJECT. DO WE

14     ABSOLUTELY HAVE EVIDENCE THAT HE CAN IDENTIFY

15     THIS PERSON AS A TARGET OR IS IT MERELY A

16     SUBJECT?  OR, ARE WE STILL TRYING TO FIGURE

17     IT OUT?

18     MR. AMBEAU: I KNOW THE ANSWER.

19     THE COURT: I DON'T THINK IT'S A VERY

20         DIFFICULT ---

21     MR. STEVENS: YES.  I DON'T MEAN ---

22     MR. AMBEAU: I REPRESENTED HIM THERE.  AND

23         I DIDN'T RECEIVE A TARGET LETTER OR

24     ANYTHING.  I KNOW -- I MEAN, I KNOW I WAS

25     THE ATTORNEY THAT REPRESENTED HIM AT THE

1    GRAND JURY HEARING.

2    MR. STEVENS: NO.  THE ANSWER IS NO.  I'M

3         NOT SAYING THAT'S NOT THE ANSWER.  I'M

4    SAYING SHE JUST MAY NOT UNDERSTAND THAT THESE

5    -- THESE TECHNICALITIES.

6    THE COURT: WELL, LET ME TELL YOU, AFTER 18

7         YEARS AS A SPECIAL AGENT, AFTER

8    ATTENDING GLYNCO TRAINING -- NOT JUST 18

9    YEARS AGO, BUT I KNOW THEY GO THROUGH

10   PERIODIC RETRAINING. IT'S -- MY LAW CLERK

11   KNOWS WHAT A SUBJECT IS VERSUS A TARGET.

12   MR. STEVENS: I KNOW, JUDGE.  I KNOW YOU DO.

13        AND I DON'T MEAN TO ---

14   THE COURT: AND HE WENT TO THE UNIVERSITY OF

15        -- HE WENT TO UNC.

16   MR. STEVENS: AND EVEN HE COULD PICK IT OUT.

17   MR. AMBEAU: YOUR HONOR, IN THE INTEREST OF

18        GETTING THIS MOVING, CAN WE TALK TO HER

19   A LITTLE BIT AND MAYBE WE CAN THE AUSA TALK

20   TO HER?

21   THE COURT:  LET'S JUST SEE HOW IT GOES.

22        OKAY?

23   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

24        THE BENCH CONFERENCE WAS CONCLUDED.)

25 MR. AMBEAU:

1  Q.   IN THE SUMMER OF 2014 WHEN MR. LINARES WAS

2       SUBPOENAED TO THE GRAND JURY, AT THAT TIME HE WAS

3       SUBPOENAED BY IRS INVESTIGATIVE AGENTS; WAS THAT

4       CORRECT, BY YOU?

5  A.   WE SERVED A GRAND JURY SUBPOENA ON HIM.  YES.

6  Q.   OKAY.  AND AT THAT TIME MR. LINARES WAS ALSO WELL

7       AWARE THAT HE HAD PARTICIPATED IN THE IRS

8       EXAMINATIONS IN HIS BUSINESS IN 2010 AND 2013; IS

9       THAT CORRECT?

10 A.   YES.

11 Q.   AND HE WAS AWARE THAT AS A SUBJECT TO THOSE

12      INVESTIGATIONS AND EXAMINATIONS, HE HAD TURNED

13      OVER A TREMENDOUS NUMBER OF BANKING DOCUMENTS

14      OVER TO THE IRS PRIOR TO BEING CALLED TO THE

15      GRAND JURY; IS THAT RIGHT?

16 A.   IT'S NOT MY UNDERSTANDING THAT HE TURNED OVER A

17      TREMENDOUS NUMBER OF RECORDS.  I BELIEVE HE GOT A

18      DOCUMENT REQUEST FROM EACH OF THE COMPLIANCE

19      EXAMINERS AND HE WENT TO THE BANK AND GOT A

20      SELECTIVE SAMPLE.

21 Q.   AND, SO, BECAUSE MR. LINARES WAS NOT A TARGET

22      DURING THAT GRAND JURY SUBPOENA IN 2014, HIS

23      BEING SUBPOENAED TO THE GRAND JURY, HIS

24      UNDERSTANDING OF THAT, WAS THAT HE WAS ASSISTING

25      IN AN INVESTIGATION; IS THAT CORRECT?

1  A.   I DON'T KNOW WHAT MR. LINARES' UNDERSTANDING IS

2       OR WAS.

3  Q.   DID YOU HAVE A CONVERSATION WITH MR. LINARES

4       PRIOR TO THE GRAND JURY HEARING?

5  A.   I SERVED THE SUBPOENA TO HIM, BUT I SIMPLY HANDED

6       HIM THE SUBPOENA AND EXPLAINED THE DATES THAT HE

7       NEEDED TO ATTEND.

8  Q.   DID YOU HAVE A CONVERSATION WITH MR. LINARES IN

9       THE WITNESS ROOM BEFORE THE GRAND JURY

10      PROCEEDING?

11 A.   VERY BRIEF GREETING HIM.  HE HAD COUNSEL AND

12      THERE WOULD BE A TRANSLATOR PRESENT.  THAT'S

13      ABOUT IT.

14 Q.   AND IT WAS CLEAR IN THAT MEETING WITH YOU AND MR.

15      LINARES THAT HE WASN'T THE TARGET OF THE

16      INVESTIGATION AND WHAT HE WAS DOING WAS ASSISTING

17      THE IRS IN ANOTHER INVESTIGATION, CORRECT?

18 A.   I DO NOT KNOW WHAT MR. LINARES' UNDERSTANDING

19      WAS.

20 Q.   WAS THAT WHAT WAS EXPRESSED TO HIM WHEN YOU WERE

21      IN THAT MEETING?

22 A.   IT WAS TOLD TO HIM THAT HE HAD BEEN SUBPOENAED TO

23      PROVIDE DOCUMENTS, THAT THE TRANSLATOR WAS THERE

24      AND HE WAS ASKED IF HE HAD A PRODUCTION ON BEHALF

25      OF LATINO'S, AND HE SAID HE DID.  THAT'S THE

1      EXTENT OF WHAT I RECALL.

2  Q.   AND THAT YOU DON'T RECALL HAVING TOLD HIM THAT HE

3       WAS THERE FOR ANOTHER INVESTIGATION AND THAT HE

4       WAS ASSISTING IN THAT INVESTIGATION AT THAT TIME?

5  A.   I DO NOT RECALL THAT.

6  Q.   WE'LL MOVE ON.  THE GOVERNMENT YESTERDAY TALKED

7       TO YOU ABOUT THE 2010 EXAM THAT OCCURRED IN MR.

8       LINARES' STORE.  IS THAT CORRECT?

9  A.   YES.

10 Q.   AND IN THAT 2010 EXAM, THE GOVERNMENT TALKED

11      ABOUT THE FACT THAT MR. LINARES MADE A

12      REPRESENTATION TO THE EXAMINE AGENT THAT HE

13      DIDN'T CASH CHECKS OVER $5,000.00; IS THAT

14      CORRECT?

15 A.   YES.

16 Q.   AND, IN FACT, HE HAD CASHED SOME CHECKS OVER

17      $5,000.00; IS THAT CORRECT?

18 A.   YES.

19 Q.   IS IT ALSO CORRECT THAT THE $5,000.00 LIMIT WAS

20      SET BY MR. LINARES AS HIS CHECK CASHING POLICY?

21 A.   THAT IS MY UNDERSTANDING.

22 Q.   AND THAT THE $5,000.00 LIMIT WAS ARBITRARY, FOR

23      LACK OF A BETTER TERM, NOT LEGALLY IMPOSED BY THE

24      LAW?

25 A.   THAT THAT WAS HIS CHECK CASHING POLICY, I GUESS.

1  Q.  AND IT WAS ALSO HIS CHECK CASHING POLICY, AT

2      LEAST IN 2014, THAT HE COULD AUTHORIZE CHECKS

3      OVER WHATEVER LIMIT HE SET, CORRECT?

4  A.  I RECALL THAT FROM THE DOCUMENT THAT WAS

5      PROVIDED.  YES.

6  Q.  SO, THE INFORMATION THAT THE EXAMINER ASKED HIM

7      ABOUT, DO YOU CHECK -- CASH CHECKS OVER

8      $5,000.00, SHE WAS ASKING HIM ABOUT ACTIVITY THAT

9      WAS NOT CRIMINAL IN ANY WAY, CORRECT?

10 A.  DURING THE COMPLIANCE EXAM?  CORRECT.

11 Q.  AND, SO, THOSE QUESTIONS WERE RELATED TO JUST HIS

12     POLICY AND NOT TO ANY CRIMES THAT WERE AFOOT, IS

13     MY POINT, RIGHT?

14         CASHING A CHECK OVER $5,000.00. I'LL WITHDRAW

15     THAT PREVIOUS QUESTION AND ---

16 MR. AMBEAU:

17 Q.  THE CHECK -- CASHING THE CHECK OVER $5,000.00 IS

18     NOT A CRIME, TRUE?

19 A.  NO.  RIGHT.  IT WAS GOING WITH HIS CHECK CASHING

20     POLICY.

21 Q.  RIGHT.

22 A.  FOR TRYING TO DETERMINE.

23 Q.  AND, IN FACT, CASHING IN -- WHEN YOU CASH A CHECK

24     OVER $5,000.00, YOU'RE NOT REQUIRED TO FILE

25     ANYTHING WITH THE IRS OR FILE ANYTHING WITH THE

1    BANK SECRECY ACT; IS THAT RIGHT?

2  A.  NOT TO MY KNOWLEDGE.

3  Q.  AND AN ASSERTION THAT MULTIPLE PEOPLE THAT CASHED

4      A CHECK ON A SINGLE DAY OVER 5,000, AGAIN, ALL OF

5      THOSE TRANSACTIONS COMPORT WITH THE LAST FOUR OR

6      FIVE QUESTIONS I'VE ASKED YOU; NONE OF THAT IS

7      ILLEGAL, CORRECT?

8  A.  CORRECT.  WHETHER IT'S SUSPICIOUS OR NOT IS

9      ANOTHER MATTER -- A LEGAL MATTER.

10 Q.  NONE OF THAT VIOLATES THE LAW, RIGHT?

11 A.  RIGHT.

12 Q.  AND THEN, AGAIN, IN 2013, MR. LINARES WAS CITED

13     WITH THREE VIOLATIONS OF THE BANK SECRECY ACT; IS

14     THAT RIGHT?

15 A.  I BELIEVE THAT'S MY RECOLLECTION FROM THE REPORT.

16 Q.  THREE DISTINCT AND DIFFERENT VIOLATIONS THAN

17     THOSE IN 2010, CORRECT?

18 A.  WHAT -- I THINK ONE WAS LIKE A REFINEMENT OF THE

19     PREVIOUS VIOLATION.  BUT WE'D HAVE TO GET OUT

20     THAT REPORT.

21 Q.  FALLING UNDER THE SAME STATUTE, RIGHT?

22 A.  RIGHT.

23 Q.  1022210.  BUT A SEPARATE STATEMENT OF THAT

24     STATUTORY VIOLATION, A DISTINCT STATEMENT,

25     CORRECT?

1    A.   IT WAS A SEPARATE ITEM THAT THE EXAMINER

2         SELECTED, BASED ON MY ---

3    Q.   BECAUSE IN THE FIRST INSTANCE, DO YOU RECALL IN

4         2010, THAT HE -- THAT IN THAT INVESTIGATION THE

5         -- THAT SAID YOU NEED A MONEY LAUNDERING PROGRAM,

6         AND AT A MINIMUM IT NEEDS TO HAVE THESE THINGS,

7         CORRECT?

8    A.   YES.  FROM THE 2010.  YES.

9    Q.   BUT IN THE 2013, THAT STATEMENT WASN'T USED.  THE

10        STATEMENT WAS, "IN REGARD TO YOUR CURRENT ANTI-

11        MONEY LAUNDERING PROGRAM, YOU NEED TO HAVE

12        WRITTEN CHECK CASHING POLICIES"; IS THAT RIGHT?

13   A.   YES.  BECAUSE SHE WAS BASING THAT OFF OF THE

14        RESPONSE THAT HE HAD ADOPTED THE SIGUE, THE WIRE

15        TRANSFER SERVICE AML.

16   Q.   BUT SHE BASED THAT NOT ON HIS RESPONSE.  SHE

17        BASED IT ON THE FACT THAT SHE SAW SIGUE'S ANTI-

18        MONEY LAUNDERING PROGRAM, RIGHT?

19   A.   I DON'T RECALL IF IT WAS THE RESPONSE OR WHAT SHE

20        SAW.  I DIDN'T CONDUCT THAT.

21   Q.   AND, IN FACT, SHE CONDUCTED AN INTERVIEW WITH MR.

22        LINARES, AND SHE DETERMINED WHAT ALL OF HIS CHECK

23        CASHING POLICIES AND PROCEDURES WERE, CORRECT?

24        DO YOU RECALL THAT?

25   A.   MY UNDERSTANDING, SHE -- SHE HAD AN INTERVIEW AND

1       SHE QUESTIONED HIM ABOUT IT AND RECORDED

2       RESPONSES.

3   Q.  AND HE TOLD HER IN THOSE RESPONSES THAT HE HAD A

4       CHECK CASHING POLICY, RIGHT?  THAT HE SAID, "I

5       DON'T CASH CHECKS THIS AMOUNT OR FOR THIS MANY

6       PEOPLE."  YOU REMEMBER?  YOU RECALL THAT, RIGHT?

7   A.  YES.

8   Q.  AND YOU RECALL THAT -- THAT -- SHE SAID THAT

9       REALLY, THE ONLY THING HE HADN'T DONE WAS HE

10      HADN'T WRITTEN IT DOWN.  HE DIDN'T GET THAT CHECK

11      BOX, RIGHT?

12  A.  YES.

13  Q.  AND THAT'S THE VIOLATION THAT SHE CITED HIM WITH?

14  A.  YES.

15  Q.  THE SUBSTANTIVE VIOLATION, RIGHT?  THE OTHER ONE

16      WAS ABOUT A NUMBER OF AGENTS AND THEN ABOUT

17      ADDING A LINE, RIGHT, SAYING THAT I HAVE MULTIPLE

18      WIRE SERVICES, RIGHT?  DO YOU RECALL THAT THAT'S

19      THE CASE?

20  A.  I REMEMBER THERE WERE TWO -- TWO ADDITIONAL.  I

21      DON'T RECALL.

22  Q.  OKAY.  THE SUBSTANTIVE ONE RELATED TO THE ANTI-

23      MONEY LAUNDERING PROGRAM WAS THIS -- THIS ISSUE

24      ABOUT YOU NEED A WRITTEN CHECK CASHING POLICY,

25      CORRECT?

1    A.    CORRECT.

2    Q.    YOU ALSO NOW KNOW, BY THE EVIDENCE THAT THE

3          GOVERNMENT GAVE YOU, THAT MR. LINARES HAD A

4          WRITTEN CHECK CASHING POLICY IN HIS STORE ON

5          FEBRUARY 1ST OF 2014?

6    A.    YES.  YES.  THAT'S THE DATE ON IT AND IT WAS --

7          THE FIRST TIME I SAW THAT WAS FROM THE GRAND JURY

8          PRODUCTION IN JUNE, 2014.

9    Q.    OKAY.  SO, HE PRODUCED THAT AS A PART OF THE

10         GRAND JURY PRODUCTION IN JUNE, 2014?

11   A.    YES.

12   Q.    WHEN ASKED YESTERDAY ABOUT WHETHER OR NOT MR.

13         LINARES' BANK HAD ANY LOSS, I BELIEVE, AND I

14         WROTE IT DOWN, YOU RESPONDED, "MAY NOT BE ANY

15         LOSS TO THE BANK."  WAS THERE A LOSS TO HANCOCK

16         BANK ON RECLAMATIONS IN MR. LINARES' CASE?

17   A.    MY UNDERSTANDING IS THEY WERE ABLE TO RECOUP THE

18         RECLAMATIONS OUT OF HIS ACCOUNT.  SO, THEY

19         RECEIVED THE MONEY.

20   Q.    SO, ---

21   A.    THEY WOULD NOT BE OUT ANYTHING.

22   Q.    THE ANSWER TO THAT QUESTION IS THAT THERE WAS NO

23         LOSS TO THE BANK RELATED TO MR. LINARES; IS THAT

24         CORRECT

25   A.    CORRECT.  THEY GOT ALL THE MONEY IN HIS ACCOUNT.

1          MR. AMBEAU:  I JUST HAVE A COUPLE OF MORE

2                THINGS, YOUR HONOR.  WE'RE MOVING

3          QUICKLY HERE.

4    MR. AMBEAU:

5    Q.   LET'S TALK A LITTLE BIT ABOUT THE ID'S THAT YOU

6         FOUND IN THE SEARCH WARRANT MATERIAL.  YOU SAID

7         THAT YOU WENT THROUGH THE SEARCH WARRANT

8         MATERIALS HOW MANY TIMES?

9    A.   I CAN'T TELL YOU HOW MANY TIMES.  I WORKED

10        THROUGH THEM FROM THE TIME THEY ARRIVED UNTIL WE

11        BROUGHT THE BOXES.  BUT IT WAS ONGOING.

12   Q.   OKAY.  AND I'M CURIOUS ABOUT FINDING THOSE ID'S

13        IN THE SEARCH WARRANT MATERIALS, HOW DIFFICULT

14        THEY WERE LOCATED OR WHERE THEY WERE LOCATED.

15             CAN YOU TELL ME HOW YOU ALL TOOK POSSESSION

16        OF THOSE MATERIALS?  WERE THEY IN BOXES?

17   A.   WHEN WE CONDUCTED THE SEARCH, HOW DID WE COLLECT

18        THE ITEMS AT THE SEARCH WARRANT?

19   Q.   YES, MA'AM.

20   A.   OKAY.  WE HAVE A VERY ORGANIZED PROTOCOL, AS YOU

21        SAW FROM THE VIDEO.  WE ASSUMED CONTROL OF THE

22        LOCATION.  PROVIDED COPY OF THE WARRANT AND

23        EXPLAINED WHAT WE WERE DOING.  WE HAVE AN

24        ATTACHMENT TO THE WARRANT COVERING THE ITEMS THAT

25        WE WANT TO SEIZE THAT WE ARE LOOKING FOR.  WE

1    SECURED THE AREA AND THEN WE HAVE AN INDIVIDUAL

2    THAT SETS UP TO LOG ALL THE EVIDENCE IN.  AND AS

3    WE METHODOLOGY WORK THROUGH THE DIFFERENT

4    SECTIONS OF THE STORE, WE DIVIDE IT INTO AREAS,

5    AND, OF COURSE, BEHIND THE COUNTER, AS YOU SAW IN

6    THE VIDEO, WHERE MOST OF THE MONEY TRANSMISSION

7    FUNDS WERE.

8        AND THEN LOOKED LIKE OFFICE EQUIPMENT, CHECK

9    CASHING APPARATUS, ET CETERA.  WE LOOKED BEHIND

10   THERE.  COLLECTED THINGS AND WE MARK THEM AS WE

11   COLLECT THEM.  WHOEVER FOUND THEM, THEY SIGN OFF

12   ON THE LABEL.  THOSE WERE BAGGED AND PUT INTO

13   BOXES AND LOGGED INTO A COMPUTER PROGRAM.

14  Q.  YOU ENDED UP WITH, AFTER COLLECTING PAPERS FROM

15   THREE OR FOUR -- ACTUALLY, FOUR DIFFERENT

16   LOCATIONS IN THAT STORE, YOU ENDED UP WITH SIX --

17   SEVEN BOXES OF MATERIAL, CORRECT?

18  A.  SEVEN, YES.

19  Q.  SEVEN BOXES OF MATERIAL.  ALL RIGHT.  AND DID YOU

20   GO THROUGH EACH OF THOSE BOXES OF MATERIAL?

21  A.  YES.

22  Q.  AND INSIDE THOSE BOXES OF MATERIAL YOU FOUND

23   ID'S, CORRECT?  YOU SAID YESTERDAY YOU FOUND

24   120-ISH ID'S?

25  A.  I FOUND DIFFERENT ID DOCUMENTS.  PURPORTED ID

1    DOCUMENTS, ID DOCUMENTS WITH REGULAR CHECK

2    CASHING, WITH WIRE TRANSFERS, ET CETERA.

3  Q.  AND YESTERDAY YOU STATED THAT YOU HAD FOUND 120

4    PURPORTED ID'S RELATED TO THE 272 FRAUDULENT

5    CHECKS PRESENTED TO MR. LINARES, CORRECT?

6  A.  THAT'S AN APPROXIMATE NUMBER.  YES.

7  Q.  AND CAN YOU TELL ME IF THOSE WERE PREDOMINANTLY

8    ONE ID ON A SINGLE PAGE OR WERE THEY MULTIPLE

9    ID'S ON THE PAGES?

10  A.  A COMBINATION.  I CAN'T TELL YOU.  WE FOUND A LOT

11    ON INDIVIDUAL PAGES.  VERY FEW WITH THE CHECKS.

12  Q.  YOU FOUND A VERY FEW ID'S WITH CHECKS.  WHAT

13    PERCENTAGE OF PAGES DID YOU FIND WITH MULTIPLE

14    ID'S ON IT?

15  A.  I DON'T -- I WOULD SAY LOW.  I DO NOT RECALL

16    EXACTLY.  NOW, ID'S ON THE REGULAR CHECKS THAT HE

17    CASHED, I FOUND, YOU KNOW, THAT'S THROUGHOUT A

18    LARGE NUMBER.

19  Q.  HUNDREDS OF THEM?

20  A.  CORRECT.

21  Q.  BUT FOR ID'S FOUND BY THEMSELVES AND THEN MATCHED

22    TO TREASURY CHECKS, HOW MANY OF THOSE WERE -- HOW

23    MANY PAGES WERE THERE, WHERE THERE WERE MULTIPLE

24    ID'S ON THE PAGE?  DO YOU HAVE ANY IDEA?

25  A.  I DO NOT RECALL.  I NOT HAVE THE NUMBER.

1  Q.  IN THE 120-ISH DOCUMENTS THAT ARE PURPORTED TO BE

2      ID'S THAT YOU FOUND IN THE SEARCH WARRANT, WERE

3      THEY SPREAD EVENLY THROUGHOUT THE SIX OR SEVEN --

4      EXCUSE ME, THE SEVEN BOXES YOU HAD?

5  A.  NO.  THEY WERE NOT.

6  Q.  THEY WERE IN ONE BOX, TWO BOXES; DO YOU HAVE ANY

7      IDEA, DO YOU RECALL?

8  A.  MY RECOLLECTION, PROBABLY THREE MAIN BOXES.

9  Q.  THAT HAD ID'S IN THEM?

10 A.  CORRECT.

11 Q.  AND WHEN SEARCHING THROUGH AND FINDING THESE

12     ID'S, WERE THEY IN BUNCHES, WERE THEY ALTOGETHER,

13     OR WERE THEY SPREAD OUT WITHIN THOSE BOXES?

14 A.  THEY WERE BASICALLY SPREAD OUT, BUT YOU MIGHT

15     HAVE TWO OR THREE TOGETHER.

16 Q.  AND THAT'S ---

17 A.  LITTLE CLUSTERS.

18 Q.  TWO OR THREE TOGETHER, THAT'S ABOUT IT?

19 A.  YES.  AND WHEN I STATED THEY WERE IN TWO OR THREE

20     MAIN BOXES, I'M NOT GOING TO SAY YOU DIDN'T HAVE

21     A COUPLE OF SMALL ONES IN THE OTHER BOX.

22 Q.  BUT YOU DON'T RECALL WHETHER OR NOT -- WHAT

23     YOU'RE SAYING IS THAT THEY WERE IN TWO OF THREE

24     BOXES -- TWO OR THREE BOXES AND THAT SOMETIMES

25     THERE WERE A FEW ID'S TOGETHER, BUT THEY WERE

1    SEPARATED BY OTHER MATERIALS?

2    A.   INTERSPERSED.

3    Q.   I'M GOING TO SHOW YOU WHAT HAS BEEN PREVIOUSLY

4         MARKED "DEFENSE EXHIBIT 18."

5              MR. AMBEAU: AND, YOUR HONOR, I'M REFERRING

6                   TO PAGE 3930.  "DEFENSE EXHIBIT 18."

7              THE NUMBER ON THE BOTTOM IS 17, YOUR HONOR.

8    MR. AMBEAU:

9    Q.   IS THAT -- THIS IS ONE OF THE ID'S FOUND IN THE

10        SEARCH WARRANT; IS THAT CORRECT?

11   A.   YES.

12   Q.   IN FACT, ALL OF THESE ID'S HAVE BEEN FOUND IN THE

13        SEARCH WARRANT.  WE KNOW THAT BECAUSE THEY HAVE

14        BEEN PREVIOUSLY ADMITTED AS SUCH?

15   A.   YES.

16   Q.   SO, WHAT I'M GOING TO DO IS I'M GOING TO ASK YOU

17        TO READ THE SEARCH WARRANT NUMBER ON THE TOP OF

18        THAT.  IS THAT 3930?

19   A.   YES.

20   Q.   AND THEN THE NEXT PAGE, --

21             MR. AMBEAU: PAGE 18, OF MY EXHIBIT, YOUR

22                  HONOR.

23   MR. AMBEAU:

24   Q.   -- IS THAT 3932?

25   A.   YES.

1  Q.   AND 3933?

2  A.   YES.

3  Q.   AND 3935?

4  A.   I CAN'T SEE THE TOP.

5  Q.   SORRY.  3935?

6  A.   YES.  UH HUH.

7  Q.   3936?

8  A.   YES.

9  Q.   3937?

10 A.   THAT'S THE NUMBER.  YES.

11 Q.   I'M NOT GOING TO ON, BECAUSE I'M GOING TO SPARE

12      THE JURY THAT PROCESS OVER AND OVER AND OVER

13      AGAIN.

14          BUT THE MAJORITY OF THESE ID'S WERE FOUND

15      BUNCHED TOGETHER, 20, 30, 40, 50 AT A TIME. BACK

16      TO BACK TO BACK TO BACK TO BACK TO BACK, IN THE

17      SEARCH WARRANT MATERIAL.

18          THE COURT: IS THERE A QUESTION?

19 MR. AMBEAU:

20 Q.   HOW WOULD YOU -- HOW WOULD YOU RECONCILE THE FACT

21      THAT THAT'S THE PHYSICAL APPEARANCE OF THESE ID'S

22      BUT YOU COULDN'T RECALL THAT JUST NOW?

23 A.   I SAID THERE WERE CLUSTERS BECAUSE OF ---

24 Q.   YOU SAID THEY WERE CLUSTERS OF TWO ---

25          THE COURT: WAIT, WAIT, WAIT.  ALLOW HER

1                   TO ANSWER THE QUESTION.

2              MR. AMBEAU: I'M SORRY.

3              THE COURT: HAVE YOU COMPLECTED YOUR

4                   ANSWER, AGENT?

5              THE WITNESS: I SAID THERE WERE SOME

6                   CLUSTERS, AND THE ID'S WERE SPREAD OUT

7                   OVER A COUPLE OF BOXES.  I DIDN'T FIND ID'S

8                   IN EVERY BOX.

9   MR. AMBEAU:

10  Q.   BUT YOU SAID THAT THOSE CLUSTERS WERE TWO OR

11       THREE ID'S AND THEN SEPARATED BY THE MATERIALS,

12       AND THEN TWO OR THREE ID'S, CORRECT?

13  A.   THE WAY I RECALL.

14              THE COURT: ANYTHING FURTHER?

15              MR. AMBEAU: YES, YOUR HONOR.  ONE LAST

16                   THING.

17  MR. AMBEAU:

18  Q.   LET'S TALK ONE LAST TIME ABOUT THIS STACK OF

19       CHECKS THAT THE GOVERNMENT SHOWED YOU YESTERDAY.

20              MR. AMBEAU:  WHICH IS "GOVERNMENT EXHIBIT

21                   NUMBER 7," YOUR HONOR.  STARTING ON

22                   PAGE 91.

23  MR. AMBEAU:

24  Q.   THIS IS WHAT I'M SHOWING YOU HERE.

25              MR. AMBEAU:  THIS IS PAGE 93, YOUR HONOR,

1        OF THAT GOVERNMENT EXHIBIT.

2   MR. AMBEAU:

3   Q.   YOU SEE THESE CHECKS THAT ARE ALL FROM OUR

4        LOCALITY IN 2010, IN APRIL OF 2010 -- SEEM TO BE

5        BATON ROUGE.  CAN YOUR READ THAT?

6   A.   JUST A LITTLE BIT LARGER.

7   Q.   I KNOW THAT IS DIFFICULT FURTHER AWAY. THE CHECK

8        ON PAGE 93 AT THE TOP LEFT CORNER IS FROM BATON

9        ROUGE; IS THAT CORRECT?

10  A.   THAT'S THE ADDRESS. YES.

11  Q.   AND ONE FROM WINCHESTER, TENNESSEE?

12  A.   YES.

13  Q.   AND TWO FROM BATON ROUGE AND TWO MORE -- ONE IS

14       FROM BATON ROUGE AND ONE MORE IS FROM LOUISIANA;

15       IS THAT RIGHT?

16  A.   YES.

17  Q.   OKAY.  BUT THE NATURE OF THESE CHECKS CHANGED,

18       AND THE GOVERNMENT MADE A POINT OF THIS

19       YESTERDAY, TO --

20            MR. AMBEAU:  THIS IS PAGE 94 OF THAT SAME

21                 "U.S. NUMBER 7," YOUR HONOR.

22  MR. AMBEAU:

23  Q.   -- TOP RIGHT CORNER IS FROM SMYRNA, GEORGIA; IS

24       THAT RIGHT?

25  A.   YES. I SEE THIS ONE.

1  Q.  AND THEN THE BOTTOM FOUR CHECKS ARE FROM GEORGIA,

2      AS WELL.  THREE OF THEM FROM SMYRNA, GEORGIA, AND

3      ONE OF THEM FROM CARROLLTON, GEORGIA; IS THAT

4      RIGHT?

5  A.  YES.

6          MR. AMBEAU:  AND THEN PAGE 95 OF THAT SAME

7                  DOCUMENT, YOUR HONOR.

8  MR. AMBEAU:

9  Q.  SIX CHECKS FROM SMYRNA, GEORGIA; IS THAT RIGHT?

10 A.  COULD YOU GO BACK TO THE TOP TO -- OH, OKAY.

11 Q.  SIX CHECKS FROM SMYRNA, GEORGIA, ALL DEPOSITED ON

12     MAY 12TH, 2010; IS THAT RIGHT?

13 A.  IT APPEARS SO.  YES.

14 Q.  AND, IN FACT, CHECKS FROM CARROLLTON, GEORGIA, A

15     CHECK FROM MARTIN, GEORGIA, CORRECT?

16 A.  YES.

17 Q.  PAGE 96 OF THAT SAME EXHIBIT?

18 A.  YES.

19 Q.  AND A COUPLE OF CHECKS THAT THE GOVERNMENT

20     HIGHLIGHTED FROM --

21          MR. AMBEAU: AND THIS IS PAGE 100 OF THAT

22                  SAME EXHIBIT, YOUR HONOR.

23 MR. AMBEAU:

24 Q.  -- FROM NEWNAN, GEORGIA, DEPOSITED ON THE SAME

25     DATE, 6/8, 2010; IS THAT CORRECT?

1  A.   I SEE THE TWO FROM -- YES, I SEE FOUR FROM

2       NEWNAN.

3  Q.   FOUR FROM NEWNAN, ALL DEPOSITED ON JUNE 8TH, 2010?

4  A.   YES.

5  Q.   AND ANOTHER ONE THERE ON JUNE 8TH, 2010, FROM

6       NEWNAN, GEORGIA, RIGHT?

7  A.   YES.

8  Q.   AND, IN FACT, PAGE 99 OF THAT SAME EXHIBIT,

9       "GOVERNMENT EXHIBIT 7."  AGAIN FOUR MORE CHECKS,

10      THREE FROM NEWNAN, GEORGIA, ONE FROM

11      CARTERSVILLE, GEORGIA, ALL DEPOSITED ON 6/8,

12      2010, CORRECT?

13 A.   YES.

14 Q.   AND JONESBORO, GEORGIA, NEWNAN, GEORGIA.  GO

15      AHEAD.

16 A.   YES.  I SEE THE BOTTOM TWO.

17 Q.   OKAY.  AND, SO, AGAIN WITHOUT WASTING THE JURY'S

18      TIME IN GOING OVER AND OVER AND OVER THAT AGAIN.

19      IN 2010, MR. LINARES WAS GETTING OUT-OF-STATE

20      CHECKS PRESENTED TO HIS BUSINESS AND THEN

21      DEPOSITING THEM INTO HIS BANK ON THE SAME DAY,

22      CORRECT?  BY THAT -- BY THAT EVIDENCE WE JUST

23      SHOWED.

24 A.   YES.

25 Q.   AND, NONE OF THOSE CHECKS WERE FRAUDULENT AT ALL?

1        THESE WERE LEGITIMATE IRS TREASURY CHECKS BEING

2        CASHED IN HIS STORE?

3   A.   TO MY KNOWLEDGE.

4   Q.   AND CERTAINLY TO MR. LINARES' KNOWLEDGE, RIGHT?

5        BECAUSE HE'S NOT EITHER CHARGED WITH ANY OF

6        THOSE, DIDN'T GET CHARGED WITH THOSE BACK THEN.

7        AND, AS FAR AS YOU KNOW, THERE WERE ABSOLUTELY NO

8        RECLAMATIONS RELATED TO ANY OF THESE TREASURY

9        CHECKS?

10  A.   NOT TO MY KNOWLEDGE.

11  Q.   I MEAN, YOU -- YOU'RE THE CASE AGENT.  YOU

12       INVESTIGATED THESE CHECKS IN 2010, CORRECT?

13  A.   THAT -- 2010 IS -- WE SUBPOENAED BANK RECORDS

14       BEYOND THE INVESTIGATIVE SCOPE.  BUT I'M NOT

15       AWARE OF ANY RECLAMATIONS.

16  Q.   2010 IS BEYOND THE INVESTIGATIVE SCOPE OF YOUR

17       INVESTIGATION?

18  A.   THE INVESTIGATIVE PERIOD THAT WE FOCUSED ON WAS

19       MARCH, 2012, TO MAY, 2013.

20  Q.   EXCEPT THAT MR. LINARES IS CHARGED WITH CRIMINAL

21       ACTIVITY IN 2010.

22  A.   THAT RELATED TO THE COMPLIANCE EXAM.

23  Q.   YOU DIDN'T DO ANY INVESTIGATION ON THE COMPLIANCE

24       EXAM?

25  A.   I -- I REVIEWED THE COMPLIANCE EXAM.

1  Q.  BUT THAT'S IT?

2  A.  SUBPOENAED BANK DOCUMENTS BEYOND THE MAIN

3      INVESTIGATIVE PERIOD.

4  Q.  IN ORDER TO REVIEW THEM FOR ANY ILLEGAL ACTIVITY?

5  A.  RELATED TO THE COMPLIANCE EXAM AND THE CHARGES

6      THAT WE HAVE.

7  Q.  AND, SO, IF ANY OF THESE 2010 CHECKS FROM THE IRS

8      WERE FRAUDULENT, YOU WOULDN'T KNOW THAT?

9  A.  I HAVE NO KNOWLEDGE THAT THERE ARE.

10 Q.  SO, IN 2010, MR. LINARES IS PRESENTED WITH ACTUAL

11     TREASURY CHECKS AND IN 2013 -- '12 AND '13 DURING

12     THIS PERIOD, HE'S ALSO PRODUCED WITH ACTUAL

13     TREASURY CHECKS, CORRECT?

14 A.  YES.

15 Q.  THE "YES" IS SUFFICIENT.  AND -- AND IN 2010 AND

16     2013, THE TREASURY CHECKS ARE PRESENTED TO MR.

17     LINARES AT HIS STORE, CORRECT?

18 A.  YES.

19 Q.  IN 2010 AND 2013, NON-FRAUDULENT TREASURY CHECKS

20     AND WHAT TURNS OUT TO BE FRAUDULENT TREASURY

21     CHECKS, IN BOTH INSTANCES THOSE CHECKS ARE CASHED

22     BY HIM, CORRECT?

23 A.  YES.  IN 2010 AND 2013, YES.  HE CASHED TREASURY

24     CHECKS.

25 Q.  IN BOTH OF THOSE INSTANCES, IN 2010 AND 2013,

1        THOSE TREASURY CHECKS ARE MADE OUT TO SPANISH

2        PEOPLE, SPANISH NAMES FOR THE MOST PART, CORRECT?

3   A.   YES.

4   Q.   OKAY.  IN 2010 AND 2013, THE MAJORITY OF THOSE

5        CHECKS HAVE OUT-OF-TOWN ADDRESSES, CORRECT?

6   A.   NO. THE VOLUME OF OUT-OF-TOWN CHECKS ARE SO MUCH

7        GREATER DURING THE INVESTIGATIVE PERIOD COMPARED

8        TO 2010.

9   Q.   THAT'S NOT THE QUESTION I ASKED.

10           THE COURT: REPEAT YOUR QUESTION.

11  MR. AMBEAU:

12  Q.   THE QUESTION IS, IS THAT THE -- IN 2010 AND IN

13       2013, THE MAJORITY OF CHECKS PRESENTED TO MR.

14       LINARES WERE PRESENTED FROM OUT OF THE STATE OF

15       LOUISIANA?

16  A.   FOR 2010, THAT'S NOT MY UNDERSTANDING, THAT THE

17       MAJORITY OF THE TREASURY CHECKS PRESENTED WERE

18       ---

19  Q.   HOW MANY TREASURY CHECKS DID HE CASH IN 2010?

20       IT'S "GOVERNMENT EXHIBIT 52."

21  A.   WAIT, I WAS JUST GOING TO SAY --

22  Q.   THE SUMMARY THAT YOU --

23  A.   -- I NEED TO SEE THE EXHIBIT.

24  Q.   -- THE SUMMARY THAT YOU DID WITH THE GOVERNMENT.

25  A.   COULD I SEE THE EXHIBIT?

1  Q.   YOU CAN SEE THE EXHIBIT TO REFRESH YOUR MEMORY.

2            MR. STEVENS: HE'S ASKING ABOUT SOMETHING

3               THAT WE HAVEN'T SHOWN HER.  WE HAVEN'T

4            -- IT'S NOT IN EVIDENCE.  SO, I -- OBVIOUSLY,

5            SHE'S NOT GOING TO REMEMBER IT OFF THE TOP OF

6            HER HEAD.

7  MR. AMBEAU:

8  Q.   WOULD YOU LIKE TO REVIEW YOUR OWN RECORDS TO SEE

9       HOW MANY TREASURY CHECKS WERE CASHED IN 2010?

10           THE COURT: WAIT, LET ME CLARIFY.  "52"

11              IS IN EVIDENCE. WELL, IT GOES TO

12           THE DEMONSTRATIVE.

13           MR. STEVENS: I DON'T THINK HE'S REFERRING

14              TO "52" NOW. I THINK HE'S REFERRING TO

15           SOMETHING ELSE.  I THINK HE'S REFERRING TO

16           "50" AND "51."  AND THOSE ARE SEPARATE.

17           THE COURT: THAT'S CORRECT.  THOSE ARE NOT IN

18              EVIDENCE.

19  MR. AMBEAU:

20  Q.   SO, DESPITE THE FACT THAT YOU MADE A SUMMARY WITH

21       THE GOVERNMENT OF HOW MANY CHECKS WERE CASHED IN

22       2010, IRS CHECKS, TOTAL IRS CHECKS, YOU CAN'T

23       RECALL WHAT THAT NUMBER IS?

24  A.   I BELIEVE IT'S 70, BUT I WOULD LIKE TO SEE THE

25       CHART.

1  Q.  WELL, THAT'S THE LOUISIANA CHECKS.  THE CHART

2      WE'RE TALKING ABOUT IS THIS ONE.

3          MR. AMBEAU: YOUR HONOR, I'M GOING TO SHOW

4              WHAT'S BEEN MARKED AS "U.S. EXHIBIT 52."

5  MR. AMBEAU:

6  Q.  THE GOVERNMENT SHOWED THIS CHART YESTERDAY,

7      RIGHT, TO SHOW THE DIFFERENCE IN THE PRICE -- I

8      MEAN, THE VALUE OF THESE CHECKS, RIGHT?

9  A.  AVERAGE.  YES.

10 Q.  AND THE CHECKS FROM 2012 THAT THEY SHOWED, THOSE

11     ARE ALL CHECKS.  BUT THE CHECKS FROM 2010, '11

12     AND '12, THOSE ARE THE LOUISIANA CHECKS, RIGHT?

13 A.  YES.

14 Q.  AND HE CASHED A LOT MORE THAN LOUISIANA TREASURY

15     CHECKS THAN THOSE YEARS, DID HE NOT?

16 A.  DID HE CASH OUT-OF-STATE CHECKS?  YES.

17 Q.  IN FACT, WE JUST LOOKED AT IT, RIGHT?  WE CAN GO

18     THROUGH "STATES EXHIBIT 7," WHICH ARE THE

19     TREASURY CHECKS HE CASHED IN 2010.  DO YOU RECALL

20     THAT NUMBER?  IT'S 191 TOTAL TREASURY CHECKS IN

21     2010?

22 A.  NO, I DO NOT RECALL THAT NUMBER.

23 Q.  SO, HE CASHES 191 TREASURY CHECKS IN 2010.  THE

24     MAJORITY OF THOSE CHECKS, OBVIOUSLY IF ONLY 70 OF

25     THEM ARE LOUISIANA CHECKS, ARE FROM OUT OF STATE,

1       RIGHT?

2    A.  THAT'S THE DIFFERENCE, YES.

3    Q.  SO, WE'RE GOING TO GET BACK TO WHAT I WAS TALKING

4        ABOUT A MOMENT AGO.

5            WHICH IN 2010, WHERE THE CHECKS ARE

6        LEGITIMATE, ACTUAL TREASURY CHECK, IN 2013 WHERE

7        THOSE LEGITIMATE TREASURY CHECKS TURN OUT TO BE

8        FRAUDULENT, THE MAJORITY OF THOSE CHECKS IN BOTH

9        CASES WERE FROM OUT OF STATE; IS THAT RIGHT?

10   A.  DIFFERENT RATIOS.  BUT, YES.

11   Q.  AND, IN FACT, IN 2010 AND IN 2013, MR. LINARES

12       MADE DEPOSITS OF MULTIPLE CHECKS ON THE SAME DAY,

13       RIGHT?

14   A.  YES.

15   Q.  OKAY.  AND, IN FACT, IN 2010 AND 2013, MULTIPLE

16       PEOPLE BROUGHT IN CHECKS UNDER A SINGLE NAME; IS

17       THAT CORRECT?

18   A.  YES.

19   Q.  AND, IN FACT, IN 2010 AND 2013, MULTIPLE PEOPLE

20       BROUGHT IN CHECKS AT THE SAME ADDRESS IN BOTH OF

21       THOSE TAX SEASONS?

22   A.  YES.

23   Q.  AND, SO, THE ONLY DIFFERENCE WE ARE LEFT WITH OUT

24       OF ALL OF THOSE FACTORS, BETWEEN THE 2010 CHECKS

25       THAT TURNED OUT TO BE EXACTLY WHAT THEY WERE

1    PURPORTED TO BE WHEN GIVEN TO MR. LINARES, WERE

2    LEGITIMATE, UNITED STATES TREASURY CHECKS.  AND

3    THE 2012-13 CHECKS THAT ARE THE SUBJECT HERE,

4    WHICH WERE ACTUAL TREASURY CHECKS THAT TURNED OUT

5    TO BE FRAUDULENT OBTAINED.  THE ONLY DIFFERENCE

6    IS, THAT MORE OF THEM WERE FROM OUT OF STATE,

7    CORRECT?

8  A.  THERE WERE MORE OUT OF STATE, YES.

9  Q.  AND THE AMOUNT OF THOSE CHECKS WAS GREATER IN '12

10    AND '13 THAN IN 2010?

11  A.  THAT IS ANOTHER FACTOR, YES.

12  Q.  AND BY THOSE TWO DISTINGUISHING FACTORS OUT OF

13    ALL THOSE FACTORS, YOU EXPECT MR. LINARES TO HAVE

14    ROOTED OUT THIS FRAUD PERPETRATED ON THE UNITED

15    STATES TREASURY?

16  A.  THOSE ARE -- THOSE ARE TWO OF THE FACTORS THAT

17    ARE SIGNIFICANT.

18  Q.  BUT WE JUST WENT DOWN A WHOLE LIST OF FACTORS,

19    RIGHT?

20  A.  I'D HAVE TO -- I'D HAVE TO GO BACK TO -- TO WHAT

21    OCCURRED, THE NUMBER OF THE CHECKS AND WHAT WE

22    DISCUSSED SO FAR.

23  Q.  SURE.  I MEAN, ---

24  A.  CASHING OUT-OF-STATE CHECKS.

25  Q.  ALL RIGHT.  WELL, WE WENT THROUGH A WHOLE LIST OF

1    FACTORS OF 2010 WHERE THIS ACTIVITY OCCURRED IN

2    HIS BUSINESS AND EVERYTHING WAS LEGITIMATE AND

3    FINE.  AND IN 2012 AND '13, WHERE IT TURNED OUT

4    TO BE THAT THE CHECKS WERE OBTAINED FRAUDULENTLY.

5    BUT THOSE TWO THINGS DIFFER.  THOSE TWO YEARS

6    DIFFER.  THOSE TWO MOMENTS IN TIME DIFFERENT BY

7    VERY, VERY LITTLE INFORMATION COMPARED TO THE

8    WHOLE OF THE INFORMATION MR. LINARES WAS

9    CONSIDERING, CORRRECT? FOREVER.

10   A.   SIR, WOULD YOU REPEAT THAT?

11   Q.   SURE.

12   A.   I DON'T FOLLOW YOU.

13   Q.   THE TIME PERIOD IN 2010 AND THE TIME PERIOD IN

14   2012 AND '13, TO DIFFERENTIATE, RIGHT, GOOD

15   CHECKS, EVERYTHING FINE.  GOOD CHECKS, EVERYTHING

16   TURNS OUT TO BE FRAUDULENT.  THOSE ARE

17   DIFFERENTIATED BY ONLY TWO POINTS OF 15; IS THAT

18   CORRECT

19   A.   THE NUMBER OF THE CHECKS, THE DOLLAR AMOUNTS, THE

20   ADDRESSES.  WE'VE GONE ---

21        MR. AMBEAU: I'M SORRY.  I'LL LET HER

22        FINISH THE QUESTION.  I APOLOGIZE.

23   THE WITNESS:

24   A.   WE'VE GONE OVER A NUMBER OF FACTORS THAT ---

25   MR. AMBEAU:

1  A.   WELL, WE JUST LOOKED AT THE FACT THAT 2010 AND

2       2013, THERE WERE OUT OF STATE ADDRESSES,

3       REPETITIVE ADDRESSES, IN BOTH OF THOSE, RIGHT?

4            MR. STEVENS: OBJECTION, YOUR HONOR.

5                 HE'S JUST ARGUING AND THEN PUTTING ---

6            THE COURT: IT'S GETTING A LITTLE

7                 ARGUMENTATIVE, COUNSEL.  LET'S MOVE ON

8            OR LET'S WRAP IT UP.  OKAY?

9            MR. AMBEAU: ONE MOMENT, YOUR HONOR.

10                THAT'S ALL I HAVE.

11           THE COURT: ALL RIGHT.  THANK YOU.

12                ANY REDIRECT?

13           MR. STEVENS: YES, JUDGE, IF I MAY.

14                REDIRECT EXAMINATION

15 MR. STEVENS:

16 Q.   ALL RIGHT, MS. SCHMIT.  TAKE A DEEP BREATH.

17      DO YOU HAVE WATER?

18 A.   SOME, YES.

19 Q.   I'M GOING TO TRY TO SPEAK VERY PLAINLY AND VERY

20      CLEARLY AND EVEN VERY SLOWLY, WHICH I DON'T

21      USUALLY DO.  AND I WANT YOU TO SPEAK VERY CLEARLY

22      IN RESPONSE, OKAY?

23 A.   (INDICATING AFFIRMATIVE RESPONSE)

24 Q.   WE DIDN'T HEAR THAT.

25 A.   YES.

1  Q.  AND IF I ASK YOU A QUESTION THAT YOU DON'T

2      UNDERSTAND, PLEASE STOP ME AND LET ME KNOW.

3  A.  OKAY.

4  Q.  WILL YOU DO THAT?  YOU RESPOND -- AND I MEAN THIS

5      IN A POLITE WAY.  YOU RESPOND TO A LOT OF

6      QUESTIONS THAT I ASKED YOU AND THAT MR. AMBEAU

7      ASKED YOU WITH VERY, VERY TECHNICAL ANSWERS,

8      RIGHT?

9          MR. AMBEAU: YOUR HONOR, I OBJECT TO THE

10             ---

11         THE COURT: WHERE ARE WE GOING WITH THIS,

12             COUNSEL?  LISTEN, JUST ASK THE QUESTION

13         AND LET'S MOVE ON.  OKAY?

14         MR. STEVENS: OKAY.

15         THE COURT: ANY QUESTION THAT WAS RAISED

16             DURING DIRECT, WE ALL KNOW THE RULES,

17         AND LET'S JUST MOVE ON TO THE SUBSTANCE OF

18         YOUR QUESTIONS.

19  MR. STEVENS:

20  Q.  DID YOU RESPOND TO A LOT OF QUESTIONS THAT WERE

21      JUST ASKED TO YOU BY MR. AMBEAU WITH, "NOT TO MY

22      KNOWLEDGE"?

23  A.  YES.

24  Q.  AND DID YOU RESPONSE TO A NUMBER OF HIS QUESTIONS

25      WITH THE ANSWER SUCH AS, "THAT'S MY UNDERSTANDING

1      OF THE ISSUE"?

2  A.   YES.

3  Q.   AND WHEN MR. AMBEAU WOULD ASK ABOUT THE TIME

4      PERIOD AND THE TIME FRAME, WOULD YOU RESPOND WITH

5      ---

6          THE COURT: LET ME SHUT YOU DOWN RIGHT THERE.

7              THERE'S NO NEED.  DO YOU HAVE ANY --

8          THE JURY WILL DECIDE HOW TO RECEIVE THIS

9          WITNESS' ANSWERS, AS WELL AS ANY WITNESS'

10          ANSWERS.  BUT IF YOU HAVE A SPECIFIC

11          QUESTION, A SPECIFIC -- NOT THE MANNER IN

12          WHICH SHE ANSWERED THE QUESTION, BUT A

13          SPECIFIC, SUBSTANTIVE QUESTION THAT WAS

14          RAISED ON CROSS, YOU MAY ASK THAT.  IT'S NOT

15          NECESSARY TO EVALUATE THE MANNER IN WHICH SHE

16          ANSWERED THE QUESTION.  OKAY?

17          MR. STEVENS: YES, SIR.

18          THE COURT: SO, AGAIN, LET'S GET TO THE

19              ISSUES AND THE SPECIFIC SUBSTANCE OF

20          QUESTIONS, THE FACTUAL QUESTION.

21          MR. STEVENS: YES, JUDGE.

22  MR. STEVENS:

23  Q.   AGENT SCHMIT, WERE YOU ASKED A NUMBER OF

24      QUESTIONS ABOUT THE ID'S IN THIS CASE?

25  A.   YES.

1  Q.  I AM SHOWING YOU WHAT'S ALREADY BEEN ADMITTED

2      INTO EVIDENCE.

3          MR. STEVENS:  JUDGE, AND THIS IS "EXHIBIT

4              U.S. 43."

5  MR. STEVENS:

6  Q.  CAN YOU SEE THAT ID?  AND THIS FIRST PAGE OF

7      "U.S. 53"?

8  A.  YES.

9  Q.  3935.  CAN YOU SEE THAT CLEARLY?

10 A.  YES.

11 Q.  AND IS THIS -- DOES THIS APPEAR TO BE AN ID FROM

12     THE MEXICAN CONSULATE WHERE MS. FLORES, WHO LIVES

13     ON FLORIDA BOULEVARD, DENEN SPRIN, LOUISIANA?

14 A.  YES.

15 Q.  AND I WANT TO SHOW YOU "EXHIBIT 14B."

16          MR. STEVENS: AND THIS HAS ALREADY BEEN

17              ADMITTED INTO EVIDENCE.

18 MR. STEVENS:

19 Q.  I'M SHOWING YOU FIRST THE BIG PICTURE.  BUT I'M

20     TURNING TO PAGE TWO OF "14B."  AND I'M GOING TO

21     ASK YOU IF YOU SEE MS. CARMEN RIVERA FLORES' NAME

22     FIVE LINES FROM THE BOTTOM?

23 A.  YES.

24 Q.  WHEN WAS HER TREASURY CHECK ISSUED BY THE

25     TREASURY?

1   A.   AUGUST 30TH, 2012.  IS THAT -- DID I READ THE ONE

2        ABOVE IT OR ---

3   Q.   I THINK YOU MAY HAVE.

4   A.   OH, OKAY.  I'M SORRY.

5   Q.   WHAT IF I DO THIS?

6   A.   YES.  OKAY.  SEPTEMBER 7TH, 2012.

7   Q.   WAS THAT CHECK MAILED OR TRANSMITTED TO HER IN

8        SOME OTHER WAY?

9   A.   IT WAS MAILED.

10  Q.   OKAY.  DO YOU KNOW WHERE THESE TREASURY CHECKS

11       ARE MAILED FROM?

12  A.   I REALLY DON'T KNOW.  I BELIEVE THAT THE CLOSEST

13       PROCESSING CENTER FOR WORCESTER WOULD BE THE ONE

14       IN ANDOVER.

15  Q.   OKAY.

16  A.   BUT I COULD BE MISTAKEN.

17  Q.   WHERE WAS THIS CHECK MAILED TO?

18  A.   MS. FLORES' ADDRESS WAS 37 ILLINOIS STREET,

19       APARTMENT 2, WORCESTER, MASSACHUSETTS.

20  Q.   AND THAT WAS HER ADDRESS AS OF WHAT DATE?

21  A.   SEPTEMBER 7TH, 2010.

22  Q.   AND IS IT REASONABLE TO ASSUME THAT SHE WOULD

23       HAVE RECEIVED THE CHECK BY SEPTEMBER 9TH OR 10TH?

24  A.   YES.

25  Q.   I MEAN, AT THE EARLIEST, I SUPPOSE?

1  A.    YES.

2  Q.    WHEN DID THE DEFENDANT DEPOSIT THIS CHECK?

3  A.    I CAN'T SEE THAT EDGE.  I'M SORRY.  SEPTEMBER

4        19TH, 2010.

5  Q.    SO, DOES THAT LEAVE ABOUT A TEN-DAY GAP?

6  A.    YES.

7  Q.    BETWEEN WHEN SHE WOULD HAVE RECEIVED THE CHECK

8        AND WHEN THE DEFENDANT DEPOSITED IT?

9  A.    YES.

10 Q.    AND IN THAT TEN DAYS, I'M GOING BACK TO "53."  IN

11       THAT TEN DAYS, MS. FLORES -- DO YOU KNOW WHETHER

12       SHE PACKED UP IN MASSACHUSETTS, WENT DOWN TO THE

13       MEXICAN CONSULATE IN DALLAS, GOT THIS ID, MOVED

14       IN IN DENAN SPRIN, AND THEN FOUND THE DEFENDANT'S

15       STORE?  DO YOU KNOW WHETHER THAT'S EVEN POSSIBLE

16       FOR HER TO HAVE DONE THAT?

17          MR. AMBEAU: YOUR HONOR, I'M GOING TO OBJECT

18             TO THE SPECULATION.

19          THE COURT: WELL, SHE CAN ANSWER IT IF SHE

20             KNOWS.  SHE IS THE CASE AGENT.  EITHER

21          SHE KNOWS -- THE ANSWER IS YES OR NO.  LET'S

22          JUST SEE.

23             DO YOU RECALL THE QUESTION, MA'AM?

24             THE OBJECTION IS OVER-RULED.

25 THE WITNESS:

1  A.  IF WE'RE GOING TO SAY SHE PRESENTED THE CHECK,

2      THEN SHE WOULD HAVE TO HAVE BEEN BUSY.  BUT I

3      DON'T THINK THAT'S IMPOSSIBLE.

4  MR. STEVENS:

5  Q.  ALL RIGHT.  THIS ID.  IS THIS ONE OF THE ID'S

6      THAT YOU FOUND SUSPICIOUS?

7  A.  YES.

8  Q.  HOW LONG DID IT TAKE YOU TO DEVELOP CONCERNS

9      ABOUT THIS ID?

10 A.  A FEW SECONDS, BASED ON THE ---

11 Q.  YOU WERE ASKED 20 QUESTIONS, PROBABLY, ABOUT

12     SOPHISTICATED TECHNIQUES AND ALL THE ADVANCED

13     METRICS THAT PEOPLE HAVE TO DETECT FRAUD.  DID

14     YOU EMPLOY ANY OF THOSE TECHNIQUES OR SYSTEMS TO

15     SPOT CONCERNS ABOUT THIS ID?

16 A.  NO.

17 Q.  YOU WERE ASKED YESTERDAY AND AGAIN TODAY ABOUT

18     PERFORMING A FINANCIAL ANALYST -- ANALYSIS OF THE

19     DEFENDANT'S BANK ACCOUNTS; DO YOU REMEMBER THAT?

20 A.  YES.

21 Q.  AND MR. AMBEAU BEGAN ONE OF HIS QUESTIONS BY

22     SAYING, "YOU DIDN'T DO ANY FORENSIC ANALYSIS OR

23     ANY OTHER KIND OF ANALYSIS ON THE ACCOUNTS."  AND

24     DO YOU RECALL THAT YOUR ANSWER WAS, "YES"?

25 A.  YES.

1  Q.  DID YOU MEAN TO SAY THAT?

2  A.  (NO RESPONSE.)

3  Q.  LET ME ASK YOU THIS.  HOW MUCH TIME DO YOU THINK

4      YOU HAVE SPENT IN THIS CASE LOOKING AT THE

5      DEFENDANT'S BANK RECORDS?

6  A.  HOURS AND HOURS.  I DON'T KNOW THAT I CAN ---

7  Q.  DID YOU TRY TO ACCOUNT FOR ALL THE MONEY THAT WAS

8      COMING IN AND OUT OF HIS ACCOUNT?

9  A.  I ATTEMPTED IT.  LIKE I SAID, I WAS NOT ABLE TO

10     COMPLETE IT.

11 Q.  WERE YOU ABLE -- AND I THINK YOU BEGAN TO ANSWER

12     THAT YESTERDAY AND THEN MR. AMBEAU MOVED ON.

13     TELL US ABOUT SOME OF THE PROBLEMS YOU

14     ENCOUNTERED TRYING TO TRACK DOWN THE MONEY.

15 A.  THE FUNDS IN THE ACCOUNT ARE COMMINGLED WITH THE

16     OTHER SERVICES -- THE FUNDS COMING AND GOING FOR

17     WIRE SERVICES, THE CHECK CASHING FOR REGULAR

18     CHECKS.  THERE'S A LOT OF CASH -- CHECKS TO CASH,

19     CHECKS WRITTEN TO INDIVIDUALS THAT I'M NOT SURE

20     WHAT THE RELATIONSHIP IS TO THE BUSINESS.

21 Q.  DID THE DEFENDANT WRITE A LOT OF CHECKS TO

22     HIMSELF?

23 A.  YES.

24 Q.  AND DID HE -- AND ONCE HE DOES THAT, DO YOU HAVE

25     ANY WAY OF KNOWING WHERE THAT MONEY GOES?

```
 1  A.   IT'S CHECKS CASHED.  IT'S FUNDABLE.  IT BECOMES
 2       CASH.
 3  Q.   DID YOU FIND THAT HE ALSO WROTE A LOT OF CHECKS
 4       TO FAMILY MEMBERS AND OTHERS CLOSE TO HIM?
 5  A.   YES.
 6            MR. STEVENS: MAY I APPROACH THE WITNESS,
 7                 JUDGE?
 8            THE COURT: YES.
 9            MR. STEVENS: THESE HAVE NOT BEEN ADMITTED,
10                 JUDGE.  BUT I'VE MARKED FOR
11                 IDENTIFICATION "85, 86," AND "87."
12  MR. STEVENS:
13  Q.   AGENT SCHMIT, DO YOU HAVE ALL THREE DOCUMENTS IN
14       FRONT OF YOU?
15  A.   YES.  I HAVE THOSE THREE FOLDERS.
16  Q.   LET ME ASK YOU ABOUT "85" AND "87" FIRST. ARE
17       THOSE EXCERPTS OF DOCUMENTS THAT HAVE ALREADY
18       BEEN ADMITTED?
19  A.   YES.
20  Q.   OKAY.
21            MR. STEVENS: AND, JUDGE, THESE ARE BOTH
22                 EXCERPTS FROM "U.S. EXHIBIT 9."
23            I WOULD MOVE TO -- IN FACT, I THINK IT MAKES
24            SENSE TO HAVE THEM MARKED SEPARATELY.  AND
25            I'D MOVE TO ADMIT "85" AND "87" AT THIS TIME.
```

1           THE COURT: OKAY.  WELL, LET MET ME SEE THE

2               EXHIBIT.  I HAVE NOT BEEN PROVIDED WITH

3           A COPY.

4               MR. AMBEAU, HAVE YOU BEEN PROVIDED A

5           COPY OF THE EXHIBIT?

6           MR. AMBEAU: YES, YOUR HONOR.

7           THE COURT: AND THESE ARE PORTIONS OF

8               "EXHIBIT 9"?

9           MR. STEVENS: "85" AND "87" ARE, JUDGE.

10              YES.

11          THE COURT: OKAY.

12          MR. STEVENS: AND "86" I NEED TO ASK

13              ABOUT NEXT.

14          THE COURT: VERY WELL.  WITHOUT OBJECTION

15              "GOVERNMENT'S EXHIBITS 85" AND "87" ARE

16          ADMITTED.

17  MR. STEVENS:

18  Q.  AND, AGENT SCHMIT, I JUST TOOK YOUR COPY FROM

19      YOU.  BUT DID YOU HAVE A CHANCE TO LOOK AT WHAT'S

20      BEEN MARKED AS "86"?

21  A.  NO, I DID NOT.  I SET IT ASIDE.

22          MR. STEVENS: JUDGE, MAY I -- THANK YOU.

23          THE COURT: LET THE RECORD REFLECT THAT

24              THE WITNESS HAS BEEN PROVIDED

25          "GOVERNMENT EXHIBIT 86," THAT'S BEEN MARKED

1          FOR IDENTIFICATION.

2   MR. STEVENS:

3   Q.   AND IS "86" ONE OF THE FINANCIAL RECORDS YOU

4        FOUND AT THE DEFENDANT'S STORE?

5   A.   YES.

6   Q.   AND HOW DO YOU RECOGNIZE IT?

7   A.   THE SEARCH WARRANT, STAMP BATES NUMBER AT THE

8        TOP.

9             MR. STEVENS: AND, JUDGE, AT THIS POINT

10                 I'D MOVE TO ADMIT "U.S. 86."

11            THE COURT: ANY OBJECTION?

12            MR. AMBEAU: NONE, YOUR HONOR

13            THE COURT: ADMITTED.

14  MR. STEVENS:

15  Q.   ALL RIGHT.  AGENT SCHMIT, DOES THE DEFENDANT HAVE

16       A SON NAMED CARLOS F. LINARES?

17  A.   YES.

18  Q.   AND HOW DO YOU KNOW THAT?

19  A.   BECAUSE I CONTACTED HIM.

20  Q.   OKAY.  I'M SHOWING YOU "EXHIBIT 85," WHICH HAS

21       BEEN ADMITTED.

22            MR. STEVENS: MAY I PUBLISH THIS TO THE JURY?

23            THE COURT: YES.

24            MR. AMBEAU: YOUR HONOR, MAY WE APPROACH?

25            THE COURT: YES.

1    REPORTER'S NOTE: (THEREFORE, AT THIS TIME

2        A BENCH CONFERENCE WAS HELD.)

3    MR. AMBEAU: I DON'T KNOW HOW MUCH OF THIS

4        REDIRECT RELATES TO HIS SON.  BUT I

5    DIDN'T ASK ANY QUESTIONS ABOUT HIS SON OR HIS

6    SON'S RELATIONSHIP TO THE BUSINESS OR WHAT

7    HIS SON DID IN THE BUSINESS.  AND, SO, I'M

8    NOT SURE HOW THE REDIRECT IS WITHIN THE SCOPE

9    OF CROSS IF HE STARTS TALKING ABOUT WHAT HIS

10    SON DOES IN THE BUSINESS OR DID IN THE

11    BUSINESS.

12    MR. STEVENS: JUDGE, HE SPENT AN HOUR

13        TALKING -- AND HOURS WITH OTHER

14    WITNESSES TALKING ABOUT HOW HIS BUSINESS

15    WASN'T PROFITABLE. HE WAS ONLY KEEPING ONE

16    AND A HALF PERCENT.  IF I CAN SHOW THAT TENS

17    OF THOUSANDS OF DOLLARS OF THE BUSINESS'

18    MONEY WERE GOING TO THE DEFENDANT'S FAMILY

19    MEMBERS, THAT CUTS DIRECTLY TO WHAT MR.

20    AMBEAU HAS SPENT HOURS TALKING ABOUT.

21    THE COURT: HOW?  I MEAN, IF ---

22    MR. STEVENS: BECAUSE IF ---

23    THE COURT: WAIT, WAIT.

24    MR. STEVENS: I'M SORRY.

25    THE COURT: MY POINT IS THIS.  HOW RELEVANT

1          IS IT?  IT DOESN'T MATTER WHAT HE DID

2     WITH THE MONEY?  DOES IT EVER -- IF A DRUG

3     DEALER EARNS A HUNDRED THOUSAND DOLLARS A

4     YEAR SELLING DRUGS, WHY IS IT RELEVANT THAT

5     HE USED IT TO BUY HIS MOTHER A HOUSE AND ALL

6     THAT?  MAYBE THAT'S -- IF YOU'VE ALREADY

7     ESTABLISHED THAT HE'S MADE THE MONEY FROM

8     SOME ILLEGAL MEANS, WHY IS IT NECESSARY OR

9     EVEN RELEVANT TO SHOW ---

10    MR. STEVENS: I DON'T KNOW THAT IT IS, JUDGE.

11         BUT WE'VE ALREADY LET -- RESPECTFULLY,

12    YOU'VE ALREADY LET MR. AMBEAU SPEND HOURS

13    TALKING ABOUT THIS ONE AND A HALF PERCENT AND

14    HOW THAT'S ONLY $23,000.00.  AND HOW HE LOST

15    MONEY ON THIS SCHEME BECAUSE HE HAD TO PAY

16    THE BANK BACK.

17    THE COURT: BUT IT WENT DIRECTLY TO ---

18    MR. STEVENS: BUT NONE OF THAT'S TRUE,

19         JUDGE.

20    THE COURT: BUT AS I APPRECIATE IT, THERE

21         WAS -- THE GOVERNMENT OFFERED EVIDENCE

22    ABOUT THE ONE AND A HALF PERCENT.  AND THEN

23    THERE WAS EVIDENCE ABOUT ALL THE CHECKS.  AND

24    AS I RECALL FROM THE EVIDENCE, THERE WAS

25    TESTIMONY ABOUT HOW MUCH DID THAT ADD UP TO.

1     I DON'T KNOW IF THERE WAS ANYTHING BEYOND

2     THAT THOUGH.  I MEAN, WHAT AM I MISSING?

3     MR. STEVENS: I THINK MR. AMBEAU HAS ALREADY

4          CLEARLY SAID A COUPLE OF TIMES THAT

5     THE DEFENDANT'S A VICTIM, THAT HE LOST MONEY.

6     THE COURT: YES, HE DID.

7     MR. STEVENS: THAT HE ONLY MADE WHATEVER THE

8          CALCULATION IS, ONE ONE AND A HALF

9     PERCENT OF 1.5 MILLION.

10     THE COURT: CORRECT.

11     MR. STEVENS: AND THESE DOCUMENTS REFUTE

12          THAT.

13     THE COURT: HOW SO?

14     MR. STEVENS: BECAUSE THE -- THE MONEY THAT

15          HE'S FUNNELING TO HIS SON AND HIS

16     DAUGHTER OR TO OTHER FAMILY MEMBERS AND OTHER

17     PEOPLE, THAT ADDS UP TO A MUCH GREATER POOL

18     OF MONEY THAN ANYTHING MR. AMBEAU HAS BROUGHT

19     TO THIS JURY'S ATTENTION.  AND THAT'S ALL --

20     THAT'S ALL PROFIT, JUDGE.  IT'S NOT TO PAY

21     FOR GROCERIES.  IT'S NOT TO PAY FOR THE MILK

22     IN THE COOLER.

23     MR. AMBEAU: YOU CAN'T POSSIBLY KNOW THAT.

24     MR. STEVENS: IT'S JUST THE PROFIT -- IT'S

25          JUST THE PROFITS OF THE SCHEME BEING

1    FUNNELED TO HIS FAMILY.

2    THE COURT: I'M STILL MISSING SOMETHING.

3         BECAUSE I THOUGHT THE EVIDENCE WAS --

4    OKAY, IT'S 1.5 ON ALL OF THESE CHECKS THAT

5    HAVE BEEN INTRODUCED BY THE GOVERNMENT.  AND

6    NOW YOU'RE TRYING TO GET IN EVEN MORE

7    INFORMATION OF MORE MONEY THAT ALLEGEDLY HE

8    RAN THROUGH HIS BUSINESS THAT MAY BE

9    UNRELATED.  HOW DO WE KNOW THAT -- I MEAN,

10   THIS IS ANOTHER CONCERN.  HOW DO WE KNOW THAT

11   WHATEVER MONIES YOU WANT TO INTRODUCE WERE

12   NOT MONIES FROM THE SALE OF MILK AND BREAD

13   AND ALL KIND OF OTHER THINGS, WIRE TRANSFERS

14   THAT WERE LAWFUL.  HOW DO WE KNOW THAT?

15   MR. STEVENS: WE DON'T KNOW THE 1.5 PERCENT.

16        I DON'T THINK THAT THAT -- THAT'S NOT

17   SETTLED.  BUT -- BUT THIS EVIDENCE SHOWS THAT

18   MR. LINARES WAS NOT JUST SCRAPING BY.  HE WAS

19   NOT LOSING MONEY BECAUSE OF THESE CHECKS.

20   THE COURT: WELL, LISTEN.  I DON'T THINK HE

21        WAS LOSING MONEY.  I THINK THE POINT WAS

22   THAT HE PAID MONEY TO THE BANK TO COVER THIS.

23   I DON'T THINK THE EVIDENCE WAS THAT HE WAS

24   LOSING MONEY TO THE POINT WHERE HE WAS READY

25   TO FOLD UP SHOP.  I MEAN, THE EVIDENCE IS

1     THAT HE'S STILL AN ONGOING BUSINESS.

2          I GUESS I DON'T UNDERSTAND THE RELEVANCE

3     OF ALL OF THIS.

4     MR. CROSSWELL: WELL, -- YOUR HONOR, I JUST

5          HAVE ONE THING.

6     THE COURT: PLEASE.  YES.  I MEAN, LISTEN.

7          I'M NOT GOING TO SHUT YOU DOWN.  I'M

8     JUST TRYING TO UNDERSTAND MORE FULLY.

9     MR. CROSSWELL: AND WE THINK THAT'S ONE OF

10         THE THINGS THAT THE DEFENSE HAS USED TO

11    CONFUSE THE JURY IN OPENING AND THROUGH EVERY

12    WITNESS, IS THIS PART ABOUT BEING ABLE TO PAY

13    THE BANK BACK.  WELL, OUR POINT IS, HE'S

14    PAYING IT BACK WITH STOLEN FUNDS.  YOU SEE?

15    HE'S -- HE'S -- THE REASON ALL THAT MONEY WAS

16    IN HIS BANK IS BECAUSE HE KNOWS IT WAS

17    STOLEN.  IT GOES STRAIGHT TO HIS INTENT.

18    IT'S BEEN A THEME SINCE OPENING. AND THE JURY

19    SHOULD BE ENTITLED TO HEAR EVIDENCE THAT

20    REFUTES THAT.

21    THE COURT: HOW WAS IT STOLEN FUNDS?

22    MR. CROSSWELL: BECAUSE IT'S FROM THESE

23         TREASURY CHECKS.  IF HE'S ABLE TO PAY

24    BACK FRAUDULENT CHECKS THAT HE'S CASHED AND

25    HE KEEPS MONEY IN HIS ACCOUNT, WHICH SHOWS

1    THAT HE'S SMART ABOUT IT.

2    THE COURT: I UNDERSTAND THAT.  BUT ---

3    MR. CROSSWELL: AND THE JURY CAN DECIDE

4         WHATEVER THEY WANT.  BUT I THINK IT'S

5    SORT OF AN IRRELEVANT THAT THE JURY MAY

6    DECIDE THAT ---

7    MR. AMBEAU: IF I CAN RESPOND, YOUR HONOR.

8    THE COURT: YES, YES.

9    MR. AMBEAU: THERE'S BEEN NO EVIDENCE OF

10        ANY KIND THAT MR. LINARES COLLECTED

11   ANYTHING MORE THAN THE ONE AND A HALF

12   PERCENT.  SO, THERE'S NOT EVEN A FOUNDATION

13   NECESSARY OTHER THAN TO CONFUSE THE JURY.  IF

14   YOU START NOW TALKING ABOUT LOTS OF MONEY AND

15   -- I DON'T WANT ---

16   THE COURT: TO THE CONTRARY.  IN MY -- MY

17        RECOLLECTION IS THAT WHEN THE AGENT WAS

18   ASKED -- I BELIEVE YOU WAS ASKED, DID HE EARN

19   ANY OTHER MONEY OR DO YOU HAVE EVIDENCE THAT

20   HE'S EARNED ANY OTHER MONEY OTHER THAN THE

21   ONE AND A HALF PERCENT, THE ANSWER WAS, "NO."

22   MR. AMBEAU: SHE SAID, "NO."  THAT'S CORRECT.

23   THE COURT: AND, SO, THAT BEING THE CASE,

24        I'M WONDERING WELL, WAIT.  THE FOCUS, AT

25   LEAST ON THE CROSS EXAMINATION WAS WITH

1    RESPECT TO THE BANK.  AND THE ONE AND A HALF

2    PERCENT THAT -- AND I DON'T RECALL IF YOUR

3    QUESTION WAS, DID THE BANK LOSE ANYTHING OR

4    DID HE -- AGAIN, IF IT WAS JUST ---

5    MR. AMBEAU: I THINK IT WAS BOTH QUESTIONS.

6        DID THE BANK LOSE ANY MONEY? AND SHE

7    SAID, "NO, BECAUSE HE PAID THE 59,000."  I

8    SAID, "DO YOU HAVE ANY EVIDENCE THAT HE

9    CHARGED MORE THAN ONE AND A HALF PERCENT?"

10   AND SHE SAID, "NO."  JUDGE, THEY HAVEN'T --

11   THEY'VE ADMITTED NO EVIDENCE THAT HE

12   COLLECTED ANY MORE MONEY.

13   THE COURT: THAT WAS MY RECOLLECTION.  I

14       MEAN, SO NOW IT LOOKS LIKE YOU'RE

15   OPENING UP A WHOLE NEW CAN OF WORMS.

16   MR. STEVENS: JUDGE, I ---

17   MR. CROSSWELL: HE SAID IN OPENING.  HE SAID

18       AT OPENING, MR. LINARES IS OUT

19   $59,000.00.

20   THE COURT: GRANTED.  ASSUMING THAT IS THE

21       CASE, THOUGH, MR. CROSSWELL.  THE

22   GOVERNMENT HAS PUT ON ITS CASE IN CHIEF.

23   THIS IS THE CROSS EXAMINATION.  WHEN YOU

24   HEARD HIM SAY THAT IN OPENING, YOU SHOULD

25   HAVE HAD A WITNESS PREPARED AND READY TO GO

1    TO SAY, "NO, THAT'S NOT REALLY WHAT

2    HAPPENED."

3         SO, I GUESS MY POINT IS, THIS IS CROSS

4    EXAMINATION.  THIS IS -- AND IT JUST SEEMS TO

5    ME THAT YOU'RE TRYING TO INTRODUCE A WHOLE

6    DIFFERENT AREA NOW.  AND, AGAIN, I THINK IT

7    GOES WELL BEYOND THE CROSS EXAMINATION.

8    MR. STEVENS: I HEAR YOU, JUDGE.  I ACCEPT

9         THAT.  THE MAIN POINT I WANTED TO MAKE

10   AND I APPRECIATE YOU ALLOWING ME TO MAKE IT,

11   WAS, HE KIND OF TRICKED HER AND GOT HER TO

12   ADMIT YESTERDAY, IT'S BETTER TO SAY THAT SHE

13   HADN'T DONE ANY FINANCIAL ANALYSIS.  AND I

14   HAD TO MAKE SURE THAT THE JURY UNDERSTOOD

15   THAT THAT WAS SIMPLY NOT TRUE.  THAT HE HAD

16   KIND OF TRICKED HER INTO AGREEING TO THAT.

17   THE COURT: AND IF SHE DID THAT ANALYSIS

18        AND SHE GOT CONFUSED, YOU CAN ASK THE

19   QUESTION AGAIN AND MAYBE SHE'S -- WELL, WHAT

20   DID YOU MEAN BY THAT.  YOU CAN TRY TO

21   REHABILITATE HER.  BUT I THINK BY INTRODUCING

22   ALL OF THIS INFORMATION, AT LEAST AT THIS

23   STAGE, IS NOT ONLY PREJUDICIAL, BUT IT'S WELL

24   BEYOND THE CROSS EXAMINATION AND ESSENTIALLY

25   DOESN'T COMPORT WITH THE RULES.

1          MR. STEVENS: UNDERSTOOD, JUDGE.  I'LL MOVE

2               ON.  I THINK "85" THROUGH "87" ARE

3          ALREADY ADMITTED, THOUGH.

4          THE COURT: YES.

5          MR. STEVENS: AND I'LL MOVE ON.  THANK YOU,

6               JUDGE.

7          MR. AMBEAU: THANK YOU.

8          THE COURT: THANK YOU.

9          REPORTER'S NOTE: THEREFORE, AT THIS TIME,

10              THE BENCH CONFERENCE WAS CONCLUDED.)

11  MR. STEVENS:

12  Q.   I DON'T KNOW THAT THIS WAS CLEAR ON CROSS, AND I

13       JUST WANT TO CLARIFY.

14          DO YOU KNOW WHETHER LATINO'S WAS THE BANK'S

15       ONLY CUSTOMER AT THE TIME?

16  A.   HANCOCK BANK'S ONLY CUSTOMER?

17  Q.   YES.

18  A.   NO.  THEY HAD THOUSANDS OF CUSTOMERS.

19  Q.   DOES THE BANK SEE THE PEOPLE WHO BRING CHECKS TO

20       ITS CUSTOMERS' STORES?

21  A.   NO.

22  Q.   DOES THE BANK SEE THE ID'S THAT THOSE PEOPLE

23       PRESENT TO ITS CUSTOMERS, THE CHECK CASHERS?

24  A.   NO, NOT TO MY KNOWLEDGE.

25  Q.   YOU WERE ASKED AT LEAST 20 QUESTIONS ABOUT A & R

1      ELITE.

2          MR. STEVENS: I ONLY HAVE A FEW QUESTIONS

3          ABOUT THIS, JUDGE. BUT I DO THINK IT'S

4          IMPORTANT THAT WE CLARIFY.

5  MR. STEVENS:

6  Q.   WHO IS A & R ELITE?  WHO WAS A & R ELITE?

7  A.   A & R ELITE IS ANOTHER SMALL HISPANIC CONVENIENCE

8       STORE/CHECK CASHER THAT WAS A FEW BLOCKS,

9       PROBABLY, MAYBE A HALF MILE, DOWN FLORIDA

10      BOULEVARD FROM MR. LATINO'S LOCATION.

11 Q.   AND WHO RAN A & R ELITE, WHO WAS ---

12 A.   ANYELINA REYES.

13 Q.   MS. REYES?

14 A.   YES.

15 Q.   NOW, IT'S A MATTER OF PUBLIC RECORD.  IS IT A

16      MATTER OF PUBLIC RECORD THAT MS. REYES HAS BEEN

17      CONVICTED OF A CRIME?

18 A.   YES.

19 Q.   WOULD YOU AGREE THAT THE FACT THAT ONE BUSINESS

20      OWNER COMMITS A CRIME DOESN'T MEAN THAT SOME

21      OTHER BUSINESS OWNER DOWN THE STREET HAS

22      COMMITTED A CRIME?

23 A.   YES.

24 Q.   DID YOU FIND ANY EVIDENCE THAT MS. REYES AND THIS

25      DEFENDANT WORKED TOGETHER?

1   A.   NO.

2   Q.   DID YOU FIND ANY EVIDENCE THAT THEY COMMUNICATED

3        WITH ONE ANOTHER ABOUT THESE FRAUDULENT OR ANY

4        TREASURY CHECKS OF ANY KIND?

5   A.   NO.

6   Q.   YOU WERE ASKED IN DETAIL ABOUT WHAT MR. AMBEAU

7        DESCRIBED AS DISTINCTIONS AND DIFFERENCES BETWEEN

8        THAT DEFENDANT AND THIS DEFENDANT.  DO YOU RECALL

9        THOSE QUESTIONS?

10  A.   YES.

11  Q.   AND I DON'T MEAN IN DETAIL.  BUT DO YOU RECALL

12       THAT LINE OF QUESTIONING?

13  A.   YES.

14  Q.   I WANT TO ASK YOU ABOUT A COUPLE OF SIMILARITIES

15       THAT YOU FOUND.  DURING THE 2012 TO 2013 TIME

16       FRAME, THAT DEFENDANT, WAS THAT DEFENDANT MS.

17       REYES -- WAS SHE RECEIVING FRAUDULENT U.S.

18       TREASURY CHECKS FROM ALL OVER THE NORTHEAST?

19  A.   YES.

20  Q.   DURING THAT SAME TIME PERIOD, WAS THIS DEFENDANT

21       RECEIVING FRAUDULENT U.S. TREASURY CHECKS FROM

22       ALL OVER THE NORTHEAST?

23  A.   YES.

24  Q.   DURING THAT 2012 TO 2013 TIME FRAME, DID THAT

25       DEFENDANT CASH AND DEPOSIT MORE THAN 200

1    FRAUDULENT U.S. TREASURY CHECKS?

2  A.   YES.

3  Q.   DURING THAT SAME TIME PERIOD, DID THIS DEFENDANT

4       CASH AND DEPOSIT MORE THAN 200 FRAUDULENT U.S.

5       TREASURY CHECKS?

6  A.   YES.

7            MR. STEVENS: THE LAST TWO QUESTIONS, JUDGE.

8                 I' SORRY.

9  MR. STEVENS:

10 Q.   DURING THE 2012-2013 TIME FRAME, DID THAT

11      DEFENDANT'S CONDUCT, MS. REYES, DID HER CONDUCT

12      CAUSE A LOSS TO THE TREASURY OF MORE THAN A

13      MILLION DOLLARS?

14 A.   YES.

15 Q.   DURING THAT SAME TIME PERIOD DID THIS DEFENDANT'S

16      CONDUCT CAUSE A LOSS TO THE TREASURY OF MORE THAN

17      ONE MILLION DOLLARS?

18 A.   YES.

19            MR. STEVENS: THANK YOU, JUDGE.

20            THE COURT: OKAY.  THANK YOU, AGENT.  YOU

21                 MAY RETURN TO COUNSEL TABLE AT THIS

22            TIME.

23                 WELL, LADIES AND GENTLEMEN, THIS IS

24            PROBABLY A GOOD TIME FOR US TO TAKE OUR

25            MORNING BREAK.

1        PLEASE REMEMBER THE RULES.  DON'T

2    DISCUSS THE CASE AMONG YOURSELVES OR WITH

3    ANYONE YOU MAY ENCOUNTER DURING THE BREAK.  I

4    DON'T THINK YOU HAVE ANY ACCESS TO THE MEDIA.

5    BUT IF YOU DO, AS YOU KNOW, AVOID IT.  DON'T

6    CONDUCT ANY OUTSIDE RESEARCH, TO THE EXTENT

7    YOU MAY EVEN HAVE THE ABILITY TO DO THAT.

8    PLEASE DON'T BEGIN TO MAKE ANY JUDGMENTS OR

9    DECISIONS YET OR FORM ANY OPINIONS ABOUT THE

10    ULTIMATE ISSUES IN THIS CASE AT THIS TIME.

11        WE WILL BREAK FOR TEN MINUTES.

12        ALL RISE FOR THE JURY.

13    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

14        THE JURY IS EXCUSED FOR A BREAK.)

15    THE COURT: BE SEATED.

16        OKAY.  HOW MANY MORE WITNESSES FOR

17    THE GOVERNMENT, MR. STEVENS?

18    MR. STEVENS: ONE WITNESS, JUDGE.

19    THE COURT: OKAY.

20    MR. STEVENS: SHE'S HERE.

21    THE COURT: ALL RIGHT.  HOW LONG DO YOU

22        THINK IT WILL TAKE TO GET THROUGH THAT

23    WITNESS?

24    MR. STEVENS: FIFTEEN MINUTES, JUDGE.

25    THE COURT: OKAY.  AND, MR. AMBEAU, IF YOU

1   INTEND TO PRODUCE ANY TESTIMONY, IS YOUR

2   WITNESS TO GO?

3   MR. AMBEAU: READY TO GO.

4   THE COURT: HOW MANY WITNESSES -- OR, DO YOU

5        FEEL COMFORTABLE DISCLOSING THAT?

6   MR. AMBEAU: A SINGLE WITNESS, YOUR HONOR.

7   THE COURT: ONE SINGLE WITNESS.  OKAY.

8        ALL RIGHT.  WELL, I WILL TELL YOU IT

9   WOULD BE GREAT IF WE COULD CONCLUDE THE

10  EVIDENCE PORTION OF THE TRIAL BY NOON.

11  MR. AMBEAU: I DON'T THINK THERE'S ANY --

12       I THINK THAT'S VERY POSSIBLE.

13  YOUR HONOR, EXCUSE ME FOR TALKING.

14  THE COURT: AND THAT'S FINE.  BECAUSE

15       IF THERE'S A WAY TO DO SO, THEN WE CAN

16  GO ON AND HAVE THE JURY CHARGE -- FIRST OF

17  ALL, OUR CHARGE CONFERENCE FOLLOWED BY, OF

18  COURSE, OPENING STATEMENTS.  THAT MEANS

19  THERE'S A LOT HERE.  I'D LIKE TO GIVE YOU UP

20  TO AN HOUR ON EACH SIDE IF THAT'S WHAT YOU

21  THINK, YOU CAN USE AN HOUR.  YOU DON'T HAVE

22  TO USE AN HOUR; 45 MINUTES IS EVEN BETTER.

23  MR. STEVENS: I KNOW MR. AMBEAU WILL USE THE

24       HOUR.

25  MR. AMBEAU: I THINK I'LL USE THE HOUR.

1          MR. STEVENS: I THINK I'LL TAKE THE HOUR.

2          THE COURT: ALL RIGHT.  US LAWYERS ARE

3              LONG-WINDED SOMETIMES.

4          MR. AMBEAU: I HATE TO ADMIT HOW LONG I'VE

5              HAD A CLOSING BEFORE, YOUR HONOR.

6          THE COURT: WELL, LET'S SEE IF WE CAN'T

7              CONFINE IT TO AN HOUR.

8          MR. AMBEAU: I WILL FOLLOW THE COURT'S

9              INSTRUCTIONS.

10         THE COURT: ALL RIGHT.

11         MR. STEVENS: JUDGE, CAN WE APPROACH,

12             BRIEFLY?

13         THE COURT: YES.

14         REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

15             TIME, A BENCH CONFERENCE WAS HELD.)

16         MR. STEVENS: TWO QUICK QUESTIONS.  ONE.

17             I THINK THIS IS CLEAR, BUT I'M FREE TO

18         TALK TO SPECIAL AGENT SCHMIT NOW ABOUT HER

19         TESTIMONY?

20         THE COURT: OH, YES.  ABSOLUTELY.

21         MR. STEVENS: OKAY.  NUMBER TWO.  I -- AND

22             MAYBE I DON'T NEED TO DO THIS.  BUT YOU

23         OBVIOUSLY DIDN'T LIKE MY FIRST LINE OF

24         QUESTIONING.  I'M TRYING TO REHABILITATE HER

25         AND EXPLAIN, AND I JUST WANTED YOU TO KNOW

1     WHY I THOUGHT I SHOULD DO THAT AND WHY I

2     THOUGHT AT THE TIME I COULD DO THAT.  WHEN WE

3     HAD BEEN AT THE BENCH EARLIER, I THOUGHT I

4     HAD HEARD CONCERNS ABOUT HER BEING COMBATIVE

5     AND HOSTILE.  I'VE KNOWN THE AGENT FOR YEARS.

6     I BELIEVE THAT SHE'S JUST INCREDIBLY

7     TECHNICAL. AND I THOUGHT THAT WAS PROPER,

8     KIND OF -- TO HELP THE JURY UNDERSTAND WHY

9     SHE ANSWERS THOSE QUESTIONS IN THE WAY THAT

10    SHE DOES.  AND I DIDN'T MEAN TO DO SOMETHING

11    THAT YOU OBVIOUSLY DID NOT LOOK WITH FAVOR

12    UPON.

13    THE COURT: WELL, LET ME JUST SAY THIS.

14        I DON'T THINK SHE WAS BEING HOSTILE.

15    BUT LET ME TELL YOU.  EVEN THOUGH SHE'S BEEN

16    AN AGENT FOR MANY, MANY YEARS, THE FACT IS,

17    IS THAT, YOU KNOW, THEY'RE NOT LIKE POLICE

18    OFFICERS ON DWI BEAT.  IN OTHER WORDS, THEY

19    DON'T GO TO COURT VERY OFTEN, AND I REALIZE

20    THAT.  AND I UNDERSTAND.

21        WHAT I WAS CONCERNED ABOUT IS THAT IN AN

22    EFFORT TO -- THAT YOU WERE NOT GOING TO

23    REHABILITATE HER TESTIMONY, BUT THE MANNER OF

24    TESTIMONY.  AND I'M FINE.  I WILL ALLOW

25    LAWYERS TO ASK, WELL, ARE YOU NERVOUS?

1           BECAUSE, OF COURSE, PEOPLE ARE NERVOUS AND

2           THE JURY NEEDS TO UNDERSTAND ABOUT BEING

3           THEY'RE NERVOUS.  BUT I'M NOT COMFORTABLE

4           GOING BEYOND THAT.  I THINK ANYTHING BEYOND

5           THAT ALMOST SEEMS TO OFFER EXCUSES FOR THE

6           MANNER IN WHICH THE WITNESS ANSWERS.  AND I

7           JUST THINK THAT CERTAINLY -- WITH RESPECT TO

8           THIS JURY, IS SMART ENOUGH, THEY CAN -- THEY

9           DON'T NECESSARILY NEED ALL OF THAT.  I MEAN,

10          I THINK IT WAS CLEAR THAT IT'S ALWAYS

11          UNCOMFORTABLE, I GUESS, TESTIFYING.

12                 SO, AGAIN, THE IMPORTANT THING IS I JUST

13          WANT TO TELL YOU, I DON'T THINK SHE WAS BEING

14          COMBATIVE.  I'VE BEEN WHERE YOU ARE AND I

15          KNOW AGENTS SOMETIMES FEEL LIKE, I DON'T WANT

16          TO SAY YES OR NO, EVEN SO YES OR NO MIGHT BE

17          THE APPROPRIATE ANSWER, BECAUSE I DON'T WANT

18          TO -- AND I GET THAT.  THERE ARE JUST TIMES

19          FOR A VARIETY OF REASONS.

20          MR. STEVENS: IS IT FAIR TO ASSUME, AND

21                 I'M PRETTY SURE THAT IT IS.  YOU KNOW, I

22          HAD A COUPLE OF OTHER PAGES OF OUTLINES ABOUT

23          ISSUES WHERE HER ANSWERS IN THE TARGET ISSUE

24          -- WHO THE GRAND JURY SUBPOENA WAS ISSUED TO.

25          WHERE I WOULD HAVE GONE INTO DETAIL ABOUT WHY

1     SHE -- BUT I THINK IT'S PROBABLY FAIR THAT I

2     WOULDN'T HAVE BEEN ALLOWED TO DO THAT?

3     THE COURT: WELL, NO.  I MEAN, I CERTAINLY

4          WOULD HAVE ALLOWED QUESTIONS ABOUT THE

5     GRAND JURY -- THE TARGET OF THE GRAND JURY OR

6     ANYTHING ABOUT THE INVESTIGATION ITSELF.

7          AGAIN, MY CONCERN WAS ABOUT EFFORTS TO

8     REHABILITATE THE MANNER OF -- HER MANNER OF

9     ANSWERING, NOT THE SUBSTANCE OF HER ANSWERS.

10    MR. STEVENS: AND MY QUESTIONS WOULD HAVE BEEN

11         AIMED AT THE MANNER OF HER ANSWERS.

12    AND, SO, I -- I THINK I WAS RIGHT TO JUST

13    SCRATCH THOSE OUT AND MOVE ON.

14    MR. CROSSWELL: WE SHARE THE FRUSTRATION,

15         YOUR HONOR.  THAT'S HOW SHE TALKS TO US.

16    PERHAPS,  THAT'S HOW -- THAT'S WHAT ---

17    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

18         AN OFF-THE-RECORD BENCH CONFERENCE WAS

19         HELD.)

20    REPORTER'S NOTE: ( BENCH CONFERENCE WAS

21         CONCLUDED.)

22    THE COURT: THANK YOU, GENTLEMEN.

23         OKAY.  COURT IS IN RECESS.

24    REPORTER'S NOTE: (THEREFORE, AT THIS

25         TIME, THE COURT IS IN RECESS.)

1    (COURT IS RESUMED.)

2         THE COURT: LET'S ALL REMAIN STANDING

3             FOR THE JURY.

4         REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

5             THE JURY IS RETURNED FROM BREAK.)

6         THE COURT:  BE SEATED.

7             WELCOME BACK, LADIES AND GENTLEMEN.

8         LET'S CALL THE NEXT WITNESS.

9         MR. STEVENS: UNITED STATES CALLS ALLYSON

10            HOFFINE.

11        THE CLERK: RAISE YOUR RIGHT HAND.

12   THE WITNESS, ALLYSON HOFFINE, AFTER HAVING FIRST BEEN

13   DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND

14   NOTHING BUT THE TRUTH, TESTIFIED AS FOLLOWS:

15        THE CLERK: STATE AND SPELL YOUR NAME

16            FOR THE RECORD.

17        THE WITNESS: ALLYSON HOFFINE, A-L-L-Y-S-O-N

18            HOFFINE, H-O-F-F-I-N-E.

19            DIRECT EXAMINATION

20   MR. STEVENS:

21   Q.   THANK YOU, AGENT HOFFINE.  WOULD YOU TELL THE

22        JURORS WHERE YOU WORK?

23   A.   U.S. POSTAL INSPECTION SERVICE.

24   Q.   WHAT'S YOUR TITLE?

25   A.   U.S. POSTAL INSPECTOR.

1    Q.   WHAT DOES THE POSTAL INSPECTION SERVICE DO?

2    A.   WE INVESTIGATE ANY CRIMES THAT DEAL WITH THE

3         MAIL.

4    Q.   HOW LONG HAVE YOU WORKED FOR THE POSTAL

5         INSPECTION SERVICE?

6    A.   TEN YEARS.

7    Q.   PRIOR TO DOING THE POSTAL INSPECTION SERVICE WHAT

8         DID YOU DO?

9    A.   I WAS A LAW ENFORCEMENT OFFICER FOR SEVEN YEARS.

10   Q.   WHERE WERE YOU A LAW ENFORCEMENT OFFICER FOR

11        SEVEN YEARS?

12   A.   IN HATTIESBURG, MISSISSIPPI.

13   Q.   ALL RIGHT.  DO YOU HAVE ON THE DESK IN FRONT OF

14        YOU A FOLDER THAT'S MARKED "EXHIBIT 53"?

15   A.   OKAY.

16             MR. STEVENS: AND ACTUALLY, JUDGE, THIS

17             HAS ALREADY BEEN ADMITTED INTO EVIDENCE.

18             THE COURT: VERY WELL.

19   MR. STEVENS:

20   Q.   BUT, AGENT HOFFINE, TAKE A MINUTE TO LOOK AT THAT

21        DOCUMENT.  AND LOOK UP WHEN YOU HAVE HAD A CHANCE

22        TO FAMILIARIZE YOURSELF WITH IT.

23   A.   OKAY.

24   Q.   HAVE YOU SEEN IT BEFORE?

25   A.   YES, I HAVE.

1  Q.   AND WERE YOU ASKED TO REVIEW THESE ID'S AND

2       INVESTIGATE SOME OF THE ADDRESSES THAT ARE

3       REFLECTED ON THESE ID'S?

4  A.   YES, I WAS.

5  Q.   AND DID YOU DO THAT -- DID YOU BECOME INVOLVED IN

6       THAT JUST IN THE LAST FEW DAYS?

7  A.   YES.

8  Q.   PRIOR TO THAT DID YOU HAVE ANY INVOLVEMENT IN

9       THIS CASE WHATSOEVER?

10 A.   NO, I DIDN'T.

11 Q.   OKAY.

12          MR. STEVENS: I'D LIKE TO PUBLISH "53"

13             AT THIS TIME, JUDGE.

14          THE COURT: VERY WELL.

15 MR. STEVENS:

16 Q.   TELL THE JURORS A LITTLE BIT ABOUT HOW YOU

17      INVESTIGATED THESE ADDRESSES, HOW YOU CHECKED

18      THEM OUT.

19 A.   THERE WERE A COUPLE OF THINGS.  FIRST IS, THERE

20      IS AN ONLINE WEBSITE FOR THE U.S. POSTAL SERVICE

21      THAT'S ACTUALLY OPEN TO THE PUBLIC.  ANYBODY CAN

22      GO TO USPS.COM AND VERIFY ANY ADDRESSES.

23          I WENT FURTHER TO EACH OF THE RESPECTIVE

24      POST OFFICES TO VERIFY, A, IF THERE WERE EXISTING

25      ADDRESSES, IF THEY WERE ACCURATE, SO ON AND SO

1   FORTH.

2  Q.  DID YOU CONSULT SOME STREET LISTS AND SOME MAPS?

3  A.  YES, I DID.  THE POSTAL SERVICE, EACH OFFICE HAS

4      AN ENTIRE DOCUMENT THAT LISTS EXACTLY EVERY

5      STREET THAT THEY DELIVER TO AND A NUMERICAL

6      ADDRESS THAT WOULD INCLUDE THE ZIP CODES.

7  Q.  OKAY.  WE HAVE IN FRONT OF US THE FIRST PAGE OF

8      THIS EXHIBIT.  AND THE TOP, YOU'LL SEE IT'S

9      MARKED SW3935.  AND IT SHOWS US AN ADDRESS AT

10     73432 FLORIDA BOULEVARD IN DENAN SPRIN,

11     LOUISIANA, 70819.  IS THAT A LEGITIMATE ADDRESS?

12 A.  NO, IT'S NOT.

13 Q.  WHY NOT?

14 A.  THERE IS NO DENAN SPRIN IN LOUISIANA.  THERE IS A

15     DENHAM SPRINGS.  THE ZIP CODE 70819 -- 708

16     BELONGS TO BATON ROUGE AREA.  DENHAM SPRINGS IS

17     ACTUALLY 707 AREA CODE.

18 Q.  IS ALL THAT INFORMATION PUBLICLY AVAILABLE?

19 A.  YES.  YOU CAN GO ON THE WEBSITE AND SEE IT.

20 Q.  I'M SHOWING YOU PAGE TWO OF THIS EXHIBIT.  AND

21     WE'RE AT SEARCH WARRANT 3936.  AND THIS ID SHOWS

22     AN ADDRESS OF 11632 CRISPI BOULEVARD IN BATON

23     ROUGE, 70814.  IS THIS A LEGITIMATE ADDRESS?

24 A.  NO, IT'S NOT.

25 Q.  IS THERE A CRISPI IN BATON ROUGE?

1  A.    NO, THERE IS NOT.

2  Q.    IS THAT INFORMATION PUBLICLY AVAILABLE?

3  A.    YES.

4  Q.    TURN TO PAGE THREE.  AND WE'RE AT SEARCH WARRANT

5       4947.  AND THIS ID REFLECTS AN ADDRESS OF 6428

6       COY ROAD IN BATON ROUGE, 70816.  IS THIS A

7       LEGITIMATE ADDRESS?

8  A.    NO, IT'S NOT.

9  Q.    WHY NOT?

10  A.    THERE IS NOT A COY ROAD IN BATON ROUGE.  THERE IS

11       A COY AVENUE.  THE ZIP CODE WOULD NOT BE 70816.

12       IT WOULD BE 70810.  AND COY AVENUE, THE NUMERICAL

13       BLOCK NUMBER DOESN'T START UNTIL APPROXIMATELY

14       8500.

15  Q.    AND HOW LONG DID IT TAKE YOU TO FIGURE THAT OUT

16       FOR THIS ADDRESS, JUST THIS WEEK?

17  A.    FOR THAT ADDRESS, MAYBE 15 TO 30 SECONDS LOOKING

18       AT THE WEBSITE.

19  Q.    I'M TURNING TO PAGE FOUR.  I HAVE TURNED TO PAGE

20       FOUR.  AND WE'RE LOOKING AT SEARCH WARRANT 4948.

21       AND THIS ID REFLECTS AN ADDRESS, 2680 CURSY, AND

22       IT'S SPELLED C-U-R-S-Y WITH A PERIOD, BATON

23       ROUGE, 70816.  IS THIS A LEGITIMATE ADDRESS?

24  A.    NO, IT'S NOT.

25  Q.    WHY NOT?

1  A.   THERE IS NO CURSY IN BATON ROUGE.  THERE IS A

2       COURSEY, C-O-U-R-S-E-Y.

3  Q.   IS THAT INFORMATION PUBLICLY AVAILABLE?

4  A.   IT IS.

5  Q.   HOW LONG DID IT TAKE YOU TO DETERMINE THAT THIS

6       ADDRESS WAS NOT VALID?

7  A.   FIFTEEN TO 30 SECONDS.

8  Q.   HOW LONG HAVE YOU LIVED IN BATON ROUGE?

9  A.   TEN YEARS.

10 Q.   DID YOU RECOGNIZE THIS AS A BAD ADDRESS BEFORE

11      YOU EVEN LOOKED IT UP?

12 A.   YES.

13 Q.   I'VE TURNED TO PAGE FIVE.  AND WE'RE AT SEARCH

14      WARRANT 4949.  AND THIS ID REFLECTS AN ADDRESS AT

15      25853 GARDERE COURT, BATON ROUGE, 70810.  IS THIS

16      A LEGITIMATE ADDRESS?

17 A.   NO, IT'S NOT.

18 Q.   WHY NOT?

19 A.   GARDERE COURT DOES NOT EXIST IN BATON ROUGE.

20      GARDERE AVENUE DOES.  AND THE ZIP CODE WOULD BE

21      70808, NOT 70810.

22 Q.   AND IS ALL THAT PUBLICLY AVAILABLE?

23 A.   YES.

24 Q.   HOW LONG DID IT TAKE YOU TO DETERMINE THAT THIS

25      ADDRESS WAS NO GOOD?

1   A.   FIFTEEN TO 30 SECONDS.

2   Q.   TURN TO PAGE SIX.  AND THIS IS SEARCH WARRANT

3        4974.  AND THE SPELLING'S A LITTLE DIFFERENT, BUT

4        THIS ID READS 27453 CURSEY, C-U-R-S-E-Y, B-L-V,

5        BATON ROUGE, 70819.  IS THIS A LEGITIMATE

6        ADDRESS?

7   A.   NO, IT'S NOT.

8   Q.   WHY NOT?

9   A.   AGAIN, CURSEY DOES NOT EXIST IN BATON ROUGE.  IT

10       IS COURSEY.  ALSO, COURSEY BOULEVARD COVERS THE

11       10000 TO THE 15000 BLOCK.  SO, A 27000 BLOCK,

12       EVEN IF IT WAS SOMETHING DIFFERENT, DOESN'T EVEN

13       EXIST.

14  Q.   AND HAVE I ASKED YOU HOW LONG IT TOOK YOU TO

15       DETERMINE THAT THIS ID WAS NO GOOD?

16  A.   FIFTEEN TO 30 SECONDS.

17  Q.   CAN ANYONE WHO IS WILLING TO GET IN HIS CAR AND

18       DRIVE A MILE OR TWO ON COURSEY FIGURE OUT THAT

19       THIS ID IS NO GOOD?

20  A.   YES.

21  Q.   OR ANYONE WHO HAS ACCESS TO A COMPUTER?

22  A.   YOU CAN LOOK UP GOOGLE AND RUN CURSEY AS IT'S

23       TYPED IN AND NOTHING WILL COME UP IN BATON ROUGE.

24  Q.   ALL RIGHT.  NOW, WE WON'T GO THROUGH THE REST OF

25       THESE PAGE BY PAGE.  BUT I JUST WANT TO MAKE SURE

1      WE EXPLAIN WHAT YOU'VE LOOKED AT.

2           THE NEXT PAGE WILL BE 4975, AND THAT'S AN

3      ADDRESS ON PERKINS.  THAT'S 70819.

4           THE PAGE AFTER THAT, 4989, IS ANOTHER ADDRESS

5      ON CURSEY AT 1273.

6           PAGE AFTER THAT, 4991, IS AN ADDRESS AT 1243

7      JEFFERSON BOULEVARD AT 70816, MAYBE OR 70616.

8      COULD YOU READ THE ZIP ON 4991?

9   A.  I BELIEVE THAT'S 70816.

10  Q.  AND THE LAST PAGE, 4992, IS ANOTHER ADDRESS. THIS

11     TIME IT'S JEFFERSON ROAD, 70816.  ARE ANY OF

12     THESE LEGITIMATE ADDRESSES?

13  A.  NO, THEY'RE NOT.

14  Q.  CAN ANYONE WITH INTERNET ACCESS AND A COMPUTER

15     GET THAT INFORMATION THROUGH THE POSTAL SERVICE

16     WEBSITE?

17  A.  YES.

18  Q.  CAN ALL OF THESE ADDRESSES BE CHECKED IN ABOUT 30

19     SECONDS?

20  A.  YES.

21  Q.  THANK YOU.

22          MR. STEVENS: OKAY.  CROSS EXAMINATION?

23                   CROSS EXAMINATION

24  MR. AMBEAU:

25  Q.  GOOD AFTERNOON.

1  A.   GOOD AFTERNOON -- GOOD MORNING.

2  Q.   GOOD MORNING.  IT IS STILL MORNING.

3       DO YOU HAVE ANY IDEA IF MR. LINARES HAS A

4       COMPUTER AT HIS BUSINESS?

5  A.   I HAVE NO IDEA.

6  Q.   DO YOU HAVE ANY IDEA IF MR. LINARES HAS INTERNET

7       ACCESS AT HIS BUSINESS?

8  A.   I HAVE NO IDEA.

9       MR. AMBEAU: YOUR HONOR, I'M GOING TO

10          SHOW THE DEFENDANT WHAT'S BEEN MARKED --

11          EXCUSE ME, THE WITNESS, WHAT'S BEEN MARKED

12          "DEFENDANT 18," SEARCH WARRANT 3000377.

13 MR. AMBEAU:

14 Q.   MA'AM, CAN YOU TELL ME IF THIS IS A LEGITIMATE

15      ADDRESS?

16 A.   I CAN'T VERIFY ANYTHING IN MISSISSIPPI.

17 Q.   SINCE WE DON'T WANT TO GO TO MISSISSIPPI, HOW

18      ABOUT WE GO TO "DEFENSE EXHIBIT 18," PAGE 22,

19      SEARCH WARRANT 3937.

20      THE CLERK: WHAT IS THE EXHIBIT NUMBER?

21      MR. AMBEAU: 3937.  "EXHIBIT -- DEFENSE 18."

22          THESE ARE ALL "DEFENSE 18."  SEARCH

23          WARRANT 03937.

24 MR. AMBEAU:

25 Q.   IS THAT A LEGITIMATE ADDRESS IN BATON ROUGE,

1           LOUISIANA?

2    A.     I CAN'T ANSWER THAT BECAUSE I WAS GIVEN A LIST OF

3           WHAT TO VERIFY, AND I USED DIFFERENT DATABASES

4           AVAILABLE.  AND I CAN'T GO BY MEMORY.

5    Q.     YOU WERE GIVEN A LIST OF ADDRESSES TO VERIFY BY

6           THE UNITED STATES GOVERNMENT, AND YOU ACCESSED

7           MORE THAN ONE DATABASE TO FIND WHETHER OR NOT

8           THOSE ADDRESSES WERE LEGITIMATE?

9    A.     I INITIALLY ACCESSED USPS.COM, WHICH IS OPEN TO

10          THE PUBLIC.  AND EVERY SINGLE ADDRESS CAME UP AS

11          A BAD ADDRESS ON THAT DATABASE.  I THEN WENT

12          FURTHER AS AN INVESTIGATOR, TO VERIFY WHAT I HAD

13          SEEN ON THE USPS.COM.

14   Q.     LET'S GO TO THE NEXT PAGE OF "DEFENSE EXHIBIT

15          18," PAGE 23.  IS THAT A LEGITIMATE ADDRESS IN

16          COVINGTON?

17   A.     I CAN'T ANSWER THAT.

18   Q.     LET'S GO TO WHAT IS PAGE 28 OF "DEFENSE 18."

19          03945.  IS THAT A LEGITIMATE ADDRESS IN HARWICH,

20          MASSACHUSETTS?

21   A.     I CANNOT ANSWER THAT.

22   Q.     IN THE INTEREST OF SPEED AND HAVING A LOT OF

23          THESE MARKED, LET'S GO TO WHERE YOU WERE JUST

24          TALKING ABOUT, THESE SAME ADDRESSES.  THE

25          ADDRESSES WITH THE SAME OR SIMILAR BATES STAMP

1    NUMBERS AND SO THE SAME SECTION OF ID'S THAT YOU

2    WERE LOOKING AT A MOMENT AGO.

3        "DEFENSE 18," PAGE 70 OF THAT EXHIBIT,

4    SEARCH WARRANT 4950.  IS THAT A LEGITIMATE

5    ADDRESS IN LOUISIANA?

6  A.  I CAN'T ANSWER THAT.

7  Q.  AND, AGAIN, 4954, PAGE 73 OF "DEFENSE 18," IS

8    THAT A LEGITIMATE ADDRESS?

9  A.  I CAN'T ANSWER THAT.

10 Q.  THERE ARE 149 PAGES OF WHAT PURPORTS TO BE

11    IDENTIFICATION DOCUMENTS IN MY HAND IN "DEFENSE

12    EXHIBIT 18."  HOW MANY ADDRESSES DID THE

13    GOVERNMENT GIVE YOU?

14 A.  WE WENT THROUGH THE ADDRESSES THAT I WAS GIVEN.

15 Q.  EIGHT ADDRESSES?

16 A.  THERE WAS -- THERE WAS A FEW MORE.  NONE OF THEM

17    WERE LEGITIMATE.

18 Q.  NONE OF THEM WERE LEGITIMATE?

19 A.  I DON'T RECALL THE EXACT NUMBER.

20 Q.  WOULD YOU SUSPECT THAT IF I SHOWED YOU EVERY

21    ADDRESS OTHER THAN THOSE EIGHT FROM LOUISIANA OR

22    OUTSIDE OF LOUISIANA, GEORGIA, MASSACHUSETTS, NEW

23    YORK, WOULD YOUR ANSWER BE THE SAME AS IT WAS FOR

24    THOSE EXHIBITS I JUST SHOWED YOU; YOU HAVE NO

25    IDEA WHETHER OR NOT THOSE WERE LEGITIMATE?

1    A.   BY MEMORY?  NO.

2    Q.   NOT EVEN IN THE BATON ROUGE ADDRESSES, RIGHT?

3    A.   BY MEMORY, I'M NOT GOING TO TESTIFY TO WHETHER IT

4         IS.  I'VE LIVED HERE FOR TEN YEARS.  THERE ARE

5         SOME STREETS I MAY RECOGNIZE OR NOT, BUT I'M NOT

6         GOING TO TESTIFY TO IT THAT THEY ARE LEGITIMATE

7         OR THEY ARE NOT, EVEN IN BATON ROUGE.

8    Q.   DO YOU KNOW HOW MANY STREET NAMES THERE ARE IN

9         BATON ROUGE, HOW MANY STREETS?

10   A.   NO, I DON'T.

11   Q.   AND YOU CAN'T TESTIFY AS TO WHAT ACCESS, INTERNET

12        ACCESS, MR. LINARES HAD IN HIS STORE, CAN YOU?

13   A.   NO.

14   Q.   YOU CAN'T -- YOU CAN'T TESTIFY AS TO MR. LINARES'

15        SKILL AT FINDING U.S. ADDRESSES ON AN INTERNET

16        DEVICE INSIDE OF THE STORE, CAN YOU?

17   A.   NO.

18             MR. AMBEAU: I HAVE NO FURTHER QUESTIONS.

19             THE COURT: OKAY.  ANY REDIRECT?

20                  REDIRECT EXAMINATION

21   MR. STEVENS:

22   Q.   AGENT HOFFINE, IF I HAD GIVEN YOU 200 MORE

23        ADDRESSES, HOW LONG WOULD IT HAVE TAKEN YOU TO

24        CHECK EACH OF THOSE ADDRESSES?

25   A.   APPROXIMATELY 15 TO 30 SECONDS EACH ON LINE FOR

1    THE USPS.COM, AND THEN FILING TO AND FINDING THE

2    VERIFICATION TO THE POST OFFICES, IT WOULD HAVE

3    BEEN -- DEPENDING UPON WHERE THEY WERE, WHETHER I

4    HAD TO PHYSICALLY DRIVE THERE OR TO GO THROUGH

5    PHONE.  I MEAN, 200, I COULDN'T HAVE DONE IT IN

6    THE AMOUNT OF TIME BETWEEN WHEN I WAS BROUGHT IN

7    TO THE TIME I'M TESTIFYING NOW.

8  Q.   THANK YOU.

9         MR. STEVENS: NO FURTHER QUESTIONS, JUDGE.

10        THE COURT: OKAY.  THANK YOU, INSPECTOR,

11             I GUESS IT IS, RIGHT?

12        THE WITNESS: YES, SIR.

13        THE COURT: INSPECTOR HOFFINE, THANK YOU

14             FOR COMING IN TODAY, MA'AM.  YOU

15        ARE EXCUSED.

16             OKAY.  ANY ADDITIONAL WITNESSES?

17        MR. STEVENS: NO, JUDGE.  AT THIS POINT

18             WE REST.

19        THE COURT: OKAY.  VERY GOOD.  LADIES AND

20             GENTLEMEN, AS YOU HEARD FROM MR.

21        STEVENS, THIS IS ALL THE EVIDENCE THAT THE

22        UNITED STATES INTENDS TO PRESENT TO YOU

23        DURING THE COURSE OF THIS TRIAL.  I AM

24        REQUIRED BY LAW TO TAKE A COUPLE OF MATTERS

25        WITH THE LAWYERS BEFORE WE PROCEED ANY

1    FURTHER.

2        SO, WE WILL TAKE YET ANOTHER BREAK.

3    WE'RE GOING TO MAKE EVERY EFFORT TO KEEP THIS

4    A PRETTY SHORT BREAK SO WE CAN GET YOU BACK

5    IN HERE AND TRY TO WORK TOWARD COMPLETION OF

6    THE TRIAL.  SO, BEAR WITH US.

7        AGAIN, EVEN THOUGH YOU'VE HEARD ALL THE

8    EVIDENCE THAT THE UNITED STATES INTENDS TO

9    PRODUCE TO YOU, YOU MAY NOT HAVE HEARD ALL

10    THE EVIDENCE.  BUT EVEN IF YOU HAVE, YOU

11    HAVEN'T HEARD MY INSTRUCTIONS ON THE LAW THAT

12    WILL GUIDE YOUR DELIBERATIONS.  SO, PLEASE,

13    AGAIN, DO NOT DISCUSS THE TESTIMONY AT THIS

14    TIME, DON'T BEGIN TO FORM ANY OPINIONS OF ANY

15    KIND, AS WELL.

16        LET'S ALL RISE FOR THE JURY.

17    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

18        THE JURY IS EXCUSED FOR A BREAK.)

19    THE COURT: BE SEATED.

20        OKAY.  ANY MOTIONS?  MOTIONS BY THE

21    DEFENSE AT THIS TIME?

22    MR. AMBEAU: YOUR HONOR, THE DEFENSE WOULD

23        MOVE FOR A RULE 29 MOTION.

24    THE COURT: OKAY.  LET ME ASK YOU TO STEP

25        TO THE FORWARD PODIUM TO OFFER YOUR

1          MOTION, COUNSEL.

2          MR. AMBEAU: EXCUSE ME, YOUR HONOR.

3              THE DEFENSE WOULD MAKE A RULE 29 MOTION,

4          AND IF I COULD ARGUE THAT MOTION?

5          THE COURT: SURE.

6          MR. AMBEAU: I THINK THAT THE -- THAT IT HAS

7              BEEN CLEAR, YOUR HONOR, AND I'LL GO FROM

8          THE -- START FROM THE BACK TO THE FRONT OF

9          THE INDICTMENT.  STARTING WITH COUNTS THREE

10          AND FOUR, YOUR HONOR.

11              COUNT THREE IS AN OBSTRUCTION OF A

12          PROCEEDING BEFORE A FEDERAL AGENCY RELATED TO

13          THE 2010 IRS EXAMINATION FOR BANK SECRECY ACT

14          COMPLIANCE THAT WAS HELD IN MR. LINARES'

15          STORE IN LATE 2000 -- SEPTEMBER OF 2010.

16              THE GOVERNMENT HAS ALLEGED FOUR MATTERS

17          IN WHICH MR. LINARES VIOLATED THE LAW.  AND

18          IN DOING SO, AS WE'VE ESTABLISHED PRIOR TO

19          TRIAL, THAT ANY ONE OF THOSE -- EVIDENCE

20          OFFERED FOR ANY ONE OF THOSE SUFFICIENT FOR

21          CONVICTION IS SUFFICIENT FOR CONVICTION UNDER

22          COUNT THREE.

23              AND, SO, LET'S START WITH THE FIRST.

24              THE ASSERTION HERE IS THAT MR. LINARES

25          FALSELY REPRESENTED TO THE EXAMINER THAT HE

1    DID NOT RETAIN ANY RECORDS OF HIS CHECK

2    CASHING BUSINESS OTHER THAN HIS BANK

3    STATEMENTS.

4         I THINK IT WAS VERY CLEAR FROM THE 2010,

5    MS. HARDY'S -- THE EXAMINER, THAT HE, IN

6    FACT, MADE THAT REPRESENTATION TO HER AT

7    FIRST, BUT LATER IN HER -- IN THAT

8    EXAMINATION MADE A REPRESENTATION TO HER THAT

9    HE, IN FACT, KEPT COPIES OF CHECKS FOR FIRST-

10   TIME CASHERS AND COPIES OF ID'S.  AND I

11   BELIEVE THAT SHE FREELY ADMITTED THAT ON THE

12   STAND.  AND WHEN SHE DID THAT, I BELIEVE THAT

13   SHE ESSENTIALLY UNDERMINED THE GOVERNMENT'S

14   ASSERTION THAT HE FAILED TO REPRESENT THOSE

15   MATTERS TO THE EXAMINER.

16        THE SECOND AND THIRD ARE ONE IN THE

17   SAME.  THAT MR. LINARES FALSELY STATED THAT

18   HE DID NOT CASH CHECKS EXCEEDING $5,000.00

19   AND/OR THAT HE FALSELY STATED THAT HE ONLY

20   ALLOWED INDIVIDUALS TO CASH MULTIPLE CHECKS

21   IF THE TOTAL AMOUNT OF THE CHECKS DID NOT

22   EXCEED $5,000.00.

23        I THINK, YOUR HONOR, THERE'S BEEN

24   TREMENDOUS AMOUNT OF TESTIMONY AS IT RELATES

25   TO THE LEGAL LIMIT OF CASHING CHECKS AND WHAT

1    YOU SHOULD DO IN THE CASE THAT YOU CASH

2    MULTIPLE CHECKS FOR $10,000.00, OR ONE

3    CURRENCY TRANSACTION FOR $10,000.00.  AND

4    THAT AS A RESULT OF THOSE TRANSACTIONS YOU

5    WOULD BE -- EXCUSE ME, YOUR HONOR -- REQUIRED

6    TO REPORT THOSE UNDER CIRCUMSTANCES IN THE

7    BANK SECRECY ACT.  AND, YET, THAT'S NOT

8    OCCURRING HERE.

9    WHAT WE HAVE IS AN ASSERTION BY THE

10   GOVERNMENT THAT MR. LINARES' OTHERWISE LEGAL

11   CONDUCT IS MADE ILLEGAL BY THE FACT THAT HE

12   REPORTED IT TO THE EXAMINER THAT IT WAS HIS

13   POLICY NOT TO CASH CHECKS OVER $5,000.00 OR

14   MULTIPLE CHECKS OVER $5,000.00, A POLICY

15   WHICH HE HAS EVERY RIGHT, EVERY LEGAL RIGHT,

16   TO PUT TO THE SIDE AT TIMES THAT HE CHOOSES

17   TO DO SO.  AND, IN FACT, WHEN MR. LINARES,

18   AFTER MUCH DELAY, HAS WRITTEN-CHECK POLICIES

19   IN HIS BUSINESS.  IT'S PRETTY CLEAR THAT HIS

20   INTENT IN THAT CHECK POLICY FOR SURE, THAT IF

21   ANY CHECK IS WRITTEN -- I MEAN, EXCUSE ME,

22   YOUR HONOR, CASHED ABOVE THAT -- THE LIMIT HE

23   SET IN THOSE POLICIES, THAT THAT WOULD HAVE

24   TO BE APPROVED BY HIM.

25   IT ONLY FOLLOWS THAT MR. LINARES HAD

1      THAT SAME UNDERSTANDING IN 2010 OF HIS CHECK

2      CASHING POLICY, HIS PERSONALLY-IMPOSED CHECK

3      CASHING POLICY, YOUR HONOR, THAT HE WOULD, IN

4      FACT, CASH CHECKS OVER $5,000.00 IF APPROVED

5      BY HIM, AND HE WAS THE PERSON DOING ALL THE

6      CHECK CASHING.

7           AND, SO, WHAT THIS AMOUNTS TO, YOUR

8      HONOR, IS AN ASSERTION BY THE GOVERNMENT THAT

9      MR. LINARES MADE A MISREPRESENTATION AS TO

10     THE AMOUNT OF -- DOLLAR AMOUNT OF CHECKS HE

11     WAS CASHING, BUT THAT'S OTHERWISE LEGAL

12     CONDUCT.  AND IN ORDER FOR THAT CONDUCT TO BE

13     ILLEGAL, IT CAN'T JUST BE THAT THE GOVERNMENT

14     ASKED ABOUT IT AND MR. LINARES MADE A

15     REPRESENTATION THAT THAT WAS HIS POLICY.

16     THAT THAT'S THE GUIDANCE HE FOLLOWS ON A

17     REGULAR BASIS.  YOU CAN'T THEN CREATE A

18     VIOLATION OF THE LAW BASED ON THAT.

19          AND THEN LASTLY, YOUR HONOR, THERE'S AN

20     ASSERTION THAT MR. LINARES CONCEALED NUMEROUS

21     RECORDS RELEVANT TO THE EXAMINATION.

22          I BELIEVE WHEN THE -- THE DEFENSE FILED

23     A MOTION FOR A BILL OF PARTICULARS AND THE

24     GOVERNMENT ANSWERED THAT IN COMMUNICATION TO

25     THE DEFENSE, THAT THOSE CONCEALED RECORDS

1    WERE THE CHECKS, THE UNITED STATES TREASURY

2    CHECKS, THAT MR. LINARES HAD CASHED AT HIS

3    BUSINESS PRIOR TO THAT 2010 EXAMINATION.

4         I THINK IT'S PLAINLY OBVIOUS THAT THE

5    EXAMINER ISSUED WHAT -- THE ACRONYM THAT I

6    CONTINUE TO FORGET, THE DOCUMENTS REQUEST TO

7    MR. LINARES WHEN MR. LINARES WILLINGLY AND

8    PURPOSEFULLY BROUGHT THAT DOCUMENT TO THE

9    BANK AND GOT ALL OF HIS BANK RECORDS FOR THE

10   EXAMINER AT THAT TIME, EVERYTHING THAT SHE

11   ASKED FOR WITHIN THE SCOPE OF HER

12   EXAMINATION.

13        CAN IT BE POSSIBLE THAT MR. LINARES

14   CONCEALED RECORDS OUTSIDE THE SCOPE OF HER

15   EXAMINATION BECAUSE THE SCOPE OF HER

16   EXAMINATION IS THE REASON FOR HER

17   EXAMINATION.

18        AND, LASTLY, AND -- AND REQUIRED IN AN

19   OBSTRUCTION CHARGE, YOUR HONOR, IS THAT MR.

20   LINARES TOOK THESE ACTIONS CORRUPTLY.  THAT

21   HE DID SO FOR THE PURPOSE OF HIDING SOME

22   CRIME, SOME MALICE, SOMETHING THAT MR.

23   LINARES DID THAT HE WAS TRYING TO HIDE FROM

24   THE AGENT.  AND I THINK THAT IT'S BEEN VERY

25   CLEAR THROUGHOUT THIS TRIAL THAT, IN FACT, IN

1    2010, ABSOLUTELY NO LAW WAS BEING BROKEN

2    UNDER ANY CIRCUMSTANCES BY USE, BY OTHER

3    PEOPLE USING MR. LINARES AND/OR BY MR.

4    LINARES.  HE WAS DOING EXACTLY WHAT HE WAS

5    SUPPOSED TO BE DOING AT THAT TIME.  OTHER

6    THAN HAVING AN ANTI-MONEY LAUNDERING PROGRAM

7    WRITTEN IN HIS STORE, HE WAS AT THAT TIME NOT

8    CASHING CHECKS LARGER THAN $10,000.00, NOT

9    NOT REPORTING THOSE CHECKS WHEN HE NEEDED TO

10   DO SO. NOT CASHING -- NOT CASHING WHAT TURNED

11   OUT TO BE FRAUDULENT TAX CHECKS.

12        AND, SO, TO THINK THAT HE SOMEHOW

13   CORRUPTLY WAS SEEKING TO OBSTRUCT THIS

14   EXAMINATION IN 2010, YOUR HONOR, IS, I THINK,

15   WITHOUT MERIT.  AND THE EVIDENCE, EVEN VIEWED

16   MOST FAVORABLY TO THE GOVERNMENT, DOES NOT

17   EQUAL THE OBSTRUCTION CHARGE FOR NUMBER

18   THREE.

19        AND I'LL BE SHORT ON NUMBER -- THE

20   SECOND CHARGE ---

21   THE COURT: LET ME SPEAK.  LET ME HEAR FROM

22        THE GOVERNMENT WITH RESPECT TO COUNTS

23   THREE AND FOUR.

24   MR. AMBEAU: WELL, CAN I TALK ABOUT NUMBER

25        FOUR FOR JUST A MOMENT, YOUR HONOR?  I

1       DIDN'T COVER THAT.

2       THE COURT: GO AHEAD.

3       MR. AMBEAU:  WITH COUNT NUMBER FOUR, YOUR

4           HONOR, THE TWO CHARGES OF THE GOVERNMENT

5       IN COUNT NUMBER FOUR THAT MR. LINARES FALSELY

6       REPRESENTED TO THE EXAMINER THAT HE HAD NOT

7       RETAINED ANY RECORDS OF HIS CHECK CASHING

8       BUSINESS OTHER THAN HIS BANK STATEMENTS.

9           I THINK THAT'S ALSO CLEAR THAT MS.

10      ARMWOOD ALSO SELF-ADMITTED, YOUR HONOR, THAT

11      HE BOTH TOLD HER THAT HE KEPT BANK RECORDS

12      THAT HE TURNED OVER TO HER, BUT ALSO THAT HE

13      KEPT COPIES OF ID'S AND COPIES OF CHECKS.

14      AND SHE SAID REPEATEDLY, "I DIDN'T RECEIVE

15      THOSE.  I DIDN'T RECEIVE THOSE."  AND WE HAD

16      THIS BANTER BACK AND FORTH ABOUT, WELL, THE

17      ASSERTION HERE IS NOT THAT YOU DIDN'T RECEIVE

18      THEM.  IT IS, IN FACT, THAT YOU WERE NOT TOLD

19      THAT THEY WERE IN THE BUILDING.  AND, IN

20      FACT, SHE WAS TOLD THAT THEY WERE IN THE

21      BUILDING.

22          AND, LASTLY, YOUR HONOR, AS TO COUNT

23      FOUR.  AGAIN, THERE'S THE SAME CONCEALING

24      NUMEROUS RECORDS RELATIVE TO THE EXAMINATION.

25      I THINK I'VE ANSWERED THAT SUFFICIENTLY.

1           THE COURT: OKAY.

2           MR. AMBEAU: OR PLED THAT SUFFICIENTLY.

3           THE COURT: MR. STEVENS?

4           MR. STEVENS: JUDGE, DO YOU WANT ME TO

5               ADDRESS COUNTS THREE AND FOUR OR JUST

6       THREE?

7           THE COURT: EITHER ONE.

8           MR. STEVENS: I MEAN, I'LL ADDRESS THEM

9           BOTH, IF THAT'S ALL RIGHT.

10          THE COURT: SURE.

11          MR. STEVENS: JUDGE, I -- I TRY TO STICK

12          TO THE ELEMENTS, WHICH I HAVE IN FRONT

13      OF ME.

14          THE FIRST ELEMENT FOR BOTH DEFENSES,

15      THAT THERE WAS A PROCEEDING PENDING.  NO

16      QUESTION ABOUT THAT.  BUT IT'S "EXHIBITS 4A"

17      THROUGH "4D" AS TO COUNT THREE, "6A" TO "6D"

18      AS TO COUNT FOUR.

19          SECOND:  THAT HE KNEW THAT THE

20      PROCEEDING WAS PENDING.  NO QUESTION ABOUT

21      THAT.  "4A" THROUGH "4D" AS TO COUNT THREE.

22      "6A" TO "6D" AS TO COUNT FOUR.

23          THE THIRD ELEMENT: THAT HE CORRUPTLY

24      ENDEAVORED TO INFLUENCE, OBSTRUCT AND IMPEDED

25      THE ADMINISTRATION OF THE LAW.

1        A LOT OF WHAT MR. AMBEAU'S ARGUMENT IS,

2    IS JUST NOT RELEVANT.  IT JUST DOESN'T RELATE

3    TO WHETHER THERE'S EVIDENCE SUFFICIENT TO

4    SUSTAIN A CONVICTION.  FOR 2010, THAT'S COUNT

5    THREE.  MS. HARDY ASKED HIM FOR CHECKS.  HE

6    NEVER PROVIDED ANY CHECKS.  WE FOUND THAT HE

7    HAD CHECKS THE WHOLE TIME.  THAT'S "EXHIBIT

8    24."  THE FACT THAT SHE WAS ABLE TO GET

9    IMAGES OF THOSE CHECKS FROM THE BANK IS

10   TOTALLY IRRELEVANT.  AND YOUR HONOR'S

11   INSTRUCTIONS ARE GOING TO MAKE THAT CLEAR TO

12   THE JURY.

13        AS TO COUNT FOUR.  SAME ISSUE, JUDGE.

14   MS. ARMWOOD ASKED HIM FOR CHECKS.  HE WOULD

15   NOT PROVIDE HER WITH CHECKS.  HE HAD THE

16   CHECKS THE WHOLE TIME.  THAT'S "U.S. EXHIBIT

17   24."  AND, AGAIN, WHETHER WE WERE ABLE TO GET

18   THOSE CHECKS FROM SOME OTHER MEANS IS TOTALLY

19   IRRELEVANT.

20        OBVIOUSLY THERE WERE OTHER STATEMENTS

21   THAT THOSE WITNESSES TESTIFIED ABOUT --

22   DEFENDANT MADE TO THEM, WHICH EVIDENCE

23   SUPPORTS THAT THOSE WERE FRAUDULENT, BASED ON

24   THE TREASURY CHECKS, THE SEARCH WARRANT

25   DOCUMENTS, THE BANK RECORDS.  I CAN TALK

1     ABOUT THOSE IN DETAIL, JUDGE.  BUT I THINK

2     JUST BASED ON THAT ISSUE OF CONCEALING THOSE

3     CHECKS, AFTER BEING EXPLAINED THE PURPOSE OF

4     THE EXAM, AFTER GETTING THOSE NOTICES.

5     EVIDENCE IS CERTAINLY SUFFICIENT TO SUPPORT A

6     CONVICTION.

7     THE COURT: OKAY.  WELL, WITH RESPECT TO RULE

8          -- TO COUNTS THREE AND FOUR, OF COURSE,

9     THE STANDARD UNDER RULE 29C IS WHETHER A JURY

10    -- IN VIEWING THE EVIDENCE IN A LIGHT MOST

11    FAVORABLE TO THE PROSECUTION COULD STILL

12    RENDER A VERDICT IN THE CASE; THAT IS, CAN

13    FIND THAT THE GOVERNMENT HAS SATISFIED THE

14    ELEMENTS BEYOND A REASONABLE DOUBT.  I WILL

15    DEFER RULING ON THE MOTION AT THIS TIME.  I

16    BELIEVE -- I'D LIKE TO HEAR, IF THERE IS ANY

17    ADDITIONAL EVIDENCE, I'D LIKE TO HEAR IT.

18        I WILL SAY THAT, BASED UPON OUR

19    RESEARCH, THE CASE LAW OF THE FIFTH CIRCUIT,

20    IT'S CERTAINLY CLEAR THAT EVEN WITHHOLDING

21    DOCUMENTS FROM AN IRS EXAMINER MAY BE ENOUGH

22    TO SATISFY THE ELEMENTS OF THE CHARGES

23    CONTAINED IN COUNTS THREE AND FOUR.

24        NONETHELESS, I WOULD DEFER RULING ON THE

25    DEFENDANT'S MOTION WITH RESPECT TO THOSE

1   COUNTS AT THIS TIME.

2       LET ME GIVE YOU AN OPPORTUNITY, MR.

3   AMBEAU, IF YOU WANT, TO ARGUE ANY OTHER

4   COUNTS UNDER RULE 29.

5   MR. AMBEAU: YOUR HONOR, AS TO THE FIRST

6       COUNT, THE THEFT OF GOVERNMENT FUNDS

7   AIDING AND DID -- KNOWINGLY STEAL AND PURLOIN

8   OR AIDED AND ABETTED THE THEFT OF GOVERNMENT

9   FUNDS THAT WAS A PART OF THIS FRAUD.

10      I THINK THAT THE GOVERNMENT HAVING TO

11  PROVE THAT THE DEFENDANT KNOWINGLY CONVERTED

12  THESE FUNDS, WRONGFULLY, WITH THE INTENT

13  NECESSARY WOULD HAVE -- WOULD HAVE REQUIRED

14  FOR HIM TO KNOW THAT THERE WAS A FRAUD

15  OCCURRING IN THE UNITED STATES TREASURY.

16      GIVEN THE EVIDENCE THAT WE HAVE BEEN --

17  THAT WE HAVE HEARD THROUGHOUT THE LAST THREE

18  DAYS, I DON'T THINK THAT THE GOVERNMENT -- IN

19  FACT, I KNOW THAT THE GOVERNMENT DIDN'T OFFER

20  ANY EVIDENCE THAT, IN FACT, MR. LINARES WAS

21  CONNECTED TO THE FRAUD ON THE UNITED STATES

22  TREASURY OTHER THAN THE FACT THAT PEOPLE

23  APPEARED AT HIS STORE WITH WHAT TURNED OUT TO

24  BE FRAUDULENT TREASURY CHECKS, PRESENTED HIM

25  WITH ID'S AND CASHED THOSE CHECKS AT HIS

1    STORE.

2        THE GOVERNMENT HAS NOT SHOWN THAT HE

3    CONVERTED MONEY OR PROPERTY TO HIS OWN USE,

4    YOUR HONOR.  OR TO THE USE OF ANOTHER IN THAT

5    HE DID SO KNOWINGLY.  THEY HAVE MADE -- THEY

6    HAVE GIVEN NO WITNESS, PUT UP NO TESTIMONY

7    THAT MR. LINARES KNEW THAT THIS -- THIS CRIME

8    WAS OCCURRING.

9        IN FACT, WHAT THE GOVERNMENT HAS DONE IS

10   PRESENT A LOT OF INFORMATION THAT HE HAD A

11   DUTY TO KNOW OR MAYBE PERHAPS HE SHOULD HAVE

12   KNOWN OR SHOULD HAVE DISCOVERED THE FRAUD

13   THAT WAS BEING COMMITTED IN NEW YORK, AND

14   SHOULD HAVE STOPPED IT OR TOLD SOMEONE ABOUT

15   IT OR FILED SOME REPORTS THAT HE WAS NOT

16   REQUIRED TO FILE.  AND -- AND IN DOING SO,

17   MAYBE COULD HAVE STOPPED THIS CRIME.

18       BUT NONE OF THOSE THINGS, NONE OF THAT

19   ---

20   THE COURT: LET ME HEAR FROM MR. STEVENS

21       OR MR. CROSSWELL.

22   MR. STEVENS: JUDGE, WHAT I -- WHAT I THINK

23       I'M HEARING IS THAT THE ONLY ELEMENT

24   THAT THERE IS REALLY DISPUTE ON IS THE

25   KNOWLEDGE.  I'M CERTAINLY HAPPY TO ---

1       THE COURT: WELL, THIS IS MY CONCERN.

2           HE IS CHARGED IN COUNT ONE WITH

3       KNOWINGLY OR KNOWINGLY DID STEAL AND PURLOIN.

4       WHAT EVIDENCE DO YOU HAVE THAT THE DEFENDANT

5       HIMSELF -- AND I UNDERSTAND THAT YOU HAVE

6       ALSO CHARGED IN AIDING AND ABETTING.  BUT

7       LET'S FIRST TRY TO RESOLVE THE ISSUE OF

8       WHETHER THE DEFENDANT HIMSELF STOLE MONEY.

9       MR. STEVENS: STOLE OR CONVERTED TO HIS USE

10          OR TO THE USE OF OTHERS.

11      THE COURT: OR CONVERTED.  YES.

12      MR. STEVENS: YES, JUDGE.  WELL, I THINK

13          AMONG THE BEST EVIDENCE ON THAT IS

14      "EXHIBIT 12."  THOSE ARE THE RECLAMATIONS.

15      MS. CRAIG TALKED ABOUT THOSE.  THOSE BEGAN IN

16      -- AND I DON'T MEAN TO MISSTATE THEM.  THEY

17      BEGAN IN JULY OR AUGUST, 2012, EARLY IN THE

18      SCHEME.  AND THOSE ARE DIRECT KNOWLEDGE BY

19      THE BANK TO HIM THAT HE HAD BEEN CASHING

20      CHECKS THAT HAD BEEN STOLEN, THAT WERE --

21      THAT SHOULD NOT HAVE BEEN CASHED.  THOSE

22      BEGAN EARLY IN THE SCHEME.

23      THE COURT: AND THAT CONTINUED AFTER BEING

24          MADE AWARE OF IT; IS THAT YOUR ---

25      MR. STEVENS: ABSOLUTELY, JUDGE.  AND -- AND

1   THE FACT THAT THAT CONTINUED FOR

2   HUNDREDS AND HUNDREDS OF CHECKS, --

3   THE COURT: SO, THAT WENT ---

4   MR. STEVENS:  -- WE CAN SEE IN THE BANK

5   RECORDS.

6   THE COURT: BUT AT LEAST GO -- IN OTHER

7   WORDS, YOUR ARGUMENT IS THAT IT AT LEAST

8   SHOWS SOME SORT OF, PERHAPS, AIDING AND

9   ABETTING?

10   MR. STEVENS: WELL, NO.  I WAS ADDRESSING

11   YOUR QUESTION ABOUT WHETHER HE -- HE

12   ACTUALLY WAS PERSONALLY CONVERTING THESE

13   FUNDS TO THE -- TO THE USE OF SOMEONE ELSE.

14   THE COURT: OKAY.  SO, IN OTHER WORDS, AFTER

15   BEING PUT ON NOTICE, ASSUMING HE WAS PUT

16   ON NOTICE, AFTER BEING PUT ON NOTICE, EVEN

17   CHARGING THE ONE AND A HALF PERCENT?

18   MR. STEVENS: AFTER HE'S PUT ON NOTICE IN

19   JULY OR AUGUST, --

20   THE COURT: YES.

21   MR. STEVENS:  -- BY THE BANK.

22   THE COURT: ANY FUNDS, ANY FEES HE WOULD

23   HAVE COLLECTED AS A RESULT OF CASHING

24   THOSE CHECKS, KNOWING -- ALLEGEDLY KNOWING

25   THAT THEY WERE FRAUDULENTLY OBTAINED BY

1           ANYONE, HE WAS THEN STEALING, FALSELY

2           CONVERTING TO HIS OWN USE, LET'S SAY, PART OF

3           THOSE CHECKS.  THEREFORE, STEALING GOVERNMENT

4           FUNDS?

5           MR. STEVENS: YES, JUDGE.  BUT TO BE CLEAR,

6               THE ONE AND A HALF PERCENT WAS WHAT HE

7           WAS CONVERTING TO HIS USE. THE FACE VALUE OF

8           THOSE CHECKS IS WHAT HE WAS CONVERTING ---

9           THE COURT: OH, I UNDERSTAND.  OKAY.  I THINK

10              THAT WAS ---

11          MR. STEVENS: YES.

12          THE COURT: I ASSUMED THAT'S WHAT YOU WERE

13              TALKING ABOUT.

14          MR. STEVENS: YES.  AND, SO, AFTER HE HAS

15              THE FIRST NOTICE FROM THE BANK THAT HE'S

16          DONE THAT, THE NEXT TIME HE CASHES ONE OF

17          THESE CHECKS WITH THE FRAUDULENT ID THAT

18          COULD HAVE BEEN VERIFIED IN 15 SECONDS, HE IS

19          CONVERTING THOSE CHECKS, EITHER TO HIS USE OR

20          THE USE OF ANOTHER.

21          THE COURT: OKAY.  VERY WELL.  LET ME HEAR

22              FROM MR. AMBEAU ON COUNT TWO.

23          MR. AMBEAU: YOUR HONOR, MAY I RESPOND TO

24              COUNT ONE FOR A MOMENT?

25          THE COURT: YES.  YES, YOU MAY.

1      MR. AMBEAU: JUST TO SAY, YOUR HONOR.  THAT

2          THE GOVERNMENT'S OFFERED NO EVIDENCE

3      THAT THE NOTICE -- THAT THERE WAS ANY NOTICE

4      TO MR. LINARES, OTHER THAN THE FACT THAT THE

5      CHECK WAS NOT HONORED.  SO, THERE WAS NO

6      FURTHER NOTICE.  THERE WAS NO NOTICE THAT IT

7      WAS FRAUDULENT.  THE PURPOSE OF DISHONORING

8      THE CHECK -- ALL THEY SAID WAS THERE'S A

9      RECLAMATION RELATED TO THIS CHECK, AND THEY

10     TOOK THE MONEY OUT OF HIS ACCOUNT.

11         AND, SO, I'M NOT SURE THAT THE NOTICE IS

12     NECESSARY -- I'M NOT SURE THE NECESSARY

13     NOTICE IS THERE FOR HIM TO HAVE KNOWN WHAT

14     THE POINT OF THAT RECLAMATION WAS SUFFICIENT

15     FOR KNOWING, HAVING THE INTENT THEN, TO STEAL

16     MONEY FROM THE GOVERNMENT.

17     THE COURT: I'M SURE MR. STEVENS WILL TELL

18         ME OTHERWISE THAT THERE WAS SOMETHING.

19     MR. STEVENS: LOOK, JUDGE, I DON'T MEAN TO

20         BE DIFFICULT.

21     THE COURT: NO, YOU'RE NOT BEING DIFFICULT.

22         THIS IS VERY IMPORTANT.  SO, PLEASE.

23     MR. STEVENS: IF YOU LOOK AT "EXHIBIT 12,"

24         MR. LINARES -- THE EVIDENCE WAS THAT MR.

25     LINARES WAS SENT SWORN STATEMENTS BY THESE

1       TAXPAYERS SAYING, "I DIDN'T GET THAT CHECK.

2       I DIDN'T SIGN THAT CHECK."  THAT WENT TO MR.

3       LINARES.

4            SO, IT'S NOT -- IT'S DISINGENUOUS TO

5       SUGGEST THAT ALL HE KNEW WAS THAT THE MONEY

6       IS BEING TAKEN OUT OF THE ACCOUNT BECAUSE OF

7       SOME -- SOME TECHNICALITY.  HE WAS -- HE WAS

8       GIVEN DIRECT KNOWLEDGE BY THE ACTUAL

9       TAXPAYERS THAT THEIR CHECKS HAD BEEN STOLEN

10      AND HE HAD CASHED THEM.  AND HE GOT -- HE GOT

11      12 OR 13 OF THESE, JUDGE.  AND THAT'S --

12      THAT'S -- YOU CAN READ "EXHIBIT 12" IN FIVE

13      MINUTES AND KNOW THAT THAT'S THE FACT.

14      THE COURT: I'M LOOKING AT "EXHIBIT 12"

15           RIGHT NOW.

16           OKAY.  LET'S TURN NOW TO COUNT TWO.

17      MR. AMBEAU: AS TO COUNT TWO, YOUR HONOR,

18           I THINK THAT THE POINT HERE, AND WE HAD

19      SPOKEN ABOUT THIS EARLIER, THAT THIS HAS TO

20      BE WILLFUL FAILURE TO ENACT AN EFFECTIVE

21      MONEY LAUNDERING PROGRAM.

22           AND, SO, THE WILLFUL FAILURE AND THE

23      EFFECTIVE ADJECTIVES, AS THEY ARE WRITTEN IN

24      THE STATUTE ARE IMPORTANT.  I THINK THAT IT

25      HAS TO SHOW THAT MR. LINARES BOTH KNEW THE

1     LAW, TOOK ACTION TO VIOLATE THE LAW, AND DID

2     SO KNOWINGLY.  DID SO NOT OUT OF MERE

3     NEGLIGENCE.

4          IN FACT, ALL OF THE JURISPRUDENCE ON

5     THESE TAX LAWS IN THESE COMPLEX REGULATORY

6     LAWS SAYS VERY CLEARLY THAT WHEN THE WORD

7     "WILLINGLY" IS PUT IN, THAT, IN FACT, WHAT

8     THAT IS ESSENTIALLY DOING IS SAYING THAT YOU

9     CAN'T PUNISH THE MERELY-NEGLIGENT CONDUCT.

10          AND -- AND I THINK THAT IT'S VERY CLEAR

11     THAT THE GOVERNMENT HASN'T SHOWN THAT MR.

12     LINARES WAS DOING ANYTHING OTHER THAN BEING

13     SLOW IN HIS RESPONSE TO THE 2010 AND 2013.

14     THERE'S A DISTINCT AND OBVIOUS DIFFERENCE

15     BETWEEN THE EXAMINATION OF 2010 AND THE

16     CHANGE THAT HE WAS MAKING TO -- THE

17     CORRECTIVE ACTION HE WAS TAKING BETWEEN THAT

18     AND THE 2013 EXAMINATION.  AND THEN A

19     DISTINCT CHANGE, THE ONLY CORRECTIVE ACTION

20     THAT HE HAD TO TAKE, THE SUBSTANTIVE

21     CORRECTIVE ACTION HE HAD TO TAKE, TO THE 2013

22     EXAM AND WHEN HE EVENTUALLY GOES TO RESPOND

23     TO THE GRAND JURY AND PRESENTS THEM WITH

24     WRITTEN CHECK POLICIES AND PROCEDURES THAT HE

25     REVISED AND HAD IN PLACE ON FEBRUARY 1ST OF

1    2014.

2            AND, SO, I THINK THAT, AGAIN, WITHOUT

3        GOING ON AND ON, I THINK THE GOVERNMENT HAS

4        FAILED TO SHOW THE TWO NECESSARY ELEMENTS OF

5        COUNT TWO, WHICH ARE WILLINGNESS -- WILLINGLY

6        AND ---

7        THE COURT: NOW, MR. AMBEAU, WE'LL BE ABLE

8            TO TALK ABOUT THIS WHEN WE DISCUSS THE

9        JURY INSTRUCTIONS MORE FULLY.  BUT IT'S BASED

10       UPON YOUR FILINGS LAST NIGHT, YOU REQUEST

11       THAT THE JURY BE INSTRUCTED THAT IT MUST BE

12       AN EFFECTIVE MONEY LAUNDERING -- ANTI-MONEY

13       LAUNDERING PROGRAM, CORRECT?

14       MR. AMBEAU: THAT'S CORRECT, YOUR HONOR.

15       THE COURT: WELL, I WANT TO SPEAK TO THAT IN

16           JUST A MINUTE.  BUT LET ME FIRST GIVE

17       MR. STEVENS AN OPPORTUNITY TO BE HEARD ON THE

18       ARGUMENT THAT IT WAS ESSENTIALLY AN EFFECTIVE

19       AND COMMENSURATE WITH THE SIZE OF HIS

20       BUSINESS.

21       MR. STEVENS: YOUR HONOR, WHAT I WAS GOING TO

22           -- I THOUGHT THE FOCUS OF MR. AMBEAU'S

23       REMARKS WERE ON THE WILLFULLY.

24       THE COURT: WELL, THAT'S RIGHT.

25       MR. STEVENS: AND I GUESS I HAVE TWO

1    RESPONSES, JUDGE.  THE FIRST IS THAT

2    WILLFULLY MEANS, AND I THINK YOU'RE GOING TO

3    INSTRUCT THE JURY THAT WILLFULLY MEANS WHAT

4    THE FIFTH CIRCUIT PATTERN INSTRUCTIONS SAYS

5    IT MEANS AND NOT WHAT MR. AMBEAU SAYS IT

6    MEANS.

7    AND HE MAY HAVE REVIEWED MORE OF THE

8    JURISPRUDENCE THAN I HAVE.  BUT ALL OF THE

9    JURISPRUDENCE I HAVE LOOKED AT IS VERY CLEAR,

10   THAT FALSE STATEMENTS AND LIES AND

11   WITHHOLDING DOCUMENTS IS ALL EVIDENCE OF YOUR

12   STATE OF MIND AND YOUR WILLFULNESS.

13   THE EVIDENCE WAS -- THERE IS CERTAINLY

14   SUFFICIENT EVIDENCE BEFORE THE JURY THAT HE

15   KNEW OF HIS OBLIGATIONS.  MS. HARDY WAS CLEAR

16   ABOUT THAT.  MS. ARMWOOD WAS CLEAR ABOUT

17   THAT.  WE ALSO INTRODUCED OTHER IRS GUIDANCE

18   THAT HE WAS GIVEN.  I THINK THOSE WERE

19   "EXHIBITS 27" AND "28."

20   AND WE TALKED EARLIER ABOUT THE EVIDENCE

21   THAT THE JURY COULD FIND, SHOWS THAT HE TOLD

22   FALSE STATEMENTS.  HE MADE FALSE STATEMENTS

23   TO MS. HARDY AND MS. ARMWOOD.  THOSE FALSE

24   STATEMENTS SHOW HIS WILLFULNESS, AMONG OTHER

25   THINGS.  FALSE STATEMENTS TO MS. HARDY IN

1        2010.  FALSE STATEMENTS TO THE OFI IN 2011.

2        FALSE STATEMENTS TO MS. ARMWOOD IN 2013.  AN

3        INCOMPLETE PRODUCTION TO THE GRAND JURY IN

4        2014.

5              THE LAW IS, I THINK, FAIRLY CLEAR THAT

6        THEY CAN FIND THAT HE WAS MAKING FALSE

7        STATEMENTS AND LYING, AND ALL OF THAT SHOWS

8        THE STATE OF MIND.

9        THE COURT: TAKEN TOGETHER, THAT COULD SHOW

10             THE SPECIFIC INTENT.

11       MR. STEVENS: ABSOLUTELY, JUDGE.  AND THE

12             SUPREME COURT HAS SAID THAT.  I THINK I

13       MENTIONED THAT AT A BENCH CONFERENCE.  I

14       HAVEN'T BRIEFED IT.  BUT THAT'S -- THAT'S

15       PRETTY CLEAR.

16       THE COURT: OKAY.  WELL, GENTLEMEN, I WILL

17             TAKE THE MATTER UNDER ADVISEMENT.  I

18       WILL DEFER RULING ON THE DEFENDANT'S MOTION

19       AT THIS TIME.

20             I WILL TELL YOU NOW THAT OVER THE COURSE

21       OF THE LUNCH BREAK I WILL ASK YOU ALL TO

22       CONFER ABOUT THE JURY CHARGES WITH RESPECT TO

23       COUNT TWO.  COUNT TWO CHARGES THE DEFENDANT

24       WITH FAILING TO MAINTAIN AN EFFECTIVE ANTI-

25       MONEY LAUNDERING PROGRAM OR POLICY.

1          AND MR. AMBEAU, MY UNDERSTANDING IS THAT

2     YOU WOULD LIKE -- YOU'RE FINE WITH THAT; IS

3     THAT -- BASED UPON YOUR FILINGS, YOU TOO

4     BELIEVE THAT THE JURY SHOULD BE INSTRUCTED

5     THAT WHATEVER THE DEFENDANT PUT IN PLACE HAS

6     TO HAVE BEEN EFFECTIVE.  AND THAT BY

7     EXTENSION YOU BELIEVE IT WAS EFFECTIVE?  IS

8     THAT YOUR ARGUMENT?

9     MR. AMBEAU: THAT'S CORRECT, YOUR HONOR.

10    THE COURT: ALL RIGHT.  THE PROBLEM THAT

11         I'M HAVING, GENTLEMEN, I'M FLAGGING THIS

12    FOR YOU RIGHT NOW.  THERE IS NOTHING --

13    THERE'S NOWHERE IN THE STATUTE IS THE WORD

14    "EFFECTIVE" USED, IS MY POINT.  NOW, WE CAN

15    ALL AGREE THAT THERE ARE NO FIFTH CIRCUIT

16    PATTERN JURY INSTRUCTION ON THIS POINT.

17         I WILL ALSO TELL YOU THAT WE WILL LOOK

18    AT VIRTUALLY EVERY OTHER CIRCUIT AND THERE'S

19    NO PATTERN JURY INSTRUCTION ON THAT.

20         IS THAT RIGHT, MAX?

21    MR. MAX: YES, JUDGE.  AND IT'S -- THE WORD

22    "EFFECTIVE" IS USED IN THE RELEVANT

23    REGULATION.

24    THE COURT: CORRECT.  IN THE CFR IT IS USED.

25    MR. MAX: YES.

1          THE COURT: THAT IS CORRECT.

2          MR. MAX: YES, YOUR HONOR.

3          THE COURT: BUT THE STATUTE ITSELF DOES NOT.

4                IN FACT, THE STATUTE, BY -- THE LAST

5          TIME I LOOKED SPEAKS IN TERMS OF APPROPRIATE

6          PROCEDURES TO INSURE COMPLIANCE.  IT DOES

7          NOT, HOWEVER, USE THE TERM "EFFECTIVE."

8                SO, I POINT THAT OUT JUST TO TELL YOU

9          THAT I'M NOT SURE I'M GOING TO INCLUDE THAT

10         WORD.  I AM GOING TO ASK YOU ALL TO CONFER.

11               NOW, COULD YOU POSSIBLY INCLUDE PORTIONS

12         OF THE CFR?  WE'LL TALK ABOUT THAT AS WELL.

13               BUT I DON'T WANT -- MY CONCERN IS THAT I

14         DON'T WANT TO EXPAND THE STATUTE BEYOND THE

15         MANNER IN WHICH IT IS WRITTEN BY CONGRESS.

16         CONGRESS DOES NOT INCLUDE THE WORD

17         "EFFECTIVE," AS THAT -- IN THE STATUTE.  AND,

18         SO, TO THE EXTENT IT'S USED IN THE CFR, MAYBE

19         WE NEED A LITTLE BIT MORE IN THAT JURY

20         CHARGE.

21               ALL RIGHT.  IS THE DEFENDANT PREPARED TO

22         PRESENT EVIDENCE AT THIS TIME?

23         MR. AMBEAU: YES, YOUR HONOR.

24         MR. CROSSWELL: YOUR HONOR, JUST ONE MORE

25               THING BEFORE WE STOP?

1  THE COURT: SURE.

2  MR. CROSSWELL: AND I DON'T KNOW IF IT'S

3  EVEN GOING TO COME UP.  BUT WE DID HAVE

4  A FEELING THAT PERHAPS THE DEFENDANT WOULD

5  TRY TO ENTER IN CERTIFICATES OF COMPLIANCE

6  WITH MONEY TRANSMISSION SERVICES, WHICH WE

7  HAVE ALREADY TOLD YOU WE BELIEVE IS

8  COMPLETELY IRRELEVANT.  THIS IS ABOUT CHECK

9  CASHING.  BUT ASIDE FROM THAT, WE ALSO

10  BELIEVE IT'S HEARSAY.

11  AND, SO, WE DID JUST PUT TOGETHER A

12  QUICK TRIAL BRIEF, JUST A PAGE LONG,

13  BASICALLY.  IF, IN CASE, IT COMES UP.

14  THE COURT: MR. AMBEAU, IS YOUR INTENTION

15  TO SEEK TO INTRODUCE THAT KIND OF

16  EVIDENCE?

17  MR. AMBEAU: NOTHING OF THE KIND, YOUR HONOR.

18  THE COURT: WELL, MR. CROSSWELL, I ASSURE

19  YOU THAT IF HE ATTEMPTS TO DO SO -- BUT

20  I APPRECIATE YOUR BEING PREPARED TO ADDRESS

21  IT.

22  MR. CROSSWELL: ALL THAT RESEARCH AND WRITING.

23  THE COURT: THE FACULTY AT DUKE LAW SCHOOL

24  WOULD BE VERY PROUD OF YOU.

25  I DON'T KNOW IF THEY WERE PROUD OF YOUR

1       BASKETBALL TEAM RIGHT ABOUT NOW, BUT THEY

2       CERTAINLY WOULD BE PROUD OF YOU.

3           ALL RIGHT.  ARE WE -- NO, NO, MAX.

4       NO NEED TO NOD YOUR HEAD IN AGREEMENT ABOUT

5       THE DUKE BASKETBALL TEAM.

6           ALL RIGHT.  ARE WE PREPARED TO PROCEED?

7       MR. AMBEAU: YES, YOUR HONOR.

8       THE COURT: ALL RIGHT.  LET'S ALL RISE FOR

9           THE JURY.

10          MR. AMBEAU, WILL THE DEFENDANT TESTIFY?

11      MR. AMBEAU: AND HE WILL BE THE WITNESS,

12          YOUR HONOR.

13      THE COURT: OKAY.

14      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

15          `THE JURY RETURNS FROM BREAK.)

16      THE COURT: BE SEATED.

17          LADIES AND GENTLEMEN, I HAVE BEEN

18      ADVISED BY MR. AMBEU THAT THE DEFENDANT DOES,

19      IN FACT, INTEND TO PRODUCE EVIDENCE IN HIS

20      DEFENSE.

21          MR. AMBEAU, YOU MAY PROCEED AT THIS

22      TIME.

23      MR. AMBEAU: THANK YOU, YOUR HONOR.  THE

24          DEFENSE CALLS MR. CARLOS LINARES.

25      THE CLERK: RAISE YOUR RIGHT HAND.

1   THE WITNESS, CARLOS L. LINARES, AFTER HAVING FIRST

2   BEEN DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH,

3   AND NOTHING BUT THE TRUTH, TESTIFIED AS FOLLOWS:

4               THE CLERK: STATE AND SPELL YOUR NAME

5                  FOR THE RECORD.

6               THE WITNESS: MY NAME IS CARLOS LINARES.

7                  C-A-R-L-O-S  L-I-N-A-R-E-S.

8                  DIRECT EXAMINATION

9   MR. AMBEAU:

10  Q.   MR. LINARES, DO YOU SPEAK ENGLISH?

11  A.   A LITTLE.

12  Q.   CAN WE ---

13               MR. AMBEAU: WITH YOUR PERMISSION, YOUR

14                  HONOR, MAY WE SUSPEND THE TRANSLATION

15                  FOR A MOMENT AND LET MR. LINARES SPEAK IN

16                  ENGLISH?

17               THE COURT: MR. LINARES?

18               THE WITNESS: YES.

19               THE COURT: NOW, I AM -- AS THE RECORD

20                  SHOWS, I AM NOW SPEAKING TO YOU IN THE

21                  ENGLISH LANGUAGE.  DO YOU HAVE ANY DIFFICULTY

22                  HEARING AND UNDERSTANDING ME, SIR?

23               THE WITNESS: IF I CAN ANSWER IN ENGLISH AND

24                  I ANSWER IN SPANISH?

25               THE COURT: YOU MAY ANSWER IN ENGLISH.  IT

1            IS YOUR CHOICE, SIR.  I WILL ALLOW YOU

2        TO ANSWER IN ENGLISH IF YOU WISH TO DO SO.

3            BUT MY QUESTION TO YOU, SIR, IS DO YOU

4        HAVE ANY PROBLEMS HEARING ME IN THE ENGLISH

5        LANGUAGE AND UNDERSTANDING ME IN THE ENGLISH

6        LANGUAGE?

7        THE WITNESS: SOME WORDS IS A LITTLE BIT

8            DIFFICULT FOR ME.

9        THE COURT: MR. AMBEAU, I BELIEVE WE SHOULD

10            PROBABLY USE THE INTERPRETER.

11        MR. AMBEAU: OKAY.

12   MR. AMBEAU:

13   Q.   MR. LINARES, ---

14        THE COURT: MR. LINARES, IS IT YOUR DESIRE

15            TO ANSWER ME IN THE ENGLISH LANGUAGE?

16        THE WITNESS: I WOULD RATHER ANSWER IN

17            THE SPANISH LANGUAGE.

18        THE COURT: ALL RIGHT.  VERY WELL.

19   MR. AMBEAU:

20   Q.   MR. LINARES, WHY ARE WE HAVING THE PROCEEDINGS

21        TRANSLATED IN SPANISH?

22   A.   BECAUSE I WANT TO BE SURE ABOUT MY ANSWERS.

23   Q.   CAN YOU SPEAK ENGLISH?  DO YOU AND I SPEAK

24        ENGLISH TO EACH OTHER?

25   A.   YES.

```
 1   Q.   AND CAN YOU SPEAK ENGLISH TO PEOPLE OUTSIDE OF

 2        THE COURTROOM OR INSIDE OF THE COURTROOM THAT

 3        UNDERSTAND GENERALLY WHAT'S BEING SAID?

 4   A.   YES.

 5   Q.   OKAY.  AND, IN FACT, THE REASON WE'RE DOING THAT

 6        HERE IS BECAUSE OF THE LEGAL TERMS?

 7   A.   YES.

 8   Q.   YOU'RE NOT TRYING TO CONVINCE THE JURY THAT YOU

 9        DON'T SPEAK THE ENGLISH LANGUAGE, CORRECT?

10   A.   NO.  NO.

11   Q.   AND, IN FACT, THERE ARE TIMES WHERE YOU AND I

12        HAVE SPOKEN AND I'VE HAD TRANSLATORS THERE BUT

13        YOU UNDERSTAND?

14   A.   YES.  YES.

15   Q.   MR. LINARES, TELL ME WHERE YOU WERE BORN.

16   A.   I WAS BORN IN GUATEMALA.  GUATEMALA.

17   Q.   AND WHEN WERE YOU BORN IN GUATEMALA, MR. LINARES?

18   A.   1960.

19   Q.   MAKES YOU HOW OLD?

20   A.   MARCH.

21             THE COURT: WELL, WHAT WE'LL DO IS --

22                  MR. LINARES -- MR. LINARES.

23             THE WITNESS: YES.

24             THE COURT: NOW, MR. LINARES, I NEED YOU

25                  TO LOOK AT ME WHEN I SPEAK TO YOU.
```

1            OKAY?  ALL RIGHT.

2                  NOW, I ASKED YOU EARLIER IF YOU HAVE ANY

3       DIFFICULTY HEARING AND UNDERSTANDING ME, AND

4       YOUR ANSWER WAS YOU DID HAVE SOME DIFFICULTY.

5       AM I CORRECT?

6       THE WITNESS: YES.

7       THE COURT: ALL RIGHT.  IT APPEARS THAT MR.

8            AMBEAU WOULD LIKE TO EXAMINE YOU NOT

9       USING THE INTERPRETER.  DO YOU UNDERSTAND

10      THAT, SIR?

11      THE WITNESS: YES, I UNDERSTAND.

12      THE COURT: ARE YOU COMFORTABLE WITH THAT?

13           ARE YOU WILLING TO BE EXAMINED BY YOUR

14      LAWYER WITHOUT THE USE OF AN INTERPRETER?

15      MR. AMBEAU: YOUR HONOR, MAY WE APPROACH

16           BEFORE WE -- BECAUSE THAT'S NOT WHAT MY

17      INTENT IS AT ALL.

18      THE COURT: I THOUGHT YOUR INTENT WAS WHEN --

19           IF THERE WAS A QUESTION THAT HE NEEDED

20      -- WHAT DO YOU WANT?  WHAT'S YOUR REQUEST?

21      MR. AMBEAU: MY DESIRE WOULD BE TO EXAMINE

22           HIM IN THE ENGLISH LANGUAGE.  AND IF HE

23      DID NOT UNDERSTAND WHAT I SAY, TO THEN HAVE

24      THE TRANSLATOR ASSIST HIM IN THAT.

25      THE COURT: NOW, ---

1          MR. AMBEAU: IN AN EFFORT TO TRY AND SPEED

2              THIS UP, JUDGE.

3          THE COURT: I WAS ABOUT TO GET TO THAT POINT.

4          MR. AMBEAU: OKAY.

5          THE COURT: MY POINT TO YOU, MR. LINARES,

6              IS THAT PURSUANT TO YOUR LAWYER'S

7          REQUEST, IF YOU'RE FINE WITH THAT, I WILL

8          ALLOW HIM TO QUESTION YOU IN THE ENGLISH

9          LANGUAGE.  DO YOU UNDERSTAND THAT?

10         THE WITNESS: YES, I DO.

11         THE COURT: AND I WILL ALLOW YOU TO ANSWER

12             THE QUESTIONS IN THE ENGLISH LANGUAGE.

13         DO YOU UNDERSTAND THAT, SIR?

14         THE WITNESS: YES.

15         THE COURT: NOW, IF AT ANY TIME YOUR LAWYER

16             USES AN ENGLISH WORD THAT YOU DO NOT

17         UNDERSTAND, PLEASE LET ONE OF THE

18         INTERPRETERS KNOW AND THEY WILL TRANSLATE THE

19         SENTENCE FOR YOU, NOT JUST THE WORD, BUT THE

20         ENTIRE SENTENCE FOR YOU.  OKAY?

21         THE WITNESS: THANK YOU.

22         THE COURT: ALL RIGHT.  LET'S PROCEED.

23         MR. AMBEAU: THANK YOU, YOUR HONOR.

24   MR. AMBEAU:

25   Q.  AND HOW OLD DOES THAT MAKE YOU, MR. LINARES?

1   A.   FIFTY-FIVE (55).

2   Q.   AND HOW LONG HAVE YOU BEEN IN THE UNITED STATES

3        OF AMERICA?

4   A.   THIRTY-ONE (31) YEARS.

5   Q.   OKAY.  THAT'S 31 YEARS?

6   A.   YES.

7   Q.   AND WHEN YOU MOVED FROM THE COUNTRY WHERE YOU

8        WERE BORN TO THE UNITED STATES.  WHEN DID YOU --

9        WHERE DID YOU MOVE TO IN THE UNITED STATES?

10  A.   1984.

11  Q.   AND WHERE DID YOU MOVE TO?

12  A.   I MOVED TO CALIFORNIA.

13  Q.   HOW LONG DID YOU LIVE IN CALIFORNIA?

14  A.   ABOUT 29 YEARS, I THINK, 30 -- 30 SOMETHING LIKE

15       THAT.

16  Q.   OKAY.  AND HOW -- WHEN DID YOU MOVE TO BATON

17       ROUGE, LOUISIANA?

18  A.   19 -- 2008.

19  Q.   2008?

20  A.   UH HUH.

21  Q.   PRIOR TO COMING TO AMERICA OR EVEN IN THE UNITED

22       STATES, WHAT EDUCATION HAVE YOU HAD?

23  A.   VERY LITTLE.

24  Q.   WHAT'S THE HIGHEST EDUCATION GRADE YOU ---

25  A.   MY EIGHTH GRADE.

1   Q.   AND YOU COMPLETED THAT EIGHTH GRADE EDUCATION

2        WHERE?

3   A.   GUATEMALA.

4   Q.   DESPITE THAT FACT, YOU ARE CAPABLE OF RUNNING A

5        BUSINESS, CORRECT?

6   A.   YES.

7   Q.   AND, IN FACT, WHEN YOU MOVED TO BATON ROUGE, WHAT

8        DID YOU DO WHEN YOU MOVED TO BATON ROUGE IN 2008?

9   A.   IN THE BEGINNING I WAS WORKING CONSTRUCTION.

10  Q.   AND IS THAT WHAT YOU HAD DONE PRIOR TO 2008 IN

11       CALIFORNIA?

12  A.   UH HUH.  I MOVED 2008 FROM CALIFORNIA TO HERE.

13  Q.   RIGHT.  IN CALIFORNIA, WHAT DID YOU DO FOR A

14       LIVING, FOR WORK?

15  A.   CONSTRUCTION.

16  Q.   OKAY.  AND THEN YOU MOVED HERE IN 2008, AND YOU

17       DID CONSTRUCTION HERE, DID YOU SAY?

18  A.   YES, I DO A LITTLE BIT.

19  Q.   OKAY.  AND THEN -- AND THEN WHAT DID YOU DO?

20  A.   I DECIDE TO PUT A BUSINESS.

21  Q.   OKAY.  AND WHY DID YOU DO THAT?

22  A.   I FEEL A LITTLE BIT OLDER, YOU KNOW.

23  Q.   A LITTLE BIT --

24  A.   OLDER.

25  Q.   -- OLDER?

1  A.   UH HUH.

2  Q.   OKAY.  AND BECAUSE OF THAT YOU WANTED TO GET OUT

3       OF THE CONSTRUCTION BUSINESS?

4  A.   YES.

5  Q.   ALL RIGHT.  AND, SO, WHAT BUSINESS DID YOU OPEN,

6       MR. LINARES?

7  A.   2009.

8  Q.   WHAT BUSINESS DID YOU OPEN?

9  A.   I OPENED LATINO'S SUPERMARKET.

10 Q.   AND WHAT DOES LATINO'S SUPERMARKET DO?

11 A.   WE PROVIDE CUSTOMERS -- SERVICE TO THE CUSTOMERS,

12      LIKE CASH CHECKS, MONEY TRANSFER AND VEGETABLES.

13      YOU KNOW, LIKE A MARKET STUFF.

14 Q.   LIKE A GROCERY STORE, RIGHT?

15 A.   GROCERY STORE.  EXACTLY.

16 Q.   AND ARE YOU STILL IN BUSINESS AT LATINO'S?

17 A.   YES.

18 Q.   ON FLORIDA BOULEVARD IN BATON ROUGE?

19 A.   CORRECT.

20 Q.   MR. LINARES, WHEN DID YOU START CASHING CHECKS AT

21      LATINO'S?

22 A.   I THINK IT STARTED ME LIKE ONE YEAR, 2010.

23 Q.   OKAY.  YOU STARTED CASHING CHECKS?

24 A.   YES.

25 Q.   OKAY.  AND IN THAT SAME YEAR DID YOU HAVE A IRS

1        AGENT COME IN FOR AN EXAMINATION?

2   A.   YES.

3   Q.   DO YOU REMEMBER TALKING -- US TALKING TO HER

4        WHILE SHE WAS ON THE STAND?

5   A.   UH HUH.

6             THE COURT: IS THAT A YES?

7             THE WITNESS: YES.

8   MR. AMBEAU:

9   Q.   YOU HAVE TO ANSWER YES.  YOU HAVE TO ANSWER WITH

10       LANGUAGE.

11            AND, SO, DO YOU RECALL HEARING THAT IRS

12       AGENT TAKE THE STAND AND TESTIFY IN THIS

13       PROCEEDING?

14  A.   YES.

15  Q.   AND, THAT AGENT HAS SAID THAT YOU MADE A

16       REPRESENTATION TO HER THAT YOU DIDN'T KEEP ANY

17       OTHER RECORDS OTHER THAN CHECK-CASHING RECORDS.

18       IS THAT A TRUE STATEMENT?

19  A.   YES.  SHE SAID THAT.

20  Q.   OKAY.  AND THAT'S NOT THE CASE, RIGHT?  YOU KEPT

21       MORE RECORDS THAN THAT?  TELL US WHAT OTHER

22       RECORDS YOU KEPT IN YOUR BUSINESS.

23  A.   PHOTOCOPIES FROM THE CHECKS AND ID'S, YOU KNOW.

24  Q.   AND IS THAT ALL CHECKS YOU CASHED IN YOUR

25       BUSINESS?

1   A.   YES.

2   Q.   AND, SO, YOU KEPT A COPY OF EVERY CHECK YOU'VE

3        EVER CASHED IN YOUR BUSINESS?

4   A.   YES.

5   Q.   AND WHERE DID YOU -- WHERE DID YOU PUT THOSE

6        CHECK COPIES AT?

7   A.   IN THE BACK OFFICE IN BOXES.

8            MR. AMBEAU: MADAME TRANSLATOR, WOULD YOU

9               TRANSLATE THIS STATEMENT TO HIM?

10  MR. AMBEAU:

11  Q.   DID YOU KEEP A COPY OF EVERY CHECK YOU CASHED IN

12       YOUR BUSINESS?

13  A.   YES.

14  Q.   OKAY.  AND, DID YOU REQUIRE AN IDENTIFICATION

15       FROM EVERY PERSON THAT CASHED A CHECK IN YOUR

16       BUSINESS?

17  A.   YES.

18  Q.   WHEN YOU EXAMINED THOSE IDENTIFICATIONS, STARTING

19       IN 2010, WHEN YOU EXAMINED THOSE IDENTIFICATIONS,

20       WHAT DO YOU LOOK FOR, CARLOS?

21  A.   I LOOKING FOR -- TRY TO MATCH THE FACE OF THE

22       PERSON AND THE -- AND THE NAME ON THE CHECK.

23  Q.   OKAY.  IS THERE ANYTHING ELSE THAT YOU LOOK FOR?

24       AND YOU CAN ANSWER IN SPANISH IF YOU NEED TO.

25  A.   SOMETIMES THE ADDRESS.

1    Q.   OKAY.  AND WHY WOULD YOU -- WHY WOULD YOU LOOK

2         FOR ALL THESE THINGS WHEN YOU CASH CHECKS?

3    A.   WE WANT TO MAKE SURE, YOU KNOW, THAT EVERYTHING

4         IS PERFECT.

5    Q.   AND THAT'S BECAUSE -- WHAT HAPPENS IF THE CHECK

6         IS NOT GOOD?

7    A.   SOMETIMES WE WOULDN'T BE ABLE TO FIND THE PEOPLE.

8    Q.   AND THEN YOU HAVE TO PAY FOR THE CHECK?

9    A.   YES.

10   Q.   AND DID THAT -- DOES THAT HAPPEN OFTEN YOUR

11        BUSINESS IN 2010?

12   A.   NO.

13   Q.   NO.  NOT TOO MUCH?

14   A.   NO.

15   Q.   AND, SO, WHEN THE CHECK -- WHEN THE IRS EXAMINER

16        CAME TO YOUR BUSINESS IN 2010, AND YOU TOLD HER

17        THAT YOU DON'T KEEP OTHER RECORDS OF CHECK

18        CASHING OTHER THAN YOUR BANK RECORDS, WHAT DID

19        YOU MEAN BY THAT?

20   A.   I THINK WHEN SHE CAME, WE DIDN'T UNDERSTAND TOO

21        MUCH EACH OTHER, YOU KNOW.  AND -- BUT SHE ASKING

22        SOMETIMES SHE'S A LITTLE BIT MAD, YOU KNOW,

23        BECAUSE WHEN -- WHEN THEY COME, SHE ASKING FOR

24        THE -- OWNER FOR THE -- FOR THE BUSINESS.

25   Q.   YES.

1  A.   BUT -- AND, YOU KNOW, I SAID, I DON'T KNOW WHAT

2       IS IT.  AND THEN SHE -- AND THEN FINALLY SHE

3       SHOWED ME THE BATCH.  AND I SAID, "OKAY.  WE CAN

4       TALK IT."

5  Q.   SO, YOU DIDN'T UNDERSTAND SOME OF WHAT SHE WAS

6       ASKING YOU DURING THIS EXAMINATION?

7  A.   SOMETIMES, NO.

8  Q.   DID YOU TELL HER THAT?

9  A.   I TELL HER.

10 Q.   WELL, SHE ASKED YOU IF YOU KEPT OTHER RECORDS OF

11      CHECK CASHING BUSINESS.  WHAT DID YOU -- WHAT WAS

12      -- WHAT DID YOU THINK THAT QUESTION WAS ABOUT?

13 A.   I THINK -- CAN YOU?

14 Q.   YES.

15 A.   SHE ASKING ME IF ID'S, PHOTO COPIES FOR THE

16      CHECKS.

17 Q.   OKAY.

18 A.   AND I SAY, "YES. I HAVE SOME IN MY STORE."  AND

19      THEN SHE ASKED ME TO MAYBE I CAN GO TO THE BANK

20      AND GET THE -- EVERYTHING.

21 Q.   AND DID YOU DO SO?

22 A.   YES.

23 Q.   AND DID THE BANK HAVE A COPY OF EVERY CHECK THAT

24      YOU CASHED IN YOUR BUSINESS?

25 A.   YES.

1  Q.  BECAUSE YOU DEPOSITED ALL THE CHECKS INTO THE

2      BANK?

3  A.  I DEPOSITED ALL OF THE CHECKS IN THE BANK.  YES.

4  Q.  WHEN YOU TOLD HER THAT YOU HAD SOME ID'S AND SOME

5      CHECKS IN THE BUILDING, DID YOU SHOW HER WHERE

6      THOSE WERE?

7  A.  YES, I -- I GIVE IT TO HER SOME, AND SHE STARTED

8      WORK IT UP IN THE COMPUTER.  BUT SHE HAD SOME IN

9      THERE AND MORE THERE, TRANSFER MONEY, WIRE.

10 Q.  AND THE CHECK CASHING?

11 A.  AND THE CHECK.  YES.  THE CHECK CASHING SHE

12     DIDN'T PAY TOO MUCH ATTENTION.  ONLY FOR THE

13     TRANSFER.

14 Q.  THE WIRE TRANSFERS?

15 A.  YES.

16 Q.  AND WE SAW THAT SHE SPENT A LOT OF TIME IN YOUR

17     BUSINESS IN 2010, THAT FIRST EXAM; IS THAT RIGHT?

18 A.  SHE WORKED ABOUT THREE HOURS AND THEN SHE LEFT.

19     SHE COME BACK ABOUT TWO O'CLOCK, I THINK.  AND

20     THEN MAYBE SHE LEFT ABOUT FOUR OR FIVE, SOMETHING

21     LIKE THAT.

22 Q.  DURING THE THREE DAYS THAT SHE WAS IN YOUR

23     BUSINESS AND ALL THE TIME THAT SHE WAS

24     COMMUNICATING WITH YOU, WERE YOU TRYING TO ASSIST

25     HER IN THE EXAMINATION?

1   A.   YES, I'M TRYING TO HELP HER. YOU KNOW, TRYING TO

2        PUT EVERYTHING THERE.

3   Q.   AND WHY?

4   A.   SHE CHECK THEM OUT.  EVERYTHING.  WHAT SHE DO IS

5        MOSTLY WIRE MONEY TRANSFER.

6   Q.   OKAY.  AND WHY DID YOU THINK THAT IT WAS

7        IMPORTANT FOR YOU TO HELP AND ASSIST AND/OR

8        COOPERATE IN THIS?

9   A.   I WANT TO COOPERATE.

10  Q.   AND WHY IS THAT?

11  A.   I WANT TO HELP HER.

12  Q.   AND YOU WANT TO STAY IN BUSINESS?

13  A.   UH HUH.  OF COURSE.  YES.

14  Q.   AND, SO, LET'S FAST FORWARD NOW.  ACTUALLY, LET'S

15       TALK A LITTLE BIT ABOUT 2010.  IN 2010, WERE YOU

16       TAKING IN A LOT OF TAX CHECKS?

17  A.   NO.

18  Q.   THERE'S BEEN SOME TESTIMONY THAT YOU TOOK 191 TAX

19       CHECKS IN 2010.

20  A.   I DON'T REMEMBER EXACTLY, YOU KNOW.  BUT IT'S

21       OKAY.  THESE THINGS.  I DON'T REMEMBER EXACTLY,

22       BUT IF THAT'S WHAT THEY SAY, IT'S OKAY.

23  Q.   OKAY.  AND DURING THAT TIME, NONE OF THOSE TAX

24       CHECKS WERE FRAUDULENT, RIGHT?

25  A.   NO.

1    Q.   AND, SO, THEN LET'S FAST FORWARD THEN TO 2011.

2         IN 2011 YOU ALSO CASHED SOME TAX CHECKS, CORRECT?

3    A.   YES.

4    Q.   AND, DURING 2011 THOSE TAX CHECKS, NONE OF THOSE

5         TAX CHECKS WERE FRAUDULENT, RIGHT?

6    A.   NO.

7    Q.   AND WERE YOU DOING THE SAME THINGS, IDENTIFYING

8         PEOPLE WITH TAX CHECKS, IN 2010 AND '11 THAT YOU

9         WERE DOING IN '12 AND '13?

10   A.   YES.

11   Q.   AND WHAT IS THAT?  WHAT DID YOU REQUIRE FROM

12        EVERY PERSON THAT CASHED A TAX CHECK IN YOUR

13        BUILDING?

14   A.   REQUIRE A PHOTO ID.

15   Q.   AND WHY IS THAT?

16   A.   A PICTURE -- A PICTURE OF THE PERSON, YOU CAN GET

17        ANY PASSPORT OR MEXICAN ID'S FOR ANYTHING TO

18        MATCH THE PERSON THAT'S IN FRONT OF YOU AND THE

19        -- AND THEIR NAME.

20   Q.   SO, YOU LOOKED AT THE PICTURE ON THE

21        IDENTIFICATION CARD?

22   A.   UH HUH.  YES.

23   Q.   AND YOU LOOKED AT THE PERSON GIVING YOU THE

24        IDENTIFICATION?

25   A.   YES.

1   Q.   AND THEN WHAT DID YOU MATCH AFTER THAT?

2   A.   THEN YOU MATCH THE IRS, TOO, YOU KNOW.

3   Q.   AND, SOMETIMES THAT MATCHES AND SOMETIMES IT

4        DOESN'T?

5   A.   NO.

6   Q.   OKAY.  AND AS FAR AS CHECKS ARE CONCERNED, MR.

7        LINARES, YOU HAVE AN IRS CHECK IN YOUR HAND

8        THAT'S ISSUED BY THE UNITED STATES TREASURY.  CAN

9        YOU TRUST THAT THAT'S A GOOD CHECK?

10  A.   YES.

11  Q.   IS THAT WHY YOU CASHED TAX CHECKS?

12  A.   YES.

13  Q.   AND IN EVERY INSTANCE IN '10, '11, '12 AND '13,

14       EVERY CHECK YOU RECEIVED WAS A GOOD, ACTUAL

15       UNITED STATES TREASURY CHECK, RIGHT?

16  A.   YES.

17  Q.   AND EVERY CHECK YOU -- EVERY TREASURY CHECK YOU

18       CASHED, RIGHT, ARE THE SAME, GOOD, VALID UNITED

19       STATES TREASURY CHECKS; IS THAT CORRECT?

20  A.   YES.

21  Q.   DID YOU GET AN ID FROM EVERY PERSON THAT CAME IN

22       YOUR STORE?

23  A.   YES.

24  Q.   WE'VE ONLY BEEN ABLE TO LOCATE -- ID'S FOR 195

25       CHECKS OUT OF THE 272.  DO YOU UNDERSTAND THAT?

1   A.   YES.

2   Q.   WHY IS THAT?

3   A.   CAN YOU REASK THE ---

4   Q.   YES.  I'LL ASK IT IN SPANISH.  WE'VE ONLY BEEN

5        ABLE TO LOCATE ID'S FOR 195 OF THE 272 CHECKS.

6        WHY IS THAT?

7             MR. AMBEAU: WOULD YOU TRANSLATE THAT INTO

8                 SPANISH, PLEASE?

9             THE WITNESS: CAN YOU TRANS?

10            MS. BROADBECK: PLEASE REPEAT THE NUMBERS.

11            MR. AMBEAU: OKAY.  IT'S 195 OUT OF 272.

12  THE WITNESS:

13  A.   WELL, THE OTHERS COULD HAVE BEEN LOST.

14  MR. AMBEAU:

15  Q.   BUT YOU KNOW THAT YOU TOOK AN ID FROM EVERY

16       PERSON THAT CAME IN TO YOUR STORE?

17  A.   YES.

18  Q.   DID EVERY TAX CHECK THAT WAS PRESENTED TO YOU IN

19       2012 AND '13 HAVE A PERSON GIVE YOU THE CHECK

20       WITH THE ID?

21  A.   YES.

22  Q.   MUCH LIKE ALL OF THE OTHER CHECKS THAT YOU CASH

23       IN YOUR STORE, CORRECT?

24  A.   OTHER ONES.

25  Q.   LET'S TALK A LITTLE BIT ABOUT THE ANTI-MONEY

1    LAUNDERING PROGRAM THAT WAS IN -- THAT WAS IN

2    PLACE IN YOUR BUSINESS IN 2013 EXAM.

3  A.   OKAY.

4  Q.   SO, IN 2010, YOU WERE TOLD THAT YOU DIDN'T HAVE

5    AN ANTI-MONEY LAUNDERING PROGRAM IN PLACE; IS

6    THAT CORRECT?

7        MR. AMBEAU: TRANSLATE THAT FOR ME, PLEASE.

8  THE WITNESS:

9  A.   YES.

10 MR. AMBEAU:

11 Q.   I'M GOING TO ASK A LOT OF QUESTIONS ABOUT THE

12    ANTI-MONEY LAUNDERING PROGRAM.  IT'S PROBABLY

13    GOOD THAT WE TRANSLATE -- GO TO THE SPANISH IN

14    THIS.  A LOT OF THESE WORDS ARE GOING TO BE

15    DIFFICULT.

16 A.   OKAY.

17 Q.   SO, IN 2010 YOU WERE TOLD THAT YOU DID NOT HAVE

18    AN EFFECTIVE ANTI-MONEY LAUNDERING PROGRAM IN

19    PLACE; IS THAT CORRECT?

20 A.   YES.  SHE TOLD ME THAT.

21 Q.   OKAY.  AND DID YOU TAKE THE CORRECTIVE ACTION SHE

22    ASKED YOU TO TAKE?

23 A.   YES.

24 Q.   AND DO YOU RECALL WHAT ACTION YOU TOOK BETWEEN

25    2010 AND 2013?

1   A.   YES.

2   Q.   AND WHAT WAS THAT?

3   A.   PUT IN THE ANTI-MONEY LAUNDERING PROGRAM.

4   Q.   YOU ADOPTED AN ANTI-MONEY LAUNDERING PROGRAM?

5   A.   YES.

6   Q.   AND WHERE DID YOU GET THAT ANTI-MONEY LAUNDERING

7        PROGRAM FROM?

8   A.   FIRST IT WAS GIVEN TO ME BY SIGUES.  THEN WE PUT

9        IN THE PROGRAM BASED ON SIGUES PROGRAM.

10  Q.   OKAY.  SO, YOU USED SIGUES PROGRAM TO DEVELOP

11       YOUR OWN ANTI-MONEY LAUNDERING PROGRAM?

12  A.   SOME OF THE IDEAS.

13  Q.   OKAY.  AND THEN -- AND THEN WHEN THE EXAMINER

14       CAME IN IN 2013, SHE SAW THAT -- EXCUSE ME -- THE

15       FACT THAT YOU HAD THE MONEY LAUNDERING PROGRAM IN

16       PLACE, CORRECT?

17  A.   YES.

18  Q.   AND WHAT DID SHE TELL YOU IN 2013 WAS THE LAST

19       THING YOU NEEDED TO DO TO COME INTO COMPLIANCE?

20  A.   I DON'T REMEMBER WHAT SHE SAID.

21  Q.   SHE SAID TO HAVE WRITTEN CHECK CASHING POLICIES;

22       DOES THAT REFRESH?

23  A.   YES.  I THINK SHE HELPED ME IN THAT.

24  Q.   OKAY.  AND THEN, DID YOU PUT WRITTEN CHECK

25       CASHING POLICIES IN PLACE, EVENTUALLY, IN YOUR

1   BUSINESS?

2   A.   YES.

3   Q.   AND, WHEN DID YOU PUT WRITTEN CHECK CASHING

4        POLICIES IN PLACE, DO YOU RECALL?

5   A.   I DON'T REMEMBER VERY WELL.

6   Q.   OKAY.  BUT WE KNOW THAT -- WE'VE SEEN THAT YOU AT

7        LEAST HAD ONE SIGNED BY YOU IN FEBRUARY OF 2014;

8        IS THAT RIGHT?

9   A.   YES.  YES.  I REMEMBER THAT.

10  Q.   AND YOU GAVE THAT TO THE GRAND JURY SUBPOENA,

11       CORRECT?

12  A.   YES.

13  Q.   OKAY.  NOW, AT ANY TIME DURING THE TIME YOU WERE

14       CASHING CHECKS DID YOU HAVE A CHECK CASHING

15       POLICY IN PLACE AND JUST NOT HAVE IT WRITTEN

16       DOWN?

17  A.   YES.  IN OUR MINDS WE HAD IT.  I TOLD THEM WE HAD

18       TO PRACTICE IT, BUT I DIDN'T HAVE IT IN WRITING.

19  Q.   AND, SO, IN ALL THE TIMES THAT YOU WERE CASHING

20       CHECKS, YOU HAD AN ACTUAL POLICY OF HOW TO CASH

21       THOSE CHECKS, CORRECT?

22  A.   YES.

23  Q.   DID YOU FOLLOW THAT POLICY, MR. LINARES?

24  A.   YES.

25  Q.   AND DURING THIS ENTIRE TIME YOU DIDN'T VIOLATE

1        THE BANK SECRECY ACT BY NOT FILING ANY REQUIRED

2        DOCUMENTS; IS THAT RIGHT?

3             MR. STEVENS: OBJECTION.  JUDGE, THAT'S

4             CALLS ---

5             THE COURT: SUSTAINED.

6   MR. AMBEAU:

7   Q.   DO YOU KNOW THAT THERE IS A REQUIREMENT UNDER THE

8        BANK SECRECY ACT TO FILE CERTAIN DOCUMENTS?

9   A.   YES.

10  Q.   AND, CAN YOU TELL THE JURY WHAT YOUR

11       UNDERSTANDING IS WHEN YOU ARE REQUIRED TO FILE

12       NOTICES WITH THE BANK SECRECY?  WHEN YOU'RE

13       REQUIRED TO FILE.

14  A.   WHEN YOU GO TO THE BANK TO DEPOSIT THE CHECK MORE

15       THAN $10,000.00, THEY THEMSELVES DO THAT.  THEY

16       GET ID.  THEY GET YOUR SOCIAL SECURITY NUMBER.

17       THEY DO ALL OF THE PAPERWORK.  YOU DON'T HAVE TO

18       DO ANYTHING.

19  Q.   OKAY.  AND, BUT YOU DIDN'T -- YOU NEVER TOOK ANY

20       CHECK OVER $10,000.00 IN YOUR BUSINESS; IS THAT

21       RIGHT?

22  A.   NO.  NO.

23  Q.   AND, DESPITE THE FACT THAT ON SOME OCCASIONS YOU

24       TOOK CHECKS OVER $5,000.00, RIGHT?

25  A.   YES.

1    Q.    WAS THAT AGAINST THE LAW?

2    A.    NO.

3    Q.    IN 2013 WHEN THE LADY CAME FOR THE EXAMINATION,

4          DID SHE ALSO ASK YOU FOR DOCUMENTS?

5    A.    I THINK SHE DID.  YES.

6    Q.    DID SHE ASK YOU FOR BANKING DOCUMENTS, DO YOU

7          REMEMBER THAT?

8    A.    YES.

9    Q.    DID YOU -- DID YOU GIVE HER THOSE BANKING

10         DOCUMENTS?  DID YOU GO TO THE BANK AND GET THEM

11         AND GIVE THEM TO HER?

12   A.    YES.

13   Q.    DID YOU ALSO SHOW HER WHERE IN THE BUILDING YOU

14         KEPT YOUR OTHER DOCUMENTS?

15   A.    YES.

16   Q.    AND WHEN ASKED WHETHER OR NOT YOU KEPT OTHER

17         DOCUMENTS OTHER THAN BANK RECORDS FOR CHECKING,

18         WHAT DID YOU RESPOND?

19   A.    THAT I DID HAVE THEM.

20   Q.    AND WHAT KIND OF DOCUMENTS WERE THOSE OTHER

21         DOCUMENTS CALLED?

22   A.    THEY ARE PERSON'S ID'S FOR -- FOR PICK UP THE

23         CHECK.

24   Q.    AND DID YOU SHOW HER WHERE THOSE WERE OR TELL HER

25         WHERE THOSE WERE IN THE BUILDING?

1    A.   YES.

2    Q.   THE GOVERNMENT CLAIMS THAT YOU DIDN'T GIVE HER

3         COPIES OF TAX CHECKS AT THAT TIME.  DO YOU

4         UNDERSTAND THAT?

5    A.   YES.  THEY TOOK SOME.

6    Q.   OKAY.

7    A.   BECAUSE SHE GIVE ME A LIST FROM ONE MONTH TO

8         ANOTHER MONTH.

9    Q.   OKAY.  AND THEN YOU WENT AND GOT THOSE -- ALL OF

10        THE COPIES OF THOSE TAX CHECKS FROM WHERE?

11   A.   YES.  FROM THE BANK.

12   Q.   AND, SO, YOU GAVE THE -- THE IRS EXAMINER IN 2013

13        ALL OF THE CHECKS THAT SHE REQUESTED FROM THE

14        BANK?

15   A.   YES.  YES.

16   Q.   AND YOU, IN FACT, GAVE THE IRS EXAMINER FROM 2010

17        --

18   A.   YES.

19   Q.   -- ALL OF THE TAX CHECKS FROM THE BANK, CORRECT?

20   A.   YES.

21   Q.   WERE THERE ANY TAX CHECKS THAT YOU HAD TAKEN INTO

22        YOUR BUSINESS OTHER THAN THOSE THAT YOU HAD

23        DEPOSITED IN YOUR BANK ACCOUNT?

24   A.   NO.

25   Q.   SO, IN TURNING OVER YOUR BANK ACCOUNTS WITH ALL

1          OF THE TAX CHECKS YOU CASHED IN YOUR BUSINESS,

2          YOU GAVE HER EVERYTHING YOU HAD?

3    A.   YES.

4    Q.   IN ORDER FOR YOU TO GIVE HER THE COPIES OF THE

5          ID'S THAT YOU HAD, COULD YOU HAVE DONE THAT AS

6          WELL?

7    A.   YES, I DID THAT.

8    Q.   OKAY.  AND, DID -- AND, DID YOU GO THROUGH ALL

9          6,000 PAGES OF THOSE DOCUMENTS IN YOUR BUILDING

10         AND FIND EVERY ID IN THERE?

11   A.   I GAVE HER COPIES OF WHAT SHE ASKED ME, THE

12         COPIES THAT WERE GIVEN TO ME AT THE BANK.

13   Q.   OKAY.  AND THAT WAS BOTH IN 2010 AND IN 2013?

14   A.   YES.

15   Q.   LET'S TALK A LITTLE ABOUT THIS FRAUD.  DID YOU

16         HEAR INFORMATION ABOUT THE FACT THAT THERE WERE

17         PEOPLE FILING FALSE TAX RETURNS IN NEW YORK?

18   A.   NO.

19   Q.   YOU HEARD IN THIS COURTROOM, DIDN'T YOU?

20   A.   YES.

21   Q.   WHEN YOU WERE IN YOUR BUSINESS TAKING THESE

22         CHECKS IN, DID YOU HAVE ANY IDEA THAT THAT WAS

23         GOING ON?

24   A.   NO.

25   Q.   IF YOU HAD KNOWN THAT THAT WAS GOING ON, WOULD

1         YOU HAVE DONE ANYTHING ABOUT IT?

2    A.   YES.

3    Q.   WHAT WOULD YOU HAVE DONE?

4    A.   STOP CASHING CHECKS.

5    Q.   AND WHAT ELSE?

6    A.   WELL, JUST NOT CASHING THEM ANY MORE.

7    Q.   RIGHT.  IF YOU HAD KNOWN THAT THERE WAS THIS

8         FRAUD GOING ON, THOUGH, WOULD YOU HAVE CONTACTED

9         ANYONE ELSE; WOULD YOU HAVE CONTACTED THE

10        AUTHORITIES?

11   A.   YES.

12   Q.   IF YOU KNEW THAT WAS GOING ON IN 2013 WHEN THE

13        EXAMINER CAME, WOULD YOU HAVE TOLD HER?

14   A.   YES.

15   Q.   IS CHECK CASHING THE ONLY SOURCE OF INCOME IN

16        YOUR BUSINESS?

17   A.   REPEAT THE QUESTION.

18   Q.   IS CHECK CASHING THE ONLY SOURCE OF INCOME IN

19        YOUR BUSINESS?

20   A.   NO.

21   Q.   COULD YOU STOP CASHING CHECKS TOMORROW AND STILL

22        STAY IN BUSINESS?

23   A.   YES.

24   Q.   SO, KNOWING THAT, WOULD YOU HAVE UNDERTAKEN TO

25        FOOL THE GOVERNMENT INTO ALLOWING YOU TO CASH A

1        BUNCH OF CHECKS?

2            MR. AMBEAU: SAY THAT IN SPANISH.

3            MS. MORALES: CAN YOU REPEAT THE QUESTION

4              FOR ME?

5            MR. AMBEAU: SURE.

6   MR. AMBEAU:

7   Q.   WOULD YOU UNDERTAKE TO FOOL THE GOVERNMENT TO

8        ALLOW YOU CASHING FRAUDULENT CHECKS?

9   A.   NO.  NO.

10  Q.   AND WHY NOT?

11           MS. MORALES: SAY THE QUESTION.

12           MR. AMBEAU: SURE.

13  MR. AMBEAU:

14  Q.   WHY WOULD YOU NOT WANT TO FOOL THE GOVERNMENT?

15  A.   HOW AM I GOING TO FOOL -- I CANNOT FOOL THE

16       GOVERNMENT.

17  Q.   TO YOU THE GOVERNMENT IS AN ENTITY THAT YOU

18       CANNOT TRICK, RIGHT?

19  A.   NO.

20  Q.   WOULD YOU TRY TO?

21  A.   NO.

22  Q.   WHY DO YOU LAUGH?

23  A.   YOU CAN'T DO IT.  MY GOD WOULDN'T LET ME DO IT.

24  Q.   WHAT DOES THAT MEAN, CARLOS?

25           THE COURT: IT'S MR. LINARES.

1  MR. AMBEAU:

2  Q.  WHAT'S THAT MEAN, MR. LINARES?

3  A.  I'M NOT THAT TYPE OF PERSON.

4  Q.  MR. LINARES, DID YOU SEEK TO STEAL MONEY FROM THE

5      UNITED STATES GOVERNMENT?

6  A.  NO.

7  Q.  DID YOU KNOW THAT OTHER PEOPLE WERE STEALING

8      MONEY FROM THE GOVERNMENT AND USING YOUR BUSINESS

9      TO CASH THESE CHECKS?

10 A.  YES.  THAT WAS -- THAT'S WHAT HURTS ME.

11 Q.  YOU -- YOU'VE SEEN THAT IN THE COURTROOM, RIGHT?

12 A.  QUESTION AGAIN, PLEASE?

13 Q.  I SAID, YOU'VE SEEN THAT IN THE COURTROOM THAT

14     THESE PEOPLE WERE USING YOUR BUSINESS TO STEAL

15     FROM THE GOVERNMENT, RIGHT?

16 A.  YES.  YES.

17 Q.  AND THAT UPSETS YOU EMOTIONALLY?

18 A.  CORRECT.

19 Q.  DID YOU KNOW WHEN YOU WERE CASHING THESE CHECKS

20     THAT THESE PEOPLE WERE STEALING FROM THE

21     GOVERNMENT?

22 A.  NO.

23 Q.  DID YOU KNOW WHEN YOU WERE CASHING THESE CHECKS,

24     THESE CHECKS WERE OBTAINED THROUGH FRAUD?

25 A.  NO.  NO.

1  Q.  WHEN YOU DIDN'T WRITE DOWN YOUR CHECK CASHING

2      POLICY, CARLOS, DID YOU DO THAT TO FOOL THE

3      GOVERNMENT?

4  A.  NO.

5  Q.  DID YOU DO THAT TO TRY NOT TO DO WHAT YOU WERE

6      SUPPOSED TO DO, CARLOS?

7  A.  HOW IS THAT?

8  Q.  I'LL REPEAT THE QUESTION.  I'LL REPEAT THE

9      QUESTION, MR. LINARES.

10         IN 2010 AND 2013, WERE YOU TRYING TO DO

11     EVERYTHING THE IRS EXAMINERS WERE TELLING YOU TO

12     DO?

13 A.  YES.

14 Q.  WERE YOU TRYING TO ENACT WHATEVER THINGS THEY

15     WERE REQUIRING YOU TO ENACT, THE BANK SECRECY ACT

16     MONEY LAUNDERING PROGRAM?

17 A.  YES.

18 Q.  DID YOU COOPERATE AND GIVE EVERYTHING YOU HAD TO

19     THE AGENTS IN 2010 --

20 A.  YES.

21 Q.  -- AND THE AGENT IN 2013?

22 A.  YES.

23 Q.  ANSWER THE QUESTION.

24 A.  YES.

25 Q.  THANK YOU, CARLOS.

1      THE COURT: OKAY.  ANY CROSS EXAMINATION?

2      MR. STEVENS: YES, JUDGE.

3          MAY WE APPROACH VERY BRIEFLY BEFORE?

4      MR. AMBEAU: I APOLOGIZE FOR CALLING MY CLIENT

5          CARLOS, YOUR HONOR.

6      THE COURT: THAT'S OKAY.

7      MR. AMBEAU: MY APOLOGIES.

8      THE COURT: YES.

9      MR. STEVENS: MAY WE APPROACH VERY BRIEFLY?

10     THE COURT: YES.

11     REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

12         A BENCH CONFERENCE WAS HELD.)

13     MR. STEVENS: I WANT TO BE EXTRA CAREFUL

14         SO I DON'T DO ANYTHING I CAN'T DO IN

15     FRONT OF THE JURY.  SO, I'M KIND OF SEEKING

16     AN ADVISORY OPINION HERE.

17     THE COURT: SURE.

18     MR. STEVENS: QUESTIONS ABOUT CHECKS TO

19         FAMILY MEMBERS, OTHER WOMEN, ET CETERA,

20     FROM THE LATINO'S ACCOUNT.  MY SENSE IS IF I

21     WOULD TRY TO PRODUCE THOSE, BECAUSE HE DIDN'T

22     TALK REALLY ABOUT HIS BUSINESS' PROFITABILITY

23     ON DIRECT, THAT WOULD EXCEED THE SCOPE OF

24     DIRECT?

25     THE COURT: THAT'S EXACTLY.  THAT WOULD BE

1        MY RULING, THAT THAT WOULD CERTAINLY

2        EXCEED THE SCOPE OF DIRECT EXAMINATION.

3        MR. STEVENS: THAT'S ALL I WANTED TO CLEAR

4        UP, JUDGE.  I APPRECIATE IT.

5        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

6        THE BENCH CONFERENCE WAS CONCLUDED.)

7        THE COURT: OKAY.  LET'S PROCEED.

8        CROSS EXAMINATION

9   MR. STEVENS:

10  Q.   HELLO, MR. LINARES.  MY NAME IS ALAN STEVENS.

11       AND OTHER THAN MAYBE IN COURT, WE HAVE NEVER MET

12       BEFORE, HAVE WE?

13  A.   NO.

14  Q.   OKAY.  I WANT TO ASK YOU A FEW QUESTIONS ABOUT

15       YOUR TESTIMONY AND WHAT WE'VE BEEN TALKING ABOUT

16       IN THIS CASE ALL WEEK.

17       AND THE FIRST THING I WANT TO ASK YOU ABOUT

18       IS SOMETHING YOU JUST SAID A FEW MINUTES AGO.

19       AND I WANT TO MAKE SURE I UNDERSTOOD IT.

20       YOU SAID THAT YOU WOULD GET AN ID FROM EVERY

21       PERSON WHO CAME IN TO YOUR STORE WITH A TREASURY

22       CHECK; IS THAT RIGHT?

23  A.   YES.

24  Q.   AND YOU DID THAT EVERY SINGLE TIME; IS THAT

25       RIGHT?

1  A.  YES.

2  Q.  AND EVERY CHECK YOU CASHED, EVERY TREASURY CHECK

3      YOU CASHED, HAD AN ID -- AT ONE POINT, SOME OF

4      THEM MAY HAVE BEEN LOST, BUT AT ONE POINT THERE

5      WAS AN ID THAT WENT WITH THAT TREASURY CHECK; IS

6      THAT RIGHT?

7  A.  YES.

8  Q.  AND WHEN THESE PEOPLE BROUGHT THESE TREASURY

9      CHECKS TO YOUR STORE AND THEY SHOWED YOU THEIR

10     ID'S, AS YOU TESTIFIED, YOU LOOKED AT THE

11     PERSON'S FACE EVERY TIME; IS THAT RIGHT?

12 A.  YES.

13 Q.  YOU LOOKED INTO THE EYES OF THE PEOPLE BRINGING

14     THESE CHECKS IN?

15 A.  EYES, FACE, EVERYTHING.

16 Q.  EYES, FACE, EVERYTHING ABOUT THEM; IS THAT RIGHT?

17 A.  YES.

18 Q.  OKAY.  AND THEN YOU WOULD LOOK AT THE NAME ON THE

19     CHECK, TOO, RIGHT?

20 A.  UH HUH.  YES.

21 Q.  AND YOU WOULD MAKE SURE THEY -- AND YOU WOULD

22     MAKE SURE THEY MATCHED, THAT THEY LOOKED RIGHT?

23 A.  YES.

24 Q.  AND YOU DID THAT EVERY SINGLE TIME; THAT'S YOUR

25     TESTIMONY?

1  A.   YES.

2  Q.   AND YOUR TESTIMONY IS THAT YOU DID THAT EVERY

3       SINGLE TIME BECAUSE YOU WANTED TO MAKE SURE YOU

4       WERE DOING THINGS RIGHT; IS THAT RIGHT?

5  A.   YES.

6  Q.   OKAY.  I'M SHOWING YOU PAGE 68 FROM "U.S. EXHIBIT

7       13."

8            MR. STEVENS: JUDGE, THIS HAS ALREADY BEEN

9                 ADMITTED.  SO, I'D LIKE TO PUBLISH IT,

10            IF I MAY.

11           THE COURT: VERY WELL.

12 MR. STEVENS:

13 Q.   CAN YOU SEE THAT CHECK IN FRONT OF YOU, MR.

14      LINARES?

15 A.   YES.

16 Q.   YOU DIDN'T LOOK AT THIS PERSON'S FACE, DID YOU?

17 A.   WHY NOT?

18 Q.   WELL, WHAT DOES SOMEONE WHO IS NAMED PERCENTAGE

19      NA LOOK LIKE?

20           MR. AMBEAU: YOUR HONOR, I'M GOING TO OBJECT

21                TO THIS ARGUMENTATIVE QUESTION.  THERE'S

22           A HUMAN BEING STANDING IN FRONT OF HIM.  I

23           DON'T KNOW -- I DON'T KNOW WHAT KIND OF

24           ARGUMENT THAT -- THE GOVERNMENT IS MAKING

25           WITH HIM, BUT THE HUMAN BEING THAT PRESENTED

1                    THE CHECK CERTAINLY HAS A FACE.

2                    THE COURT: I UNDERSTAND.  WHY DON'T YOU

3                        REPHRASE THE QUESTION.  IT IS A BIT,

4                    ARGUABLY, ARGUMENTATIVE.  BUT WHY DON'T YOU

5                    REPHRASE.

6    MR. STEVENS:

7    Q.   MR. LINARES, HOW IS IT POSSIBLE -- HOW IS IT

8         POSSIBLE THAT WHEN THE PERSON THAT BROUGHT THIS

9         CHECK TO YOU AND LOOKED YOU IN THE EYES AND HAD

10        AN ID, HOW IS IT POSSIBLE THAT YOU COULD HAVE

11        LOOKED AT THIS CHECK AND LOOKED INTO THEIR FACE

12        AND LOOKED AT THE ID AND THOUGHT THAT THIS WAS

13        OKAY?

14   A.   IT DEPENDS ON THE MOVEMENT YOU ARE DOING AT THE

15        TIME IN THE STORE.

16   Q.   I'M SORRY.  MA'AM, WOULD YOU REPEAT THAT FOR ME?

17   A.   IT DEPENDS ON THE MOVEMENT YOU ARE DOING AT THE

18        TIME IN THE STORE.

19   Q.   IT DEPENDS ON THE MOVEMENT?

20   A.   WE ARE BUSY SOMETIMES WHEN PEOPLE COME CASHING

21        CHECKS AND SOMETHING MIGHT HAVE ---

22   Q.   OKAY.  SO, LET ME MAKE SURE I UNDERSTAND.  WHEN

23        MR. AMBEAU WAS ASKING YOU QUESTIONS, YOU WERE

24        VERY CLEAR ABOUT HOW IMPORTANT IT IS TO YOU TO

25        CHECK ID'S EVERY SINGLE TIME; IS THAT RIGHT?

1    A.    CORRECT.

2    Q.    AND TO MAKE SURE YOU DO IT RIGHT, TO MAKE SURE

3          THESE ID'S MATCH THE PEOPLE WITH THE CHECKS; IS

4          THAT RIGHT?

5    A.    YES.

6    Q.    PRESENTED WITH THE CHECK PAYABLE TO PERCENTAGE

7          MARK -- PERCENTAGE SYMBOL NA, YOUR EXPLANATION

8          IS, "WELL, WHEN I WAS BUSY DOING OTHER THINGS IN

9          THE STORE, MAYBE I DIDN'T LOOK AS CAREFULLY."

10         AND I WANT TO MAKE SURE I UNDERSTAND.  IS THAT

11         YOUR TESTIMONY?

12   A.    WE ARE HUMANS.  SO WE MAKE MISTAKES.

13   Q.    WE DO.  YOU WERE ASKED A NUMBER OF QUESTIONS

14         ABOUT WHETHER YOU WOULD EVER WANT TO FOOL THE

15         GOVERNMENT.  DO YOU RECALL THOSE QUESTIONS?

16   A.    YES.

17   Q.    OKAY.  AND YOUR TESTIMONY WAS THAT YOU WOULD

18         NEVER TRY TO FOOL THE GOVERNMENT; IS THAT RIGHT?

19   A.    YES.

20   Q.    NEVER.  BECAUSE YOU'RE NOT THAT TYPE OF PERSON;

21         IS THAT RIGHT?

22   A.    NO.

23   Q.    AND YOUR TESTIMONY WAS ALSO THAT YOU KEPT COPIES

24         OF EVERY CHECK THAT YOU EVER CASHED -- EVERY

25         TREASURY CHECK THAT YOU EVER CASHED; IS THAT

1        RIGHT?

2   A.   YES.

3   Q.   AND THAT CONSISTS OF HUNDREDS AND HUNDREDS OF

4        CHECKS, DOESN'T IT, SIR?

5   A.   CONSIST IN WHAT?

6   Q.   LET ME WITHDRAW THAT QUESTION.  AND, SIR, I WANT

7        TO MAKE CLEAR.  I'M NOT ASKING YOU ABOUT -- I'M

8        NOT ASKING YOU TO SAY WHETHER OTHER CHECKS YOU

9        CASHED WERE ALSO FRAUDULENT. I DON'T MEAN

10       FRAUDULENT CHECKS.  I MEAN, EVERY CHECK YOU EVER

11       CASHED.

12            TREASURY CHECKS THAT YOU CASHED, DID YOU

13       ALWAYS KEEP COPIES?

14  A.   YES.

15  Q.   AND THAT UNIVERSE OF CHECKS IS HUNDREDS AND

16       HUNDREDS OF CHECKS, RIGHT?

17  A.   YES.

18  Q.   OKAY.  AND IN JUST THE 15-MONTH TIME PERIOD THAT

19       THIS CASE IS REALLY ABOUT OR PART OF IT IS ABOUT,

20       MARCH OF 2012 TO MAY OF 2013, IN THAT TIME PERIOD

21       YOU CASHED OVER 250 TREASURY CHECKS, RIGHT?

22  A.   YES.

23  Q.   AND "EXHIBIT 13" WAS ADMITTED EARLIER.  BUT THOSE

24       TREASURY CHECKS THAT WE'VE BEEN TALKING ABOUT IN

25       JUST THAT 15-MONTH PERIOD OF TIME, THERE'S A LOT

1    OF CHECKS, RIGHT?  THERE'S A LOT OF DOCUMENTS

2    WITH -- THERE'S A LOT OF PAGES HERE.

3         MR. AMBEAU: YOUR HONOR, I WOULD OBJECT TO

4              "A LOT."  CAN YOU BE A LITTLE MORE

5         PRECISE?  I DON'T KNOW IF THAT ---

6         THE COURT: WELL, I'LL ALLOW MR. STEVENS

7              TO GO ON AND GET TO THE QUESTION AND

8         LET'S SEE WHERE WE'RE GOING HERE.

9         MR. STEVENS: ALL RIGHT.

10  MR. STEVENS:

11  Q.  WELL, YOU REMEMBER WHEN THE FEDERAL GRAND JURY

12      ASKED YOUR COMPANY TO BRING IN COPIES OF EVERY

13      TREASURY CHECK THAT YOU HAD CASHED.  DO YOU

14      REMEMBER THAT?

15  A.  I DON'T REMEMBER EXACTLY.

16  Q.  YOU DON'T?  OKAY.

17         MR. STEVENS: JUST ONE SECOND, JUDGE.

18  MR. STEVENS:

19  Q.  IF I WERE TO SHOW YOU A COPY OF THE SUBPOENA, THE

20      SECOND SUBPOENA, WOULD THAT REFRESH YOUR

21      RECOLLECTION?

22  A.  YES.

23         MR. STEVENS: JUDGE, THIS HAS BEEN ADMITTED.

24              MAY I PUBLISH IT?

25         THE COURT: YES.

1  MR. STEVENS:

2  Q.   SIR, I'M SHOWING YOU "U.S. EXHIBIT 18."  CAN YOU

3       SEE IT ON THE SCREEN THERE?

4  A.   YOU CALL "18" THE WHOLE PAGE?

5  Q.   WELL, "18" IS ABOUT FOUR PAGES, SIR.  AND I CAN

6       -- I CAN BRING THOSE PAGES TO YOU, IF YOU'D LIKE.

7  A.   OKAY.  YES.  YES.  I REMEMBER.

8  Q.   OKAY.  YOU DO REMEMBER.  SO, THE FEDERAL GRAND

9       JURY ASKED YOUR COMPANY TO PRODUCE COPIES OF

10      TREASURY CHECKS GOING BACK FIVE YEARS; IS THAT

11      RIGHT?

12 A.   I DON'T REMEMBER THAT VERY WELL.

13 Q.   OKAY.  WELL, SIR, IF I WERE TO SHOW YOU THE

14      SUBPOENA AGAIN, WOULD THAT REFRESH YOUR

15      RECOLLECTION?

16 A.   YES, I THINK THAT -- I THINK THAT THE -- WAS THE

17      ALL OF THAT COPY.

18 Q.   OKAY.  AND I'M ONLY ASKING YOU ABOUT THIS FIRST

19      ONE. "COPIES OF ALL UNITED STATES TREASURY CHECKS

20      ACCEPTED, RECEIVED OR CASHED BY YOUR COMPANY

21      WITHIN THE PAST FIVE YEARS."

22 A.   YES.

23 Q.   DO YOU REMEMBER THAT NOW?

24 A.   YES.

25 Q.   AND, SO, THAT CALLED FOR HUNDREDS OF CHECKS, THE

1     HUNDREDS OF CHECKS THAT YOU HAD ACCEPTED AND

2     RECEIVED AND CASHED AT YOUR STORE OVER THE LAST

3     FIVE YEARS.

4 A.   I REMEMBER THAT I GAVE THEM ALL OF THAT.

5 Q.   OKAY.  WELL, I'M GOING TO SHOW YOU WHAT YOU

6     PRODUCED, SIR.  AND IT'S BEEN ADMITTED AS

7     "EXHIBIT 19."  BUT BEFORE WE DO THAT, I WANT TO

8     MAKE SURE THAT WE UNDERSTOOD YOUR TESTIMONY.

9     THAT YOU KEPT COPIES OF EVERY CHECK.  THAT'S WHAT

10     YOU SAID, RIGHT?

11 A.   YES.

12 Q.   AND YOU ACCEPTED HUNDREDS OF TREASURY CHECKS OVER

13     THE LAST FIVE YEARS.  THAT'S TRUE, ISN'T IT?

14 A.   YES.

15 Q.   AND WHEN YOU -- WHEN YOUR COMPANY RECEIVED THAT

16     SUBPOENA THAT WE JUST LOOKED AT, ---

17        MR. STEVENS: MAY I APPROACH, JUDGE?

18        THE COURT: YES.

19        MR. STEVENS: THIS WILL BE EASIER.

20 MR. STEVENS:

21 Q.   AND, SIR, I'VE HANDED YOU "U.S. EXHIBIT 19," A

22     HARD COPY.

23 A.   YES.

24 Q.   DO YOU -- DO YOU RECALL -- DID YOUR COMPANY MAKE

25     THAT PRODUCTION TO THE GRAND JURY?

1  A.   YES.

2  Q.   AND DO YOU RECALL WHETHER THERE WAS AN

3       INTERPRETER IN THE GRAND JURY?

4  A.   NO, I DON'T REMEMBER.

5  Q.   YOU DON'T RECALL. IF I WERE TO SHOW YOU A

6       TRANSCRIPT OF THAT GRAND JURY APPEARANCE, WOULD

7       THAT REFRESH YOUR RECOLLECTION?

8  A.   YES.

9           MR. STEVENS: JUDGE, MAY I HAVE PERMISSION

10              TO APPROACH AND SHOW THE WITNESS WHAT'S

11              BEEN MARKED FOR IDENTIFICATION AS "U.S. 20"?

12              THE COURT: YES.

13  THE WITNESS:

14  A.   WHO IS MARIA MORALES?

15  MR. STEVENS:

16  Q.   WELL, LET ME ASK YOU ---

17  A.   MORALES?

18  Q.   LET ME ASK YOU TO TURN TO PAGE THREE.

19  A.   OKAY.

20  Q.   AND I DON'T KNOW THAT YOU NEED TO READ THIS

21       ALOUD, ALTHOUGH I DON'T MIND IF YOU DO.  BUT

22       WOULD YOU READ TO YOURSELF THE FIRST PARAGRAPH ON

23       PAGE THREE?

24  A.   WHAT PARAGRAPH ON PAGE THREE?

25  Q.   ON PAGE THREE THAT BEINGS, "ALL QUESTIONS WERE

1          TRANSLATED BY THE INTERPRET INTO SPANISH."

2   A.     IT'S FINE.

3   Q.     OKAY.  I WANT TO MAKE SURE I KNOW WHAT'S FINE.

4          DOES THAT REFRESH YOUR RECOLLECTION?

5   A.     IN WHAT COURT THIS TOOK PLACE?

6   Q.     IT TOOK PLACE IN THIS COURT, RIGHT, IN THIS

7          BUILDING.  DO YOU REMEMBER THAT?

8   A.     YES.  YES.

9   Q.     OKAY.  SO, YOU REMEMBER THE GRAND JURY WAS HERE

10         IN THIS BUILDING; IS THAT RIGHT?

11  A.     YES.

12  Q.     AND -- AND YOU REMEMBER THAT AN INTERPRETER WAS

13         THERE TO INTERPRET ALL THE QUESTIONS AND THE

14         RESPONSES; IS THAT RIGHT?

15  A.     YES.

16  Q.     AND DO YOU REMEMBER WHETHER YOU TOOK AN OATH TO

17         TELL THE TRUTH?

18  A.     YES.

19  Q.     AND IN RESPONSE -- IN RESPONSE TO THAT SUBPOENA

20         THAT WE LOOKED AT, THAT ASKED FOR ALL CHECKS

21         GOING BACK FIVE YEARS, HUNDREDS AND HUNDREDS OF

22         CHECKS THAT YOU SAID YOU CASHED.  ALL YOU

23         PRODUCED IS "EXHIBIT 19."  ISN'T THAT RIGHT?

24  A.     ACCORDING TO THIS, YES.

25  Q.     I DON'T -- I DON'T WANT TO KNOW ACCORDING TO

1    THIS.  I WANT TO KNOW ACCORDING TO YOU.  IS

2    "EXHIBIT 19" WHAT LATINO'S PRODUCED TO THE GRAND

3    JURY?

4  A.  IF I BROUGHT 19 CHECKS TO YOU, IT'S -- THEN IT'S

5    19 CHECKS.

6  Q.  OKAY.

7  A.  BUT I DON'T KNOW WHY I DIDN'T BRING THE ALL

8    CHECKS.

9  Q.  YOU DON'T.  SO, YOU ADMIT THAT THERE WERE OTHERS?

10  A.  YES.

11  Q.  THERE WERE TONS OF OTHER CHECKS, RIGHT?

12  A.  YES.

13  Q.  AND YOU KNEW YOU HAD TONS OF OTHER CHECKS AT THE

14    TIME?

15  A.  I THINK THAT I -- YES, YES, YES, I HAD COPIES OF

16    OTHERS.  I THINK.

17  Q.  AND YOU -- YOU DON'T KNOW WHY YOU DIDN'T BRING

18    THEM WHEN THE GRAND JURY ASKED FOR THEM?

19  A.  I DON'T KNOW WHY I DIDN'T FIND THEM.  I DON'T

20    KNOW WHY.

21  Q.  OKAY.  YOU HAVE BEEN IN THE -- YOU'VE BEEN IN

22    THIS COUNTRY FOR HOW LONG AGAIN, SIR?

23  A.  ABOUT 31 YEARS.

24  Q.  OKAY.  AND YOU MOVED TO LOUISIANA IN 2008; IS

25    THAT RIGHT?

1  A.    YES.

2  Q.    HOW MANY DIFFERENT COMPANIES HAVE YOU FORMED? HOW

3        MANY COMPANIES HAVE YOU STARTED SINCE MOVING TO

4        LOUISIANA?

5              MR. AMBEAU: OBJECTION, YOUR HONOR.

6                   MAY WE APPROACH?

7              THE COURT: YES.

8              REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

9                   A BENCH CONFERENCE WAS HELD.)

10             MR. AMBEAU: HOW IS IT RELEVANT THE NUMBER

11                  OF COMPANIES MR. LINARES HAS FORMED

12             SINCE HE'S BEEN LIVING IN LOUISIANA?

13             MR. STEVENS: JUDGE, WE HEARD A LOT ABOUT

14                  HOW HE WAS A CARPENTER.  AND HE'S

15             UNSOPHISTICATED SMALL BUSINESS OWNER.  AND

16             THAT -- HIS SOPHISTICATION IS RIGHT AT THE

17             HEART OF SOME OF THESE CHARGES.

18             THE COURT: WELL, HE WAS ALREADY QUESTIONED

19                  ON DIRECT ABOUT HIS BACKGROUND.  SO, IF

20             YOU WANT TO QUESTION HIM ABOUT HIS

21             BACKGROUND, YOU --

22             MR. STEVENS: AND IT WON'T TAKE LONG.

23             THE COURT:  -- YOU ARE FREE TO DO THAT.

24                  YES.  THE OBJECTION IS OVER-RULED.

25             MR. STEVENS: THANK YOU, JUDGE.

1           REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

2              THE BENCH CONFERENCE WAS CONCLUDED.)

3       THE COURT: COUNSEL, LET ME SEE YOU

4              AT THE BENCH.

5       REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

6              AN OFF-THE-RECORD BENCH CONFERENCE WAS

7              HELD.)(BENCH CONFERENCE WAS CONCLUDED.)

8       THE COURT: LADIES AND GENTLEMEN, THANK YOU

9              SO MUCH FOR YOUR PATIENCE.  WE ARE

10      REALLY GOING OVERBOARD -- OVER THE LUNCH

11      HOUR.  BUT I'M GIVEN TO BELIEVE THAT WE WILL

12      FINISH UP THIS WITNESS HOPEFULLY BY 12:30.

13      SO, WE'RE GOING TO TAKE A LITTLE LATER LUNCH

14      TODAY.  AND I THINK THAT WILL REALLY HELP US

15      MOVE THINGS ALONG.  SO, THANK YOU ONCE AGAIN

16      FOR YOUR PATIENCE.

17             OKAY. LET'S PROCEED.

18  MR. STEVENS:

19  Q.  SIR, WE HEARD ABOUT YOUR BACKGROUND AS A

20      CARPENTER AND AS A OWNER OF A SMALL GROCERY

21      STORE.  SINCE LIVING IN LOUISIANA, HOW MANY

22      DIFFERENT COMPANIES HAVE YOU FORMED?

23  A.  LAGUNA BEACH VOLLEYBALL CLUB.

24  Q.  I'M SORRY?

25  A.  I HAD LAGUNA BEACH VOLLEYBALL CLUB.

1  Q.  OKAY.  SO, NOT -- NOT COUNTING THE SUPERMARKET?

2  A.  NO.

3  Q.  THAT'S LATINO'S, WE'LL PUT THAT TO THE SIDE.  AND

4      YOU'VE FORMED A BEACH VOLLEYBALL CLUB?

5  A.  FOR ONE YEAR WE HAD THAT BUSINESS.

6  Q.  AND WHAT WAS THE NAME OF THAT BUSINESS?

7  A.  IF I REMEMBER RIGHT, IT WAS CALLED LAGUNA BEACH

8      VOLLEYBALL CLUB.

9  Q.  OKAY.  AND ARE THOSE THE ONLY TWO COMPANIES YOU

10     FORMED SINCE MOVING TO LOUISIANA?

11 A.  WE ALSO HAD A CONSTRUCTION.

12 Q.  WHAT WAS THE NAME OF THE CONSTRUCTION COMPANY?

13 A.  AT THE BEGINNING IT WAS CALLED CHAMPE, LLC.

14 Q.  AND DID IT HAVE OTHER NAMES AS WELL?

15 A.  I THINK AT THE BEGINNING IT WAS ALSO CALLED

16     LINARES PAINTING OR SOMETHING LIKE THAT.  LLC.

17     LLC.

18 Q.  AND IS THAT IT; HAVE WE COVERED THEM ALL?

19 A.  AND RIGHT NOW ANOTHER ONE THAT'S C.L.

20     CONSTRUCTION SERVICE.

21 Q.  C.L. CONSTRUCTION SERVICE?

22 A.  YES.

23 Q.  OKAY.  SO, WE'VE GOT LATINO'S, THE BEACH

24     VOLLEYBALL BUSINESS, THE CHAMPE, LLC, WHICH MAY

25     HAVE BEEN KNOWN AT SOME POINT AS THE PAINTING

1    COMPANY, AND C.L. CONSTRUCTION; IS THAT RIGHT?

2  A.   YES.  BUT ALL THOSE NAMES, THE COMPANIES HAVE

3    BEEN CHANGING NAMES.

4  Q.   YOU'VE BEEN CHANGING THE NAMES OF YOUR COMPANIES?

5  A.   WE CHANGE THEM.  YES.  RIGHT NOW IT'S C.L.

6    CONSTRUCTION.

7        MR. STEVENS:  LET ME DO IT THIS WAY, JUDGE.

8            THE NEXT SEVERAL EXHIBITS ARE ALL

9        CERTIFIED COPIES OF PUBLICLY FILED RECORDS.

10        AND I'D LIKE TO JUST GO THROUGH THEM VERY,

11        VERY BRIEFLY ONE AT A TIME.

12        THE COURT: VERY WELL.

13        MR. STEVENS: MAY I PUBLISH THEM AS I

14            SHOW THEM?

15        MR. AMBEAU: YOUR HONOR, I'M GOING TO

16            OBJECT.  MY OBJECTION HERE IS MY

17        RELEVANCY.

18        MR. STEVENS: WELL, THIS IS -- NOW, THIS IS

19            DIRECT IMPEACHMENT.

20        THE COURT: I'LL -- LET ME SEE THE LAWYERS

21            AT THE BENCH.

22        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

23            A BENCH CONFERENCE WAS HELD.)

24        THE COURT: IMPEACHMENT IMPLIES THAT HE

25            MADE A STATEMENT AND NOW HE'S

1    ESSENTIALLY IS CHANGING HIS STORY.  WHAT IS

2    THE INCONSISTENT STATEMENT?

3    MR. STEVENS: I THINK HE SAID HE'S FORMED

4         FOUR DIFFERENT COMPANIES.

5    THE COURT: OKAY.

6    MR. STEVENS: IF I HAVE CERTIFIED RECORDS

7         SHOWING THAT HE'S FORMED SIX OR SEVEN

8    DIFFERENT COMPANIES, THAT'S IMPEACHMENT.

9    THE COURT: YOU CAN ASK HIM IS IT TRUE THAT

10        THOSE -- ON WHATEVER DATE YOU FORMED

11   THIS COMPANY?  IS IT TRUE THAT THIS DATE YOU

12   FORMED THIS COMPANY OR THAT COMPANY?

13        SO, YOU CERTAINLY CAN ASK HIM ABOUT

14   THAT.

15   MR. STEVENS: AND I JUST THOUGHT IT WOULD

16        BE EASIER FOR HIM TO SEE THE DOCUMENTS.

17   THE COURT: YES.

18   MR. STEVENS: BUT I LIKE YOUR APPROACH BETTER.

19   THE COURT: YES.  I THINK THAT WOULD BE THE

20        MOST EFFICIENT WAY TO DO IT.  YOU KNOW,

21   IF HE DOESN'T RECALL AND YOU WANT TO SHOW HIM

22   AND MARK IT FOR IDENTIFICATION. BUT MAYBE IF

23   HE SEES THE DOCUMENTS IT WILL REFRESH HIS

24   RECOLLECTION.  AND, SO, IF WE GET TO THAT

25   POINT.  HOPEFULLY HE'LL REMEMBER.

1        MR. STEVENS: I'LL DO THAT, JUDGE.

2        MR. AMBEAU: I THINK THAT THE ---

3        MR. STEVENS: HOPEFULLY, HE'LL REMEMBER.

4        MR. AMBEAU: I THINK THAT'S SORT OF SAYING

5            THAT HE WAS IMPEACHING HIM ABOUT LAYING

6        A PROPER FOUNDATION FOR THAT IMPEACHMENT,

7        CALLING HIS ATTENTION TO THE STATEMENT ---

8        THE COURT: PRECISELY.  IF HE ---

9        MR. AMBEAU: NOT A GREAT IDEA, BUT.

10       THE COURT: IF HE DENIES, NO I DIDN'T, AND

11           YOU HAVE EVIDENCE THAT HE DID.  I'LL

12       CERTAINLY ALLOW THAT.

13       MR. STEVENS: OKAY.  WE'LL GO ONE AT A

14           TIME.

15       MR. AMBEAU: AND THEN -- AND, I GUESS I'M

16           JUST TO RE-URGE MY ARGUMENT, OR RE-URGE

17       MY RELEVANCE.  AT SOME POINT TALKING ABOUT

18       ALL THESE OTHER COMPANIES THAT ARE ---

19       THE COURT: OKAY.  AND YOUR OBJECTION IS

20           NOTED.

21       MR. AMBEAU: THANK YOU, YOUR HONOR.

22       THE COURT: OKAY.

23       REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

24           THE BENCH CONFERENCE WAS CONCLUDED.)

25 MR. STEVENS:

1  Q.  SO, MR. LINARES, IN 2009, YOU FORMED -- YOU

2      INCORPORATED LATINO'S SUPERMARKET, LLC; IS THAT

3      RIGHT?

4  A.  YES.

5  Q.  AND IN 2010, YOU INCORPORATED CHAMPE C-H-A-M-P-E,

6      LLC; IS THAT RIGHT?

7  A.  YES.

8  Q.  AND LATER IN 2010 YOU INCORPORATED C-L-G-U-A,

9      LLA; IS THAT RIGHT?

10 A.  COULD YOU SPELL FOR THE INTERPRETER THE LAST

11     WORD?

12 Q.  IT'S C-L-G-U-A, LLC.

13 A.  WHAT IS THAT?  WHAT NAME IS THAT?

14         MR. STEVENS: PERMISSION TO APPROACH,

15            JUDGE?

16         THE COURT: YES.

17         MR. STEVENS: OR, SINCE THIS IS AUTHENTIC,

18            MAY I JUST USE THE ELMO?

19         THE COURT: YOU MAY.

20 MR. STEVENS:

21 Q.  SIR, I'M GOING TO SHOW YOU SOMETHING THAT'S GOING

22     TO SHOW UP ON THAT SCREEN.  AND IT'S BEEN MARKED

23     FOR IDENTIFICATION AS "U.S. 62."  DO YOU SEE THAT

24     NAME OF THAT COMPANY THERE?  C-L-G-U-A, LLC.

25 A.  NO.  THAT I DON'T HAVE ANY KNOWLEDGE OF THAT.

1  Q.  WELL, I'LL TURN TO PAGE TWO.  AND THAT'S YOUR

2      NAME THERE, ISN'T IT?

3  A.  YES.

4  Q.  AND THAT'S YOUR ADDRESS?

5  A.  YES.

6  Q.  AND THAT'S YOUR NAME AND ADDRESS AGAIN AT THE

7      BOTTOM, ISN'T IT?

8  A.  YES.

9  Q.  DOES THIS REFRESH YOUR RECOLLECTION AS TO WHETHER

10     YOU ALSO FORMED C-L-G-U-A, LLC, IN 2010?

11 A.  YES.  IT WAS DONE, BUT IT WAS NEVER OPENED.

12     NOTHING WAS DONE.

13 Q.  YOU FORMED THE COMPANY, YOU FILLED OUT THE

14     PAPERWORK AND YOU FILED IT?

15 A.  YES.

16 Q.  BUT NEVER DID ANYTHING ELSE WITH THAT CORPORATE

17     STRUCTURE?

18 A.  YES.  BUT I THINK IT'S THE SECRETARY'S -- AT THE

19     SECRETARY OF STATE IS OPEN, BUT IT WAS NEVER

20     OPENED.

21 Q.  OKAY.

22 A.  WE NEVER USED IT.

23 Q.  OKAY.  WELL, LET'S -- AND THAT'S FINE.  LET'S

24     MOVE ON.

25         AFTER FORMING C-L-G-U-A, YOU FORMED LINARES

1          CONSTRUCTION, LLC; IS THAT RIGHT?

2    A.    YES.

3    Q.    AND THEN AFTER THAT THERE WAS A COMPANY CALLED

4          LINARES CONSTRUCTIONS, INC.; IS THAT RIGHT?

5    A.    YES.

6    Q.    OKAY.  AND THEN DID YOU FORM A COMPANY CALLED

7          HOUSTON MOTORS OF LOUISIANA, LLC?

8    A.    NO.

9    Q.    NO?

10   A.    THAT'S MY SON.

11   Q.    OKAY.  SO, IF THE NAME -- WHAT'S YOUR SON'S NAME?

12   A.    IT'S CARLOS LINARES.  WE HAVE THE SAME NAME, BUT

13         THE DIFFERENCE IS WE -- HE IS CARLOS F. LINARES.

14   Q.    AND, SO, THE NAME CARLOS LINARES IS ON THE

15         DOCUMENTS FOR HOUSTON MOTORS, THAT'S YOUR SON?

16   A.    YES.

17   Q.    OKAY.  AND THEN IN 2014, DID YOU FORM SUSHI

18         CONSTRUCTION, INC.?

19   A.    SUSHI?

20   Q.    SUSHI.

21   A.    YES.  BUT THE SAME THING HAPPENED.  IT WAS NEVER

22         OPENED.

23   Q.    OKAY.

24   A.    IT'S ONLY THERE AT THE SECRETARY OF STATE OPENED.

25   Q.    OKAY.  SO IN THE TIME THAT YOU'VE LIVED IN

1    LOUISIANA, WOULD YOU AGREE WITH ME THAT YOU HAVE

2    FORMED -- PUTTING ASIDE WHETHER YOU EVER DID

3    ANYTHING WITH THEM, YOU FORMED SEVEN DIFFERENT

4    COMPANIES?

5  A.   FOR WHAT YOU CAN SEE.  YES.  BUT ---

6  Q.   ARE THERE OTHERS THAT WE CAN'T SEE?

7  A.   BUT THERE'S NEVER IN OPERATION.

8  Q.   OKAY.  WELL, WOULD YOU AGREE THAT YOU HAVE A LOT

9    OF EXPERIENCE AS A BUSINESSMAN?

10 A.   YOU DON'T NEED A LOT OF EXPERIENCE TO OPEN A

11   CONSTRUCTION COMPANY.  THAT'S WHY I KNOW,

12   CONSTRUCTION.

13 Q.   OKAY.  FAIR ENOUGH.  I WANT TO ASK YOU A COUPLE

14   OF QUESTIONS ABOUT YOUR RECORD KEEPING.

15       YOU KEPT GREAT RECORDS FOR YOUR GROCERY

16   BUSINESS, THE GROCERY STORE, DIDN'T YOU?

17 A.   YES.  YOU ALWAYS TRY TO DO THE BEST.

18 Q.   AND BECAUSE YOU ALWAYS TRY TO DO THE BEST, YOU

19   WOULD KEEP RECEIPTS FOR $72.00 PURCHASES OF

20   QUESADILLAS, WOULDN'T YOU?

21 A.   QUESADILLAS?

22 Q.   WELL, LET ME ASK YOU THIS.  WHEN YOU WOULD SPEND

23   $48.00 ON QUESADILLAS, YOU WOULD KEEP RECORDS OF

24   THAT PURCHASE; YOU WOULD KEEP THE RECEIPT,

25   WOULDN'T YOU?

1  A.    RECEIPT FROM THE QUESADILLAS?  YOU TRY TO KEEP

2        ALL THE RECEIPTS YOU CAN.

3  Q.    OKAY.  AND WHAT ABOUT WHEN YOU PURCHASE $72.00

4        WORTH OF CABBAGE AND LIMES, YOU WOULD KEEP THE

5        RECEIPT FROM THAT, WOULDN'T YOU?

6  A.    WHEN I SPEND $72.00 IN LIMES?

7  Q.    WELL, I THINK I'VE SAID LIMES AND CABBAGE.  BUT

8        WHO CARES, RIGHT?

9             YOU WOULD KEEP AS MANY RECEIPTS AS YOU

10       COULD?

11 A.    YES.

12 Q.    OKAY.  AND YOU KEPT DETAILED LOGS OF EVERY

13       EXPENSE WITH YOUR GROCERY STORE, DIDN'T YOU?

14 A.    YES.  WE KEEP A GOOD CONTROL OF EVERYTHING, LIKE

15       $72.00 -- LIMES, MANGOS.

16 Q.    AND YOU KEEP DAILY LOGS, DETAILED LOGS, OF ALL

17       THE MONEY BEING WIRED IN AND OUT, WOULDN'T YOU?

18 A.    FOR THE INTERPRETER.  YOU KEPT DAILY LOGS,

19       DETAILED LOGS OF?

20 Q.    ALL THE MONEY BEING WIRED IN AND OUT OF YOUR

21       STORE.

22 A.    YES.  YOU -- WE KEEP A RECORD.

23 Q.    AND THE DOLLAR AMOUNTS IN THOSE ENTRIES COULD BE

24       AS LOW AS 30 OR $40.00, RIGHT?  IT WAS IMPORTANT

25       TO KEEP RECORDS FOR EVERYTHING, RIGHT?

1  A.   YES.

2  Q.   AND YOU EVEN KEPT -- YOU EVEN KEPT THOSE LITTLE

3       TICKETS THAT COME OUT OF THE CASH REGISTER THAT

4       GET PRINTED OUT EVERY TIME THERE'S A TRANSACTION.

5       YOU KEPT HUNDREDS AND HUNDREDS OF PAGES OF THOSE,

6       DIDN'T YOU?

7  A.   I THINK SO.

8  Q.   OKAY.  BUT YOU DIDN'T KEEP -- YOU DIDN'T KEEP

9       COPIES OF EVERY TREASURY CHECK AND EVERY ID

10      COMPRISING HUNDREDS AND HUNDREDS OF THOUSANDS

11      WORTH OF FUNDS?

12 A.   YES.  THERE WERE ID'S.  IF THEY WERE LOST, IF

13      THEY WERE MISPLACED, WHAT DO WE KNOW?

14 Q.   WELL, LET ME ASK YOU A SLIGHTLY DIFFERENT

15      QUESTION, SIR.

16           LET'S SAY THE ID'S GOT LOST.  LET'S SAY SOME

17      OF THE CHECKS GOT LOST.  YOU DIDN'T KEEP ANY KIND

18      OF LOG OR LISTING OF THESE CHECKS AS THEY WERE

19      COMING IN, DID YOU?

20 A.   NO.  BECAUSE THEY WERE IN BOXES, BEING KEPT.

21 Q.   BUT WHAT WAS IN BOXES?  I THOUGHT THESE PEOPLE

22      WERE COMING IN TO YOUR STORE ONE AT A TIME.

23 A.   WHAT DO YOU WANT ME TO DO, TO TAKE THE NAME OF

24      EACH PERSON AND WRITE IT DOWN IN A BOOK AND ALL

25      THAT?

1         MR. STEVENS: WELL, JUDGE, MAY I APPROACH

2              TO SHOW THE WITNESS A DOCUMENT?

3         THE COURT: WHAT DOCUMENT IS THAT?

4         MR. STEVENS: IT'S BEEN MARKED FOR

5              IDENTIFICATION "U.S. 67."

6         THE COURT: IT HAS NOT BEEN OFFERED?

7         MR. STEVENS: I HAVEN'T OFFERED IT.

8         THE COURT: IT'S NOT BEEN INTRODUCED.

9              HAS MR. AMBEAU BEEN PROVIDED A COPY?

10        MR. AMBEAU: YES.

11        MR. STEVENS: IN DISCOVERY, YOUR HONOR.

12             I THINK IT'S PART OF THE SEARCH

13        WARRANT MATERIAL, 6,000 PAGES.

14        THE COURT: VERY WELL.

15        MR. AMBEAU: CAN I BE TOLD WHAT RANGE OF

16             THE SEARCH WARRANT?

17        MR. STEVENS: WELL, IT'S "EXHIBIT 67."

18        MR. AMBEAU: YOU HAVEN'T GIVEN ME --

19             I THINK ---

20   MR. STEVENS:

21   Q.   TAKE A MINUTE TO LOOK AT THAT DOCUMENT, PLEASE,

22        SIR.

23   A.   YES.

24   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

25   A.   YES.

1    Q.   AND IS THIS ONE OF THE EXPENSE LOGS THAT YOU

2         WOULD KEEP AT YOUR STORE?

3    A.   YES.

4              MR. STEVENS: AT THIS POINT, JUDGE,

5                   I'D OFFER "67, U.S. 67" INTO EVIDENCE.

6              THE COURT: ANY OBJECTION?

7              MR. AMBEAU: NONE, YOUR HONOR.

8              THE COURT: WITHOUT OBJECTION, "U.S. 67"

9                   IS ADMITTED.

10   MR. STEVENS:

11   Q.   ALL RIGHT.  SO, CAN YOU SEE "67" ON THE SCREEN IN

12        THERE?

13   A.   YES.

14   Q.   I'M JUST GOING TO PICK A PAGE.  I'VE TURNED TO

15        PAGE 3677.  I'M JUST WAITING FOR ---

16             IS THIS AN EXAMPLE OF THE THOROUGH RECORD

17        KEEPING YOU PRACTICED WITH RESPECT TO YOUR

18        GROCERY STORE?

19   A.   AND, SO, WHAT DOES PINEDAS MEAN?

20   Q.   WHAT DOES THAT WORD MEAN?

21   A.   THAT PINEDAS IS THE NAME OF A MAN AT THE STORE

22        WHERE WE BOUGHT BREAD.

23   Q.   OKAY.  AND, SO, MY -- I GUESS MY POINT IS, YOU

24        RECORDED $46.00 FOR PINEDAS, AND IT WAS IMPORTANT

25        TO YOU TO RECORD THAT; IS THAT RIGHT?

1  A.   YES.

2  Q.   AND YOU SPENT $30.00 ON PANES DULCES.  I'M JUST

3       PRONOUNCING THAT I KNOW.

4  A.   YES.  IF IT'S WRITTEN THERE, YES.

5  Q.   IT WAS IMPORTANT FOR YOU TO WRITE THAT DOWN,

6       RIGHT?  IT WAS IMPORTANT TO YOUR BUSINESS?

7  A.   YES, SIR.

8  Q.   AND MR. -- THE PINEDAS AGAIN, $54.00.  THAT

9       AMOUNT WAS SIGNIFICANT TO YOU AND YOU WANTED TO

10      RECORD IT; IS THAT RIGHT?

11 A.   YES, SIR.

12 Q.   BUT A MINUTE AGO I ASKED YOU WHY YOU DIDN'T KEEP

13      ANY LISTS OF THE TREASURY CHECKS, AND WE SAW

14      HUNDREDS OF THEM, RIGHT?  WE SAW OVER A MILLION

15      DOLLARS WORTH.  AND I -- AND I THOUGHT I HEARD

16      YOU SAY, "WHAT DO YOU WANT ME TO DO, KEEP A

17      RECORD OF THEM?"

18 A.   SIR, THE STORE, CHECKS, MONEY WIRE, THEY ARE

19      THREE DIFFERENT THINGS.

20 Q.   WELL, I KNOW THAT.  I KNOW THAT.  WHY WOULDN'T

21      YOU KEEP RECORDS OF THE TREASURY CHECKS, THOUGH?

22 A.   WE HAD THE PICTURES.  WE HAD THE RECORD OF THE

23      AMOUNTS OF THE CHECKS.  SO, ---

24 Q.   BUT YOU DON'T HAVE THE PICTURES.  YOU SAID THAT

25      YOU LOST SOME OF THEM.

1   A.   WE ---

2         MR. AMBEAU: YOUR HONOR, I OBJECT TO THE

3             ARGUMENTATIVE NATURE OF MR. STEVENS.

4         THE COURT: SUSTAINED.  LET'S MOVE ON.

5   MR. STEVENS:

6   Q.   THIS IS MY LAST QUESTION.  IF YOU HAD KEPT A LOG

7        OF THOSE TREASURY CHECKS, IF YOU HAD KEPT A

8        LISTING, WOULDN'T THAT HAVE BEEN A GOOD IDEA IN

9        CASE YOU WERE GOING TO LOSE SOME OF THE CHECKS OR

10       ID'S LATER?

11  A.   THERE ARE MANY THINGS, THREE DIFFERENT THINGS.

12       THE STORE HAS MANY THINGS YOU HAVE TO WRITE DOWN.

13       THE MONEY, THE MONEY TRANSFER, THE CHECKS, IT'S

14       SOMETHING SIMPLE.

15            THE COURT: OKAY.

16         MR. STEVENS: YES.  AND I'LL MOVE ON,

17             JUDGE.  I JUST HAVE A FEW FINAL

18             QUESTIONS.

19  MR. STEVENS:

20  Q.   YOU HAVE BEEN ASKED A LOT OF QUESTIONS ABOUT

21       TREASURY CHECKS BACK IN 2010; IS THAT RIGHT?

22  A.   YES.

23  Q.   AND SOMETIMES BACK THEN YOU WOULD DO MORE; YOU

24       WOULD -- PEOPLE WOULD FINGERPRINT THE CHECKS FOR

25       YOU, WOULDN'T THEY?

1  A.   NOT THAT I REMEMBER TO THIS DAY.

2  Q.   OKAY.

3         MR. STEVENS: PERMISSION TO APPROACH,

4             JUDGE?

5         THE COURT: YES.

6         MR. AMBEAU: CAN YOU TELL ME WHAT YOU'RE

7             SHOWING HIM?

8         MR. STEVENS: "79, EXHIBIT 79."

9         THE COURT: I ASSUME THAT'S ONE OF THE

10            CHECKS WITH THE FINGERPRINTS?

11        MR. STEVENS: YES, JUDGE.

12        THE COURT: OKAY.  YOU CAN -- WHY DON'T

13            YOU PUT IT ON THE ELMO.  IT'S

14        ALREADY BEEN ADMITTED, RIGHT?

15        MR. STEVENS: NO, I DON'T THINK SO.

16        MR. AMBEAU: IT'S NOT, JUDGE.  AND I ---

17        THE COURT: WE'VE HAD SOME THAT HAVE ALREADY

18            BEEN ADMITTED WITH THE THUMBPRINT ON IT.

19        MR. STEVENS: IF I HAD ONE OF THOSE HANDY

20            I WOULD SHOW IT TO HIM.

21        THE COURT: OKAY.

22        REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

23            AN OFF-THE-RECORD DISCUSSION WAS HELD.)

24        (DISCUSSION WAS CONCLUDED.)

25        MR. STEVENS: JUDGE, MAY I APPROACH TO

1           SHOW MR. LINARES?

2                MR. AMBEAU: I DON'T OBJECT TO PUBLISH IT.

3                THE COURT: LET'S GO ON AND PUT IT ON THE

4                     ELMO.  WE WON'T PUBLISH IT, BUT AT

5                LEAST WE'LL HAVE THE WITNESS -- UNLESS YOU

6                MOVE FOR ITS ADMISSION, OF COURSE.

7                MR. STEVENS: OKAY.  SO, I'M SHOWING THIS

8                     JUST TO THE WITNESS?

9                THE COURT: YES.

10  MR. STEVENS:

11  Q.  CAN YOU SEE "EXHIBIT" -- WHAT'S BEEN MARKED AS

12      "EXHIBIT 79"?

13  A.  YES.

14  Q.  AND IS THIS A CHECK THAT YOU WOULD HAVE RECEIVED

15      AND HAD SOMEONE -- A FINGERPRINT WHEN THEY

16      PRESENTED IT TO YOU?

17  A.  YES.

18  Q.  AND DO YOU ALSO RECOGNIZE THE SECOND PAGE OF

19      "EXHIBIT 79," AS A DOCUMENT FROM YOUR FILES?

20  A.  YES.

21  Q.  ALL RIGHT.

22                MR. STEVENS: AND I'D MOVE TO ADMIT "79"

23                     AT THIS TIME, JUDGE.

24                THE COURT: ANY OBJECTION?

25                MR. AMBEAU: NONE, YOUR HONOR.

1            THE COURT: ADMITTED.

2  MR. STEVENS:

3  Q.   SO, MR. LINARES, MY QUESTION IS, BACK IN 2010,

4       WHAT'S THIS RIGHT HERE, DO YOU KNOW; IS THAT A

5       FINGERPRINT?

6  A.   I DON'T KNOW WHAT THAT IS.

7  Q.   OKAY.  SO, IF SOMEONE'S FINGERPRINT WAS PLACED ON

8       THIS CHECK, YOU DIDN'T DO IT?

9  A.   NOT THAT I REMEMBER TO THIS DAY.

10 Q.   OKAY.  WELL, LET ME SHOW YOU PAGE TWO.  BACK IN

11      2010, IS THIS A FORM THAT YOU WOULD HAVE PEOPLE

12      FILL OUT?

13           MR. AMBEAU: YOUR HONOR, I'M GOING TO OBJECT

14              TO THIS.  AGAIN, THIS IS OUTSIDE OF

15           THE SCOPE OF ALL OF THE FRAUDULENT TREASURY

16           CHECKS IN 2010.  THERE'S NOTHING FRAUDULENT

17           GOING ON. I DON'T KNOW WHY THIS IS RELEVANT

18              TO THE INQUIRY.

19           MR. STEVENS: IT'S DIRECTLY RELEVANT IF HE'S

20              DOING THINGS IN 2010 TO PREVENT FRAUD

21           THAT HE DECIDES NOT TO DO IT IN 2012 AND

22           2013.

23           THE COURT: YES.  BUT THE POINT IS, IS THAT

24              IS IT OUTSIDE THE SCOPE OF DIRECT.  I

25           DON'T RECALL ANY TESTIMONY ABOUT THIS

1          INFORMATION.  I WILL GIVE YOU A LITTLE BIT

2          MORE LATITUDE, BUT THEN WE HAVE TO HAVE TO

3          WRAP IT UP ON THIS.

4          MR. STEVENS: YES, JUDGE.

5          THE COURT: HE KNOWS IT OR HE DOESN'T KNOW

6              IT.  WE'LL LET THE JURY DECIDE WHAT

7          THE FACTS ARE AND WE'LL MOVE ON.

8  MR. STEVENS:

9  Q.  DO YOU REMEMBER FILLING OUT THIS FORM?

10 A.  NO.

11 Q.  YOU DON'T REMEMBER WHETHER YOU WOULD EVER HAVE

12     PEOPLE SIGN A DOCUMENT SAYING THAT THEY ARE THE

13     PAYEE ON THE TREASURY CHECK?

14 A.  NOT THAT I CAN REMEMBER.  BUT IF WE DID IT,

15     GREAT.

16 Q.  OKAY.  AND BACK IN 2010, YOU WOULD ALSO REPORT

17     SUSPICIOUS TRANSACTIONS, WOULDN'T YOU?

18         MR. AMBEAU: YOUR HONOR, I'M GOING TO OBJECT.

19             THIS IS WAY OUTSIDE THE SCOPE OF DIRECT.

20         THE BANK SECRECY ACT WAS NOT ---

21         THE COURT: THIS IS WELL BEYOND -- I THINK

22             THIS IS WELL BEYOND THE SCOPE OF DIRECT

23         EXAMINATION, SIR.  SO.

24         MR. STEVENS: YES, JUDGE.

25 MR. STEVENS:

1   Q.   SO, MR. LINARES, LET ME JUST SHOW YOU "16G," AS

2        WE WRAP UP.

3            MR. STEVENS:  AND THIS HAS ALREADY BEEN

4                ADMITTED, JUDGE.

5   MR. STEVENS:

6   Q.   CAN YOU SEE "16G" ON YOUR SCREEN?

7   A.   YES.

8   Q.   SO, ALL THESE PEOPLE CAME IN TO YOUR STORE AND

9        PRESENTED ID'S TO YOU?

10  A.   YES.

11  Q.   AND YOU LOOKED THEM IN THE FACES AND YOU CHECKED

12       THE ID'S?

13  A.   YES.

14  Q.   AND EVERYTHING MATCHED?

15  A.   YES.

16  Q.   AND YOU DIDN'T THINK THERE WAS ANYTHING

17       SUSPICIOUS ABOUT ANY OF THIS?

18  A.   NO.

19  Q.   AND THIS IS "16E."  CAN YOU SEE "16E"?

20  A.   YES.

21  Q.   AND ALL OF THESE PEOPLE CAME IN TO YOUR STORE?

22  A.   YES.

23  Q.   EVERY SINGLE ONE OF THEM PRESENTED AN ID?

24  A.   YES.

25  Q.   AND YOU CASHED $30,000.00 WORTH OF CHECKS TO

1          THESE FOLKS?

2   A.    YES.

3   Q.    AND YOU DIDN'T THINK THERE WAS ANYTHING

4         SUSPICIOUS ABOUT THAT?

5   A.    NO.

6              THE COURT: ANYTHING ELSE?

7              MR. STEVENS: YES, JUDGE.  THIS IS "16A."

8                  IT'S ALREADY BEEN ADMITTED.

9   MR. STEVENS:

10  Q.    MR. LINARES, IS IT YOUR TESTIMONY THAT ALL OF

11        THESE PEOPLE CAME TO YOUR STORE IN 2012 FROM

12        SEDGWICH AVENUE IN THE BRONX?

13  A.    YES.

14  Q.    AND NOW I'M ON PAGE TWO.  IS IT YOUR TESTIMONY

15        THAT ALL OF THESE PEOPLE CAME TO YOUR STORE IN

16        2012 AND ONE IN 2013?

17  A.    YES.

18  Q.    AND THAT ALL 54 OF THESE PEOPLE PRESENTED YOU

19        WITH ID?

20  A.    YES.

21  Q.    AND FOR THESE PEOPLE YOU CASHED, WHO APPEARED AT

22        YOUR STORE, YOU CASHED OVER $330,000.00 WORTH OF

23        CHECKS?

24  A.    YES.

25  Q.    AND YOU NOW KNOW -- YOU HAVE CONCEDED IN THIS

1       TRIAL, THESE WERE ALL BASED ON FRAUDULENT TAX

2       RETURNS; YOU DON'T DISPUTE THAT, DO YOU?

3              MS. BROADBECK: FOR THE INTERPRETER.  FOR

4                 ALL THESE CHECKS OR ALL THESE ID'S?

5              MR. STEVENS: LET ME ASK MY QUESTION.

6    MR. STEVENS:

7    Q.  MR. LINARES, AFTER THE 40TH, 45TH, OR THE 50TH CHECK

8        FROM SEDGWICH AVENUE, YOU STILL DIDN'T THINK THAT

9        ANY OF THESE CHECKS WERE SUSPICIOUS?

10   A.  NO.

11   Q.  AND YOU NEVER REPORTED ANY OF THIS?

12   A.  NO.

13   Q.  ALL RIGHT.  THANK YOU, SIR.

14             MR. STEVENS: THOSE ARE ALL MY QUESTIONS.

15             THE COURT: OKAY.  VERY LIMITED REDIRECT?

16             MR. AMBEAU: YOUR HONOR, IF WE CAN TAKE

17                A FEW MINUTES AND THEN I CAN -- MORE

18             THAN I CAN DO IT NOW.  IT'LL TAKE A FEW

19             MINUTES.  FIFTEEN MINUTES AT THE MOST, YOUR

20             HONOR.

21             THE COURT: NO, I'M NOT GOING TO DO THAT TO

22                THIS JURY.

23                LADIES AND GENTLEMEN, WE'RE GOING TO

24             TAKE A BREAK.

25                WELL, LET ME ASK YOU.  AND I'M GOING TO

1    ASK YOU ALL TO EXCUSE YOURSELVES.  GO IN THE

2    BACK.  TEL ME IF YOU WANT TO COMPLETE THIS

3    WITNESS OR IF YOU WANT TO GO TO LUNCH NOW.

4        LET'S ALL RISE FOR THE JURY, AND I WOULD

5    ASK YOU TO COME RIGHT BACK.  JUST LET THE

6    CAPTAIN KNOW.  WELL, ACTUALLY, IF YOU DECIDE

7    THAT YOU WANT TO GO TO LUNCH NOW, YOU'LL HAVE

8    TO COME BACK FOR ME TO GIVE YOU THE

9    INSTRUCTIONS.  OKAY?

10   (REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

11       THE JURY IS EXCUSED FOR A BREAK.)

12   THE COURT: BE SEATED.  GENTLEMEN, AGAIN,

13       I'M REALLY NOT TRYING TO PREVENT ANYBODY

14   FROM TRYING THEIR CASE.  BUT I WOULD ASK THAT

15   YOU ALL PLEASE, PLEASE TRY TO BE VERY -- ASK

16   THE TIGHTEST, MOST TARGETED, MOST EFFICIENT

17   QUESTIONS IN THE MOST EFFICIENT WAY POSSIBLE.

18   OKAY?  I MEAN, I'M JUST REALLY CONCERNED

19   ABOUT THE ATTENTION OF THIS JURY.  WE'VE BEEN

20   BEATING ON THESE SAME ISSUES FOR THREE AND A

21   HALF DAYS NOW.  SO, THEY'VE BEEN VERY, VERY

22   ATTENTIVE, AND I'M JUST CONCERNED WE'RE

23   LOSING THEM.

24       SO, IF YOU CAN DO IT IN TEN MINUTES, IF

25   THEY AGREE TO STAY, GREAT.  BUT IF ---

1          MR. AMBEAU: IT MAY EVEN BE LESS THAN THAT,

2      YOUR HONOR.  JUST A FEW QUESTIONS.  I'VE

3      ONLY ONE PAGE AND IT'S MAYBE TEN QUESTIONS,

4      15 QUESTIONS.  IT'S GOING TO BE VERY TIGHT.

5      THE COURT: OKAY.  OKAY.  THE JURY WISHES

6          TO TAKE A RESTROOM BREAK AND THEN WE'LL

7      FINISH.

8          SO, CAPTAIN, TELL THEM FIVE MINUTES.

9      OKAY?

10          NOW, MR. LINARES, WE'RE GOING TO TAKE A

11      BREAK AT THIS TIME.  IF YOU CAN INTERPRET

12      THIS FOR ME, PLEASE?

13          NOW, I'M SPECIFICALLY DIRECTING YOU, YOU

14      MAY TAKE A RESTROOM BREAK AT THIS TIME IF YOU

15      WISH.  BUT I'M SPECIFICALLY DIRECTING YOU NOT

16      TO DISCUSS YOUR TESTIMONY WITH YOUR LAWYER OR

17      WITH ANYONE ELSE DURING THE COURSE OF THE

18      BREAK.  OKAY?  DO YOU UNDERSTAND THAT, SIR?

19      THE WITNESS: YES.

20      THE COURT: DO YOU HAVE ANY QUESTIONS ABOUT

21          THAT?

22      THE WITNESS: NO.

23      THE COURT: ALL RIGHT.  COURT IS IN RECESS.

24      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

25          THE COURT IS IN RECESS.)

1          (THE COURT RESUMES.)

2          THE COURT: BE SEATED.

3              OKAY.  LET'S SEE IF THE JURY IS READY

4          TO RETURN.

5              LET'S ALL RISE.

6          (REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

7              THE JURY RETURNS FROM BREAK.)

8          THE COURT: BE SEATED.  WELCOME BACK,

9              LADIES AND GENTLEMEN.  AT THIS TIME

10         WE WILL HEAR THE REDIRECT TESTIMONY OF THE

11         DEFENDANT.

12              REDIRECT EXAMINATION

13     MR. AMBEAU:

14     Q.   GOOD AFTERNOON, MR. LINARES.  I'M GOING TO SHOW

15          YOU WHAT YOU JUST LOOKED AT, "U.S. EXHIBIT 16E."

16          HAVE YOU EVER SEEN -- BEFORE THIS COURT, DID YOU

17          EVER SEE A SUMMARY OF THESE CHECKS LIKE THIS?

18     A.   YES.

19     Q.   WHEN DID YOU SEE A SUMMARY OF THESE CHECKS LIKE

20          THIS?

21     A.   WHEN WE CAME TO THE COURT.

22     Q.   OKAY.  BUT BEFORE COURT, DID YOU EVER SEE

23          ANYTHING LIKE THIS BEFORE COURT?

24     A.   NO.

25     Q.   AND, TO BE CLEAR, ON "16E," THAT'S THREE PEOPLE

1        BRINGING THOSE CHECKS INTO YOUR BUSINESS, RIGHT?

2   A.   YES.

3   Q.   YOU GOT AN IDENTIFICATION FROM EACH OF THOSE

4        THREE PEOPLE?

5   A.   YES.

6             MR. AMBEAU: "16ALPHA, 16A" OF THE

7                  GOVERNMENT, YOUR HONOR.

8   MR. AMBEAU:

9   Q.   HAVE YOU EVER SEEN THIS BEFORE COURT?

10  A.   NO.

11  Q.   AND THESE ARE CHECKS BROUGHT TO YOUR BUSINESS

12       OVER A FOUR-MONTH PERIOD; IS THAT RIGHT?

13  A.   YES.

14  Q.   AND DURING THAT FOUR-MONTH PERIOD DID YOU GET

15       HUNDREDS OF OTHER CHECKS, CARLOS?

16            MS. MORALES: CAN YOU REPEAT THE QUESTION

17                 FOR THE INTERPRETER?

18            MR. AMBEAU: SURE.

19  MR. AMBEAU:

20  Q.   DURING THIS FOUR-MONTH PERIOD DID YOU GET

21       HUNDREDS OF OTHER CHECKS EVERY MONTH?

22  A.   FROM OTHER TYPES.  YES.

23  Q.   YES.  MANY, MANY CHECKS, RIGHT?

24  A.   YES.

25  Q.   AND, IN FACT, THIS ISN'T ALL OF THE TREASURY

1       CHECKS YOU RECEIVED IN THE FOUR-MONTH PERIOD, IS

2       IT?

3  A.   YES.

4  Q.   THE GOVERNMENT ASKED YOU A LOT OF QUESTIONS ABOUT

5       THE GRAND JURY PRODUCTION.  DID YOU GO THROUGH

6       EVERY ONE OF THESE 6,000 DOCUMENTS IN YOUR

7       BUILDING BEFORE YOU WENT TO THE GRAND JURY?

8  A.   NO.

9  Q.   DID YOU SEARCH EVERY BOX IN EVERY PART OF YOUR

10      BUILDING BEFORE YOU WENT TO THE GRAND JURY?

11 A.   NO.

12 Q.   WHY NOT, CARLOS?

13          THE COURT: MR. LINARES.

14 MR. AMBEAU:

15 Q.   MR. LINARES.  EXCUSE ME.  WHY NOT, MR. LINARES?

16 A.   BECAUSE I THINK THAT -- NO, I DIDN'T NEEDED IT.

17 Q.   DID YOU UNDERSTAND THAT YOU WERE NOT THE FOCUS OF

18      THAT GRAND JURY INVESTIGATION, YOU WERE NOT THE

19      TARGET?

20 A.   I DIDN'T EVEN KNOW THERE WERE AN INVESTIGATION.

21 Q.   YOU WERE JUST CALLED TO THE GRAND JURY AND YOU

22      WERE TRYING TO COOPERATE WITH THE GOVERNMENT?

23 A.   YES.

24 Q.   A MOMENT AGO THE GOVERNMENT ASKED YOU ABOUT SIX

25      OR SEVEN OR OTHER BUSINESSES THAT YOU HAD OPENED.

1        DOES THAT HAVE ANYTHING TO DO WITH YOU CASHING

2        CHECKS IN YOUR BUSINESS?

3   A.   NO.

4   Q.   THE GOVERNMENT SHOWED YOU WHAT WAS "U.S. EXHIBIT

5        67," WHICH WAS THIS NOTEBOOK.  DID YOU REMEMBER

6        THAT, LOOKING AT THAT JUST NOW?

7   A.   YES.

8   Q.   IS THIS NOTEBOOK AND ALL OF ITS PAGES AND

9        CONTENTS RELATED TO THE GROCERY STORE THAT YOU

10       OWN?

11  A.   YES.

12  Q.   IS IT IMPORTANT FOR YOU TO KEEP SOME RECORDS AS

13       TO THE GROCERY STORE THAT YOU OWN, MR. LINARES?

14  A.   THE GROCERY DEPARTMENT, YES.

15  Q.   WHO WRITES IN THAT NOTEBOOK?  IS IT JUST YOU OR

16       IS IT OTHER PEOPLE IN THE GROCERY?

17  A.   THE DIFFERENT PERSON.

18  Q.   IN 2010, THE GOVERNMENT WAS ASKING YOU OVER AND

19       OVER ABOUT SOME 2010 CHECKS AND WHEN YOU GOT

20       FINGERPRINTS AND THINGS.  WERE ANY OF THOSE 2010

21       CHECKS FRAUDULENT?

22  A.   NO.

23  Q.   YOU CASHED 191 CHECKS IN 2010, RIGHT, TREASURY

24       CHECKS?

25  A.   YES.

1  Q.  YOU CASHED THEM -- YOU CASHED A SIMILAR AMOUNT IN

2      2011, CORRECT?

3  A.  YES.

4  Q.  AND IN 2012, CORRECT?

5  A.  YES.

6  Q.  AS YOU BEGAN TO CASH THESE CHECKS OVER TIME, DID

7      YOU GAIN CONFIDENCE THAT THEY WERE GOOD CHECKS?

8  A.  YES.

9  Q.  DO YOU TRUST THE UNITED STATES TREASURY TO ISSUE

10     VALID UNITED STATES TREASURY CHECKS?

11 A.  YES.

12 Q.  AND WHEN YOU'RE PRESENTED THOSE CHECKS AT A STORE

13     WITH A PERSON STANDING IN FRONT OF YOU WITH AN

14     ID, WHEN YOU CASHED THOSE CHECKS, DID YOU FEEL

15     LIKE THAT THAT WAS A GOOD CHECK?

16 A.  GOVERNMENT CHECK -- EVERYBODY TRUST THEM BECAUSE

17     THE MONEY IS THERE.

18 Q.  RIGHT.  MORE THAN ANY OTHER CHECK, RIGHT?

19 A.  YES.

20 Q.  ONE LAST QUESTION.  A LOT HAS BEEN MADE ABOUT

21     MULTIPLE PEOPLE LIVING AT ONE ADDRESS.  CAN YOU

22     TELL ME WHAT YOU KNOW ABOUT MULTIPLE SPANISH

23     PEOPLE LIVING AT ONE ADDRESS?

24 A.  WHEN WE COME TO THE UNITED STATES, OUR FINANCIAL

25     SITUATION IS BAD.  AND AT TIMES WE HAVE MAYBE TEN

1    PEOPLE IN ONE APARTMENT -- IN ONE-BEDROOM

2    APARTMENT.

3  Q.  DID YOU DO THAT WHEN YOU CAME TO THE UNITED

4    STATES, CARLOS?

5  A.  YES.

6  Q.  IS THAT WHY IT WAS OF NO CONSEQUENCE THAT THERE

7    WERE MULTIPLE PARTIES LIVING AT ONE ADDRESS?

8  A.  YES.

9  Q.  WHAT ELSE DID YOU TELL ME ABOUT ADDRESSES AND THE

10    SPANISH POPULATION, CARLOS?

11        MR. STEVENS: OBJECTION.

12        THE COURT: WAIT.  THAT'S -- SUSTAINED.

13          IF YOU HAVE A SPECIFIC QUESTION, YOU CAN

14        ASK IT.  THAT'S TOO BROAD, TOO OPEN ENDED.

15  MR. AMBEAU:

16  Q.  WHAT'S THE OTHER REASON THAT PEOPLE HAVE THE SAME

17    ADDRESS, MULTIPLE SPANISH PEOPLE HAVE THE SAME

18    ADDRESS, FROM YOUR UNDERSTANDING?

19  A.  BECAUSE THE AREA WE USED TO LIVE IS SO BAD, TOO

20    MUCH VIOLATION.  SO, WE GOT TO LOOK FOR FRIENDS

21    AND ASKING A FAVOR IF WE CAN USE HIS ADDRESS TO

22    KEEP OUR MAIL.  THAT'S -- THAT'S THE ONLY REASON.

23  Q.  IS THAT SOMETHING THAT YOU HAD TO DO, PERSONALLY?

24        MR. STEVENS: OBJECTION.

25  THE WITNESS:

1  A.   YES.

2           THE COURT: WAIT, WAIT, WAIT, WAIT.

3           MR. STEVENS: WHAT'S THE RELEVANCE OF THAT,

4                JUDGE?

5           THE COURT: I'LL ALLOW THE QUESTION.

6                OVER-RULED.

7  MR. AMBEAU:

8  Q.   IS THAT SOMETHING THAT YOU HAD TO DO, PERSONALLY?

9  A.   YES.

10 Q.   TO GET YOUR MAIL AT ANOTHER LOCATION BECAUSE IT

11      WAS UNSAFE TO GET IT WHERE YOU LIVED?

12 A.   YES.

13          THE COURT: WAIT, WAIT.  THAT'S -- ALL

14               RIGHT.  LET'S MOVE ON TO OTHER THINGS.

15               AND I WILL TELL YOU THAT I SUSPECT THAT MR.

16               STEVENS WOULD OBJECT BECAUSE IT'S

17               SPECULATIVE.

18          MR. AMBEAU: THAT'S HIS OWN -- THAT'S HIS

19               OWN ---

20          THE COURT: BUT I UNDERSTAND THAT.  BUT

21               HIS CHECKS ARE NOT AT ISSUE HERE.  IT'S

22          THE CHECKS -- WHAT IS NOT AT ISSUE HERE ARE

23          CHECKS AT HIS ADDRESS, BUT THE CHECKS AT

24          OTHER ADDRESSES.  SO, I DON'T WANT THE JURY

25          TO ASSUME THAT HIS EXPERIENCE IS THE SAME AS

1        OTHER PEOPLE'S EXPERIENCES.

2        MR. AMBEAU: WELL, WHAT I'M ATTEMPTING TO

3            GET THE WITNESS TO EXPLAIN, YOUR HONOR,

4        IS WHY IT DIDN'T -- WAS OF NO CONSEQUENCE --

5        THE COURT: RIGHT.

6        MR. AMBEAU:  -- THAT THERE WERE MULTIPLE

7            PEOPLE LIVING AT THE SAME PLACE,

8        FROM HIS EXPERIENCE.

9        THE COURT: AND HE HAS DONE SO.  SO, LET'S

10           MOVE ON.

11       MR. AMBEAU: I HAVE NO FURTHER QUESTIONS,

12           YOUR HONOR.

13       THE COURT: OKAY.  MR. LINARES, YOU MAY

14           RETURN TO COUNSEL TABLE AT THIS TIME.

15           FOLKS, I CAN'T THANK YOU ALL ENOUGH FOR

16       YOUR PATIENCE.  WE WILL TAKE OUR LUNCH BREAK

17       AT THIS TIME.  PLEASE DO NOT DISCUSS THE CASE

18       AMONG YOURSELVES OR WITH ANYONE DURING THE

19       COURSE OF THE LUNCH BREAK.  PLEASE DO NOT

20       WATCH, LISTEN TO OR READ ANY POSSIBLE NEWS

21       COVERAGE OF THIS CASE.  PLEASE DON'T YET

22       BEGIN TO FORM OPINIONS.  AND PLEASE DON'T

23       CONDUCT ANY OUTSIDE RESEARCH OF ANYTHING

24       YOU'VE LEARNED ABOUT THUS FAR.

25           IT'S NOW ONE O'CLOCK.  WE WILL BREAK

1   UNTIL 2:15.  WHEN WE COME BACK AT 2:15, WE

2   MAY OR MAY NOT HAVE ADDITIONAL EVIDENCE OR

3   TESTIMONY FOR YOU.  BUT I CAN ASSURE YOU THAT

4   WE WILL HAVE THE CLOSING ARGUMENTS SOME TIME

5   THIS AFTERNOON IN TIME FOR YOU TO BEGIN YOUR

6   DELIBERATIONS.

7       LET'S ALL RISE FOR THE JURY.

8   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

9       THE JURY WAS EXCUSED FOR A LUNCH BREAK.)

10  THE COURT: BE SEATED.  LET ME THANK THE

11      LAWYERS AGAIN FOR YOUR EFFORTS TO KEEP

12  THAT MOVED ALONG.  I KNOW THIS WAS ALL VERY

13  IMPORTANT TESTIMONY.  BUT, NONETHELESS, I

14  APPRECIATE YOUR EFFORTS TO HELP MOVE IT.

15      ALL RIGHT.  SO, WE'LL TAKE OUR BREAK.

16  I'VE GOT A PRE-TRIAL CONFERENCE AT TWO

17  O'CLOCK THAT I'VE GOT TO ATTEND TO.  THAT

18  WILL TAKE NO MORE THAN TEN MINUTES.

19      IT'S IMPORTANT, HOWEVER, THAT WE HAVE

20  OUR CHARGE CONFERENCE AS EARLY AS POSSIBLE.

21  HAVE BOTH SIDES RECEIVED A COPY FROM MAX OF

22  THE JURY CHARGES AND THE PROPOSED VERDICT

23  FORM?

24  REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

25      AN OFF-THE-RECORD DISCUSSION WAS HELD.)

1       (DISCUSSION WAS CONCLUDED.)

2       THE COURT: SO, IN THE MEANTIME, HOPEFULLY,

3           I BELIEVE YOU RECEIVED THOSE YESTERDAY

4       AT NOON.  AND, SO, HOPEFULLY YOU'VE HAD A

5       CHANCE -- I KNOW MR. AMBEAU YOU REVIEWED

6       THEM.

7           AND, MR. LINARES, YOU MAY RETURN TO

8       COUNSEL TABLE.

9           SO, WHAT I'D LIKE TO DO IS ---

10      PAM, CLARE, LET ME SEE YOU ALL.

11  REPORTER'S NOTE: (THEREFORE, AT THIS TIME, AN

12      OFF-THE-RECORD DISCUSSION WAS HELD.)

13      (DISCUSSION WAS CONCLUDED.)

14      THE COURT: ALL RIGHT.  GENTLEMEN, WHAT

15          WE'LL DO IS THIS.  LET'S SEE IF WE CAN'T

16      CONVENE.  I DON'T WANT TO SHORTEN THE LUNCH,

17      BUT I DON'T THINK WE HAVE A CHOICE.  WHY

18      DON'T WE PLAN TO RECONVENE AT 1:50.  LET'S

19      SAY 1:50, SO WE CAN AT LEAST BEGIN OUR CHARGE

20      CONFERENCE AT THAT TIME.  WE'LL HAVE TO BREAK

21      RIGHT AT TWO O'CLOCK, AND THEN WE'LL RETURN

22      AS SOON AS I CAN THEREAFTER.  BUT LET ME ASK

23      YOU ALL TO BE HERE IN THE COURT RIGHT AT 1:50

24      TO DISCUSS THE CHARGES.  IF WE CAN DISCUSS

25      THE CHARGES.  I MEAN, I'M MAKING A HUGE

1    ASSUMPTION HERE.

2        DOES THE DEFENSE INTEND TO PRODUCE ANY

3    OTHER WITNESSES?

4    MR. AMBEAU: WE DO NOT.

5    THE COURT: OKAY.  SO, WHEN THE JURY RETURNS

6        I WOULD APPRECIATE IF YOU WOULD JUST

7    SIMPLY INDICATE THAT ON THE RECORD.

8        DOES THE UNITED STATES INTEND TO PRODUCE

9    ANY REBUTTAL EVIDENCE?

10   MR. STEVENS: NO, JUDGE.

11   THE COURT: OKAY.  ALL RIGHT.  OKAY.  AND

12       IF YOU WOULD JUST SIMPLY INDICATE THAT

13   ON THE RECORD IN THE PRESENCE OF THE JURY, I

14   WOULD APPRECIATE THAT.

15       SO, I GUESS THE GOAL -- MY GOAL WOULD BE

16   TO GET THIS TO THE JURY BEFORE TOO -- AT

17   LEAST BEGIN THE CLOSING ARGUMENTS BY 2:30, NO

18   LATER THAN 2:30, GENTLEMEN.  IS THAT

19   AGREEABLE?

20   MR. AMBEAU: YES, YOUR HONOR.

21   THE COURT: ALL RIGHT.  THANK YOU ALL AGAIN.

22       AND -- YES.

23   MR. AMBEAU: ONE OTHER ISSUE, YOUR HONOR.

24       BEING THAT I HAD TO LEAVE THE COURTROOM

25   DURING THE LUNCH BREAK, IS IT POSSIBLE THAT I

1    STAY IN THE COURTROOM FOR THE LUNCH BREAK ON

2    THIS OCCASION SO THAT I CAN LOOK AT THE

3    CLOSING?

4    THE COURT: I DON'T HAVE A -- ARE YOU OKAY

5         WITH THAT?  I HAVE TO DEFER TO THE

6    EXPERTS ON THAT.  THESE GENTLEMEN AND LADIES

7    ARE RESPONSIBLE FOR MY SAFETY AND EVERYONE

8    ELSE'S SAFETY.  AND, SO, I DEFER TO THEM.  IF

9    THE CSO'S ARE GOOD WITH THAT.  I WOULD ASK,

10   THOUGH, THAT YOU NOT BRING ANY FOOD, OF

11   COURSE, INTO THE COURTROOM.

12   MR. AMBEAU: I WON'T DO ANYTHING OF THE KIND.

13   THE COURT: YOU'RE SURE YOU'RE GOING TO BE

14        ABLE TO DO THAT ON AN EMPTY STOMACH?

15   MR. AMBEAU: I SHALL.

16   THE COURT: YOU'RE SURE?

17   MR. AMBEAU: YES, SIR.

18   THE COURT: ALL RIGHT.  ALL RIGHT.  WE'LL

19        RECONVENE AT 1:50.  COURT IS IN RECESS.

20   REPORTER'S NOTE:  (THEREFORE, AT THIS TIME,

21        COURT IS RECESS FOR THE LUNCH BREAK.)

22   REPORTER'S NOTE: (COURT RESUMES AND AT THIS

23        TIME THE CHARGE CONFERENCE COMMENCES.)

24   THE COURT: ALL RIGHT.  AGAIN, WE HAVE --

25        LET'S SPEND THE NEXT FEW MINUTES,

1           ALTHOUGH IT WILL ONLY BE ABOUT FIVE TO TEN

2           MINUTES OR SO.  BUT LET'S TRY TO GET THROUGH

3           AS MUCH AS WE CAN.

4                I NOTICE THAT THE DEFENDANT IS NOT

5           PRESENT AT THIS TIME.  FOR PURPOSES OF THE

6           JURY CHARGE, WHICH WOULD OTHERWISE BE

7           CONDUCTED IN CHAMBERS, I WILL EXCUSE THE

8           DEFENDANT'S PRESENCE AT THIS TIME.

9           MR. AMBEAU: THANK YOU, YOUR HONOR.

10          THE COURT: MR. CROSSWELL, I NOTICED ALSO

11               THAT MR. STEVENS ISN'T PRESENT.  ARE YOU

12          PREPARED TO GO FORWARD AT THIS TIME?

13          MR. CROSSWELL: I AM, YOUR HONOR.

14          THE COURT: OKAY.  VERY WELL.

15               ALL RIGHT.  HAVE BOTH SIDES HAD AN

16          OPPORTUNITY TO REVIEW THE JURY CHARGES, THE

17          PROPOSED JURY INSTRUCTIONS?

18          MR. CROSSWELL: THE GOVERNMENT HAS,

19               YOUR HONOR.

20          MR. AMBEAU: THE DEFENSE HAS, YOUR HONOR.

21          THE COURT: YES.  OKAY.  SO, GENTLEMEN,

22               FOR OUR PURPOSES TODAY, YOU CAN REMAIN

23          SEATED AT COUNSEL TABLE.  JUST MAKE SURE THAT

24          YOU HAVE A MICROPHONE NEARBY AND YOU SPEAK

25          CLEARLY INTO THE MICROPHONE.  OKAY?

1    ALL RIGHT.  NOW, WITH RESPECT TO THE

2    INFORMATION ON PAGE ONE.  DOES THE DEFENDANT

3    HAVE ANY OBJECTIONS TO THE INFORMATION ON

4    PAGE ONE OF THE JURY INSTRUCTIONS?

5    MR. AMBEAU: NO, YOUR HONOR.

6    THE COURT: ANY OBJECTIONS BY THE GOVERNMENT?

7    MR. CROSSWELL: NO, YOUR HONOR.

8    THE COURT: AND YOU CAN REMAIN SEATED,

9         MR. CROSSWELL.

10        ANY OBJECTIONS BY THE DEFENDANT AS TO

11   PAGE TWO?

12   MR. AMBEAU: NO, YOUR HONOR.

13   THE COURT: ANY OBJECTIONS BY THE GOVERNMENT

14        ON PAGE TWO?

15   MR. CROSSWELL: NO, YOUR HONOR.

16   THE COURT: ANY OBJECTIONS BY THE DEFENDANT

17        AS TO PAGE THREE?

18   MR. AMBEAU: NO, YOUR HONOR.

19   THE COURT: ANY OBJECTIONS BY THE GOVERNMENT?

20   MR. CROSSWELL: NO, YOUR HONOR.

21   THE COURT: ANY OBJECTIONS ON PAGE FOUR?

22   MR. AMBEAU: NO, YOUR HONOR.

23   THE COURT: BY THE DEFENDANT?

24   MR. AMBEAU: NO.

25   THE COURT: AND BY THE GOVERNMENT?

1    MR. CROSSWELL: NO, YOUR HONOR.

2    THE COURT: ANY OBJECTIONS TO THE INFORMATION

3         ON PAGE FIVE BY THE DEFENDANT?

4    MR. AMBEAU: NO, YOUR HONOR.

5    THE COURT: GOVERNMENT?

6    MR. CROSSWELL: NO, YOUR HONOR.

7    THE COURT: ANY OBJECTIONS AS TO PAGE SIX

8         BY THE DEFENDANT?

9    MR. AMBEAU: NO, YOUR HONOR.

10   THE COURT: THE UNITED STATES?

11   MR. AMBEAU: NO, YOUR HONOR.

12   THE COURT: PAGE SEVEN, ANY OBJECTIONS

13        BY THE DEFENSE?

14   MR. AMBEAU: NO, YOUR HONOR.

15   THE COURT: BY THE UNITED STATES?

16   MR. AMBEAU: NO, YOUR HONOR.

17   THE COURT: ANY OBJECTIONS TO THE

18        CHARGES ON PAGE EIGHT BY THE DEFENSE?

19   PAGE EIGHT, MR. AMBEAU, ANY ---

20   MR. AMBEAU: NO, YOUR HONOR.

21   THE COURT: MR. CROSSWELL, FOR THE GOVERNMENT?

22   MR. CROSSWELL: NO, YOUR HONOR.

23   THE COURT: PAGE NINE, ANY OBJECTIONS, MR.

24        AMBEAU?

25   MR. AMBEAU: NO, YOUR HONOR.

1       THE COURT: MR. CROSSWELL?

2       MR. CROSSWELL: NO, YOUR HONOR.

3       THE COURT: AS TO COUNT TEN, MR. AMBEAU?

4       MR. AMBEAU: PAGE TEN, NO, YOUR HONOR.

5       THE COURT: MR. CROSSWELL?

6       MR. CROSSWELL: NO, YOUR HONOR.

7       THE COURT: PAGE 11, ANY OBJECTION BY THE

8             DEFENDANT?

9       MR. AMBEAU: NO, YOUR HONOR.

10      THE COURT: ANY BY THE GOVERNMENT?

11      MR. CROSSWELL: NO, YOUR HONOR.

12      THE COURT: PAGE 12, ANY OBJECTIONS BY

13            THE DEFENDANT?

14      MR. AMBEAU: NO, YOUR HONOR.

15      THE COURT: BY THE GOVERNMENT?

16      MR. CROSSWELL: NO, YOUR HONOR.

17      THE COURT: ANY OBJECTIONS TO THE CHARGES

18            ON PAGE 13 BY THE DEFENDANT?

19      MR. AMBEAU: NO, YOUR HONOR.

20      THE COURT: GOVERNMENT?

21      MR. CROSSWELL: NO, YOUR HONOR.

22      THE COURT: PAGE 14, ANY OBJECTIONS BY

23            THE DEFENDANT?

24      MR. AMBEAU: NO, YOUR HONOR.

25      THE COURT: GOVERNMENT?

1           MR. CROSSWELL: NO, YOUR HONOR.

2           THE COURT: PAGE 15, ANY OBJECTIONS BY

3                THE DEFENDANT?

4           MR. AMBEAU: NO, YOUR HONOR.

5           THE COURT: GOVERNMENT?

6           MR. CROSSWELL: NO, YOUR HONOR.

7           THE COURT: PAGE 16, ANYTHING BY THE

8                -- ANY OBJECTIONS BY THE DEFENDANT?

9           MR. AMBEAU: NO, YOUR HONOR.

10          THE COURT: BY THE UNITED STATES?

11          MR. AMBEAU: NO, YOUR HONOR.

12          THE COURT: PAGE 17, ANY BY THE -- ANY

13               OBJECTIONS BY THE DEFENDANT?

14          MR. AMBEAU: NO, YOUR HONOR.

15          THE COURT: THE GOVERNMENT?

16          MR. CROSSWELL: NO, YOUR HONOR.

17          THE COURT: PAGE 18, ANY OBJECTION BY

18               THE DEFENDANT?

19          MR. AMBEAU: NO, YOUR HONOR.

20          THE COURT: BY THE UNITED STATES?

21          MR. CROSSWELL: NO, YOUR HONOR.

22          THE COURT: PAGE 19, ANY OBJECTION

23               BY THE DEFENDANT?

24          MR. AMBEAU: NO, YOUR HONOR.

25          THE COURT: BY THE UNITED STATES?

1      MR. CROSSWELL: NO, YOUR HONOR.

2      THE COURT: PAGE 20, ANY OBJECTIONS BY

3           THE DEFENDANT?

4      MR. AMBEAU: YES, YOU HONOR.  FROM THE

5           DEFENSE.

6      THE COURT: OKAY.

7      MR. AMBEAU: MY ARGUMENT HERE IS THAT,

8           AND I -- MY ARGUMENT HERE, YOUR HONOR,

9      IS THAT 31 CFR 1022210, WHICH IS THE

10     DEFINITION OF THE ANTI-MONEY LAUNDERING

11     PROGRAM FOR MONEY SERVICES, --

12     THE COURT: MR. AMBEAU, YOU CAN REMAIN SEATED.

13     MR. AMBEAU: -- IN THE UNITED STATES DEFINES

14          WHAT WE'RE HERE FOR.  AND AS I GO DOWN

15     THIS, IT SAYS, "MUST BE IN WRITING HERE," AS

16     THOUGH THAT WERE ONE OF THE REQUIREMENTS.

17     BUT IN ACTUALITY, AT 1022.210D, "AT A MINIMUM

18     THE PROGRAM SHALL," AND THEN THERE'S A

19     LISTING OF FOUR THINGS THAT THE PROGRAM

20     SHALL.  AND WE LIST THOSE THINGS AFTER IN

21     WRITING.

22          IN FACT, "WHAT MUST BE IN WRITING" COMES

23     FROM, YOUR HONOR, IS FROM ABOVE THAT AT A, B,

24     AND C.  AND, SO, "A" IS WHERE IT SAYS THAT,

25          "IT MUST BE IN WRITING."

1          BUT, ALSO, IN "B" IT SAYS, "IT MUST

2     COMMENSURATE WITH THE RISK POSED BY THE

3     LOCATION."

4          I MEAN IN "B" -- AND THEN IN "C" IT SAYS

5     THAT "IT SHALL BE AN EFFECTIVE ANTI-MONEY

6     LAUNDERING PROGRAM."

7          AND, SO, I THINK -- I THINK I REVERSED

8     THAT.  "A" SAYS IT SHOULD BE EFFECTIVE.  "B"

9     SAYS IT SHOULD BE COMMENSURATE WITH THE

10    RISKS.  AND "C" SAYS IT SHOULD BE IN WRITING.

11         IF WE'RE GOING TO INCLUDE THAT IT SHOULD

12    BE IN WRITING AS A PART OF THAT SET OF

13    INSTRUCTIONS ABOVE WHERE THAT -- WHERE THE

14    PROGRAM SHALL MINIMALLY INVOLVE.  I THINK WE

15    SHOULD EITHER PUT ALL THREE OF THOSE IN SO

16    THAT IT SHOULD SAY THAT THE PROGRAM SHOULD BE

17    COMMENSURATE WITH THE RISKS, THAT THE PROGRAM

18    SHOULD BE EFFECTIVE, AND THAT THE PROGRAM

19    SHOULD BE IN WRITING. AND THEN, AT A MINIMUM,

20    THOSE OTHER ITEMS.

21         AND, SO, I THINK TO TAKE ONE ITEM FROM

22    THAT AND PUT IT INTO WHAT, AT THE MINIMUM,

23    THE PROGRAM SHOULD BE, I THINK IS -- IS

24    ESSENTIALLY, YOU KNOW, READING THE CHART TO

25    THE JURY AND CHARGING THE DEFENDANT WITH --

1       NOT WITH THE STATUTE, YOUR HONOR.  WITH

2       SOMETHING THAT WE'VE CREATED THAT IS IN THE

3       STATUTE.

4       THE COURT: AND LET ME TAKE A LOOK AT THIS.

5           IS THAT THE SUBJECT OF ONE OF YOUR TWO

6       MOTIONS THAT YOU FILED LAST NIGHT?

7       MR. AMBEAU: IT IS, YOUR HONOR.  FOR THE

8           COURT'S CONVENIENCE, I HAVE 1022.210 IF

9       YOU WOULD LIKE.

10      THE COURT: LET ME SEE.  WELL, MR. CROSSWELL,

11          WHAT'S THE GOVERNMENT'S POSITION ON

12      THAT?

13      MR. CROSSWELL: YOUR HONOR, IT GETS

14          CONFUSING.  AND IF SOMETHING WAS FILED

15      ON THIS, I MEAN, I -- I HAVEN'T FINISHED

16      TRIAL BRIEFING.  I THINK IT RELATES BACK TO

17      HIS TALKING ABOUT THE WILFULNESS.  AND SO

18      THAT WAS WHAT I WAS KIND OF PREPARED TO

19      ADDRESS.

20          SO, I GUESS MY FIRST POINT IS, AND I

21      KNOW THE COURT IS AWARE OF THIS, BUT WE FILED

22      AN INSTRUCTION THAT WE THOUGHT WAS VERY

23      CONSISTENT WITH THE LAW.  I THINK OVER EIGHT

24      -- A WEEK AGO.  AND -- AND THE DEFENDANT DID

25      RESPOND.  AND, SO, NOW I'M KIND OF COMING UP

1    WITH THIS ON THE FLY.  BUT I THOUGHT OUR

2    INSTRUCTION WAS VERY CONSISTENT LAW AND THEY

3    DUMPED -- THE OBJECTION CAME LAW NIGHT WITH

4    REGARD TO THE WILFULNESS, WHICH -- AND THE

5    QUESTION ABOUT THE EFFECT.  AND I WAS JUST

6    NOT PREPARED TO ADDRESS THAT.

7    THE COURT: OKAY.  WELL, LET'S DO THIS.

8    LET'S PUT THAT ASIDE FOR JUST A MINUTE.

9    BECAUSE I'VE GOT TO TAKE UP THIS STATUS

10    CONFERENCE IN ANOTHER MATTER.  BUT BEFORE

11    DOING SO, LET'S SEE IF WE CAN'T GET THROUGH

12    SOME OF THE OTHER JURY CHARGES AND THEN WE'LL

13    COME BACK TO THIS.

14    SO, I WILL NOTE THAT THE DEFENSE HAS

15    OBJECTIONS TO THE INFORMATION CONTAINED ON

16    PAGES 20 AND 21 AND 22 UP THROUGH LINE TEN;

17    IS THAT CORRECT, MR. AMBEAU?  THAT IS ALL OF

18    THE COUNT TWO INSTRUCTIONS?

19    MR. AMBEAU: THAT IS CORRECT, YOUR HONOR.

20    THE COURT: YES.  OKAY.

21    MR. AMBEAU: AND THE SECOND PART OF THAT IS

22    WHAT I FILED LAST NIGHT, WHICH IS THAT

23    IN STATING THAT THE CONDUCT HAS TO BE

24    WILLFUL, I BELIEVE THAT THERE NEEDS TO BE

25    SOMETHING IN THERE ABOUT MERELY NEGLIGENT

1        CONDUCT.  UNDER THIS PARTICULAR STATUTE, DOES

2        NOT EQUAL CRIMINAL LIABILITY.

3        THE COURT: RIGHT.

4        MR. AMBEAU: AND I BELIEVE THAT THAT'S

5            BRIEFED.  AND I WOULD STAND ON THAT

6        BRIEFING.

7        THE COURT: ALL RIGHT.  WELL, LET'S, AGAIN,

8            TAKE THAT UP IN JUST A FEW MINUTES.

9            NOW, LET'S TURN NOW TO PAGE 22, LINE 12,

10       WHICH PICKS UP ON COUNTS THREE AND FOUR.  AT

11       LEAST WITH RESPECT TO THE INFORMATION ON PAGE

12       22, AT LINE 12, ANY OBJECTION TO ANY OF THAT

13       PORTION OF THE INSTRUCTION, MR. AMBEAU?

14       MR. AMBEAU: NONE FROM THE DEFENSE, YOUR

15            HONOR.

16       THE COURT: BY THE UNITED STATES?

17       MR. CROSSWELL: NO, YOUR HONOR.

18       THE COURT: PAGE 23, ANY OBJECTION BY THE

19            DEFENDANT?

20       MR. AMBEAU: NONE FROM THE DEFENSE, YOUR

21            HONOR.

22       THE COURT: BY THE UNITED STATES?

23       MR. CROSSWELL: NO, YOUR HONOR.

24       THE COURT: ANY OBJECTION TO THE INFORMATION

25            ON PAGE 24 BY THE DEFENDANT?

1      MR. AMBEAU: LINE ONE, YOUR HONOR, WHERE IT

2          SAYS, "AN ENDEAVOR NEED NOT BE

3      SUCCESSFUL TO BE CORRUPT."  YOUR HONOR, I

4      BELIEVE THAT HAS BEEN COVERED IN MY ORIGINAL

5      RESPONSE TO THOSE JURY INSTRUCTIONS, IN WHICH

6      THERE IS SOME JURISPRUDENCE THAT SAYS -- IN

7      THE FIFTH CIRCUIT THAT SAYS THAT TO -- "TO

8      DEFINE ENDEAVOR IN THIS MANNER IS TO MAKE

9      WHAT IS OTHERWISE LEGAL CONDUCT ILLEGAL

10     WITHOUT, IN FACT, INCLUDING THAT IT MUST BE

11     PERFORMED IN A CORRUPT MANNER."  AND, SO, I

12     THINK THAT THAT'S NOT WHAT THIS SAYS.  THIS

13     SAYS THAT IT -- IT SAYS THAT IT NEED NOT BE

14     SUCCESSFUL IN ORDER TO BE CORRUPT.

15     THE COURT: CORRECT.

16     MR. AMBEAU: BUT IN ORDER FOR AN ENDEAVOR TO

17         QUALIFY UNDER THIS STATUTE AS THE

18     ENDEAVOR ITSELF MUST BE CORRECT.

19     THE COURT: SO, YOU'RE SUGGESTING -- YOU

20         DON'T DISPUTE THE ACCURACY OF THIS

21     INSTRUCTION?

22     MR. AMBEAU: I DO NOT, YOUR HONOR.

23     THE COURT: YOU'RE SIMPLY SUGGESTING THAT

24         THERE OUGHT TO BE AN ADDITIONAL

25     INSTRUCTION?

1        MR. AMBEAU: AND/OR MAYBE JUST REWRITTEN

2             SO THAT IT'S CLEAR THAT IT -- IT CAN'T

3        JUST BE ANY ENDEAVOR.

4        THE COURT: RIGHT.

5        MR. AMBEAU: IT HAS TO BE A CORRUPT ENDEAVOR.

6        THE COURT: AND DID YOU PROVIDE --

7        MR. AMBEAU: I DID WHEN I -- WHEN I --

8        THE COURT: -- IN THE ITEMS YOU PRODUCED ---

9        MR. AMBEAU:  -- IN MY OBJECTIONS TO THE

10            PROPOSED JURY INSTRUCTIONS.

11       THE COURT: OKAY.

12       MR. AMBEAU: THE FIRST SET.

13       THE COURT: OKAY.  ALL RIGHT.  LET ME

14            JUST ASK MR. CROSSWELL.  DOES THE UNITED

15       STATES HAVE ANY OBJECTION TO LINE OF PAGE 24?

16       MR. CROSSWELL: NO, YOUR HONOR.

17       THE COURT: ALL RIGHT.  HAVE YOU HAD AN

18            OPPORTUNITY TO CONSIDER THE DEFENDANT'S

19       REQUEST FOR AN INSTRUCTION ON CORRUPT

20       ENDEAVOR?

21       MR. CROSSWELL: YOUR HONOR, SO IS HE --

22            I THINK HE'S WANTING -- MAY I JUST HAVE

23       THE EXACT WORDS OF WHAT THE DEFENSE COUNSEL

24       IS ASKING FOR?

25       MR. AMBEAU: I THINK IT WOULD BE SUFFICIENT,

1          YOUR HONOR, TO SAY, "A CORRUPT ENDEAVOR

2      NEED NOT BE SUCCESSFUL TO BE CORRUPT."

3      THE COURT: "A CORRUPT ENDEAVOR" ---

4      MR. AMBEAU: "NEED NOT BE SUCCESSFULLY

5          COMPLETED."

6      THE COURT: SUCCESSFULLY -- YES.  I THINK ---

7      MR. AMBEAU: YES.

8      THE COURT: ALL RIGHT.  WELL, WE'LL JUST

9          CONSIDER THAT AND WE'LL TAKE THAT UP AS

10     WELL.

11          ANYTHING ELSE ON PAGE 24?

12     MR. AMBEAU: NOTHING, YOUR HONOR, FROM THE

13          DEFENSE, YOUR HONOR.

14     MR. CROSSWELL: NO, YOUR HONOR.

15     THE COURT: ANYTHING ON PAGE 25,  MR.

16          AMBEAU?

17     MR. AMBEAU: NOTHING FROM THE DEFENSE,

18          YOUR HONOR.

19     THE COURT: MR. CROSSWELL?

20     MR. CROSSWELL: NO, YOUR HONOR.

21     THE COURT: ANYTHING ON PAGE 26, MR. AMBEAU?

22     MR. AMBEAU: NOTHING FROM THE DEFENSE,

23          YOUR HONOR.

24     THE COURT: MR. CROSSWELL?

25     MR. CROSSWELL: NO, YOUR HONOR.

1        THE COURT: ANYTHING ON PAGE 27?

2        MR. AMBEAU: NOTHING FROM THE DEFENSE,

3            YOUR HONOR.

4        THE COURT: MR. CROSSWELL?

5        MR. CROSSWELL: NO, YOUR HONOR.

6        THE COURT: NOW, LET'S TALK FOR A MOMENT

7            ABOUT THE VERDICT FORM.  HAVE YOU ALL

8        BEEN FURNISHED WITH A COPY?  I BELIEVE YOU

9        HAVE.

10           NOW, GENTLEMEN, BEFORE WE CONCLUDE OUR

11       DISCUSSION ABOUT THE VERDICT FORM, I MEAN,

12       THE INSTRUCTIONS, I DON'T TYPICALLY -- I DO

13       NOT TYPICALLY INCLUDE THE JURY CHARGES -- I

14       DON'T GIVE IT TO THE JURY, IN MOST CASES.

15       DOES THE DEFENSE HAVE A POSITION ON THAT?

16       MR. AMBEAU: I'D RATHER THE JURY NOT HAVE THE

17           JURY CHARGES.

18       THE COURT: THE UNITED STATES -- DO YOU HAVE A

19           POSITION ON THAT?

20       MR. CROSSWELL: YOUR HONOR, THAT'S FINE WITH

21           US.

22       THE COURT: YES.  BUT WHAT I WILL TYPICALLY

23           DO IF THEY HAVE QUESTIONS, AND ACTUALLY

24       NOT JUST ONE, BUT TWO OR THREE QUESTIONS

25       ABOUT THE INSTRUCTIONS, I'LL THEN GO ON AND

1    SEND THEM IN.

2        SO, THAT PORTION OF PAGE 27 THAT

3    INDICATES THAT -- OKAY.  SO, THAT'S FINE.

4        OKAY.  NOW, HAVE WE TAKE A LOOK AT THE

5    VERDICT FORM?

6    MR. AMBEAU: YES, YOUR HONOR.

7    THE COURT: ANY OBJECTIONS TO THE VERDICT

8        FORM, MR. AMBEAU?

9    MR. AMBEAU: NOT FROM THE DEFENSE, YOUR

10        HONOR.

11    THE COURT: ANY BY THE GOVERNMENT?

12    MR. CROSSWELL: NO, YOUR HONOR.

13    THE COURT: OKAY.  VERY WELL.  I WILL NOW

14        EXCUSE MYSELF AND TAKE UP THE OTHER

15    MATTER.  AND HOPEFULLY THAT WILL ONLY BE

16    ABOUT FIVE TO TEN MINUTES.  WE'LL RESUME

17    SHORTLY.  I WILL INFORM YOU WHEN I RETURN IF

18    I WILL GO ON AND MAKE THOSE SUGGESTED CHANGES

19    SO THAT BY THE TIME YOU ALL DELIVER YOUR

20    SUMMATION, YOU WILL KNOW EXACTLY WHAT THE

21    JURY CHARGES WILL BE.  OKAY?

22    MR. CROSSWELL: YOUR HONOR, CAN I JUST

23        ADDRESS ONE THING?

24    THE COURT: YES.

25    MR. CROSSWELL: I THINK ON THIS, JUST THE

1    INSTRUCTION WITH REGARD TO ADMISSIONS.

2    WE -- WE DID WANT THAT INSTRUCTION AND ---

3    THE COURT: THE STIPULATIONS.  I DON'T THINK

4    WE HAVE A STIPULATION.  DO WE HAVE A

5    STIPULATION IN THERE -- INSTRUCTION?

6    LAW CLERK: NO, JUDGE.

7    THE COURT: YES.  SO, LET'S GO ON AND

8    INCLUDE THE FIFTH CIRCUIT'S PATTERN

9    STIPULATION INSTRUCTION.  IS THAT WHAT YOU

10    WERE REFERRING TO?

11    MR. CROSSWELL: NO, YOUR HONOR.  IT WAS

12    INSTRUCTION 1.26, CONFESSIONS.

13    THE COURT: OKAY.  YES.  THAT'S UNDER

14    CONFESSIONS?

15    MR. CROSSWELL: RIGHT, YOUR HONOR.

16    THE COURT: I DON'T THINK HE'S CONFESSED.

17    WHAT DID HE CONFESS TO?

18    MR. CROSSWELL: WELL, YOUR HONOR, WE DON'T

19    THINK -- CONFESSION PROBABLY MIGHT NOT

20    BE THE RIGHT WORD.  BUT WE DO THINK IT WAS AN

21    ADMISSION IN THE 2013 WRITTEN ACCEPTANCE

22    STATEMENT THAT HE HAD SIGNED WITH MS.

23    ARMWOOD, STATING THAT HE DIDN'T HAVE A BANK

24    SECRECY ACT POLICY IN PLACE.

25    AND THEN ALSO IN 2010, AND SAYING THAT

1    HE WOULD PROVIDE ONE WITHIN THREE WEEKS.

2    MR. AMBEAU: YOUR HONOR, IF HE HAS AN

3         ADMISSION IN 2013, THAT HE DOESN'T HAVE

4    A BANK SECRECY ACT, ANTI-MONEY LAUNDERING

5    PROGRAM IN PLACE, THEN IT IS OBVIOUSLY

6    COUNTER TO THE EVIDENCED OFFERED THAT THE

7    JURY HAS RECEIVED.  I DON'T THINK HE HAS

8    THAT IN THERE.

9         I THINK HE ADMITS HE DOESN'T HAVE A

10   WRITTEN CHECK CASHING POLICY, ONLY.

11   THE COURT: WELL, THAT'S -- BUT HE'S

12        ALREADY -- BUT HE HAS MADE THAT

13   ADMISSION.

14   MR. AMBEAU: I THINK THAT WAS CLEAR.

15   THE COURT: YES.

16   MR. AMBEAU: IN THAT HE'S ADMITTED CLEARLY

17        THAT HE DIDN'T HAVE A WRITTEN CHECK

18   CASHING POLICY.

19   THE COURT: SO, WHY SHOULDN'T WE INCLUDE THIS,

20        MR. AMBEAU?

21   MR. AMBEAU: THE INSTRUCTION ON ADMISSION

22        AND ---

23   THE COURT: ANY STATEMENT CLAIMED TO HAVE BEEN

24        MADE BY THE DEFENDANT OUTSIDE OF COURT

25   AND AFTER -- WAS KNOWINGLY AND VOLUNTARILY

1    MADE, YOU SHOULD CONSIDER THE EVIDENCE

2    CONCERNING SUCH A STATEMENT WITH CAUTION AND

3    GREAT CARE. YOU SHOULD GIVE IT SUCH WEIGHT AS

4    ---   SO I, ---

5    MR. AMBEAU: AND MY RESPONSE, YOUR HONOR,

6        IF I MAY.  AND MY RESPONSE TO THE -- MY

7    RESPONSE AND OBJECTION TO THE GOVERNMENT'S

8    REQUESTED JURY INSTRUCTION ON THAT MATTER, I

9    JUST ASK TO EXCISE THE WORD "CONFESSION."

10    THE COURT: OH, YES.

11    MR. AMBEAU: BECAUSE I DON'T WANT TO MISLEAD

12        ---

13    THE COURT: IN FACT, THERE WILL BE NO --

14        CONFESSION IS THE DESCRIPTION OF -- I

15    DON'T THINK THAT THE GOVERNMENT IS ASKING

16    THAT THE DESCRIPTION BE INCLUDED, SIMPLY THAT

17    THE INSTRUCTION ITSELF.

18        AND, IN FACT, I WILL TELL YOU, AND IT'S

19    ONE OF THE THINGS THAT -- ONE OF THE REASONS

20    THAT I DON'T TYPICALLY GIVE THE JURY

21    INSTRUCTIONS, BECAUSE THEY'RE SORT OF

22    HIGHLIGHTED FOR OUR CONVENIENCE, BUT I DON'T

23    WANT TO CALL -- I DON'T WANT TO SUGGEST BY

24    HAVING THEM HIGHLIGHTED THAT ONE IS MORE

25    IMPORTANT THAN THE OTHER.

1      SO, I WILL GO ON AND GIVE THAT

2      INSTRUCTION, BUT I CERTAINLY WON'T

3      CHARACTERIZE IT AS CONFESSION. THIS IS AN

4      INSTRUCTION ON A CONFESSION.  BECAUSE,

5      FRANKLY, I'M NOT SURE THAT WOULD BE

6      APPLICABLE.

7          AGAIN, I DON'T THINK THE GOVERNMENT IS

8      SUGGESTING THAT THAT'S APPLICABLE.  IS THAT

9      RIGHT, MR. CROSSWELL?

10     MR. CROSSWELL:  THAT'S FAIR, YOUR HONOR.

11     THE COURT: ALL RIGHT.  SO, IN ADDITION

12         TO THESE WE'LL ADD 1.26 AND MAX WILL

13     ALSO ADD THE STIPULATION INSTRUCTION.  OKAY?

14         ALL RIGHT.  COURT IS IN RECESS FOR ---

15     MR. CROSSWELL: YOUR HONOR, JUST ONE MORE.

16         I'M SORRY.

17     THE COURT: YES.

18     MR. CROSSWELL: AND -- WELL, -- ONLY MY SECOND

19         CRIMINAL TRIAL, SO, I GUESS YOU GOT

20     CONFUSED.  I THOUGHT WE WENT THROUGH AND THEN

21     WE ASKED FOR THINGS THAT, SO ---

22     THE COURT: THAT'S OKAY.

23     MR. CROSSWELL: BUT WE ALSO THOUGHT THAT

24         SIMILAR ACTS WAS APPROPRIATE IN THE

25     CASE.

1      THE COURT: WELL, WHAT IS THE SIMILAR ACT?

2      MR. CROSSWELL: IT'S INSTRUCTION 130,

3          YOUR HONOR.

4      THE COURT: THE PROBLEM IS THAT SIMILAR ACTS

5          IS USUALLY UNDER -- WHEN 404B EVIDENCE

6      IS INTRODUCED.  AND I DON'T WANT TO CONFUSE

7      THE JURY ON THAT.  I MEAN, THAT'S USUALLY --

8      THAT'S THE 404B.  LET ME TAKE A LOOK AT IT.

9      WHAT NUMBER IS IT?

10     MR. CROSSWELL: IT'S 1.30.

11     MR. AMBEAU: AND, TO BE CLEAR, I WASN'T GOING

12         TO DO IT IN THIS PROCEEDING, BUT IN THE

13     NEXT, YOUR HONOR, WHEN WE COME BACK.  THE

14     DEFENSE WAS GOING TO MAKE A MOTION IN LIMINE

15     TO -- I THINK THAT THE GOVERNMENT HAS

16     REFERRED TO THESE FALSE STATEMENTS IN THIS

17     OFI INVESTIGATION.  AND I BELIEVE THAT WE

18     SPOKE ABOUT THAT AT THE BENCH.  AND YOUR

19     HONOR AGREED THAT THAT WAS MORE THAN LIKELY

20     INADMISSIBLE, BASED ON THE FACT THAT IT WAS

21     -- THAT WAS OTHER ACTS' EVIDENCE, AND WE DID

22     THAT AT THE BENCH.  AND I WOULD -- I WOULD

23     ASK THE COURT TO --TO RULE THAT THE

24     GOVERNMENT CAN'T TALK ABOUT STATEMENTS MADE

25     TO THE OFI INVESTIGATOR BECAUSE THAT'S

1    COMPLETELY UNCHARGED CONDUCT AND/OR OTHER

2    ACTS' CONDUCT FOR WHICH THEY DON'T HAVE THE

3    ---

4    THE COURT: NOW, WHEN ---

5    MR. STEVENS: BUT, NOW, I'M CONFUSED.

6        BECAUSE THAT WAS ADMISSIBLE.  AND YOU --

7    YOU ALLOWED US TO ELICIT THAT TESTIMONY.

8    THE COURT: I DID.

9    MR. STEVENS: AND IT'S -- IT'S IN THE CASE

10        NOW.

11    THE COURT: YES.  OKAY.  LET ME GO ON AND

12        DEAL WITH THIS OTHER MATTER FIRST.

13    WELL, LET'S PROCEED.  I'M TOLD THAT ONE OF

14    THE LAWYERS IS NOT PRESENT.

15        ALL RIGHT.  SO, WITH RESPECT TO THE

16    SIMILAR ACTS EVIDENCE.  WHAT ARE THE SIMILAR

17    ACTS THAT MR. ---

18    MR. CROSSWELL: YOUR HONOR, WE'LL WITHDRAW

19        IT.  IT'S FINE.

20    THE COURT: OKAY.  VERY WELL.  ALL RIGHT.

21        OKAY.  SO, LET ME DO THIS.  LET ME GO ON

22    AND DEAL WITH THIS OTHER MATTER.  AND WE WILL

23    RETURN IN JUST A MOMENT.

24        COURT IS IN RECESS.

25    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

1          COURT IS IN RECESS.)(COURT IS RESUMED.)

2      THE COURT: OKAY.  VERY GOOD.  NOW, I BELIEVE

3          YOU ALSO HAD -- LET'S GO BACK TO PAGE

4      20, SPECIFICALLY COUNT TWO.  NOW, MR. AMBEAU,

5      YOU'VE REQUESTED THAT THE JURY BE INSTRUCTED

6      THAT THIS MUST BE A, QUOTE, "EFFECTIVE ANTI-

7      MONEY LAUNDERING PROGRAM IN PLACE," CORRECT?

8      MR. AMBEAU: THAT'S CORRECT, YOUR HONOR.

9      THE COURT: AND DOES THE GOVERNMENT HAVE ANY

10          OBJECTION TO THAT?  AND LET ME TELL YOU

11      SPECIFICALLY.  MY INCLINATION IS TO GO ON AND

12      INSERT THE WORD "EFFECTIVE" ON LINE 15 ON

13      PAGE 22.  AND THE REASON FOR THAT, GENTLEMEN,

14      IS THAT THE UNITED STATES HAS CHARGED IN THE

15      INDICTMENT THAT FAILURE TO CREATE AND

16      MAINTAIN AN EFFECTIVE -- THE STATUTE DOESN'T

17      USE THE WORD "EFFECTIVE," BUT THE INDICTMENT

18      DOES.    AND, SO, CONSISTENT WITH THE

19      INDICTMENT.

20          NOW, THE CFR THAT IS -- THAT IMPLEMENTS

21      SECTION 5322 DOES, IN FACT, USE THE WORD

22      "EFFECTIVE."

23          SO, IS THERE ANY OBJECTION BY THE UNITED

24      STATES -- FIRST OF ALL, IS THERE AN OBJECTION

25          ---

1       MR. AMBEAU: I THINK THAT IT'S A SOLUTION,

2           YOUR HONOR.  I BELIEVE THAT THE STATUTE

3       DOESN'T EITHER REQUIRE THAT IT BE IN WRITING.

4       IN FACT, THE ONLY PLACE ---

5       THE COURT: WE'RE NOT TALKING ABOUT WRITING.

6           THAT'S ANOTHER ISSUE; WE'LL ADDRESS

7       THAT IN A MINUTE.  I'M SIMPLY DISCUSSING THE

8       WORD "EFFECTIVE" NOW.  IF YOU'RE TELLING ME

9       YOU DON'T WANT THE WORD "EFFECTIVE" ANYWHERE

10      IN THE JURY CHARGES, THAT'S FINE, TOO.

11      MR. AMBEAU: I DO WANT THE WORD "EFFECTIVE"

12          BEFORE "DEVELOP AN EFFECTIVE ANTI-MONEY

13      LAUNDERING."

14      THE COURT: ALL RIGHT.  ANY OBJECTION BY THE

15          UNITED STATES?

16      MR. CROSSWELL: YOUR HONOR, I MEAN, I THINK IN

17          -- VALID IN THE STATUTE AND THE

18      REGULATION IN THE STATUE SHOULD WIN. BUT I,

19      YOU KNOW, I SEE YOUR POINT ABOUT THE ---

20      THE COURT: THE INDICTMENT, HOWEVER, HAS

21          CHARGED AS A QUOTE "EFFECTIVE."  SO.

22      ALL RIGHT.

23          VERY WELL.  SO, WE'LL GO ON AND INSERT

24      THE WORD "EFFECTIVE" ON LINE 15, PAGE 22.

25          NOW, LET'S NOW TURN TO YOUR OBJECTION,

1    MR. AMBEAU.  AND, AGAIN, YOU CAN BE SEATED

2    FOR THIS PORTION OF THE PROCEEDING WHERE YOU

3    TAKE ISSUE WITH THE SENSE OF THE BALANCE OF

4    THE CHARGE ON COUNT TWO.  SPECIFICALLY, AND I

5    DON'T WANT TO MISCHARACTERIZE YOUR ARGUMENT,

6    SIR.  YOU ESSENTIALLY ARGUE THAT ALL OF THE

7    FACTORS THAT ARE DESCRIBED IN THE CFR OUGHT

8    TO BE INCLUDED.  IS THAT WHAT YOU'RE ARGUING,

9    SIR?

10    MR. AMBEAU: WHAT I'M ARGUING, YOUR HONOR,

11    IS THAT 31 US CODE SECTION 5322 DOES NOT

12    ADDRESS THAT AN ANTI-MONEY LAUNDERING PROGRAM

13    HAS TO BE IN WRITING, IN ANY PLACE.  AND ---

14    THE COURT: DOES THE GOVERNMENT AGREE WITH

15    THAT?

16    MR. CROSSWELL: YOUR HONOR, WE THINK THE

17    INSTRUCTION IS ACCURATE.  WE THINK THE

18    INSTRUCTION THAT WE SENT IS ACCURATE, AND WE

19    STAND BY THAT.

20    MR. AMBEAU: THE GOVERNMENT JUST MADE AN

21    ARGUMENT MOMENTS AGO AND SAID THAT THE

22    STATUTE SHOULD TRUMP THE CODE OF FEDERAL

23    REGULATIONS, I BELIEVE, OR WORDS FROM THE

24    GOVERNMENT.

25    THE COURT: IT'S IN THE -- WHAT IS IT, MAX?

1          IS IT IN THE CFR?

2      MR. AMBEAU: IT IS, YOUR HONOR.  AND IT'S

3          IN PART C OF 31 CFR 1022.210.  OR A --

4      IN PART "A" IT SAYS, "THE MONEY LAUNDERING

5      PROGRAM SHOULD BE EFFECTIVE."  PART "B" IT

6      SAYS, "IT SHOULD BE COMMENSURATE WITH THE

7      RISKS."  AND PART IN "C" IT SAYS, "IT SHOULD

8      BE IN WRITING."  THAT'S ALL ONLY IN THE

9      REGULATION, YOUR HONOR.  IT'S NOT IN THE

10     UNITED STATES CODE SECTION.

11     THE COURT: CORRECT.

12     MR. CROSSWELL: YOUR HONOR, I THINK MY

13         STATEMENT WAS THAT THERE'S A DISPUTE

14     BETWEEN THE REGULATION AND THE STATUTE.  BUT

15     THAT CERTAINLY DOESN'T MEAN THAT THE

16     REGULATION ISN'T RELEVANT.  AND, AGAIN, I

17     MEAN, THIS IS SOMETHING, YOU KNOW, WE GAVE TO

18     THE COURT EIGHT DAYS AGO.  AND IT'S BEING

19     BROUGHT UP ---

20     THE COURT: WELL, I'M PREPARED TO RULE.  I

21         MEAN, I'M SATISFIED WITH THE PROPOSED

22     JURY INSTRUCTION AS IT STANDS.  I MEAN, THE

23     FACT IS, MR. AMBEAU, THAT THERE ARE A NUMBER

24     OF SUBSECTIONS TO 31 CFR 1022.210.  THE

25     UNITED STATES HAS THE RIGHT TO DESCRIBE IN

1       THE INDICTMENT THE VIOLATIONS OF THAT STATUTE

2       -- THAT REGULATION THAT IT BELIEVES TO HAVE

3       BEEN VIOLATED.  I DON'T THINK IT WILL -- IT

4       ADDS NOTHING TO INCLUDE ALL OF THE

5       REQUIREMENTS OF THE CFR WHEN THE GOVERNMENT

6       IS ONLY ALLEGED THAT THE DEFENDANT'S CONDUCT

7       VIOLATED THE STATUTE BY NOT DOING FIVE OF THE

8       THINGS REQUIRED BY THE CFR.

9       IN OTHER WORDS, THE CFR HAS A LIST OF, I

10      DON'T KNOW, TEN, 12 THINGS THAT ---

11      MR. AMBEAU: ACTUALLY, YOUR HONOR, IF I MAY.

12      IN THAT SECTION OF THE CFR 1022.210,

13      THAT COVERS THE MONEY LAUNDERING, THERE ARE

14      SIMPLY THREE PARAGRAPHS WITH ONE SENTENCE

15      EACH.  AND THEN FOUR SUBPARAGRAPHS WHERE IT

16      SAYS, "SHOULD BE IN WRITING."  IT SAYS, "IT

17      SHOULD HAVE A MINIMUM CONTAINED."

18      AND I THINK THE DEFENDANT, YOUR HONOR,

19      IF THE GOVERNMENT IS CHARGING UNDER THIS

20      PARTICULAR REGULATION, THE DEFENDANT HAS THE

21      RIGHT TO HAVE THAT REGULATION READ IN FULL

22      BECAUSE, COMMENSURATE WITH THE RISK, AND

23      EFFECTIVE ARE BOTH LIMITING CONDITIONS AS TO

24      THEIR REGULATION.  AND THE DEFENDANT HAS A

25      RIGHT TO THOSE LIMITING CONDITIONS.

1        THE COURT: WELL, LET'S TALK ABOUT THAT.

2            I THINK THE LIMITING CONDITION -- TERM

3        IS THE COMMENSURATE; THAT IS, IS SECTION B.

4        MR. AMBEAU: YES, YOUR HONOR.

5        THE COURT: I MEAN, I AGREE WITH YOU ON

6            THAT.  I DON'T KNOW -- SO, I'VE GIVEN

7        YOU WHAT YOU WANT ESSENTIALLY WITH RESPECT TO

8        "A" AND THAT WE'RE INSERTING THE WORD

9        "EFFECTIVE" IN.

10           THE GOVERNMENT IS GETTING WHAT IT WANTS

11       WITH RESPECT TO SECTION "C," BY ENSURING THAT

12       THE JURY KNOWS THAT THE PLAN MUST BE IN

13       WRITING.

14           I'M NOT QUITE SURE WHAT "D" ADDS.  I

15       MEAN, THAT'S A WHOLE LOT OF THINGS THERE THAT

16       FRANKLY, I'M NOT SURE WEIGH IN FAVOR OF -- IN

17       THE DEFENDANT'S FAVOR BASED UPON THE EVIDENCE

18       THAT I'VE HEARD.  BUT.

19       MR. AMBEAU: HE HAS THE FOUR PILLARS, YOUR

20           HONOR.  THE FOUR THINGS THAT ARE LISTED

21       THERE.

22       THE COURT: IS THERE AN OBJECTION TO THAT

23           BY THE GOVERNMENT, JUST INCLUDING THE

24       ENTIRE CFR?

25       MR. CROSSWELL: YOUR HONOR, YES.  I THINK

1           I JUST GETS CONFUSING.  I MEAN, WE

2       ACTUALLY, SIGNIFICANTLY PARED IT DOWN.  WE

3       THOUGHT THAT THE -- I MEAN, IT COULD ARGUABLY

4       BE MADE EVEN MORE DIFFICULT FOR THE

5       DEFENDANT.  AND WE PARED IT DOWN TO JUST, YOU

6       KNOW, THIS SECTION.  AND IT'S JUST -- I MEAN,

7       WE THINK IT'S AN ACCURATE REFLECTION OF THE

8       LAW.

9           SO, WE -- WE BELIEVE THAT WE -- YOU

10      KNOW, WE WERE OKAY WITH THE CHANGE OF ADDING

11      THE ---

12      THE COURT: ALL RIGHT.  SO, I'LL TELL YOU.

13          WELL, LET ME ASK YOU THIS MORE

14      SPECIFICALLY.  DOES THE DEFENDANT -- THE

15      DEFENDANT HAS REQUESTED THAT SECTION "B" OF

16      THE SECTION BE INCLUDED.  DOES THE GOVERNMENT

17      HAVE AN OBJECTION TO THAT, THE INCLUSION AT

18      LEAST AS TO SUBSECTION "B"?

19      MR. CROSSWELL: YOUR HONOR, HOW ARE WE

20          READING THE INSTRUCTION, I GUESS IS THE

21          QUESTION?

22      THE COURT: SO, LET'S SEE NOW.

23      MR. AMBEAU: YOUR HONOR, COULD THE DEFENSE

24          SUGGEST THAT, PERHAPS, THAT JUST BE

25      NUMBER ONE, THAT THE PROGRAM SHOULD BE

1        COMMENSURATE WITH THE RISKS BY THE LOCATION
2        SIZE?
3        THE COURT: THAT'S NOT NUMBER ONE UNDER THE
4            CFR.
5        MR. AMBEAU: NEITHER IS THE WRITING
6            REQUIREMENT, YOUR HONOR, SINCE THAT'S
7        "C."  MAYBE THE WRITING REQUIREMENT NEEDS TO
8        BE TAKEN OUT OF THIS.
9        THE COURT: OKAY.  JUST A MINUTE.
10           ALL RIGHT.  THIS IS WHAT I INTEND TO DO.
11       SO, ON PAGE 20, LINE 20, WE'LL SAY THAT:
12           FIRST. "THAT THE DEFENDANT OPERATED A
13       FINANCIAL INSTITUTION LOCATED IN THE UNITED
14       STATES."
15           AND, SECOND.  "THAT THE DEFENDANT
16       WILLFULLY FAILED TO DEVELOP AN EFFECTIVE
17       ANTI-MONEY LAUNDERING PROGRAM COMMENSURATE
18       WITH THE RISKS POSED BY THE LOCATION AND SIZE
19       OF AND THE NATURE AND VOLUME OF THE FINANCIAL
20       SERVICES PROVIDED BY THE MONEY SERVICE
21       BUSINESS, AS REQUIRED BY FEDERAL LAW."
22           ANY OBJECTION?
23       MR. STEVENS: YOU'RE READING THE REGULATION,
24           I THINK?
25       THE COURT: YES.  THAT'S DIRECTLY FROM THE

1           REGULATION.

2       MR. STEVENS: NO OBJECTION, JUDGE.

3       THE COURT: ALL RIGHT.  YOU GOT THAT, MAX?

4       LAW CLERK: YES, JUDGE.

5       THE COURT: ALL RIGHT.  OKAY.  ANYTHING

6           ELSE THAT WE HAVEN'T COVERED?

7       MR. STEVENS: AM I CORRECT IN ASSUMING,

8           THOUGH, THAT LINE 16 THEN, AND DOWN,

9       THERE IS NO CHANGE TO THE ---

10      THE COURT: THERE WILL BE NO CHANGE.  CORRECT.

11          IT WILL STILL SAY, "MUST BE IN WRITING,"

12      ET CETERA, ET CETERA.

13      MR. STEVENS: THANK YOU, JUDGE.

14      MR. AMBEAU: WELL, YOUR HONOR, AND NOT TO

15          BELABOR THE POINT, BUT THE "MUST BE IN

16      WRITING," AGAIN, IS NOT ONE OF THOSE FOUR

17      THINGS UNDER "D."  AND, SO, CAN THE "MUST BE

18      IN WRITING" BE, PERHAPS A THIRD REQUIREMENT

19      TO BE PROVED BEYOND A REASONABLE DOUBT?

20          AGAIN, IT'S BEEN ADDED AS ONE OF THOSE

21      FOUR THINGS UNDER "D."  "AT A MINIMUM, THE

22      PROGRAM SHALL."  BUT THAT IS NOT -- "WRITING"

23      IS NOT INCLUDED IN WHAT "AT A MINIMUM THE

24      PROGRAM SHALL CONTAIN."  THE WRITING IS "C"

25      ABOVE THAT "D," YOUR HONOR.

1          AND, SO, I THINK, AGAIN, IT'S JUST

2     MISLEADING AS TO THE NATURE OF THE WRITING

3     AND THE NATURE OF THE STATUTE, YOUR HONOR, TO

4     HAVE THE WRITING BE ONE OF THOSE AT A

5     MINIMUM.

6     THE COURT: WELL, ---

7     MR. AMBEAU: ONE OF THOSE THINGS THAT ARE --

8          THAT ARE REQUIRED AT A MINIMUM, YOUR

9     HONOR.

10     THE COURT: SO, IN OTHER WORDS, "C" -- THE

11          "IN WRITING" REQUIREMENT IS NOT IN "D,"

12     IT'S IN "C"?

13     MR. AMBEAU: THAT'S CORRECT, YOUR HONOR.

14     THE COURT: YOU'RE ASKING THAT WRITING

15          STAND ALONE?  IN OTHER WORDS, THAT --

16     MR. AMBEAU: THE THIRD, THE --

17     THE COURT:  -- THE FIRST AND THEN SECOND?

18     MR. AMBEAU:  -- THAT THE ---

19     THE COURT: THAT THIRD, THAT IT BE IN WRITING?

20     MR. AMBEAU: AND THAT THEY MUST PROVE THAT IT

21          WAS NOT IN WRITING.

22     THE COURT: ANY OBJECTION TO THAT?

23     MR. STEVENS: IF WE'RE TALKING ABOUT --

24          IF WE'RE TALKING ABOUT ON LINE 20, I

25     GUESS MAKING A, YOU KNOW, A NEW -- IF WE'RE

1    CARVING LINE ONE -- IF WE'RE CARVING LINE 19

2    FROM PAGE 20 OUT AND SAYING, "THIRD, THAT THE

3    PROGRAM MUST BE IN WRITING," I MEAN, THAT'S

4    JUST A MATTER OF FORM, I SUPPOSE.  AND I

5    DON'T HAVE ANY OBJECTION TO THAT.

6         WHAT I THOUGHT I HEARD MR. AMBEAU SAY

7    WAS THAT THAT LANGUAGE WOULD ALSO HAVE TO SAY

8    THAT WE MUST PROVE THAT.

9    THE COURT: NO.  IT WOULD SIMPLY SAY, FIRST,

10        THAT THE DEFENDANT OPERATED A FINANCIAL

11   INSTITUTION LOCATED.  AND THEN, SECOND, THAT

12   THE DEFENDANT WILLFULLY, ET CETERA, ET

13   CETERA, FAILED TO DEVELOP.  THIRD, MUST BE IN

14   WRITING.  AND THEN, FOURTH, MUST INCLUDE

15   POLICIES AND PROCEDURES, ET CETERA, ET

16   CETERA.  THAT IT'S ALREADY COVERED IN TWO,

17   THREE, FOUR AND FIVE.

18   MR. STEVENS: YES. I THINK THAT SOUNDS FINE,

19        JUDGE.

20   THE COURT: OKAY.  ALL RIGHT.

21        GOT IT, MAX?

22   LAW CLERK: I THINK I GOT IT, MAYBE.

23   THE COURT: YOU GOT IT?

24   LAW CLERK: SO, WHAT'S NOW ---

25   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

1    AN OFF-THE-RECORD DISCUSSION WAS HELD.)

2    (DISCUSSION WAS CONCLUDED.)

3    THE COURT: ALL RIGHT.  SO, AGAIN, IT WILL

4    READ SOMETHING TO THIS EFFECT:

5    "FIRST.  THAT THE DEFENDANT OPERATED A

6    FINANCIAL INSTITUTION LOCATED IN THE UNITED

7    STATES.

8    AND, SECOND.  THAT THE DEFENDANT

9    WILLFULLY FAILED TO DEVELOP AN EFFECTIVE

10    ANTI-MONEY LAUNDERING PROGRAM COMMENSURATE

11    WITH THE RISKS POSED BY THE LOCATION AND SIZE

12    OF AND THE NATURE AND VOLUME OF THE FINANCIAL

13    SERVICES PROVIDED BY THE MONEY SERVICES

14    BUSINESS, AS REQUIRED BY FEDERAL LAW.

15    THIRD.  THAT SAID MONEY LAUNDERING

16    PROGRAM OR POLICY WAS NOT IN WRITING.

17    FOURTH.  SAID MONEY LAUNDERING PROGRAM

18    FAILED TO INCLUDE POLICIES, PROCEDURES AND

19    INTERNAL CONTROLS FOR ET CETERA, ET CETERA."

20    MR. AMBEAU: YES, YOUR HONOR.  I THINK THAT

21    IS EXACTLY RIGHT.

22    THE COURT: OKAY.  MR. STEVENS, MR. CROSSWELL,

23    IS THAT CLEAR?  ABOUT AS CLEAR AS MUD, I

24    GUESS, RIGHT?

25    MR. CROSSWELL: YES, SIR, YOUR HONOR.

1      THANKS.

2      THE COURT: ALL RIGHT.  ANYTHING ELSE?

3          ANY OTHER OBJECTIONS TO ANY OF THE OTHER

4      INSTRUCTIONS?

5      MR. AMBEAU: NOTHING FROM THE DEFENSE, YOUR

6          HONOR.

7      THE COURT: ANYTHING BY THE UNITED STATES?

8      MR. CROSSWELL: NO, YOUR HONOR.

9      THE COURT: OKAY.  OH, AND DID WE TALK ABOUT

10         THE ISSUE OF INTENT?  DID WE ADDRESS

11     THAT, MAX?

12     THE LAW CLERK: MAX: NO, JUDGE.

13     THE COURT: AS TO WILLFULNESS.  OKAY.

14         SO, LET'S SEE WHAT IT HAS.

15         NOW, MR. AMBEAU, DID YOU HAVE AN

16     OBJECTION TO THAT?

17     MR. AMBEAU: THE OBJECTION, AND I UNDERSTAND

18         THAT THE WILLFULLY TO ACT IS THE FIFTH

19     CIRCUIT PATTERN INSTRUCTION, YOUR HONOR.

20     THE COURT: CORRECT.

21     MR. AMBEAU: MY DIFFICULTY IS THAT, AGAIN,

22         IN THESE PARTICULAR KINDS OF CRIMES, TAX

23     CRIMES, WHERE IT'S -- WHERE THE WILLFULNESS

24     IS REQUIRED BECAUSE KNOWLEDGE IS REQUIRED,

25     THAT AT THE SAME TIME, THAT THE LAW HAS BEEN

1       HELD REPEATEDLY NOT TO CREATE AN ENVIRONMENT

2       WHERE NEGLIGENCE, MERE NEGLIGENCE, WOULD

3       EQUAL CRIMINAL LIABILITY.  AND WHERE YOU

4       WOULD MAKE OTHERWISE WHAT IS OTHERWISE LEGAL

5       ACTIVITY CRIMINAL BECAUSE THE PERSON IS

6       MERELY NEGLIGENT IN EXERCISE.

7            AND, SO, I THINK THAT'S -- I THINK THE

8       -- ALL THE JURISPRUDENCE IS PRETTY CLEAR ON

9       THAT.  AND, SO, THIS WILLFUL SECTION, I WAS

10      JUST ASKING, YOUR HONOR, THAT WE PUT

11      SOMETHING IN THERE THAT WILLFUL DOESN'T --

12      BECAUSE SOMETHING IS WILLFUL, ALSO MEANS THAT

13      IT CAN'T BE NEGLIGENT AND APPEAR CRIMINAL.

14      THE COURT: WELL, THE WAY IT'S GOING TO

15           READ IS THAT, "IN ORDER FOR YOU TO FIND

16      THE DEFENDANT WILLFULLY FAILED TO DEVELOP THE

17      ABOVE LINED -- OUTLINED ANTI-MONEY LAUNDERING

18      PROGRAM, THE GOVERNMENT MUST PROVE THAT HE

19      ACTED WITH KNOWLEDGE THAT HIS CONDUCT WAS

20      UNLAWFUL."

21      MR. AMBEAU: AND -- AND THE ---

22      THE COURT: THAT'S NOT SAYING BY ACCIDENT.

23           THE SPECIFIC KNOWLEDGE THAT HE KNEW HIS

24      CONDUCT WAS UNLAWFUL.

25      MR. AMBEAU: I UNDERSTAND.  I UNDERSTAND

1          THAT.  AND THE LEARNED INDIVIDUALS IN

2     THIS ROOM, I'M SURE, GET THAT COMPLETELY,

3     YOUR HONOR, AND WHOLEHEARTEDLY.  AND TO NO

4     OFFENSE TO THE HONORABLE JURY.  BUT THOSE

5     TERMS OF ART THAT WE'RE SO FAMILIAR WITH ARE,

6     IN FACT, NOT SO FAMILIAR TO LAY PERSONS.  AND

7     THEY COULD BE MISCONSTRUED THAT THE

8     NEGLIGENCE, PERHAPS, TO -- TO KEEP THIS ANTI-

9     MONEY LAUNDERING PROGRAM IN PLACE EQUALS

10    CRIMINAL LIABILITY, DESPITE THE FACT THAT

11    WE'VE SAID IT'S WILLFUL AND KNOWING, AND THE

12    JURY JUST NOT HAVING THE LEGAL TRAINING TO

13    UNDERSTAND THOSE TERMS OF ART AND THE FACT

14    THAT ---

15    THE COURT: I THINK THAT'S ALL THAT THE

16         SUPREME COURT REQUIRES IN THE RATZLAF.

17    IS THAT WHAT WE FOUND, MAX?

18    LAW CLERK:  YES, JUDGE.  IT IS.

19    THE COURT: YES. I MEAN, THE SUPREME

20         COURT HAS SAID -- WELL, MR. STEVENS?

21    MR. STEVENS: I WAS JUST GOING TO SAY,

22         JUDGE, I THINK THE FIFTH CIRCUIT HAS

23    DONE ITS RESEARCH AND THEIR PATTERN

24    INSTRUCTION IS PERFECTLY APPROPRIATE.

25    THE COURT: YES. I THINK THAT'S RIGHT.  I

1       THINK THIS IS A VERY BRIGHT JURY.  AND I

2       THINK IT WILL KNOW WHAT THE TERM "WITH

3       KNOWLEDGE THAT HIS CONDUCT WAS UNLAWFUL"

4       MEANS.  AND THAT IF THEY BELIEVE THAT HE

5       ACTED NEGLIGENTLY OR IN ANY -- THAT HE

6       INTENDED, THEY WILL BE FULLY CAPABLE OF

7       EVALUATING THAT WITH THIS INSTRUCTION.

8       MR. AMBEAU: THANK YOU, YOUR HONOR.

9       THE COURT: ALL RIGHT.  OKAY.  GOOD?

10          ALL RIGHT.

11      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

12          AN OFF-THE-RECORD DISCUSSION WAS HELD.)

13      (DISCUSSION WAS CONCLUDED.)

14      THE COURT: ALL RIGHT.  ANYTHING ELSE WE

15          SHOULD DISCUSS BEFORE THE JURY IS

16      RETURNED TO THE COURTROOM?

17      MR. STEVENS: NOTHING I'M AWARE OF, JUDGE.

18      THE COURT: OKAY.  SO, LET'S TALK ABOUT

19          WHERE WE'LL GO FROM HERE.

20          I WOULD APPRECIATE IT, MR. AMBEAU, IF

21      YOU WOULD SIMPLY STATE ON THE RECORD WHEN I

22      ASK THAT THE DEFENSE RESTS, I WILL THEN, OF

23      COURSE, ASK MR. STEVENS IF THE UNITED STATES

24      INTENDS TO PRODUCE ANY REBUTTAL EVIDENCE.

25      I'M TOLD YOU'VE DECIDED NOT TO DO SO.  VERY

1   WELL.  IT WILL THEN PROCEED TO CLOSING

2   ARGUMENTS.

3       SO, CAN YOU CONFINE IT TO 50 MINUTES,

4   GENTLEMEN?  I MEAN, GIVEN THE LATENESS OF THE

5   HOUR.  IF YOU NEED MORE, BUT I'M GOING TO ASK

6   YOU TO TRY TO KEEP IT TO 50 MINUTES.  OKAY?

7   MR. AMBEAU: IN AN EFFORT TO COMPLY, YOUR

8       HONOR, CAN I PUT A TIMER ON THE TABLE IN

9   FRONT OF ME?

10  THE COURT: ABSOLUTELY.

11  MR. AMBEAU: THANK YOU.

12  THE COURT: AND, YOU KNOW WHAT, I'M GOING TO

13      HELP YOU ALONG.  BECAUSE I'LL GIVE YOU

14  -- AT THE TEN-MINUTE MARK, I'LL LET YOU KNOW.

15  MR. AMBEAU: THANK YOU, YOUR HONOR.

16  THE COURT: AND AT THE THREE-MINUTE MARK

17      I'LL LET YOU KNOW.

18  MR. AMBEAU: ALL RIGHT.

19  THE COURT: IF NECESSARY, AT THE 30-SECOND

20      MARK I WILL LET YOU KNOW.

21      ANY SUCH REQUESTS FROM THE GOVERNMENT?

22  MR. STEVENS: NO.  I BROUGHT A WATCH, AND

23      I THINK THAT TIME LIMIT IS NOT A

24  PROBLEM.

25  THE COURT: AND HOW DO YOU WISH TO

1        APPORTION YOUR TIME?

2    MR. STEVENS: OUT OF 50?

3    THE COURT: YES.

4    MR. STEVENS: IF I GET DOWN TO TEN MINUTES

5        LEFT, WILL YOU LET ME KNOW?

6    THE COURT: OKAY.  I'LL LET YOU KNOW.

7        FAIR ENOUGH.

8    MR. AMBEAU: AND THEN LASTLY, YOUR HONOR,

9        WHERE CAN I PLACE THE WHITE BOARD THAT I

10   WRITE ON?

11   THE COURT: I WOULD PREFER THAT YOU PLACE IT

12       AS CLOSE TO THE JURY, FRANKLY, AS

13   POSSIBLE.  IT MAY BE NECESSARY FOR COUNSEL

14   FOR THE UNITED STATES TO REPOSITION

15   THEMSELVES. BUT MAYBE WHAT WE'LL DO IS WE'LL

16   PUT IT RIGHT ALONG THE SIDE OF THE CHAIR

17   THERE AT THE GOVERNMENT COUNSEL TABLE.

18   MR. AMBEAU: AND I'LL LOOK AGAIN AT WHAT I'M

19       DOING, AND PERHAPS I CAN USE THE ---

20   THE COURT: THAT'S FINE.

21   MR. AMBEAU: I'LL DO WHAT I CAN.

22   THE COURT: LET ME KNOW.

23   MR. AMBEAU: HAVE EVERYBODY DO IT.

24   THE COURT: WHY DON'T WE GO ON.  MAX, IF

25       YOU WOULD BE KIND ENOUGH TO REPOSITION

1    THE PODIUM.  AND REMEMBER, NOW, IF IT BREAKS,

2    IT'S ON YOUR SALARY.  THANK YOU, MAX.  YOU

3    CAN -- YES.  OKAY.

4         LET'S ALL RISE FOR THE JURY.

5    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

6         THE JURY RETURNS FROM BREAK.)

7    THE COURT: BE SEATED.

8         LADIES AND GENTLEMEN, THANK YOU ALL FOR

9    YOUR PATIENCE WITH US.  BEFORE WE TOOK THE

10   LUNCH BREAK, WHICH WAS QUITE A LONG LUNCH

11   BREAK, EVEN THOUGH WE BROKE VERY, VERY LATE.

12   I INSTRUCTED YOU NOT TO DISCUSS THE CASE WITH

13   ANYONE DURING THE LUNCH BREAK, NOT TO, OF

14   COURSE, ENGAGE ANYONE IN DISCUSSION, ANYONE

15   THAT YOU MAY ENCOUNTER ALONG THE WAY, NOT TO

16   CONDUCT ANY OUTSIDE RESEARCH ON ANY OF THE

17   ISSUES, PLACES, PERSONS OR THINGS YOU'VE

18   LEARNED ABOUT THUS FAR IN THIS TRIAL. NOT TO

19   BEGIN FORMING ANY OPINION YET, BECAUSE YOU

20   MAY NOT HAVE HAD ALL THE EVIDENCE IN THE

21   CASE.  YOU MOST CERTAINLY HAVEN'T RECEIVED

22   THE INSTRUCTIONS THAT WILL GUIDE YOUR

23   DEPOSITIONS.  AND, FINALLY, I INSTRUCTED YOU

24   TO NOT TO WATCH, LISTEN TO OR READ ANY

25   POSSIBLE MEDIA COVERAGE OF THIS CASE.

1    IF ANYONE HERE WAS UNABLE TO ABIDE BY

2    THOSE INSTRUCTIONS, PLEASE RAISE YOUR HAND

3    AND I'LL HAVE ADDITIONAL QUESTIONS FOR YOU.

4    AND LET THE RECORD REFLECT THAT NO HANDS ARE

5    BEING RAISED.  SO, AGAIN, THANK YOU FOR

6    FOLLOWING THOSE INSTRUCTIONS.

7    AT THIS TIME, I WILL ASK MR. AMBEAU,

8    DOES THE DEFENDANT HAVE ANY ADDITIONAL

9    EVIDENCE TO PRESENT?

10   MR. AMBEAU: FOR THE DEFENSE CASE, YOUR

11   HONOR, THE DEFENSE RESTS.

12   THE COURT: THANK YOU VERY MUCH.

13   NOW, LADIES AND GENTLEMEN, AS I

14   EXPLAINED TO YOU EARLIER, THE GOVERNMENT

15   BEARS THE BURDEN OF PROOF IN THIS CASE.  AND

16   FOR THAT REASON THE LAW PERMITS THE UNITED

17   STATES TO PRODUCE ADDITIONAL EVIDENCE AT THE

18   CLOSE OF THE DEFENDANT'S CASE.

19   MR. STEVENS, DOES THE UNITED STATES

20   INTEND TO PRESENT ANY EVIDENCE IN REBUTTAL?

21   MR. STEVENS: NO, JUDGE.

22   THE COURT: OKAY.  THANK YOU.

23   WELL, THERE YOU HAVE IT, FOLKS.  THAT IS

24   ALL THE EVIDENCE THAT BOTH SIDES WILL PRESENT

25   TO YOU FOR YOUR CONSIDERATION IN THIS TRIAL.

1       IT IS NOW TIME FOR US TO PROCEED TO WHAT

2   IS CALLED CLOSING ARGUMENTS.  BOTH COUNSEL

3   FOR THE UNITED STATES, AS WELL AS COUNSEL FOR

4   THE DEFENDANT WILL HAVE AN OPPORTUNITY TO

5   ADDRESS YOU AND TO SPEAK WITH YOU ABOUT THE

6   EVIDENCE THAT THEY BELIEVE WAS IMPORTANT FOR

7   YOUR CONSIDERATION AS YOU DELIBERATE.

8       AND I ALSO TALKED TO YOU A LITTLE BIT

9   ABOUT THE SIGNIFICANCE OF THAT.  I TOLD YOU

10  AT THE BEGINNING OF THIS TRIAL, DURING

11  OPENING STATEMENTS, THAT THE LAWYERS WERE NOT

12  PERMITTED TO ARGUE THE CASE.  THEY COULD

13  MERELY TELL YOU WHAT THEY EXPECTED THE

14  EVIDENCE TO BE AND HOW IT MAY LINK UP.  WELL,

15  NOW, IS THE OPPORTUNITY FOR THE LAWYERS TO

16  ACTUALLY ARGUE THEIR CASES.

17      THE UNITED STATES WILL GO FIRST,

18  FOLLOWED BY COUNSEL FOR THE DEFENDANT.  AND,

19  AGAIN, BECAUSE THE LAW REQUIRES THAT THE

20  GOVERNMENT BEAR THE BURDEN OF PROOF, IT ALSO

21  PERMITS THE GOVERNMENT TO SPEAK TO YOU A

22  SECOND TIME IN CLOSING ARGUMENTS.

23      SO, AGAIN, I WOULD ASK THAT YOU GIVE

24  THEM YOUR FULL ATTENTION BECAUSE THIS IS A

25  VERY, VERY IMPORTANT PART OF THEIR CASES AND

1           CERTAINLY OF THIS TRIAL.

2                MR. STEVENS, YOU MAY PROCEED.

3           MR. STEVENS: THANK YOU, JUDGE.

4           CLOSING STATEMENT BY THE GOVERNMENT

5           MR. STEVENS: MEMBERS OF THE JURY, IF YOU

6                HAVE A TEENAGER OR YOU'VE HAD A TEENAGER

7           OR YOU'VE GONE TO COLLEGE OR YOU LIVE IN A

8           COLLEGE TOWN, YOU KNOW THAT THERE ARE BARS IN

9           TOWN WHERE UNDERAGE KIDS CAN GO AND ORDER

10          WHATEVER THEY WANT.  RIGHT?  EIGHTEEN, 19-

11          YEAR OLD KIDS CAN WALK THROUGH THE FRONT

12          DOOR, ORDER WHATEVER THEY WANT TO DRINK, AND

13          IT HAPPENS EVERY DAY.  MAYBE THERE'S A

14          BOUNCER, MAYBE THERE'S A BARTENDER THAT

15          CHECKS ID'S.  AND IF THERE IS, IT PROBABLY

16          DOESN'T MATTER WHAT YOU SHOW THE PERSON,

17          RIGHT?  YOU COULD SHOW THEM SOME EXPIRED

18          LICENSE THAT MAYBE YOU GOT FROM YOUR OLDER

19          BROTHER.  YOU CAN SHOW THEM SOMETHING THAT

20          YOUR FRIENDS MADE IN COMPUTER LAB.  MOST OF

21          THE TIME THE PERSON DOESN'T EVEN CARE ENOUGH

22          TO ASK YOU TO SHOW AN ID.  AND THAT HAPPENS

23          ALL THE TIME.  AND, YOU KNOW, WHATEVER AGENCY

24          IS IN CHARGE OF POLICING THAT DOESN'T CATCH

25          IT RIGHT AWAY.  DOESN'T CATCH IT ALL THE

1    TIME.  BUT THAT DOESN'T MAKE IT LEGAL.  ALL

2    RIGHT?  THAT DOESN'T CHANGE THE FACT THAT

3    THAT'S A CRIME.

4        GREEDY BUSINESS PEOPLE, THOUGH, THAT'S

5    HOW THEY OPERATE.  AND THEY OPERATE LIKE THAT

6    ALL OVER THE COUNTRY.  THEY SHOULDN'T, BUT

7    THEY DO.

8        IN THE WORLD, THE UNDERWORLD OF BAD,

9    STOLEN, FRAUDULENT, U.S. TREASURY CHECKS,

10    THIS DEFENDANT'S STORE WAS ONE OF THOSE BARS.

11    RIGHT?  PEOPLE COULD COME IN, 270 OF THEM, IN

12    A 15-MONTH WINDOW, AND CASH TREASURY CHECKS

13    THAT YOU'VE SEEN THOSE NO QUESTION THEY WERE

14    STOLEN AND THEY WERE FRAUDULENT.  AND THEY

15    DID IT EVERY DAY, MANY, MANY TIMES PER DAY.

16    AND IT'S NOT LEGAL.  IT SHOULD NEVER HAVE

17    HAPPENED.

18        YOU HEARD A LOT ABOUT RULES AND

19    REGULATIONS AND LAWS IN THIS CASE.  AND

20    SOMETIMES IT GOT A BIT TECHNICAL.  I'M GOING

21    TO TELL YOU WHY LATER, I THINK A LOT OF THAT

22    JUST DOESN'T MAKE ANY DIFFERENCE AND WE

23    SHOULDN'T HAVE -- YOU SHOULDN'T HAVE HAD TO

24    SIT THROUGH IT.

25        NOBODY LIKES RULES AND LAWS AND

1    REGULATIONS.  NO ONE LIKES A LOT OF THAT

2    STUFF, BUT THEY'RE IMPORTANT.  RIGHT?  IT'S

3    IMPORTANT TO TRY TO KEEP KIDS FROM GOING INTO

4    BARS AND GETTING DRUNK.  AND THE REGULATION

5    AND THE LAWS THAT WE'VE BEEN TALKING ABOUT IN

6    THIS CASE, THEY'RE IMPORTANT BECAUSE THEY'RE

7    DESIGNED TO PREVENT MONEY LAUNDERING.

8    THEY'RE DESIGNED TO PREVENT CRIMINALS FROM

9    TAKING, YOU KNOW, CONTRABAND.  TAKING, IN

10   THIS CASE, FRAUDULENT CHECKS AND CONVERTING

11   THEM INTO CASH, WHICH IS IMPOSSIBLE TO TRACE.

12       AND BECAUSE THOSE RULES AND REGULATIONS

13   WEREN'T BEING FOLLOWED IN THIS CASE AND

14   BECAUSE OF ALL THE OTHER CONDUCT BY THE

15   DEFENDANT THAT YOU'VE HEARD ABOUT, AND I'M

16   GOING TO TRY TO SUMMARIZE IT IN A MINUTE OR

17   TWO.  OVER ONE AND A HALF MILLION DOLLARS OF

18   TREASURY FUNDS WERE STOLEN.  AND THEY WERE

19   STOLEN AT THIS MAN'S STORE.  AND YOU SAW ON

20   THE VIDEO, IT'S A TINY STORE ON FLORIDA

21   BOULEVARD, NOT FAR FROM HERE.  IT'S AN

22   ASTOUNDING AMOUNT OF MONEY THAT THIS

23   DEFENDANT HELPED OTHERS -- HE STOLE IT AND

24   HELPED OTHERS STEAL.  AND THAT'S WHY THIS IS

25   SUCH AN IMPORTANT CASE.

1          I THOUGHT, YOU KNOW, DAYS AGO WHEN I WAS

2     KIND OF DRAFTING UP MY NOTES, I THOUGHT I'D

3     HAVE TO SPEND A LOT OF TIME TALKING ABOUT THE

4     FACT THAT THESE CHECKS WERE FRAUDULENT.  BUT

5     I THINK YOU KNOW THAT NOW.  YOU HEARD FROM

6     MS. WATSON.  YOU HEARD FROM MR. HERNANDEZ.

7     YOU WILL HAVE SOME OF THE TAX INFORMATION

8     AVAILABLE FOR YOUR REVIEW IF YOU WANT.  YOU

9     SAW THE RECLAMATIONS, THOSE NOTICES FROM THE

10     BANK.  YOU SAW THE STIPULATION.  SO, THERE'S

11     NO QUESTION THAT WHAT WE'RE DEALING WITH HERE

12     IS THE POOL OF MONEY OF FRAUDULENT PROCEEDS

13     OF OVER ONE AND A HALF MILLION DOLLARS.

14          WHAT DOES THE DEFENDANT WANT YOU TO

15     BELIEVE?  I MEAN, WHAT'S HIS STORY AND HOW IN

16     THE WORLD IS THIS BELIEVABLE?  WHAT THE STORY

17     HE TOLD YOU ABOUT HOW THIS HAPPENED.

18          AND I THINK TO WHAT HIS PARKING LOT MUST

19     HAVE LOOKED LIKE IN THE SUMMER OF 2012.  WHEN

20     I THINK THE TESTIMONY WAS 100 PEOPLE FROM NEW

21     YORK CAME TO CASH THESE CHECKS, AND 64 PEOPLE

22     FROM MASSACHUSETTS, I BELIEVE WAS THE

23     TESTIMONY, AND 40 FROM GEORGIA.  AND YOU

24     HEARD -- YOU HEARD THE EVIDENCE THAT, YOU

25     KNOW, YOU THINK THAT TEXAS -- IF YOU'RE GOING

1       TO DO A LOT OF OUT-OF-STATE BUSINESS, YOU

2       WOULD HAVE TO BE FROM TEXAS.  AND TEXAS, THE

3       SECOND -- IT'S THE TINY, TINY BLUE SLIVER. I

4       THINK THERE WERE TWO OR THREE CHECKS FROM

5       TEXAS AND NONE FROM MISSISSIPPI AND NONE FROM

6       ALABAMA.

7       YOU KNOW, I THINK A REASONABLE INFERENCE

8       FROM THE EVIDENCE, AND THE JUDGE IS GOING TO

9       TELL YOU THAT THAT'S THE PERFECTLY

10      APPROPRIATE FOR YOU TO DO IS TO -- YOU SIFT

11      THROUGH THE EVIDENCE AND YOU FIGURE OUT WHAT

12      -- YOU KNOW, WHAT HAPPENED.  WHAT REALLY IS

13      GOING ON?

14      AND WHAT I THINK YOU'LL FIND WAS

15      PROBABLY GOING ON, WAS THAT PEOPLE WERE

16      BRINGING IN THESE CHECKS EIGHT OR TEN AT A

17      TIME.  RIGHT?  AND THAT'S WHY YOU SEE THE

18      DATE OF ISSUE DATE OVER AND OVER AND OVER

19      AGAIN.  AND THAT'S WHY WE SEE THEM BEING

20      DEPOSITED, YOU KNOW, IN -- IN BUNDLES, FIVE,

21      SIX, EIGHT CHECKS AT A TIME.  THAT'S ONE VERY

22      REASONABLE INFERENCE FROM THE EVIDENCE.

23      BUT THAT'S NOT EVEN THE DEFENDANT'S

24      STORY.  HIS STORY IS EVEN -- EVEN MORE

25      INCREDIBLE.  RIGHT?  HE TOLD YOU FROM THAT

1    STAND THAT -- THAT ALL OF THESE PEOPLE CAME

2    TO HIS STORE, SHOWED HIM AN ID.  HE LOOKED

3    THEM IN THE EYE -- AND I THINK HE SAID HE

4    DIDN'T JUST LOOK IN THEIR FACES, HE LOOKED IN

5    THEIR EYES, THEIR FACES, HE LOOKED AT OTHER

6    THINGS ABOUT THEM.  HE CHECKED ID'S.  AND

7    THEN HE DECIDED THAT ALL 272 CHECKS WERE

8    OKAY, WERE GOOD, THAT HE SHOULD JUST HAND OUT

9    THAT CASH 272 TIMES.  I MEAN, THAT'S -- WE

10   SUBMIT TO YOU RESPECTFULLY THAT THAT'S NEARLY

11   IMPOSSIBLE TO BELIEVE.

12       WHAT ELSE WAS WRONG?  RIGHT?  WHAT WERE

13   THE RED FLAGS?  CHECKS COMING IN FOR ENTIRE

14   APARTMENTS, ENTIRE NEIGHBORHOODS.  PEOPLE

15   COMING IN AND I HAVE "COMING IN" IN QUOTES.

16   I DON'T MEAN TO BE ARGUE -- YOU KNOW, OVERLY

17   ARGUMENTATIVE.  BUT THE POINT HERE IS TO BE

18   ARGUMENTATIVE.  BUT, I HAVE IT IN QUOTES

19   BECAUSE THAT'S HIS STORY, RIGHT?  THAT THESE

20   PEOPLE WERE COMING IN ONE AT A TIME.  AND I

21   DON'T KNOW WHETHER YOU BELIEVE THAT.  BUT

22   EVEN IF THAT'S REMOTELY POSSIBLE, THAT'S A

23   RED FLAG, RIGHT?  CAR -- CARLOADS AND VAN

24   LOADS OF PEOPLE FROM GEORGIA AND

25   MASSACHUSETTS AND CAPE COD COMING IN WITH

1    THESE CHECKS AND WALKING OUT WITH FIVE, SIX,

2    SEVEN, $8,000.00.  YOU SAW NUMEROUS EXAMPLES

3    OF PEOPLE WALKING OUT WITH OVER $10,000.00.

4        YOU'VE SEEN ID'S THAT DIDN'T MATCH THE

5    CHECKS.  I BELIEVE THE TESTIMONY WAS THAT

6    THERE MAY HAVE BEEN A HANDFUL THAT MATCHED.

7    YOU'RE THE JURY.  YOU CAN SIFT THROUGH THOSE

8    ID'S AND MATCH THEM UP, BUT THAT WAS A RED

9    FLAG.

10       YOU SAW ID'S THAT WERE OBVIOUSLY FAKE.

11   RIGHT?  POSTAL INSPECT HOFFINE, I BELIEVE,

12   TESTIFIED THAT SHE'S LIVED IN BATON ROUGE FOR

13   NINE YEARS, AND SHE SPOTTED THESE ADDRESSES

14   AS FAKE RIGHT OFF THE BAT.  RIGHT?  THERE'S

15   NO CURSY BOULEVARD.  EVERYONE KNOWS THAT.

16   THERE'S NO CRISPI BOULEVARD.  AND ANYONE WHO

17   CARED TO CHECK COULD HAVE CHECKED THOSE

18   THINGS IN TEN OR 15 SECONDS.  PEOPLE WITH NO

19   IDEA AT ALL, RIGHT?  I MEAN, THE LAST TWO

20   ASSUMED THAT THERE IS AN ID FOR EVERYONE AND

21   YOU ALSO KNOW THAT THAT'S NOT TRUE.

22       AND, YOU KNOW, THAT EXHIBIT THAT I'M

23   GOING TO SHOW YOU IN A SECOND, I THINK IT'S

24   "52," THAT THESE CHECK AMOUNTS ARE WAY HIGHER

25   THAN ANYTHING HE'D BEEN USED TO SEEING FROM

1    ALL HIS -- HIS TREASURY CHECKS THAT HE'S BEEN

2    CASHING FOR LOUISIANA RESIDENTS.

3         AND I KNOW I ASKED THE QUESTIONS OF THE

4    AGENT AT THE TIME AND THEY WERE A LITTLE

5    CLUMSY.  BUT THE POINT OF THOSE QUESTIONS

6    WAS, THIS "EXHIBIT 52," AND YOU'LL BE ABLE TO

7    SEE IT BETTER LATER.  THE POINT OF THOSE

8    QUESTIONS WAS, IF THERE'S OVER 100 CHECKS

9    HERE, TREASURY CHECKS TO LOUISIANA RESIDENTS,

10   RIGHT?  SO, THAT'S A GOOD SAMPLE SIZE.  IT'S

11   NOT THAT HE HAD CASHED ONE OR TWO AND MAYBE

12   HE DIDN'T KNOW WHAT A TREASURY CHECK, YOU

13   KNOW, WOULD LOOK LIKE OR THE AMOUNT THAT

14   WOULD BE ON A CHECK.  OR, MAYBE HE DIDN'T

15   HAVE ANY IDEA WHAT A TAX REFUND AMOUNT --

16   TYPICAL AMOUNT WOULD BE.  HE CASHED OVER 100

17   OF THEM.  AND HE HAD KIND OF A BASELINE,

18   RIGHT -- 2,700, 1,700, 3,200.

19        AND THEN THESE OUT-OF-STATE CHECKS START

20   COMING IN.  ACCORDING TO THE DEFENDANT, THE

21   PEOPLE THEMSELVES START COMING IN.  AND THE

22   AMOUNTS WERE JUST THROUGH THE ROOF, RIGHT?

23   MORE THAN TWICE AS HIGH.  TEN CHECKS FROM

24   GRAND AVENUE.  I DON'T REMEMBER IF THAT WAS

25   THE BRONX OR BROOKLYN, BUT $7,500.00 A CHECK?

1          I MEAN, YOU KNOW THAT THE RETURNS WERE

2     FRAUDULENT.  THAT'S AWFULLY HIGH AND EVERYONE

3     KNOWS THAT THAT'S AWFULLY HIGH FOR A RETURN.

4     TO GET TEN OF THEM FROM ONE STREET IN NEW

5     YORK.

6          HOW ELSE DID THE DEFENDANT KNOW THAT

7     THESE CHECKS WERE NO GOOD?  RIGHT?  THAT THEY

8     WERE FRAUDULENT.  HIS BANK TOLD HIM.  A LOT

9     OF THIS STUFF I'VE BEEN TALKING ABOUT, I HAVE

10    NO DOUBT THAT MR. AMBEAU IS GOING TO GET UP

11    AND TALK TO YOU ABOUT CIRCUMSTANTIAL EVIDENCE

12    AND CIRCUMSTANTIAL.  NOW, LATER, THE JUDGE IS

13    GOING TO TELL YOU, I BELIEVE, THAT YOU SHOULD

14    CONSIDER CIRCUMSTANTIAL EVIDENCE JUST LIKE

15    ANY OTHER EVIDENCE.

16         BUT THIS IS DIRECT EVIDENCE.  HIS BANK

17    TELLS HIM THAT HE'S CASHING CHECKS THAT HAVE

18    BEEN STOLEN OUT OF THE MAIL.  RIGHT?  IT'S

19    "EXHIBIT 12."  IT'S A STACK.  I THINK THERE'S

20    12 OR 13 OF THEM.  AND IT'S NOT JUST A FORM

21    LETTER.  AND IT DOESN'T JUST SAY THERE HAS

22    BEEN SOME MIX-UP.  EACH TIME THE BANK SENDS

23    HIM A SWORN STATEMENT FILLED OUT BY THESE

24    TAXPAYERS.  AND YOU HAVE THEM THERE.  YOU

25    WILL BE ABLE TO LOOK AT THEM.  BUT THESE

1    TAXPAYERS ARE SAYING, "NO, I DIDN'T GET THIS

2    CHECK.  NO, THAT'S NOT MY SIGNATURE.  NO, I

3    DIDN'T CASH IT."  AND THEY START SENDING

4    THESE NOTICES IN AUGUST OF 2012.  THERE WAS

5    ANOTHER THE EXACT SAME MONTH.  I THINK THE

6    NEXT WAS OCTOBER 1ST, 2012.  AND THEY -- THEY

7    KEEP COMING AND COMING AND COMING.  HE KNEW

8    FROM THE BANK THAT HE WAS TAKING IN BAD

9    CHECKS AND HE JUST KEPT DOING IT.

10    LET ME MAKE ONE MORE QUICK POINT ABOUT

11    THAT, JUST TO CLARIFY.

12    YOU HEARD A LOT OF QUESTIONS FROM MR.

13    AMBEAU ABOUT HOW THE DEFENDANT WENT IN AND

14    REPAID THIS MONEY OUT OF THE GOODNESS OF HIS

15    HEART.  THE BANK DIDN'T SUFFER A LOSS.  BUT I

16    WANT YOU TO THINK BACK CAREFULLY TO WHAT MS.

17    CRAIG TOLD YOU ABOUT THE PROCESS.  AND I

18    THINK YOU'LL SEE THIS, TOO, IN "EXHIBIT 12."

19    HE DIDN'T GO BACK TO THE BANK WITH A

20    CHECKBOOK AND SAY, "GOSH, I'M SORRY.  HERE'S

21    THE MONEY."  THE BANK TOOK THE MONEY OUT OF

22    HIS ACCOUNT.  RIGHT?  THEY HAD ALREADY TAKEN

23    THE MONEY BACK AND THEY SENT HIM A NOTICE.

24    AND THAT'S A BIG DIFFERENCE, I WOULD SUBMIT,

25    THAN HIM VOLUNTEERING TO GIVE THIS MONEY

1    BACK.  THEY HAD TAKEN IT BACK.  AND THE FACT

2    THAT THEY HAVEN'T LOST ANY MONEY IS A GOOD

3    THING.  RIGHT?  IT'S A GOOD THING THAT THE

4    BANK HASN'T LOST ANY MONEY.  UNFORTUNATELY,

5    THE TREASURY DEPARTMENT HAS LOST AN AWFUL LOT

6    OF MONEY.

7        I WANT TO ASK YOU TO REMEMBER.  IT CAME

8    UP TODAY.  I THINK IT WAS TODAY.  CARMEN

9    RIVERA FLORES.  BUT IF YOU TO GO "EXHIBIT

10   14B," PAGE TWO, A COUPLE OF LINES UP FROM THE

11   BOTTOM, THERE'S A CHECK ISSUED TO MS. FLORES

12   ON SEPTEMBER 7TH OF 2012.  IT'S MAILED TO HER

13   IN WORCESTER, MASSACHUSETTS.  RIGHT?  SO,

14   THAT CHECK GETS TO HER, ACCORDING TO THE

15   DEFENDANT, OR SOMEBODY AT THAT ADDRESS MORE

16   LIKELY.  THAT CHECK GETS TO THAT PERSON ON

17   THE 9TH, THE 10TH, THE 11TH, DEPENDING ON HOW

18   FAST THE MAIL IS IN WORCESTER.

19        IN THE SPAN OF ABOUT EIGHT OR NINE DAYS,

20   THAT PERSON APPARENTLY SHOWS UP AT THE

21   DEFENDANT'S STORE HERE IN BATON ROUGE.  SHE'S

22   ALREADY MOVED TO LOUISIANA.  SHE'S GOT AN ID

23   FROM THE MEXICAN CONSULATE IN DALLAS?  THAT'S

24   "EXHIBIT 53."  AND I THINK IT MAY BE THE

25   FIRST PAGE.  IT'S GOT A BOGUS ADDRESS ON IT.

1    I MEAN, IT JUMPS OFF THE PAGE.  IT'S AN

2    ADDRESS IN DENAN SPRIN, LOUISIANA.

3         AND ON SEPTEMBER 22ND, THE DEFENDANT

4    DEPOSITS THAT CHECK.  IS THAT EVEN POSSIBLE,

5    PHYSICALLY POSSIBLE?  TO PACK UP IN

6    WORCESTER, MASSACHUSETTS.  SHE'S -- ACCORDING

7    TO THE DEFENDANT, SHE'S IN WORCESTER.  SHE'S

8    PLANNING TO LEAVE WORCESTER AND MOVE TO BATON

9    ROUGE, BUT SHE'S WAITING ON THE CHECK.  AND

10   THEN WHEN THE CHECK ARRIVES, SHE PACKS UP,

11   DRIVES TO DALLAS, GETS HER ID FROM THE

12   MEXICAN CONSULATE.  WHY IS SHE GETTING ID

13   FROM THERE WITH HER DENAN SPRIN ADDRESS AND

14   NOT SHOW UP WITH THE ADDRESS THAT SHE WOULD

15   HAVE HAD IN WORCESTER BEFORE SHE MOVED?

16        I KNOW I'M GETTING OFF ON A TANGENT.

17   THIS IS INCREDIBLE, RIGHT?  IT'S JUST NOT

18   BELIEVABLE.  AND THAT'S WHAT HE WANTS YOU TO

19   BELIEVE.

20        ALSO, REMEMBER THE CHECK, IT'S PAGE 68

21   OF "EXHIBIT 13," IT'S THE CHECK THAT'S

22   PAYABLE TO THE PERCENTAGE SYMBOL NA.  OKAY?

23   THAT CHECK WAS MAILED TO AN ADDRESS IN TAMPA,

24   FLORIDA.  SHOULD THAT HAVE BEEN CAUGHT?

25   SHOULD THE IRS HAVE CAUGHT THAT AND NOT SENT

1    THE CHECK?  SURE.  THAT'S NOT WHAT THIS CASE

2    IS ABOUT.  THE JUDGE WILL TALK TO YOU ABOUT

3    THAT A LITTLE LATER.  BUT THE CHECK IS MAILED

4    TO THAT ADDRESS IN TAMPA, IN FEBRUARY.  IT'S

5    A $4,400.00 CHECK.

6        AND THEN THAT -- SOME PERSON SHOWS UP TO

7    CASH THAT CHECK AT THE DEFENDANT'S STORE AND

8    HE CASHES IT, NO QUESTIONS ASKED.  ADD WHAT I

9    THINK IS SIGNIFICANT ABOUT THIS, MEMBERS OF

10   THE JURY, IS, YOU KNOW, ON DIRECT EXAM MR.

11   AMBEAU -- I MEAN, THE DEFENDANT WAS

12   DEFINITIVE.  "I CHECKED EVERY ID.  I LOOKED

13   IN THEIR FACES.  I LOOKED IN THEIR EYES.  I

14   MADE SURE THESE MATCH."

15       WHEN I SHOWED HIM THAT CHECK, WHAT DID

16   HE SAY?  MY RECOLLECTION IS, AND YOU'LL

17   RECALL BETTER THAN ME.  MY RECOLLECTION IS HE

18   SAID, "WELL, GOSH, THAT'S WHAT I SAID.  BUT,

19   YOU KNOW WHAT, SOMETIMES WE'RE BUSY AND I

20   DON'T -- I DON'T HAVE THE ABILITY TO CHECK."

21       IT WOULD HAVE BEEN NICER IF IN MARCH OF

22   2012, WHEN THESE HUNDREDS AND HUNDREDS OF

23   THOUSANDS OF CHECKS WERE COMING IN IF HE

24   HADN'T BEEN SO BUSY, RIGHT, SO THAT THIS CASH

25   HADN'T LEFT THE DOOR.

1          REMEMBER THIS, TOO.  THIS IS A DEFENDANT

2     WHO IS IN THE BUSINESS OF CASHING CHECKS.

3     OKAY?  HE'S NOT, YOU KNOW, YOU OR ME OR

4     SOMEBODY WHO'S SEEING A TREASURY CHECK FOR

5     THE FIRST TIME OR, YOU KNOW, RUNNING SOME

6     SORT OF BUSINESS THAT -- THAT ISN'T FAMILIAR

7     WITH THIS.  HE FORMS A COMPANY, A FOR-PROFIT

8     COMPANY TO CONDUCT THIS BUSINESS.  IT'S "5A."

9     HE APPLIES FOR A BUSINESS LICENSE.  MAINTAINS

10    TWO DIFFERENT BANK ACCOUNTS, BUSINESS

11    ACCOUNTS FOR HIS BUSINESS.  HE TELLS THE IRS

12    AND HE TELLS THE LOUISIANA OFFICE OF

13    FINANCIAL INSTITUTIONS THAT HE KNOWS WHAT HIS

14    OBLIGATIONS ARE.  AND HE SIGNS THOSE

15    CERTIFICATIONS "5B" AND "5C," AND THEY BOTH

16    SAY SOMETHING TO THE EFFECT OF, "I KNOW MY

17    RESPONSIBILITIES UNDER THE BANK SECRECY ACT

18    AND ITS REGULATIONS.  I'M SIGNING IT AS THE

19    OWNER OF THIS COMPANY."  HE TELLS THE

20    GOVERNMENT THAT HE KNOWS WHAT HIS OBLIGATIONS

21    ARE.

22         HE WAS WARNED SPECIFICALLY ABOUT THESE

23    SCHEMES.  ALL RIGHT?  YOU HEARD A LOT ABOUT A

24    LOT OF REGULATIONS.  BUT "6B," REMEMBER, IS

25    THAT NOTICE THAT THE IRS GIVES HIM THAT TALKS

1    ABOUT THESE SCHEMES, STOLEN TREASURY CHECK

2    REFUND SCHEMES.  AND IT TELLS HIM.  "LOOK,

3    HERE'S WHAT YOU NEED TO LOOK OUT FOR, THESE

4    TYPES OF ID'S, THESE TYPES OF RED FLAGS."  HE

5    HAD THAT GUIDANCE.  HE JUST DIDN'T CARE.  HE

6    WAS IN THIS BUSINESS.  HE WAS IN THE BUSINESS

7    OF DOING IT AND HE WAS RECEIVING A CUT.  HE

8    WAS RECEIVING AT LEAST SOME PERCENTAGE OF

9    EVERY CHECK THAT HE CASHED.

10        WHAT WOULD A RESPONSIBLE PERSON HAVE

11    DONE?  WHAT WOULD AN HONEST, LAW ABIDING,

12    RESPONSIBLE PERSON HAVE DONE IN THIS

13    SCENARIO?

14        FIRST OF ALL, I WOULD SUGGEST HE WOULD

15    NEVER HAVE BEEN IN THIS SITUATION IN THE

16    FIRST PLACE.  RIGHT?  AFTER THE FIRST FIVE OR

17    TEN OR 15 OR 20 CHECKS, THIS WOULD HAVE

18    STOPPED.

19        A RESPONSIBLE PERSON, THOUGH, WOULD CALL

20    THE POLICE, CALL THE IRS, FILED REPORTS,

21    TURNED SOME OF THESE CUSTOMERS AWAY.

22        THE DEFENDANT DIDN'T DO ANY OF THAT.  HE

23    CASHED EVERY CHECK; HE TOOK HIS CUT.  HE

24    HANDED CASH OVER TO THE CRIMINALS.  AND

25    ACCORDING TO THE DEFENDANT -- THERE WAS A LOT

1     OF TALK ABOUT THE OTHER CRIMINALS.  ACCORDING

2     TO THE DEFENDANT, THERE WERE 250 PLUS OTHER

3     CRIMINALS THAT ALL HAPPENED TO WALK THROUGH

4     HIS FRONT DOOR.  HE'S HANDING CASH OVER TO

5     THEM ON A DAILY BASIS.  AND HE LIES TO THE

6     GOVERNMENT ABOUT THIS AT EVERY OPPORTUNITY.

7          2010, THE FIRST BSA EXAM.  2012, I

8     BELIEVE, THE OFI EXAM THAT MS. DANIELLE

9     LEBLANC TESTIFIED ABOUT.  AND 2013, THE

10    SECOND BSA EXAM THAT MS. ARMWOOD TALKED

11    ABOUT.

12         SO, LET ME TRY TO FOCUS DOWN ON THE

13    COUNTS THAT YOU ARE ASKED TO -- YOU WILL BE

14    IN A LITTLE WHILE ASKED TO DELIBERATE ABOUT,

15    FOUR COUNTS IN THE INDICTMENT, THE

16    SUPERCEDING INDICTMENT.

17         I'M GOING TO START WITH COUNT TWO. AND

18    IT CHARGES HIM WITH FAILURE TO MAINTAIN AN

19    EFFECTIVE ANTI-MONEY LAUNDERING PROGRAM.

20    OKAY.  IT'S NOT AS TRICKY OR COMPLEX OR

21    CONVOLUTED AS I THINK MAYBE YOU'VE BEEN LED

22    TO BELIEVE OVER THE COURSE OF THIS TRIAL.  BE

23    THE OPERATOR OF A CHECK CASHING BUSINESS IN

24    THE UNITED STATES.  NO QUESTION HE DID THAT.

25    AND WILLFULLY FAILED TO DEVELOP AN AML, AN

1    ANTI-MONEY LAUNDERING PROGRAM, UNDER THE BANK

2    SECRECY ACT.  WILLFULLY MEANS THAT IT WAS

3    DONE VOLUNTARILY AND PURPOSEFULLY WITH THAT

4    PURPOSE EITHER TO DISOBEY OR DISREGARD THE

5    LAW.  YOU HAVE TO KNOW THAT WHAT THEY'RE

6    DOING IS AGAINST THE LAW; THAT THERE IS

7    SOMETHING WRONG.

8         WHAT KIND OF PROGRAM IS REQUIRED?  ALL

9    RIGHT.  YOU DON'T HAVE TO BE A ROCKET

10   SCIENTIST.  YOU DON'T HAVE TO BRING IN AN

11   OUTSIDE AUDITOR.  YOU DON'T HAVE TO GO TO

12   SOME SPECIAL COURSE OR SIT DOWN WITH, YOU

13   KNOW, AN IRS EXPERT TO GET THIS PLAN IN

14   PLACE.  IT'S GOT TO BE IN WRITING.  IT'S GOT

15   TO INCLUDE POLICIES FOR VERIFYING CUSTOMER

16   IDENTIFICATION, FILING REPORTS, CREATING

17   RECORDS, RESPONDING TO LAW ENFORCEMENT

18   REQUESTS, MAYBE PROVIDING A FEDERAL GRAND

19   JURY WITH ALL THE DOCUMENTS THEY REQUEST AND

20   NOT JUST 60 OR 70 PAGES OUT OF HUNDREDS AND

21   HUNDREDS AND HUNDREDS OF PAGES THAT YOU CLAIM

22   TO HAVE.

23        YOU MUST DESIGNATE A COMPLIANCE OFFICER

24   WHO IS SUPPOSED TO ASSURE THAT YOU'RE

25   COMPLIANT ON A DAILY BASIS.  YOU HAVE TO

1    PROVIDE FOR ONGOING EMPLOYEE TRAINING AND YOU

2    HAVE TO HAVE AN INDEPENDENT TESTING, AN

3    INDEPENDENT AUDIT.

4        MARCH, 2012, TO FEBRUARY, 2014, I WOULD

5    SUBMIT TO YOU THE EVIDENCE WAS CLEAR.  THE

6    ABSOLUTELY, NO WRITTEN CHECK-CASHING PLAN IN

7    PLACE, ABSOLUTELY NO WRITTEN ANTI-MONEY

8    LAUNDERING PROGRAM IN PLACE.  ABSOLUTELY NO

9    WRITTEN POLICY FOR VERIFYING ANY CUSTOMER

10   IDENTIFICATION.  ABSOLUTELY NO WRITTEN POLICY

11   FOR RECORD KEEPING.  ZERO REPORTS FILED.  AND

12   YOU SAW THOSE SUMMARIES, "16A" THROUGH "H."

13   YOU SAW THOSE SUMMARIES.  HE NEVER FLAGGED

14   ANY OF THOSE AS SUSPICIOUS.  NEVER FILED ANY

15   REPORTS.  HE DID VIRTUALLY NOTHING.  HE DID

16   VIRTUALLY NOTHING.  THAT DOESN'T COMPLY WITH

17   THE ANTI -- WITH THE BSA.

18       HE ADMITTED HE HAD NO PLAN.  OKAY?

19   DON'T FORGET THAT, EITHER.  IN 2010, AFTER

20   MS. HARDY MET WITH HIM, SHE SENDS HIM HER

21   FINDINGS.  HE ADMITS THAT THAT'S TRUE; THAT

22   THOSE FINDINGS ARE TRUE. AND THAT'S "EXHIBIT

23   4D."

24       THREE YEARS LATER, TWO AND A HALF YEARS

25   LATER, MS. ARMWOOD COMES.  GOES OVER THE

1    BUSINESS.  TELLS HIM HE'S STILL OUT OF

2    COMPLIANCE.  HE ACKNOWLEDGES THAT HE'S STILL

3    OUT OF COMPLIANCE AND HE SIGNS ANOTHER

4    ADMISSION FORM.  AND THAT'S "EXHIBIT 6D."  HE

5    ADMITTED THAT HE HAD NO PLAN.

6         LET ME SAY ONE OTHER THING ABOUT THAT.

7    WE HEARD -- YOU HEARD AN AWFUL LOT FROM MR.

8    AMBEAU ABOUT HOW THE FINDINGS WERE DIFFERENT;

9    THAT THE EXAMS WERE DIFFERENT.  AND THIS

10   EXAMINER SAID ONE THING AND THIS SAID THE

11   OTHER.  AND THIS EXAMINER CITED THIS CODE

12   SECTION OR THIS REGULATION AND THIS ONE CITED

13   SOME OTHER REGULATION.  YOU WILL HAVE THE

14   EXHIBITS.  "4C" IS THE FINDINGS THAT THE

15   REPORT THAT MS. HARDY ISSUES TO THE

16   DEFENDANT.  "6C" ARE THE FINDINGS THAT HE WAS

17   ISSUED IN 2013.  AND YOU WILL BE ABLE TO READ

18   THEM.  BUT I'LL JUST TELL YOU, "4C" SAYS,

19   "THIS ENTITY HAS NOT DEVELOPED, IMPLEMENTED

20   OR MAINTAINED A WRITTEN COMPLIANCE PROGRAM."

21   AND THERE'S A LOT OF OTHER STUFF ON THE PAGE,

22   TOO, THAT ISN'T REALLY DIRECTLY RELEVANT TO

23   THIS CASE.  BUT IT TELLS HIM LOUD AND CLEAR

24   HE'S GOT NO POLICY.

25        AND THEN "6C," HE -- THEY EVEN GOT

1    ASTERISKS OR STARS NEXT TO THIS LANGUAGE.

2    "CHECK CASHING POLICIES AND PROCEDURES SHOULD

3    BE DEVELOPED IMMEDIATELY.  AT A MINIMUM, YOUR

4    PROGRAM NEEDS TO DO THESE THINGS.  PLEASE

5    DEVELOP WRITTEN CHECK CASHING POLICIES AND

6    PROCEDURES IMMEDIATELY."  WITH THREE

7    ASTERISKS.  THAT'S WHAT THEY SEND HIM.

8    THAT'S WHAT HE ACKNOWLEDGES IS TRUE.

9    AND I MIGHT TALK ABOUT THIS BRIEFLY

10   LATER, BUT, YOU KNOW, WHETHER HE WAS

11   COMPLYING WITH THE RULES FOR WIRING MONEY,

12   RIGHT, YOU HEARD HIM REFERENCE THE SIGUE, AND

13   OTHER COMPANIES THAT -- WHERE YOU CAN COME

14   INTO HIS STORE AND WIRE MONEY.  YOU KNOW,

15   WHETHER HE WAS KEEPING THE RIGHT RECORDS FOR

16   PAYROLL CHECKS OR ANYTHING ELSE THAT HE

17   WANTED TO DO AT HIS BUSINESS, NONE OF THAT

18   MATTERS.  RIGHT?  THIS CASE IS ABOUT IS DID

19   HE HAVE AN ANTI-MONEY LAUNDERING PROGRAM.

20   WAS HIS CHECK CASHING BUSINESS, WAS HE DOING

21   WHAT HE NEEDED TO DO OR WAS IT ALL NON-

22   COMPLIANT?  WAS IT ALL FACILITATING THIS

23   MASSIVE FRAUD?  AND YOU'VE GOT TWO ADMISSIONS

24   FROM THE DEFENDANT THAT HE WASN'T DOING WHAT

25   HE NEEDED TO DO.

1        HE ACTED WILLFULLY.  HE KNEW WHAT HIS

2      OBLIGATIONS WERE AND HE SIMPLY DIDN'T CARE.

3      RIGHT?  NO ONE WHO OWNS A BAR DOESN'T KNOW

4      THAT THEY CAN'T, YOU KNOW, -- THEY CAN'T HAVE

5      TABLES FILLED UP WITH 18 AND 19-YEARS OLD,

6      YOU KNOW, DRINKING PITCHERS OF BEER.  THEY DO

7      IT ANYWAY BECAUSE THEY'RE MAKING A LITTLE BIT

8      OF MONEY ON THOSE SALES.  THEY JUST DON'T

9      CARE.  THEY KNOW IT'S ILLEGAL.  AND THIS

10     DEFENDANT IS NO DIFFERENT.

11        IN 2009, YOU SAW THE SWORN

12     CERTIFICATION, THE OFI, HE SIGNS IT.  "I KNOW

13     THE RULES.  I'M GOING TO ABIDE BY THE RULES."

14     THEY SPECIFICALLY REFERENCE THE BANK SECRECY

15     ACT.  THEY SPECIFICALLY REFERENCE THE

16     REGULATIONS.  HE SAYS HE KNOWS WHAT HE'S

17     GOING TO DO AND HE SENDS IT IN.

18        MS. HARDY -- THE ADMISSION.  I TALKED

19     ABOUT IT.  SHE WENT OVER THIS WITH HIM.

20        2012, HE SUBMITS ANOTHER SWORN

21     CERTIFICATION TO OFI.  "I KNOW THE RULES.  I

22     PROMISE TO DO WHAT I'M SUPPOSED TO DO."

23     THAT'S "EXHIBIT 5C."  MS. ARMWOOD SHOWS UP IN

24     2013.  WE TALKED ABOUT THE ADMISSION EARLIER.

25     MY RECOLLECTION OF HER TESTIMONY WAS HE

1          DIDN'T HAVE A SINGLE PILLAR OF THE POLICY --

2          OF THE FOUR PILLARS.  THERE'S FOUR, AND HE

3          DIDN'T HAVE A SINGLE ONE OF THEM.

4                NOW, REMEMBER, THIS CASE IS ABOUT THE

5          CHECK CASHING.  OKAY?  NOT THE WIRINGS, NOT

6          THE SIGUE STUFF, NOT THE MONEY ORDERS.  BUT

7          HE KNEW WHAT HE HAD TO DO.  HE HAD BEEN TOLD

8          REPEATEDLY AND HE REPRESENTED TO THE

9          GOVERNMENT THAT HE KNEW WHAT HE HAD TO DO.

10         HE REPRESENTED THAT REPEATEDLY.  AND HE ALSO

11         RECEIVED GUIDANCE FROM THE IRS.

12               SO, AS YOU WRAP UP YOUR DELIBERATIONS

13         ON COUNT TWO, THE JUDGE IS GOING TO TELL YOU

14         IF YOUR ANSWER TO THOSE FIRST TWO ELEMENTS --

15         IF YOUR ANSWER IS YES, THERE IS ONE

16         ADDITIONAL QUESTION YOU HAVE TO ANSWER:  DID

17         HE COMMIT THE OFFENSE WHILE VIOLATING ANOTHER

18         LAW OF THE UNITED STATES OR AS A PART OF A

19         PATTERN OF ANY ILLEGAL ACTIVITY INVOLVING

20         MORE THAN $100,000.00 IN A 12-MONTH PERIOD?

21         AND THE COURT IS GOING TO INSTRUCT YOU THAT

22         ANY OF THE OTHER THREE COUNTS CHARGING THAT,

23         IT WOULD QUALIFY.

24               SO, IF YOU DECIDE, WHICH I SUGGEST -- OF

25         WHICH I HOPE YOU WILL, THAT HE'S GUILTY OF

1       COUNT TWO, YOU WILL ALSO HAVE TO DECIDE

2       WHETHER HE'S GUILTY OF THESE OTHER -- ONE OF

3       THESE OTHER OFFENSES OR WHETHER HE VIOLATED

4       COUNT TWO AS PART OF A PATTERN OF ILLEGAL

5       ACTIVITY, INVOLVING MORE THAN $100,000.00 IN

6       A 12-MONTH PERIOD.

7           AND IT MAY BE THAT THE EASIEST EVIDENCE

8       OF THAT IS THE STIPULATION THAT THE CHECKS

9       WERE FRAUDULENT, AND WE KNOW THE TOTAL IS

10      1.65 MILLION DOLLARS.

11          COUNTS THREE AND FOUR.  I'M GOING TO TRY

12      TO SET THE STAGE FOR THEM AT THE SAME TIME

13      BECAUSE THE ELEMENTS ARE THE SAME.  I THINK

14      THIS WILL SAVE A FEW MINUTES, ANYWAY.

15          WE HAVE TO PROVE THAT THERE WAS A

16      PROCEEDING PENDING BEFORE AN AGENCY OF THE

17      UNITED STATES.  WE HAVE TO PROVE THE

18      DEFENDANT KNEW THAT THE PROCEEDING WAS

19      PENDING.  AND WE HAVE TO PROVE THAT HE

20      CORRUPTLY ENDEAVORED TO INFLUENCE, OBSTRUCT

21      OR IMPEDE THE DUE AND PROPER ADMINISTRATION

22      OF THE PROCEEDING.

23          WELL, THERE'S NO DISPUTE, I DON'T THINK,

24      IN EITHER COUNT OF ITEMS ONE AND TWO.  ALL

25      RIGHT?

1        THE 2010 EXAM, THAT'S COUNT THREE.  THAT

2    WAS PENDING.  YOU HEARD FROM MS. HARDY.  AND

3    HE KNEW IT WAS PENDING.  SHE MET WITH HIM

4    ABOUT IT.

5        SAME THING WITH THE 2013.  MS. ARMWOOD

6    TOLD YOU THERE WAS A PROCEEDING.  HE KNEW IT

7    WAS A PROCEEDING.  HE KNEW IT WAS PENDING.

8    SHE MET WITH HIM ABOUT IT.  NO DISPUTE ABOUT

9    THOSE.

10        SO, REALLY, WHAT YOU'LL HAVE TO FOCUS ON

11    IS DID HE ATTEMPT TO -- AND HE DIDN'T HAVE TO

12    SUCCEED.  THE COURT IS GOING TO TELL YOU IT

13    DOESN'T MATTER -- IT DOESN'T MATTER WHETHER

14    HE WAS SUCCESSFUL.  BUT DID HE ATTEMPT TO

15    INFLUENCE OR OBSTRUCT OR IMPEDE THAT 2010

16    EXAM?

17        WELL, MY RECOLLECTION OF THE EVIDENCE,

18    AND YOU WILL BE ABLE TO DECIDE THIS. IS THAT

19    THE DEFENDANT TOLD THE REVENUE AGENT, MS.

20    HARDY, "I DON'T HAVE ANY COPIES OF CHECKS.  I

21    DON'T KEEP COPIES OF THE CHECKS.  I DON'T

22    HAVE CHECK-CASHING RECORDS.  BUT, MS. HARDY,

23    REST ASSURED, I DON'T CASH CHECKS OVER

24    $5,000.00.  AND I DON'T ALLOW PEOPLE TO CASH

25    MULTIPLE CHECKS.  I ONLY ALLOW PEOPLE TO CASH

1      MULTIPLE CHECKS IF THE TOTAL IS NOT OVER

2      $5,000.00." THAT'S WHAT HE TELLS MS. HARDY

3      TO SEND HER ON HER WAY.

4          WHAT'S THE TRUTH? WHAT DO YOU KNOW THE

5      TRUTH IS BASED ON OTHER EVIDENCE? YOU KNOW

6      HE KEPT COPIES. YOU SAW THE CHECKS. YOU SAW

7      A SUMMARY OF THE CHECKS THAT WERE DISCOVERED

8      DURING A FEDERAL SEARCH YEARS LATER. THAT'S

9      "EXHIBIT 24." CHECKS FROM BACK IN 2010 THAT

10     HE HAD IN HIS RECORDS THE WHOLE TIME. HE

11     TOLD MS. HARDY HE DIDN'T HAVE THEM.

12         YOU ALSO HEARD THE DEFENDANT HIMSELF SAY

13     HE KEEPS COPIES OF ALL THE CHECKS. HE HAD

14     THESE CHECKS. HE JUST DIDN'T WANT TO GIVE

15     THEM, APPARENTLY, TO MS. HARDY.

16         THERE WAS ALSO A LOT OF CONFUSION IN

17     THIS TRIAL ABOUT IMAGES OF CHECKS -- IMAGES

18     OF CHECKS. AND MAYBE YOU CAN GO GET

19     SOMETHING FROM A BANK AND, YOU KNOW, IF YOU

20     DON'T HAVE A COPY, YOU CAN GET IT FROM THE

21     BANK AND GIVE IT TO THE EXAMINER AND MAYBE

22     THAT WAS ENOUGH. THAT'S NOT WHAT THE

23     EVIDENCE WAS. THE EVIDENCE WAS, HE WAS ASKED

24     FOR COPIES OF CHECKS. HE SAID HE DIDN'T HAVE

25     ANY. AND YOU KNOW THERE'S NO QUESTION THAT

1    HE DID.  HE JUST DIDN'T WANT TO PROVIDE THEM.

2         YOU ALSO SAW THAT HE ROUTINELY CASHED

3    CHECKS OVER $5,000.00.  AND I WENT THROUGH

4    THAT WITH SPECIAL AGENT SCHMIT IN SOME

5    DETAIL.  BUT YOU CAN GO TO "EXHIBIT 7."

6    THOSE ARE THE 2010 BANK STATEMENTS.  AND YOU

7    CAN JUST PICK OUT ONE CHECK AFTER ANOTHER.

8    PEOPLE COMING IN WITH CHECKS OVER $5,000.00

9    THAT HE CASHED.

10        AND, YES.  THERE WERE A LOT OF QUESTIONS

11   FROM MR. AMBEAU ABOUT THE FACT THAT CASHING A

12   CHECK OVER $5,000.00 IS NOT, PER SE, ILLEGAL.

13   NO QUESTION ABOUT THAT.  BUT LET ME GIVE YOU

14   TWO CAVEATS.

15        FIRST OF ALL, ANY SUSPICION -- ANY

16   TRANSACTION THAT'S SUSPICIOUS, YOU GOT TO BE

17   ON THE LOOKOUT FOR.  RIGHT?  A TRANSACTION

18   MIGHT ONLY BE FOR A COUPLE OF THOUSAND

19   DOLLARS.  BUT IF IT'S SUSPICIOUS, YOU'VE GOT

20   TO HAVE A POLICY IN PLACE TO IDENTIFY THAT OR

21   REPORT IT.  HE DIDN'T DO ANY OF THAT.

22        AND, NUMBER TWO.  IT DOESN'T MATTER WHAT

23   HE NOW CLAIMS HIS POLICY WAS AT THE TIME, HIS

24   SELF-IMPOSED POLICY.  WHAT HE TOLD MS. HARDY

25   IS, "I DON'T DO THAT. I DON'T CASH CHECKS

1    OVER $5,000.00." AND THAT WAS FALSE.  THAT

2    WAS DEMONSTRABLY FALSE.  YOU CAN SEE IT IN

3    HIS BANK RECORDS.

4         AND HE ROUTINELY ALLOWED PEOPLE TO COME

5    IN AND CASH MULTIPLE CHECKS TOTALING MORE

6    THAN $5,000.00.  IT'S THE SAME EXHIBIT,

7    "EXHIBIT 7."  YOU CAN BASICALLY START AT PAGE

8    94 AND GO ON THROUGH THE EXHIBIT IF YOU WANT.

9    AND YOU CAN PICK THEM OUT ON JUST ABOUT EVERY

10   OTHER PAGE.

11        AND, AGAIN, MR. AMBEAU IS RIGHT.  THAT'S

12   NOT INHERENTLY ILLEGAL.  BUT IF THOSE

13   TRANSACTIONS ARE SUSPICIOUS, YOU'VE GOT TO

14   IDENTIFY THEM. YOU'VE GOT TO FLAG THEM AND

15   YOU'VE GOT TO REPORT THEM.

16        AND MORE IMPORTANTLY FOR PURPOSES OF

17   THIS COUNT, HE TOLD MS. HARDY HE DIDN'T DO

18   IT.  AND THAT WAS A LIE.  AND YOU SEE THAT IN

19   THE BANK RECORDS.

20        THAT'S A SUMMARY OF COUNT THREE THAT I

21   HOPE WILL CONVINCE YOU THAT HE'S GUILTY OF

22   THAT OFFENSE.

23        COUNT FOUR.  THE ATTEMPT TO INFLUENCE,

24   OBSTRUCT OR IMPEDE THE 2013 EXAM.  AND THE

25   ISSUES ARE PRETTY SIMILAR.  WHAT DID HE TELL

1    MS. ARMWOOD?  "I DON'T HAVE COPIES OF THE

2    CHECKS."  WELL, YOU KNOW THAT WAS FALSE.  WE

3    TALKED ABOUT IT A MINUTE AGO.  WE SAW THE

4    CHECKS.  HE HAD TONS OF CHECKS.  HE JUST

5    DIDN'T WANT TO GIVE THEM TO HER.  HE TELLS

6    MS. ARMWOOD, "I DON'T CASH MORE THAN ONE PER

7    PERSON.  MAYBE I DO IF IT'S A PAYROLL CHECK,

8    BUT USUALLY I DON'T."  HE DID THAT ALL THE

9    TIME.  YOU'VE SEEN THAT.  HE WAS DOING IT IN

10    2013 AT THE TIME OF THIS EXAM.  AND YOU CAN

11    SEE THOSE SUMMARIES IN THE "16'S" THAT GIVE

12    YOU SOME GOOD EXAMPLES.

13        HE TOLD MS. ARMWOOD HE NEVER ALLOWS

14    PEOPLE TO CASH MORE THAN $10,000.00 AT A

15    TIME.  RIGHT?  AND THERE WAS A LOT OF TALKING

16    IN THIS TRIAL ABOUT HOW, YOU KNOW, MAYBE

17    TRANSACTIONS UNDER $10,000.00 AREN'T A BIG

18    DEAL.  BUT IT WAS A LOT OF TALK --

19    $10,000.00, THAT'S KIND OF A MAGIC NUMBER.

20    THAT'S WHEN THERE ARE EVEN MORE RED FLAGS.

21    HE TELLS HER, "WELL, I NEVER ALLOW PEOPLE TO

22    DO THAT."  HE DID IT ALL THE TIME.  HE DID IT

23    NUMEROUS TIMES.  PEOPLE WOULD COME IN WITH

24    THREE CHECKS.  THOSE CHECKS WOULD EXCEED

25    "$10,000.00.  HE WOULD LET THAT CASH WALK OUT

1      THE FRONT DOOR OF HIS STORE.  NOT FILING A

2      REPORT.  HE TOLD YOU TODAY HE DIDN'T THINK

3      THAT WAS SUSPICIOUS.  AND HE SAID, "MOST

4      CHECKS ARE FROM REGULAR CUSTOMERS WHO LIVE

5      AND WORK IN THE AREA."  THAT'S WHAT HE TOLD

6      MS. ARMWOOD.  AND THE TRUTH IS, ALMOST NONE

7      OF HIS CHECKS WERE FROM REGULAR CUSTOMERS WHO

8      LIVED AND WORKED IN THE AREA.

9           AND "EXHIBIT 15" IS THAT PIE CHART THAT

10     WE LOOKED AT IN THE BEGINNING.  THAT SHOWS

11     THAT AT 95 POINT SOMETHING PERCENT OF ALL OF

12     HIS CHECKS WERE FROM OUT OF STATE.  NOT FROM

13     REGULAR CUSTOMERS WHO LIVED AND WORKED IN THE

14     AREA.

15          AND "16A" IS A GOOD EXAMPLE.  THOSE ARE

16     THE SEDGWICH CHECKS.  AND I THINK THAT

17     BETWEEN SEDGWICK AVENUE, WORCESTER,

18     MASSACHUSETTS, AND HARWICH, MASSACHUSETTS, I

19     THINK THAT'S "16A, B" AND "C."  I THINK THAT

20     THOSE THREE ADDRESSES REPRESENT $750,000.00

21     OF FRAUDULENT TREASURY FUNDS AT THOSE

22     ADDRESSES.  HE DIDN'T THINK ANY OF THAT WAS

23     SUSPICIOUS.  AND HE LIED TO MS. ARMWOOD ABOUT

24     THAT HE WAS DOING IT AT ALL.

25          SO, WE GET TO COUNT ONE.  AND THAT'S

1    AIDING AND ABETTING THEFT OF GOVERNMENT

2    FUNDS.

3         WELL, WE HAVE TO PROVE THAT THE MONEY OR

4    THE PROPERTY BELONGED TO THE U.S. GOVERNMENT

5    IN A VALUE IN EXCESS OF MORE THAN $1,000.00.

6    I THINK YOU'LL SEE THAT PRETTY MUCH EVERY

7    CHECK WAS OVER $1,000.00.  SO, THAT'S GOING

8    TO BE PRETTY CLEAR.

9         THAT SOME PERSON OR PERSONS EMBEZZLED,

10   STOLE OR KNOWINGLY CONVERTED THE MONEY OR

11   PROPERTY TO THEIR OWN USE OR THE USE OF

12   OTHERS.  THAT THEY DID SO KNOWING IT WASN'T

13   THEIRS, WITH THE INTENT TO DEPRIVE THE OWNER.

14   RIGHT.  THE REAL PAYEE OR THE GOVERNMENT, OF

15   THAT PROPERTY.  AND THAT THIS DEFENDANT

16   VOLUNTARILY PARTICIPATED IN THE COMMISSION OF

17   A CRIME.

18        LET ME EMPHASIZE AGAIN.  THERE'S NO

19   REASONABLE DISPUTE THAT THESE CHECKS WERE

20   FRAUDULENT.  THEY WERE STOLEN.  SOME OF THEM

21   WERE STOLEN.  ABOUT $58,000.00 WORTH.  YOU

22   CAN PULL THOSE UP FROM THE REGULATIONS, WHICH

23   IS "EXHIBIT 12."  MOST OF THEM WERE

24   FRAUDULENT.  THEY WERE BASED ON FALSE TAX

25   RETURNS.  MR. HERNANDEZ TOLD YOU ABOUT THAT.

1      MS. WATSON TOLD YOU ABOUT THAT.  AGENT SCHMIT

2      TALKED ABOUT THAT.  AND YOU CAN DO YOUR OWN

3      ANALYSIS, CERTAINLY, OF THE TAX RETURNS AND

4      OF THE OTHER DOCUMENTS.

5          HE KNEW THEY WERE -- THIS IS THE KEY,

6      THOUGH.  HE KNEW THAT THOSE CHECKS WERE NO

7      GOOD.  HE KNEW THEY WERE FRAUDULENT OR THAT

8      THEY HAD BEEN STOLEN.

9          THIS IS WHERE -- THIS IS ONE OF THE

10     PERHAPS MANY PLACES WHERE THE DEFENDANT MAY

11     TRY TO CONFUSE YOU.

12         NOW, JUDGE JACKSON IS GOING TO EXPLAIN

13     THE LAW TO YOU WHEN THE LAWYERS ARE DONE.

14     AND I HOPE YOU'LL LISTEN CAREFULLY.

15         BECAUSE THERE ARE A NUMBER OF THINGS

16     THAT MR. AMBEAU IS GOING TO TALK ABOUT THAT

17     WE'RE NOT REQUIRED TO PROVE.  THEY HAVE

18     NOTHING TO DO WITH THIS CASE.  AND YOU WON'T

19     HEAR JUDGE JACKSON TELL YOU THAT WE'RE

20     REQUIRED TO PROVE ANY OF THE THINGS THAT MR.

21     AMBEAU IS GOING TO TALK ABOUT.  ALL RIGHT?

22         WE'RE NOT REQUIRED TO PROVE THAT THIS

23     DEFENDANT DID THE WHOLE THING.  THERE WERE A

24     LOT OF QUESTIONS ABOUT MASSIVE FRAUD SCHEMES

25     AND ALL THESE PEOPLE IN OTHER STATES AND

1  OTHER JURISDICTIONS.  WE'RE NOT REQUIRED TO

2  PROVE THAT HE DID IT ALL.  OKAY?

3  WE'RE NOT REQUIRED TO PROVE HOW HE AND

4  THESE OTHER PEOPLE GOT THE CHECKS.  MAYBE

5  THESE PEOPLE CAME IN, ONE AT A TIME.  WE KNOW

6  THEY'RE FRAUDULENT CHECKS.  WE KNOW THEY'RE

7  NO GOOD.  MAYBE THEY WERE ARRIVING IN BATCHES

8  OR IN BULK.  IT DOESN'T MATTER.  WE'RE NOT

9  REQUIRED TO PROVE EXACTLY HOW THESE CHECKS

10  ARRIVE AT THE DEFENDANT'S STORE.

11  WE'RE NOT REQUIRED TO PROVE WHO THE

12  OTHER CRIMINALS ARE.  AND HOW CAN WE?  WE

13  DON'T KNOW WHO THE DEFENDANT'S WORKING WITH.

14  WE DON'T KNOW HOW THESE PEOPLE ARE FINDING

15  THE DEFENDANT'S STORE.  WE DON'T KNOW WHO

16  HE'S CONSPIRING WITH TO GET THESE CHECKS

17  CASHED AND GET THIS CASH OUT THE DOOR.

18  WE'RE NOT REQUIRED TO PROVE THAT THE

19  DEFENDANT PROFITED FROM THIS CRIME.  RIGHT?

20  GOING BACK TO THE BAR ANALOGY.  IT'S NOT --

21  IF THE BAR OWNER IS ONLY CHARGING THOSE 18

22  AND 19-YEAR OLD KIDS THE SAME AMOUNT PER BEER

23  AS ME OR AS PEOPLE WHO ARE OLDER. IT DOESN'T

24  MEAN IT'S DOING ANY LESS, ILLEGAL.  IT

25  DOESN'T MATTER IF THE DEFENDANT IS NOT

1    PROFITING. OR MAYBE A BETTER WAY TO PUT THAT

2    IS, WE DON'T HAVE TO PROVE THE EXTENT OF HIS

3    PROFIT.  MAYBE IT WAS ONLY ONE AND A HALF

4    PERCENT.  ONE AND A HALF PERCENT OF 1.65

5    MILLION IS STILL A GOOD BIT OF MONEY.  AND

6    PEOPLE CAN MAKE CRIMES ALL THE TIME FOR A LOT

7    LESS.

8         WE'RE NOT REQUIRED TO PROVE -- WE CAN'T

9    PROVE THAT SOMEONE SHOULD HAVE CAUGHT THE

10   CRIME EARLIER.  I SURE WISH IT WOULD HAVE

11   BEEN CAUGHT EARLIER.  BUT THE DEFENDANT'S ON

12   TRIAL TODAY FOR THE CRIMES THAT THE JUDGE IS

13   GOING TO READ TO YOU WHEN HE READS THE

14   INDICTMENT.

15   THE COURT: YOU HAVE FIVE MINUTES LEFT

16        ON YOUR FIRST CLOSING, MR. STEVENS.

17   MR. STEVENS: YES, JUDGE. I MAY GO OVER BY

18        A COUPLE OF MINUTES.

19        THIS CASE IS ABOUT HIS CHECK CASHING

20   BUSINESS.  NOT SIGUE.  NOT THE WIRINGS.  NOT

21   THE MONEY ORDERS.  NOT PAYROLL CHECKS.  I

22   WISH I HAD A -- ONE OF THOSE CHEST CLOCKS OR

23   A TIMER TO SEE HOW MUCH TIME WE SPENT HEARING

24   ABOUT HOW THE NUMBERING SYSTEM OF THESE

25   FEDERAL REGULATIONS HAD CHANGED FROM 2010 TO

1  2013 EXAM.  THAT DOESN'T MAKE ANY DIFFERENCE.

2  OKAY?  IT'S NOT -- THIS CASE IS NOT ABOUT ANY

3  OF THESE THINGS.

4       HE KNEW THAT THESE CHECKS WERE

5  FRAUDULENT OR THAT THEY HAD BEEN STOLEN.  THE

6  BANK TOLD HIM.  HE SAW THE RED FLAGS.  HE

7  DIDN'T BOTHER TO TAKE ANY PRECAUTIONS.  HE

8  NEVER FILED ANY REPORTS.  HE KEPT THE WORST

9  RECORDS -- HE KEPT FEWER DOCUMENTS FOR HIS

10  CHECK CASHING BUSINESS THAN FOR THE REST OF

11  HIS STORE.  RIGHT?  YOU SAW HE KEPT DETAILED

12  RECORDS FOR THE GROCERIES THAT 40 AND 50 AND

13  $60.00 CHECKS THAT -- TO I THINK HE SAID

14  EMPLOYEES, MR. PIRADES, WHEN WE LOOKED AT

15  "EXHIBIT 67."

16       HE SAID HOW IMPORTANT IT WAS TO KEEP

17  GOOD RECORDS.  AND WHEN I ASKED HIM ABOUT THE

18  TREASURY CHECKS, I THINK HIS RESPONSE WAS,

19  "WELL, DO YOU EXPECT ME TO WRITE THIS ALL

20  DOWN?"  HE SAID SOMETHING LIKE THAT.  "YOU'LL

21  REMEMBER IT."  BUT THAT WAS ASTOUNDING,

22  RIGHT?  TO KEEP A TON OF RECORDS FOR

23  QUESADILLAS AND CABBAGE AND PAYING SOMEONE

24  $40.00, BUT TO NOT KEEP EVERY TREASURY CHECK

25  THAT'S SIX, SEVEN, $8,000.00?  TO NOT KEEP

1    RECORDS FOR A MILLION AND A HALF DOLLARS

2    WORTH OF BUSINESS?

3        HE -- YOU HEARD REFERENCES THROUGHOUT

4    THE TRIAL TO THE DEFENDANT BEING A VICTIM OF

5    A SCHEME.  AND I MAY HAVE MORE TO SAY ABOUT

6    THAT WHEN I GET BACK UP HERE.

7        BUT ASK YOURSELVES WHETHER ANY OF HIS

8    CONDUCT WAS CONSISTENT WITH THAT OF A VICTIM.

9    RIGHT?  I MEAN, IF SOMEONE BREAKS INTO YOUR

10   SHED AND STEALS A BIKE OR A LAWN MOWER, YOU

11   CALL THE POLICE.  ALL RIGHT?  IF SOMEONE

12   BREAKS INTO YOUR PORCH AND TAKES YOUR FLAT

13   SCREEN TV, YOU'RE GOING TO CALL THE POLICE.

14   BUT THIS DEFENDANT'S BANK STARTS SENDING HIM

15   NOTICES THAT'S, ACCORDING TO HIM, COSTING HIM

16   REAL MONEY AND HE'S -- AND HE'S TAKING BAD

17   CHECK AFTER BAD CHECK AND HE NEVER FILES ANY

18   REPORTS.  HE NEVER ASKS FOR ANY HELP.  HE

19   NEVER TURNS ANY OF THESE PEOPLE AWAY?  HE'S

20   NO VICTIM.  HE WAS A PARTICIPANT IN THE

21   CRIME.

22       HE ALSO BLAMES A LOT OF OTHER PEOPLE FOR

23   WHAT HE DID.  RIGHT?  HE BLAMES THESE OTHER

24   CRIMINALS, THESE 250 SOME OTHER PEOPLE THAT

25   THEY'RE THE BAD GUYS.  THEY CAME IN AND THEY

1  FOOLED HIM.  HE BLAMES THE BANK FOR NOT

2  CATCHING IT.  HE BLAMES THE IRS FOR NOT

3  CATCHING THIS SOONER.

4      TODAY HE ACTUALLY BLAMED THE EXAMINERS,

5  MS. HARDY AND MS. ARMWOOD.  MY RECOLLECTION

6  IS HE SAID THAT MS. HARDY WAS MAD AND THAT

7  THEY WEREN'T COMMUNICATING PROPERLY AND HE

8  WAS THERE AND HE WANTED TO HELP, AND SHE JUST

9  APPARENTLY WASN'T -- WASN'T DOING A GOOD JOB.

10      A LOT OF WHAT HE SAID JUST WASN'T TRUE.

11  RIGHT?  YOU HEARD THE EVIDENCE THAT THE BANK

12  IS NOT EQUIPPED TO POLICE WHAT'S GOING ON IN

13  THIS DEFENDANT'S STORE.  AND THE IRS CAN'T

14  CATCH THIS AS IT'S HAPPENING.

15      BUT NONE OF THAT MATTERS ANYWAY.  THE

16  JUDGE IS GOING TO TELL YOU THAT THE ONLY

17  THING YOU NEED TO CONSIDER IS THIS

18  DEFENDANT'S GUILT, THE CRIMES THAT THE JUDGE

19  WILL READ TO YOU.  AND IF YOU ROB A BANK AND

20  NO ONE CATCHES YOU FOR A WHILE, IT DOESN'T

21  MEAN YOU DIDN'T ROB THE BANK.  RIGHT?  IT

22  DOESN'T MEAN THAT YOU'RE NOT GUILTY.  AND

23  IT'S THE SAME, I GUESS, ANALOGY THAT APPLIES

24  HERE.

25      HE LIES AT EVERY OPPORTUNITY.  LIES TO

1        MS. HARDY, LIES TO MS. LEBLANC; THAT'S THE

2        OFI EXAMINER.  RIGHT?  SHE ASKS HIM, "HEY,

3        HAS THE IRS BEEN HERE TO DO AN EXAM?"  AND

4        SHE EXPLAINED TO YOU THAT IF HE HAD SAID,

5        "NO,"  SHE WOULD HAVE DONE A MORE THOROUGH

6        EXAMINATION.  OR IF HE HAD SAID, "YES, AND

7        HERE'S WHAT THEY FOUND," SHE WOULD HAVE

8        WANTED TO SEE IF HE CORRECTED THE THINGS THEY

9        HAD FOUND.  AND WHAT HE TOLD ---

10       MR. AMBEAU: OBJECTION, YOUR HONOR.  MAY WE

11            APPROACH?

12       THE COURT: YES.

13       REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

14            A BENCH CONFERENCE WAS HELD.)

15       MR. AMBEAU: I MADE A MOTION IN LIMINE

16            AT THIS -- I MADE A MOTION IN LIMINE AT

17       THIS DESK TO EXCLUDE THE GOVERNMENT FROM

18       BEING ABLE TO TALK ABOUT ANY OF THAT

19       INFORMATION AS TO THE OFI.  AT THE END OF

20       THAT CONVERSATION, THE GOVERNMENT SAID TO THE

21       COURT -- REPRESENTED TO THE COURT, THAT THEY

22       WOULD NOT DO THAT.  AND NOW THEY'RE TALKING

23       ABOUT THE OFI AND WHAT HE SAID TO THE OFI.

24       THE COURT: MR. STEVENS?

25       MR. STEVENS: ABSOLUTELY DID NOT SAY THAT,

1        JUDGE.  IT WAS ALREADY IN MY CLOSING,

2    WHICH I DRAFTED.  AND THE POINT I MADE AT THE

3    DESK -- AT THE BENCH WAS, THAT THAT EVIDENCE

4    HAD COME IN.  IT HAD BEEN ADMITTED.

5    THE COURT: CORRECT.

6    MR. STEVENS: AND I -- I -- I MEAN, I'M ABOUT

7        TO MOVE ON.  BUT, I MEAN, THAT'S

8    ADMISSIBLE EVIDENCE THAT YOU DECIDED,

9    RIGHTFULLY SO, IS RELEVANT.

10    THE COURT: WELL, AGAIN, LET'S JUST MOVE ON.

11    MR. STEVENS: YES.

12    THE COURT: YOU'RE NOT GOING TO MENTION THAT.

13    MR. STEVENS: I'LL MOVE ON.

14    THE COURT: IT IS -- I DON'T WANT THE JURY

15        TO BE CONFUSED ABOUT THAT.  THAT'S MY

16    REAL CONCERN ABOUT THAT.  BUT LET'S JUST GO

17    ON AND MOVE ON.

18    MR. STEVENS: OKAY.

19    THE COURT: TO OTHER AREAS. OKAY?

20    MR. STEVENS: I MEAN, YOU DON'T HAVE ANY

21        IDEA -- I HOPE YOU DON'T BELIEVE --

22    THE COURT: NO, NO.

23    MR. STEVENS:  -- BELIEVE FOR ONE SECOND

24        THAT I SAID I WASN'T GOING TO DO WHAT I

25    JUST DID.

1       MR. AMBEAU: WELL, I THOUGHT THAT THAT'S WHAT

2           ---  YOU WALKED AWAY.

3       MR. STEVENS: YOU CAN CHECK THE TAPE LATER,

4           JUDGE, IF YOU WANT.

5       THE COURT: I UNDERSTAND.  THAT'S FINE.

6           LET'S MOVE ON, GENTLEMEN.

7       REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

8           THE BENCH CONFERENCE WAS CONCLUDED.)

9       MR. STEVENS: AND HE LIES TO MS. ARMWOOD.

10          AND HE TRIES TO MISLEAD THE FEDERAL

11      GRAND JURY.  EVERYTHING'S -- ALL OF THAT WAS

12      FALSE AND YOU HEARD ABOUT THE FACT THAT AGENT

13      SCHMIT DECIDED THAT SHE HAD NO CHOICE BUT TO

14      EXECUTE THE SEARCH WARRANT AND GRAB THE

15      DOCUMENTS FROM HIS BUSINESS.

16          HE ALSO LIED TO ME IN THIS TRIAL.  HE --

17      HE SAID HE LOOKED ALL THESE PEOPLE IN THE

18      FACE.  HE ALWAYS CHECKED THE ID'S.  HE KEPT

19      ALL OF THE CHECKS.  HE DID HIS BEST.  HE'S AN

20      UNSOPHISTICATED MAN AND USED TO BE A

21      CARPENTER.  AND NONE OF THAT'S TRUE, EITHER.

22          WHY ALL THE LIES LADIES AND GENTLEMEN? I

23      WOULD SUGGEST THAT WHAT THE EVIDENCE SHOWS IS

24      THAT HE KNEW THESE CHECKS WERE FRAUDULENT.

25      HE KNEW IT WAS PART OF A FRAUDULENT SCHEME.

1    HE WANTED TO KEEP THE SCHEME RUNNING.  HE

2    WANTED TO KEEP THESE CHECKS COMING IN AS LONG

3    AS HE COULD.  AND HE'S GUILTY OF ALL FOUR

4    COUNTS IN THE INDICTMENT.

5         THANK YOU, FOLKS.

6    THE COURT: THANK YOU, MR. STEVENS.

7         MR. AMBEAU?

8      CLOSING ARGUMENT BY THE DEFENSE

9    MR. AMBEAU: I'M GOING TO START WITH THE

10       FIRST SENTENCE THAT THE GOVERNMENT HAD

11   ON ONE OF THOSE PAGES.  AND IT'S THIS

12   SENTENCE.  AND I WROTE IT DOWN BECAUSE IT

13   SHOCKS ME THAT THE GOVERNMENT WOULD PRESENT

14   TO YOU WHAT IS UTTERLY AND UNBELIEVABLY FALSE

15   INFORMATION.  AND LET'S TALK ABOUT THE BANK

16   TOLD MY CLIENT THAT THESE WERE WRONG.

17       I'M GOING TO SHOW YOU WHAT WAS "U.S.

18   NUMBER 12."  THIS IS A NOTICE FROM THE BANK

19   ON AUGUST 31ST OF 2012.  THIS IS THE FIRST OF

20   THE CHECKS THAT CAME BACK TO HIM THAT WERE

21   RECLAIMED THAT HE PAID.

22       THE GOVERNMENT SAYS, THERE'S THIS PAGE

23   ABOUT THAT PAYMENT AND THIS PAGE ABOUT THAT

24   PAYMENT THAT ALSO WENT TO HIM, THAT SAY THAT

25   THIS CHECK WAS FRAUDULENT.

1    LADIES AND GENTLEMEN, THESE LAST TWO

2    PAGES ARE FOR FINANCIAL INSTITUTION USE ONLY.

3    AND THEY'RE SENT TO MY DEFENDANT AND IT SAYS,

4    "DO NOT FORWARD.  GET AUTHORIZATION SECTION

5    TO YOUR CUSTOMER."

6    NOW, I THOUGHT THAT I WAS CRAZY FOR A

7    SECOND.  I THOUGHT, DID MS. CRAIG TAKE THE

8    STAND AND SAY THAT ALL THIS WENT TO MR.

9    LINARES?  AND I LOOKED AT MR. LINARES AND I

10   -- WHAT, WHAT IS GOING ON HERE?  AND THEN I

11   LOOKED AT THESE TWO DOCUMENTS.  THESE TWO

12   DOCUMENTS FROM THE IRS THAT ARE CLEARLY

13   MARKED, "DO NOT SEND THE AUTHORIZATION

14   SECTION TO YOUR CUSTOMER."  DON'T DO IT.

15   THIS HAS INFORMATION ABOUT THE TAXPAYER ON

16   IT.  I CAN'T TELL YOU HOW DIFFICULT IT IS TO

17   GET INFORMATION ABOUT TAXPAYERS AND PEOPLE

18   INTO FEDERAL PROCEEDINGS.  IT'S VERY

19   DIFFICULT.  BECAUSE THE FEDERAL GOVERNMENT

20   TAKES YOUR PRIVACY VERY SERIOUSLY.  AND, SO,

21   THEY DON'T ALLOW THE BANK TO SEND THIS TO

22   ANYBODY.

23   AND, SO, MR. LINARES DID NOT HAVE NOTICE

24   FROM THE BANK THAT THESE CHECKS WERE

25   FRAUDULENT.  HE DID NOT HAVE NOTICE TO THE

1      BANK -- FROM THE BANK THAT THESE CHECKS WERE

2      FRAUDULENTLY OBTAINED.  NOTHING OF THE KIND.

3      AND IT'S A GROSS MISCHARATERIZATION OF THE

4      WITNESS' TESTIMONY AND THE EVIDENCE ENTERED

5      FOR YOU BY THE GOVERNMENT THAT HE DID SO.

6      BECAUSE THE ONLY THING HE RECEIVED WAS THAT.

7      AND THERE ISN'T ANYTHING ON THERE THAT THIS

8      CHECK WAS FRAUDULENT.  NOT ONE THING.

9      AND, LADIES AND GENTLEMEN, THIS STORY,

10     THIS SENTENCE, I BELIEVE, TELLS THE STORY OF

11     THIS ENTIRE CASE.  THAT THIS ENTIRE CASE IS

12     ABOUT THE UNITED STATES GOVERNMENT

13     OVERREACHING AND TRYING TO BLAME MR. LINARES,

14     CARLOS LINARES, GROCERY STORE OWNER ON

15     FLORIDA BOULEVARD IN BATON ROUGE, FOR A

16     MASSIVE ORGANIZED, CRIMINAL FRAUDULENT

17     ENTERPRISE ENACTED ON THE FEDERAL TREASURY,

18     WHICH NO ONE ELSE WAS CAPABLE OF FINDING OUT,

19     UNTIL WAY -- 15 MONTHS AFTER IT HAD BEGUN.

20     LADIES AND GENTLEMEN, WHAT I'M TALKING

21     TO YOU RIGHT NOW ABOUT IS NOT EVIDENCE.  I

22     WANT TO MIRROR WHAT THE JUDGE SAID EARLIER.

23     THAT WHAT WE'RE GOING TO DO TOGETHER, WHAT

24     I'D LIKE TO DO TOGETHER IS WALK THROUGH THE

25     EVIDENCE TOGETHER.  AND TAKE A LOOK AT WHAT I

1    BELIEVE THE EVIDENCE SHOWED YOU WHAT WAS

2    ADMITTED DURING THE TRIAL.

3        THE GOVERNMENT STARTED BY TELLING YOU

4    THIS WAS A PRETTY SIMPLY CASE, AND I AGREE.

5    I THINK IT IS A SIMPLE CASE.  I THINK IT'S

6    PRETTY STRAIGHTFORWARD.  THAT A BUNCH OF

7    PEOPLE WALKED IN TO CARLOS LINARES' BUSINESS

8    ON FLORIDA BOULEVARD AND CASHED A BUNCH OF

9    CHECKS THAT WERE ACTUALLY, LEGITIMATELY-

10    ISSUED UNITED STATES TREASURY CHECKS.  WITH

11    THE INK AND ALL OF THE STUFF THAT YOU WOULD

12    EXPECT TO HAVE ON THEM.  AND THOSE PERSONS

13    PRESENTED MR. CARLOS LINARES WITH AN ID AND

14    LOOKED AT THAT NAME AND LOOKED AT THAT FACE

15    AND LOOKED AT THE NAME ON THE CHECK AND HE

16    CASHED IT.

17        NOW, THE GOVERNMENT WOULD HAVE YOU

18    BELIEVE THAT SOMEHOW DURING THIS TIME MR.

19    LINARES SHOULD HAVE SEEN THIS BECAUSE HE

20    SHOULD HAVE SEEN THIS BIGGER PICTURE THAT WAS

21    HAPPENING.  AND, IN FACT, IN RELATION TO THE

22    ID'S, THE GOVERNMENT JUST SAID A MOMENT AGO,

23    THAT ALL OF THEM WERE OBVIOUSLY FAKE.  THE

24    ID'S WERE OBVIOUSLY FAKE.  HOW WOULD CARLOS

25    LINARES KNOW THAT?  I MEAN, I ASKED THE POST

1      OFFICE -- THE WITNESS FROM THE POST OFFICE,

2      IS THIS ID A VALID ADDRESS?  SHE DIDN'T TELL

3      ME.  SHE COULDN'T TELL ME.  IS THIS ID A

4      VALID ADDRESS?  SHE COULDN'T TELL ME.  EVEN

5      IN BATON ROUGE.

6          BUT THE GOVERNMENT WOULD EXPECT MR.

7      CARLOS LINARES WOULD -- FROM CASHING EVERYONE

8      OF THE BETWEEN 600 AND 800 CHECKS IN HIS

9      BUSINESS, THAT HE WOULD KNOW WHERE EACH ONE

10     OF THESE ADDRESSES ARE.  HE WOULD KNOW WHAT

11     THE BUILDING LOOKED LIKE AT SEDGWICH AVENUE

12     IN THE BRONX, NEW YORK.  OR THAT HE WOULD

13     EVEN HAVE THE WHEREWITHAL TO KNOW THAT CHECKS

14     WERE COMING IN FROM THAT LOCATION BECAUSE

15     THEY'RE COMING IN ALONG WITH BETWEEN --

16     YOU'VE HEARD EVIDENCE, 600 TO 800 CHECKS A

17     MONTH HE'S CASHING.  INCLUDING EVEN MORE IRS

18     CHECKS THAN WERE FRAUDULENTLY PRESENTED TO

19     HIM.

20         AND IN THE MIDDLE OF THAT, THE

21     GOVERNMENT TAKES OUT THESE -- THESE SUMMARY

22     REPORTS AND SAY, "LOOK AT ALL THIS SEDGWICH

23     AVENUE ALL IN A ROW."  MR. LINARES NEVER SAW

24     ANYTHING LIKE THAT.  MR. LINARES NEVER HAD A

25     SUMMARY REPORT OF THE IRS CHECKS THAT HE WAS

1      CASHING IN HIS BUSINESS.

2          NOW, THE BANK MAY HAVE.  I HAVE NO IDEA.

3      I THINK THAT'S EVENTUALLY HOW MS. CRAIG UNDER

4      -- UNCOVERED THIS FRAUD WAS BY REALIZING THAT

5      THERE WAS AN ACTUAL PLACE IN BATON ROUGE,

6      ACTUALLY CASHING THESE FRAUDULENT CHECKS,

7      ACTUALLY INVOLVED IN THE CRIME, ACTUALLY PLED

8      TO BEING INVOLVED IN THE CRIME, CASHING 30

9      CHECKS A DAY.  RECEIVING IN THAT, ONES WITH

10     ABSOLUTELY NO HUMAN BEING.

11         THE GOVERNMENT WOULD -- WOULD SAY TO YOU

12     THAT THAT BIG PACK OF ID'S THAT WE HAVE, THAT

13     ACCOUNTS FOR 195 OF THE 272 CHECKS.  BUT

14     THOSE ID'S AREN'T REAL SOMEHOW.  THAT'S 72

15     PERCENT OF THE CHECKS, THE IRS CHECKS, THAT

16     HE TOOK INTO HIS PLACE.  HE STILL HAS AN ID

17     FOR THEM.  HE STILL, YEARS LATER, HAS AN ID

18     FOR THEM WHEN THEY GO IN TO -- THE FBI GOES

19     IN -- I MEAN, EXCUSE ME, THE IRS GOES IN AND

20     EXECUTES A SEARCH WARRANT.  STILL HAS THE

21     ID'S.  STILL HASN'T LOST THEM OR THROWN THEM

22     AWAY OR MISPLACED THEM OR HAD SOMEBODY THROW

23     THEM AWAY.  HE STILL HAS 72 PERCENT OF THE

24     ID'S.  I MEAN, IF HE HADN'T BEEN COLLECTING

25     ANY ID'S FROM ANY OF THESE PEOPLE AND HE --

1    HE'D BEEN DOING THIS WITHOUT PEOPLE COMING IN

2    TO HIS BUSINESS, WHY WOULD HE HAVE -- WHY

3    WOULD HE STILL HAVE 72 PERCENT?

4        LADIES AND GENTLEMEN, LET'S TALK FOR A

5    SECOND -- PUT ASIDE THIS PARTICULAR CASE AND

6    TALK FOR A SECOND ABOUT THE BURDEN OF PROOF.

7    THE UNITED STATES HAS TO PROVE THIS CASE BY

8    WHAT'S CALLED BEYOND A REASONABLE DOUBT.  I

9    REMEMBER GOING TO LAW SCHOOL AND BEING TOLD

10   BEYOND A REASONABLE DOUBT AND NOT HAVING IDEA

11   WHAT THAT MEANT.  QUITE LITERALLY.  I DIDN'T

12   KNOW HOW TO DEFINE THAT.  QUITE, FRANKLY,

13   NEITHER DID THE -- THE COURTS STRUGGLE AND

14   PEOPLE STRUGGLE.  IT'S A NORMAL THING.

15   RIGHT? IT'S DIFFICULT TO SORT OF PUT A NUMBER

16   ON THAT.  AND, IN FACT, MOST COURTS SAY YOU

17   CAN'T PUT A NUMBER ON IT.  IT DOESN'T MAKE

18   SENSE TO DO THAT.

19       BUT LET ME TELL YOU WHAT -- HOW THE

20   UNITED STATES COURT DEFINES BEYOND A

21   REASONABLE DOUBT.

22       PROOF BEYOND A REASONABLE DOUBT IS SO

23   CONVINCING, SO CONVINCING THAT YOU WOULD BE

24   WILLING TO RELY AND ACT UPON IT WITHOUT

25   HESITATION IN MAKING THE MOST IMPORTANT

1      DECISIONS OF YOUR OWN AFFAIRS.  THAT'S HOW

2      CONVINCED YOU HAVE TO BE IN THIS CASE.

3      THAT'S HOW STRONG THE GOVERNMENT'S EVIDENCE

4      HAS TO BE.  THAT MR. LINARES SHOULD HAVE SEEN

5      THESE ADDRESSES.  THAT MR. LINARES SHOULD

6      HAVE SEEN THE DIFFERENCE IN 2010 AND 2012.

7      WE'LL TALK ABOUT THAT MORE IN A SECOND.

8           WHAT DOES THAT MEAN, THE MOST IMPORTANT

9      DECISIONS OF YOUR LIFE, LIKE WHO YOU'RE GOING

10     TO MARRY?  LIKE WHERE YOU'RE GOING TO BRING

11     YOUR CHILD TO DAYCARE.  WHAT CHURCH ARE YOU

12     GOING TO JOIN.  THE MOST IMPORTANT DECISIONS

13     OF YOUR LIFE.  THAT'S THE BEYOND-A-

14     REASONABLE-DOUBT STANDARD, LADIES AND

15     GENTLEMEN.

16          AND, SO, WHEN YOU RETIRE TO DELIBERATE

17     THIS CASE, I WOULD ASK YOU TO KEEP THAT IN

18     MIND IN TERMS OF THE LEVEL OF EVIDENCE

19     RELATED TO MR. LINARES AND MR. LINARES

20     COMMITTING ANY CRIME HERE AT ALL.

21          LET'S TALK ABOUT WHAT THE EVIDENCE

22     SHOWED FOR THOSE CRIMES.

23          COUNT ONE SAYS THAT MR. LINARES AIDED

24     AND ABETTED, WHICH MEANS HE ACTED UNDER THE

25     DIRECTION OF -- THAT SOMEONE ACTED UNDER THE

1    DIRECTION OF THE DEFENDANT OR THAT HE JOINED

2    ANOTHER PERSON AND PERFORMED AN ACT WITH THE

3    INTENT TO COMMIT A CRIME.

4         THE GOVERNMENT CAN'T ESTABLISHED THAT

5    MR. LINARES AIDED AND ABETTED IN THIS -- THIS

6    FRAUD THAT WENT ON IN NEW YORK, WITHOUT

7    ESTABLISHING THAT THE DEFENDANT HAD KNOWLEDGE

8    THAT THAT CRIME WAS OCCURRING.  ABSOLUTELY NO

9    ONE TOOK THE STAND TO GIVE YOU EVIDENCE THAT

10   THE DEFENDANT HAD KNOWLEDGE OF A CRIME

11   OCCURRING.  DESPITE THE FACT THAT THEY

12   PROSECUTED MORE THAN 15 PEOPLE IN NEW YORK

13   AND ONE IN BATON ROUGE, AT THE VERY LEAST,

14   NONE OF THOSE PEOPLE TOOK THE STAND TO SAY

15   MR. LINARES WAS INVOLVED IN THIS FRAUD, IN

16   ANY WAY, SHAPE OR FORM.  AND, IN FACT, WHEN I

17   ASKED THE DIRECT QUESTION TO THE -- TO THE

18   CASE AGENT OVER AND OVER AGAIN, DESPITE THE

19   DIFFICULTY IN ANSWERING IT, SHE FINALLY

20   ADMITTED THAT THE ONLY CONNECTION WAS THE

21   FACT THAT CHECKS WERE CASHED AT HIS BUSINESS.

22   AND, SO, THEIR ENTIRE CASE AS IT RELATES TO

23   AIDING AND ABETTING THIS THEFT IS THAT

24   SOMEHOW -- SOMEHOW THE CASHING OF THE CHECKS

25   AT HIS BUSINESS EQUALS HAVING PARTICIPATED IN

1     THIS CRIME.

2          YOU WILL BE INSTRUCTED BY THE JUDGE THAT

3     HIS NEGLIGENCE TO CATCH THIS CRIME, HIS

4     NEGLIGENCE TO ROOT IT OUT AND FIGURE OUT WHAT

5     IS HAPPENING, IS NOT SUFFICIENT.  THAT'S THE

6     LAW, LADIES AND GENTLEMEN.  HIS FAILURE TO

7     FIGURE OUT THAT HE WAS BEING VICTIMIZED BY

8     THESE PEOPLE, YOU CANNOT FIND HIM GUILTY ON

9     THIS FAILURE TO FIGURE IT OUT.

10          AND THAT COUNTS FOR EVERY ONE OF THESE

11     CRIMES, BECAUSE EVERY ONE OF THESE CRIMES

12     REQUIRES INTENT.  AND NEGLIGENCE DOES NOT

13     EQUAL INTENT.  IT DOES NOT.  YOU CANNOT

14     KNOWINGLY DO SOMETHING BY NEGLIGENTLY FAILING

15     TO DO IT.  THOSE TWO THINGS ARE COMPLETELY

16     SEPARATE.

17          AND NO OTHER EVIDENCE HAS BEEN OFFERED

18     FOR MR. LINARES' INVOLVEMENT IN THIS CRIME.

19     NONE.  NO OTHER EVIDENCE.  NOT ONE THING,

20     OTHER THAN THE FACT THAT THESE PEOPLE WALKED

21     INTO HIS BUSINESS AND CASHED THESE CHECKS.

22     DESPITE ALL OF THOSE PEOPLE BEING IN FEDERAL

23     CUSTODY AND/OR UNDER FEDERAL PROSECUTION

24     AND/OR CONVICTION, NOBODY.

25          AND, IN FACT, YOU WILL REMEMBER WHEN I

1    WAS GOING THROUGH THE 2010 AND 2013

2    SIMILARITIES AND I WAS SAYING, IN 2010, --

3         ONE MOMENT, YOUR HONOR.

4         AND I WROTE IT DOWN AND I REMEMBER

5    SAYING ALL OF THIS.  IN 2010, BOTH TIMES THE

6    TREASURY CHECKS WERE ACTUAL TREASURY CHECKS,

7    2010 AND 2013.  BOTH TIMES THEY WERE

8    PRESENTED TO MR. LINARES AT HIS STORE IN 2010

9    AND 2013.  BOTH TIMES THEY WERE CASHED BY

10   HIM.  BOTH TIMES THEY WERE ADDRESSED TO

11   PREDOMINANTLY SPANISH PEOPLE.  BOTH TIMES THE

12   MAJORITY OF THOSE CHECKS WERE FROM OUT-OF-

13   TOWN/OUT-OF-STATE ADDRESSES.  BOTH TIMES

14   THERE WERE MULTIPLE PEOPLE CASHING IN ONE

15   ADDRESS.  BOTH TIMES THERE WERE MULTIPLE --

16   MULTIPLE DEPOSITS MADE ON THE SAME DAY FROM

17   THE SAME ADDRESS.  IN FACT, IN 2010, THERE

18   WERE A LOT OF THE 86, 86, 86, 86.  BOTH TIMES

19   HAD MORE THAN ONE CHECK TO A SINGLE

20   INDIVIDUAL.  AND OUT OF ALL OF THOSE THINGS,

21   THE ONLY TWO DIFFERENCES IN 2010 AND 2013 IS

22   THAT NONE OF THOSE CHECKS WERE RECLAIMED AT

23   ALL.  THEY WERE ALL GOOD CHECKS IN 2010.  NO

24   RECLAMATIONS.  THE ONLY TWO DIFFERENCES WERE

25   THAT THE PERCENTAGE OF OUT-OF-TOWN CHECKS

1    INCREASED.  AND THE DOLLAR VALUE INCREASED.

2        THE FEDERAL GOVERNMENT WOULD HAVE YOU

3    BELIEVE THAT MR. LINARES, AFTER CASHING 191

4    CHECKS IN 2010, CASHING A SIMILAR AMOUNT OF

5    CHECKS IN 2011, AND THEN GETTING TO 2012 AND

6    CASHING TAX CHECKS, HE WOULD SUDDENLY BE SO

7    SUSPICIOUS OF A -- A UNITED STATES TREASURY

8    CHECK ISSUED BY THE UNITED STATES TREASURY,

9    THAT HE WOULD BE -- HE WOULD CATCH THAT FRAUD

10    BECAUSE, OH, THIS IS -- THIS IS $2,000.00

11    MORE.  I NEED TO LOOK INTO THIS.

12        THE 2010 AND 2013 EXAMINERS BOTH SAID

13    THAT HE DID NOT VIOLATE THE BSA IN ANY WAY.

14    AND THE BSA INCLUDES FILING A SUSPICIOUS

15    ACTION REPORT ON ANY SUSPICIOUS TRANSACTION

16    OVER $3,000.00.  AND BOTH OF THEM SAID HE

17    DIDN'T VIOLATE THAT.  BECAUSE THERE WERE NO

18    SUSPICIOUS TRANSACTIONS.  NOTHING TRIGGERED A

19    FILING NECESSARY BY MR. LINARES.  NOTHING.

20        WHY, LADIES AND GENTLEMEN?  BECAUSE THE

21    FRAUD PERPETRATED ON THE UNITED STATES

22    TREASURY WAS A HIGH LEVEL, ORGANIZED CRIME

23    FRAUD.  THESE PEOPLE KNEW HOW TO SNEAK AROUND

24    THE LAW.  AND THEY USED MR. LINARES TO DO SO.

25        LET'S TALK ABOUT COUNT TWO.  COUNT TWO

1     REQUIRES A BAD PURPOSE. COUNT TWO IS THE

2     COUNT THAT HE FAILED TO ENACT AN EFFECTIVE

3     MONEY LAUNDERING PROGRAM.

4          AND SO THAT WE'RE CLEAR ABOUT THIS.  I

5     WANT TO BE CLEAR ABOUT THE TIME LINE THAT I

6     MADE IN THE OPENING.  AND I'LL SHOW YOU THAT

7     NOW.  THIS WAS THE TIME LINE I MADE IN THE

8     OPENING, OR IT'S A REWRITING OF IT BECAUSE IT

9     WAS A LITTLE MESSY, MY FIRST ONE.

10         THIS IS THE TIME LINE, LADIES AND

11    GENTLEMEN.  AND WHAT THEY'RE SAYING IS THAT

12    HE FAILED TO HAVE AN EFFECTIVE ANTI-MONEY

13    LAUNDERING PROGRAM STARTING IN MARCH OF 2012

14    AND EXTENDING TO JUNE OF 2014.  DESPITE THE

15    FACT THAT -- AND NOTICE THAT ALL OF THAT

16    STUFF ABOUT THE EFFECTIVE MONEY LAUNDERING

17    PROGRAM IN 2010 IS NOT CHARGED.  RIGHT?

18         THE GOVERNMENT HAS NOT CHARGED HIM WITH

19    NOT HAVING AN EFFECTIVE ANTI-MONEY LAUNDERING

20    PROGRAM IN 2010.  WHAT THEY'RE CHARGING HIM

21    WITH IS NOT HAVING ONE STARTING ON MARCH 12TH

22    -- MARCH OF 2012.

23         BUT, IN FACT, WHEN THE SECOND IRS

24    EXAMINATION IS DONE IN MARCH OF 2012, WHICH

25    GOES BACK FOR SIX MONTHS, SHE SAYS: OF THE

1    FOUR PILLARS, OF THE FOUR PILLARS FOR MONEY

2    TRANSFERS, YOU HAVE THEM ALL COVERED.  OF THE

3    FOUR PILLARS FOR CHECK CASHING, YOU HAVE

4    THREE OF THE FOUR COVERED.  YOU NEED TO HAVE

5    IT IN WRITING.  THAT'S THE ONLY ONE, LADIES

6    AND GENTLEMEN.

7         HE'S MADE THAT MUCH PROGRESS.  IN THAT

8    THREE-YEAR PERIOD, HE'S TAKEN -- HE'S TAKEN

9    STEPS TO CORRECT HIS ANTI-MONEY LAUNDERING

10   PROGRAM.  AND I KNOW THAT YOU ALL REMEMBER

11   THIS.  I MEAN, YOU ALL REMEMBER ME GOING OVER

12   THIS WITH THOSE -- WITH THOSE TWO WITNESSES.

13   THAT IN 2010, ---

14        AND I'M SHOWING WHAT'S BEEN MARKED AS

15   "DEFENSE EXHIBIT 5" 0233, YOUR HONOR."

16        THESE ARE THE VIOLATIONS IN 2010.

17   VIOLATIONS FOR -- BY THE WAY, AGAIN, WHICH HE

18   HAS NOT BEEN -- THE 2010 ---

19        EXCUSE ME, YOUR HONOR.

20        THESE ARE THE -- THESE ARE THE MONEY

21   LAUNDERING STEPS HE TOOK TO CORRECT HIS MONEY

22   LAUNDERING PROGRAM IN 2013.

23        I'M SORRY.  I APOLOGIZE.  I MISSTATED

24   THAT.

25        IN 2010, HE'S NOT CHARGED WITH ANYTHING.

1      AND IN 2010 SHE SAYS, "YOU DON'T HAVE AN

2      ANTI-MONEY LAUNDERING PROGRAM, AND YOU NEED

3      TO PUT IT AN ANTI-MONEY LAUNDERING IN PLACE

4      -- ANTI-MONEY LAUNDERING PROGRAM IN PLACE."

5           AND IN 2013, DURING THE CHARGE -- DURING

6      THE TIME HE'S CHARGED, RIGHT, WITH FAILING TO

7      HAVE AN ANTI-MONEY LAUNDERING PROGRAM IN

8      PLACE, SHE SAYS, THE IRS AUDITOR: "CURRENT

9      ANTI-MONEY LAUNDERING PROGRAM IN PLACE AT

10     THIS LOCATION IS NOT ADEQUATE BECAUSE IT DOES

11     NOT ADDRESS CHECK CASHING POLICIES AND

12     PROCEDURES."

13          NOW, THAT'S THE SUGGESTED LANGUAGE.  YOU

14     REMEMBER THAT?  AND THE TRUTH IS, IS THAT SHE

15     HAD AN INTERVIEW WITH HIM WHERE HE TOLD HER

16     ALL OF HIS CHECK CASHING POLICIES AND

17     PROCEDURES, WHICH WERE MUCH MORE EXTENSIVE

18     THAN THE 2010 INTERVIEW.  AND SHE SAID THAT

19     HE HAD TO HAVE THEM IN WRITING.  THAT THAT

20     WAS THE FINAL THING.  LISTEN.  GET THESE

21     CHECK CASHING THINGS IN WRITING AND THEN

22     YOU'RE IN COMPLIANCE.

23          THE GOVERNMENT REPRESENTED TO YOU THAT

24     HE HAD NO ANTI-MONEY LAUNDERING PROGRAM IN

25     PLACE IN 2013.  DO YOU KNOW HOW WE KNOW HE

1        HAS AN ANTI-MONEY LAUNDERING PROGRAM IN PLACE

2        IN 2013?  BECAUSE IN 2013 AND 2012 AND 2011,

3        AND, IN FACT, ALSO IN 2010, HE DOESN'T

4        VIOLATE ANY OF THOSE PROVISIONS OF THE LAW.

5        HE DOESN'T MAKE A TRANSACTION OVER

6        $10,000.00.  HE DOESN'T FAIL TO FILE A REPORT

7        WHEN HE'S SUPPOSED TO.  THESE ARE THE

8        VIOLATIONS HE HAD.  THESE ARE THE VIOLATIONS

9        HE HAD.  NOTHING ELSE.  THEY COMBED THROUGH

10       HIS ENTIRE RECORD, LADIES AND GENTLEMEN.

11              IN 2010, EXAMINER, DEBORAH HARDY, --

12              LATINO'S 00192, YOUR HONOR.

13              -- SAYS TO HIM, "THE 2010 EXAMINER DID

14       NOT IDENTIFY ANY ERRORS OF POTENTIAL RISK FOR

15       MONEY LAUNDERING OR TERRORIST ACTIVITY."

16       THAT'S WHEN HE DIDN'T HAVE THE MONEY

17       LAUNDERING PROGRAM IN PLACE.

18              IN 2013 THEY COME BACK AND HE'S GOT ONE

19       IN PLACE -- WELL, OF COURSE -- AND OF COURSE

20       HE GOT BETTER.  RIGHT?  I MEAN, WE KNOW THAT

21       TO BE THE CASE.  THAT'S WHAT THOSE WITNESSES

22       TOLD US.

23              WHEN MS. ARMWOOD FILLS OUT THE CHECK

24       CASHING ANALYSIS IN 2013, WHICH IS HERE, SHE

25       SAYS, IN THE CHECK CASHING ANALYSIS,

1          "EXAMINER DID NOT IDENTIFY ANY UNUSUAL

2          PATTERNS OR SUSPICIOUS ACTIVITY.  NO

3          SUSPICIOUS ACTIVITY OR REPORTABLE

4          TRANSACTIONS NOTED."  THAT'S AN IRS AUDITING

5          AGENT IN HIS BUSINESS IN MARCH OF 2013.  AND

6          SHE DOESN'T UNCOVER THE FRAUD.  AND THEY

7          EXPECT TO MR. LINARES TO HAVE DONE SO.  AND

8          BECAUSE HE DIDN'T, WELL, HE MUST BE GUILTY.

9          HE MUST BE INVOLVED.  DO YOU THINK THE IRS

10          AGENT IS INVOLVED?  I DON'T.  SHE JUST FAILED

11          TO SEE WHAT WAS A VERY COMPLEX FRAUD ENACTED

12          UPON THE FEDERAL TREASURY, AND SO DID MR.

13          LINARES.  BUT THAT NEGLIGENCE, THAT FAILURE

14          TO LOOK -- TO REALIZE THAT DOES NOT EQUAL

15          CRIMINAL LIABILITY, LADIES AND GENTLEMEN.

16               MR. LINARES HAS TO HAVE THE CRIMINAL

17          INTENT TO HAVE COMMITTED THESE CRIMES.  HE'S

18          GOT NONE OF THAT.  NONE OF THAT.

19               AS YOU WILL BE INSTRUCTED BY THE JUDGE,

20          YOU'LL BE TOLD THAT THE MONEY LAUNDERING

21          PROGRAM HAS TO BE EFFECTIVE AND IT HAS TO BE

22          COMMENSURATE WITH THE RISK.

23               WHAT DOES EFFECTIVE MEAN?  DOES

24          EFFECTIVE MEAN IT HAD TO STOP THIS FRAUD ON

25          THE TREASURY?  OBVIOUSLY NOT, BECAUSE THE

1     BANK WAS UNDER THAT SAME STANDARD AND THEY

2     DIDN'T STOP IT.

3          EFFECTIVE MEANS THAT HE HAS -- HE CANNOT

4     VIOLATE THE BSA.  HE CAN'T VIOLATE THE BANK

5     SECRECY ACT.  HE CAN'T MAKE THESE

6     TRANSACTIONS GREATER THAN $10,000.00.  HE HAS

7     TO COMPORT WITH THE BANK SECRECY ACT LAW, AND

8     HE DID SO.  DO YOU KNOW WHY HE DID SO?

9     AGAIN, THIS FRAUD WAS SO COMPLEX AND SO

10    ORGANIZED THAT THEY KNEW HOW TO GET AROUND

11    THE BANK SECRECY ACT.  THESE AREN'T STUPID

12    CRIMINALS.  THESE ARE VERY INTELLIGENT

13    CRIMINALS.  THESE PEOPLE MANAGED TO GET FAKE

14    TAX CHECKS FROM THE TREASURY OF THE UNITED

15    STATES OF AMERICA.  THAT, TO ME, IS

16    UNBELIEVABLY IMPRESSIVE.  AND I CAN SEE WHY

17    THIS WAS DIFFICULT TO FIND FOR PROFESSIONALS.

18         I CAN'T IMAGINE WHY THE GOVERNMENT

19    THINKS THAT MR. LINARES SHOULD HAVE SOUGHT,

20    CAN'T IMAGINE. I REALLY CAN'T.

21         LET'S TALK ABOUT COUNT THREE AND FOUR.

22    LET'S TALK ABOUT THE STRUCTURE.  THIS IDEA

23    THAT MR. LINARES CORRUPTLY AND OBSTRUCTED

24    THOSE TWO PROCEDURES.  NOW, IN ORDER TO FIND

25    THAT HE -- THAT HE OBSTRUCTED THOSE TWO

1    PROCEEDINGS, IT MUST BE THAT IT WAS CORRUPT.

2    IT MUST BE THAT HE HAD A CORRUPT INTENT.

3    THAT HE WANTED TO NOT REPLY FOR A PURPOSE, TO

4    BREAK THE LAW.  IT'S NOT SUFFICIENT, LADIES

5    AND GENTLEMEN, THAT HE DID NOT REPLY.

6    PERIOD.  IT'S NOT SUFFICIENT.  AND, IN FACT,

7    WHEN THEY SAY, WELL, HE DIDN'T GIVE HER THE

8    CHECKS.  WELL, HE DID.  HE GAVE HER THE BANK

9    ACCOUNT.  HE GAVE HER EVERY CHECK HE CASHED.

10    BOTH OF THEM.

11        I MEAN, HOW DOES A PERSON HAVE A CORRUPT

12    INTENT TO HIDE A FEW CHECKS IN A BOX OVER

13    HERE BUT THEN GO TO THE BANK AND GIVE YOU ALL

14    THE CHECKS THEY CASHED.  HOW IS THAT POSSIBLY

15    A CORRUPT INTENT?  IT BOGGLES THE MIND HOW

16    THE GOVERNMENT THINKS THAT'S A CORRUPT

17    INTENT.

18        MR. STEVENS SAID THAT IN 2010, HE LIED

19    TO HER ABOUT CASHING CHECKS OVER $5,000.00

20    AND THEN SENT HER ON HER WAY.  IS THAT BEFORE

21    OR AFTER SHE SPENT 30 HOURS IN THE BUSINESS?

22    THIRTY HOURS IN THE BUSINESS GOING OVER HIS

23    BOOKS AND HIS RECORDS.  THIRTY HOURS, LADIES

24    AND GENTLEMEN.  THIRTY HOURS WITH ALL OF HIS

25    WIRE TRANSFER MONEY AND ALL OF HIS WIRE

1       TRANSFER RECORDS, AND ALL OF HIS CHECK

2       RECORDS.  AND THE GOVERNMENT DOESN'T WANT YOU

3       TO PAY ATTENTION TO ANY OF THAT, RIGHT?

4       WELL, DON'T PAY ATTENTION TO THIS WIRE

5       SERVICE OR ANY MONEY.

6            LADIES AND GENTLEMEN, MR. LINARES WAS

7       OPERATING HIS WIRE SERVICES BUSINESS AS WELL.

8       THAT WAS A PART OF WHAT HE DID.  AND HE DID

9       IT ABSOLUTELY PERFECTLY.  HE DIDN'T VIOLATE

10      ONE LAW AT ONE TIME IN 2010, '12, '13 OR '14

11      OR '11, PERIOD.  BUT THE GOVERNMENT SAYS,

12      "DON'T PAY ATTENTION TO THAT.  DON'T LOOK AT

13      THAT.  JUST LOOK AT THIS.  JUST LOOK AT THE

14      FACT THAT HE DIDN'T GET THE GOOGLE CHECK BOX

15      ON THE WRITTEN -- THE WRITTEN CHECK CASHING

16      POLICY.  I THINK THAT WAS ONE OF THE MORE

17      INTERESTING THINGS I HEARD DURING THIS TRIAL

18      WAS THAT THE -- THE 2013 IRS EXAMINER SAID,

19      "WELL, IF HE'D JUST GOOGLE CHECK CASHING

20      POLICIES AND PUT THEM IN HIS BUSINESS, HE

21      WOULD HAVE BEEN FINE."  AND THEN I SAID TO

22      HER, "WAS IT BETTER TO HAVE GOOGLE CHECK

23      CASHING POLICIES AND NOT APPLY THEM TO OR IS

24      IT BETTER TO HAVE CHECK CASHING POLICIES THAT

25      YOU APPLY SUCCESSFULLY BUT THEY'RE NOT

1    WRITTEN?"  AND SHE ADMITTED THAT, "WELL,

2    PROBABLY CHECK CASHING POLICIES THAT APPLY

3    ARE PROBABLY BETTER THAN THE GOOGLE CHECK

4    CASHING POLICIES."

5        AND MR. LINARES HAD, IN FACT, HAD

6    POLICIES THAT WORKED.  AGAIN, DIDN'T HAVE ANY

7    TRANSACTIONS.

8        THEY DIDN'T CITE HIM FOR ONE VIOLATION

9    OF THE BANK SECRECY ACT IN EITHER OF THOSE

10   TIMES, BECAUSE HE DIDN'T HAVE ANY

11   TRANSACTIONS THAT REQUIRED IT.  BECAUSE HIS

12   CHECK CASHING POLICY WAS EFFECTIVE.  IT JUST

13   WASN'T WRITTEN DOWN.

14       AND THEN HE WRITES IT DOWN -- SO THAT

15   WE'RE CLEAR.  HE WRITES IT DOWN, AND YOU ALL

16   SAW IT.  IN FACT, THE GOVERNMENT ADMITTED IT.

17   IN FEBRUARY OF 2014.  BUT THE GOVERNMENT

18   WOULD SOMEHOW WANT TO TELL YOU THAT HE FAILS

19   TO HAVE THE EFFECTIVE ANTI-MONEY LAUNDERING

20   PROGRAM UNTIL JUNE OF 2014.

21       SO, I GUESS THEIR CONTENTION IS THAT THE

22   FAILURE TO HAVE AN EFFECTIVE ANTI-MONEY

23   LAUNDERING PROGRAM HAS NOTHING TO DO WITH THE

24   WRITTEN CHECK CASHING POLICIES.  IT'S GOT TO

25   DO WITH SOMETHING ELSE.  AND I DON'T REALLY

1    KNOW WHAT THAT IS, TO BE HONEST WITH YOU.

2         I THINK THE GOVERNMENT'S ASSERTION IS

3    THAT IN ORDER TO HAVE AN EFFECTIVE ANTI-MONEY

4    LAUNDERING PROGRAM, HIS ANTI-MONEY LAUNDERING

5    PROGRAM SHOULD HAVE -- SHOULD HAVE ROOTED OUT

6    THESE CRIMINALS IN NEW YORK.

7         AND, LADIES AND GENTLEMEN, WE'VE SEEN

8    OVER AND OVER AGAIN THAT THE BANK HAD ALL OF

9    THIS INFORMATION AS WELL.  THE BANK, WITH

10   THEIR APPARATUS, TO FIGHT MONEY LAUNDERING

11   AND THE COMPLIANCE WITH THE BANK SECRECY ACT,

12   AND IT TOOK THEM 15 MONTHS TO FIGURE OUT WHAT

13   WAS GOING ON.

14        THE IRS AUDITORS IN THE -- THE AUDITORS

15   BUSINESS IN 2013 COULDN'T FIGURE IT OUT.

16        BUT MR. LINARES' ANTI-MONEY LAUNDERING

17   PROGRAM WAS INEFFECTIVE BECAUSE HE DIDN'T

18   CATCH IT.  AND, OH, YES, NOT JUST

19   INEFFECTIVE, HE ALSO MUST HAVE BEEN

20   PARTICIPATING IN THIS HUMONGOUS THREAT THIS

21   HUMONGOUS THEFT OF GOVERNMENT FUNDS OF 1.6

22   MILLION DOLLARS.

23        DESPITE THE FACT THAT HIS BUSINESS IS

24   STILL OPEN.  DESPITE THE FACT THAT HE PAID

25   OFF OF THE RECLAMATIONS.  DESPITE THE FACT

1    THAT HE'S STILL HERE.  UNLIKE THE OTHER

2    PEOPLE IN BATON ROUGE, WHO RIGHT BEFORE THEY

3    STARTED CASHING CHECKS, WHO CASHED 30 CHECKS

4    A DAY, WHO DIDN'T PAY BACK THE RECLAMATIONS.

5    YOU SEE, THERE IS A DISTINCTION BETWEEN

6    PEOPLE WHO ACTUALLY COMMIT CRIMES AND PEOPLE

7    WHO GET VICTIMIZED BY THOSE COMMITTING CRIMES

8    AND THEN GET CAUGHT UP IN THIS UNBELIEVABLE

9    PROSECUTION.

10    THE GOVERNMENT WOULD HAVE YOU BELIEVE

11    THAT MR. LINARES IS GUILTY OF AIDING AND

12    ABETTING PERSONS IN A THEFT THAT OCCURRED IN

13    NEW YORK, A FRAUD THAT OCCURRED UPON THE

14    TREASURY OF THE UNITED STATES OF AMERICA.

15    AND IN ORDER TO DO THAT, THEY'VE GOT TO

16    SHOW -- THEY'VE GOT TO SHOW THAT HE WAS

17    INVOLVED.  THEY MUST SHOW THAT HE WAS, IN

18    FACT, ASSOCIATED WITH THE CRIMINAL VENTURE.

19    THAT CANNOT BE ESTABLISHED IF THE DEFENDANT

20    HAD NO KNOWLEDGE OF THE CRIMINAL ENTERPRISE.

21    THE GOVERNMENT GAVE YOU ABSOLUTELY NO

22    EVIDENCE THAT MR. LINARES HAD AFFIRMATIVE

23    KNOWLEDGE OF THAT CRIME.  WHAT THEY'VE TOLD

24    YOU IS THAT IT WAS NEGLIGENCE IN CATCHING THE

25    CRIME.  BUT THAT DOES NOT EQUAL THE INTENT

1          NECESSARY.  THEY TRIED TO SALVAGE THAT BY

2          TELLING YOU THAT THE BANKS SENT HIM NOTICE.

3          BUT THAT'S UNBELIEVABLY AND UTTERLY FALSE.

4              THOSE TWO PAGES THAT TALK ABOUT THOSE

5          CHECKS BEING FRAUDULENT WERE NOT SENT TO MR.

6          LINARES.  AND THEY WERE NOT SENT TO MR.

7          LINARES PRECISELY BECAUSE THE BANK IS

8          INSTRUCTED NOT TO SEND THEM TO THEIR

9          CUSTOMER.  AND, SO, ALL HE GOT WAS, JUST A

10         COPY OF THIS CHECK AND THE RECLAMATION AND,

11         OH, YES, A LETTER THAT SAID, "SEND -- YOU

12         KNOW, WE'RE TAKING THIS MONEY OUT OF YOUR

13         ACCOUNT IMMEDIATELY."

14             IN 2013 -- LET'S TALK A LITTLE BIT ABOUT

15         THIS FIRST.  98 PERCENT OF THE CHECKS -- 95

16         PERCENT OF THE CHECKS WERE FROM OUT OF STATE,

17         IS WHAT THE GOVERNMENT SAID A MINUTE AGO.

18         AND THE GOVERNMENT SAYS 95 PERCENT OF THE

19         CHECKS MR. LINARES IS CASHING ARE FROM OUT OF

20         STATE.  95 PERCENT OF THESE CHECKS IS FROM

21         OUT OF STATE.  HE SHOULD HAVE KNOWN THAT

22         THESE CHECKS WERE FROM OUT OF STATE.  IT'S 95

23         PERCENT OF THE TAX CHECKS WERE FROM OUT OF

24         STATE.  AGAIN, THE GOVERNMENT CONTINUES TO

25         IGNORE THE FACT THAT MR. LINARES HAD A

1     BUSINESS.  THE GOVERNMENT HAS PUT ALL OF THIS

2     INFORMATION TOGETHER IN NICE LITTLE PACKAGES

3     AND IN LITTLE BOXES AND THEY'VE HAD PIE

4     CHARTS AND THEY'VE HAD OTHER CHARTS THAT WERE

5     -- MAY OR MAY NOT HAVE BEEN MISLEADING.  AND

6     THEY TAKE THAT AND THEY -- THEY SAY, "LOOK AT

7     THIS.  LOOK AT THIS PICTURE.  OH, MY GOD. HOW

8     COULD HE HAVE NOT SEEN THIS?"  AND WHAT THE

9     GOVERNMENT CONTINUALLY FAILS TO DO IS TO PUT

10    ANY OF THAT IN THE CONTEXT OF MR. LINARES'

11    LIFE OR THE BUSINESS HE RUNS.  OF ALL THE

12    CHECKS THAT HE WAS TAKING IN, OF HIS -- HIS

13    REASONABLE BELIEF THAT TREASURY CHECKS WERE

14    GOOD AND THAT YOU WERE HAPPY WHEN SOMEBODY

15    CAME IN WITH A TREASURY CHECK BECAUSE YOU

16    KNEW THAT YOU COULD CHARGE ONE AND A HALF

17    PERCENT FEE AND THE CHECK WAS GREAT.  IT WAS

18    A GOOD CHECK.

19         WHEN MR. LINARES STARTS GETTING

20    RECLAMATIONS, HE STARTS GETTING FREAKED OUT.

21    HE SAYS, "WHAT'S GOING ON?  WHY AM I GETTING

22    THESE RECLAMATIONS?"  HE GETS SOME IN

23    DECEMBER, AND THEN FROM JANUARY TO MARCH OF

24    2013, HE CASHES 25 TO 30 CHECKS OUT OF 272

25    -- ARE CASHED AFTER DECEMBER, 2012.  BECAUSE

1       HE STARTS GETTING RECLAMATIONS AND REALIZES

2       THAT SOMETHING IS WRONG.  TWENTY-FIVE TO 30

3       OF THESE CHECKS.  AND I'M PRETTY SURE IT'S

4       27, BUT I'M NOT CERTAIN -- ARE CASHED --

5       TREASURY CHECKS ARE PRESENTED TO MR. LINARES

6       IN 2013.  BECAUSE AFTER HE GETS THE SECOND

7       SET OF RECLAMATIONS IN DECEMBER OF THAT YEAR,

8       HE STOPS.  HE THINKS, THIS IS CRAZY.  I DON'T

9       KNOW WHAT'S GOING ON, BUT I'M NOT DOING THIS

10      ANY MORE UNLESS I KNOW -- UNLESS I CAN

11      IDENTIFY THIS PERSON OR FIGURE IT OUT OR KNOW

12      WHAT'S GOING ON, BECAUSE I DON'T WANT TO GET

13      ANY MORE RECLAMATIONS.

14          THEN HE CASHES ANOTHER 25 TO 30 CHECKS

15      AND THEN THESE RECLAMATIONS JUST KEEP POURING

16      AFTER THAT AND HE KEEPS PAYING THEM FOR

17      MONTHS AND MONTHS, WELL INTO THE SUMMER OF

18      2013.

19          LADIES AND GENTLEMEN, ALL OF THE

20      EVIDENCE HAS POINTED TO THE -- THE GOVERNMENT

21      PUT UP THIS THING THAT SAID THAT I WANT TO

22      CONFUSE YOU OR I'M GOING TO TELL YOU

23      SOMETHING THAT CONFUSES YOU OR NOT TALK ABOUT

24      THE ACTUAL EVIDENCE THAT WAS ENTERED INTO

25      THIS TRIAL.  AND -- AND ONE SIDE OF THE

1    MOUTH, AND THEN SHOWING YOU DOCUMENTS THAT

2    WERE SENT TO MY CLIENT THAT WERE NOT, IN

3    FACT, SENT TO MY CLIENT, ON THE OTHER SIDE.

4        BUT PUTTING THAT TO THE SIDE.  THE

5    GOVERNMENT SAID WE WOULD CONFUSE YOU BY

6    SAYING THAT MR. LINARES HAD TO BE RESPONSIBLE

7    FOR THE WHOLE THING.  WELL, THAT'S JUST NOT

8    THE CASE.  BUT MR. LINARES DOES HAVE TO KNOW

9    THAT A CRIME WAS AFOOT, AND THEY CAN'T SHOW

10   THAT BY THE FACT THAT HE MISSED CATCHING IT

11   AT HIS BUSINESS.  THEY CANNOT -- AND YOU WILL

12   HEAR THAT IN THE INSTRUCTIONS.

13       THEY SAID I'D CONFUSED YOU BY SAYING

14   THAT HE DIDN'T -- THE GOVERNMENT HAS TO KNOW

15   THE OTHER CRIMINALS ARE FOR.  OTHER THAN MR.

16   LINARES HAS TO PROFITED FROM THIS BUSINESS.

17   YOU'VE HEARD THAT EVIDENCE.  YOU KNOW WHAT'S

18   GOING ON THERE.

19       I TALK A LOT ABOUT THE FACT THAT SOMEONE

20   ELSE SHOULD HAVE CAUGHT IT.  BUT THAT'S

21   BECAUSE THE GOVERNMENT'S ASSERTION IS THAT

22   MR. LINARES SHOULD HAVE CAUGHT IT.  AND THAT

23   BECAUSE HE DIDN'T, HE MUST BE COMPLICIT.  HE

24   MUST HAVE INCLUDED HIMSELF IN THIS CRIME.

25       SO, DOESN'T THAT BEG THE QUESTION THAT,

1    WHAT ABOUT THE OTHER PEOPLE THAT DIDN'T CATCH

2    IT?  THE IRS AGENT, THE BANK. WHAT ABOUT THE

3    OTHER PARTIES THAT WERE INVOLVED INTIMATELY

4    IN MR. LINARES' BUSINESS AT THAT TIME, THE

5    IRS AGENT, THE BANK?  THEY DIDN'T CATCH IT.

6    DOESN'T IT BEG THE QUESTION?

7        LADIES AND GENTLEMEN, THE LAST THREE

8    DAYS OF EVIDENCE HAS SHOWN US PRETTY CLEAR

9    THAT MR. CARLOS LINARES WAS VICTIMIZED BY A

10   SET OF HIGHLY ORGANIZED, HIGHLY SKILLED

11   CRIMINALS SOMEWHERE OUTSIDE OF LOUISIANA.

12   AND, PERHAPS, SOMEONE IN BATON ROUGE, ONE

13   PERSON.

14       AND THAT THOSE PARTIES, ALL OF THOSE

15   PARTIES HAVE NO INFORMATION THAT HE HAS ANY

16   CONNECTION TO ANY OF THEM AT ALL.  BUT THE

17   GOVERNMENT WOULD WANT YOU TO BELIEVE THAT

18   BECAUSE HE DIDN'T CATCH THIS CRIME HAPPENING,

19   BECAUSE HE PARTICIPATED IN TWO IRS AUDITS FOR

20   WHICH HE MADE TREMENDOUS EFFORT TO BE BETTER.

21       THAT BECAUSE HE DID THAT, AND BECAUSE HE

22   DIDN'T TAKE A FEW CHECKS OUT OF A BOX AND

23   GIVE IT TO THE IRS AUDITOR BUT, IN FACT, GAVE

24   HER ALL OF HIS BANK RECORDS, THE GOVERNMENT

25   IS PAINTING THIS PICTURE.  THE GOVERNMENT IS

1            PAINTING THIS PICTURE OF ALL OF THESE
2            UNRELATED -- OF ALL THIS CRAZY STUFF THAT MR.
3            LINARES WAS SUPPOSED TO CATCH THIS FRAUD
4            HAPPENING.  THAT THE IRS COULDN'T CATCH.
5            THAT THE IRS AGENTS COULDN'T CATCH AND THE
6            BANK COULDN'T CATCH, LADIES AND GENTLEMEN.
7            AND BECAUSE THEY THINK THAT, THEY MAY KNOW
8            THAT HE WAS NEGLIGENT IN CASHING THESE
9            CHECKS.  THAT HE COULD HAVE BEEN MORE
10           EDUCATED.  HE COULD HAVE KNOWN MORE ABOUT THE
11           ADDRESSES.
12                HE RELIED ON HIS UNDERSTANDING OF THE
13           UNITED STATES TREASURY CHECKS THAT HE HAD
14           GOTTEN IN GOOD FAITH FROM HIS OWN EXPERIENCE
15           WITH THE UNITED STATES TREASURY CHECKS IN
16           2010 AND 2011.  HE RELIED ON THESE CHECKS IN
17           2012 AND 2013, TO HIS DETRIMENT, LADIES AND
18           GENTLEMEN.
19                BECAUSE HERE HE SITS, ACCUSED WITH THIS
20           CRIME.  MR. CARLOS LINARES IS ABSOLUTELY, 100
21           PERCENT FACTUALLY INNOCENT OF EVERY ONE OF
22           THESE CHARGES.  AND THIS IS A COMPLETE OVER
23           REACH BY THE UNITED STATES GOVERNMENT TO TRY
24           AND PIN THE RESPONSIBILITY OF THE IRS AND AN
25           IRS AGENT AND PERHAPS EVEN HANCOCK BANK,

1    BECAUSE NONE OF THOSE PEOPLE CAUGHT THIS

2    FRAUD ENACTED UPON THE UNITED STATES

3    GOVERNMENT.  THEY WANT MR. LINARES TO

4    SHOULDER THAT BURDEN.  THEY WANT MR. LINARES

5    TO HAVE SAVED THE IRS AND THE TREASURY, I

6    PRESUME.

7        LADIES AND GENTLEMEN, THAT JUST DOESN'T

8    MAKE ANY SENSE.  THAT DOESN'T MAKE ANY SENSE

9    AT ALL.  THE EVIDENCE THAT YOU'VE HEARD OVER

10    THE LAST THREE DAYS DOES NOT MAKE IT.  DOES

11    NOT, LADIES AND GENTLEMEN.

12        AND WHEN YOU GO BACK TO THE DELIVERY

13    ROOM -- I'M FIXING TO HAVE A CHILD,

14    APPARENTLY.

15        WHEN YOU GO BACK TO THE DELIBERATION

16    ROOM, I'M GOING TO ASK YOU TO HONESTLY

17    CONSIDER THE THINGS THAT YOU'VE HEARD AND THE

18    THINGS THAT YOU HAVE NOT.  AND TAKE A LOOK AT

19    THESE CHARGES.  AND FIND THAT THE GOVERNMENT

20    HAS FAILED TO PROVE BEYOND A REASONABLE

21    DOUBT, OR ANY STANDARD, IN MY OPINION, BUT

22    BEYOND A REASONABLE DOUBT AT THIS POINT,

23    BECAUSE THAT'S THE STANDARD, THAT MR. LINARES

24    VIOLATED THE LAW IN ANY OF THESE COUNTS THAT

25    HE'S BEEN CHARGED WITH.  HE'S INNOCENT OF

1    THESE CRIMES.  AND I'M GOING TO ASK YOU TO

2    FIND HIM NOT GUILTY.

3        THANK YOU.

4    THE COURT: THANK YOU, MR. AMBEAU.

5        MR. STEVENS?  YOU HAVE NINE MINUTES.

6        CLOSING ARGUMENT BY THE GOVERNMENT

7    MR. STEVENS: LET ME JUST SAY A COUPLE OF

8        QUICK THINGS.  THANK YOU FOR BEING HERE

9    AND PAYING SUCH CLOSE ATTENTION ALL WEEK.

10        I DON'T HAVE TIME TO REBUT ALL OF THAT.

11    I DO WANT TO SAY THIS.  MR. AMBEAU CRITICIZED

12    US PRETTY AGGRESSIVELY FOR SUGGESTING TO YOU

13    THAT YOU SHOULDN'T LOOK AT HIS WIRINGS AND

14    HIS PAYROLL CHECKS AND ALL THE OTHER STUFF

15    THAT I TOLD YOU THAT THIS CASE ISN'T ABOUT.

16    AND I WANT TO BE CLEAR THAT THE REASON WHY

17    WE'RE NOT MENTIONING THAT AND THE REASON WHY

18    YOU DON'T -- WE DON'T THINK YOU NEED TO LOOK

19    AT THAT IS THE SAME REASON THAT JUDGE JACKSON

20    ISN'T GOING TO MENTION THAT WHEN HE READS THE

21    INDICTMENT AND WHEN HE GIVES THE

22    INSTRUCTIONS.  JUDGE JACKSON IS GOING TO TELL

23    YOU THAT NONE OF THAT IS AT ISSUE IN THIS

24    CASE.

25        IT'S LIKE WHEN SOMEONE IS ON TRIAL FOR

1    ROBBING THE BANK AND THEY WANT TO SPEND THE

2    WHOLE TRIAL TALKING ABOUT HOW HE DIDN'T SET

3    FIRE WHEN THEY WERE INSIDE THE BANK, RIGHT.

4    OR, THEY DIDN'T BREAK INTO A CAR TO ESCAPE.

5    IT -- IT DOESN'T HAVE ANYTHING TO DO WITH THE

6    NARROWER ISSUES IN THIS CASE, AND THAT'S WHAT

7    JUDGE JACKSON WILL TELL YOU.  THAT'S NOT

8    SOMETHING WE'RE TRYING TO TELL YOU TO HIDE

9    THE BALL OR TO -- TO SWAY YOU FROM THE

10    CRITICAL EVIDENCE.  THAT'S BECAUSE WE'RE

11    TRYING TO FOCUS YOU ON THE EVIDENCE THAT'S --

12    THAT'S RELEVANT HERE AND NOT WASTE YOUR TIME.

13    THE RECLAMATION ISSUE, YOU KNOW, YOU

14    WILL HAVE TO DELIBERATE AND THINK BACK TO

15    WHAT MS. CRAIG'S TESTIMONY WAS.  BUT I DON'T

16    THINK THERE'S ANY QUESTION THAT THE BANK TOLD

17    HIM. IF THEY WEREN'T TELLING HIM, WHY WERE

18    TAKING MONEY OUT OF HIS ACCOUNT; WHY WAS HE

19    PAYING IT?  WHY DID MR. AMBEAU SAY IN OPENING

20    STATEMENTS, THE BANK CAME TO MR. LINARES TO

21    GET MONEY.  THEY SAID, "WE WANT OUR MONEY

22    BACK.  WE HAVE GIVEN YOU THIS MONEY OUT OF

23    THE BANK.  YOU HAVE TO PAY US BACK."  OF

24    COURSE THE BANK WAS TELLING THE DEFENDANT

25    ABOUT THESE RECLAMATIONS.  AND YOU HEARD

1    ABOUT THAT FROM MS. CRAIG.

2        ONE OF THE THINGS THE JUDGE IS GOING TO

3    TELL YOU IS THAT YOU'VE GOT TO JUDGE

4    CREDIBILITY; IT'S YOUR JOB.  YOU HEARD FROM A

5    LOT THE WITNESSES, AND IT'S UP TO YOU TO

6    DECIDE WHO'S TELLING THE TRUTH.  WHO

7    IMPRESSED YOU AS HONEST.  WHO HAD A REASON

8    NOT TO TELL THE TRUTH.  DID MS. HARDY, DID

9    SHE HAVE ANY REASON NOT TO TELL THE TRUTH?

10   HOW MANY OF THESE DOES SHE SAY SHE DOES A

11   YEAR?  MS. ARMWOOD -- DOES SHE HAVE ANY

12   REASON NOT TO TELL THE TRUTH?  THEY CAME IN

13   AND TOLD YOU, "LOOK, I ASKED HIM FOR CHECKS.

14   HE SAID HE DIDN'T HAVE ANY CHECKS.  I ASKED

15   HIM ABOUT THIS BUSINESS. HE SAID THIS WAS HIS

16   BUSINESS."

17       ALL RIGHT.  YOU KNOW FROM THE RECORDS

18   THAT IT'S NOT TRUE.  THIS ISN'T ABOUT IMAGES

19   OR WHETHER -- WHETHER THE FACT THAT HE WAS

20   LYING TO THEM MAYBE SHOULDN'T HAVE MADE A

21   DIFFERENCE BECAUSE THEY COULD HAVE GOTTEN

22   SOME IMAGES -- THE COPIES.  HE LIED BY

23   SAYING, "LOOK, I'M NOT -- I DON'T HAVE

24   CHECKS.  I'M NOT GOING TO GIVE YOU COPIES OF

25   THE CHECKS," WHEN WE KNOW HE HAD THEM.  AND

1      YOU WILL HAVE TO DECIDE WHETHER YOU THINK

2      THEY'RE LYING ABOUT THAT OR WHETHER YOU THINK

3      THAT THE DEFENDANT IS LYING ABOUT THAT.  AND

4      I WOULD SUBMIT TO YOU THAT HE HAS A LOT OF

5      REASONS NOT TO TELL THE TRUTH; THAT HE

6      SHOULDN'T IMPRESS YOU AS VERY HONEST; THAT HE

7      HAS A PERSONAL INTEREST IN THE CASE.

8          AND THE JUDGE WILL SAY THAT YOU SHOULD

9      CONSIDER WHETHER THE WITNESS CLEARLY SAW AND

10     HEARD THE THINGS ABOUT WHICH HE TESTIFIED.

11     IT SEEMED TO ME THAT THE DEFENDANT CLEARLY

12     SAW OR CLAIMED TO HAVE CLEARLY SEEN AND HEARD

13     THE THINGS THAT HE WANTED YOU TO HEAR ABOUT.

14     BUT WHEN I WOULD ASK HIM ABOUT SOMETHING FAR

15     MORE RECENT, RIGHT, THE 2010 AND 2013 EXAMS,

16     HE SEEMED TO REMEMBER PRETTY WELL.  BUT MS.

17     HARDY -- MS. HARDY WAS DIFFICULT AND MAD.

18     WHEN ASKED ABOUT SOMETHING THAT HAPPENED IN

19     2014 IN THIS BUILDING, HE COULDN'T REMEMBER

20     SOME OF THE BASIC DETAILS ABOUT THAT.  DOES

21     THAT STRIKE YOU AS SOMEONE WHO IS HONEST, WHO

22     IS TELLING THE TRUTH?

23          THE JUDGE IS GOING TO TELL YOU THAT

24     COMMON SENSE IS IMPORTANT.  YOU CAN USE YOUR

25     COMMON SENSE.  JUST BECAUSE WE'RE IN THIS

1    BUILDING, YOU DON'T CHECK YOUR COMMON SENSE

2    AT THE DOOR.  YOU USE REASON AND THE

3    PROCESSES YOU WOULD USE TO MAKE ORDINARY

4    DECISIONS IN YOUR ORDINARY LIFE.

5         MR. AMBEAU WANTS YOU TO BELIEVE THAT

6    THIS WAS A HIGHLY ORGANIZED, SOPHISTICATED

7    CRIMINAL SCHEME.  THAT THERE'S NO WAY THE

8    DEFENDANT COULD HAVE -- THERE'S NO WAY HE

9    COULD HAVE CAUGHT THIS.  WHAT DOES YOUR

10   COMMON SENSE TELL YOU ABOUT WHETHER THE

11   DEFENDANT SHOULD HAVE NOTICED?

12        THE FIRST PAGE OF "EXHIBIT 53," THAT

13   EXHIBIT, THAT ID FROM DENAN SPRIN?  RIGHT?

14   SOMEONE CASHING A CHECK 12 DAYS AFTER IT HAD

15   BEEN ISSUED TO A MASSACHUSETTS ADDRESS, A

16   MEXICAN CONSULATE ID FROM THE DALLAS OFFICE

17   OF THE MEXICAN CONSULATE, THAT HAD A FAKE

18   ADDRESS.  DOES YOUR COMMON SENSE TELL YOU

19   THAT HE SHOULD HAVE SPOTTED THAT IN TEN

20   SECONDS?

21        WHAT ABOUT THE ID FROM CRISPI BOULEVARD?

22   DOES ANYONE THINK THAT HE COULD HAVE CAUGHT

23   THAT IN FIVE OR TEN SECONDS IF HE CARED

24   ENOUGH TO CHECK?  WHAT ABOUT ALL OF THE ID'S

25   ON CURSY BOULEVARD?  RIGHT?

1    HE COULD HAVE GOTTEN IN HIS CAR AT SOME

2    POINT, IF HE DIDN'T ALREADY KNOW, DRIVE FOR

3    FIVE MINUTES AND DETERMINE THAT ALL THESE

4    ID'S WERE FAKE.

5    WHAT DOES YOUR COMMON SENSE TELL YOU

6    ABOUT "EXHIBIT 16D"?  AND, ADMITTEDLY, WE PUT

7    THESE SPREADSHEETS TOGETHER.  HE DIDN'T HAVE

8    THE SPREADSHEET.  BUT WHAT HE SAID IS EVEN

9    MORE INCRIMINATING, BECAUSE HE SAID THAT ALL

10    OF THESE PEOPLE CAME TO HIS STORE.  DOES YOUR

11    COMMON SENSE TELL YOU THAT ONE IN EVERY SIX

12    OF THE HISPANIC PEOPLE LIVING IN HARWICH,

13    MASSACHUSETTS, IN THE SUMMER OF 2012, THAT

14    ONE IN SIX OF THEM CAME TO HIS STORE TO CASH

15    THESE CHECKS, AND THEY ALL HAD ID'S AND THE

16    ID'S ALL MATCH, AND HE DIDN'T THINK THERE WAS

17    ANYTHING SUSPICIOUS ABOUT THIS?  OF COURSE

18    NOT.  THAT MAKES NO SENSE AT ALL.

19    AND, FINALLY, THE BURDEN OF PROOF IS

20    HIGH.  MR. CROSSWELL TOLD YOU THAT AT THE

21    START.  WE DON'T RUN FROM THAT AT ALL.  YOU

22    NEED TO BE ABLE TO MAKE A DECISION THAT IS

23    BASED ON EVIDENCE THAT YOU WOULD RELY ON AND

24    ACT UPON WITHOUT HESITATION.

25    MR. AMBEAU WANTS TO TALK ABOUT A LOT OF

1    EVIDENCE THAT MR. LINARES COULDN'T HAVE SEEN.

2    AND HE DIDN'T HAVE AND HE DIDN'T HAVE THESE

3    PEOPLE DOING RESEARCH FOR HIM.  BUT HE SAW

4    THE CHECKS.  RIGHT? HE TOLD YOU THAT.  HE SAW

5    THE CHECKS.  AND HE SAW THIS CHECK.  AND WHEN

6    SOMEONE CAME IN, WHOEVER IT WAS, WE'LL NEVER

7    KNOW.  WHEN SOMEONE CAME IN HIS BUSINESS WITH

8    THIS CHECK PAYABLE TO PERCENTAGE SYMBOL NA.

9    THERE'S NO QUESTION THIS IS FRAUDULENT.

10   RIGHT?  YOU CAN SAY WITHOUT HESITATION, YOU

11   CAN ABSOLUTELY SAY WITHOUT HESITATION THAT HE

12   SHOULD NOT HAVE GIVEN THAT PERSON $4,400.00

13   IN CASH THAT HAD BEEN STOLEN FROM THE U.S.

14   TREASURY.  AND HE SHOULDN'T HAVE DONE IT 250

15   TIMES, BASED ON ALL OF THE RED FLAGS THAT WE

16   LAID OUT FOR YOU.  ALL OF THEM.

17        I APPRECIATE YOUR PATIENCE.  AND I

18   RESPECTFULLY ASK YOU TO FIND THE DEFENDANT

19   GUILTY ON ALL FOUR COUNTS.

20        THANK YOU ALL.

21   THE COURT: THANK YOU, MR. STEVENS.

22        AT THIS TIME, FOLKS, WE'RE GOING TO TAKE

23   A VERY BRIEF FIVE-MINUTE BREAK.  AND WHEN WE

24   RETURN I WILL GIVE YOU THE INSTRUCTIONS THAT

25   WILL GUIDE YOUR DELIBERATIONS.

1            EVEN THOUGH YOU'VE HEARD ALL THE

2       EVIDENCE AND YOU'VE HEARD THE ARGUMENTS OF

3       COUNSEL, YOU HAVEN'T YET RECEIVED THE

4       INSTRUCTIONS THAT WILL GUIDE YOUR

5       DELIBERATIONS.

6            WE'RE GOING TO TAKE A VERY BRIEF FIVE-

7       MINUTE BREAK.  PLEASE DO NOT DISCUSS THE CASE

8       AMONG YOURSELVES AT THIS TIME.  DO NOT BEGIN

9       TO DISCUSS THE CASE UNTIL I INFORM YOU THAT

10      YOU ARE FREE TO BEGIN YOUR DELIBERATIONS.

11            LET'S ALL RISE FOR THE JURY.

12      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

13            THE JURY IS EXCUSED FOR A BREAK.)

14      THE COURT: COURT IS IN RECESS.

15      REPORTER'S NOTE: (COURT IS RESUMED.)

16      THE COURT: BE SEATED.

17            OKAY.  I UNDERSTAND THERE'S AN

18      OBJECTION, A NEW OBJECTION NOW?

19      MR. STEVENS: YES.  IT'S A CONTINUATION OF

20            A PREVIOUS ISSUE.  BUT I -- WE -- I

21      GUESS WE DIDN'T APPRECIATE IT OR WE DIDN'T

22      FULLY SPOT THE ISSUE, JUDGE.  AND IT RELATES

23      TO SOME OF THE CHANGES TO THE LANGUAGE OF THE

24      COUNT TWO INSTRUCTION THAT WE DID AT THE VERY

25      LAST MINUTE.

1          AND HERE'S THE POINT.  WE'RE NOT TRYING

2     TO REARGUE THE "EFFECTIVE."

3     THE COURT: UH HUH.  RIGHT.

4     MR. STEVENS: WE'RE NOT TRYING TO ARGUE THAT

5          BREAKING OUT THE FACT THAT IT'S GOT TO

6     BE IN WRITING.  BUT THE WAY IT USED TO READ,

7     AND AS RECENTLY AS THE LAST COURT DRAFT, IT

8     SAID, "THE PROGRAM MUST MEET THE FOLLOWING

9     MINIMUM REQUIREMENTS." AND IT SAID, "HERE ARE

10    THOSE REQUIREMENTS."  ONE, TWO, THREE AND

11    FOUR.

12    THE COURT: CORRECT.

13    MR. STEVENS: WHICH I THINK IT MADE CLEAR

14         THAT IF YOU HAVE -- WHICH I THINK MADE

15    CLEAR THAT IF YOU HAD ONE OR TWO OR THREE OF

16    THE FOUR BUT YOU DIDN'T HAVE ALL FOUR, YOU'RE

17    NOT MEETING THOSE MINIMUM REQUIREMENTS --

18    THE COURT: CORRECT.

19    MR. STEVENS:  -- AND YOU'RE NOT ---

20    THE COURT: YOU NEED ALL OF THEM.

21    MR. STEVENS: RIGHT.  AND, SO, MR. CROSSWELL

22         POINTED THIS OUT, AND I SHOULD HAVE

23    CAUGHT IT EARLIER.  WE -- ON PAGE 21 IS FINE.

24    AND PAGE 22.  I MEAN, I SEE THAT WE BROKE --

25    WE NOW SAY THAT THAT SAID PROGRAM WAS NOT IN

1    WRITING.  BUT THEN WE SAY, FOUR: THAT THE

2    PROGRAM DID NOT THIS, THIS, THIS AND THIS.

3    AND, SO, IT'S KIND OF -- IT'S KIND OF

4    REVERSED THE STATUTE AND REGULATION.

5    THE COURT: SO, IN OTHER WORDS, ARE YOU

6         SUGGESTING THAT I ADD -- AND, FOURTH,

7    THAT SAID MINE DID NOT INCLUDE POLICIES,

8    PROCEDURES -- RESPONDS FOR ALL FOUR REQUESTS

9    AND DOES THE COMPLYING OFFICER SHOULD BE --

10   AND -- DOES THAT FIX IT? (READS)

11   MR. AMBEAU: THAT ALWAYS JUST DEPEND AT A

12        MINIMUM.  SAID ANTI-MONEY LAUNDERING

13   PROGRAM DID NOT -- AT A MINIMUM.  AND THEN

14   LIST THOSE LIKE THEY ARE IN THE STATUTE.  SO,

15   THEY WOULD MIRROR THAT LANGUAGE.

16   MR. STEVENS: WELL, WHAT IF WE  -- CAN I MAKE

17        A SUGGESTION?

18   THE COURT: SURE.

19   MR. STEVENS: I'M GOING TO TRY TO READ THIS

20        SLOWLY.  FIRST AND SECOND WOULD BE FINE.

21   THIRD, THAT THE -- SOMETHING ABOUT WRITING.

22   AND THEN WE WOULD SAY, FOURTH, THE ANTI-MONEY

23   LAUNDERING PROGRAM MUST MEET THE FOLLOWING

24   MINIMUM REQUIREMENTS.  AND THEN WE COULD HAVE

25   ONE, TWO, THREE AND FOUR, BUT THEY WOULD BE

1          SET OFF AS MINIMUM REQUIREMENTS, SEPARATED BY

2     AND.

3     THE COURT: OKAY.  SO, WE WOULD SAY THAT

4          THIRD, THAT SAID ANTI-MONEY LAUNDERING

5     PROGRAM WAS NOT IN WRITING.  YOU'RE OKAY WITH

6     THAT, RIGHT?

7     MR. STEVENS: YES.  WE ---

8     THE COURT: AND THAT SAID MONEY LAUNDERING

9          PROGRAM FAILED TO MEET THE FOLLOWING

10    MINIMUM REQUIREMENTS.

11    MR. AMBEAU: THAT'S NOT THE LANGUAGE.  THE

12         LANGUAGE SAYS THAT THE -- EXCUSE ME,

13    YOUR HONOR.  BUT THE LANGUAGE SAYS THAT, "HAS

14    PROVED EACH OF THE FOLLOWING BEYOND A

15    REASONABLE DOUBT. THAT SAID ANTI-MONEY

16    LAUNDERING PROGRAM DID NOT, AT A MINIMUM,

17    MEET THE FOLLOWING." AND THEN ---

18    THE COURT: OKAY.  SO, "IT FAILED, AT A

19         MINIMUM, TO MEET THE FOLLOWING

20    REQUIREMENTS."

21    MR. AMBEAU: I THINK THAT'S ---

22    THE COURT: IS THAT AGREEABLE?  "AT A MINIMUM

23         TO MEET THE FOLLOWING REQUIREMENTS:" AND

24    THEN, "ONE.  POLICIES OR" -- "ONE, INCLUDE

25    POLICIES, PROCEDURES, ET CETERA, ET CETERA.

1    AND," AFTER THE WORD REQUEST, INSERT THE WORD

2    "AND.  THEN, TWO, DESIGNATE A COMPLIANCE

3    OFFICER WHO ASSURE DAY-TO-DAY COMPLIANCE WITH

4    THE PROGRAM, AND THREE, INCLUDE AN ONGOING

5    EMPLOYEE-TRAINING PROGRAM, AND INCLUDE AN

6    INDEPENDENT AUDIT FUNCTION TO TEST THE

7    PROGRAM.  PERIOD."

8    MR. STEVENS: YES, JUDGE.  AND CAN YOU --

9         CAN YOU READ THE FOURTH BACK ONE MORE

10    TIME?  I'M SORRY.

11    THE COURT: YES.  THE FOURTH THAT SAID,

12         "ANTI-MONEY LAUNDERING PROGRAM FAILED TO

13    INCLUDE," LET'S SAY, "FAILED TO INCLUDE, AT A

14    MINIMUM, THE FOLLOWING REQUIREMENTS."  AND

15    THEN WE GO INTO ALL THE OTHERS.

16    MR. STEVENS: WHAT IS THE FIRST -- YES.  BUT

17         NOW IN ONE, A, B, C.  I GUESS A, B, C

18    AND D SHOULD BE SEPARATED BY AN "OR" RATHER

19    THAN AN "AND."

20    MR. CROSSWELL: YOUR HONOR, THE POINT IS THAT

21         IN ORDER FOR THE PROGRAM TO BE

22    SUFFICIENT, IT HAS TO HAVE ALL FOUR OF THOSE.

23    THE COURT: IN ONE.

24    MR. CROSSWELL: YES.  EXACTLY.

25    THE COURT: WELL, WE COULD SAY, ONE, INCLUDE

1    POLICY PROCEDURE AND THEN IDENTIFYING --

2    INCLUDE POLICIES, PROCEDURES AND INTERNAL

3    CONTROLS FOR, A, VERIFYING CUSTOMER

4    IDENTIFICATION AND, B, FILING REPORTS SUCH AS

5    TRANSACTION REPORTS, AND, C, CREATING AND

6    RETAINING RECORDS, AND RESPONDING TO LAW

7    ENFORCEMENT REQUESTS.

8    MR. CROSSWELL: YOUR HONOR, I THINK IT'S JUST

9    -- IT WOULD BE, ONE, INCLUDE POLICIES,

10   PROCEDURES AND INTERNAL CONTROLS FOR A,

11   VERIFYING CUSTOMER APPROVED IDENTIFICATION,

12   E, FILING REPORTS, C, CREATING AND RETAINING

13   RECORDS, OR D, RESPONDING TO LAW ENFORCEMENT

14   REQUESTS.   BECAUSE IF ---

15   THE COURT: MR. AMBEAU?

16   MR. AMBEAU: THE "OR" IS NOT INCLUDED IN

17   1022.210, YOUR HONOR.  IT'S JUST

18   PARENTHETICALLY SEPARATED, AND THEN THAT'S

19   IT.  THAT'S THE END OF THE SENTENCE.  IT'S --

20   IT HAS TO INCLUDE THESE THINGS AT A MINIMUM.

21   THE "OR" IS DISJUNCTIVE AND WOULD HAVE TO SAY

22   THAT ALL OF THOSE WOULD HAVE TO BE IN THERE.

23   I'M NOT SURE THAT THAT'S THE INTENT.

24   MR. STEVENS: AND THAT'S WHY I SAY, WHY DON'T

25   ---

1       THE COURT: THEY WANT.  RIGHT?  OKAY.  WELL,

2           LOOK.  LET ME JUST -- IN CONSIDERING THE

3       CFR, I'M INCLINED TO JUST LEAVE ONE AS IT IS

4       AND NOT PUT "AND."  IN OTHER WORDS, AS I

5       SUGGESTED EARLIER, THIS REALLY SHOULD HAVE

6       BEEN BRIEFED WELL BEFOREHAND.  AND I KNOW THE

7       GOVERNMENT -- I UNDERSTAND THAT.

8           THIS IS WHAT I'M GOING TO DO.  I'M NOT

9       GOING TO KEEP THIS JURY WAITING.  CAN WE ALL

10      AGREE THAT AT LEAST WHEN WE GET TO FOURTH,

11      THAT SENTENCE, "THE ANTI-MONEY LAUNDERING

12      PROGRAM FAILED TO INCLUDE, AT A MINIMUM, THE

13      FOLLOWING REQUIREMENTS"?  ARE WE GOOD WITH

14      THAT?

15      MR. AMBEAU: YES.

16      MR. CROSSWEL: YES.

17      THE COURT: ALL RIGHT.  AND THEN ON ONE.

18          ARE YOU SUGGESTING THAT WE PUT -- INSERT

19      THE WORD "AND" AFTER --

20      MR. CROSSWELL: NO, YOUR HONOR.

21      THE COURT: -- DESCRIPTION A, B, C?  NO?

22      MR. CROSSWELL: I'M SORRY TO INTERRUPT YOU.

23          BUT IF YOU KEEP THE LANGUAGE THAT YOU

24      JUST READ ON FOURTH, THEN THE ONLY CHANGE

25      THAT WE'RE SAYING THAT NEEDS TO TAKE PLACE IS

1    "AND" NEEDS TO BE CHANGED TO "OR."

2    THE COURT: "AND OR AS TO" -- SO, IT WOULD

3         INCLUDE -- INCLUDE POLICIES AND

4    PROCEDURES AND INTERNAL CONTROL FOR, A,

5    VERIFYING CUSTOMER IDENTIFICATION, AND,

6    FILING REPORTS SUCH AS CURRENCY

7    TRANSACTIONS."  WELL, NO, I'M SORRY.  WE'RE

8    NOT INCLUDE THIS.  IT'S GETTING VERY

9    CONFUSING.

10        "A, VERIFYING CUSTOMER IDENTIFICATION,

11   FILING REPORTS SUCH AS CURRENCY TRANSACTION

12   REPORTS, C, CREATING AND RETAINING RECORDS OR

13   RESPONDING TO LAW ENFORCEMENT REQUESTS."

14   MR. CROSSWELL: EXACTLY RIGHT.

15   THE COURT: MR. AMBEAU IS SHAKING HIS HEAD.

16   MR. AMBEAU: THAT'S FINE WITH ME.  THE "OR"

17        IS FINE WITH ME.

18   THE COURT: THE "OR" IS FINE WITH YOU.  OKAY.

19        AND, SO, WE DON'T WANT "AND" AFTER ONE,

20   TWO, THREE; IS THAT RIGHT?  ARE WE IN

21   AGREEMENT WITH THAT?

22   MR. CROSSWELL: YOUR HONOR, JUST ONE ---

23   THE COURT: YES.  BUT, WAIT. I THOUGHT

24        YOU SAID YOU WANTED THE "OR" IN NUMBER

25   ONE.

1       MR. AMBEAU: I THINK THAT'S CORRECT,

2           YOUR HONOR.  THAT'S RIGHT.

3       THE COURT: RIGHT?

4       MR. AMBEAU: I JUST READ IT AND THAT'S WHAT

5           HE SAID HE WANTED.

6       MR. CROSSWELL: IN ONE BETWEEN THE C AND D.

7           CORRECT.

8       THE COURT: OKAY.  AND EVERYTHING ELSE IS

9           FINE THE WAY IT'S WRITTEN?

10      MR. AMBEAU: YES.

11      MR. STEVENS: YES.

12      THE COURT: EVERYTHING ELSE -- TWO IS FINE?

13      MR. STEVENS: RIGHT.

14      THE COURT: THREE IS FINE, INCLUDING ONGOING

15          EMPLOYEE TRAINING PROGRAM, AND FOUR;

16      ALL THAT'S FINE, BOTH SIDES?

17      MR. AMBEAU: FINE BY THE DEFENSE, YOUR HONOR.

18      MR. STEVENS: THANK YOU, JUDGE.

19      THE COURT: OKAY.  GOOD.  ALL RIGHT.

20      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

21          AN OFF-THE-RECORD DISCUSSION WAS HELD.)

22      THE COURT: ALL RIGHT.  VERY GOOD.

23      MR. STEVENS: THANK YOU, JUDGE.  I

24          APPRECIATE YOUR TOLERANCE.

25      THE COURT: ALL RIGHT.  IT'S ALL RIGHT.  PAM?

1          REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

2              AN OFF-THE-RECORD DISCUSSION WAS HELD.)

3      THE COURT: LET'S ALL RISE FOR THE JURY.

4      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

5              THE JURY WAS RETURNED TO THE COURTROOM.)

6      THE COURT: BE SEATED.

7              WELCOME BACK, LADIES AND GENTLEMEN.  AT

8      THIS TIME LET ME -- I WILL READ TO YOU ONCE

9      AGAIN THE INDICTMENT THAT WAS FILED IN THIS

10     CASE.  AND WHAT I'LL DO IS -- MAX.

11     REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

12             AN OFF-THE-RECORD DISCUSSION WAS HELD.)

13     (DISCUSSION WAS CONCLUDED.)

14     THE COURT: WHAT I'M GOING TO DO, LADIES

15             AND GENTLEMEN, IS TO PLACE THE

16     INDICTMENT ON OUR DISPLAY SYSTEM.  IT'S A

17     RATHER LENGTHY INDICTMENT.  I JUST THINK IT

18     WOULD BE EASIER FOR YOU TO FOLLOW ALONG WITH

19     ME IF WE DISPLAYED THE INDICTMENT AS WELL AS

20     THE JURY CHARGES, THE INSTRUCTIONS ON THE

21     LAW, TO YOU ON OUR DISPLAY SYSTEM.  BECAUSE

22     AFTER A WHILE, IF I DON'T DO THAT, I FIND

23     THAT SOMETIMES DESPITE ALL EFFORTS TO REMAIN

24     ATTENTIVE AND ALERT, SOMETIMES IT GETS HARD

25             TO BE ATTENTIVE AND ALERT.  AND, SO, FOR THAT

1    REASON WE'LL GO ON AND ASK YOU TO FOLLOW

2    ALONG WITH ME WHEN I READ THIS.  OKAY?  ALL

3    RIGHT.

4        MY LAW CLERK, MAX, HERE IS PRINTING

5    EVERYTHING.  THIS IS AN INTERESTING DAY.  MAX

6    IS NOT WEARING ANYTHING WITH CAROLINA BLUE ON

7    IT.  HE'S A PROUD ALUM OF THE UNIVERSITY OF

8    NORTH CAROLINA.  I DON'T HOLD THAT AGAINST

9    HIM, AND I WOULD ASK THAT YOU NOT DO SO,

10   EITHER.

11       OKAY.  OKAY.  IS THE ELMO ON?  YES, IT

12   IS.  ALL RIGHT.  THERE WE GO.

13          INDICTMENT READ BY THE COURT

14   THE COURT: OKAY.  THE INDICTMENT READS, AS

15       YOU CAN SEE, AS FOLLOWS:

16       SUPERCEDING INDICTMENT FOR THEFT OF

17   GOVERNMENT FUNDS, FAILURE TO MAINTAIN AN

18   EFFECTIVE ANTI-MONEY LAUNDERING PROGRAM,

19   OBSTRUCTION OF A FEDERAL PROCEEDING AND

20   FORFEITURE ALLEGATIONS.

21       THE GRAND JURY CHARGES ---

22       AND, BY THE WAY, THIS IS, OF COURSE,

23   UNITED STATES OF AMERICA VERSUS CARLOS L.

24   LINARES.

25       THE GRAND JURY CHARGES AT ALL RELEVANT

1    TIMES CARLOS L. LINARES, THE DEFENDANT

2    HEREIN, RESIDENT OF BATON ROUGE, LOUISIANA,

3    OWNED, OPERATED AND MANAGED LATINO'S

4    SUPERMARKET, LLC., LATINO'S, WHICH WAS

5    LOCATED ON FLORIDA BOULEVARD IN BATON ROUGE.

6    THE BUSINESS INCLUDED A CONVENIENCE AND CHECK

7    CASHING STORE THAT WAS -- AND WAS REGISTERED

8    AS A MONEY SERVICE BUSINESS, WITH THE ABILITY

9    TO CASH CHECKS AND TO TRANSMIT FUNDS FOR

10   CUSTOMERS AND MEMBERS OF THE GENERAL PUBLIC.

11        2.  LINARES WAS RESPONSIBLE FOR LATINO'S

12   CHECK CASHING OPERATIONS.  LINARES OVERSAW

13   THE DAY-TO-DAY OPERATIONS OF THE STORE,

14   APPROVED TRANSACTIONS AND MAINTAINED CONTROL

15   OF THE BUSINESS' BANK ACCOUNTS.

16        COUNT ONE: THEFT OF GOVERNMENT FUNDS.

17        3.  PARAGRAPHS ONE AND TWO OF THIS

18   SUPERCEDING INDICTMENT ARE INCORPORATED

19   HEREIN AS FACTUAL ALLEGATIONS.

20        4.  BEGINNING AT LEAST BY IN OR ABOUT

21   MARCH OF 2012, AND CONTINUING THROUGH MAY OF

22   2013, IN THE MIDDLE DISTRICT OF LOUISIANA AND

23   ELSEWHERE, THE DEFENDANT, CARLOS L. LINARES,

24   KNOWINGLY DID STEAL AND PURLOIN AND DID AID

25   AND ABET OTHERS TO STEAL AND PURLOIN MONEY

1    AND FUNDS OF THE UNITED STATES.  NAMELY,

2    FUNDS ACCESSIBLE THROUGH MORE THAN 250 UNITED

3    STATES TREASURY CHECKS PAYABLE TO INDIVIDUALS

4    WHO HAVE ADDRESSES IN NEW YORK, NEW JERSEY,

5    MASSACHUSETTS, PENNSYLVANIA, GEORGIA, FLORIDA

6    AND OTHER LOCATIONS OUTSIDE THE STATE OF

7    LOUISIANA, WHICH CHECKS HAVE BEEN OBTAINED

8    THROUGH FRAUD.  THE ABOVE IS A VIOLATION OF

9    TITLE 18 UNITED STATES CODE, SECTION 641

10    AND 2.

11        COUNT TWO:  FAILURE TO MAINTAIN AN

12    EFFECTIVE MONEY LAUNDERING PROGRAM.

13        5.  PARAGRAPHS ONE AND TWO OF THIS

14    SUPERCEDING INDICTMENT ARE INCORPORATED

15    HEREIN AS FACTUAL ALLEGATIONS.

16        6.  BEGINNING AT LEAST IN OR ABOUT MARCH

17    OF 2012 AND CONTINUING THROUGH IN OR ABOUT

18    JUNE OF 2014, IN THE MIDDLE DISTRICT OF

19    LOUISIANA, CARLOS L. LINARES, THE DEFENDANT

20    HEREIN, DID WILLFULLY VIOLATE THE BANK

21    SECRECY ACT, THE BSA, SPECIFICALLY TITLE 31

22    UNITED STATES CODE SECTIONS 5318H AND 5322,

23    AND REGULATIONS ISSUED THEREUNDER; NAMELY,

24    TITLE 31 CODE OF FEDERAL REGULATIONS, SECTION

25    1022.210, BY FAILING TO DEVELOP, IMPLEMENT

1    AND MAINTAIN AN EFFECTIVE ANTI-MONEY

2    LAUNDERING PROGRAM AT LATINO'S, A DOMESTIC

3    FINANCIAL INSTITUTION AND MONEY SERVICE

4    BUSINESS.

5        7.  DURING SUCH TIME PERIOD, LINARES

6    KNOWINGLY AND WILLFULLY FAILED TO IMPLEMENT

7    AND MAINTAIN EFFECTIVE POLICIES, PROCEDURES

8    AND INTERNAL CONTROLS FOR:

9        A. VERIFYING CUSTOMER INFORMATION, IN

10   PARTICULAR WITH REGARD TO CUSTOMERS WHO CAME

11   TO LATINO'S SEEKING TO CASH UNITED STATES

12   TREASURY CHECKS ISSUED TO INDIVIDUALS WITH

13   ADDRESSES OUTSIDE THE STATE OF LOUISIANA.

14       B. CREATING AND RETAINING RECORDS.

15       AND, C, RESPONDING TO LAW ENFORCEMENT

16   REQUESTS.

17       8.  SPECIFICALLY AND AMONG OTHER ACTS

18   AND OMISSIONS, LINARES DID THE FOLLOWING:

19       A.  BETWEEN MARCH, 2012 AND MAY, 2013,

20   LINARES DEPOSITED MORE THAN 270 TREASURY

21   CHECKS INTO HIS STORE'S BUSINESS ACCOUNTS FOR

22   A TOTAL OF MORE THAN 1.6 MILLION DOLLARS.

23   THE VAST MAJORITY OF THE CHECKS, MORE THAN 95

24   PERCENT OF THEM, WERE ADDRESSED TO

25   INDIVIDUALS WITH OUT OF STATE ADDRESSES.

1     MOST OF THE CHECKS HAD BEEN OBTAINED THROUGH

2     FRAUD, EITHER BECAUSE THE CHECKS WERE BASED

3     ON FRAUDULENT FEDERAL TAX RETURNS OR BECAUSE

4     THE CHECKS HAD BEEN STOLEN.

5          B.  LINARES ROUTINELY FAILED TO REQUIRE

6     AND/OR RETAIN COPIES OF ANY IDENTIFICATION

7     DOCUMENTS IN CONNECTION WITH THE TREASURY

8     CHECKS HE ACCEPTED.  IN THOSE VERY LIMITED

9     INSTANCES IN WHICH LINARES REPORTEDLY

10    REQUIRED IDENTIFICATION AND RETAINED A COPY

11    OF SUCH IDENTIFICATION, LINARES FAILED TO

12    TAKE ANY STEPS TO VERIFY WHETHER THE

13    IDENTIFICATION DOCUMENT WAS FALSE, FICTITIOUS

14    OR COUNTERFEIT.

15         C.  FOR MUCH OF THE RELEVANT TIME

16    PERIOD, LINARES HAD NO WRITTEN POLICIES,

17    PROCEDURES OR CONTROLS IN PLACE WHATSOEVER.

18    ALTHOUGH LINARES PURPORTEDLY IMPLEMENTED

19    CERTAIN WRITTEN POLICIES AND PROCEDURES IN OR

20    ABOUT FEBRUARY, 2014, LINARES FAILED TO TAKE

21    ANY STEPS TO SEE THAT SUCH POLICIES AND

22    PROCEDURES WOULD BE FOLLOWED.

23         D.  IN JUNE OF 2014, IN RESPONSE TO A

24    VALID LAW ENFORCEMENT REQUEST FOR DOCUMENTS

25    AND INFORMATION RELATED TO THE ANTI-MONEY

1     LAUNDERING PROGRAM IN EFFECT AT LATINO'S, IF

2     ANY, LINARES MADE A PRODUCTION THAT WAS

3     INCOMPLETE.  THAT IS, IT DID NOT INCLUDE

4     DOCUMENTS WITHIN LINARES' POSSESSION THAT

5     SHOULD HAVE BEEN PRODUCED, AND WHICH

6     CONTAINED FALSE AND FRAUDULENT DOCUMENTS.

7          9.   THE CONDUCT DESCRIBED ABOVE VIOLATED

8     THE BSA CODIFY TITLE 31 UNITED STATES CODE

9     SECTIONS 5313-5326, WHICH WAS A SET OF LAWS

10     ENACTED BY CONGRESS TO ADDRESS THE INCREASE

11     IN CRIMINAL MONEY LAUNDERING THROUGH

12     FINANCIAL INSTITUTIONS.  CHECK CASHERS, FOR

13     INSTANCE, WERE A COMMON VENUE FOR INDIVIDUALS

14     WHO WANTED TO CASH LARGE NUMBERS OF CHECKS

15     ANONYMOUSLY TO FACILITATE FRAUD AND MONEY

16     LAUNDERING SCHEMES.  INDIVIDUALS ENGAGED IN

17     SUCH CRIMINAL CONDUCT COMMONLY CONVERTED THE

18     PROCEEDS OF THEIR FRAUD INTO CASH BY TAKING

19     CHECKS TO CHECK CASHERS WHO THEY KNEW WOULD

20     NOT ASK FOR PROOF OF THE PAYEE'S IDENTITIES

21     OR INQUIRE INTO THE CIRCUMSTANCES SURROUNDING

22     THE CHECKS.

23          10.   ACCORDINGLY, AMONG OTHER

24     PROVISIONS, THE BSA REQUIRED EACH CHECK

25     CASHER TO DEVELOP, IMPLEMENT AND MAINTAIN AN

1    EFFECTIVE ANTI-MONEY LAUNDERING PROGRAM

2    REASONABLY DESIGNED TO PREVENT A CHECK CASHER

3    FROM BEING USED TO FACILITATE MONEY

4    LAUNDERING.  THE PROGRAM WAS REQUIRED TO HAVE

5    WRITTEN POLICIES, PROCEDURES AND CONTROLS

6    GOVERNING THE VERIFICATION OF CUSTOMER

7    IDENTIFICATION, THE FILING OF REPORTS AS

8    REQUIRED BY LAW, THE CREATION AND RETENTION

9    OF RECORDS AND RESPONSES TO LAW ENFORCEMENT

10   REQUESTS.  AS PART OF THE PROGRAM, THE CHECK

11   CASHER WAS REQUIRED TO PROVIDE ONGOING

12   TRAINING TO ITS EMPLOYEES TO ENSURE THAT THEY

13   WERE KNOWLEDGEABLE REGARDING THE CHECK

14   CASHER'S ANTI-MONEY LAUNDERING POLICIES.

15        11.  AS DESCRIBED ABOVE, LINARES FAILED

16   TO FOLLOW THESE REQUIREMENTS AND TOOK NO

17   STEPS TO PREVENT HIS STORE FROM BEING USED TO

18   FACILITATE CRIMINAL ACTIVITY AND LAUNDER

19   MONEY.  THE ABOVE IS A VIOLATION OF TITLE 31

20   UNITED STATES CODE SECTIONS 5318 AND 5322.

21        COUNT THREE: OBSTRUCTION OF A PROCEEDING

22   BEFORE A FEDERAL AGENCY.

23        12.  PARAGRAPHS ONE THROUGH 11 OF THE

24   SUPERCEDING INDICTMENT ARE INCORPORATED

25   HEREIN AS FACTUAL ALLEGATIONS.

1         13.  ON OR ABOUT AUGUST 12TH, 2010, THE

2    UNITED STATES DEPARTMENT OF THE TREASURY,

3    INTERNAL REVENUE SERVICE, TREASURY, BEGAN AN

4    EXAMINATION OF LATINO'S TO DETERMINE WHETHER

5    LINARES AND LATINO'S WERE IN COMPLIANCE WITH

6    THE BANK SECRECY ACT AND OTHER APPLICABLE

7    LAWS.  THE EXAMINATION INCLUDED TELEPHONIC

8    AND IN-PERSON INTERVIEWS OF LINARES, A TOUR

9    OF THE STORE AND A REVIEW OF CERTAIN RECORDS

10   -- THE BOOKS AND RECORDS.

11        14.  FROM ON OR ABOUT AUGUST 12, 2010,

12   THROUGH ON OR ABOUT SEPTEMBER 22ND, 2010, IN

13   THE MIDDLE DISTRICT OF LOUISIANA, CARLOS L.

14   LINARES, THE DEFENDANT HEREIN, DID CORRUPTLY

15   INFLUENCE, OBSTRUCT AND IMPEDE AND ENDEAVOR

16   TO INFLUENCE, OBSTRUCT AND IMPEDED THE DUE

17   AND PROPER ADMINISTRATION OF THE LAW UNDER

18   WHICH A PROCEEDING WAS PENDING.  THAT IS, AN

19   EXAMINATION BY THE UNITED STATES DEPARTMENT

20   OF THE TREASURY INTERNAL REVENUE SERVICE AND

21   THAT LINARES FALSELY REPRESENTED TO THE

22   EXAMINER THAT HE DID NOT RETAIN ANY RECORDS

23   OF HIS CHECK CASHING BUSINESS OTHER THAN HIS

24   BANK STATEMENTS.  FALSELY STATED THAT HE DID

25   NOT CASH CHECKS EXCEEDING $5,000.00.  FALSELY

1    STATED THAT HE ONLY ALLOWED INDIVIDUALS TO

2    CASH MULTIPLE CHECKS IF THE TOTAL AMOUNT OF

3    THE CHECKS DID NOT EXCEED $5,000.00.  AND

4    CONCEALED NUMEROUS RECORDS RELEVANT TO THE

5    EXAMINATION.  THE ABOVE IS A VIOLATION OF

6    TITLE 18 UNITED STATES CODE SECTION 1505.

7         COUNT FOUR: OBSTRUCTION OF A PROCEEDING

8    BEFORE A FEDERAL AGENCY.

9         15.  PARAGRAPHS ONE THROUGH 14 OF THIS

10   SUPERCEDING INDICTMENT ARE INCORPORATED

11   HEREIN AS FACTUAL ALLEGATIONS.

12        16.  DESPITE LINARES' OBSTRUCTION OF THE

13   TREASURY'S 2010 EXAMINATION, REFERENCED

14   ABOVE, THE EXAMINATION FOUND NUMEROUS

15   VIOLATIONS OF THE BANK SECRECY ACT, INCLUDING

16   THE FACT THAT LINARES HAD NO ANTI-MONEY

17   LAUNDERING COMPLIANCE PROGRAM IN PLACE.

18   LINARES WAS ADVISED OF THE EXAMINATION'S

19   FINDINGS.

20        17.  ON OR ABOUT MARCH 5TH, 2013, THE

21   TREASURY INITIATED A FOLLOW-UP EXAMINATION TO

22   DETERMINE WHETHER LINARES HAD TAKEN ANY OF

23   THE CORRECTIVE MEASURES IDENTIFIED DURING THE

24   2010 EXAMINATION AND DETERMINE WHETHER

25   LINARES AND LATINO'S HAD COME INTO COMPLIANCE

1    WITH THE BANK SECRECY ACT AND OTHER

2    APPLICABLE LAWS.  THIS FOLLOW-UP EXAMINATION

3    ALSO INCLUDED TELEPHONIC AND IN-PERSON

4    INTERVIEWS OF LINARES, A TOUR OF THE STORE,

5    AND A REVIEW OF CERTAIN BOOKS AND RECORDS.

6         18.  FROM ON OR ABOUT MARCH 5TH, 2013,

7    TO ON OR ABOUT JUNE 20TH, 2013, IN THE MIDDLE

8    DISTRICT OF LOUISIANA, CARLOS L. LINARES, THE

9    DEFENDANT HEREIN, DID CORRUPTLY INFLUENCE,

10   OBSTRUCT AND IMPEDE AND ENDEAVOR TO

11   INFLUENCE, OBSTRUCT AND IMPEDE THE DUE AND

12   PROPER ADMINISTRATION OF THE LAW UNDER WHICH

13   A PROCEEDING WAS PENDING; THAT IS, AN

14   EXAMINATION BY THE UNITED STATES DEPARTMENT

15   OF THE TREASURY, INTERNAL REVENUE SERVICE.

16   AND THAT LINARES FALSELY REPRESENTED TO THE

17   EXAMINER THAT HE DID NOT RETAIN ANY RECORDS

18   OF HIS CHECK CASHING BUSINESS OTHER THAN HIS

19   BANK STATEMENTS.  AND LINARES CONCEALED

20   NUMEROUS RECORDS RELEVANT TO THE EXAMINATION.

21   THE ABOVE IS A VIOLATION OF TITLE 18 UNITED

22   STATES CODE SECTION 1505.

23        AND YOU CAN REMOVE IT FORM THE ELMO AT

24   THIS TIME.

25        THERE IS ALSO, AS YOU SAW THERE,

1    SOMETHING CALLED A FORFEITURE ALLEGATION.

2    BUT, LADIES AND GENTLEMEN, YOU ARE NOT TO

3    CONCERN YOURSELVES WITH THAT.  YOU SHOULD

4    ONLY CONCERN YOURSELF WITH THE COUNTS OF THE

5    INDICTMENT THAT I HAVE READ TO YOU.

6    MR. AMBEAU: MAY WE APPROACH BEFORE WE

7        CONTINUE FOR JUST ONE SECOND?

8    THE COURT: YES.

9    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

10        A BENCH CONFERENCE WAS HELD.)

11    MR. AMBEAU: I APOLOGIZE IF YOU DID THIS,

12        YOUR HONOR.  I WAS SORT OF CLEANING THE

13    TABLE UP.  DID I HEAR YOU INSTRUCT THE JURY

14    THAT THE INDICTMENT WAS NOT EVIDENCE AND THAT

15    IT'S JUST THE INDICTMENT AND THAT THEY CAN

16    DISREGARD

17    BY THE COURT: WE ARE GOING TO COVER THAT IN

18        JUST A MINUTE.

19    MR. AMBEAU: I JUST THOUGHT IT -- I DIDN'T

20        KNOW IF ---

21    MR. STEVENS: I DON'T MIND IF YOU SKIP IT,

22        THOUGH, JUDGE.

23    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

24        THE BENCH CONFERENCE WAS CONCLUDED.)

25    THE COURT: NOW, MEMBERS OF THE JURY, THERE IS

1        IN ANY TRIAL THERE ARE, IN FACT, TWO JUDGES.

2        PAM, HAVE WE PROVIDED THE INTERPRETERS

3        WITH A COPY?  OKAY.  SO, WHEN WE GET TO THE

4        CHANGE, I'LL ---

5        AGAIN, LADIES AND GENTLEMEN, THERE ARE

6        IN EFFECT TWO JUDGES.  AND, BY THE WAY, YOU

7        CAN FOLLOW ALONG WITH THE JURY INSTRUCTIONS

8        HERE.

9        I AM ONE OF THE JUDGES.  THE OTHER IS

10        THE JURY.  IT IS MY DUTY TO PRESIDE OVER THE

11        TRIAL AND TO DECIDE WHAT EVIDENCE IS PROPER

12        FOR YOUR CONSIDERATION.  IT IS ALSO MY DUTY

13        AT THE END OF THE TRIAL TO EXPLAIN TO YOU THE

14        RULES OF LAW THAT YOU MUST FOLLOW AND APPLY

15        IN ARRIVING AT YOUR VERDICT.

16        FIRST, I WILL GIVE YOU SOME GENERAL

17        INSTRUCTIONS WHICH APPLY IN EVERY CASE.  FOR

18        EXAMPLE, INSTRUCTIONS ABOUT BURDEN OF PROOF

19        AND HOW TO JUDGE THE BELIEVABILITY OF

20        WITNESSES.  THEN I WILL GIVE YOU SOME

21        SPECIFIC RULES OF LAW ABOUT THIS PARTICULAR

22        CASE.  AND, FINALLY, I WILL EXPLAIN TO YOU

23        THE PROCEDURES YOU SHOULD FOLLOW IN YOUR

24        DELIBERATIONS.

25        GENERAL INSTRUCTIONS. YOU AS JURORS ARE

1       THE JUDGES OF THE FACTS.  BUT IN DETERMINING

2       WHAT ACTUALLY HAPPENED, THAT IS, IN REACHING

3       YOUR DECISION AS TO THE FACTS, IT IS YOUR

4       SWORN DUTY TO FOLLOW ALL OF THE RULES OF LAW

5       AS I EXPLAIN THEM TO YOU.

6           YOU HAVE NO RIGHT TO DISREGARD OR GIVE

7       SPECIAL ATTENTION TO ANY ONE INSTRUCTION OR

8       TO QUESTION THE WISDOM OR CORRECTNESS OF ANY

9       RULE I MAY STATE TO YOU.

10          YOU MAY NOT SUBSTITUTE OR FOLLOW YOUR

11      OWN NOTION OR OPINION AS TO WHAT THE LAW IS

12      OR OUGHT TO BE.

13          IT IS YOUR DUTY TO APPLY THE LAW AS I

14      EXPLAIN IT TO YOU, REGARDLESS OF THE

15      CONSEQUENCES.

16          IT IS ALSO YOUR DUTY TO BASE YOUR

17      VERDICT SOLELY UPON THE EVIDENCE WITHOUT

18      PREJUDICE OR SYMPATHY.

19          THAT WAS THE PROMISE YOU MADE AND THE

20      OATH YOU TOOK BEFORE BEING ACCEPTED BY THE

21      PARTIES AS JURORS, AND THEY HAVE THE RIGHT TO

22      EXPECT NOTHING LESS.

23          THE INDICTMENT OR FORMAL CHARGE AGAINST

24      THE DEFENDANT IS NOT EVIDENCE OF GUILT.

25      INDEED, THE DEFENDANT IS PRESUMED BY THE LAW

1        TO BE INNOCENT.  THE DEFENDANT BEGINS WITH A

2        CLEAN SLATE.  THE LAW DOES NOT REQUIRE THE

3        DEFENDANT TO PROVE HIS INNOCENCE OR PRODUCE

4        ANY EVIDENCE AT ALL.

5            THE GOVERNMENT HAS THE BURDEN OF PROVING

6        THE DEFENDANT GUILTY BEYOND A REASONABLE

7        DOUBT.  AND IF IT FAILS TO DO SO, YOU MUST

8        ACQUIT THE DEFENDANT.  WHILE THE GOVERNMENT'S

9        BURDEN OF PROOF IS A STRICT OR HEAVY BURDEN,

10       IT IS NOT NECESSARY THAT THE DEFENDANT'S

11       GUILT BE PROVED BEYOND ALL POSSIBLE DOUBT.

12       IT IS ONLY REQUIRED THAT THE GOVERNMENT'S

13       PROOF EXCLUDE ANY REASONABLE DOUBT CONCERNING

14       THE DEFENDANT'S GUILT.  A REASONABLE DOUBT IS

15       A DOUBT BASED UPON REASON AND COMMON SENSE

16       AFTER CAREFUL AND IMPARTIAL CONSIDERATION OF

17       ALL THE EVIDENCE IN THE CASE.  PROOF BEYOND A

18       REASONABLE DOUBT, THEREFORE, IS PROOF OF SUCH

19       A CONVINCING CHARACTER THAT YOU WOULD BE

20       WILLING TO RELY AND ACT UPON IT WITHOUT

21       HESITATION IN MAKING THE MOST IMPORTANT

22       DECISIONS OF YOUR OWN AFFAIRS.

23            AS I TOLD YOU EARLIER, IT IS YOUR DUTY

24       TO DETERMINE THE FACTS. TO DO SO YOU MUST

25       CONSIDER ONLY THE EVIDENCE PRESENTED DURING

1    THE TRIAL.  EVIDENCE IS THE SWORN TESTIMONY

2    OF THE WITNESS, INCLUDING STIPULATIONS AND

3    THE EXHIBITS.  THE QUESTIONS, STATEMENTS,

4    OBJECTIONS AND ARGUMENTS MADE BY THE LAWYERS

5    ARE NOT EVIDENCE. THE FUNCTION OF THE LAWYERS

6    IS TO POINT OUT THOSE THINGS THAT ARE MOST

7    SIGNIFICANT OR HELPFUL TO THEIR SIDE OF THE

8    CASE.  AND IN DOING SO, TO CALL YOUR

9    ATTENTION TO CERTAIN FACTS OR INFERENCES THAT

10    MIGHT OTHERWISE ESCAPE YOUR NOTICE.

11    IN THE FINAL ANALYSIS, HOWEVER, IT IS

12    YOUR OWN RECOLLECTION AND INTERPRETATION OF

13    THE EVIDENCE THAT CONTROLS IN THE CASE.  WHAT

14    THE LAWYERS SAY IS NOT BINDING UPON YOU.

15    DURING THE TRIAL I SUSTAINED OBJECTIONS

16    TO CERTAIN QUESTIONS AND EXHIBITS.  YOU MUST

17    DISREGARD THOSE QUESTIONS AND EXHIBITS

18    ENTIRELY.  DO NOT SPECULATE AS TO WHAT THE

19    WITNESS WOULD HAVE SAID IF PERMITTED TO

20    ANSWER THE QUESTION OR AS TO THE CONTENT OF

21    AN EXHIBIT.

22    ALSO, CERTAIN TESTIMONY OR OTHER

23    EVIDENCE HAS BEEN ORDERED REMOVED FROM THE

24    RECORD AND YOU HAVE BEEN INSTRUCTED TO

25    DISREGARD THE EVIDENCE.  DO NOT CONSIDER ANY

1    TESTIMONY OR OTHER EVIDENCE WHICH HAS BEEN

2    REMOVED FROM YOUR CONSIDERATION IN REACHING

3    YOUR DECISION.  YOUR VERDICT MUST BE BASED

4    SOLELY ON THE LEGALLY-ADMISSIBLE EVIDENCE AND

5    TESTIMONY.

6         ALSO, DO NOT ASSUME FROM ANYTHING I MAY

7    HAVE DONE OR SAID DURING THE TRIAL THAT I

8    HAVE AN OPINION CONCERNING ANY OF THE ISSUES

9    IN THIS CASE.  EXCEPT FOR THE INSTRUCTIONS TO

10   YOU ON THE LAW, YOU SHOULD DISREGARD ANYTHING

11   I MAY HAVE SAID DURING THE TRIAL IN ARRIVING

12   AT YOUR VERDICT.

13        IN CONSIDERING THE EVIDENCE, YOU ARE

14   PERMITTED TO DRAW SUCH REASONABLE INFERENCES

15   FROM THE TESTIMONY AND EXHIBITS AS YOU FEEL

16   ARE JUSTIFIED IN THE LIGHT OF COMMON

17   EXPERIENCE.  IN OTHER WORDS, YOU MAY MAKE

18   DEDUCTIONS AND REACH CONCLUSIONS THAT REASON

19   AND COMMON SENSE LEAD YOU TO DRAW FROM THE

20   FACTS WHICH HAVE BEEN ESTABLISHED BY THE

21   EVIDENCE.

22        DO NOT BE CONCERNED ABOUT WHETHER THE

23   EVIDENCE IS DIRECT EVIDENCE OR CIRCUMSTANTIAL

24   EVIDENCE.  YOU SHOULD CONSIDER AND WEIGH ALL

25   OF THE EVIDENCE THAT WAS PRESENTED TO YOU.

1         THE LAW MAKES NO DISTINCTION BETWEEN THE

2    WEIGHT TO BE GIVEN EITHER DIRECT -- TO DIRECT

3    OR CIRCUMSTANTIAL EVIDENCE.  BUT THE LAW

4    REQUIRES THAT YOU, AFTER WEIGHING ALL THE

5    EVIDENCE, WHETHER DIRECT OR CIRCUMSTANTIAL,

6    BE CONVINCED OF THE GUILT OF THE DEFENDANT

7    BEYOND A REASONABLE DOUBT BEFORE YOU CAN FIND

8    HIM GUILTY.

9         NOW, YOU HEARD CERTAIN STIPULATIONS

10   DURING THIS TRIAL.  I WILL REMIND YOU THAT A

11   STIPULATION IS SOMETHING THAT THE ATTORNEYS

12   AGREES IS ACCURATE.  WHEN THERE IS NO DISPUTE

13   ABOUT CERTAIN TESTIMONY, THE ATTORNEYS MAY

14   AGREE OR STIPULATE TO THAT TESTIMONY.

15   STIPULATED TESTIMONY MUST BE CONSIDERED IN

16   THE SAME WAY AS IF THAT TESTIMONY HAD BEEN

17   RECEIVED HERE IN COURT.

18        I REMIND YOU THAT IT IS YOUR JOB TO

19   DECIDE WHETHER THE GOVERNMENT HAS PROVED THE

20   GUILT OF THE DEFENDANT BEYOND A REASONABLE

21   DOUBT.  IN DOING SO YOU MUST CONSIDER ALL OF

22   THE EVIDENCE.  THIS DOES NOT MEAN, HOWEVER,

23   THAT YOU MUST ACCEPT ALL OF THE EVIDENCE AS

24   TRUE OR ACCURATE.

25        YOU ARE THE SOLE JUDGES OF THE

1    CREDIBILITY OR BELIEVABILITY OF EACH WITNESS

2    AND THE WEIGHT TO BE GIVEN TO THE WITNESS'

3    TESTIMONY.  AN IMPORTANT PART OF YOUR JOB

4    WILL BE MAKING JUDGMENTS ABOUT THE TESTIMONY

5    OF THE WITNESSES, INCLUDING THE DEFENDANT,

6    WHO TESTIFIED IN THIS CASE.  YOU SHOULD

7    DECIDE WHETHER YOU BELIEVE ALL OR SOME PART

8    OR NONE OF WHAT EACH PERSON HAD TO SAY AND

9    HOW IMPORTANT THAT TESTIMONY WAS.

10    IN MAKING THAT DECISION I SUGGEST THAT

11    YOU ASK YOURSELF A FEW QUESTIONS.  DID THE

12    WITNESS IMPRESS YOU AS HONEST?  DID THE

13    WITNESS HAVE ANY PARTICULAR REASON NOT TO

14    TELL THE TRUTH?  DID THE WITNESS HAVE A

15    PERSONAL INTEREST IN THE OUTCOME OF THE CASE?

16    DID THE WITNESS HAVE ANY RELATIONSHIP WITH

17    EITHER THE GOVERNMENT OR THE DEFENSE?  DID

18    THE WITNESS SEEM TO HAVE A GOOD MEMORY?  DID

19    THE WITNESS CLEARLY SEE OR HEAR THE THINGS

20    ABOUT WHICH HE TESTIFIED OR SHE TESTIFIED?

21    DID THE WITNESS HAVE THE OPPORTUNITY AND

22    ABILITY TO UNDERSTAND THE QUESTIONS CLEARLY

23    AND TO ANSWER THEM DIRECTLY?  DID THE

24    WITNESS' TESTIMONY DIFFER FROM THE TESTIMONY

25    OF OTHER WITNESSES?

1           THESE ARE A FEW OF THE CONSIDERATIONS

2       THAT WILL HELP YOU DETERMINE THE ACCURACY OF

3       WHAT EACH WITNESS SAID.

4           THE TESTIMONY OF THE DEFENDANT SHOULD BE

5       WEIGHED AND HIS CREDIBILITY EVALUATED IN THE

6       SAME WAY AS THAT OF ANY OTHER WITNESS.

7           YOUR JOB IS TO THINK ABOUT THE TESTIMONY

8       OF EACH WITNESS YOU HAVE HEARD AND DECIDE HOW

9       MUCH YOU BELIEVE OF WHAT EACH WITNESS HAD TO

10      SAY.

11          IN MAKING UP YOUR MIND IN REACHING A

12      VERDICT, DO NOT MAKE ANY DECISION SIMPLY

13      BECAUSE THERE WERE MORE WITNESSES ON ONE SIDE

14      THAN ON THE OTHER.  DO NOT REACH A CONCLUSION

15      ON A PARTICULAR POINT JUST BECAUSE THERE WERE

16      MORE WITNESSES TESTIFYING FOR ONE SIDE ON

17      THAT POINT.

18          YOU WILL ALWAYS BEAR IN MIND THAT THE

19      LAW NEVER IMPOSES UPON A DEFENDANT IN A

20      CRIMINAL CASE THE BURDEN OR DUTY TO CALLING

21      ANY WITNESSES OR PRODUCING ANY EVIDENCE.

22          YOU WILL NOTE THAT THE SUPERCEDING

23      INDICTMENT HERE CHARGES THAT THE FOUR

24      OFFENSES WERE COMMITTED ON OR ABOUT A

25      SPECIFIED DATE.  THE GOVERNMENT DOES NOT HAVE

1   TO PROVE THAT THE OFFENSES WERE COMMITTED ON

2   THAT EXACT DATE, SO LONG AS THE GOVERNMENT

3   PROVES BEYOND A REASONABLE DOUBT THAT THE

4   DEFENDANT COMMITTED THE ALLEGED OFFENSES ON A

5   DATE REASONABLY NEAR THE DATES STATED IN THE

6   INDICTMENT.

7        YOU ARE HERE TO DECIDE WHETHER THE

8   GOVERNMENT HAS PROVED BEYOND A REASONABLE

9   DOUBT THAT THE DEFENDANT IS GUILTY OF THE

10  CRIMES CHARGED.  THE DEFENDANT IS NOT ON

11  TRIAL FOR ANY OTHER ACT, CONDUCT OR OFFENSE

12  NOT ALLEGED IN THE INDICTMENT.  NEITHER ARE

13  YOU CALLED UPON TO RETURN A VERDICT AS TO THE

14  GUILT OF ANY OTHER PERSON OR PERSONS NOT ON

15  TRIAL AS A DEFENDANT IN THIS CASE EXCEPT AS

16  THAT YOU MAY OTHERWISE BE INSTRUCTED.

17       IF THE DEFENDANT IS FOUND GUILTY, IT

18  WILL BE MY DUTY TO DECIDE WHAT THE PUNISHMENT

19  WILL BE.  YOU SHOULD NOT BE CONCERNED WITH

20  PUNISHMENT IN ANY WAY.  IT SHOULD NOT ENTER

21  YOUR CONSIDERATION OR DISCUSSION.

22       A SEPARATE CRIME IS CHARGED IN EACH OF

23  THE COUNTS -- IN EACH COUNT OF THE

24  SUPERCEDING INDICTMENT.  EACH COUNT AND THE

25  EVIDENCE PERTAINING TO IT SHOULD BE

1     CONSIDERED SEPARATELY.  THE FACT THAT YOU MAY

2     FIND THE DEFENDANT GUILTY OR NOT GUILTY AS TO

3     ONE OF THE CRIMES CHARGED SHOULD NOT CONTROL

4     YOUR VERDICT AS TO THE OTHER.

5          IN DETERMINING WHETHER ANY STATEMENT

6     CLAIMED TO HAVE BEEN MADE BY THE DEFENDANT

7     OUTSIDE OF COURT AND AFTER AN ALLEGED CRIME

8     HAS BEEN COMMITTED WAS KNOWINGLY AND

9     VOLUNTARILY MADE, YOU SHOULD CONSIDER THE

10    EVIDENCE CONCERNING SUCH A STATEMENT WITH

11    CAUTION AND GREAT CARE.  YOU SHOULD GIVE SUCH

12    WEIGHT TO THE STATEMENT AS YOU FEEL IT

13    DESERVES UNDER ALL THE CIRCUMSTANCES.  YOU

14    MAY CONSIDER IN THAT REGARD SUCH FACTORS AS

15    THE AGE, SEX, TRAINING, EDUCATION,

16    OCCUPATION, AND PHYSICAL AND MENTAL CONDITION

17    OF THE DEFENDANT, HIS TREATMENT WHILE UNDER

18    INTERROGATION AND ALL OTHER CIRCUMSTANCES AND

19    EVIDENCE SURROUNDING THE MAKING OF THE

20    STATEMENT.

21         TO ACT KNOWINGLY MEANS THAT AN ACT WAS

22    DONE VOLUNTARILY AND INTENTIONALLY.  NOT

23    BECAUSE OF MISTAKE OR ACCIDENT.

24         YOU MAY FIND THAT THE DEFENDANT HAD

25    KNOWLEDGE OF A FACT IF YOU FIND THAT THE

1    DEFENDANT DELIBERATELY CLOSED HIS EYES TO

2    WHAT WOULD OTHERWISE HAVE BEEN OBVIOUS TO

3    HIM.  WHILE KNOWLEDGE ON THE PART OF THE

4    DEFENDANT CANNOT BE ESTABLISHED MERELY BY

5    DEMONSTRATING THAT THE DEFENDANT WAS

6    NEGLIGENT, CARELESS OR FOOLISH, KNOWLEDGE CAN

7    BE INFERRED IF THE DEFENDANT DELIBERATELY

8    BLINDED HIMSELF TO THE EXISTENCE OF A FACT.

9    THE WORD "WILLFULLY" MEANS THAT AN ACT

10   WAS DONE INTENTIONALLY, VOLUNTARILY AND WITH

11   KNOWLEDGE THAT IT IS SOMETHING THE LAW

12   FORBIDS.

13   CERTAIN CHARTS AND SUMMARIES HAVE BEEN

14   SHOWN TO YOU SOLELY AS AN AID TO HELP EXPLAIN

15   THE FACTS DISCLOSED BY EVIDENCE; THAT IS, THE

16   TESTIMONY, BOOKS, RECORDS AND OTHER DOCUMENTS

17   IN THE CASE.  THESE CHARTS AND SUMMARIES ARE

18   NOT ADMITTED EVIDENCE OR PROOF OF ANY FACTS.

19   YOU SHOULD DETERMINE THE FACTS OF THE

20   EVIDENCE THAT IS ADMITTED.  CERTAIN CHARTS

21   AND SUMMARIES HAVE BEEN RECEIVED. YOU SHOULD

22   GIVE THEM ONLY SUCH WEIGHT AS YOU THINK THEY

23   DESERVE.

24   LET'S TALK NOW ABOUT THE SPECIFIC COUNTS

25   FEATURED IN THE INDICTMENT.

1    COUNT ONE CHARGES A THEFT OF GOVERNMENT

2    FUNDS.  IT ACCUSES THE DEFENDANT OF

3    COMMITTING A CRIME OF THEFT OF GOVERNMENT

4    FUNDS IN TWO WAYS: PERSONALLY, AND BY AIDING

5    AND ABETTING ITS COMMISSION.  THE GOVERNMENT

6    DOES NOT HAVE TO PROVE BOTH OF THESE THEORIES

7    IN ORDER FOR YOU TO RETURN A GUILTY VERDICT

8    ON THIS CHARGE.

9    HOWEVER, IN ORDER FOR YOU TO RETURN A

10    GUILTY VERDICT ON THIS CHARGE, YOU MUST ALL

11    AGREE ON THE METHOD THE DEFENDANT EMPLOYED;

12    THAT IS, ALL OF YOU MUST AGREE THAT THE

13    GOVERNMENT PROVED BEYOND A REASONABLE DOUBT

14    THAT THE DEFENDANT PERSONALLY COMMITTED COUNT

15    ONE OR ALL OF YOU MUST AGREE THAT THE

16    GOVERNMENT PROVED BEYOND A REASONABLE DOUBT

17    THAT THE DEFENDANT AIDED AND ABETTED COUNT

18    ONE'S COMMISSION.

19    TITLE 18 UNITED STATES CODE SECTION 641

20    MAKES IT A CRIME FOR ANYONE TO STEAL OR

21    KNOWINGLY CONVERT ANY MONEY, PROPERTY OR

22    THING OF VALUE BELONGING TO THE UNITED STATES

23    HAVING AN AGGREGATE VALUE OF MORE THAN

24    $1,000.00.

25    FOR YOU TO FIND THE DEFENDANT GUILTY OF

1    THIS CRIME, YOU MUST BE CONVINCED THAT THE

2    GOVERNMENT HAS PROVED EACH OF THE FOLLOWING

3    BEYOND A REASONABLE DOUBT:

4    FIRST.  THAT THE MONEY OR PROPERTY

5    DESCRIBED IN THE SUPERCEDING INDICTMENT

6    BELONGED TO THE UNITED STATES GOVERNMENT AND

7    HAD A VALUE IN EXCESS OF $1,000.00 AT THE

8    TIME ALLEGED.

9    SECOND.  THAT THE DEFENDANT STOLE OR

10   KNOWINGLY CONVERTED SUCH MONEY OR PROPERTY TO

11   THE DEFENDANT'S USE OR TO THE USE OF ANOTHER.

12   AND, THIRD.  THAT THE DEFENDANT DID SO

13   KNOWING THAT THE MONEY OR PROPERTY WAS NOT

14   HIS AND WITH INTENT TO DEPRIVE THE OWNER OF

15   THE USE OR BENEFIT OF THE MONEY OR PROPERTY.

16   NOW, THE WORD "VALUE" MEANS THE FACE,

17   PAR OR MARKET VALUE OR COST PRICE, EITHER

18   WHOLESALE OR RETAIL, WHICHEVER IS GREATER, OF

19   ALL SUCH THINGS OF VALUE THAT YOU FIND THE

20   DEFENDANT HAS STOLEN OR KNOWINGLY CONVERTED.

21   TO STEAL OR KNOWINGLY CONVERT MEANS TO

22   WRONGFULLY TAKE MONEY, PROPERTY OR A THING OF

23   VALUE BELONGING TO ANOTHER WITH THE INTENT TO

24   DEPRIVE THE OWNER OF ITS USE OR BENEFIT

25   EITHER TEMPORARILY OR PERMANENTLY.

1    IT IS NOT NECESSARY TO PROVE THAT THE

2    DEFENDANT KNEW THAT THE UNITED STATES

3    GOVERNMENT OWNED THE PROPERTY AT THE TIME OF

4    THE ALLEGED WRONGFUL TAKING.

5    A UNITED STATES TREASURY CHECK BELONGS

6    TO THE UNITED STATES GOVERNMENT UNTIL IT IS

7    RECEIVED BY THE INTENDED PAYEE.

8    THE GUILT OF THE DEFENDANT IN A CRIMINAL

9    CASE MAY BE ESTABLISHED WITHOUT PROOF THAT

10    THE DEFENDANT PERSONALLY DID EVERY ACT

11    CONSTITUTING THE ALLEGED OFFENSE.  THE LAW

12    RECOGNIZES THAT ORDINARILY ANYTHING A PERSON

13    CAN DO FOR HIMSELF MAY ALSO BE ACCOMPLISHED

14    BY HIM THROUGH THE DIRECTION OF ANOTHER

15    PERSON AS HIS OR HER AGENT OR BY ACTING IN

16    CONCERT WITH OR UNDER THE DIRECTION OF

17    ANOTHER PERSON OR PERSONS IN A JOINT EFFORT

18    OR ENTERPRISE.

19    IF ANOTHER PERSON IS ACTING UNDER THE

20    DIRECTION OF THE DEFENDANT OR IF THE

21    DEFENDANT JOINS ANOTHER PERSON AND PERFORMS

22    ACTS WITH THE INTENT TO COMMIT A CRIME, THEN

23    THE LAW HOLDS THE DEFENDANT RESPONSIBLE FOR

24    THE ACTS AND CONDUCT OF SUCH OTHER PERSONS

25    JUST AS THOUGH THE DEFENDANT HAD COMMITTED

1    THE ACT OR ENGAGED IN SUCH CONDUCT.

2        BEFORE ANY DEFENDANT MAY BE HELD

3    CRIMINALLY LIABLE FOR THE ACTS OF OTHERS, IT

4    IS NECESSARY THAT THE ACCUSED DELIBERATELY

5    ASSOCIATE HIMSELF IN SOME WAY WITH THE CRIME

6    AND PARTICIPATE IN IT WITH THE INTENT TO

7    BRING ABOUT THE CRIME.

8        OF COURSE, MERE PRESENCE AT THE SCENE

9    OF A CRIME AND KNOWLEDGE THAT A CRIME IS

10    BEING COMMITTED ARE NOT SUFFICIENT TO

11    ESTABLISH THAT THE DEFENDANT EITHER DIRECTED

12    OR AIDED AND ABETTED THE CRIME, UNLESS YOU

13    FIND BEYOND A REASONABLE DOUBT THAT THE

14    DEFENDANT WAS A PARTICIPANT AND NOT MERELY A

15    KNOWING SPECTATOR.

16        IN OTHER WORDS, YOU MAY NOT FIND THE

17    DEFENDANT GUILTY UNLESS YOU FIND BEYOND A

18    REASONABLE DOUBT THAT EVERY ELEMENT OF THE

19    OFFENSE, AS DEFINED IN THESE INSTRUCTIONS,

20    WAS COMMITTED BY SOME PERSON OR PERSONS AND

21    THAT THE DEFENDANT VOLUNTARILY PARTICIPATED

22    IN ITS COMMISSION WITH THE INTENT TO VIOLATE

23    THE LAW.

24        FOR YOU TO FIND THAT THE DEFENDANT AIDED

25    AND ABETTED COUNT ONE'S COMMISSION, YOU MUST

1    BE CONVINCED THAT THE GOVERNMENT HAS PROVED

2    EACH OF THE FOLLOWING BEYOND A REASONABLE

3    DOUBT:

4         FIRST.  THAT THE OFFENSE OF THEFT OF

5    GOVERNMENT FUNDS WAS COMMITTED BY SOME

6    PERSON.

7         SECOND.  THAT THE DEFENDANT ASSOCIATED

8    WITH THE CRIMINAL VENTURE.

9         THIRD.  THAT THE DEFENDANT PURPOSEFULLY

10   PARTICIPATED IN THE CRIMINAL VENTURE.

11        AND, FOURTH, THAT THE DEFENDANT SOUGHT

12   BY ACTION TO MAKE THAT VENTURE SUCCESSFUL.

13        TO ASSOCIATE WITH THE CRIMINAL VENTURE

14   MEANS THAT THE DEFENDANT SHARED THE CRIMINAL

15   INTENT OF THE PRINCIPLE.  THIS ELEMENT CANNOT

16   BE ESTABLISHED IF THE DEFENDANT HAD NO

17   KNOWLEDGE OF THE PRINCIPLE'S CRIMINAL

18   VENTURE.

19        TO PARTICIPATE IN THE CRIMINAL VENTURE

20   MEANS THAT THE DEFENDANT ENGAGED IN SOME

21   AFFIRMATIVE CONDUCT DESIGNED TO AID THE

22   VENTURE OR ASSIST THE PRINCIPLE OF THE CRIME.

23        NOW, COUNT TWO CHARGES THE DEFENDANT

24   WITH FAILURE TO MAINTAIN AN EFFECTIVE MONEY

25   LAUNDERING PROGRAM -- ANTI-MONEY LAUNDERING

1    PROGRAM.

2        TITLE 31 UNITED STATES CODE SECTION

3    5322A MAKES IT A CRIME FOR ANYONE TO

4    WILLFULLY VIOLATE VARIOUS STATUTORY

5    SUBSECTIONS OR REGULATORY PROVISIONS.  FOR

6    YOU TO FIND THE DEFENDANT GUILTY OF THIS

7    CRIME YOU MUST BE CONVINCED THAT THE UNITED

8    STATES HAS PROVED EACH OF THE FOLLOWING

9    BEYOND A REASONABLE DOUBT:

10       FIRST.  THAT THE DEFENDANT OPERATED A

11   FINANCIAL INSTITUTION LOCATED IN THE UNITED

12   STATES.

13       AND, SECOND.  THAT THE DEFENDANT

14   WILLFULLY FAILED TO DEVELOP AN EFFECTIVE

15   ANTI-MONEY LAUNDERING PROGRAM COMMENSURATE

16   WITH THE RISKS POSED BY THE LOCATION AND SIZE

17   OF THE FINANCIAL PROGRAM, AND THE NATURE AND

18   VOLUME OF THE FINANCIAL SERVICES PROVIDED.

19       THIRD.  THAT SAID ANTI-MONEY LAUNDERING

20   PROGRAM WAS NOT IN WRITING.

21       AND, FOURTH.  THAT SAID ANTI-MONEY

22   LAUNDERING PROGRAM FAILED TO INCLUDE, AT A

23   MINIMUM, THE FOLLOWING REQUIREMENTS:

24       1.  POLICIES AND PROCEDURES AND INTERNAL

25   CONTROLS FOR:

1         A.  VERIFYING CUSTOMER IDENTIFICATION.

2         B.  FILING REPORTS, SUCH AS CURRENCY

3  TRANSACTION REPORTS.

4         C.  CREATING AND RETAINING RECORDS OR,

5         D.  RESPONDING TO LAW ENFORCEMENT

6  REQUESTS.

7         2.  A COMPLIANCE OFFICER WHO ASSURED

8  DAY-TO-DAY COMPLIANCE WITH THE PROGRAM.

9         3.  AN ONGOING EMPLOYEE TRAINING

10  PROGRAM, AND

11         4.  AN INDEPENDENT AUDIT FUNCTION TO

12  TEST THE PROGRAM.

13      A CHECK CASHING BUSINESS IS A, QUOTE,

14  "FINANCIAL INSTITUTION," CLOSE QUOTE, WITHIN

15  THE MEANING OF THE STATUTE.

16      IN ORDER FOR YOU TO FIND THAT THE

17  DEFENDANT ACTED WILLFULLY, THAT THE DEFENDANT

18  WILLFULLY FAILED TO DEVELOP THE ABOVE-

19  OUTLINED ANTI-MONEY LAUNDERING PROGRAM, THE

20  GOVERNMENT MUST PROVE THAT HE ACTED WITH

21  KNOWLEDGE THAT HIS CONDUCT WAS UNLAWFUL.

22      IF YOU DETERMINE THAT ALL OF THE ABOVE

23  ELEMENTS ARE MET, YOU MUST ALSO DETERMINE

24  WHETHER THE DEFENDANT COMMITTED THE OFFENSE:

25         A.  WHILE VIOLATING ANOTHER LAW OF THE

1    UNITED STATES, OR

2         B.  AS PART OF A PATTERN OF ILLEGAL

3    ACTIVITY INVOLVING MORE THAN $100,000.00 IN A

4    12-MONTH PERIOD.

5         THE OTHER THREE CHARGES IN THE

6    SUPERCEDING INDICTMENT, THAT IS, ALL

7    CONSTITUTE THE OTHER LAWS OF THE UNITED

8    STATES.

9         COUNTS THREE AND FOUR.  OBSTRUCTION OF A

10   PROCEEDING BEFORE A FEDERAL AGENCY.

11        TITLE 18 UNITED STATES CODE SECTION 1505

12   MAKES IT A CRIME FOR ANYONE TO OBSTRUCT

13   PROCEEDINGS BEFORE A FEDERAL AGENCY.

14        FOR YOU TO FIND THE DEFENDANT GUILTY OF

15   THIS CRIME YOU MUST BE CONVINCED THAT THE

16   UNITED STATES HAS PROVED EACH OF THE

17   FOLLOWING BEYOND A REASONABLE DOUBT:

18        FIRST.  THAT ON OR ABOUT THE DATES SET

19   FORTH IN THE INDICTMENT A PROCEEDING WAS

20   PENDING BEFORE AN AGENCY OF THE UNITED

21   STATES.

22        SECOND.  THAT THE DEFENDANT KNEW THAT A

23   PROCEEDING WAS PENDING BEFORE AN AGENCY OF

24   THE UNITED STATES.

25        AND, THIRD.  THAT THE DEFENDANT

1    CORRUPTLY ENDEAVORED TO INFLUENCE, OBSTRUCT

2    OR IMPEDE THE DUE AND PROPER ADMINISTRATION

3    OF THE LAW UNDER WHICH THE PROCEEDING WAS

4    BEING CONDUCTED.

5        TO ACT CORRUPTLY IS TO ACT KNOWINGLY AND

6    DISHONESTLY.  THAT IS, WITH RESPECT TO COUNTS

7    THREE AND FOUR, TO ACT CORRUPTLY IS TO ACT

8    WITH THE SPECIFIC INTENT TO INFLUENCE,

9    OBSTRUCT OR IMPEDE THE DUE AND PROPER

10   ADMINISTRATION OF THE LAW UNDER WHICH THE

11   PROCEEDING WAS BEING CONDUCTED.  A CORRUPT

12   ENDEAVOR NEED NOT BE SUCCESSFUL TO BE

13   CORRUPT.

14       THE DATES SET FORTH IN THE INDICTMENT

15   ARE SPECIFIC TO EACH COUNT.

16       I WILL ALSO INSTRUCT YOU THAT THE

17   INTERNAL REVENUE SERVICE IS AN AGENCY OF THE

18   UNITED STATES.  AN INTERNAL REVENUE SERVICE

19   INVESTIGATION IS A PROCEEDING WITHIN THE

20   MEANING OF TITLE 18 UNITED STATES CODE

21   SECTION 1505.

22       NOW, TO REACH A VERDICT, WHETHER IT IS

23   GUILTY OR NOT GUILTY, ALL OF YOU MUST AGREE.

24   YOUR VERDICT MUST BE UNANIMOUS ON EACH COUNT

25   OF THE SUPERCEDING INDICTMENT.  YOUR

1      DELIBERATIONS WILL BE SECRET.  YOU WILL NEVER

2      HAVE TO EXPLAIN YOUR VERDICT TO ANYONE.

3           IT IS YOUR DUTY TO CONSULT WITH ONE

4      ANOTHER AND TO DELIBERATE IN AN EFFORT TO

5      EACH AGREEMENT IF YOU CAN DO SO.

6           EACH OF YOU MUST DECIDE THE CASE FOR

7      YOURSELF, BUT ONLY AFTER AN IMPARTIAL

8      CONSIDERATION OF THE EVIDENCE WITH YOUR

9      FELLOW JURORS.

10          DURING YOUR DELIBERATIONS DO NOT

11     HESITATE TO RE-EXAMINE YOUR OWN OPINIONS AND

12     CHANGE YOUR MIND IF YOU ARE CONVINCED THAT

13     YOU WERE WRONG.  BUT DO NOT GIVE UP YOUR

14     HONEST BELIEFS AS TO THE WEIGHT OR EFFECT OF

15     THE EVIDENCE SOLELY BECAUSE THE OPINION OF

16     YOUR FELLOW -- BECAUSE OF THE FELLOW -- THE

17     OPINION OF YOUR FELLOW JURORS OR FOR THE MERE

18     PURPOSE OF RETURNING A VERDICT.

19          REMEMBER, AT ALL TIMES YOU ARE THE

20     JUDGES, JUDGES OF THE FACTS.  YOUR DUTY IS TO

21     DECIDE WHETHER THE GOVERNMENT HAS PROVED THE

22     DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

23          NOW, WHEN YOU RETIRE TO THE JURY ROOM,

24     THE FIRST THING YOU MUST DO IS TO SELECT ONE

25     FROM AMONG YOU TO SERVE AS YOUR FOREPERSON

1    WHO WILL HELP GUIDE YOUR DELIBERATIONS AND

2    WHO WILL SPEAK FOR YOU HERE IN COURT.

3         A VERDICT FORM HAS BEEN PREPARED FOR

4    YOUR USE.  IT IS PRETTY STRAIGHTFORWARD.  IT

5    IS SIMPLY IS ENTITLED, "UNITED STATES OF

6    AMERICA VERSUS CARLOS L. LINARES."  IT IS --

7    SAYS, "JURY VERDICT FORM."

8         QUESTION ONE: AS TO COUNT ONE, --

9    THE COURT:  DO WE HAVE THE COPY OF THE

10        VERDICT FORM?

11   MR. MAX: NO, JUDGE.  I DON'T.

12   THE COURT: THAT'S OKAY.  MERELY -- IT'S

13        PRETTY SIMPLE.

14        COUNT ONE.  "AS TO COUNT ONE, WE FIND

15   THE DEFENDANT, CARLOS L. LINARES," AND THEN

16   IT SAYS, "NOT GUILTY" AND "GUILTY."

17        THEN IT INSTRUCTS YOU TO PROCEED TO

18   QUESTION TWO.  "WE THE JURY FIND THE

19   DEFENDANT, CARLOS L. LINARES, AS TO COUNT

20   TWO, NOT GUILTY OR GUILTY."

21        THEN IT INSTRUCTS YOU TO PROCEED TO

22   QUESTION THREE.  THE SAME QUESTION AS TO

23   COUNT THREE.

24        AND THEN FINALLY AS TO COUNT FOUR, IT

25   REQUIRES THAT YOU DETERMINE IF THE DEFENDANT

1    IS NOT GUILTY OR GUILTY.  HOWEVER, IF YOUR

2    DECISION OR VERDICT IS GUILTY ON COUNT FOUR,

3    YOU THEN MUST -- LET'S SEE.

4         IF YOU ANSWER GUILTY ON COUNT TWO, IT

5    WILL TELL YOU TO GO BACK.  IF YOUR ANSWER TO

6    COUNT TWO, I SHOULD HAVE MENTIONED THIS.  BUT

7    IT'S -- I'M MAKING THIS MORE CONFUSING THAN

8    IT ACTUALLY IS.

9         BUT IF YOUR VERDICT IS GUILTY ON COUNT

10   TWO, THEN YOU HAVE TO ALSO ANSWER QUESTION

11   FIVE, WHICH SIMPLY ASKS, AS I JUST READ TO

12   YOU, TO DETERMINE WHETHER THE DEFENDANT

13   COMMITTED THE OFFENSE DESCRIBED AND ALLEGED

14   IN COUNT TWO:

15        A.  WHILE VIOLATING ANOTHER LAW OF THE

16   UNITED STATES, OR

17        B.  AS PART OF A PATTERN OF ILLEGAL

18   CONDUCT INVOLVING MORE THAN $100,000.00 IN A

19   12-MONTH PERIOD.

20        NOW, IF YOU ANSWER THOSE, THE FOREPERSON

21   SHOULD DATE AND SIGN THE VERDICT FORM.

22        AGAIN, THE FOREPERSON WILL WRITE THE

23   UNANIMOUS ANSWER OF THE JURY IN THE SPACE

24   PROVIDED FOR EACH COUNT IN THE INDICTMENT,

25   EITHER GUILTY OR NOT GUILTY.  AT THE

1    CONCLUSION OF THE DELIBERATIONS, AGAIN, THE

2    FOREPERSON SHOULD DATE AND SIGN THE VERDICT

3    FORM.

4         NOW, IF YOU NEED TO COMMUNICATE WITH ME

5    DURING YOUR DELIBERATIONS, THE FOREPERSON

6    SHOULD WRITE THE MESSAGE AND GIVE IT TO THE

7    COURT SECURITY OFFICER AND I WILL REPLY

8    EITHER IN WRITING OR RETURN YOU TO THE

9    COURTROOM.  AS YOU KNOW, THERE IS A NOTE PAD

10   AND PENCILS IN THE JURY ROOM.

11        BEAR IN MIND THAT YOU WILL -- ARE NEVER

12   TO REVEAL TO ANY PERSON, NOT EVEN TO ME, HOW

13   THE JURY STANDS, NUMERICALLY OR OTHERWISE, ON

14   ANY COUNT OF THE INDICTMENT UNTIL -- AFTER

15   YOU HAVE REACHED THE UNANIMOUS VERDICT.

16        I WILL NOW GIVE THE PARTIES -- I NOW

17   MUST TAKE UP SOME PROCEDURAL MATTERS WITH THE

18   PARTIES.

19        DO NOT YET BEGIN YOUR DELIBERATIONS

20   UNTIL YOU ARE INSTRUCTED TO DO SO.

21        MS. HARTER WILL GO ON AND PROVIDE TO YOU

22   ALL OF THE EVIDENCE THAT HAS BEEN RECEIVED SO

23   THAT YOU CAN TAKE A LOOK AT IT, CONSIDER IT.

24   SHE'LL EXPLAIN TO YOU HOW TO WORK THE DEVICE,

25   THE SCREEN THAT'S IN THE JURY ROOM AND HOW TO

1    CALL UP THE EVIDENCE ON THE SCREEN.  SHE WILL

2    ALSO PROVIDE YOU A COPY OF THE SUPERCEDING

3    INDICTMENT, AS WELL AS A COPY OF THE VERDICT

4    FORM.

5         SO, AGAIN, THE OTHER THING, TOO, I WILL

6    TELL YOU, LADIES AND GENTLEMEN, RIGHT NOW

7    IT'S 5:14.  I'M GOING TO GO ON AND I WILL ASK

8    THAT YOU AT LEAST BEGIN YOUR DELIBERATIONS AT

9    THIS POINT.  I WOULD ALSO ASK YOU TO CONSIDER

10   WHETHER YOU WANT TO STAY LATER.  WE ARE

11   PREPARED TO BRING YOUR DINNER IN FOR YOU.

12   BUT I WILL NOT -- I CAN'T -- CERTAINLY WOULD

13   NOT FORCE YOU TO WORK LATE.  I WOULD ASK YOU

14   TO TRY TO BEGIN YOUR DELIBERATIONS THIS

15   EVENING, EVEN THOUGH IT'S LATE IN THE DAY.

16   WE DID TALK ABOUT THAT YESTERDAY, I THINK.

17   WE HAVE ASKED YOU TO BE PREPARED TO STAY

18   LATE.  AND, SO, I APPRECIATE YOUR PATIENCE

19   WITH US.

20        OKAY.  AT THIS TIME, I WILL EXCUSE YOU.

21   DO NOT YET BEGIN YOUR DELIBERATIONS.  AND AT

22   LEAST UNTIL YOU HAVE EVERYTHING THAT YOU WILL

23   NEED TO BEGIN YOUR DELIBERATIONS.

24        LET'S ALL RISE FOR THE JURY.

25   REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

1          THE JURY WAS EXCUSED TO THE JURY ROOM.)

2     THE COURT: BE SEATED.

3          ALL RIGHT.  ANY OBJECTION BY THE

4     DEFENDANT TO THE JURY INSTRUCTIONS OTHER THAN

5     WHAT'S BEEN NOTED?

6     MR. AMBEAU: NONE, YOUR HONOR.

7     THE COURT: ANY OBJECTION BY THE GOVERNMENT?

8     MR. CROSSWELL: NO, YOUR HONOR.

9     THE COURT: ALL RIGHT.  IN JUST A MINUTE I

10         WILL CALL THE ALTERNATES OUT AND THANK

11    THEM, OF COURSE.

12         BEFORE DOING SO, LET'S MAKE SURE THAT WE

13    ALL AGREE ON THE EVIDENCE THAT THE JURY WILL

14    RECEIVE.

15         ACCORDING TO MY NOTES, AND PAM, ---

16    THE CLERK: THEY HAVE MY LIST.

17    THE COURT: OKAY.  I'VE GOT "GOVERNMENT

18         EXHIBIT" -- AND THIS IS NOT NECESSARILY

19    -- AND THIS IS IN THE ORDER IN WHICH IT WAS

20    INTRODUCED.

21         "GOVERNMENT'S EXHIBIT 4A, 4B, 4C, 4D,

22    5A, 5B, 5C, 5D, 5E, 6A, 6B, 6C, 6D, 7, 8, 9,

23    10, 11, 12, 13, 14A, 14B, 45, 47, 48, 1, 24,

24    55, 27, 28," ---

25    THE CLERK: HOLD ON, JUDGE.

1    MR. STEVENS: CAN YOU GO BACK TO "1," JUDGE?

2        I'M SORRY.

3    THE COURT: OKAY.  GOING BACK TO "1, 24,

4        55, 27, 28, 3, 16A, 16B, 16D, 16C, 16E,

5    16F."

6    THE CLERK: I DON'T HAVE THOSE.  I HAVE

7        THOSE AS IDENTIFIED FOR AUTHENTICITY

8    ONLY.

9    MR. STEVENS: JUDGE, "E, F," -- "16A, B" AND

10       "D" I BELIEVE WERE ADMITTED.  "16C, E, F"

11   AND THE OTHERS, I THINK WERE DEMONSTRATIVES

12   ONLY.

13   THE COURT: OKAY.  VERY WELL.

14   MR. STEVENS: BUT "A, B" AND "D" SHOULD BE

15       ---

16   THE COURT: ANY OBJECTION TO THAT; DO YOU

17       DISPUTE THAT, MR. AMBEAU?

18   MR. AMBEAU: I BELIEVE THAT IS, IN FACT,

19       THE CASE, YOUR HONOR.

20   THE COURT: OKAY.  GOOD.  OKAY.  NEXT,

21       PICKING UP WITH "16H, 52, 18, 19, 25,

22   85, 86, 87."

23   MR. STEVENS: I REMEMBER IT.  I REMEMBER IT.

24       IT'S TWO PAGES FROM A BANK STATEMENT.

25   THE CLERK: THEY EMAILED IT TO ME.

1    THE COURT: "67," AND "79."

2    MR. AMBEAU: I BELIEVE THOSE WERE THE ONES

3        THAT WERE ---

4    THE COURT: THOSE WERE DEMONSTRATIVES, RIGHT?

5    MR. AMBEAU: THE JUDGE EXCLUDED THEM BECAUSE

6        THEY WERE THE ONES WITH THE CHECKS

7    WRITTEN TO THE FAMILY MEMBERS.

8    MR. STEVENS: I THINK THEY WERE ADMITTED,

9        BUT THEN YOU STOPPED MY QUESTIONING

10   ABOUT THEM.

11   THE COURT: YES.  I THINK THAT'S RIGHT.

12   THE CLERK: SO, THEY'RE NOT ADMITTED?

13   THE COURT: "67" AND "79."

14   MR. STEVENS: WELL, I THINK THE -- THE

15       EXHIBITS MR. AMBEAU IS ASKING ABOUT ARE

16   "85, 86" AND "87."  THOSE WERE -- MY

17   RECOLLECTION IS THEY WERE ADMITTED, BUT THEN

18   I DIDN'T ASK ANY -- I WASN'T PERMITTED TO ASK

19   QUESTIONS ABOUT THEM AFTER THEY HAD BEEN

20   ADMITTED.

21   THE COURT: I THINK THAT'S RIGHT.

22   MR. AMBEAU: I OBJECTED TO THEIR RELEVANCY.

23       YOU SUSTAINED THAT OBJECTION.

24   THE CLERK: AT THE BENCH?

25   MR. AMBEAU: YES.

1    THE CLERK: ALL RIGHT.

2    MR. STEVENS: TO THE QUESTIONS ABOUT THEM

3         AFTER THEY HAD BEEN ADMITTED.

4    THE COURT: I HAVE IT NOTED BECAUSE I

5         WOULD HAVE -- THEY INITIALLY DIDN'T

6    HAVE AN OBJECTION TO IT AND THEN LATER YOU

7    HAD AN OBJECTION TO IT?

8    MR. AMBEAU: WELL, WHAT HAPPENED WAS -- YOU

9         ARE RIGHT, YOUR HONOR.  AS HE BEGAN

10   ASKING THE QUESTION, I REALIZED WHAT I WAS

11   LOOKING AT.  SO, THEN, BEFORE HE ASKED THE

12   FIRST QUESTION I WOULD HAVE OBJECTED.

13   THE COURT: AND WHAT EXHIBIT WAS THAT?

14   MR. AMBEAU: THOSE WERE THE THREE ---

15   THE CLERK: "85, 86, 87."

16   THE COURT: OKAY.  WELL, LET'S -- BECAUSE

17        YOU DIDN'T QUESTION HIM ABOUT THEM?  I

18   THOUGHT THERE WAS ONE -- I THINK THE QUESTION

19        ---

20   MR. STEVENS: I LAID THE FOUND -- I MEAN, I

21        LAID SOME -- I ASKED SOME QUESTIONS THAT

22   WERE FOUNDATIONAL IN NATURE.  AND THEN I JUST

23   DON'T REMEMBER. I THINK I ASKED ONE QUESTION

24   AND THERE WAS A "YES."  AND THEN I -- THERE

25   WAS AN OBJECTION TO THE NEXT QUESTION.  BUT I

1    -- THAT'S JUST MY RECOLLECTION, JUDGE.

2    THE COURT: ALL RIGHT.  WELL, ---

3    MR. AMBEAU: AND ---

4    THE COURT: GO ON, MR. AMBEAU.

5    MR. AMBEAU: I THINK THE POINT, YOUR HONOR,

6         IS THAT THE DEFENSE OBJECTED TO THE

7    PURPOSE OF THEIR INTRODUCTION.  AT THAT POINT

8    I REALIZED WHY THEY WERE BEING INTRODUCED.

9    AND THEN YOU DID NOT ALLOW THE FURTHER

10   QUESTIONING ON THAT.

11   THE COURT: I DID.  BUT I ADMITTED IT.  THE

12        FACT IS, IS THAT NOW I GUESS IN THE

13   FUTURE I GUESS YOU COULD HAVE REQUESTED THAT

14   MY RULING BE RECONSIDERED ---

15   MR. STEVENS: RECONSIDERED AT THE TIME?

16   THE COURT: BUT THE FACT IS IS THEY ARE IN

17        EVIDENCE AND I BELIEVE THEY WERE IN

18   EVIDENCE WITHOUT OBJECTION.

19        SO, THEY'RE GOING TO HAVE TO REMAIN IN

20   EVIDENCE.

21        ALL RIGHT.  ANY OTHER GOVERNMENT ---

22   MR. STEVENS: YES, JUDGE.  I DIDN'T HEAR YOU

23        CALL OFF "15."

24   THE COURT: OKAY.  LET'S SEE.  YES.  THAT'S

25        -- WELL.

1    MR. STEVENS: THAT WAS THE FIRST EXHIBIT OF

2        SPECIAL AGENT SCHMIT.

3    THE COURT: YES.  YOU'RE RIGHT.  "15."  I

4        CERTAINLY HAVE IT HERE.  OKAY.

5    MR. STEVENS: I DIDN'T HEAR YOU SAY "23,"

6        WHICH IS THE WARRANT THAT AGENT MOTON

7    PRODUCED.

8    THE COURT: YES.  "23," YES.

9    MR. STEVENS: AND I DIDN'T HEAR "50" OR "53,"

10        WHICH WAS THE STACK OF TEN ID'S THAT

11    SPECIAL AGENT SCHMIT ADMITTED NEAR THE END.

12    THE COURT: YES.  THAT'S CORRECT.  "53."

13    MR. STEVENS: AND WE COVERED THE

14        DEMONSTRATIVES, I THINK, EARLIER.

15    THE CLERK: "16C" ---

16    MR. STEVENS: "E, F" AND "H."

17    THE CLERK: "E, F" AND "H."  YES.

18    MR. STEVENS: THE "16'S" THAT SHOULD BE IN

19        EVIDENCE ARE "A, B" AND "D," AS IN

20    DAUGHTER.

21    THE COURT: RIGHT.  "A, B" AND "D."

22    MR. STEVENS: THANK YOU.  THANK YOU, JUDGE.

23    THE COURT: OKAY.  ALL RIGHT.  ANY DISPUTE

24        ABOUT THAT, MR. AMBEAU?

25    MR. AMBEAU: NO, YOUR HONOR.

1     THE COURT: NOW, FOR THE DEFENSE I'VE GOT

2         "DEFENSE EXHIBIT 1, 2, 3, 4, 5, 6" FROM

3     00081 THROUGH 00087. "EXHIBIT" -- AND THIS

4     IS THE ORDER IN WHICH THEY WERE INTRODUCED.

5     "EXHIBIT 12," 00073 TO 80."

6     THE CLERK: AND "12," I BELIEVE, IS A

7         DUPLICATE -- "6" IS A DUPLICATE OF "12,"

8     HE TOLD ME?  HE ADMITTED IT TWICE, GAVE IT

9     TWO DIFFERENT NUMBERS.  IS THAT RIGHT?

10    THE COURT: WELL, NO.  THAT WAS "6" AND "7."

11        BECAUSE "7" I HAVE AS 00081 THROUGH

12    00087.  SO, "6" AND "7" ARE DUPLICATES.

13        OKAY.  "8" IS 00088 TO 00093.

14        "DEFENSE EXHIBIT 9" IS 00094 THROUGH

15    00097."

16        "DEFENSE EXHIBIT 10" IS 00098 TO 00102.

17        AND "DEFENSE EXHIBIT 11" IS 00103 TO

18    00108.

19    MR. AMBEAU: YOUR HONOR, COULD YOU PLEASE

20        TELL ME WHAT "6, 7" AND "8" ARE SO I CAN

21    MAKE SURE THAT THEY'RE PROPER -- BESIDES, I

22    THINK THE CLERK CAN FIX THAT.  BUT I ---

23    THE COURT: ACCORDING TO MY NOTES, THE

24        DUPLICATE WAS WITH "6" AND "7," WERE

25    BOTH 00081 TO 00087.  THAT WAS "6" AND "7."

1      THE CLERK: I THINK THEY GAVE ME A LIST OF

2          THE BATES NUMBERS THAT WERE ACTUALLY

3      CORRECTED AFTERWARDS.

4      MR. AMBEAU: IT'S FINE, BECAUSE I HAVE THEM

5          HERE.  I CAN DO EXACTLY WHAT YOUR --

6      WHAT YOUR LIST SHOWS THERE.

7      THE COURT: OKAY.  SO, THIS LIST SAYS "D1"

8          IS 00086 THROUGH 000 ---

9      MR. AMBEAU: I DON'T THINK THERE'S ANY

10         DISPUTE AS TO "DEFENSE 5."  IT'S JUST

11     STARTS AT THE "6."

12     THE COURT: OKAY.  "6" IS 00073 TO 00080.

13         "7" IS 00081 THROUGH 00087.

14         "8" IS 00088 THROUGH 00093.

15         "9" IS 00094 THROUGH 00097.

16         "10" IS 00098 THROUGH 00102.

17         "11" IS 00103 TO 00108.

18     MR. AMBEAU: AND I HAVE THOSE, YOUR HONOR.

19     THE COURT: THEN WE HAVE -- I HAVE "16,

20         17, 18," AND THEN "19."

21     THE CLERK: THIS IS "19."

22     THE COURT: I DON'T HAVE "13, 14" AND "15."

23     MR. AMBEAU: THOSE WERE NOT ADMITTED,

24         YOUR HONOR.

25     THE COURT: CORRECT.

1        MR. AMBEAU: JUST ---

2        THE COURT: OKAY.  ALL RIGHT.  ARE WE IN

3            AGREEMENT?

4        MR. AMBEAU: AND "19" WAS NEVER ADMITTED,

5            AS WELL.  THAT'S THE SWORN AFFIDAVIT.

6        THE COURT: OH, THAT'S RIGHT.

7        THE CLERK: YES.  OKAY.

8        THE COURT: OKAY.  EVERYONE IN AGREEMENT?

9        MR. AMBEAU: YES, JUDGE.

10       THE COURT: ALL RIGHT.  SO, WE'RE GOING TO

11           GO ON AND PROVIDE THAT, ALONG WITH THE

12       INDICTMENT AND THE MENU.

13           SO, LET ME AT THIS TIME -- LET'S SEE.

14       ANYTHING ELSE?

15       MR. STEVENS: I'M SORRY.  I WAS JUST ASKING

16           MS. HARTER A QUESTION.

17       THE CLERK: NO, THEY DIDN'T GET IN JERS. NOT

18           THESE.

19       MR. STEVENS: SO, WHAT WAS THAT?

20       THE CLERK: "1, 2" AND "3" ARE IN THE JERS

21           SYSTEM.

22       MR. STEVENS: SO, WHAT DOES THAT MEAN, THOUGH?

23       THE CLERK: I HAVE TO GO BACK AND HARD COPY

24           THEM.

25       MR. STEVENS: CAN WE BRING HARD COPIES OF

1          OURS, AS WELL?

2      THE CLERK: THAT'S WHAT I THOUGHT WAS GOING

3          TO HAPPEN.

4      MR. STEVENS: IT JUST -- I MEAN, THIS SOUNDS

5          LIKE A NITPICK, BUT IT'S SO MUCH EASIER

6      FOR THEM TO -- IF THEY'VE GOT HARD -- WHY

7      WOULDN'T THEY START WITH THOSE?

8      THE COURT: DO YOU HAVE HARD COPIES AVAILABLE

9          RIGHT NOW?

10     MR. STEVENS: I CAN GO GET THEM.

11     THE COURT: HOW LONG WILL IT TAKE YOU TO

12         GET THEM?

13     MR. STEVENS: JUST TO GO BACK TO MY OFFICE

14         AND PULL THESE UP.

15     THE COURT: WHILE YOU RETRIEVE THEM, I'LL

16         CALL AND -- MR. CROSSWELL, WHY DON'T YOU

17     REMAIN.  THAT WAY I'LL CALL THE ALTERNATES

18     IN.

19     MR. CROSSWELL: OKAY.

20     THE COURT: SO, AGAIN, I MEAN, I DON'T HAVE

21         A PROBLEM.  IF ONE SIDE HAS HARD COPIES,

22     I'LL ALLOW THE OTHER PARTY.

23     MR. STEVENS: AND I WAS JUST FILING THE

24         ORDER AND JERS, AND THAT'S WHY, YOU

25     KNOW.

1      THE COURT: NO, NO.  I APPRECIATE THAT.  AND,

2          SO, MR. AMBEAU, THAT'S WHY WE'VE GOT TO

3      HAVE ALL THE STUFF BEFOREHAND.

4          OKAY.  LET'S ALL RISE NOW.

5          CAPTAIN, WOULD YOU ASK MS. TOWNSEND AND

6          MR. GUILLORY TO PLEASE COME OUT, PLEASE.

7      MR. AMBEAU: AND, YOUR HONOR, FOR THE RECORD,

8          I'M SORRY THAT MY LEARNING CURVE WAS SO

9      STEEP IN REGARD TO THOSE.  I APOLOGIZE.

10     THE COURT: THAT'S ALL RIGHT.  OKAY.

11         LET'S ALL RISE.

12     REPORTER'S NOTE:(THEREFORE, AT THIS TIME,

13         ALTERNATE JURORS ENTER THE COURTROOM.)

14     THE COURT: WOULD YOU ALL COME TO THE PODIUM

15     HERE?  BE SEATED.

16         MS. TOWNSEND AND MR. GUILLORY, THANK YOU

17     ALL SO MUCH.  AS YOU ALL KNOW, BOTH OF YOU

18     WERE SELECTED TO SERVE AS ALTERNATES IN THE

19     CASE.  IT DOES NOT APPEAR THAT YOUR SERVICES

20     WILL BE REQUIRED.  YET, I'M NOT 100 PERCENT

21     SURE.  THE JURY WILL BEGIN ITS DELIBERATIONS

22     THIS EVENING, AS YOU KNOW.  AND BARRING ANY

23     UNFORESEEN EVENTS, HOPEFULLY, THEY WILL REACH

24     A VERDICT, IF NOT TONIGHT THEN TOMORROW.

25         THERE IS, HOWEVER, STILL A POSSIBILITY, A

1    VERY SLIGHT POSSIBILITY, QUITE REMOTE, THAT

2    ONE OR BOTH YOU MAY, NONETHELESS, BE REQUIRED

3    TO RETURN TO THE COURTHOUSE TO JOIN WITH THE

4    REGULAR JURORS TO DELIBERATE.  AND, SO, FOR

5    THAT REASON, EVEN THOUGH I WILL EXCUSE YOU AT

6    THIS TIME, I WOULD ASK THAT YOU NOT DISCUSS

7    THE CASE WITH ANYONE.  IN FACT, WHAT I WILL

8    DO IS I WILL HAVE A MEMBER OF THE CLERK'S

9    OFFICE CALL YOU ALL EITHER TOMORROW OR

10    WHENEVER THE JURY REACHES A VERDICT IN THE

11    CASE TO NOTIFY YOU THAT A VERDICT WAS REACHED

12    AND THAT YOU ARE NO LONGER SUBJECT TO THE

13    SECRECY RULE, IF YOU WILL.

14    AGAIN, WE JUST WANT TO BE CAREFUL.

15    UNDER OUR LAWS THE DEFENDANT IS ENTITLED TO A

16    12-PERSON JURY.  WHAT WE DON'T WANT IS FOR

17    YOU ALL TO START TALKING ABOUT THINGS IN A

18    WAY THAT WOULD JEOPARDIZE YOUR ABILITY TO

19    CONTINUE TO SERVE AND THEN HAVE TO RETRY THIS

20    CASE ALL OVER AGAIN, IN THE EVENT ONE OR MORE

21    OF THE JURORS BECOMES ILL OR CANNOT CONTINUE

22    TO DISCHARGE THEIR DUTIES.

23    I HOPE YOU ALL -- I WANT TO MAKE MYSELF

24    CLEAR ABOUT THE REASON FOR THAT.

25    DO YOU HAVE ANY QUESTIONS ABOUT THAT,

1    MS. TOWNSEND?

2    MS. TOWNSEND?  NO.

3    THE COURT: MR. GUILLORY?

4    MR. GUILLORY: YES, SIR, YOUR HONOR.  SO,

5         ON TOMORROW, WE STILL KIND OF STAND BY-

6    ISH OR SHOULD I NOT GO TO WORK?

7    THE COURT: YOU WILL NOT -- YES. YOU CAN GO TO

8         WORK.

9    MR. GUILLORY: OKAY.

10   THE COURT: YOU ARE NOT REQUIRED TO COME TO

11        THE COURTHOUSE UNLESS YOU ARE CALLED.

12   OKAY?

13   MR. GUILLORY: OKAY.

14   THE COURT: AND I ASSUME, PAM, THAT CHELETTA

15        HAS THEIR CONTACT INFORMATION.

16   THE CLERK: I WOULD ASSUME SO.  BUT, DO YOU

17        WANT ME TO ---

18   THE COURT: YES.  JUST TO BE SURE, WE'RE

19        GOING TO GO ON AND GET THE CONTACT

20   INFORMATION WHERE WE CAN REACH YOU IN THE

21   UNLIKELY EVENT THAT WE WILL HAVE TO CALL YOU.

22        BUT, YES, MR. GUILLORY, YOU ARE FREE TO

23   RETURN TO WORK.

24        SO, WHY DON'T WE JUST -- IF YOU WOULD

25   SIMPLY WRITE DOWN YOUR ---

1       THE CLERK: AND I THINK CHELETTA LEFT THEIR

2           LEVERS OF SERVICE IN THE BACK.

3       THE COURT: CORRECT.  OKAY.

4           SO, OUR JURY COORDINATOR WILL CALL YOU

5       ALL TOMORROW AND DISCUSS THIS FURTHER WITH

6       YOU.

7           AGAIN, WE VERY MUCH APPRECIATE YOUR

8       COMING DOWN HERE AND SPENDING FOUR FULL DAYS

9       WITH US.  AGAIN, WHAT YOU ALL HAVE DONE IS

10      VERY, VERY IMPORTANT TO OUR DEMOCRACY.  AS

11      CORNY AS THAT MIGHT SOUND, BUT IT'S

12      ABSOLUTELY TRUE.  SO, AGAIN, THANK YOU ALL SO

13      MUCH FOR COMING DOWN.  YOU HAVE OUR THANKS.

14          THE GOOD NEWS IS THAT YOU WON'T GET, AT

15      LEAST, A FEDERAL JURY SUMMONS AT LEAST FOR

16      ANOTHER TWO OR THREE YEARS.  OKAY?

17          WELL, YOU ALL TAKE CARE, AND THANK YOU

18      ALL ONCE AGAIN.

19          LET'S ALL RISE.

20      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

21      THE ALTERNATE JURORS ARE EXCUSED.)

22      THE COURT: OKAY.  YOU GOT EVERYTHING?  OKAY.

23      LET'S SEE.  WHY DON'T WE SEE IF WE CAN -- DO

24      YOU HAVE ALL OF THAT, GENTLEMEN?

25      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

1    AN OFF-THE-RECORD DISCUSSION WAS HELD.)

2    (DISCUSSION WAS CONCLUDED.)

3    THE COURT: OKAY.  FINALLY, GENTLEMEN, MAKE

4    SURE THAT PAM HAS YOUR CONTACT

5    INFORMATION.  MR. AMBEAU, HAVE YOU SUPPLIED

6    PAM WITH YOUR CELL PHONE?

7    MR. AMBEAU: I HAVE NOT YET DONE THAT.

8    THE COURT: OKAY.  DON'T LEAVE WITHOUT

9    DOING SO.  AND, ALL, PLEASE TRY TO BE AT

10    LEAST -- NO MORE THAN TEN MINUTES AWAY FROM

11    THE COURTHOUSE IN THE EVENT WE HAVE A

12    QUESTION OR A VERDICT.  OKAY?

13    MR. AMBEAU: YES, YOUR HONOR.

14    MR. STEVENS:   YES, SIR.

15    THE COURT: COURT IS IN RECESS.

16    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

17    COURT IS IN RECESS.)(COURT IS RESUMED.)

18    THE COURT: WE'RE BACK ON THE RECORD IN

19    THE CASE OF THE UNITED STATES OF AMERICA

20    VERSUS CARLOS L. LINARES.

21    THE JURY HAS SENT A NOTE OUT.  LET THE

22    RECORD REFLECT, HOWEVER, THAT COUNSEL FOR ALL

23    PARTIES ARE PRESENT, AND THAT THE DEFENDANT

24    IS PRESENT AT THIS TIME.

25    THE NOTE READS, IS POSSIBLE:

1          1.  WELL, THE FIRST SENTENCE IS, "IF

2     POSSIBLE, CAN WE GET A COPY OF THE

3     DESCRIPTION OF EACH COUNT?"

4          NEXT IT SAYS, "EXHIBIT 9" FOLDER IS

5     EMPTY.  CAN WE GET WHAT BELONGS IN THERE?"

6          NEXT IT READS: "WE THINK SOME OF

7     "EXHIBIT 16" IS MISSING.  CAN WE GET ALL THE

8     PAPERS?"

9          NOW, WITH RESPECT TO THE FIRST REQUEST,

10     THAT IS, QUOTE, "IF POSSIBLE, CAN WE GET A

11     COPY OF THE DESCRIPTION OF EACH COUNT?"

12          I AM PREPARED TO SEND TO THE JURY

13     COPIES OF -- A COPY OF THAT PORTION OF THE

14     JURY CHARGES THAT SIMPLY DESCRIBES THE

15     ELEMENTS OF EACH OF THE FIVE COUNTS.

16          IS THERE ANY OBJECTION BY THE DEFENSE?

17     MR. AMBEAU: YOUR HONOR, IF WE SEND A

18          PORTION OF THE JURY INSTRUCTION, THE

19     DEFENSE WOULD REQUEST THAT WE SEND THE ENTIRE

20     INSTRUCTION?

21     THE COURT: I'M NOT GOING TO SEND EVERYTHING.

22          I'M GOING TO SEND THEM WHATEVER THEY

23     REQUEST.  BUT YOUR OBJECTION IS NOTED.

24          DOES THE GOVERNMENT HAVE AN OBJECTION

25     TO THE COURT SENDING ONLY THAT PORTION OF THE

1    JURY INSTRUCTIONS THAT DESCRIBE THE ELEMENTS

2    OF THE OFFENSES?

3    MR. STEVENS: NO, JUDGE.

4    THE COURT: OKAY.  I'LL GO ON AND DO THAT.

5         THEN, MR. AMBEAU, YOUR OBJECTION IS

6    NOTED.

7    MR. AMBEAU: UNDERSTOOD.

8    THE COURT: NOW, NEXT, "EXHIBIT 9" FOLDER IS

9       EMPTY.  CAN WE GET WHAT BELONGS THERE?"

10        I BELIEVE THAT'S A GOVERNMENT FOLDER,

11   "NUMBER 9"?

12   MR. STEVENS: YES, JUDGE.  I HAVE A --

13        WE'VE ASKED -- I'VE ASKED SOMEONE TO GO

14   BACK AND RETRIEVE HARD COPIES OF THESE

15   EXHIBITS, ADDITIONAL HARD COPIES.  "9," I

16   THINK, IS A STACK OF BANK RECORDS.  AND, YOU

17   KNOW, MOST WERE IN THOSE THINK BROWN FOLDERS.

18   THE COURT: RIGHT.

19   MR. STEVENS: BUT SOMETIMES WHEN THERE IS

20        A STACK OF BANK RECORDS, THOSE

21   OBVIOUSLY WOULDN'T FIT IN A BROWN FOLDER.

22   AND, SO, THE BROWN FOLDER THAT HAS THE LABEL

23   MIGHT BE AT THE BACK OF A REDWELL AND THE

24   PAGES ARE IN THAT REDWELL.

25        SO, A COMMON MISTAKE WE HAD IN THIS

1        TRIAL WAS WE PULLED THE FOLDER FOR AN EXHIBIT

2        AND THE EXHIBIT ISN'T IN THERE BECAUSE

3        THEY'RE IN THE GUSSET, AND SO --

4        THE COURT: OKAY.

5        MR. STEVENS: -- THAT MAY BE WORTH CLARIFYING.

6           IF WE CAN GET ADDITIONAL DOCUMENTS UP

7        HERE.  BUT -- AND THEN WITH RESPECT TO ---

8        THE COURT: WELL, LET ME JUST TELL YOU THAT

9           APPARENTLY THERE SEEMS TO BE SOME SORT

10       OF TECHNOLOGICAL GLITCH WITH RESPECT TO SOME

11       OF THE EXHIBITS.

12          IS THAT RIGHT, PAM?

13       THE CLERK: THIS ONE IN PARTICULAR THEY SAID

14          IT WAS ENCRYPTED.

15       MR. STEVENS: FOR THE JERS COPY "9."

16          I THOUGHT THAT ---

17       THE CLERK: AND THE FOLDER IS EMPTY.  THEY

18          CAN'T SEE IT EITHER PLACE.

19       MR. STEVENS: OKAY.

20       THE CLERK: IT HAS 339 PAGES, FOR ONE THING.

21       MR. STEVENS: OKAY.

22       THE COURT: IS THAT "GOVERNMENT EXHIBIT 9"?

23       MR. STEVENS: JUDGE, CAN I JUST TAKE A QUICK

24          LOOK?

25       THE COURT: YES.

1        MR. STEVENS: ALL RIGHT, JUDGE.  MR.

2            AMBEAU AND I JUST LOOKED.  AND THIS IS A

3        HARD COPY OF "EXHIBIT 9, U.S. 9."

4        THE COURT: VERY WELL.  ARE BOTH SIDES --

5            MR. AMBEAU, ARE YOU SATISFIED THAT

6        THAT'S THE ENTIRETY OF "EXHIBIT 9"?

7        MR. AMBEAU: YES, YOUR HONOR.  WE ARE.

8        THE COURT: ALL RIGHT.  SO, THE NEXT -- THE

9            FINAL QUESTION IS, "WE THINK SOME OF

10       "EXHIBIT 16" IS MISSING.  CAN WE GET ALL THE

11       PAPERS?"

12       MR. AMBEAU: "EXHIBIT 16," YOUR HONOR, IS

13           -- "EXHIBIT 16," WHAT WAS ADMITTED WAS,

14       I BELIEVE, "A, B" AND "D."  PERHAPS THEY'RE

15       ALLUDING TO THE FACT THAT "C" IS MISSING

16       AND/OR FURTHER PARTS.  AND I DON'T THINK ANY

17       OF THAT WAS ADMITTED.

18       MR. STEVENS: THAT'S MY GUESS, TOO, JUDGE.

19           THAT THEY ARE -- THEY REMEMBER SEEING

20       THOSE DEMONSTRATIVE AIDS.  I'D LOVE FOR THEM

21       TO SEE AGAIN.  BUT "A, B" AND "D" ARE THOSE

22       THAT WERE ADMITTED INTO EVIDENCE.  I HAVE

23       EXTRA HARD COPIES OF THOSE.

24       THE COURT: OKAY.

25       MR. AMBEAU: AND I HAVE NO OBJECTION TO

1    GIVING THEM THE HARD COPIES OF THOSE.

2    THE COURT: VERY WELL.

3    MR. AMBEAU: "A, B" AND "D."

4    THE COURT: SO, WE HAVE -- WE'RE ALSO

5    PROVIDING ALL OF THE DOCUMENTS IN

6    "EXHIBIT 9," RIGHT?  AND THOSE ARE ALL THE

7    DOCUMENTS, CORRECT?

8    MR. AMBEAU: IN "EXHIBIT 9" AND "16."

9    THE COURT: BUT "EXHIBIT 9"?

10   MR. AMBEAU: YES, YOUR HONOR.

11   MR. STEVENS: "EXHIBIT 9" IS THE BANK -- THE

12   BANK RECORDS.  THE YEAR'S WORTH OF BANK

13   RECORDS.

14   THE COURT: OKAY.  AND, FINALLY, WITH RESPECT

15   TO "EXHIBIT 16."

16   THE CLERK: "6," I BELIEVE.

17   THE COURT: "16."

18   THE CLERK: YES, SIR.  I'M SORRY.

19   THE COURT: SO, THEY SHOULD HAVE "16A, B"

20   AND "D."

21   MR. STEVENS: YES, SIR.

22   REPORTER'S NOTE: (THEREFORE, AT THIS TIME

23   AN OFF-THE-RECORD DISCUSSION WAS HELD.)

24   (DISCUSSION WAS CONCLUDED.)

25   THE COURT: ALL RIGHT.  OKAY. MY REPLY IS

1          THE FOLLOWING:

2          REPLY OF THE COURT:

3          1.  THE PORTION OF THE JURY INSTRUCTIONS

4    THAT DESCRIBE THE ELEMENTS OF EACH OF THE

5    FOUR COUNTS OF THE INDICTMENTS ARE INCLUDED

6    HEREWITH.

7          AND, AGAIN, THAT IS THAT PORTION OF THE

8    JURY INSTRUCTIONS THAT DESCRIBE THE ELEMENTS.

9          2.  ALL OF THE DOCUMENTS OF "EXHIBIT 9"

10   ARE INCLUDED HEREWITH.  AND WE WILL INCLUDE

11   ALL THE DOCUMENTS THAT YOU HAVE PROVIDED, MR.

12   STEVENS.

13         3.  "EXHIBITS 16A, 16B" AND "16D" HAVE

14   BEEN PROVIDED TO YOU.  NO OTHER DOCUMENTS ARE

15   INCLUDED IN "EXHIBIT 16."  IF WE DO NOT HAVE

16   "EXHIBITS 16A, 16B" AND "16D," PLEASE ADVISE.

17         SIGNED AND DATED.  AND I'VE ALSO

18   INCLUDED THE TIME.

19         ANY OBJECTION TO THE RESPONSE OF THE

20   COURT FROM THE DEFENDANTS?

21   MR. AMBEAU: NO, YOUR HONOR.

22   THE COURT: ANY OBJECTION TO THE RESPONSE

23         OF THE COURT FROM THE UNITED STATES?

24   MR. STEVENS: NO OBJECTION, JUDGE.  I GUESS

25         I WOULD BE TEMPTED TO SUGGEST.  DO WE --

1       IS THERE A WAY TO REFERENCE THE OTHER "16'S"

2       THAT THEY MAY HAVE IN MIND AND JUST MENTION

3       THAT THOSE WERE DEMONSTRATIVE AIDS AND THEY

4       ARE NOT IN EVIDENCE?

5       THE COURT: YOU KNOW, I WOULD JUST RATHER

6           -- I DON'T WANT TO CONFUSE THEM.  I

7       JUST WANT THEM TO KNOW.  I MEAN, I THOUGHT

8       ABOUT GIVING THEM A LENGTHIER EXPLANATION

9       ABOUT THERE WERE OTHER DOCUMENTS INCLUDED IN

10      "16" THAT WERE REFERENCED, BUT THAT WERE

11      NEVER OFFERED OR ACCEPTED INTO EVIDENCE.  BUT

12      I THINK, HOPEFULLY, THIS IS SATISFACTORY.

13      AND, AGAIN, I'VE INVITED THEM TO ADVISE ME IF

14      --

15      MR. STEVENS: YES, JUDGE.

16      THE COURT:  -- IF THEY DON'T HAVE THOSE.

17          OKAY?

18          SO, CAPTAIN, IF YOU WOULD BE KIND ENOUGH

19      TO DELIVER THAT TO THE JURY, I WOULD

20      APPRECIATE IT.

21          WHILE WE'RE ALL ASSEMBLED, LET ME JUST

22      TELL YOU WHAT MY PLAN IS FOR THE REST OF THE

23      EVENING.

24      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

25          TIME AN OFF-THE-RECORD DISCUSSION WAS

1      HELD.)(DISCUSSION WAS CONCLUDED.)

2      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

3          COURT IS RESUMED.)

4      THE COURT: BE SEATED.

5          OKAY.  THE JURY -- FIRST OF ALL, WE'RE

6      BACK ON THE RECORD IN THE CASE OF UNITED

7      STATES VERSUS CARLOS LINARES.  LET THE

8      REFLECT THAT THE DEFENDANT IS PRESENT AT THIS

9      TIME, AS WELL AS COUNSEL FOR ALL PARTIES.

10          THE JURY HAS NOTIFIED THE COURT THROUGH

11      THE CSO THAT IT WISHES TO ADJOURN FOR THE

12      DAY.  LET THE RECORD REFLECT THAT IT IS NOW

13      APPROXIMATELY FIVE AFTER 9:00 P.M.  I WILL

14      EXCUSE THE JURY FOR THE DAY.  WE WILL REQUEST

15      THAT THEY RETURN TO THE COURTHOUSE TO RESUME

16      DELIBERATIONS AT NINE O'CLOCK TOMORROW.

17          AND I WILL, OF COURSE, GIVE THEM THE

18      CUSTOMARY INSTRUCTIONS AND ADMONITIONS, AND

19      WE'LL LET THEM GO HOME AND RECONVENE IN THE

20      MORNING.

21          SO, LET'S ALL RISE FOR THE JURY.

22      REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

23          THE JURY RETURNS TO THE COURTROOM.)

24      THE COURT: BE SEATED. FOLKS, I'VE BEEN

25          INFORMED THAT YOU ALL WISH TO ADJOURN

1    FOR THE DAY AND TO RESUME YOUR DELIBERATIONS

2    TOMORROW MORNING.  IS THAT CORRECT?

3         LET ME THANK YOU ALL ONCE AGAIN FOR ALL

4    YOUR HARD WORK.  IT'S CLEAR TO EVERYONE

5    ASSOCIATED WITH THIS CASE THAT YOU ALL NOT

6    ONLY HAVE BEEN A VERY ATTENTIVE JURY, BUT

7    THAT YOU ARE COMMITTED TO TAKING VERY

8    SERIOUSLY YOUR RESPONSIBILITIES IN THIS CASE.

9    AND, SO, AGAIN, WE THANK YOU FOR THAT.

10        YOU SHOULD KNOW THAT ONE OF THE REASONS

11   THAT I REQUESTED THAT YOU AT LEAST BEGIN

12   DELIBERATIONS TONIGHT IS BECAUSE, AS YOU

13   KNOW, WE'RE IN THE MARDI GRAS SEASON.  AND WE

14   HAVE PARADES TOMORROW NIGHT AND ON THIS

15   SATURDAY.  NOT THAT I EXPECT YOU ALL TO BE

16   AROUND THAT LONG.  BUT I JUST WANTED TO TRY

17   TO GET AS MUCH IN AS POSSIBLE JUST SO THAT WE

18   COULD AVOID ANY POSSIBLE SCHEDULING CONFLICTS

19   THAT ANY OF YOU MAY HAVE HAD.

20        NONETHELESS, WE'LL ADJOURN FOR THE

21   EVENING.

22        LET ME AGAIN REMIND YOU OF THE USUAL

23   INSTRUCTIONS.  PLEASE DON'T DISCUSS THE CASE

24   WITH ANY OF YOUR FAMILY MEMBERS, FRIENDS,

25   NEIGHBORS, COWORKERS OR ANYONE.  AND SHOULD

1    YOU ENCOUNTER ONE ANOTHER, EITHER LEAVING THE

2    COURTHOUSE OR RETURNING TO THE COURTHOUSE

3    TOMORROW MORNING, PLEASE DON'T ENGAGE IN ANY

4    DISCUSSIONS OF THE CASE IN ANY WAY.  THOSE

5    DISCUSSIONS SHOULD ONLY OCCUR IN THE SANCTITY

6    OF THE JURY ROOM AND IN THE PRESENCE OF YOUR

7    CO-JURORS.  PLEASE DON'T CONDUCT ANY OUTSIDE

8    RESEARCH USING THE INTERNET OR ANY OTHER

9    RESEARCH TOOL.  PLEASE DON'T WATCH, LISTEN OR

10   READ ANY POSSIBLE NEWS MEDIA ACCOUNTS.  AND

11   PLEASE, AGAIN, DON'T DISCUSS THE CASE WITH

12   ANYONE.

13       WE WILL SEE YOU ALL TOMORROW MORNING

14   PROMPTLY AT NINE O'CLOCK AND YOU CAN RESUME

15   YOUR DELIBERATIONS AT THAT TIME.

16       OKAY. LET'S ALL RISE FOR THE JURY.  I

17   HOPE YOU ALL HAVE A GOOD NIGHT.

18   REPORTER'S NOTE : (THEREFORE, AT THIS TIME,

19       THE JURY WAS EXCUSED FOR THE EVENING.)

20   THE COURT: BE SEATED.

21       THANK YOU, CAPTAIN.

22       ALL RIGHT.  ANYTHING WE SHOULD TAKE UP

23   BEFORE WE ADJOURN FOR THE EVENING?

24   MR. STEVENS: NONE THAT I'M AWARE OF,

25       JUDGE.

1    THE COURT: OKAY.  YOU ALL CAN -- IF YOU HAVE

2         ANY BINDERS OR DOCUMENTS, YOU CAN KEEP

3    THEM HERE.  THE CAPTAIN IS GOING TO LOCK UP

4    THE COURTROOM.  WE'LL SEE YOU ALL FIRST THING

5    IN THE MORNING.  OKAY?

6         YOU ALL HAVE A GOOD NIGHT.

7         COURT IS ADJOURNED.

8    REPORTER'S NOTE: (THEREFORE, AT THIS TIME,

9         COURT IS ADJOURNED FOR THE EVENING.)

10

11              C E R T I F I C A T E

12

13    I CERTIFY THAT THE FOREGOING IS A CORRECT

14    TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN

15    THE ABOVE-ENTITLED NUMBERED MATTER.

16

17

18         _____S/CLARE SMITH-NEELY_____

19         CLARE SMITH-NEELY, CCR

20         CERTIFIED COURT REPORTER

21

22

23

24

25